OFFICE COPY

NICOLETTI HORNIG & SWEENEY
*Attorneys for Plaintiffs*
*The Northern Assurance Company of America*
*and American Home Assurance Company*
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005-1801
Tel: (212) 220-3830
Fax: (212) 220-3780
Email: jnicoletti@nicolettihornig.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

THE NORTHERN ASSURANCE COMPANY
OF AMERICA and AMERICAN HOME
ASSURANCE COMPANY,

                              Plaintiffs,

        - against -

LAFARGE NORTH AMERICA, INC. and
AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY
ASSOCIATION, INC.

                              Defendants.
-----------------------------------------------------------X



Case No.:

**08 CV 03289**

**DECLARATORY
JUDGMENT COMPLAINT**

Plaintiffs THE NORTHERN ASSURANCE COMPANY OF AMERICA ("NACA") and

AMERICAN HOME ASSURANCE COMPANY ("AHAC"), by and through their attorneys,

Nicoletti Hornig & Sweeney, as and for a Complaint against defendants LAFARGE NORTH

AMERICA, INC. ("LAFARGE") and AMERICAN STEAMSHIP OWNERS MUTUAL

PROTECTION AND INDEMNITY ASSOCIATION, INC., ("AMERICAN CLUB" or "THE

CLUB") respectfully allege upon information and belief as follows:

## SUMMARY

1.      The matter in controversy relates to the demands by defendant LAFARGE under separate primary liability insurance coverages issued by New York Marine and General Insurance Company ("NYMAGIC"), and the defendant AMERICAN CLUB, and an excess liability policy issued on a subscription basis by the plaintiffs and the non-party NYMAGIC, for defense costs and indemnification against potential liability in respect of claims arising from the breakaway of a barge that was at defendant LAFARGE'S New Orleans, Louisiana facility during Hurricane Katrina in August, 2005 ("Katrina Claims").

2.      In the several third-party lawsuits pending against defendant LAFARGE for Katrina Claims, it is alleged that the barge, called the Barge ING 4727, struck and caused or contributed to the collapse of the 17th Street Industrial Canal floodwall causing massive flooding in the City of New Orleans.

3.      By this action, plaintiffs NACA and AHAC seek 1) a declaration that coverage for defense costs and indemnity exists under defendant LAFARGE'S entry in the defendant AMERICAN CLUB and 2) a declaration that plaintiffs NACA and AHAC are not obligated to pay the defense costs and/or to indemnify defendant LAFARGE until all primary policies have responded up to their full respective limits.

## JURISDICTION

4.      This action is filed under and pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

5.      The following issues constitute questions of insurance coverage under Admiralty or Maritime contracts of insurance and thereby come within the Admiralty and Maritime

jurisdiction of the United States District Court pursuant to Title 28 U.S.C. § 1333 *et seq.*, and within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

6.    An actual controversy of a justiciable nature exists between plaintiffs and defendants involving the rights and obligations under these several marine contracts of insurance and depending on the construction of said contracts, the aforesaid controversy can be determined by a judgment of this Court without further suit.

### VENUE

7.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) inasmuch as a substantial part of events giving rise to the insurance coverage dispute herein occurred in this judicial district and the defendants AMERICAN CLUB and LAFARGE are currently litigating a related action in this judicial district entitled *American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Lafarge North America, Inc.*, United States District Court, Southern District of New York, 06 CV 3123 (CSH).

### PARTIES

8.    At all times relevant, plaintiff NACA was and is a corporation duly organized and existing under and by virtue of the laws of the State of Massachusetts, with a place of business for marine insurance located at One Beacon Street, Boston, Massachusetts 02108.

9.    At all times relevant, plaintiff NACA was and is authorized to issue policies of marine excess liability insurance in the State of New York.

10.    At all times relevant, plaintiff AHAC was and is a corporation duly organized under and existing under and by virtue of the laws of the State of New York with an office and principal place of business at 70 Pine Street, New York, New York.

11.    At all times relevant, plaintiff AHAC was and is authorized to issue policies of marine excess liability insurance in the State of New York.

12.    NYMAGIC is an insurance company duly qualified pursuant to the laws of the State of New York and doing business in this jurisdiction through its authorized representative Mutual Marine Office, Inc. ("MMO"), with an office and principal place of business at 919 Third Avenue, New York, New York. NYMAGIC and/or MMO are not parties to this action.

13.    Defendant LAFARGE is a corporation duly organized under and existing by virtue of the laws of the State of Maryland or another one of the states of the United States of America, with its principal place of business at 12950 Worldgate Drive, Suite 500, Herndon, Virginia 20170.

14.    Defendant LAFARGE is registered to do business in the State of New York and/or is otherwise doing business in the State of New York.

15.    Defendant LAFARGE is a diversified construction materials company and supplier of cement, aggregates and concrete, and other materials for residential, commercial, institutional and public works construction.

16.    Defendant AMERICAN CLUB is a mutual insurance association, operated by its members for their exclusive benefit and is incorporated in New York and has a principal place of business at 60 Broad Street, New York, New York.

17.    Defendant AMERICAN CLUB provides liability insurance, which provides cover to members against third-party liabilities encountered in their commercial operations.

## THE POLICIES

**The Primary MMO Policy**

18.    MMO, as the authorized representative for NYMAGIC, agreed to issue a Primary Marine Liabilities Policy of Insurance No. MMO-30981ML505, to defendant LAFARGE, for the period of May 1, 2005 to May 1, 2006 (the "MMO Policy").

19.    For the policy period of May 1, 2005 to May 1, 2006, NYMAGIC and defendant LAFARGE agreed that the general terms and conditions of the Binding Memorandum for the Primary Marine Policy of Insurance would remain in force and effect for the period of May 1, 2005 to May 1, 2006 until such time as the policy of insurance was issued.

20.    The MMO Policy has an aggregate limit of $5,000,000.00 for any one accident or occurrence.

21.    MMO, as the authorized representative of NYMAGIC, also agreed to participate in an excess liability policy issued to defendant LAFARGE with limits in excess of the primary limit of $5,000,000.00 and up to $50,000,000.00 under certain circumstances for the period of May 1, 2005 to May 1, 2006.

22.    The MMO Policy provides in relevant part:

> **14.    OTHER INSURANCE:**
>
> Except for insurance carried by the Assured specifically as excess over and above the amount(s) recoverable hereunder, this Company shall not be liable for any loss, damage, liability or expense which may be recoverable under any other insurance arranged by the Assured, arranged by others for the Assured's account or otherwise available to the Assured, except as excess over and above the amount(s) recovered thereunder. (emphasis added).

23.    The MMO Policy's "Other Insurance" clause is commonly referred to as an "excess clause."

24.    NYMAGIC has accepted the obligation under the MMO Policy to pay the reasonable defense costs and has provided defendant LAFARGE with a defense in the multiple Katrina Claims lawsuits through an assigned counsel, Sutterfield & Webb, LLC., as well as through other investigators and experts.

25.    To date, NYMAGIC has paid and/or incurred defense costs in excess of $3.7 million.

26.    At this time, defendant LAFARGE is claiming against NYMAGIC under the MMO Policy for payment of its separately incurred defense costs in an amount in excess of $7.5 million, which, if payable, would exhaust the limits of the primary MMO Policy and potentially trigger the obligations of plaintiffs NACA and AHAC, *albeit* denied by these plaintiffs, to pay defense costs under a particular Excess Policy issued to defendant LAFARGE in which they participate.

**The American Club Primary Policy**

27.    The rights and obligations of every member of THE CLUB, including defendant LAFARGE, are governed at least in part by the American Club By-Laws and Rules (the "Club Rules").

28.    Upon becoming a member of THE CLUB, defendant LAFARGE received a Certificate of Entry, which expressly makes applicable the Club Rules to the member's insurance. The Certificate of Entry includes additional Member-Specific provisions, which are listed on a separate rider to the Certificate of Entry.  (LAFARGE'S Certificate of Entry for the period February 20, 2005 to February 20, 2006, is attached as Exhibit 1).

29.    The Certificate of Entry is the paramount document and to the extent that the terms of the Certificate of Entry are contrary to the Club Rules, the terms of the Certificate of

Entry are controlling with respect to the rights and obligations of the defendant AMERICAN CLUB and defendant LAFARGE under the Club cover.

30.    The Certificate of Entry does not by its terms require any pre-approval by the Club of an agreement pursuant to which defendant LAFARGE acquires an insurable interest in a vessel for the Club cover to automatically attach to said vessel.

31.    Defendant LAFARGE first became a member of THE CLUB on or about February 20, 1999. It renewed its coverage each year, up to and including the policy year commencing February 20, 2005.

32.    At all times relevant, defendant LAFARGE was a member of the defendant AMERICAN CLUB.

33.    Defendant LAFARGE'S Certificate of Entry contains a Member-Specific clause entitled "Chartered Barges," which states:

CHARTERED BARGES.

If Lafarge Corporation et al acquires an insurable interest in any vessel in addition to or in substitution for those set forth herein, through purchase, charter, lease or otherwise, such insurance as is afforded hereunder to any similar vessel shall automatically cover such additional vessel effective from the date and time the Assured acquires an insurable interest in such additional vessel. With respect to a chartered, leased or similarly acquired vessel, the insurance hereunder automatically includes the owner as an additional Assured with waiver of subrogation against the owner, if required, effective from the date and time such vessel is insured hereunder.

The above provision shall not apply to vessels which are chartered under a contract whereby the owner (or Demise Owner) and Charterer agree that the owner (or Demise Owner) shall procure Protection & Indemnity Insurance on the vessel and such insurance shall include the charterer as an Assured.

The Assured agrees to report the name and gross tonnage of any vessel in which they acquire an insurable interest at the expiration

7

of this policy and pay any additional premium as may be required annually, at expiry at daily pro-rate the annual rates agreed. (emphasis added).

34.    Pursuant to the terms of the Certificate of Entry, defendant LAFARGE did report the name and gross tonnage of the Barge ING 4727 and is prepared to pay the reasonable additional premium assessed by the defendant AMERICAN CLUB, if any reasonable additional premium is due and owing.

35.    The Club Rules also provide in relevant part:

Class I Rule 2  Risks and Losses Covered

Each Member of the Association shall be indemnified in connection with each vessel entered in the Association for Protection and Indemnity Insurance against any loss, damage or expense which the Member shall become liable to pay and shall pay by reason of the fact that the Member is the owner (or operator, manager, charterer, mortgagee, trustee, receiver or agent, as the case may be) of the insured vessel, subject to the provisions of these Rules and to all the limitations herein stated or agreed to by the acceptance of the application for membership, or by the entry of the vessel, in the Association, and which shall result from the following liabilities, risks, events, occurrences and expenditures; provided that such liabilities, risks, events, occurrences and expenditures arise in respect of the Member's interest in such vessel; and in connection with the operation of such vessel by or on behalf of the Member; and out of events occurring during the period of entry of such vessel. (emphasis added).

36.    The Club Rules also provide in relevant part:

Class I Rule 1  Introductory: Interpretation:
                Membership: General Provisions

**34.**    The Association shall not be liable for any loss, damage or expense against which, but for the insurance herein provided, the Member, Co-assured or Affiliate would have been insured under any other existing insurance, except as set forth above in Rule 1.4.33; nor shall the Association provide prorated or allocated cover on the basis of double insurance or otherwise, except as set forth above in Rule 1.4.33; nor will this insurance replace any other insurance

8

> where (for whatever reason) that other insurance does not
> or is not able to respond to a claim thereunder.

37.     The defendant AMERICAN CLUB'S "Other Insurance" terms are commonly referred to as an "escape clause."

38.     The defendant AMERICAN CLUB has wrongfully declined defendant LAFARGE'S demand for payment of defense costs and indemnification under the Certificate of Entry and Club Rules.

**The Plaintiffs' Excess Policy**

39.     On or before May 1, 2005, the plaintiffs NACA and AHAC, together with the non-party NYMAGIC, subscribed to an Excess Marine Liability Policy ("Excess Policy") with an insured limit of $45,000,000.00, and up to $50,000,000.00 under certain circumstances, excess of $5,000,000.00 any one accident or occurrence.

40.     The plaintiffs, together with non-party NYMAGIC, issued the Excess Policy on a several and not joint basis.

41.     Plaintiff NACA subscribed to 25% of risk under the Excess Policy.

42.     Plaintiff AHAC subscribed to 35% of the risk under the Excess Policy.

43.     The non-party NYMAGIC subscribed to 40% of the risk under the Excess Policy.

44.     As a true Excess Policy, there was a requirement that defendant LAFARGE maintain certain "Underlying Insurances" as set forth and identified in the Excess Policy binder.

45.     The primary MMO Policy with a primary limit of $5,000,000.00, is identified as "Underlying Insurance" to the Excess Policy.

46.     Defendant LAFARGE'S entry in the defendant AMERICAN CLUB'S coverage with an underlying limit per Club Rules in an amount of at least $1,000,000,000.00, is also listed as an "Underlying Insurance" in the Excess Policy.

47.     The Excess Policy also provides in relevant part:

**7.     OTHER INSURANCE:**

> If other valid and collectible insurance with any other
> Insurer is available to the Assured covering a loss also
> covered by this Policy, other than insurance that is in
> excess of the insurance afforded by this Policy, the
> insurance afforded by this Policy shall be in excess of and
> shall not contribute with such other insurance, either as
> double insurance or otherwise.  Nothing herein shall be
> construed to make this Policy subject to the terms,
> conditions and limitations of other insurance.

48.     The "Other Insurance" clause in the Excess Policy is commonly referred to as an "excess clause."

## UNDERLYING KATRINA CLAIMS

49.     Prior to August 29, 2005, Barge ING 4727 was utilized by defendant LAFARGE to transport cement under the Transportation Agreement ("TA") to its New Orleans facility.

