HILL RIVKINS & HAYDEN LLP
Attorneys for Defendant
Lafarge North America, Inc.
45 Broadway – Suite 1500
New York, New York 10006
(212) 669-0600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
THE NORTHERN ASSURANCE COMPANY
OF AMERICA and AMERICAN HOME
ASSURANCE COMPANY,

                                         Index No.:
                                         08 CV 03289 (CSH)

                       Plaintiffs,

      - against -

LAFARGE NORTH AMERICA, INC. and
AMERICAN STEAMSHIP OWNERS
MUTUAL PROTECTION AND
INDEMNITY ASSOCIATION, INC.,

                     Defendants.
----------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF THE
CROSS-MOTION OF DEFENDANT, LAFARGE
NORTH AMERICA INC., TO DISMISS THE
COMPLAINT AND IN OPPOSITION TO
PLAINTIFFS' MOTION TO CONSOLIDATE**

                                HILL RIVKINS & HAYDEN LLP
                                Attorneys for Defendant,
                                Lafarge North America Inc.
                                45 Broadway, Suite 1500
                                New York, New York 10006
                                (212) 669-0600

OF COUNSEL:

ROBERT G. CLYNE
JOHN J. SULLIVAN
MICHAEL D. WILSON

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................. iii

PRELIMINARY STATEMENT................................................................ 1

FACTS...................................................................................... 2

ARGUMENT................................................................................... 9

POINT I     THE COMPLAINT OF NACA AND AHAC MUST BE
            DISMISSED BECAUSE THEIR STATUS AS MERE
            FOLLOWING EXCESS INSURERS UNDER THE TERMS
            OF THE EXCESS POLICY PRECLUDES THEIR
            DECLARATORY JUDGMENT ACTION................................. 9

POINT II    THE SOUND EXERCISE OF THIS COURT'S
            DISCRETION COMPELS DISMISSAL OF THE COMPLAINT
            WHERE NACA AND AHAC ARE PROCEEDING WITHOUT
            NYMAGIC, WHO HAS ALREADY COMMUNICATED
            ITS COVERAGE POSITION TO LNA.................................... 13

            A. The action Should Not Proceed Where
               NYMAGIC Has Elected Not to Join
               The Action......................................................... 14

            B. Dismissal of the Declaratory Judgment
               Complaint Is Proper Where It Purports
               To Assert Policy Defenses that NYMAGIC
               Has Not Preserved................................................ 17

            C. The Second Cause of Action in the
               Declaratory Judgment Complaint
               Should Be Dismissed Because There
               Is No Dispute That LNA Maintained
               Its Underlying P&I Coverage with the
               American Club..................................................... 19

            D. The Third Cause of Action Should be
               Dismissed Because It Duplicates the
               Issues of the Action Brought Under the
               Primary NYMAGIC Policy Without the
               Benefit of the Primary Policy's Language........................ 22

    E.  The Fourth Cause of Action Must Be
        Dismissed Because the Excess Policy Must
        Pick up LNA's Wharfinger's Liability as
        Soon as LNA's Loss Exceeds the Primary
        NYMAGIC Policy Limit……………………………………… 24

POINT III    THE COURT SHOULD PROPERLY EXERCISE ITS
             DISCRETION AND DECLINE TO CONSOLIDATE
             THE CASES…………………………………………………… 25

POINT IV    NACA AND AHAC'S ATTEMPT TO CONSOLIDATE
             THEIR FIRST CAUSE OF ACTION WITH THE
             AMERICAN CLUB ACTION IS AN IMPERMISSIBLE
             ATTEMPT TO INTERVENE……………………………………… 28

    A.      Intervention As Of Right……………………………….. 28

    B.      Permissive Intervention…………………………………. 30

CONCLUSION……………………………………………………………….. 32

**TABLE OF AUTHORITIES**

<u>Cases</u>                                                                                      <u>Page</u>

<u>Ambassador Assoc. v. Corcoran</u>, 541 N.Y.S.2d 715 (Supr. Ct. 1989),
<u>aff'd</u>, 562 N.Y.S.2d 507 (1st Dep't 1990), <u>aff'd</u>,
589 N.E.2d 1258 (N.Y. 1992)                                                           21

<u>Appell v. Liberty Mutual Ins. Co.</u>, 255 N.Y.S.2d 545 (2d Dep't 1964),
<u>aff'd</u>, 214 N.E.2d 792 (N.Y. 1966)                                                 18

<u>Arney v. Finney</u>, 967 F.2d 418 (10th Cir. 1992)                                 31

<u>Chiles v. Thornburgh</u>, 865 F.2d 1197 (11th Cir. 1989)                         30

<u>In re Combustion Equipment Assoc., Inc.</u>, 838 F.2d 35 (2d Cir. 1988)     10

<u>Continental Casualty Co. v. ZHA, Inc.</u>, 154 F.R.D. 281 (M.D. Fla. 1994)     30

<u>Davis v. Board of School Commissioners of Mobile County</u>,
517 F.2d 1044 (5th Cir. 1975), <u>cert. denied</u>, 425 U.S. 944 (1976)           28

<u>Dow Jones & Co., Inc. v. Harrods, Ltd.</u>, 346 F.3d 357 (2d Cir. 2003)     13

<u>Dow Jones & Co., Inc. v. Harrods Ltd.</u>, 237 F. Supp. 2d 394
(S.D.N.Y. 2002), <u>aff'd</u>, 346 F.3d 357 (2d Cir. 2003)              9, 11-12, 14

<u>Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.</u>,
411 F.3d 384 (2d Cir. 2005)                                                           10

<u>Flintkote Co. v. Allis-Chalmers Corp.</u>, 73 F.R.D. 463 (S.D.N.Y. 1977)     26

<u>General Accident Ins. Group v. Cirucci</u>, 387 N.E.2d 223 (N.Y. 1979)     18

<u>Hanes Co. v. Ronson</u>, 712 F. Supp. 1223 (M.D.N.C. 1988)                   25

<u>H.L. Hayden Co. v. Siemens Med Sys.</u>, 797 F.2d 85 (2d Cir. 1986)         31

<u>In re Ingram Barge Co.</u>, 2008 WL 906303 (E.D. La. 2008)                    4

<u>International Longshoremen's Ass'n, AFL-CIO v. Seatrain Lines</u>,
326 F.2d 916 (2d Cir. 1964)                                                        10-11

<u>Johnson v. Celotex Corp.</u>, 899 F.2d 1281 (2d Cir.),
<u>cert. denied</u>, 498 U.S. 920 (1990)                                               25

Kheel v. American Steamship Owners Mutual Protection & Indem. Ass'n,
45 F.R.D. 281 (S.D.N.Y. 1968)                                          29

League of United Latin Am. Citizens v. Clements,
884 F.2d 185 (5th Cir. 1989)                                         31

Luria Bros. & Co. v. Alliance Assurance Co.,
780 F.2d 1082 (2d Cir. 1986)                                          18

National Union Fire Ins. Co. of Pittsburgh v. Karp,
108 F.3d 17 (2d Cir. 1997)                                            13

New Jersey & P. Concentrating Works v. Ackerman,
39 N.Y.S. 585 (1st Dep't 1896)                                      10

New York v. AMRO Realty Corp., 936 F.2d 1420 (2d Cir. 1991)          17-18

Olin Corp. v. Consolidated Aluminum Corp.,
5 F.3d 10 (2d Cir. 1993)                                              11