50.     On or about August 29, 2005, Barge ING 4727 was moored at defendant LAFARGE'S facility on the Inner Harbor Navigation Canal.

51.     On or about August 29, 2005, Hurricane Katrina made landfall along the Louisiana and Mississippi Gulf Coast.

52.     On or about August 29, 2005, Barge ING 4727 became adrift from her moorings and floated through a breach in the Industrial Canal floodwall or was carried over the floodwall by the rising water.

53.     At least four lawsuits, including class actions, arising out of Hurricane Katrina are pending against defendant LAFARGE.

54.     The allegations set forth in the pleadings in the multiple Katrina Claims-related lawsuits are sufficient to trigger the obligations of both NYMAGIC under the primary MMO

Policy and under the defendant AMERICAN CLUB'S primary cover for the cost of defending defendant LAFARGE in the actions.

55.     For example, in the action entitled: *Blair Boutte, et al. v. Lafarge North America, Inc.*, Index No.: 05 CV 5531, U.S.D.C. : E.D.La., it is alleged:

## CLASS ACTION COMPLAINT

\* \* \*

### I.

### Nature of the Action

1.     This is a personal injury, wrongful death/survival, real property damage, personal property damage and business damage class action on behalf of all persons, property owners, and business owners who sustained personal injury, wrongful death/survival claims, personal and real property damage and/or business damage as the result of flooding in New Orleans, Louisiana following Hurricane Katrina, beginning on or about August 30th, 2005 and thereafter. Plaintiffs seek compensatory and exemplary damages.

\* \* \*

### III.

### Parties

3.     Plaintiffs, BLAIR BOUTTE, DORIS SHANTS AND HERBERT WARREN are representative of classes of persons on New Orleans, Louisiana and surrounding parishes who sustained the following types of damage due to flooding following Hurricane Katrina: persons who sustained damage to their personal and real property, persons who sustained personal injury, persons who are the heirs of persons who died as the result of the flooding and are representative of those with wrongful death and survival claims, persons whose businesses were damaged due to the flooding.

4.     The following parties, made defendants in this suit, are indebted to plaintiffs, in solido, for such damages as are

reasonable in the premises, with legal interest thereon from the date of judicial demand until paid:

a.  Defendant, Lafarge North America, Inc., is a Virginia Corporation that can be served through its registered agent for service of process, The Prentice-Hall Corporation Systems, Inc., 11 S. 12th Street, P.O. Box 1463, Richmond, Virginia, 23218.

b.  Defendant, John Doe, was an individual charged with the responsibility of adequately securing the barge made the basis of this suit prior to Hurricane Katrina's landfall.

c.  Defendants' acts and omissions have caused Plaintiffs' injuries and damages detailed above in that Defendants' negligence lead to the flooding of New Orleans following Hurricane Katrina on or about August 30, 2005.

## IV.

### Louisiana State Law Causes of Action

5.  Prior to Hurricane Katrina's landfall, Lafarge North America, Inc. (hereafter "Lafarge") was operating a barge believed to be know as the ING4727, owned by Ingram Barge Company, as an inland hopper barge. On or about August 28 and 29, 2005, the ING4727 was under the care, custody and control of Lafarge after having unloaded its cargo at Lafarge's terminal adjacent to the Industrial Canal.

\* \* \*

## V.

### Count 1 Negligence

9.  Defendants' conduct in not removing and/or failing to adequately secure the barge was the cause in fact of all Plaintiffs' injuries and damages as set forth above. Defendants owed a duty to Plaintiffs to exercise reasonable care in removing and/or securing the barge prior to the landfall of Hurricane Katrina. Defendants breached their duty and such breach was the legal cause of all Plaintiff's injuries. Plaintiffs have all suffered substantial damage as

12

the result of Defendants' conduct, including, but not limited to, personal injury, wrongful death, medical expenses, hospital expenses, funeral expenses, physical pain and suffering, mental anguish and distress, permanent injury and disability, loss of earnings, and or loss of real and personal property and damage to their businesses.

## VI.

### The Class

10.    Plaintiffs, individually, and on behalf of THOSE SIMILARLY SITUATED, bring this action as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of a Class, consisting of all persons who sustained personal injury, wrongful death/survival, real property damage, personal property damage and business damage class action on behalf of all persons, property owners, and business owners who sustained personal injury, wrongful death/survival claims, personal and real property damage and/or business damage as the result of flooding in New Orleans following Hurricane Katrina, beginning on or about August 30th, 2005. Excluded from the Class is the Defendants, any parent, subsidiary, affiliate, or controlled person of Defendants, as well as officers, directors, agents, servants, or employees of Defendants, and the immediate family members of such persons and any trial judge who may preside over this case.

56.    For example, in the action entitled: *Ethel Mumford v. Ingram Barge Company and Riverway Company*, Index No.: 05 CV 5724, U.S.D.C. : E.D.La., it is alleged:

## FIRST SUPPLEMENTAL AND AMENDED COMPLAINT

The first supplemental and amended complaint of Ethel Mumford, individually, and on behalf of a class of persons with common claims, with respect, represents:

### I.

Plaintiff desires to add Lafarge North America, Inc., a foreign corporation licensed to do and doing business in the State of Louisiana and within the venue of this Honorable Court, as a party defendant in the title, body, and prayer of the original complaint liable, jointly and in solido, with the original defendants

for the legal liability, acts of omission, acts of commission, and damages, alleged arising out of their joint, and concurrent, responsibility arising out of its ownership, charter, operation, and [. . . .]

* * *

## SUIT FOR DAMAGES
## TRIAL BY JURY

* * *

### IV.

Defendants at all times pertinent were the owners, charterers, operators of a steel freight barge 200 feet in length, 35 feet in breadth, and 12 feet in depth, identified as ING 4727, VIN #955868, hull # 1942-10, and alternative VIN #CG025606.

### V.

The allision between the unmanned barge and the east side flood wall compels defendants to prove that their negligence was not a proximate cause of the allision. At all times pertinent the aforesaid barge was under the joint, and concurrent, control and supervision of defendants through their employees acting in the course and scope of their employment with defendants. The incident was of a kind and nature that cannot occur without negligence and all of the facts are within the exclusive knowledge, and control of defendants and not equally accessible to plaintiffs wherefore the doctrine of res ipsa loquitur is applicable and specially pleaded herein.

* * *

### VII.

The aforesaid barge, abandoned by defendants to the elements, broke loose from its inadequate moorings and crashed through the East side flood wall of the Industrial Canal taking out a large section of the flood wall causing a huge amount of water from Lake Pontchartrain and the Industrial Canal to flow into the Ninth Ward of Orleans Parish and St. Bernard Parish causing catastrophic damage, personal injury and mental anguish to the nominal plaintiff and the class she seeks to represent.

* * *

IX.

Plaintiff's are entitled to recover of defendants the following elements of compensatory damage, among others that will be shown at the time of trial, to wit:

1.    Damage to their immovable and movable properties;

2.    Demolition and salvage of their immovable and movable properties;

3.    Cost of restoration of their land to the pre-Katrina uncontaminated state;

4.    Displacement cost in the temporary replacement of their home, and property;

5.    Lost income;

6.    Pain, suffering, and mental anguish.

57.    For example, in the action entitled: *In The Matter Of The Complaint Of Ingram Barge Company, As Owner Of The ING4727, Petitioning For Exoneration From Or Limitation Of Liability*, Index No.: 05 CV 4419, U.S.D.C. : E.D.La., it is alleged:

**THIRD-PARTY COMPLAINT AND CLASS ACTION
FOR COMPENSATORY AND EXEMPLARY
DAMAGES AND FOR REASONABLE
ATTORNEY'S FEES AND TAXABLE COSTS**

I.

Claimants and Third-Party Plaintiffs are The Parfait Family, Ashton R. O'Dwyer, Jr. (appearing in proper person), Wilson Simmons, Procula D. Simmons, Tammy Amos, Michael Green, Helen Frank . . . .

II.

Made third-party defendants in this action are the following:

* * *

2)    Lafarge North America Inc., a foreign corporation having its principal office and place of business in Baltimore, Maryland.

* * *

IV.

Sometime during or after the Category 5 hurricane KATRINA's passing through the Greater New Orleans Metropolitan area, a barge owned by Ingram Barge Company, namely the Barge ING-4727, broke free from its moorings and knocked down the floodwall of the Industrial Canal, causing widespread flooding in an area below the Industrial Canal, which otherwise would have survived the storm, causing Claimants to suffer the following:

a)    Death;

b)    Bodily injury;

c)    Loss of or damage to immovable property;

d)    Loss of or damage to movable property;

* * *

VII.

Claimants and Third-Party Plaintiffs invoke the Pennsylvania Rule, and aver that Third-Party Defendants are presumed to be at fault, because a moving vessel struck and penetrated a fixed or stationary object, namely the floodwall of the Industrial Canal.

58.    In each of the actions referenced above in paragraphs 55, 56, and 57, *supra*, it has been alleged that defendant LAFARGE was, at all times relevant, the owner, operator and/or in control of the Barge ING 4727 and by virtue of alleged negligent conduct caused the Barge ING 4727 to break loose of its moorings and strike the levy along the Industrial Canal, causing widespread flooding with ensuing personal injury and property damage.

16

59.     On or about September 9, 2005, defendant LAFARGE placed NYMAGIC on notice of claims that may be covered by the primary MMO Policy.

60.     On or about March 3, 2006, defendant LAFARGE submitted a claim to THE CLUB seeking "indemnification for all potential liability and/or reasonable settlements and litigation costs . . ." in connection with certain claims for property damage and/or personal injury relating to the breakaway of Barge ING 4727 and arising from the Hurricane Katrina disaster in New Orleans.

61.     On or about April 21, 2006, the defendant AMERICAN CLUB sent a letter to defendant LAFARGE wrongfully declining coverage to defendant LAFARGE, on the alleged ground that Barge ING 4727 had not been entered with the defendant AMERICAN CLUB at the time of the casualty, or at any other time, and even if it had been entered, coverage for claims against the vessel would have been excluded.

62.     Defendant LAFARGE is pursuing its claim for coverage and defense costs from the defendant AMERICAN CLUB relating to claims arising from the breakaway of the Barge ING 4727 in a related lawsuit entitled: *American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Lafarge North America, Inc.*, United States District Court, Southern District of New York, 06 CV 3123 (CSH) ("the Club D.J. Action").

63.     Defendant AMERICAN CLUB maintains that it does not cover any of defendant LAFARGE'S liabilities or defense costs arising from the breakaway of Barge ING 4727, which is central to the Katrina Claims.

64.     If the defendant AMERICAN CLUB is permitted to maintain its wrongful denial of defendant LAFARGE'S claim for defense costs and possible indemnification, these plaintiffs,

together with the non-party NYMAGIC, will sustain damage by defendant LAFARGE'S pursuit of coverages under the Excess Policy.

### AS AND FOR A FIRST CAUSE OF ACTION,
### AN ACTION AGAINST THE AMERICAN CLUB

65.    Repeat and incorporate by reference the allegations set forth in paragraphs 1 through 64, inclusive of this Complaint with the same force and effect as if more fully set forth herein.

66.    On or about April 21, 2006, defendant AMERICAN CLUB declined the claim by defendant LAFARGE for defense costs and indemnity with regard to the Katrina Claims by filing the Club D.J. Action.  A copy of the Complaint without exhibits is annexed hereto as Exhibit 2.

67.    In the Club D.J. Action filed by the defendant AMERICAN CLUB, two (2) causes of action are set forth for the declination of defendant LAFARGE'S claim for defense costs and indemnity with regard to the Katrina Claims.

68.    In the First Cause of Action in the Club D.J. Action, the defendant AMERICAN CLUB alleges that it does not insure the defendant LAFARGE for the liabilities arising out of or in connection with the Barge ING 4727 because 1) that barge is not listed on the Schedule of Vessels in the Certificate of Entry, 2) the Barge ING 4727 was not acquired by defendant LAFARGE in addition to or in substitution of scheduled vessels, 3) defendant LAFARGE did not acquire insurable interest in Barge ING 4727, and 4) defendant LAFARGE'S interest in Barge ING 4727 was not pursuant to a purchase or charter.

69.    The legal relationship which defendant LAFARGE has with the Barge ING 4727 is set forth, at least in part, in a particular Transportation Agreement (hereinafter "TA") by and

between defendant LAFARGE and Ingram Barge Company.  A copy of the TA is annexed

hereto as Exhibit 3.

      70.     In and by the terms of the TA, it provides in relevant part:

          34.     Possession of the Barge during Loading/Unloading:

> Carrier [Ingram] shall deliver an empty or loaded barge to a
> loading/unloading facility designated by Shipper [Lafarge]
> for loading or unloading.  Shipper shall assume the duty
> and responsibility for the safety of each barge in its
> possession.    For the purposes of this Agreement,
> "possession" shall begin when a Carrier delivers an empty
> or loaded barge for loading or unloading to the landing
> designated by Shipper and shall end when the barge is
> removed by the Carrier or its agent(s).  Shipper shall be
> responsible for the safekeeping of Carrier's barge delivered
> to a landing regardless of whether Shipper owns or operates
> the landing.  During possession, any barge delivered to a
> landing designated by the Shipper shall be held without
> charge to Carrier.

* * *

          36.     Mooring:

> Shipper warrants that barges will be safely and adequately
> moored free of wharfage, dockage, port and harbor charges
> at the loading and unloading points and that the barges will
> have warning lights properly displayed as required by
> applicable U.S. Coast Guard and U.S. Army Corps. of
> Engineers regulations and permits.  While barges are in the
> care and custody of Shipper, or its agents, all U.S. Coast
> Guard and U.S. Army Corps of Engineers regulations will
> be complied with, . . . . (emphasis added).