Public Serv. Comm'n of Utah v. Wycoff Co., Inc.,
344 U.S. 237 (1952)                                                   12

In re Repetitive Stress Injury Litig., 11 F.3d 368 (2d Cir. 1993)     25

Restor-a-Dent Dental Laboratories, Inc. v. Certified Alloy Products, Inc.,
725 F.2d 871 (2d Cir. 1984)                                           29

Richards v. Select Ins. Co., 40 F. Supp. 2d 163 (S.D.N.Y. 1999)       11

Rio Energy Int'l, Inc. v. Hilton Oil Transport,
776 F. Supp. 120 (S.D.N.Y. 1991)                                      26

In re September 11th Liability Ins. Coverage Cases,
458 F. Supp. 2d 104 (S.D.N.Y. 2006)                                  22-23

Singleton v. Wulff, 428 U.S. 106 (1976)                               17

United States v. Texas E. Transmission Corp.,
923 F.2d 410 (5th Cir. 1991)                                        31

United States Postal Service v. Brennan, 579 F.2d 188 (2d Cir. 1978)  29

Wilton v. Seven Falls Co., 515 U.S. 277 (1995)                       13-14

| **Statutes & Rules** | **Page** |
| --- | --- |
| Declaratory Judgment Act, 28 U.S.C. § 2201 | *passim* |
| Fed. R. Civ. Proc. 12 | 1, 9 |
| Fed. R. Civ. Proc. 24 | 28-31 |

## PRELIMINARY STATEMENT

Defendant, Lafarge North America Inc. ("LNA"), submits this memorandum of law in support of its motion under Federal Rule of Civil Procedure 12(b)(1) and/or 12(b)(6) to dismiss the declaratory judgment complaint of the plaintiffs, The Northern Assurance Co. of America ("NACA") and American Home Assurance Co. ("AHAC"). The complaint fails to state a cause of action at law or by contract, fails to establish this Court's subject matter jurisdiction within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201,and in the sound exercise of this Court's discretion should not be allowed to stand.  LNA also submits this memorandum in opposition to the motion of NACA and AHAC to consolidate the instant action with the matter of *American Steamship Owners Mutual Protection and Indemnity Ass'n, Inc. v. Lafarge North America Inc.*, 06 CV 3123 (CSH) (hereinafter "the American Club Action").

The instant action is the third declaratory judgment action filed against LNA by its marine liability insurers arising from the catastrophic events in New Orleans caused by Hurricane Katrina in August and September 2005.  To date, LNA has been engaged in the vigorous defense of thousands of individual claims and potential class actions, yet has been reimbursed only for the costs of the expert witnesses and consultants it has retained in defense of those claims, even though each of its marine liability policies provides coverage for defense costs.

As set out in detail below, LNA's cross motion to dismiss the complaint of NACA and AHAC should be granted.  NACA and AHAC are merely following excess insurers who specifically agreed that all coverage decisions would be made by the lead insurer on the applicable excess marine liability policy, New York Marine and General

1

Insurance Co., and that they would be bound by any such decisions. The refusal of the lead insurer to join this action precludes application of the declaratory judgment remedy, because the following insurers have no right to obtain a declaration of the extent of coverage. In addition, because the declaratory judgment remedy is purely discretionary, this Court should properly dismiss the complaint under its discretionary authority where the lead insurer has refused to join the action, and where the plaintiffs' complaint is itself a breach of the contract of insurance, which entitles LNA to deal only with the lead insurer, and where the complaint is plainly based upon erroneous factual and legal assertions.

In the alternative, the plaintiffs' motion to consolidate should be denied because it constitutes an impermissible attempt to intervene in the American Club Action. Because the plaintiffs cannot satisfy the standards for either permissive intervention or intervention as of right, they have resorted to a consolidation motion that if granted would serve only to delay the resolution of the American Club Action, without adding any substance to that action. Moreover, only the first cause of action in the NACA/AHAC complaint relates to issues of American Club coverage. The declaratory judgment complaint asserts three other causes of action that have nothing in common with the American Club Action and can only confuse the issues in that case.

## FACTS

NACA and AHAC are two of the three subscribing insurers on a policy of excess marine liability insurance issued to LNA in May 2005. This excess policy, bearing Risk Control Number WCM05-531, was issued through Willis of New York, Inc., LNA's

broker, effective from 12:01am on May 1, 2005, through 12:01am on May 1, 2006 (hereinafter "the Excess Policy"). According to the confirmation of insurance, NACA and AHAC each had 25% of the risk on the policy, while the remaining 50% of the risk was insured by New York Marine and General Insurance Co. ("NYMAGIC"). (Clyne Decl., Exh. B, page 2 of 22). NYMAGIC was also designated as the lead underwriter on the Excess Policy, by virtue of the following clause:

**POLICY GENERAL CONDITIONS**

2.     **LEADER**

> It is agreed that all alterations, extensions, additions, endorsements settlement of claim, etc. New York Marine & General Insurance Company to be agreed by as lead underwriter and to be binding on all remaining Underwriters participating hereon. (Exh. B, page 4 of 22).

The Excess Policy included a "Schedule of Underlying Insurances", which listed the primary liabilities polices issued to LNA to which the Excess Policy purports to be excess. The Schedule listed a Primary Marine Liabilities policy issued by NYMAGIC (hereinafter "the Primary NYMAGIC Policy"), and LNA's Protection & Indemnity coverage with the American Club. (Exh. B, page 13 of 22). The Primary NYMAGIC Policy, also issued through Willis in May 2005, for the period May 1, 2005, through May 1, 2006, covered LNA's Stevedores/Wharfingers/Landing Owners Liability and Charterers Liability. (Clyne Decl., Exh. A). The American Club P&I policy, effective February 20, 2005, through February 20, 2006, was documented by a Certificate of Entry, which was issued in accordance with and subject to the Rules and the By-Laws of the American Club. (Declaratory Judgment Complaint ¶¶ 28-29).

The alleged casualty that gave rise to the instant litigation and the American Club Action was the breaking free of a barge during or shortly after Hurricane Katrina struck

New Orleans on August 29, 2005. Barge ING 4727, owned by Ingram Barge Company ("Ingram"), had been moored at a pier at a cement terminal owned and operated by LNA and located on the Inner Harbor Navigation Canal in New Orleans. The barge had originally transported cement for LNA to its New Orleans facility before the storm pursuant to a transportation agreement between LNA and Ingram. According to the New Orleans court, after the barge was unloaded but before the Hurricane, LNA retained Domino Towing to move it off the dock and essentially "flip" it with a loaded barge. In re Ingram Barge Co., 2008 WL 906303, at *1-2 (E.D. La. 2008). Several days after the storm, the barge was located on residential property on the land side of the levee separating the Inner Harbor Navigation Canal from New Orleans' Lower Ninth Ward. The Lower Ninth Ward suffered catastrophic flooding when the levee along the east side of the Canal failed. Consequently, LNA was named as a defendant in a number of separate law suits filed in New Orleans brought by residents and business owners there, alleging claims for various types of damage, including wrongful death, personal injury, and property damage. LNA expects to demonstrate in the New Orleans litigation that the failure of the levee occurred before the barge approached it and that the barge was merely carried over or sucked through the already breeched levee by the force of the flood waters. Nevertheless, until the New Orleans cases are resolved in LNA's favor, LNA faces considerable expenses associated with its defense of those claims.