      71.     At all times relevant, pursuant to the terms of the TA and at law, defendant

LAFARGE had an insurable interest in Barge ING 4727.

      72.     At all times relevant, Barge ING 4727 was at least a vessel in addition to if not in

substitution for those vessels identified in the "Certificate of Entry."

73.    Pursuant to the terms of the TA, defendant LAFARGE did obtain an insurable interest in the Barge ING 4727 through a "charter, lease or <u>otherwise</u>." (emphasis added).

74.    Pursuant to the Certificate of Entry, and the terms and conditions of the TA, coverage under the Club Rules "automatically" attached to the Barge ING 4727.

75.    Defendant LAFARGE did report to the defendant AMERICAN CLUB the name and gross tonnage of Barge ING 4727 and is willing to pay any additional reasonable premium as part of the automatic coverage that attached to the Barge ING 4727.

76.    Defendant LAFARGE has complied with all necessary conditions under the Certificate of Entry for coverage to attach on the Barge ING 4727 under the liability insurance provided by the Club Rules and the Certificate of Entry.

77.    Defendant AMERICAN CLUB is liable under the Certificate of Entry and the Club Rules 1) to provide defendant LAFARGE with the defense costs in the underlying Katrina related litigations, 2) to reimburse defendant LAFARGE for the cost of defending the Club D.J. Action and is liable to pay the cost of this declaratory judgment action incurred by plaintiffs NACA and AHAC to have the defendant AMERICAN CLUB'S wrongful declination found judicially null and void and without effect.

78.    In the Second Cause of Action in the Club D.J. Action, defendant AMERICAN CLUB alleges that defendant LAFARGE does not have any coverage under the Club Rules because of 1) the existence of Other Insurance and/or 2) that whatever liability, if any, arises from a indemnity agreement, because no such indemnity agreement was presented to the defendant AMERICAN CLUB for approval, and/or 3) defendant LAFARGE did not provide the defendant AMERICAN CLUB with a copy of the TA for THE CLUB'S approval.

79.    By virtue of the specific grounds for declination set forth in the Declaratory Judgment Complaint filed by defendant AMERICAN CLUB, any other possible or potential defenses to coverage under the Club Rules or Certificate of Entry have been waived.

80.    There is no express or implied term in the Certificate of Entry requiring THE CLUB'S approval for the TA.

81.    As set forth in the allegations of the underlying complaint by the various and several claimants in the Katrina litigations, liabilities being sought to be imposed upon defendant LAFARGE, in whole or in part, do not arise under a contract of indemnity.

82.    Based upon the terms and conditions of the "Other Insurance" clauses set forth in the MMO Policy and the Club Rules, THE CLUB'S defense of "Other Insurance" under New York law is invalid because an escape clause, such as that set forth in the Club Rules, is rendered ineffective and/or invalid when the Other Insurance policy on the same level as THE CLUB'S primary cover contains an "Other Insurance" clause which transforms the primary to an excess policy such as that set forth in the MMO Policy.

## AS AND FOR A SECOND CAUSE OF ACTION,
## AN ACTION AGAINST LAFARGE

83.    Repeat and incorporate by reference the allegations set forth in paragraphs 1 through 82, inclusive of this Complaint with the same force and effect as if more fully set forth herein.

84.    The Excess Policy provides in relevant part:

11.    MAINTENANCE OF UNDERLYING INSURANCE:

A.    It is a condition of this policy that the Section(s) or Policy(ies) referred to below in the "Schedule of Underlying Insurance" shall be maintained in full effect during the currency of this insurance except for any reduction of the aggregate limit(s) contained

therein solely by payment of claims in respect of accidents and/or occurrences, occurring during the term of this Policy.

B.    Inadvertent failure of the Assured to comply with Paragraph A above or inadvertent failure to notify this Company of any changes in the Underlying Insurances shall not prejudice the Assured's rights of recovery under this Policy, but in the event of such failure, this Company to be liable only to the same extent as they would have been had the Assured complied with the said condition.

85.    In the event that defendant LAFARGE failed to comply with all requirements of the Club Rules and/or the Certificate of Entry, which were and are necessary to bring the Barge ING 4727 within the scope of the coverage provided by the AMERICAN CLUB, such failure even if inadvertent, relieves the subscribers to the Excess Policy, including these plaintiffs of any obligation to make payment to defendant LAFARGE until such time as the amount which would have been covered under the Club Rules and the Certificate of Entry would have been exhausted as if coverage under the Club Rules and the Certificate of Entry were in fact in full force and effect.

86.    By virtue of the foregoing premises, the subscribing underwriters to the Excess Policy, including these plaintiffs shall not be required to pay under the Excess Policy until such time as an amount equivalent to the full amount of coverage under the AMERICAN CLUB been paid by defendant LAFARGE.

## AS AND FOR A THIRD CAUSE OF ACTION, AN ACTION AGAINST LAFARGE

87.    Repeat and incorporate by reference the allegations set forth in paragraphs 1 through 86, inclusive of this Complaint with the same force and effect as if more fully set forth herein.

88.    The MMO Policy provides in relevant part:

4.    **NAMING ATTORNEYS:**

<u>This Company</u>, in consideration, in consultation with the Assured, <u>shall have the option of naming any mutually acceptable attorneys who shall represent the Assured in the prosecution or defense of any litigation</u> or negotiations between the Assured and third parties concerning any claim based on a liability or an alleged liability covered by this policy, and shall have the direction of such litigation's [sic] or negotiations. If the Assured shall fail or refuse to settle any claim as authorized by this Company, the liability of this Company shall be limited to the amount for which settlement could have been made. (emphasis added).

89.    In and by the terms of the MMO Policy, the non-party NYMAGIC had the sole right with the consent of the Assured to name counsel for defendant LAFARGE in the actions involving the Katrina Claims.

90.    In and by the terms of the MMO Policy, defendant LAFARGE had no right whatsoever to name counsel to defend its interest in the Katrina Claims at the expense of the primary insurer NYMAGIC and/or the excess insurers, NYMAGIC, and plaintiffs AHAC and NACA.

91.    At all times relevant, the non-party NYMAGIC, after consultation with LAFARGE, sought the consent of LAFARGE for the retention of one of several firms to provide a defense for defendant LAFARGE in the underlying actions involving the Katrina Claims.

92.    At all times relevant, defendant LAFARGE failed to consult with NYMAGIC in good faith and wrongfully and unreasonably withheld consent to the appointment of counsel by NYMAGIC to defend defendant LAFARGE in the underlying Katrina Claims.

93.    By reason of defendant LAFARGE's failure to consult with NYMAGIC in good faith and then unreasonably withhold its consent to the counsel named by NYMAGIC, defendant

LAFARGE has, as a matter of law, waived its rights to participate in the naming of defense counsel under the MMO Policy and Excess Policy.

94.     After due consideration, NYMAGIC retained the law firm of Sutterfield & Webb, LLC., as counsel to defend LAFARGE in the Katrina Claims.

95.     At this time, defendant LAFARGE has paid and/or incurred cost for its separately retained counsel, Goodwin Procter, Holland & Knight, and Chaffe McCall, in an amount in excess of $7.5 million, whose services were and are, in whole or in part, duplicative of those services and/or unwarranted services rendered by counsel retained by NYMAGIC on behalf of defendant LAFARGE in defense of the underlying Katrina Claims.

96.     Defendant LAFARGE is now making claim under the MMO Policy and the Excess Policy for reimbursement of the costs for its separately retained counsel without having consulted with and/or having obtained the approval of plaintiffs AHAC and NACA and the non-party NYMAGIC.

97.     In and by the terms of the Excess Policy, it provides in relevant part:

> 4.     **ASSISTANCE AND COOPERATION:**
>
> This Company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceedings instituted against the Assured, but <u>this Company shall have the right and shall be given the opportunity to associate with the Assured or the Assured's Underlying Insurers, or both, in the defense and control of any claim,</u> suit or proceeding relative to an occurrence where the claim or suit involves or appears reasonably likely to involve this Company in which event the Assured, the Underlying Insurers and this Company shall cooperate in all things in the defense of such claim, suit or proceeding. (emphasis added).

98.    By the terms of the Excess Policy, plaintiffs AHAC and NACA, together with the non-party NYMAGIC, have the absolute right to be given the opportunity to associate with the insured and the underlying insurer in the defense and control of the Katrina Claims.

99.    Defendant LAFARGE did not give the plaintiffs AHAC and NACA and/or the non-party NYMAGIC an opportunity to associate with the defendant LAFARGE on the selection of its counsel and/or on the proper management and cost control of the defense of the underlying Katrina Claims with respect to the counsel which were separately retained by defendant LAFARGE.

100.    By virtue of the foregoing premises, defendant LAFARGE has no right to seek reimbursement for the past and/or future payments to be made to those counsel which were separately retained by defendant LAFARGE without the consent of, and/or without consultation with, its primary and excess insurers.

## AS AND FOR A FOURTH CAUSE OF ACTION, AN ACTION AGAINST BOTH THE AMERICAN CLUB AND LAFARGE

101.    Repeat and incorporate by reference the allegations set forth in paragraphs 1 through 100, inclusive of this Complaint with the same force and effect as if more fully set forth herein.

102.    The MMO Policy contains an "Other Insurance" clause which renders the MMO Policy excess to any other primary policy.

103.    The primary insurance coverage provided under the Club Rules and Certificate of Entry contains an "Other Insurance" clause or terms which attempts to make THE CLUB coverage null and void if Other Insurance coverage is applicable to the claim.

104.    Under New York law, when comparing an excess type "Other Insurance" clause in a primary policy to an escape type of "Other Insurance" clause in a second primary policy

covering the same insured, the escape clause is given no force and effect rendering the primary policy with the escape clause the ultimate primary policy to respond to the claim with the other primary policy containing the excess clause being the first excess policy.

105.    The Excess Policy subscribed to by these plaintiffs, together with the non-party NYMAGIC, is a true Excess Policy which schedules both the MMO Policy and THE CLUB cover as Underlying Insurance and therefore renders the Excess Policy the excess insurance coverage to both the MMO Policy and THE CLUB cover.

106.    The Excess Policy also contains an "Other Insurance" clause which by its terms makes it excess to any primary policy.

107.    By virtue of the foregoing, the coverage afforded under the Excess Policy is not triggered until the limits of liability for the coverage afforded under both the MMO Policy and THE CLUB cover are fully exhausted.

WHEREFORE, the plaintiffs The Northern Assurance Company of America and American Home Assurance Company prays for judgment as follows:

A.    On the First Cause of Action, a judgment in favor of the plaintiffs The Northern Assurance Company of America and American Home Assurance Company against the defendant American Steamship Owners Mutual Protection and Indemnity Association, Inc. declaring that the Club's denial of coverage to defendant Lafarge North America, Inc. is invalid and that there is coverage under the Club Rules and Certificate of Entry issued to defendant Lafarge North America, Inc. for, at a minimum, the cost of paying for defending all underlying Katrina Claims and related litigations;

B.    On the Second Cause of Action, a judgment in favor of plaintiffs The Northern
Assurance Company of America and American Home Assurance Company
against defendant Lafarge North America, Inc., declaring that the Excess Marine
Liability Policy, issued by plaintiffs The Northern Assurance Company of
America and American Home Assurance Company, together with the non-party
NYMAGIC, to defendant Lafarge North America, Inc. does not respond until the
dollar limit under the primary MMO Policy has been paid up to its full limit of
$5,000,000.00 and defendant Lafarge North America, Inc. has paid the full
amount which should have been paid under the Club cover but for defendant
Lafarge North America, Inc.'s failure to comply with the requirements to have the
Barge ING 4727 validly entered for coverage under the Club Rules and
Certificate of Entry.

C.    On the Third Cause of Action, a judgment in favor of plaintiffs The Northern
Assurance Company of America and American Home Assurance Company
against defendant Lafarge North America, Inc. declaring that the Excess Marine
Liability Policy issued by the plaintiffs The Northern Assurance Company of
America and American Home Assurance Company, including the non-party
NYMAGIC, are not liable to reimburse defendant Lafarge North America, Inc.
for payments to those several counsel engaged by Lafarge North America, Inc.
without the consent of the insurers.

D.    On the Fourth Cause of Action, a judgment in favor of plaintiffs The Northern
Assurance Company of America and American Home Assurance Company
against both defendants Lafarge North America, Inc. and American Steamship

Owners Mutual Protection and Indemnity Association, Inc. declaring that the

Excess Marine Liability Policy issued by the plaintiffs The Northern Assurance

Company of America and American Home Assurance Company, including the

non-party NYMAGIC, to defendant Lafarge North America, Inc. is excess to the

available coverages under both the MMO Policy and the Club cover; and

E.     For other and such further relief as the Court deems just and proper;

and for the cost and disbursements of this action.


Dated:     New York, New York
           April 1, 2008


                              NICOLETTI HORNIG & SWEENEY
                              *Attorneys for Plaintiffs*
                              *The Northern Assurance Company of America*
                              *and American Home Assurance Company*


                    By:     _John A. V. Nicoletti (N.N.)_
                              John A. V. Nicoletti (JN-7174)
                              Nooshin Namazi (NN-9449)
                              Wall Street Plaza
                              88 Pine Street, 7th Floor
                              New York, New York 10005-1801
                              Telephone:   (212) 220-3830
                              Facsimile:    (212) 220-3780
                              Email:        jnicoletti@nicolettihornig.com
                              (FILE NO.:  10000478 JAVN/NN/WMF)


X:\Public Word Files\1478\Legal\D.J. COMPLAINT.4.01.08.mis (FINAL).doc

# EXHIBIT 1

Mitchell 4



American Steamship Owners Mutual Protection and Indemnity Association, Inc.
60 Broad Street – 37th Floor,
New York, NY 10004, U.S.A.