As a consequence of the Katrina litigation, LNA has now been named as a defendant in three separate declaratory judgment actions before this Court, whereby its marine insurers are seeking to escape from and/or limit their obligations to indemnify LNA for its loss. First, in November 2005, NYMAGIC filed a declaratory judgment

action (05 CV 9612 (CSH)) seeking a declaration as to the extent it is obligated to reimburse LNA for its defense costs in New Orleans. Second, the American Club filed its action in April 2006, seeking a declaration that it is not obligated to indemnify LNA at all for either defense costs or liability in connection with the claims arising from the breakaway of Ingram barge 4727, on the theory, among others, that the barge never became a covered vessel under LNA's Certificate of Entry with the Club. Now, NACA and AHAC, but not NYMAGIC, the lead excess insurer, seek a declaratory judgment on several theories, including that the American Club covers LNA for the claims, and that coverage under the Excess Policy does not commence until the coverage limits of <u>both</u> the Primary NYMAGIC Policy and the American Club P&I cover are reached. Specifically, NACA and AHAC have asserted the following:

1. A First Cause of Action against the American Club in which NACA and AHAC seek a finding of American Club coverage for LNA's claim for defense costs and indemnity. <u>Declaratory Judgment Complaint</u>, ¶ ¶ 65-82.

2. A Second Cause of Action against LNA in which NACA and AHAC seek a finding that, in the event American Club coverage of LNA's claim is not owed as a result of any failure by LNA to comply with the Club Rules or the Certificate of Entry, then Excess Policy underwriters, including NACA and AHAC, are not obliged to make payment to LNA under the Excess Policy until the amount which would have been covered by the American Club has been paid by LNA. <u>Declaratory Judgment Complaint</u>, ¶ ¶ 83-86.

3. A Third Cause of Action against LNA for a judgment declaring that Excess Underwriters, including NACA and AHAC are not liable to reimburse LNA for certain

defense costs LNA has incurred for its defense of the Katrina claims.  <u>Declaratory Judgment Complaint</u>, ¶ ¶ 87-100.

4.  A Fourth Cause of Action against LNA and the American Club for judgment declaring that the Excess Policy coverage is not triggered until the coverage of both the Primary NYMAGIC Policy and the American Club cover are exhausted.

Now, more than two (2) years after commencement of the American Club action, in which factual discovery is now closed, NACA and AHAC seek consolidation of the Excess Action with the American Club action.  NACA and AHAC argue that three of the causes of action asserted by them in their Excess Action, i.e., the first, second and fourth causes of action, contain questions of law and fact common with those in the American Club action, warranting consolidation.  <u>Memorandum of Law in Support of Plaintiffs' Motion to Consolidate</u>, 5-6.  NACA and AHAC are incorrect; the second and fourth causes of action involve issues of fact and law wholly unrelated to any issues in the American Club Action, while the first cause of action alleged by NACA and AHAC is duplicative of the coverage issue in the American Club Action, which LNA is capably prosecuting.  LNA is opposed to consolidation because it would result in no benefit of economy or efficiency in the resolution of either case.  To the contrary, consolidation will confuse and delay resolution of the American Club Action and offer no benefit to the Excess Action in the event this action is not dismissed.

Various provisions of the Primary NYMAGIC Policy and the Excess Policy sued are implicated by LNA's instant motion to dismiss and the consolidation motion of AHAC and NACA.  The Primary NYMAGIC Policy Action, for example, turns largely on the following policy provisions:

4.    **NAMING ATTORNEYS:**

This Company, in consideration, in consultation with the Assured, shall have the option of naming any mutually acceptable attorneys who shall represent the Assured in the prosecution or defense of any litigation or negotiations between the Assured and third parties concerning any claim based on a liability or an alleged liability covered by this policy, and shall have the direction of such litigation or negotiations. (Exh. A, page 4 of 16).

11.    **SURVEY AND LEGAL EXPENSES:**

This Company is also to pay survey and related expenses reasonably incurred by the Assured and the legal cost of defending and/or investigation and/or conducting proceedings to limit liability on any suit or claim against the Assured based on a liability or an alleged liability coming within the scope of this insurance, without application of the deductible provision of this policy, but this Company shall not be liable for the cost or expense of defending any suit or claim unless said costs or expense shall have been incurred with the written consent of this Company. This Company, however, reserves the right to conduct the defense of any actions or suits at its own expense. (Exh. A, page 6 of 16).

14.    **OTHER INSURANCE:**

Except for insurance carried by the Assured specifically as excess over and above the amount(s) recoverable hereunder, this Company shall not be liable for any loss, damage, liability or expense which may be recoverable under any other insurance arranged by the Assured, arranged by others for the Assured's account or otherwise available to the Assured, except as excess over and above the amount(s) recovered thereunder. (Exh. A, page 7 of 16).

In addition to the "Leader" clause quoted above, the Excess Policy contains the following language relevant to these motions:

## INSURING AGREEMENTS

**COVERAGE:**

This policy is to indemnify the Assured in respect of the following marine liabilities (including such expenses as are set out in the definition of "ULTIMATE NET LOSS") arising out of the Assured's marine operations only:

> A.    All Protection and Indemnity risks of whatsoever nature . . .
>
> B.    General Average, Collision Liabilities, Tower's Liabilities, . . .
>
> C.    All other sums which the Assure shall become legal liable to pay . . in respect of claims made against the Assured for damages of whatsoever nature . . . (Exh. B, page 5 of 22).

3.    **ULTIMATE NET LOSS:**

> The terms "Ultimate Net Loss: shall mean the total sum which the Assured becomes obligated to pay by reason of matters set out in the Insuring Agreement I, including compromise settlements, and shall include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding however the salaries of the Assured's permanent employees and general office overhead and also excluding any part of such expenses for which the Assured is covered by other valid and collectible insurance.
>
> Nothing herein shall be construed to require the Assured to enforce by legal action, any rights of salvage, subrogation or indemnity, before this Company shall pay any loss covered hereunder.  (Exh. B, page 6 of 22).

4.    **ASSISTANCE AND COOPERATION:**

> This Company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceedings instituted against the Assured, but this Company shall have the right and shall be given the opportunity to associate with the Assured or the Assured Underlying Insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involved or appears reasonably likely to involve this Company in which event the Assured, the Underlying Insurers and this Company shall cooperate in all things in the defense of such claim, suit or proceeding.  (Exh. B, page 10 of 22).

The Excess Policy does not contain any clause that in any way provides that its coverage follows or otherwise adopts the terms and conditions of the underlying policies.

Finally, the insuring agreement in the Club Rules of the American Club, which is discussed below, reads in pertinent part as follows:

> Rule 2:
> Each Member of the Association shall be indemnified in connection with each vessel entered in the Association for Protection and Indemnity insurance against any loss, damage or expense which the Member shall become liable to pay by reason of the fact that the Member is the owner (or operator, manager, charterer, mortgagee, trustee, receiver or agent, as the case may be) of the insured vessel, subject to the provisions of these Rules and to all limitations stated . . . (Clyne Decl. Exh. C).