Shipowners Claims Bureau, Inc., Manager

## CERTIFICATE OF ENTRY

of the vessel(s) set out herein for account of the Member named hereunder subject to the By-Laws and Rules of the Association from time to time in force and to any special terms and conditions endorsed hereon and/or as may from time to time be circularized. Unless indicated to the contrary herein, the cover evidenced by this Certificate of Entry commences at noon GMT on the date specified below and continues until cover ceases or is terminated in accordance with the said By-Laws and Rules.

### Class I – Protection & Indemnity Insurance

| VESSEL(S) | FLAG | GROSS TONNAGE | COVER TO COMMENCE |
|---|---|---|---|
| As per Schedule | As per Schedule | As per Schedule | 20 February, 2005 **RENEWAL DATE:** 20 February, 2006 |

| MEMBER |
|---|
| LAFARGE NORTH AMERICA INC. |

| SPECIAL TERMS & CONDITIONS AS ATTACHED |
|---|

**IMPORTANT**

This Certificate of Entry is evidence only of the contract of indemnity insurance between the above-named Member and the Association and shall not be construed as evidence of any undertaking, financial or otherwise, on the part of the Association to any other party.

If a Member tenders this Certificate as evidence of insurance under any applicable law relating to financial responsibility, or otherwise shows or offers it to any other party as evidence of insurance, such use of this Certificate by the Member is not to be taken as any indication that the Association thereby consents to act as guarantor or to be sued directly in any jurisdiction whatsoever. The Association does not so consent.

The Member named in this Certificate of Entry is liable to pay Mutual Premium as provided for in Rule 4. Furthermore, the Member may become liable under the said Rule 4 to pay Overspill Calls to meet the Association's proportion of any Overspill Claims up to the limit per vessel as provided for in the said Rule 4.

CERTIFICATE NO.:    01729000

NEW YORK:    31 March, 2005    BY:    _Stewart Lord_

AUTHORIZED SIGNATURE

CLUB000424



CERTIFICATE NO.:    017;9000

## SCHEDULE OF VESSELS

| VESSEL NAME | TYPE | FLAG | GROSS TONNAGE |
|---|---|---|---|
| ADELAIDE | Barge (dry) | USA | 8,512 |
| ALEXANDRA | Barge (dry) | USA | 8,512 |
| BARGE JOPPA | Tank Barge | USA | 1,500 |
| BELCRAFT | Barge (dry) | USA | 3,814 |
| CITADEL I | Barge (dry) | USA | 1,500 |
| CITADEL II | Barge (dry) | USA | 1,500 |
| CITADEL III | Barge (dry) | USA | 1,500 |
| CITADEL IV | Barge (dry) | USA | 1,500 |
| FLOATING DOCK JOPPA | Tank Barge | USA | 1,500 |
| G.L. OSTRANDER | Tug/Supply | USA | 198 |
| INTEGRITY | Dirty Oil Tank | USA | 7,557 |
| J.B. FORD | Bulk | USA | 4,368 |
| MAGNOLIA | Tank Barge | USA | 1,734 |
| MARIA T | Barge (dry) | USA | 8,865 |
| MC 65-2 | Barge (dry) | USA | 180 |
| MC 66-2 | Barge (dry) | USA | 180 |
| MPC253 | Barge (dry) | USA | 1,400 |
| MPC256 | Barge (dry) | USA | 1,400 |
| MPC257 | Barge (dry) | USA | 1,400 |
| MPC258 | Barge (dry) | USA | 1,400 |
| MPC259 | Barge (dry) | USA | 1,400 |
| MPC31 | Barge (dry) | USA | 1,800 |
| MPC32 | Barge (dry) | USA | 1,800 |
| MPC33 | Barge (dry) | USA | 2,600 |
| MPC350 | Barge (dry) | USA | 1,200 |
| MPC351 | Barge (dry) | USA | 1,500 |
| MPC352 | Barge (dry) | USA | 1,500 |
| MPC51 | Barge (dry) | USA | 1,526 |
| MPC52 | Barge (dry) | USA | 1,526 |
| MPC53 | Barge (dry) | USA | 1,526 |
| MPC54 | Barge (dry) | USA | 1,526 |
| MPC55 | Barge (dry) | USA | 1,526 |

2

CERTIFICATE NO.:    01729000



| MPC66 | Barge (dry) | USA | 1,400 |
| MPC67 | Barge (dry) | USA | 1,400 |
| MPC68 | Barge (dry) | USA | 1,400 |
| MPC69 | Barge (dry) | USA | 1,400 |
| MPC70 | Barge (dry) | USA | 1,400 |
| MPC71 | Barge (dry) | USA | 1,400 |
| MPC72 | Barge (dry) | USA | 1,400 |
| MPC73 | Barge (dry) | USA | 1,400 |
| MPC74 | Barge (dry) | USA | 1,400 |
| MPC75 | Barge (dry) | USA | 1,400 |
| MPC76 | Barge (dry) | USA | 1,400 |
| MPC77 | Barge (dry) | USA | 1,400 |
| MPC78 | Barge (dry) | USA | 1,400 |
| MPC79 | Barge (dry) | USA | 1,400 |
| MPC80 | Barge (dry) | USA | 1,400 |
| MPC81 | Barge (dry) | USA | 1,400 |
| MPC82 | Barge (dry) | USA | 1,400 |
| MPC83 | Barge (dry) | USA | 1,400 |
| MPC84 | Barge (dry) | USA | 1,400 |
| MPC85 | Barge (dry) | USA | 1,400 |
| MPC86 | Barge (dry) | USA | 1,400 |
| MPC87 | Barge (dry) | USA | 1,400 |
| MPC88 | Barge (dry) | USA | 1,400 |
| MPC89 | Barge (dry) | USA | 1,400 |
| MPC90 | Barge (dry) | USA | 1,400 |
| MPC91 | Barge (dry) | USA | 1,400 |
| MPC92 | Barge (dry) | USA | 1,400 |
| MPC93 | Barge (dry) | USA | 1,400 |
| MPC94 | Barge (dry) | USA | 1,400 |
| MPC95 | Barge (dry) | USA | 1,400 |
| MPC96 | Barge (dry) | USA | 1,400 |
| MPC97 | Barge (dry) | USA | 1,400 |
| NORFOLK | Tug | USA | 499 |
| TRINITY I | Barge (dry) | USA | 400 |
| TRINITY II | Barge (dry) | USA | 1,102 |

3

CLUB000426



CERTIFICATE NO.:    01729000

| MPC61 | Barge (dry) | USA | 1,400 |
| MPC62 | Barge (dry) | USA | 1,400 |
| MPC64 | Barge (dry) | USA | 1,400 |
| MPC63 | Barge (dry) | USA | 1,400 |
| MPC65 | Barge (dry) | USA | 1,400 |

4

CLUB000427



CERTIFICATE NO.:   01729000

## SPECIAL TERMS & CONDITIONS

| COLLISION | FOUR-FOURTHS COLLISION COVERAGE INCLUDED<br><br>Coverage hereunder, pursuant to Rule 2, Section 3.2, includes four-fourths of those liabilities, costs and expenses set out as insured losses in the Collision Clause of the American Institute Hull Clauses (June 2, 1977), or as provided for by such similar terms as may be contained in the insured vessel's hull policies, and which would have been covered under the said Clauses, or hull policies but for their exclusion therefrom, and subject always and in any event to each and every other provision of Rule 2, Section 3, in general. |
|---|---|
| EXCLUSIONS | COVERAGE IN RESPECT OF CARGO AND UNRECOVERABLE G.A. CONTRIBUTIONS EXCLUDED<br><br>Coverage hereunder excludes absolutely all those claims in respect of cargo otherwise recoverable in accordance with Rule 2, Section 7, all those claims for Fines otherwise recoverable under Rule 2, Section 8.1, and all those claims in respect of unrecoverable general average contributions otherwise recoverable in accordance with Rule 2, Section 12. |
| DEDUCTIBLES | US$25,000 from all claims, each accident or occurrence. |
| OTHER CLAUSES | NO LAID-UP RETURNS<br><br>It is hereby noted and agreed that the provisions of Rule 4, Section 11, do not apply to the coverage evidenced by this Certificate of Entry. |
| MEMBER SPECIFIC CLAUSES | CHARTERED BARGES<br><br>If Lafarge Corporation et al acquires an insurable interest in any vessel in addition to or in substitution for those set forth herein, through purchase, charter, lease or otherwise, such insurance as is afforded hereunder to any similar vessel shall automatically cover such additional vessel effective from the date and time the Assured acquires an insurable interest in such additional vessel. With respect to a chartered, leased or similarly acquired vessel, the insurance hereunder automatically includes the owner as an additional Assured with waiver of subrogation against the owner, if required, effective from the date and time such vessel is insured hereunder.<br><br>The above provision shall not apply to vessels which are chartered under a contract whereby the owner (or Demise Owner) and Charterer agree that the owner (or Demise Owner) shall procure Protection & Indemnity Insurance on the vessel and such insurance shall include the charterer as an Assured. |

5

CLUB000428



CERTIFICATE NO.:    01729000

| | |
|---|---|
| | The Assured agrees to report the name and gross tonnage of any vessel in which they acquire an insurable interest at the expiration of this policy and pay any additional premium as may be required annually, at expiry at daily pro-rate the annual rates agreed. |

6

CLUB000429



CERTIFICATE NO.:    01729000

## PREMIUM(S)

| VESSEL NAME | RISK NUMBER | GT | RATE (USD per GT per annum) | ADVANCE PREMIUM FOR PERIOD (US Dollar) |
|---|---|---|---|---|
| ADELAIDE | 37741 | 8,512 | 1.6128 | 13,728.15 |
| ALEXANDRA | 37742 | 8,512 | 1.6128 | 13,728.15 |
| BARGE JOPPA | 37743 | 1,500 | 1.6128 | 2,419.20 |
| BELCRAFT | 37744 | 3,614 | 1.6128 | 5,828.66 |
| CITADEL I | 37745 | 1,500 | 1.6128 | 2,419.20 |
| CITADEL II | 37746 | 1,500 | 1.6128 | 2,419.20 |
| CITADEL III | 37747 | 1,500 | 1.6128 | 2,419.20 |
| CITADEL IV | 37748 | 1,500 | 1.6128 | 2,419.20 |
| FLOATING DOCK JOPPA | 37749 | 1,500 | 1.6128 | 2,419.20 |
| G.L. OSTRANDER | 37750 | 198 | 94.9772 | 18,805.49 |
| INTEGRITY | 37751 | 7,557 | 1.6128 | 12,187.93 |
| J.B. FORD | 37752 | 4,368 | 1.6128 | 7,044.71 |
| MAGNOLIA | 37753 | 1,734 | 1.6128 | 2,796.60 |
| MARIA T | 37754 | 8,865 | 1.6128 | 14,297.47 |
| MC 05-2 | 37755 | 180 | 13.4400 | 2,419.20 |
| MC 66-2 | 37756 | 180 | 13.4400 | 2,419.20 |
| MPC253 | 37757 | 1,400 | 1.7280 | 2,419.20 |
| MPC256 | 37758 | 1,400 | 1.7280 | 2,419.20 |
| MPC257 | 37759 | 1,400 | 1.7280 | 2,419.20 |
| MPC258 | 37760 | 1,400 | 1.7280 | 2,419.20 |
| MPC259 | 37761 | 1,400 | 1.7280 | 2,419.20 |
| MPC31 | 37762 | 1,800 | 1.3440 | 2,419.20 |
| MPC32 | 37763 | 1,800 | 1.3440 | 2,419.20 |
| MPC33 | 37764 | 2,600 | 0.9486 | 2,461.16 |
| MPC350 | 37765 | 1,200 | 2.0160 | 2,419.20 |
| MPC351 | 37766 | 1,500 | 1.6128 | 2,419.20 |
| MPC352 | 37767 | 1,500 | 1.6128 | 2,419.20 |
| MPC51 | 37768 | 1,526 | 1.6128 | 2,461.13 |
| MPC52 | 37769 | 1,526 | 1.6128 | 2,461.13 |
| MPC53 | 37770 | 1,526 | 1.6128 | 2,461.13 |