## ARGUMENT

### POINT I

### THE COMPLAINT OF NACA AND AHAC MUST BE DISMISSED BECAUSE THEIR STATUS AS MERE FOLLOWING EXCESS INSURERS UNDER THE TERMS OF THE EXCESS POLICY PRECLUDES THEIR DECLARATORY JUDGMENT ACTION

The complaint of NACA and AHAC must fail where they cannot satisfy the jurisdictional prerequisites of the Declaratory Judgment Act, 28 U.S.C. § 2201(a). By specifically agreeing to have NYMAGIC act as the lead excess insurer pursuant to the Leader Clause in the Excess Policy,[1] NACA and AHAC assigned all decision-making authority with respect to claims to NYMAGIC and agreed contractually to be bound by NYMAGIC's determination as to coverage and settlement of claims. Therefore, they ceded any right they may have had to act independently of NYMAGIC vis-à-vis LNA, who is entitled to deal solely with NYMAGIC on any claims arising under the Excess Policy. Accordingly, NACA and AHAC can neither state a cause of action nor satisfy

---

[1] On a Rule 12(b)(1) motion challenging the court's subject matter jurisdiction over a declaratory judgment action, the court is permitted to look beyond the pleadings and examine the relevant insurance policies. Dow Jones & Co., Inc. v. Harrods Ltd., 237 F. Supp. 2d 394, 404 (S.D.N.Y. 2002), aff'd, 346 F.3d 357 (2d Cir. 2003).

the requirement of the Declaratory Judgment Act that they have legal interests adverse to LNA of sufficient immediacy. To maintain a declaratory judgment action, a plaintiff must demonstrate that there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality, to justify the declaratory judgment. Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 388 (2d Cir. 2005). Because NACA and AHAC have contractually deferred all decision-making authority to NYMAGIC in respect of claims, they cannot demonstrate that they have immediate, redressable legal interests that are adverse to LNA. As following excess insurers, NACA and AHAC have waived any right to bring their own declaratory judgment action independent of NYMAGIC, and any grievances they may have must be asserted against NYMAGIC, the lead insurer under the policy, and not to LNA. Thus, this action itself is a breach of their duties under the Leader clause of the Excess Policy to defer all decision-making to NYMAGIC and to permit LNA to deal solely with NYMAGIC.[2]

The fact that a plaintiff may suffer some harm if the declaratory relief is not granted does not automatically render a plaintiff's declaratory judgment action ripe for review by the court, especially where a party with decision-making authority has yet to make a decision that could moot the entire action. In re Combustion Equipment Assoc., Inc., 838 F.2d 35, 39 (2d Cir. 1988). The action must touch upon legal relations of parties having adverse legal interests. International Longshoremen's Ass'n, AFL-CIO v.

---

[2] In New Jersey & P. Concentrating Works v. Ackerman, 39 N.Y.S. 585 (1st Dep't 1896), the New York Appellate Division held that an insured had violated the terms of its insurance policy where it sued all 100 underwriters on the policy, despite a provision in the policy requiring that suit be brought against the lead underwriter and that all followers would abide by the outcome. Conversely, the actions of NACA and AHAC in commencing suit against LNA, when LNA is entitled to deal only with NYMAGIC, violate the Excess Policy.

Seatrain Lines, 326 F.2d 916, 918 (2d Cir. 1964). In the absence of any participation by NYMAGIC in this action, or more importantly, in the absence of a stated coverage position by NYMAGIC consistent with the position of NACA and AHAC, this Court cannot attempt to determine the legal relations or obligations of the parties. Any decision by NYMAGIC to indemnify LNA under the Excess Policy, which would be binding upon NACA and AHAC, would automatically trump the declaratory judgment NACA and AHAC are seeking against LNA. A declaratory judgment action cannot be maintained in such cases where the case depends on action beyond the control of the parties. Richards v. Select Ins. Co., 40 F. Supp. 2d 163, 169 (S.D.N.Y. 1999). Any action by NYMAGIC inconsistent with the declaration sought by NACA and AHAC would render this Court's determination a mere advisory opinion, a procedure not permitted by the Declaratory Judgment Act. Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 17 (2d Cir. 1993).

As Judge Marerro stated in a detailed opinion dismissing a declaratory judgment complaint:

> As a threshold issue, [Declaratory Judgment Act] actions are justiciable only in cases in which an "actual controversy" exists. The relevant inquiry for this prerequisite is coextensive with the analysis applicable to the "case or controversy" standard embodied in Article III of the United States Constitution. To this end, the Supreme Court has reinforced that the DJA does not alter the essential predicates for the exercise of federal jurisdiction embodied in the prescription that " '[t]he judicial power does not extend to abstract questions' and that '[c]laims based merely upon 'assumed potential invasions' of rights are not enough to warrant judicial intervention.' " This requirement circumscribes federal jurisdiction to real conflicts so as to preclude the courts from gratuitously rendering advisory opinions with regard to events in dispute that have not matured to a point sufficiently concrete to demand immediate adjudication and thus that may never materialize as actual controversies.

Dow Jones & Co., Inc. v. Harrods, Ltd., 237 F. Supp. 2d 394, 406 (S.D.N.Y. 2002), aff'd, 346 F.3d 357 (2d Cir. 2003) (citations omitted).

It is also established that:

The disagreement must not be nebulous or contingent but must have taken a fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on its adversaries, and some useful purpose to be achieved in deciding them.

Public Serv. Comm'n of Utah v. Wycoff Co., Inc., 344 U.S. 237, 244 (1952). Without the participation of NYMAGIC, this Court cannot know whether the declaratory judgment NACA and AHAC seek would ever actually bind the parties. The purported claims asserted by NACA and AHAC therefore lack "sufficient immediacy and reality" as required by the Declaratory Judgment Act. The entire coverage issue between LNA and the subscribers to the Excess Policy is contingent upon NYMAGIC's coverage position, so that any disagreement claimed by NACA and AHAC cannot satisfy the initial case and controversy requirement.

The lack of participation by NYMAGIC renders this lawsuit all the more baseless, and unquestionably undermines the positions that NACA and AHAC are seeking to assert. Statements by counsel for NACA and AHAC regarding the extent to which NYMAGIC has authorized this action has no binding effect and is otherwise insufficient to overcome the requirement that it actually participate. NYMAGIC would not be bound by the result of this action, but rather would be bound only by its own actions. As set out in further detail in Point II below, NYMAGIC has not denied coverage and has taken a position as the lead insurer that is at odds with the positions asserted by these plaintiffs.

By proceeding against LNA without the participation of NYMAGIC, NACA and AHAC are unable to state a cause of action, and have in fact breached their own policy.

Only NYMAGIC as lead underwriter has the right to assert a coverage position, and NACA and AHAC specifically agreed to defer to NYMAGIC. Because only NYMAGIC could have a cause of action for declaratory judgment, and has refused to join NACA and AHAC, the complaint must be dismissed.

## POINT II

### THE SOUND EXERCISE OF THIS COURT'S DISCRETION COMPELS DISMISSAL OF THE COMPLAINT WHERE NACA AND AHAC ARE PROCEEDING WITHOUT NYMAGIC, WHO HAS ALREADY COMMUNICATED ITS COVERAGE POSITION TO LNA

This Court has discretion to dismiss the complaint for declaratory judgment where NACA and AHAC are proceeding without NYMAGIC, who as the lead insurer with sole decision-making authority, is an indispensable party to any action concerning the Excess Policy. Whether a party should be entitled to proceed by way of a declaratory judgment action is entirely within the sound discretion of the district court. Wilton v. Seven Falls Co., 515 U.S. 277, 282-83 (1995); Dow Jones & Co., Inc. v. Harrods, Ltd., 346 F.3d 357, 359 (2d Cir. 2003); National Union Fire Ins. Co. of Pittsburgh v. Karp, 108 F.3d 17 (2d Cir. 1997). As the Court of Appeals stated in Dow Jones, "[c]ourts have consistently interpreted th[e] permissive language [of 22 U.S.C. § 2201(a)] as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear." 346 F.3d at 359.