7

CLUB000430



CERTIFICATE NO.:   01729000

| | | | | |
|---|---|---|---|---|
| MPC54 | 37771 | 1,526 | 1.6128 | 2,461.13 |
| MPC55 | 37772 | 1,526 | 1.6128 | 2,461.13 |
| MPC66 | 37773 | 1,400 | 1.7280 | 2,419.20 |
| MPC67 | 37774 | 1,400 | 1.7280 | 2,419.20 |
| MPC68 | 37775 | 1,400 | 1.7280 | 2,419.20 |
| MPC89 | 37776 | 1,400 | 1.7280 | 2,419.20 |
| MPC70 | 37777 | 1,400 | 1.7280 | 2,419.20 |
| MPC71 | 37778 | 1,400 | 1.7280 | 2,419.20 |
| MPC72 | 37779 | 1,400 | 1.7280 | 2,419.20 |
| MPC73 | 37780 | 1,400 | 1.7280 | 2,419.20 |
| MPC74 | 37781 | 1,400 | 1.7280 | 2,419.20 |
| MPC75 | 37782 | 1,400 | 1.7280 | 2,419.20 |
| MPC76 | 37783 | 1,400 | 1.7280 | 2,419.20 |
| MPC77 | 37784 | 1,400 | 1.7280 | 2,419.20 |
| MPC78 | 37785 | 1,400 | 1.7280 | 2,419.20 |
| MPC79 | 37786 | 1,400 | 1.7280 | 2,419.20 |
| MPC80 | 37787 | 1,400 | 1.7280 | 2,419.20 |
| MPC81 | 37788 | 1,400 | 1.7280 | 2,419.20 |
| MPC82 | 37789 | 1,400 | 1.7280 | 2,419.20 |
| MPC83 | 37790 | 1,400 | 1.7280 | 2,419.20 |
| MPC84 | 37791 | 1,400 | 1.7280 | 2,419.20 |
| MPC85 | 37792 | 1,400 | 1.7280 | 2,419.20 |
| MPC86 | 37793 | 1,400 | 1.7280 | 2,419.20 |
| MPC87 | 37794 | 1,400 | 1.7280 | 2,419.20 |
| MPC88 | 37795 | 1,400 | 1.7280 | 2,419.20 |
| MPC89 | 37796 | 1,400 | 1.7280 | 2,419.20 |
| MPC90 | 37797 | 1,400 | 1.7280 | 2,419.20 |
| MPC91 | 37798 | 1,400 | 1.7280 | 2,419.20 |
| MPC92 | 37799 | 1,400 | 1.7280 | 2,419.20 |
| MPC93 | 37800 | 1,400 | 1.7280 | 2,419.20 |
| MPC94 | 37801 | 1,400 | 1.7280 | 2,419.20 |
| MPC95 | 37802 | 1,400 | 1.7280 | 2,419.20 |
| MPC96 | 37803 | 1,400 | 1.7280 | 2,419.20 |
| MPC97 | 37804 | 1,400 | 1.7280 | 2,419.20 |
| NORFOLK | 37805 | 499 | 13.5271 | 6,750.02 |

8

CLUB000431

CERTIFICATE NO.:    01729000



| | | | | |
|---|---|---|---|---|
| TRINITY I | 37806 | 400 | 6.0480 | 2,419.20 |
| TRINITY II | 37807 | 1,102 | 2.1953 | 2,419.22 |
| MPC61 | 37812 | 1,400 | 1.7280 | 2,419.20 |
| MPC62 | 37813 | 1,400 | 1.7280 | 2,419.20 |
| MPC64 | 37819 | 1,400 | 1.7280 | 2,419.20 |
| MPC63 | 37820 | 1,400 | 1.7280 | 2,419.20 |
| MPC65 | 37821 | 1,400 | 1.7280 | 2,419.20 |

9

CLUB000432

American Steamship Owners Mutual Protection & Indemnity Association, Inc.



THE AMERICAN CLUB

Shipowners Claims Bureau, Inc., Manager
60 Broad Street – 37th Floor
New York, New York 10004
U.S.A.

Tel: +1 212-847-4500
Fax: +1 212-847-4599

Willis of New York, Inc.
7 Hanover Square
New York, NY 10004-2594
USA

Date:        31 Mar 2005

Invoice No:     28299

For the Account of:  Lafarge North America Inc.
Our Reference:   440

## ADVANCE PREMIUM
## CLASS P&I
### FOR THE PERIOD FROM 20 Feb 2005 TO 20 Feb 2006
### NO OF DAYS PRO RATA 365/365

| Vessel | (Risk No) | GT | Annual Rate USD per GT | Advance Premium for Period |
|---|---|---|---|---|
| ADELAIDE | (37741) | 8,512 | 1.6128 | 13,728.15 |
| ALEXANDRA | (37742) | 8,512 | 1.6128 | 13,728.15 |
| BARGE JOPPA | (37743) | 1,500 | 1.6128 | 2,419.20 |
| BELCRAFT | (37744) | 3,614 | 1.6128 | 5,828.66 |
| CITADEL I | (37745) | 1,500 | 1.6128 | 2,419.20 |
| CITADEL II | (37746) | 1,500 | 1.6128 | 2,419.20 |
| CITADEL III | (37747) | 1,500 | 1.6128 | 2,419.20 |
| CITADEL IV | (37748) | 1,500 | 1.6128 | 2,419.20 |
| FLOATING DOCK JOPPA | (37749) | 1,500 | 1.6128 | 2,419.20 |
| G.L. OSTRANDER | (37750) | 198 | 94.9772 | 18,805.49 |
| INTEGRITY | (37751) | 7,557 | 1.6128 | 12,187.93 |
| J.B. FORD | (37752) | 4,368 | 1.6128 | 7,044.71 |
| MAGNOLIA | (37753) | 1,734 | 1.6128 | 2,796.60 |
| MARIA T | (37754) | 8,865 | 1.6128 | 14,297.47 |
| MC 65-2 | (37755) | 180 | 13.4400 | 2,419.20 |
| MC 65-2 | (37756) | 180 | 13.4400 | 2,419.20 |
| MPC253 | (37757) | 1,400 | 1.7280 | 2,419.20 |
| MPC256 | (37758) | 1,400 | 1.7280 | 2,419.20 |
| MPC257 | (37759) | 1,400 | 1.7280 | 2,419.20 |
| MPC258 | (37760) | 1,400 | 1.7280 | 2,419.20 |
| MPC259 | (37761) | 1,400 | 1.7280 | 2,419.20 |
| MPC31 | (37762) | 1,800 | 1.3440 | 2,419.20 |
| MPC32 | (37763) | 1,800 | 1.3440 | 2,419.20 |
| MPC33 | (37764) | 2,600 | .9466 | 2,461.16 |

Wire/telegraphic transfers to the American Club should be made to its account at:
Deutsche Bank Trust Company Americas, New York, New York, U.S.A.
Depending upon the origin of funds, one of the following bank codes should be used:
Wire transfers made through a bank within the U.S.: ABA: 021-001-033
Wire transfers made through a bank outside the U.S.: SWIFT: BKTRUS33 or CHIPS: 0103
In both cases, funds should be indicated as being for the credit of:
Account Name: American Steamship Owners P&I Assn. Inc.
Account Number: 00-700-269

CLUB000433

American Steamship Owners Mutual Protection & Indemnity Association, Inc.



Shipowners Claims Bureau, Inc., Manager
60 Broad Street – 37th Floor
New York, New York 10004
U.S.A.

Tel: +1 212-847-4500
Fax: +1 212-847-4599

| Vessel | (Risk No) | GT | Annual Rate USD per GT | Advance Premium for Period |
|--------|-----------|-----|------------------------|----------------------------|
| MPC350 | (37765) | 1,200 | 2.0160 | 2,419.20 |
| MPC351 | (37766) | 1,500 | 1.8128 | 2,419.20 |
| MPC352 | (37767) | 1,500 | 1.8128 | 2,419.20 |
| MPC51 | (37768) | 1,526 | 1.8128 | 2,461.13 |
| MPC52 | (37769) | 1,526 | 1.8128 | 2,461.13 |
| MPC53 | (37770) | 1,526 | 1.8128 | 2,461.13 |
| MPC54 | (37771) | 1,526 | 1.8128 | 2,461.13 |
| MPC55 | (37772) | 1,526 | 1.8128 | 2,461.13 |
| MPC61 | (37812) | 1,400 | 1.7280 | 2,419.20 |
| MPC62 | (37813) | 1,400 | 1.7280 | 2,419.20 |
| MPC63 | (37820) | 1,400 | 1.7280 | 2,419.20 |
| MPC64 | (37819) | 1,400 | 1.7280 | 2,419.20 |
| MPC65 | (37821) | 1,400 | 1.7280 | 2,419.20 |
| MPC66 | (37773) | 1,400 | 1.7280 | 2,419.20 |
| MPC67 | (37774) | 1,400 | 1.7280 | 2,419.20 |
| MPC68 | (37775) | 1,400 | 1.7280 | 2,419.20 |
| MPC69 | (37776) | 1,400 | 1.7280 | 2,419.20 |
| MPC70 | (37777) | 1,400 | 1.7280 | 2,419.20 |
| MPC71 | (37778) | 1,400 | 1.7280 | 2,419.20 |
| MPC72 | (37779) | 1,400 | 1.7280 | 2,419.20 |
| MPC73 | (37780) | 1,400 | 1.7280 | 2,419.20 |
| MPC74 | (37781) | 1,400 | 1.7280 | 2,419.20 |
| MPC75 | (37782) | 1,400 | 1.7280 | 2,419.20 |
| MPC76 | (37783) | 1,400 | 1.7280 | 2,419.20 |
| MPC77 | (37784) | 1,400 | 1.7280 | 2,419.20 |
| MPC78 | (37785) | 1,400 | 1.7280 | 2,419.20 |
| MPC79 | (37786) | 1,400 | 1.7280 | 2,419.20 |
| MPC80 | (37787) | 1,400 | 1.7280 | 2,419.20 |
| MPC81 | (37788) | 1,400 | 1.7280 | 2,419.20 |
| MPC82 | (37789) | 1,400 | 1.7280 | 2,419.20 |
| MPC83 | (37790) | 1,400 | 1.7280 | 2,419.20 |
| MPC84 | (37791) | 1,400 | 1.7280 | 2,419.20 |
| MPC85 | (37792) | 1,400 | 1.7280 | 2,419.20 |
| MPC86 | (37793) | 1,400 | 1.7280 | 2,419.20 |
| MPC87 | (37794) | 1,400 | 1.7280 | 2,419.20 |
| MPC88 | (37795) | 1,400 | 1.7280 | 2,419.20 |
| MPC89 | (37796) | 1,400 | 1.7280 | 2,419.20 |
| MPC90 | (37797) | 1,400 | 1.7280 | 2,419.20 |
| MPC91 | (37798) | 1,400 | 1.7280 | 2,419.20 |
| MPC92 | (37799) | 1,400 | 1.7280 | 2,419.20 |
| MPC93 | (37800) | 1,400 | 1.7280 | 2,419.20 |

Wire/telegraphic transfers to the American Club should be made to its account at:
Deutsche Bank Trust Company Americas, New York, New York, U.S.A.
Depending upon the origin of funds, one of the following bank codes should be used:
Wire transfers made through a bank within the U.S.: ABA: 021-001-033
Wire transfers made through a bank outside the U.S.: SWIFT: BKTRUS33 or CHIPS: 0103
In both cases, funds should be indicated as being for the credit of:
Account Name: American Steamship Owners P&I Assn. Inc.
Account Number: 00-700-269

CLUB000434

American Steamship Owners Mutual Protection & Indemnity Association, Inc.



Shipowners Claims Bureau, Inc., Manager
60 Broad Street – 37th Floor
New York, New York 10004
U.S.A.

Tel:  +1 212-847-4500
Fax:  +1 212-847-4599

| Vessel | (Risk No) | GT | Annual Rate USD per GT | Advance Premium for Period |
|--------|-----------|-----|------------------------|----------------------------|
| MPC94 | (37801) | 1,400 | 1.7280 | 2,419.20 |
| MPC95 | (37802) | 1,400 | 1.7280 | 2,419.20 |
| MPC96 | (37803) | 1,400 | 1.7280 | 2,419.20 |
| MPC97 | (37804) | 1,400 | 1.7280 | 2,419.20 |
| NORFOLK | (37805) | 499 | 13.5271 | 6,750.02 |
| TRINITY I | (37806) | 400 | 6.0480 | 2,419.20 |
| TRINITY II | (37807) | 1,102 | 2.1953 | 2,419.22 |

| Total | USD | 247,828.42 |
|-------|-----|------------|

| Due Dates | | Amount |
|-----------|-----|--------|
| 31 Mar 2005 | USD | 61,957.11 |
| 20 Jun 2005 | USD | 61,957.10 |
| 20 Sep 2005 | USD | 61,957.10 |
| 20 Dec 2005 | USD | 61,957.10 |

| Additional Details: |
|---------------------|
| |

Wire/telegraphic transfers to the American Club should be made to its account at:
Deutsche Bank Trust Company Americas, New York, New York, U.S.A.
Depending upon the origin of funds, one of the following bank codes should be used:
Wire transfers made through a bank within the U.S.: ABA: 021-001-033
Wire transfers made through a bank outside the U.S.: SWIFT: BKTRUS33 or CHIPS: 0103
In both cases, funds should be indicated as being for the credit of:
Account Name: American Steamship Owners P&I Assn. Inc.
Account Number: 00-700-268

CLUB000435

# EXHIBIT 2

THACHER PROFFITT & WOOD LLP
Two World Financial Center
New York, New York 10281
(212) 912-7400
John M. Woods (JW/0697)
Alan F. Kaufman (AK/9114)
Neil T. Bloomfield (NB/0669)
*Attorneys for Plaintiff*



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RECEIVED
APR 2 4 2006
ECF CASE U.S.D.C. S.D. N.Y.
CASHIERS

AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY ASSOCIATION,
INC.,

                                    Plaintiff,

Case No.:

    - against -

LAFARGE NORTH AMERICA, INC.,

                                    Defendant.

**COMPLAINT**

Plaintiff, American Steamship Owners Mutual Protection and Indemnity Association,

Inc. (the "American Club" or the "Club"), by and through its attorneys, Thacher Proffitt & Wood

LLP, as and for its Complaint alleges as follows:

1.      The matter in controversy relates to the demand of one of the Club's members,

Lafarge North America, Inc. ("Lafarge"), for indemnification against potential liability and

defense costs in respect of claims arising from the breakaway of a barge that was at Lafarge's

New Orleans, Louisiana facility during Hurricane Katrina in August, 2005. In other lawsuits

pending against Lafarge, it is alleged that the barge, called the ING 4727, struck and caused or

contributed to the collapse of the 17th Street Industrial Canal floodwall causing massive flooding

in the City of New Orleans. By this action, the Club seeks a declaration that it is not obligated to

defend or provide cover to Lafarge because the Barge ING 4727 was never insured by the Club,

and because even if the barge had been insured pursuant to Lafarge's Certificate of Entry in the Club, coverage is excluded pursuant to the terms of the Club's rules.