The factors a court should consider to guide the exercise of its discretion are "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty". Id. In this case, NACA and AHAC can satisfy neither standard. They have filed their declaratory judgment complaint without the essential participation of

13

NYMAGIC, who has elected not to join this action and has already communicated a coverage position to LNA, a position that attempts to place limited restrictions on LNA's coverage. The action would therefore not serve a legal purpose or finalize the controversy. Accordingly, the Court should properly exercise its discretion to dismiss the complaint.

**A.      The Action Should Not Proceed Where NYMAGIC Has
        Elected Not to Join the Action**

The Supreme Court in <u>Wilton</u> eliminated any confusion in this Circuit and others regarding the extent to which a district court's review of a declaratory judgment complaint is mandatory or purely discretionary.

> By the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants. Consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment before trial or after all arguments have drawn to a close. In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration.

344 U.S. at 288. As Judge Marrero stated, the <u>Wilton</u> Court confirmed that a district court "possesses statutory latitude to deny a declaratory judgment where the court finds that granting relief would serve no useful purpose". <u>Dow Jones</u>, 237 F. Supp. 2d at 431. As stated above, NACA and AHAC agreed when subscribing to the Excess Policy to defer all decision-making authority to the lead insurer, NYMAGIC. As the Excess policy states:

> It is agreed that all alterations, extensions, additions, endorsements settlement of claim, etc. New York Marine & General Insurance Company to be agreed by as lead underwriter and to be binding on all remaining Underwriters participating hereon. (Exh. B, page 4 of 22).

Because decisions by NYMAGIC regarding settlement of claims are binding on NACA and AHAC, no declaratory judgment this Court can issue would exculpate NACA and AHAC from their obligations that arise from NYMAGIC's decision to settle LNA's claim. NYMAGIC has already communicated a coverage position to LNA, and NACA and AHAC cannot use this action to get around their obligations to follow NYMAGIC's decision.

On March 11, 2008, counsel for LNA wrote to counsel for NYMAGIC, and requested that the Excess Policy respond and reimburse LNA for its defense costs as follows:

> At this juncture, LNA has expended the sum of $7,493,699.81, not including the defense costs, expert witness expenses and other costs that may have been incurred by New York Marine and General Insurance Co. ("NYMAGIC"). Thus, the defense costs significantly exceed the primary layer. As you know the excess cover affords underwriters no specific rights to select or approve counsel or pre-approve such costs. Consequently, the expenses falling within the excess layer ought to be approved immediately.
>
> *  *  *
>
> Accordingly, we again demand that NYMAGIC and following underwriters undertake their respective obligations and immediately reimburse LNA for the sums expended to date and to assume the further defense costs that will be incurred in the EDLA proceedings. (Clyne Decl., Exh. D).

On March 26, 2008, counsel for NYMAGIC replied to LNA's claim under the Excess Policy as follows:

> [A]t this time, NYMAGIC has not exhausted the limits of the primary policy with the defense costs and expenses it has incurred to date. However, if and when, the primary policy limits are exhausted, NYMAGIC and the other underwriters on the excess policy will still maintain the right and authority to approve and authorize all defense counsel and defense costs that are incurred in this matter. Despite your claim to the contrary, underwriters' right to approve counsel and defense costs does not extinguish once the primary policy is exhausted. Should you have any case law or other authority in support of your position,

15

please provide it to us and we will be pleased to review it.[3]  (Clyne Decl., Exh. E).

Thus, NYMAGIC unequivocally asserted its coverage position on the Excess Policy that LNA could not recover defense costs that were not approved and authorized by NYMAGIC.  As NYMAGIC has never denied LNA's claim under the Excess Policy or sought to impose any limitations on LNA's recovery except as stated in the March 26, 2008, letter, NACA and AHAC are attempting through this action to assert a coverage position that is inconsistent from the position stated by NYMAGIC.  However, it is the position of NYMAGIC, as lead underwriter, that is binding on NACA and AHAC, not the other way around.  Accordingly, because the purported coverage position of NACA and AHAC binds neither LNA nor NYMAGIC, this Court may not properly issue a declaration that will not be binding on either LNA or the plaintiffs.

By refusing to participate in this action, NYMAGIC undoubtedly has made a conscious decision not to ratify the coverage position of NACA and AHAC. NYMAGIC's refusal to participate in this action plainly demonstrates that it does not agree with the coverage position asserted by NACA and AHAC.  Certainly, as the lead underwriter with the authority to bind its followers by a coverage position, NYMAGIC is an indispensable party to any action where coverage under the Excess Policy will be litigated.  As the Supreme Court has stated, district courts should hesitate before

---

[3]  LNA's reference to NYMAGIC's coverage position should not be construed as an admission that LNA agrees with NYMAGIC's position.  Nothing in the Excess Policy allows NYMAGIC to rely on the terms and conditions of the Primary NYMAGIC Policy. The Excess Policy does not incorporate the terms of the Primary Policy, either explicitly or by implication, nor does it otherwise contain any indication that it follows the terms or the coverage positions of the Primary Policy.  The quoted language is included only to demonstrate the coverage position taken by the leader (NYMAGIC) under the Excess Policy.

resolving declaratory judgment actions based on the rights of non-parties, as "it may be that in fact the holders of those either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not". Singleton v. Wulff, 428 U.S. 106, 113-14 (1976). NYMAGIC's refusal to participate in this action, regardless of whether it has purportedly "consented" to the action, as counsel for NACA and AHAC has represented to the Court, compels the conclusion that this action should not go forward.

**B.    Dismissal of the Declaratory Judgment Complaint Is Proper Where It Purports to Assert Policy Defenses That NYMAGIC Has Not Preserved**

Because NACA and AHAC are bound by NYMAGIC's decisions regarding claims, their declaratory judgment complaint seeking to assert policy defenses not preserved by NYMAGIC should be dismissed. Where an insurer raises only certain grounds for denial of a claim in correspondence to its insured, any other grounds of which the insurer is or reasonably should be aware are deemed to be waived. New York v. AMRO Realty Corp., 936 F.2d 1420, 1431-33 (2d Cir. 1991). On March 26, 2008, counsel for NYMAGIC issued a letter purporting to deny coverage for LNA's defense costs that NYMAGIC had not pre-approved. NYMAGIC did not raise any other grounds for denying or otherwise refusing to pay LNA's claim, so that any other defenses are waived. The position set out in the March 26 letter originated in 2005 when NYMAGIC filed its declaratory judgment complaint on the Primary Policy, a complaint that referenced at Paragraph 10 the Excess Policy, and sought a declaration that NYMAGIC was obligated to reimburse LNA only for those defense costs it had specifically agreed to pay. Because NYMAGIC's decisions regarding claims bind NACA and AHAC, they

also should be deemed to have waived any coverage positions not stated in NYMAGIC's letter.

The Court of Appeals thoroughly analyzed New York insurance law in <u>AMRO Realty</u>, reviewing both state and federal decisions, and properly concluded that an insurer's ability to raise new grounds for denial is severely restricted after the insurer has purported to issue a denial letter. The Court of Appeals concluded that a *per se* rule had been established where an insurer communicates grounds for denial while omitting other grounds.

> [A]n insurer is deemed, as a matter of law, to have intended to waive a defense to coverage where other defenses are asserted, and where the insurer possesses sufficient knowledge (actual or constructive) of the circumstances regarding the unasserted defense.