## JURISDICTION

2.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332, 1333 because it is an admiralty or maritime dispute between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of fees and costs.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Club's principal place of business is within this district and a substantial part of the events giving rise to Lafarge's claim occurred in this judicial district.

## NATURE OF THE ACTION

4.      This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, and involves an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

5.      Plaintiff seeks a declaration of its rights and other legal relations pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, in order to resolve an actual controversy between the parties to this action as is more fully described below.

## THE PARTIES

6.      Plaintiff, the American Club, is a non-profit mutual insurance association, operated by its members for their exclusive benefit. The Club provides protection and indemnity insurance (commonly referred to as "P&I Insurance"), which provides cover to shipowners and charterers against third-party liabilities encountered in their commercial operations. Traditional P&I Insurance is based on the not-for-profit principle of mutuality where members of the Club essentially insure one-another and, therefore, are both the insurers and the assureds. The

2

American Club is incorporated in New York and has its principal place of business at 60 Broad Street, New York, New York.

7.    Upon information and belief, defendant Lafarge is a diversified construction materials company and supplier of cement, aggregates and concrete, and other materials in the United States and Canada.  Lafarge is incorporated in Maryland and has its principal place of business at 12950 Worldgate Drive, Suite 500, Herndon, Virginia.

8.    Lafarge is registered to do business in the State of New York and/or is otherwise doing business in the State of New York including, but not limited to, entering into contracts with the Club.

## FACTUAL BACKGROUND

### A.    Entry into the Club

9.    The rights and obligations of every member of the Club are governed by the American Club By-Laws and Rules (the "Club Rules").

10.    When an assured becomes a member of the Club, it receives a Certificate of Entry, which expressly makes applicable the Club Rules to the member's insurance, and which lists a Schedule of Vessels which are insured by the Club. The Certificate of Entry may include additional Member-Specific provisions, which are listed on a separate rider to the Certificate of Entry. (Lafarge's Certificate of Entry for the period February 20, 2005 to February 20, 2006, is attached as Exhibit A.)

11.    Traditional P&I insurance is written on a policy year basis, with an inception date of February 20th for each policy year.  For example, the Club's current policy year incepted on February 20, 2006 and runs for twelve months.

3

**B.**    **Lafarge's Entry into the Club**

12.    Lafarge first became a member of the Club on or about February 20, 1999.  It

renewed its coverage each year, up to and including the policy year commencing February 20,

2005.

13.    Lafarge's Certificate of Entry contains a Schedule of Vessels that Lafarge entered

with the Club.  The Barge ING 4727 was never listed on any Schedule of Vessels for Lafarge's

entry with the Club.

14.    Lafarge's Certificate of Entry contains a Member-Specific clause entitled

"Chartered Barges," which states:

> CHARTERED BARGES.
>
> If Lafarge Corporation et al <u>acquires an insurable interest in any</u>
> <u>vessel in addition to or in substitution for those set forth herein,</u>
> <u>through purchase, charter, lease or otherwise,</u> such insurance as is
> afforded hereunder to any similar vessel shall <u>automatically</u> cover
> such additional vessel effective from the date and time the Assured
> acquires an insurable interest in such additional vessel. With
> respect to a chartered, leased or similarly acquired vessel, the
> insurance hereunder automatically includes the owner as an
> additional Assured with waiver of subrogation against the owner, if
> required, effective from the date and time such vessel is insured
> hereunder.
>
> The above provision shall not apply to vessels which are chartered
> under a contract whereby the owner (or Demise Owner) and
> Charterer agree that the owner (or Demise Owner) shall procure
> Protection & Indemnity Insurance on the vessel and such insurance
> shall include the charterer as an Assured.
>
> <u>The Assured agrees to report the name and gross tonnage of any</u>
> <u>vessel in which they acquire an insurable interest at the expiration</u>
> <u>of this policy and pay any additional premium as may be required</u>
> <u>annually, at expiry at daily pro-rate the annual rates agreed.</u>
> (emphasis added).

15.    Accordingly, to obtain cover for a vessel under the Chartered Barges clause,

Lafarge must meet each of the following conditions:

> a.    first, Lafarge must acquire the requisite insurable interest in a vessel;

4

b.      second, the vessel must be acquired <u>in addition to or in substitution for</u> those vessels listed on the Schedule of Vessels;

c.      third, the interest in a vessel acquired by Lafarge must be akin to a purchase, charter or lease;

d.      fourth, the vessel(s) to be covered must be declared to the Club;

e.      fifth, Lafarge must pay premium to the Club for the vessel(s) to be covered.

## C.   The Transportation Agreement

16.     Upon information and belief, on or about December 14, 2004, Lafarge entered into a Transportation Agreement (the "Transportation Agreement") with Ingram Barge Company ("Ingram"), to be performed during the period from January 1, 2005 through December 31, 2005, and providing for the transportation by Ingram of approximately 160,000 net tons of cement in covered barges from Lafarge's Joppa, Illinois plant to its New Orleans, Louisiana facility on the Inner Harbor Navigation Canal. (The Transportation Agreement is attached as Exhibit B.)

17.     Clause 51 of the Transportation Agreement defines Lafarge as an "Independent Contractor" and explicitly states that "[n]othing in this Contract shall be construed as a contract by Shipper [Lafarge] for the chartering, hiring, or leasing of any barge . . . ."

18.     Upon information and belief, Ingram began transporting cargo for Lafarge under the Transportation Agreement beginning in January of 2005.

19.     Lafarge did not submit the Transportation Agreement to the Club for its review and approval.

20.     Upon information and belief, on or about May 1, 2005, Lafarge obtained a primary marine liability/wharfinger's policy with a limit of $5,000,000 from New York Marine & General Insurance Company (the "MMO Policy").

5

21.    The MMO Policy specifically includes coverage for Lafarge's "liability for damage caused directly or indirectly by the freeing or breaking away" of vessels at landing and/or mooring facilities that are owned operated, utilized, controlled or leased by Lafarge.

22.    Lafarge also obtained a policy providing excess coverage to the MMO Policy with a limit of $45,000,000 above the MMO Policy limit, for total wharfinger's liability coverage up to $50,000,000.

**D.    Lawsuits Against Lafarge Arising From Hurricane Katrina**

23.    Upon information and belief, prior to August 29, 2005, Ingram used its Barge ING 4727 to transport cement under the Transportation Agreement to Lafarge's New Orleans' facility.

24.    Upon information and belief, on or about August 29, 2005, Barge ING 4727 was moored at Lafarge's facility on the Inner Harbor Navigation Canal.

25.    On or about August 29, 2005, Hurricane Katrina made landfall along the Louisiana and Mississippi Gulf Coast.

26.    Upon information and belief, on or about August 29, 2005, Barge ING 4727 tore free of her moorings and drifted through a breach in the Industrial Canal floodwall or was carried over the floodwall by the rising water.

27.    Barge ING 4727 is not listed on any Lafarge Schedule of Vessels entered with the Club, nor were any Ingram vessels.

**E.    Lafarge's Claim for Defense and Cover from the Club**

28.    At least four lawsuits arising out of Hurricane Katrina are pending against Lafarge.

6

29.    Upon information and belief, on or about September 9, 2005, Lafarge placed their

terminal operators and wharfinger's liability underwriters on notice of claims that may be

covered by the MMO Policy.

30.    On or about March 3, 2006, Lafarge submitted a claim to the Club seeking

"indemnification for all potential liability and/or reasonable settlements and litigation costs . . ."

in connection with certain claims for property damage and/or personal injury relating to the

breakaway of Barge ING 4727 and arising from the Hurricane Katrina disaster in New Orleans.

31.    On or about April 21, 2006, the Club sent a letter to Lafarge declining coverage to

Lafarge because Barge ING 4727 had not been entered with the Club at the time of the casualty,

or at any other time, and even if it had been entered, coverage for claims against the vessel would

have been excluded.

32.    Upon information and belief, Lafarge intends to pursue its claim for cover and

defense costs relating to claims arising from the breakaway of the ING 4727 from the Club.

33.    The Club maintains that it does not cover any of Lafarge's liabilities or defense

costs arising from the breakaway of Barge ING 4727.

34.    An actual and justiciable controversy within the jurisdiction of this Court

therefore exists between the parties to this action regarding the rights and liabilities of the parties,

which controversy may be determined by a judgment of this Court.

### AS AND FOR A FIRST CAUSE OF ACTION

35.    Plaintiff repeats and realleges each and every allegation contained in the

foregoing paragraphs 1 through 34 as though fully set forth herein.

36.    Barge ING 4727 is not listed on the Schedule of Vessels in Lafarge's 2004 – 2005

Certificate of Entry issued by the Club.

7

37.     Lafarge did not acquire the Barge ING 4727 in addition to or in substitution for the vessels set forth in the Schedule of Vessels.

·38.     Lafarge did not acquire an insurable interest in Barge ING 4727 as required by Lafarge's Certificate of Entry.

39.     Any interest that Lafarge acquired in Barge ING 4727 was not akin to a purchase, charter or lease.

40.     Lafarge cannot obtain cover from the Club for Barge ING 4727 pursuant to the Chartered Barges clause of Lafarge's Certificate of Entry.

41.     Nonetheless, Lafarge contends that the Club is required to defend and provide cover to Lafarge for the claims asserted against Lafarge in connection with the breakaway of Barge ING 4727.

42.     An actual and justiciable controversy has thus arisen between the Club and Lafarge concerning the coverage of Barge ING 4727.

## AS AND FOR A SECOND CAUSE OF ACTION

43.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

44.     Even if Barge ING 4727 could be insured with the Club under the Chartered Barges clause, coverage is excluded.

45.     The Club Rules exclude liability "for any loss, damage or expense against which, but for the insurance herein provided, the Member, Co-assured or Affiliate would have been insured under any other existing insurance . . . ."

46.     The Club Rules also exclude "[l]iabilities, costs and expenses which would not have arisen but for the terms of a contract or indemnity entered into by a Member, unless those terms have been expressly approved in writing by the Managers."

8

47.    Cover by the Club for Barge ING 4727 is excluded because Lafarge's liability for the breakaway of Barge ING 4727 is covered by the MMO Policy.

48.    Cover by the Club for Barge ING 4727 is also excluded because Lafarge did not provide for review or obtain the Club's approval of the Transportation Agreement.

49.    Nonetheless, Lafarge contends that the Club is required to defend and provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727.

50.    The Club maintains that coverage is excluded.

51.    An actual and justiciable controversy has thus arisen between the Club and Lafarge concerning the coverage of Barge ING 4727.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

1.    that this Court declare the rights and liabilities of the parties with respect the American Club's obligations, if any, to defend and/or provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727;

2.    that this Court find and declare that Barge ING 4727 was not entered with or insured by the American Club, and as a result, the Club has no obligation to defend and/or provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727;

3.    that this Court find and declare that, because Lafarge maintained other insurance coverage, the American Club has no obligation to defend and/or provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727;

4.    that this Court find and declare that, because Lafarge failed to submit the Transportation Agreement to and obtain the approval of the American Club, the Club has no

9

obligation to defend and/or provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727;

5.      that this Court award the American Club its costs and disbursements for this action, including attorneys fees; and

6.      that this Court grant the Club such other and further relief as is just and proper.

Dated:      New York, New York
            April 21, 2006

                                THACHER PROFFITT & WOOD LLP


                                By: _John M Woods_____
                                    John M. Woods (JW/0697)
                                    jwoods@tpw.com
                                    Alan F. Kaufman (AK/9114)
                                    akaufman@tpw.com
                                    Neil T. Bloomfield (NB/0669)
                                    nbloomfield@tpw.com

                                Two World Financial Center
                                New York, New York 10281
                                (212) 912-7400

                                *Attorneys for Plaintiff*

# EXHIBIT 3

*Rev. 7/13/04*

## TRANSPORTATION AGREEMENT

**INGRAM**

| **Carrier: INGRAM BARGE COMPANY** | **Shipper: LAFARGE NORTH AMERICA** | |
|---|---|---|
| 13 Executive Drive, Suite 8 | *Contact Address:* | *Billing Address (if different):* |
| Fairview Heights, IL 62208-1342 | 600 SW Jefferson Street, Suite 302 | 2500 Portland Road |
| | Lee's Summit, MO 64063 | Grand Chain, IL 62941 |
| Attn:   J. E. (Gene) Shiver | Attn:  Mr. Jay Darlington | Attn:   Rachael Burnett |
| Sales Manager | Traffic Coordinator Barge | Barge Scheduler |
| Telephone:      618-628-3099 | Telephone:      816-251-2115 | Telephone:      618-543-3902 |
| E-Mail: shiverg@ingrambarge.com | E-Mail: jay.darlington@lafarge-na.com | E-Mail: rachael.burnett@lafarge-na.com |
| Facsimile:      618-628-3494 | Facsimile:      816-347-1884 | Facsimile:      618-543-3959 |
| Carrier's Contract No:      35443 | Shipper's Contract No: | Shipper's Contract No: |
| Carrier's Job No:      15070574 | Shipper's Customer No: | Shipper's Customer No: 10661 |

This Agreement is made as of **December 14, 2004** by and between Carrier and Shipper (each as identified above) and is for the transportation of dry cargo by barge under the terms and conditions of Parts I and II as contained in this Agreement. In the event of a conflict, the provisions of Part I shall prevail over those contained in Part II to the extent of such conflict.