936 F.2d at 1431. "[T]he act by an insurer of disclaiming on certain grounds but not others is deemed *conclusive* evidence of the insurer's intent to waive the unasserted grounds." <u>Id.</u> at 1432 (emphasis in original). The holding in <u>AMRO Realty</u> is entirely consistent with a long line of case law in New York limiting an insurer to the policy defenses stated in its original correspondence to an insured and concluding that any other defenses are waived. <u>Luria Bros. & Co. v. Alliance Assurance Co.</u>, 780 F.2d 1082, 1090 (2d Cir. 1986); <u>General Accident Ins. Group v. Cirucci</u>, 387 N.E.2d 223, 225 (N.Y. 1979); <u>Appell v. Liberty Mutual Ins. Co.</u>, 255 N.Y.S.2d 545, 547 (2d Dep't 1964), <u>aff'd</u>, 214 N.E.2d 792 (N.Y. 1966).

In the present case, NYMAGIC represented to LNA that it would pay pre-approved defense costs, reserving the right (however incorrectly) to reject defense costs that it had not approved or costs of counsel it had not approved. Consequently, NYMAGIC will be deemed to have accepted all other recoverable expenses within the

meaning of the excess policy's definition of Ultimate Net Loss, as it unquestionably had full knowledge of all potential policy defenses as of March 26, 2008, more than 2½ years after receiving notice of the Katrina claim. Not only has NYMAGIC conceded this point, but because NYMAGIC's actions as the lead insurer bind NACA and AHAC as the followers, both must be deemed to have waived any such potential policy defenses.

**C.    The Second Cause of Action in the Declaratory Judgment Complaint Should Be Dismissed Because There Is No Dispute That LNA Maintained Its Underlying P&I Coverage with the American Club**

The second cause of action of the NACA/AHAC complaint in NACA and AHAC must necessarily fail on both the law and the facts, because there is no issue that LNA's coverage with the American Club was in full force and effect at all relevant times. The declaratory complaint concedes that the P&I coverage was valid and in full effect. (Declaratory Judgment Complaint, ¶¶ 31-32). This concession alone is sufficient to warrant dismissal of the cause of action, in light of the relevant language of the Excess Policy. In addition, the complaint in the American Club Action also concedes that P&I cover was in effect, (American Club Complaint, ¶ 12), so that no party has maintained in any pleading that LNA's underlying P&I cover was not maintained.

The Excess Policy does contain a requirement that LNA maintain the American Club P&I cover and the Primary NYMAGIC Policy in full effect. The Maintenance of Underlying Insurance clause in the Excess Policy reads as follows:

> It is a condition of this policy that the Section(s) of Policy(ies) referred to below in the of "Schedule of Underlying Insurance" shall be maintained in full effect during the currency of this insurance except for and reduction of the aggregate limit(s) contained therein solely by payment of claims in respect of accidents and/or occurrences, occurring during the term of this Policy.

However, in light of the admissions by both the American Club and NACA and AHAC that LNA's membership was in full effect at the time of the Katrina casualty, LNA clearly satisfies its obligations under the clause. Accordingly, NACA and AHAC can in no way prevail on the second cause of action.

Simply because a P&I risk might not be covered by the underlying P&I cover does not mean that LNA may not collect under the Excess Policy until the LNA's loss exceeds the limits of the American Club's underlying P&I coverage. To the contrary, the Excess Policy contemplates that LNA would be insured for risks that overlap the coverage under the primary policies, without any self-insured amount by LNA. For example, Paragraph A of the insuring agreement states that the Excess Policy covers "All Protection and Indemnity risks of whatsoever nature including, but not limited to, those covered by the Underlying Protection and Indemnity Insurances" (emphasis added). Because the Primary NYMAGIC Policy also covers certain P&I risks ("The legal or assumed liability of the Assured . . . arising out of the Assured's operations as bailee, custodian or stevedore of or to tankers, towboats, barges or other vessels" (Exh. A, page 10 of 16)), and NYMAGIC has accepted liability under its Primary Policy for the P&I risks implicated by the Katrina barge cases, the Excess Policy must insure LNA for wharfinger risks and the P&I risks covered by the NYMAGIC Policy as soon as the limits of the NYMAGIC policy are reached.

Even if NACA and AHAC were correct in their apparent assertion that a failure by LNA to enter the applicable Ingram barge with the American Club constitutes a failure to maintain underlying insurance, the second cause of action cannot stand. For an excess insurer to avoid a "drop down" to a primary layer of insurance, the excess policy must

unambiguously so provide. For example, in <u>Ambassador Assoc. v. Corcoran</u>, 541

N.Y.S.2d 715 (Supr. Ct. 1989), <u>aff'd</u>, 562 N.Y.S.2d 507 (1st Dep't 1990), <u>aff'd</u>, 589

N.E.2d 1258 (N.Y. 1992), the court held that the excess insurer's policy did not provide

for drop down coverage where the underlying insurer was insolvent, because it

unambiguously stated that "the Ultimate Net Loss", defined as the amount of liability for

which the excess insurer would pay, would be paid where it was "in excess of the

Underlying Insurance". In stark contrast, the insuring agreement of the Excess Policy in

this case contains no provision that restricts payment only to those amounts beyond the

limits of the underlying insurance.

> This policy is to indemnify the Assured in respect of the following marine
> liabilities (including such expenses as are set out in the definition of
> "ULTIMATE NET LOSS") arising out of the Assured's marine operations
> only:
>
> A.     All Protection and Indemnity risks of whatsoever nature . . .
>
> B.     General Average, Collision Liabilities, Tower's Liabilities, . . .
>
> C.     All other sums which the Assure shall become legal liable to pay . .
>        in respect of claims made against the Assured for damages of
>        whatsoever nature . . . (Exh. B, page 5 of 22).

AHAC and NACA cannot rely upon the "Other Insurance" clause in the Excess Policy,

either, as it applies only "[i]f other <u>valid and collectible</u> insurance with any other Insurer

is available". (Exh. B, page 11 of 22). The definition of "Ultimate Net Loss" similarly

omits any reference to the underlying policies, mentioning only the same "valid and

collectible insurance" as the "Other Insurance" clause. (Exh. B, page 6 of 22). If the

American Club cover is not collectible, as the second cause of action posits, then neither

Excess Policy provision can preclude or delay coverage under the Excess Policy.

21

Accordingly, the Excess Policy's insuring agreement contains no language that might be construed to support the legal arguments of NACA and AHAC set out in the second cause of action of their declaratory judgment complaint. This Court should properly exercise its discretion by refusing to ratify the attempt of NACA and AHAC to turn the Excess Policy on its head by transforming their insured, LNA, into NACA's and AHAC's primary insurer. LNA has underlying insurance under the Primary NYMAGIC Policy that is covering the loss, even if the extent of NYMAGIC's coverage for defense costs may be in dispute. NACA and AHAC should not be permitted to escape their obligations to LNA under the Excess Policy merely by relying on a coverage dispute between LNA and the American Club under the other underlying policy.

**D.     The Third Cause of Action Should be Dismissed Because It Duplicates the Issues of the Action Brought Under the Primary NYMAGIC Policy Without the Benefit of the Primary Policy's Language**

The Court should exercise its discretion to dismiss the Third Cause of Action, which duplicates the relief sought by NYMAGIC under the Primary Policy. NACA and AHAC seek a declaration on the same grounds NYMAGIC has sought relief, namely the extent to which LNA's insurers are permitted to refuse to reimburse LNA for defense costs that NYMAGIC has not pre-approved. Such a claim is particularly improper in this action, where NACA and AHAC seek to rely on terms and conditions in a policy other than the one to which they have subscribed.