### PART I

| | | |
|---|---|---|
| 1. | Loading Date(s): | January 1, 2005 through December 31, 2005 |
| 2. | Equipment: | Fiber-Lift Covered Barges <u>ONLY</u>. All cover handling expense for the account of Shipper. |
| 3. | Cargo: | Cement |
| 4. | Cargo Value: | $300.00 per net ton or actual invoice value, whichever is less |
| 5. | Number of Net Tons: | Approximately 160,000 net tons. Refer to Appendix I for projected monthly shipping schedule. |
| 6. | Origin(s): | Joppa, IL (Lafarge)          OH 953.2 T |
| 7. | Destination(s): | New Orleans, LA (Lafarge-France Road Wharf)          GIWE 8.0 T3 |
| 8. | Base Freight Rate(s): | $12,700 Flat Rate Per Barge |
| 9. | Free Time: | Six days all-purpose to load and unload each barge, including Sundays and holidays that occur within the freetime period.  (Refer to Part II, Section 28) |
| 10. | Demurrage Rate: | $185.00 per barge per day |
| 11. | Minimums: | Not applicable, due to flat rates per barge. |
| 12. | Fuel Protection: | Beginning January 1, 2005, the base freight rate(s) listed herein shall be subject to escalation during the term of this Agreement in the event of an increase in the cost of fuel above $.90 per gallon.  If the actual average cost of fuel to Carrier for the second month immediately preceding the month of shipment rises above the specified cost per gallon, Carrier shall have the right to escalate the freight rate(s) on the first of every month during the term of this Agreement in accordance with the following formula: |

$$[\text{Base Freight Rate} \times 30\% \times \frac{\text{Actual Fuel Cost} - \text{Fuel Protection Cost}}{\text{Fuel Protection Cost}}] + \text{Base Freight Rate} = \text{Adjusted Freight Rate}$$

| | | |
|---|---|---|
| | | As an example, Carrier's actual fuel cost for the month of November 2004 would determine the January 2005 rate(s). In no event will the adjusted freight rate(s) ever be lower than the base freight rate(s). |
| 13. | Cleaning Allowance: | $800.00 maximum per barge account Carrier (refer to Part II, Section 31) |
| 14. | Special Provisions: | Refer to Part II |

In witness whereof, the parties have executed this Agreement as of the date first written above.

Accepted:

Carrier:  **INGRAM BARGE COMPANY**                    Shipper:  **LAFARGE NORTH AMERICA**

Signature: *X J*                    Signature: *Frank Lazarowicz*    (JI)

By:      J. E. (Gene) Shiver – Sales Manager          By:      Frank Lazarowicz – Transportation Manager River Region

 Carrier's Contract No. 35443                APPENDIX I                Carrier's Job No. 15070574

| Projected Monthly Shipping Schedule: | Monthly Breakdown of Projected Volume | | | |
|---|---|---|---|---|
| | January | 19,500 | July | 10,500 |
| | February | 18,000 | August | 9,000 |
| | March | 17,500 | September | 10,500 |
| | April | 9,000 | October | 15,500 |
| | May | 12,000 | November | 19,500 |
| | June | 10,500 | December | 7,500 |

Carrier Representative's Initials:                    Shipper Representative's Initials:

Rev. 7/13/04

**INGRAM**    Carrier's Contract No. 35443    PART II    Carrier's Job No. 15070574

15. Cargo Description: Prior to loading, Shipper will notify Carrier of the generic name of the cargo to be transported pursuant to this Agreement. In addition, Shipper will, if requested by the Carrier, provide Material Safety Data Sheets (MSDS). Further, the Shipper shall notify the Carrier of the cargo classification under U. S. Coast Guard regulations and any other applicable regulations. In the event of Shipper's improper or incomplete description of the cargo or failure to disclose all necessary information about the cargo which results in any expense, loss, damage, and/or penalty to the Carrier, Shipper agrees to reimburse Carrier for such expense, loss, damage, and/or penalty.

16. Tonnage: Wherever used in this Agreement, the term "ton" shall mean a net ton of 2,000 pounds avoirdupois.

17. Cargo Insurance: Carrier will, at its own expense, obtain and keep in full force and effect during the term of this Agreement, or any extension thereof, Cargo Insurance on the full value of all cargo transported under this Agreement. Carrier may, at its own risk, elect to self-insure the cargo. Cargo is insured up to the value stated in Part I, or the actual value of the cargo, whichever is less. In no case will the Carrier be responsible for any amount exceeding $700 per net ton.

18. Weights: Freight charges shall be calculated on the basis of loaded weights at origin. Carrier shall not assume any responsibility to weigh the cargo at origin or destination.

Within 72 hours after completion of loading, Shipper shall submit to Carrier a written report descriptive of the cargo and the weight thereof per barge.

If the actual weight of cargo cannot be ascertained upon completion of loading, estimated weights may be used for billing which shall be adjusted to out-turn weights at destination, if available, and applicable charges determined accordingly. If facilities for determining weight at destination are not available, the barge will be gauged before unloading, at Shipper's expense, and the weight thus ascertained will be used in determining the applicable charges.

Carrier may require proof of scale or gauged weights.

19. Minimum Weights: The freight due from Shipper will be based on the actual tons loaded subject to the minimum weights specified in Part I.

However, if the capacity of the barge (or draft if so specified by the Carrier) will not allow the Shipper to load to the minimum level specified, then the charges will be based on the actual tons loaded or the tons that could have been loaded at the specified draft according to Carrier's draft tables, whichever is greater.

20. Loading Requirements: Shipper shall load a barge to the draft specified by Carrier. Shipper shall be governed by Carrier's instructions regarding the height of load, the tonnage of the cargo, the draft of the barge, and such other instructions as Carrier may deem necessary for safe transportation where variable waterway conditions and anticipated weather conditions make such precautions desirable. Shipper shall be subject to any demurrage charges that may accrue due to the detention of any barge occasioned by non-compliance with Carrier's loading requirements specified herein. The Shipper shall load the barge so that the cargo is evenly distributed throughout the hopper hold; the Shipper shall not "center load" or "end load" a barge.

21. Transport of Barges: A barge loaded with Shipper's cargo will move only at the convenience of the Carrier, and either singly or with one or more other craft. Carrier will have the right to shift or interchange the tow from one to another towing vessel as frequently as it may find it convenient to do so, to procure towage from any other vessel not owned or operated by the Carrier; to tie off the tow at any point and for any purpose; and to deviate from its route, and visit any port whether or not on said route, and in any order. Carrier is not bound to transport any barges containing Shipper's cargo in time for any particular market.

If, due to operating conditions, it is necessary in the judgment of the Carrier to delay the movement of barges while in transit, Carrier reserves the right to do so. Carrier makes no representation as to the time which will elapse between the acceptance of this Agreement until placement at origin, nor between departure of the barge from origin and arrival of the barge at destination; and under no circumstances shall Carrier be liable for any loss, damage, or expense incurred by Shipper or others by reason of delay.

22. Inaccessible Points: Carrier will not place barges for loading, nor pick up loaded barges, when the shipments are destined to points or points which are inaccessible because of an actual or anticipated, temporary or permanent condition that adversely affects the navigability of a waterway to be traversed by barge between origin and destination. If shipment has been accepted or is re-consigned for transportation to a port or point which subsequently becomes inaccessible because of a condition that adversely affects the navigability of a waterway to be traversed between origin and destination, the Carrier shall be privileged to tender delivery of such shipment at an accessible intermediate point nearest to consigned destination, in which event freight charges shall be adjusted in accordance with the transportation service actually rendered on the basis of the rate applicable for the movement to the original destination. In the determination of the inaccessibility of a destination point, the type and draft of propelling vessel, the type of barge, the loaded draft of barge, and necessity of returning empty barge, among other considerations, shall govern. Carrier's determination in this regard shall be final. In the event that operating conditions, including ice, prevents or delays the delivery of a barge, the Carrier will place the barge at a point short of the point of interruption and the barge will be subject to demurrage.

23. Accessorial Charges: Except as otherwise provided, the Carrier will not be liable for the following accessorial charges: ballasting, cleaning, demurrage, dockage, drayage, elevation, loading or unloading of cargo, opening or closing of barge hatch covers, removal or replacement of barge covers, sheddage, stacking or restacking of barge covers, switching tollage, wharfage, or any other terminal expense at either origin or destination.

24. Shifting: Rates stated herein will include only one shift of barges into and one shift of loading and unloading facilities by Carrier at origin and/or destination. Any additional shifting of barges to accommodate loading or unloading will be for Shipper's account.

When Shipper arranges for shifts to be made without expense to Carrier, Shipper shall assume full responsibility for safety of barge and cargo thereof during such shifts, and further, Shipper shall reimburse Carrier in full for any damage or loss which may occur during such movements.

25. Diversions, Re-Consignments, Holding in Transit, Stop-Offs for Partial Unloads

A barge may be diverted, re-consigned, held in transit to await orders, or stopped-off for partial unloads only with the consent of Carrier, which may be withheld for any reason. The cost, terms, and conditions of any agreement for re-consignment, diversion, holding in transit for orders, or partial stop-offs, must be confirmed in writing by all parties prior to Carrier's taking the requested action.

Any barge that is stopped to permit a partial discharge will not be allowed any additional free time. All time incurred during a partial stop will be charged at the demurrage rate.

26. Payment of Freight: Upon loading, the entire amount of the freight charge will become earned and due and payable to Carrier in cash and without discount, even though the barge or cargo is lost or not lost, damaged or not damaged, in whole or in part, at any stage of the voyage. The Carrier does not have to deliver the Cargo until all freight and demurrage due hereunder have been paid by Shipper. The actual date of loading, not placement date nor requested date, shall govern as to what freight rate shall be invoiced.

Interest at a rate of two percent (2%) per month (or any fraction thereof) or the maximum interest rate allowed by law, shall accrue on any payment obligations hereunder that are past due until such payment obligations are satisfied in full together with said interest. If any agency or attorney is employed to assist in the collection of such payment obligation, then the delinquent party also shall be required to pay such agency/attorney's reasonable fees relating to such collection. Carrier has the right to defer placement of any barge and/or delivery of the cargo if Shipper's payment obligations are past due until such time as all amounts due Carrier are paid in full.

Unless specified elsewhere, and notwithstanding the above, Shipper may be granted credit by Carrier's Credit Manager, in which case the monies owed must be paid by the Shipper within 30 days from the date of the invoice or within the number of days specified by Carrier's Credit Manager. The Carrier's Credit Manager has complete discretion as to whether or not credit is to be extended to Shipper, the amount of credit to be granted to Shipper, and the payment due date from the Shipper, and the form of payment. Shipper is to comply with all reasonable requests for financial information by Carrier's Credit Manager in order to establish Shipper's credit. The Carrier's Credit Manager may change or cancel the extension and amount of credit and the payment due date or the form of the payment at the Credit Manager's sole discretion and at any time.

27. Lien: Carrier will have a lien upon all cargo for any freight or demurrage due hereunder, which lien will survive the delivery of such cargo.

28. Demurrage and Free Time: The free time to be allowed is to be that which is specified in Part I. No free time will be allowed on empty barges placed upon Shipper's request for placement if, subsequent to placement, such order is cancelled.

After the period of free time has expired, the demurrage charges specified under this agreement will be made for each day, including Saturdays, Sundays, and National Holidays, until the barge is released to the Carrier.

Except as otherwise provided, time will be computed for the total period barge is in Shipper's possession for loading or for unloading and will begin as of the first 7:00 a.m. after barge is actually or constructively placed for loading or for unloading and will run until Carrier has been notified in writing that barge has completed loading or unloading and is available for pick up. The written release must be received by Carrier by 11:00 a.m. CST (Nashville time) or the barge will not be considered as having been released by 7:00 a.m. In computing time, days will consist of 24 hours running from 7:00 a.m. until the next 7:00 a.m. A fraction of a day will be considered as one day.

**Carrier Representative's Initials:** _____    **Shipper Representative's Initials:** _____

Rev. 7/13/04

 **Carrier's Contract No. 35443**        **PART II**        Carrier's Job No. 15070574

When Carrier, for its convenience, places a barge for loading prior to date specified by Shipper, time will run from the first 7:00 a.m. of the date specified by Shipper or from 7:00 a.m. of the date when actual loading began, whichever occurs sooner.

Actual placement is made by Carrier when barge is placed for loading or unloading at docks or wharves specified by Shipper or at a nearby fleet selected by Carrier, whichever occurs first.

Except as otherwise provided for herein, if Carrier is prevented from making actual placement by any cause over which it has no control, such barge is subject to constructive placement. Constructive placement will be made by Carrier when actual placement is not possible.

Constructive placement consists of placing or holding a barge at a point of Carrier's or Shipper's choice near the specified actual delivery point. Notice of such placement will be given to Shipper. In making any subsequent placement, no free time in addition to that provided will be allowed by Carrier.

If holidays are excluded from Free Time, the following are the holidays to be recognized:

| | | | |
|---|---|---|---|
| New Year's Day | Memorial Day | Independence Day | Labor Day |
| Easter Sunday | Thanksgiving Day | Christmas Day | |

If the holiday (except for Easter) falls on a Sunday, the following Monday shall be considered as the holiday.

If a barge is on demurrage and the shipper requests a replacement, the barge will remain on demurrage, even during transit, until the barge is released back to the Carrier.

In the event that delivery of a barge involves a destination beyond the lake front entrance to Lake Michigan, the barge will be placed in a fleet of Carrier's choosing on the Illinois River Waterway and free time and demurrage shall commence upon placement in the fleet. Adverse weather conditions which delay transit and barge delivery to destinations on Lake Michigan will not be considered Force Majeure events. It is the Shipper's responsibility to notify the loading/unloading terminal of the barge placement in the Illinois River Waterway fleet.