As Judge Hellerstein has made clear in the World Trade Center insurance cases, the extent to which an excess insurer is or is not liable for defense costs to an insured depends on the terms and condition of the policy it has issued, not the underlying policies or other policies issued by excess insurers. <u>In re September 11th Liability Ins. Coverage</u>

22

Cases, 458 F. Supp. 2d 104 (S.D.N.Y. 2006). Judge Hellerstein went through each primary and excess policy before him on a policy-by-policy basis, and made determinations as to which did and did not require reimbursement for defense costs. For example, Judge Hellerstein first concluded that the Zurich primary and umbrella liability policies did not obligate Zurich to reimburse the owner of the trade center site for defense costs. Id. at 119-22. Thereafter, he went through the terms of each of the excess policies and/or policy binders one-by-one, layer-by-layer, and determined which insurers had agreed to reimburse the site owners for defense costs, while relieving from liability those that had not. Id. at 129-31.

Applying the same analysis to this case compels the conclusion that the subscribers to the Excess Policy cannot take advantage of any conditions in the Primary NYMAGIC Policy that might purport to grant NYMAGIC the right to approve defense costs. Instead, the Excess Policy contains a broad definition of Ultimate Net Loss, setting a non-exclusive list of costs for which LNA is entitled to reimbursement, including "expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder". Neither the "Ultimate Net Loss" definition nor any other Excess Policy provision grants the excess insurers the right to approve defense counsel or defense costs. The only restriction the Ultimate Net Loss provision imposes is that LNA may not recover for the salaries of its permanent employees and overhead.

Even the argument that NACA and AHAC are entitled to the benefit of cooperating with LNA in defense of the underlying claims must fail. Because

NYMAGIC is both the leader on the Excess Policy and the insurer on the NYAMGIC Primary Policy, it has been associating with LNA in the defense of the claims since September 2005, as the declaratory judgment complaint concedes. (Declaratory Judgment Complaint, ¶¶ 24-25, 59). Any complaints NACA and AHAC may have would have to be directed at NYMAGIC. Accordingly, NACA and AHAC should not be permitted to maintain the third cause of action.

**E.    The Fourth Cause of Action Must Be Dismissed Because the Excess Policy Must Pick up LNA's Wharfinger's Liability as Soon as LNA's Loss Exceeds the Primary NYMAGIC Policy Limit**

NACA and AHAC improperly seek to avoid liability until both primary policies are exhausted. This argument overlooks the fact that the two primary policies insure LNA against different risks, even if the theories of liability asserted by the third party claimants in New Orleans may implicate both policies in the same litigation. The American Club P&I coverage arises with respect to certain vessels and covers LNA for liability "which the Member shall become liable to pay by reason of the fact that the Member is the owner (or operator, manager, charterer, mortgagee, trustee, receiver or agent, as the case may be) of the insured vessel". (American Club Rule 2). The NYMAGIC Primary Policy, aside from coverage for certain P&I risks as discussed in Point II.C above, also insures LNA for liability it may incur, among other things, as a wharfinger "for damage caused directly or indirectly by the freeing or breaking away" of vessels from "landing and/or mooring facilities which are owned, operated, utilized, controlled or leased by the Assured".

Because NYMAGIC has properly accepted coverage under the Primary NYMAGIC Policy for any liability LNA may have to third parties based on the breaking

away of the vessel, the Excess Policy must cover LNA once the Primary NYMAGIC

Policy limits are reached.  The Excess Policy contains no provision stating that it pays

only when the limits of both underlying policies are exhausted.  To the contrary, the

Excess Policy's insuring agreement provides broad coverage for "[a]ll other sums which

the Assured shall become legally liable to pay . . in respect of claims made against the

Assured for damages of whatsoever nature . . ." subject only to the Excess Policy's own

limits and the requirement that the liability arise from LNA's marine operations.  (Exh.

B, page 6 of 22).


### POINT III

### THE COURT SHOULD PROPERLY EXERCISE ITS<br>DISCRETION AND DECLINE TO CONSOLIDATE THE CASES

In the event the Court does not dismiss the complaint of NACA and AHAC

outright, it should deny the motion for consolidation.  The Court's discretion to order

consolidation of cases under Rule 42(a) of the Federal Rules of Civil Procedure where

common questions of law and fact exist is broad, but not unfettered.  Johnson v. Celotex

Corp., 899 F.2d 1281, 1284-1285 (2d Cir.), cert. denied, 498 U.S. 920 (1990).  The

questions common to the cases must be sufficient to justify consolidation.  In re

Repetitive Stress Injury Litig., 11 F.3d 368, 373-74 (2d Cir. 1993).  Consolidation is

appropriate where enhanced efficiency and economy for the parties and the court will

result.  Hanes Co. v. Ronson, 712 F. Supp. 1223, 1230 (M.D.N.C. 1988).  Consolidation

of the Excess Action with the American Club case will result in no enhanced efficiency

or economy for either the parties or the Court and will bestow no benefit on either case.

The sole question common to both cases, the issue of American Club coverage, is nearing

readiness for trial in the American Club Action. Consolidation will only delay the adjudication of that issue.

Consolidation should not be granted where the prejudice to a party is sufficiently substantial to outweigh any potential advantage. Rio Energy Int'l, Inc. v. Hilton Oil Transport, 776 F. Supp. 120 (S.D.N.Y. 1991). Considerations of convenience and economy must yield to the interests of justice. Flintkote Co. v. Allis-Chalmers Corp., 73 F.R.D. 463 (S.D.N.Y. 1977).

The only issue overlapping the two cases is the question of LNA's coverage with the American Club, the subject of the American Club Action and of the first cause of action in the instant case brought by NACA and AHAC. NACA and AHAC, mere following insurers on a policy excess to LNA's P&I coverage with the American Club, are strangers to the facts surrounding the American Club coverage. LNA does not require the assistance of NACA and AHAC in the prosecution of the American Club Action, especially considering that such assistance would result in delaying the trial of the case. Under the current case management schedule, the question of LNA's American Club coverage likely will be resolved by motion or trial before the recently commenced Excess Action would be ready for trial. Efficiency and economy would be better served by denying consolidation; by the time the Excess Action is anywhere near trial readiness, the American Club coverage question will likely have been resolved.

Given the amount of discovery conducted in the American Club Action, including more than 10 depositions of fact witnesses from various parts of the country, and thousands of pages of documents, it would be extremely difficult to predict when the first cause of action alone in the NACA/AHAC complaint might be ready for trial.

Conducting discovery into the coverage issues raised by the second, third and fourth causes of action of the NACA/AHAC complaint would further complicate and impede prompt resolution of the American Club action.

As NACA and AHAC implicitly concede, the allegations in their second, third and fourth causes of action are issues relevant <u>only</u> to the instant action and are not issues that are raised in or relevant to any issues in the American Club Action. The American Club Action is concerned solely with whether the American Club is obligated to provide P&I coverage for LNA's liability relating to Ingram barge 4727. Determination of the circumstances under which the Excess Policy is triggered is relevant <u>solely</u> to the Excess Action.

The American Club Action has been pending for over two years, and factual discovery is concluded. Like NYMAGIC, NACA and AHAC have long been aware of the pendency of that action and only now seek, for tactical reasons, to become involved. The American Club Action presents the single issue of whether coverage exists under the Club rules and Certificate of Entry for LNA's claim. To saddle that action with the issues concerning the circumstances of trigger of the Excess coverage by consolidating the cases would unnecessarily burden the American Club Action and delay its resolution.