29. **Fuel Protection:** Unless otherwise addressed in this Agreement, the freight rate shall not be subject to escalation during the term of this Agreement except in the event of an increase in the cost of fuel above the cost per gallon specified in Part I. If the actual average cost of fuel to Carrier for the second month immediately preceding the month of shipment rises above the specified cost per gallon, Carrier shall have the right to escalate the freight rate on the first of every month during the term of this Agreement in accordance with the following formula:

[Base Rate x 30% x  Actual Fuel Cost − Fuel Protection Cost ] + Base Freight Rate = Adjusted Freight Rate

Fuel Protection Cost

As an example, the actual fuel cost for the month of October would determine the December rates. In no event will the adjusted freight rate ever be lower than the base freight rate.

30. **Ratability:** Unless modified in Part I, Shipper shall ship in approximately equal monthly increments and approximately equal weekly increments within each month. Should the Shipper fail to ship ratably as described above, Carrier has the right to adjust its obligation to provide barges for the remainder of this Agreement. Barges not loaded ratably within a week or within a month cannot be carried forward to the following week or month, unless Carrier agrees to do so. Further, Carrier will not be obligated to supply a number of barges in any one month that is greater than the actual number of barges shipped in the prior months under this Agreement.

31. **Cleaning:** Carrier shall absorb cleaning costs up to amount specified in Part I to remove cargo left in the hopper by shipper. All cleaning costs above the stipulated allowance are for the account of the Shipper. Shipper shall remove all dunnage, if any, at its sole expense.

If any cargo or debris is spilled or deposited on the exterior of the barge (including working surfaces, such as gunnels, covers, or decks) at either loading and unloading points, Shipper is responsible for all costs associated with cleaning the exterior of the barge.

Carrier may refuse to pick up or move a barge if an abnormal amount of cargo is left in the hopper or if cargo or debris is left or spilled on the barge if, in the Carrier's sole judgment, the cargo or debris left aboard represents a safety hazard to its crew or to other persons who may come in contact with the barge. The Carrier will require the Shipper to clean or remove all abnormal amounts of cargo left on board or to remove the cargo or debris that represents a safety hazard prior to movement. In such case, if the movement of a barge is delayed while the barge is being cleaned by the Shipper, then the Shipper shall be liable to the Carrier for the days consumed at the then applicable demurrage rate. Further, if the Carrier arranges to have a barge cleaned due to abnormal amounts of cargo left in the hopper or if cargo or debris is left or spilled on the barge, the Shipper shall be liable to the Carrier for the days consumed at the then applicable demurrage rate.

32. **Unloading:** It shall be the obligation of Shipper, or its consignee, to unload and remove the cargo from the barge, including any cargo or debris spilled on the working surfaces, promptly upon arrival of the barge at its destination. If the cargo is not so unloaded and removed, then the Carrier, at its option, shall be entitled to remove, sell or otherwise dispose of the cargo.

33. **Distribution of Cargo:** Shipper shall be required to distribute cargo in each barge so as to ensure an even draft. If a barge is not loaded to ensure an even draft, Carrier reserves the right to refuse to accept the barge for transport. If Carrier refuses to accept any barge, Shipper must, at its expense, have the cargo redistributed to meet Carrier's requirements. In addition, the barge will be subject to demurrage charges, from the time and date of placement until the barge is accepted for transportation by Carrier.

34. **Possession of the Barge during Loading/Unloading:** Carrier shall deliver an empty or loaded barge to a loading or unloading facility designated by Shipper for loading or unloading. Shipper shall assume the duty and responsibility for the safety of each barge in its possession. For the purposes of this Agreement, "possession" shall begin when Carrier delivers an empty or loaded barge for loading or unloading to the landing designated by Shipper and shall end when the barge is removed by Carrier or its agent(s). Shipper shall be responsible for the safekeeping of Carrier's barge delivered to a landing regardless of whether Shipper owns or operates the landing. During possession, any barge delivered to a landing designated by Shipper shall be held without charge to Carrier.

35. **Safe Berth:** Shipper warrants the barge shall have a safe berth of not less than nine (9) feet of draft. The barge shall not be permitted, at any time, to touch bottom while in the Shipper's control.

36. **Mooring:** Shipper warrants that barges will be safely and adequately moored free of wharfage, dockage, port and harbor charges at the loading and unloading points and that barges will have warning lights properly displayed as required by applicable U.S. Coast Guard and U.S. Army Corps of Engineers regulations and permits. While barges are in the care and custody of Shipper, or its agents, all U.S. Coast Guard and U.S. Army Corps of Engineers regulations will be complied with, and in the event that Carrier should in any manner be held responsible for Shipper's, or its agents acts or omissions in compliance with the mooring requirements herein provided, then Shipper agrees to indemnify and save harmless Carrier from all such responsibility and liability.

37. **Request for Placement:** Shipper must send Carrier a written request for placement with a specific date for loading and the designated origin for loading. Carrier requires a minimum of 14 days notice for any loading; should Shipper fail to supply 14 days advance notice of a loading, Carrier has the right to adjust its obligation to provide barges for loading.

38. **Change in Loading Date or Origin:** Any change by the Shipper in the requested loading date or designated origin given to the Carrier which is in excess of five (5) working days prior to the previously requested loading date will be accepted by Carrier without charge. Any change by the Shipper in the requested loading date or origin given to the Carrier on less than five (5) working days notice may subject the Shipper to charges (including but not limited to free days may be assessed, additional shifting or fleeting charges may be billed, barge cleaning, or cover handling).

39. **Acceptance:** Carrier will tender barges which are in a condition suitable for the cargo to be carried. Loading of the barges will constitute Shipper's acceptance of the condition and suitability of the barges for the intended cargo.

40. **Release:** Carrier shall not be liable for lost profits or other incidental or consequential damages under any circumstances. Nothing contained herein shall render Carrier responsible for the differences in the inturn weight and the outturn weight of cargo from barges safely delivered and unloaded.

41. **Failure to Accept / Failure to Place:** If either Shipper or Carrier, for reasons other than Force Majeure, determines that it will be unable to accept or place barges on the requested Load Date or within the term of this Agreement, it shall be their duty to advise the other party at once; whereupon it shall be the other party's duty at once to elect to cancel the unplaced barge or to extend the placement time. In the case of cancellation, the other party shall have the right to buy or sell, as the case may be, the respective freight and the party unable to accept or place shall reimburse the other party for any loss sustained in such purchase or sale provided same is made at the prevailing market price.

42. **Choice of Law:** This Agreement shall be governed by the laws of the State of Tennessee, both as to interpretation and performance, and all disputes that arise under this Agreement shall be resolved in accordance with Tennessee law.

43. **General Average:** In the event of accident, danger, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, Carrier is not responsible, by statute, contract, or otherwise, the cargo, Shipper, and the consignee, and other parties having an interest in the cargo, jointly and severally, will contribute in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred in respect of the cargo. General average, if any, will be adjusted, stated, and settled at such port or place in the United States as may be selected by Carrier, and will be settled in accordance with the York/Antwerp Rules of 1974.

Carrier Representative's Initials:        Shipper Representative's Initials:

Rev. 7/13/04

Carrier's Contract No. 35443          PART II          Carrier's Job No. 15070574

44. **Force Majeure:** Performance under this Contract by Shipper and Carrier shall be excused to the extent such performance is prevented by Force Majeure, provided the party declaring Force Majeure gives written notice of such condition to the other party within seventy-two (72) hours after commencement of the Force Majeure condition. The term "Force Majeure" shall include acts of God or the elements, acts of a public enemy, insurrections, riots, strikes, labor disputes, fires, explosions, floods, accidents of navigation, ice, high or low water, embargoes, acts or orders of civil or military authorities, lock delays or closings, fuel shortages, or other causes beyond the reasonable control of the party declaring Force Majeure. Such excuse from performance shall continue until the Force Majeure ceases to exist. A party declaring Force Majeure shall make reasonable efforts to eliminate or resolve the condition, recognizing, however, that the settlement of any strike or other labor dispute shall be solely within the discretion of that party. A declaration of Force Majeure by Shipper does not excuse payment of demurrage for a barge on demurrage status. When a Force Majeure is declared on a barge with remaining free time, free time shall continue to run; upon expiration of free time the barge will be placed in a demurrage status even if the Force Majeure event continues to exist. Any shortfall in cargo deliveries resulting from force majeure shall not be made up except by mutual consent of the Shipper and the Carrier.

45. **New Taxes:** There will be added to the freight rate the amount of any new or increased Federal, State, or local taxes (except net income taxes) that may hereafter be charged to and paid by Carrier on account of the transportation services rendered hereunder, including the amount of any user charge, tax, or wharfage, port, harbor, or dockage fee imposed, levied, or collected for the use of the inland waterway system or of the locks and dams in said waterway system, wharfs, ports, or the use of the harbors and docks by Carrier while engaged in the transportation services rendered hereunder, or upon fuel used in performing such services.

46. **Subcontracts:** Nothing herein shall prevent Carrier from subcontracting for any of the services provided by Carrier hereunder but Carrier will remain liable to Shipper for the proper performance of all of Carrier's obligations hereunder.

47. **Mitigation:** If all or any part of the cargo is discovered to be damaged while subject to this Agreement, Carrier, in its sole discretion, in order to minimize the damage, may sell the Cargo at public or private sale to the best advantage. In such event, Carrier shall, where practicable, provide Shipper and any known consignee with notice of the proposed sale. The proceeds of any sale made under this section shall be applied by Carrier to the payment of freight, demurrage, storage, and any other charges and the expense of notice, advertisement, sale and other necessary expense of caring for and maintaining the Cargo, and the balance, if any, shall be paid to Shipper or consignee.

48. **Claims:** As condition precedent to recovery, claims must be filed in writing with Carrier within nine (9) months of delivery of the Cargo, or, in case of failure to make delivery, then within nine (9) months after a reasonable time for delivery has elapsed. Suits shall be instituted against Carrier only within two (2) years and one (1) day from the day when notice in writing is given by the Carrier to the claimant that the Carrier has disallowed the claim or any part or parts thereof specified in the notice.

49. **Default:** No default of either party in the performance of any of its covenants or obligations hereunder, which, except for this provision, would be the legal basis for rescission or termination of this Contract by the other party hereto, shall give or result in such a right unless and until the party committing such default shall fail to correct the default within thirty (30) days after written notice of such default is given to such defaulting party by the non-defaulting party. Notwithstanding anything in this Contract to the contrary, there shall be no cure period for any payment default and each party shall have each and every other right afforded it under law against the defaulting party.

50. **Notices:** All notices, consents, determinations, instructions and communications provided for herein shall be validly given, made or served, if in writing and delivered personally, or by telegram, facsimile, electronic mail, overnight delivery or recognized courier service or sent by registered or certified mail, postage prepaid, to Shipper and Carrier at their respective addresses listed at the beginning of this Contract, or as the parties may otherwise direct in writing. Any notice, consent, determination, instruction, approval, or other communication hereunder shall be deemed given and effective as of the date of delivery in person or by courier, or as set forth on the return receipt or facsimile confirmation.

51. **Independent Contractor:** Nothing contained in this Contract shall be construed as a contract by Shipper for the chartering, hiring or leasing of any barge, towboat or other equipment of Carrier to be provided hereunder; nor shall any of the agents, servants, subcontractors or employees of Carrier be regarded as employees of Shipper, it being understood that Carrier is in all respects an independent contractor and that Shipper shall exercise no control over the operation of any barge, towboat or other equipment of Carrier or over Carrier's agent, servants, subcontractors or employees.

52. **Changes in Operation:** In the event Carrier's operating costs specifically related to the equipment, facilities, supplies, or services to be used or provided by Carrier under this Agreement are increased due to any law, rule, ordinance, regulation, restriction, directive, order, notice, advisory or interpretation, hereafter promulgated by any federal, state, or local authority, or any agency or division thereof, or any industry group advisory thereto, or any court, which is generally applicable to all barge carriers similarly situated, and such increased costs are not reimbursed to Carrier under any other provision of this Agreement, then Shipper shall reimburse Carrier monthly, following receipt of billing for the entire amount of such increase in operating costs that is fairly attributable to the services performed for Shipper under this Agreement.

53. **Miscellaneous:**

A. **Conflict:** In the event any of the terms of the Shipper's confirmation differ or conflict with any provision of this Agreement, then the terms set forth in this Agreement shall prevail.
B. **Assignment:** Shipper shall not be permitted to assign or otherwise dispose of all or any part of its rights or obligations hereunder without first obtaining the written consent of Carrier. Such consent shall not unreasonably be withheld, provided that any such permitted assignment or other disposition shall not relieve Shipper of its obligation under this Agreement.
C. **No Waiver:** The failure of Shipper or Carrier to insist upon strict performance of any of the provisions of this Agreement in one or more instances or the failure of Shipper or Carrier to exercise any of its rights hereunder in one or more instances shall not be construed as a waiver of any such provisions or the relinquishment of any such rights, but the same shall continue and remain in full force and effect.
D. **Binding Effect:** This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee and shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns, subject to the restrictions or assignability herein contained.
E. **Headings; Terms:** Section headings in the Agreement are included merely for the convenience of reference and shall not be construed as part of the governing terms of this Agreement. The term "barge" herein shall mean both the singular and the plural as intended by the parties depending on the number of barges subject to this Agreement.
F. **Integration; Execution:** This Agreement sets forth the entire understanding between the parties hereto as to the subject matter and no amendment hereto shall be valid unless made in writing and duly signed by the parties hereto. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original hereof, and all counterparts collectively are to be deemed but one instrument. Whether or not Shipper executes this agreement in the acceptance space provided hereon, loading of a barge shall constitute an acceptance of all the terms and conditions of the Agreement.

Carrier Representative's Initials:           Shipper Representative's Initials: _____