The determination of whether American Club coverage exists for the LNA claim will be made in the American Club Action litigated between the parties to that coverage, LNA and the American Club. NACA and AHAC are not necessary or indispensable parties to that action and can show no prejudice if their duplicative claims do not go forward at this time. Their presence and the importation of the Excess Policy issues will not aid or speed resolution of the American Club Action, only delay it.

## POINT IV

### NACA AND AHAC's ATTEMPT TO CONSOLIDATE THEIR FIRST CAUSE OF ACTION WITH THE AMERICAN CLUB <u>ACTION IS AN IMPERMISSIBLE ATTEMPT TO INTERVENE</u>

NACA and AHAC, by commencing a separate action against LNA and the American Club and then a month later seeking consolidation with the pending American Club Action, are in effect attempting to intervene in the American Club action under the guise of consolidation, where intervention is not available.

The first cause of action asserted in the NACA/AHAC action is identical to the cross-claims in the American Club action; the claims in both actions seek a determination that the American Club is obligated to defend and indemnify LNA. NACA/AHAC seek no different or further relief from the American Club in their first cause of action than does LNA. Since their first cause of action is duplicative of the LNA claim against the American Club for coverage, NACA's and AHAC's motion to consolidate is, in fact, an attempt to intervene in LNA's dispute with the American Club. To a large extent, the policies behind intervention and consolidation are analogous, and the differences between consolidation and intervention may be described as "semantical". <u>See Davis v. Board of School Commissioners of Mobile County</u>, 517 F.2d 1044, 1049 (5th Cir. 1975), <u>cert. denied</u>, 425 U.S. 944 (1976). However, the requirements for intervention are clearly set forth in the Federal Rules of Civil Procedure. NACA and AHAC do not satisfy the requirements for either intervention as of right or permissive intervention.

### A.      Intervention As Of Right

An applicant who seeks to intervene as of right pursuant to Rule 24(a)(2) must meet four requirements. First, the application must be timely. Second, the applicant

28

must claim an interest relating to the property or transaction which is the subject of the action. Third, the applicant must be so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest. Fourth, the applicant must show that his interest will not be adequately represented by existing parties. United States Postal Service v. Brennan, 579 F.2d 188, 191 (2d Cir. 1978). NACA and AHAC cannot satisfy any of these requirements.

First, the application is not timely. The American Club Action has been pending for more than two years, and the excess insurers have been well aware that the size of the claims asserted against LNA implicates the excess coverage, as NYMAGIC as leader has been intimately involved in LNA's defense.

Second and third, NACA and AHAC have no real interest in the property or transaction which is the subject of the action, which must be direct, not remote or contingent. Restor-a-Dent Dental Laboratories, Inc. v. Certified Alloy Products, Inc., 725 F.2d 871 (2d Cir. 1984). Thus, a defendant's general liability insurer could not intervene as of right in a products liability action for the purpose of submitting interrogatories to the jury to determine whether any damages awarded were within the scope of coverage, because the insurer's "interest" was contingent upon 1) a jury verdict against the assured, and 2) a finding in later litigation that the insurer is indeed not responsible to indemnify certain types of losses. Restor-a-Dent, 725 F.2d at 875. The mere existence of a third party's contingent interest in the outcome of pending litigation is insufficient to justify intervention. Kheel v. American Steamship Owners Mutual Protection & Indem. Ass'n, 45 F.R.D. 281 (S.D.N.Y. 1968). In this case, NACA and AHAC seek declarations that: a) the American Club is obligated to provide coverage to LNA, and b) they are not

obligated to provide coverage until the Primary Policy and the coverage amount of the American Club coverage (whether paid by the American Club or by LNA) is exhausted. Thus, based on NACA/AHAC's allegations, their interest in the American Club action is contingent upon LNA's liability in the Louisiana actions exceeding the amounts of the Primary NYMAGIC and American Club coverage, which may not happen.

NACA/AHAC therefore have no 'interest' sufficiently immediate and non-contingent, to warrant intervention.

Nor can NACA/AHAC satisfy the fourth intervention requirement by showing that their interest is not adequately represented by existing parties. Where the applicant's interest is identical to that of an existing party to the suit, the intervenor is not entitled to intervene as of right. Chiles v. Thornburgh, 865 F.2d 1197, 1215 (11th Cir. 1989); Continental Casualty Co. v. ZHA, Inc., 154 F.R.D. 281 (M.D. Fla. 1994). LNA's interest in the American Club action is identical to the interest of NACA/AHAC in their first cause of action, i.e., a declaration of American Club coverage for the Louisiana claims asserted against LNA. This interest is being pursued aggressively in the American Club action by LNA, whose stake in that litigation is very real indeed, not ephemeral as the claims of mere following excess insurers are.

**B.    Permissive Intervention**

Similarly, NACA/AHAC are not entitled to intervene permissively. Rule 24(b) of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

> Upon timely application anyone may be permitted to intervene in an action:
>
> * * *
>
> (2) when an applicant's claim or defense and the main action have a question of law or fact in common.

> In exercising its discretion the court shall consider whether the
> intervention will unduly delay or prejudice the adjudication of the rights of
> the original parties.

NACA and AHAC cannot satisfy these requirements for permissive intervention.

In determining a motion for permissive intervention, the court should consider whether the applicant's input is likely to make a useful and significant contribution to resolution of the action. H.L. Hayden Co. v. Siemens Med Sys., 797 F.2d 85, 89 (2d Cir. 1986); League of United Latin Am. Citizens v. Clements, 884 F.2d 185, 189 (5th Cir. 1989). If the intervention applicant will not make a unique contribution to the evidence presented, but only repeat the same evidence offered by existing parties, intervention should be denied. Arney v. Finney, 967 F.2d 418, 421-422 (10th Cir. 1992). Where permissive intervention would result in undue delay in resolution of the action, intervention may be denied. United States v. Texas E. Transmission Corp., 923 F.2d 410, 416 (5th Cir. 1991). It cannot reasonably be expected that NACA and AHAC, strangers to LNA's dealings with the American Club and the circumstances of LNA's membership in the American Club, are likely to make any significant novel contribution to LNA's dispute with the Club. Instead, the need for NACA and AHAC to "get up to speed" in the American Club Action and the importation into the case of the issues concerning the Excess Policy would only confuse, complicate and delay resolution of the American Club Action. As NACA and AHAC would add nothing to the American Club Action, they should not be permitted to intervene, either as of right or permissively.

## CONCLUSION

For the foregoing reasons, the declaratory judgment complaint of NACA and AHAC must be dismissed. Given NYMAGIC's refusal to participate, they have not met the basic requirements for a declaratory judgment, as they cannot show an actual case or controversy between adverse parties. In addition, NYMAGIC's absence justifies the sound exercise of the Court's discretion to dismiss the complaint. In the event the Court should not dismiss, it should deny the motion to consolidate, because the following excess insurers' complaint can only delay the action without contributing anything meaningful to it.

Respectfully submitted,

Dated: New York, New York
       June 5, 2008

HILL RIVKINS & HAYDEN LLP
Attorneys for Defendant
Lafarge North America Inc.

By: _____
    John J. Sullivan (JS 1037)
    Robert G. Clyne (RC-2987)
    45 Broadway, Suite 1500
    New York, NY 10006
    (212) 669-0600

32