**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

THE NORTHERN ASSURANCE COMPANY          08 CV 3289 (CSH) (AJP)
OF AMERICA and AMERICAN HOME
ASSURANCE COMPANY,

                                    Plaintiffs,          **Electronically Filed**

        - against -

LAFARGE NORTH AMERICA, INC. and          **AFFIDAVIT IN**
AMERICAN STEAMSHIP OWNERS MUTUAL          **SUPPORT OF**
PROTECTION AND INDEMNITY          **CROSS-MOTION FOR**
ASSOCIATION, INC.          **SUMMARY JUDGMENT**

                                    Defendants.
-----------------------------------------------------------X

STATE OF NEW YORK     )
                                    s.s.:
COUNTY OF NEW YORK  )

        JOHN A.V. NICOLETTI, being duly sworn, deposes and says:

        1.     I am duly admitted to practice law in the State and Federal Courts of

New York and before this Honorable Court and am a member of the law firm of NICOLETTI

HORNIG & SWEENEY, attorneys for plaintiffs The Northern Assurance Company of America

and American Home Assurance Company (collectively "Excess Underwriters") in the above

captioned action.

        2.     I am fully familiar with all of the pleadings and proceedings in this

action.

        3.     This affidavit is submitted in support of Excess Underwriters' Cross-

Motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

        4.     The purpose of this Affidavit is to place before the Court the following

evidence:

5.    Annexed hereto as Exhibit "1" is a true and accurate copy of the Declaratory Judgment Compliant filed by Excess Underwriters in the instant matter (Docket No. 1).

6.    Annexed hereto as Exhibit "2" is a true and accurate copy of the Answer filed by defendant Lafarge North America, Inc. ("Lafarge") in the instant matter (Docket No. 17).

7.    Annexed hereto as Exhibit "3" is a true and accurate copy of the Answer filed by American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "Club") in the instant matter (Docket No. 7).

8.    Annexed hereto as Exhibit "4" is a true and accurate copy of Joint Policy No. 02-0360-04 which was issued by Excess Underwriters to Lafarge for the period May 1, 2005 to May 1, 2006.

9.    Upon information and belief, annexed hereto as Exhibit "5" is a true and accurate copy of MMO Primary Policy No. MMO-30981ML505 issued to Lafarge for the policy period May 1, 2005 to May 1, 2006.  This document was attached as Ex. A to the Declaration of Robert G. Clyne in Support of Lafarge's Cross-motion to Dismiss (Docket No. 30), and represented by Lafarge's counsel to be a true and accurate copy of the MMO primary policy.

10.    Upon information and belief, annexed hereto as Exhibit "6" are true and accurate copies of certain excerpts from the Club Rules which were in effect at the time of Lafarge's Certificate of Entry for the period February 20, 2005 to February 20, 2006.

11.    Upon information and belief, annexed hereto as Exhibit "7" is a true and accurate copy of the Certificate of Entry issued by the Club to Lafarge for the period February

2

20, 2005 to February 20, 2006.  This document was attached as Ex. A to the Club's Complaint filed in *American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Lafarge North America, Inc.*, which is currently pending in United States District Court, Southern District of New York, Case No. 06 civ. 3123 (Docket No. 1).

    12. Upon information and belief, annexed hereto as Exhibit "8" is a true and accurate copy of the Transportation Agreement by and between defendant LAFARGE and Ingram Barge Company dated December 14, 2004. This document was attached as Ex. B to the Club's Complaint filed in *American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Lafarge North America, Inc.*, which is currently pending in United States District Court, Southern District of New York, Case No. 06 civ. 3123 (Docket No. 1).

    13. Annexed hereto as Exhibit "9" is a true and accurate copy of the Complaint filed in *American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Lafarge North America, Inc.*, which is currently pending in United States District Court, Southern District of New York, Case No. 06 civ. 3123 (Docket No. 1).

          _____
           JOHN A.V. NICOLETTI

Sworn to before me this
2nd day of July, 2008

_____
Notary Public

MICHELLE MANISCALCO
Notary Public, State of New York
No. 01MA6088438
Qualified in Kings County
Certificate Filed in New York County
Commission Expires March 3, 20 __11__

OFFICE COPY

NICOLETTI HORNIG & SWEENEY
*Attorneys for Plaintiffs*
*The Northern Assurance Company of America*
*and American Home Assurance Company*
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005-1801
Tel: (212) 220-3830
Fax: (212) 220-3780
Email: jnicoletti@nicolettihornig.com

RECEIVED
APR 02 2008
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

THE NORTHERN ASSURANCE COMPANY
OF AMERICA and AMERICAN HOME
ASSURANCE COMPANY,

                              Plaintiffs,

   - against -

LAFARGE NORTH AMERICA, INC. and
AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY
ASSOCIATION, INC.

                            Defendants.
------------------------------------------------------------X

Case No.:

# 08  CV  03289

**DECLARATORY**
**JUDGMENT COMPLAINT**

     Plaintiffs THE NORTHERN ASSURANCE COMPANY OF AMERICA ("NACA") and

AMERICAN HOME ASSURANCE COMPANY ("AHAC"), by and through their attorneys,

Nicoletti Hornig & Sweeney, as and for a Complaint against defendants LAFARGE NORTH

AMERICA, INC. ("LAFARGE") and AMERICAN STEAMSHIP OWNERS MUTUAL

PROTECTION AND INDEMNITY ASSOCIATION, INC., ("AMERICAN CLUB" or "THE

CLUB") respectfully allege upon information and belief as follows:

## SUMMARY

1.      The matter in controversy relates to the demands by defendant LAFARGE under separate primary liability insurance coverages issued by New York Marine and General Insurance Company ("NYMAGIC"), and the defendant AMERICAN CLUB, and an excess liability policy issued on a subscription basis by the plaintiffs and the non-party NYMAGIC, for defense costs and indemnification against potential liability in respect of claims arising from the breakaway of a barge that was at defendant LAFARGE'S New Orleans, Louisiana facility during Hurricane Katrina in August, 2005 ("Katrina Claims").

2.      In the several third-party lawsuits pending against defendant LAFARGE for Katrina Claims, it is alleged that the barge, called the Barge ING 4727, struck and caused or contributed to the collapse of the 17th Street Industrial Canal floodwall causing massive flooding in the City of New Orleans.

3.      By this action, plaintiffs NACA and AHAC seek 1) a declaration that coverage for defense costs and indemnity exists under defendant LAFARGE'S entry in the defendant AMERICAN CLUB and 2) a declaration that plaintiffs NACA and AHAC are not obligated to pay the defense costs and/or to indemnify defendant LAFARGE until all primary policies have responded up to their full respective limits.

## JURISDICTION

4.      This action is filed under and pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

5.      The following issues constitute questions of insurance coverage under Admiralty or Maritime contracts of insurance and thereby come within the Admiralty and Maritime

jurisdiction of the United States District Court pursuant to Title 28 U.S.C. § 1333 *et seq.*, and within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

6.    An actual controversy of a justiciable nature exists between plaintiffs and defendants involving the rights and obligations under these several marine contracts of insurance and depending on the construction of said contracts, the aforesaid controversy can be determined by a judgment of this Court without further suit.

## VENUE

7.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) inasmuch as a substantial part of events giving rise to the insurance coverage dispute herein occurred in this judicial district and the defendants AMERICAN CLUB and LAFARGE are currently litigating a related action in this judicial district entitled *American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Lafarge North America, Inc.*, United States District Court, Southern District of New York, 06 CV 3123 (CSH).

## PARTIES

8.    At all times relevant, plaintiff NACA was and is a corporation duly organized and existing under and by virtue of the laws of the State of Massachusetts, with a place of business for marine insurance located at One Beacon Street, Boston, Massachusetts 02108.

9.    At all times relevant, plaintiff NACA was and is authorized to issue policies of marine excess liability insurance in the State of New York.

10.    At all times relevant, plaintiff AHAC was and is a corporation duly organized under and existing under and by virtue of the laws of the State of New York with an office and principal place of business at 70 Pine Street, New York, New York.

3

11.     At all times relevant, plaintiff AHAC was and is authorized to issue policies of marine excess liability insurance in the State of New York.

12.     NYMAGIC is an insurance company duly qualified pursuant to the laws of the State of New York and doing business in this jurisdiction through its authorized representative Mutual Marine Office, Inc. ("MMO"), with an office and principal place of business at 919 Third Avenue, New York, New York. NYMAGIC and/or MMO are not parties to this action.

13.     Defendant LAFARGE is a corporation duly organized under and existing by virtue of the laws of the State of Maryland or another one of the states of the United States of America, with its principal place of business at 12950 Worldgate Drive, Suite 500, Herndon, Virginia 20170.

14.     Defendant LAFARGE is registered to do business in the State of New York and/or is otherwise doing business in the State of New York.

15.     Defendant LAFARGE is a diversified construction materials company and supplier of cement, aggregates and concrete, and other materials for residential, commercial, institutional and public works construction.

16.     Defendant AMERICAN CLUB is a mutual insurance association, operated by its members for their exclusive benefit and is incorporated in New York and has a principal place of business at 60 Broad Street, New York, New York.

17.     Defendant AMERICAN CLUB provides liability insurance, which provides cover to members against third-party liabilities encountered in their commercial operations.

4

## THE POLICIES

**The Primary MMO Policy**

18.    MMO, as the authorized representative for NYMAGIC, agreed to issue a Primary Marine Liabilities Policy of Insurance No. MMO-30981ML505, to defendant LAFARGE, for the period of May 1, 2005 to May 1, 2006 (the "MMO Policy").

19.    For the policy period of May 1, 2005 to May 1, 2006, NYMAGIC and defendant LAFARGE agreed that the general terms and conditions of the Binding Memorandum for the Primary Marine Policy of Insurance would remain in force and effect for the period of May 1, 2005 to May 1, 2006 until such time as the policy of insurance was issued.

20.    The MMO Policy has an aggregate limit of $5,000,000.00 for any one accident or occurrence.

21.    MMO, as the authorized representative of NYMAGIC, also agreed to participate in an excess liability policy issued to defendant LAFARGE with limits in excess of the primary limit of $5,000,000.00 and up to $50,000,000.00 under certain circumstances for the period of May 1, 2005 to May 1, 2006.

22.    The MMO Policy provides in relevant part:

> **14.    OTHER INSURANCE:**
>
> Except for insurance carried by the Assured specifically as excess over and above the amount(s) recoverable hereunder, <u>this Company shall not be liable for any loss, damage, liability or expense which may be recoverable under any other insurance</u> arranged by the Assured, arranged by others for the Assured's account or otherwise available to the Assured, <u>except as excess over and above the amount(s) recovered thereunder.</u> (emphasis added).

23.    The MMO Policy's "Other Insurance" clause is commonly referred to as an "excess clause."

24.    NYMAGIC has accepted the obligation under the MMO Policy to pay the reasonable defense costs and has provided defendant LAFARGE with a defense in the multiple Katrina Claims lawsuits through an assigned counsel, Sutterfield & Webb, LLC., as well as through other investigators and experts.

25.    To date, NYMAGIC has paid and/or incurred defense costs in excess of $3.7 million.

26.    At this time, defendant LAFARGE is claiming against NYMAGIC under the MMO Policy for payment of its separately incurred defense costs in an amount in excess of $7.5 million, which, if payable, would exhaust the limits of the primary MMO Policy and potentially trigger the obligations of plaintiffs NACA and AHAC, *albeit* denied by these plaintiffs, to pay defense costs under a particular Excess Policy issued to defendant LAFARGE in which they participate.

**The American Club Primary Policy**

27.    The rights and obligations of every member of THE CLUB, including defendant LAFARGE, are governed at least in part by the American Club By-Laws and Rules (the "Club Rules").

28.    Upon becoming a member of THE CLUB, defendant LAFARGE received a Certificate of Entry, which expressly makes applicable the Club Rules to the member's insurance. The Certificate of Entry includes additional Member-Specific provisions, which are listed on a separate rider to the Certificate of Entry.  (LAFARGE'S Certificate of Entry for the period February 20, 2005 to February 20, 2006, is attached as Exhibit 1).

29.    The Certificate of Entry is the paramount document and to the extent that the terms of the Certificate of Entry are contrary to the Club Rules, the terms of the Certificate of

6

Entry are controlling with respect to the rights and obligations of the defendant AMERICAN

CLUB and defendant LAFARGE under the Club cover.

30.    The Certificate of Entry does not by its terms require any pre-approval by the

Club of an agreement pursuant to which defendant LAFARGE acquires an insurable interest in a

vessel for the Club cover to automatically attach to said vessel.

31.    Defendant LAFARGE first became a member of THE CLUB on or about

February 20, 1999. It renewed its coverage each year, up to and including the policy year

commencing February 20, 2005.

32.    At all times relevant, defendant LAFARGE was a member of the defendant

AMERICAN CLUB.

33.    Defendant LAFARGE'S Certificate of Entry contains a Member-Specific clause

entitled "Chartered Barges," which states:

> CHARTERED BARGES.
>
> If Lafarge Corporation et al acquires an insurable interest in any vessel in addition to or in substitution for those set forth herein, through purchase, charter, lease or otherwise, such insurance as is afforded hereunder to any similar vessel shall automatically cover such additional vessel effective from the date and time the Assured acquires an insurable interest in such additional vessel. With respect to a chartered, leased or similarly acquired vessel, the insurance hereunder automatically includes the owner as an additional Assured with waiver of subrogation against the owner, if required, effective from the date and time such vessel is insured hereunder.
>
> The above provision shall not apply to vessels which are chartered under a contract whereby the owner (or Demise Owner) and Charterer agree that the owner (or Demise Owner) shall procure Protection & Indemnity Insurance on the vessel and such insurance shall include the charterer as an Assured.
>
> The Assured agrees to report the name and gross tonnage of any vessel in which they acquire an insurable interest at the expiration

of this policy and pay any additional premium as may be required annually, at expiry at daily pro-rate the annual rates agreed. (emphasis added).

34.     Pursuant to the terms of the Certificate of Entry, defendant LAFARGE did report

the name and gross tonnage of the Barge ING 4727 and is prepared to pay the reasonable

additional premium assessed by the defendant AMERICAN CLUB, if any reasonable additional

premium is due and owing.

35.     The Club Rules also provide in relevant part:

Class I Rule 2  Risks and Losses Covered

Each Member of the Association shall be indemnified in connection with each vessel entered in the Association for Protection and Indemnity Insurance against any loss, damage or expense which the Member shall become liable to pay and shall pay <u>by reason of the fact that the Member is the owner (or operator, manager, charterer, mortgagee, trustee, receiver or agent, as the case may be) of the insured vessel</u>, subject to the provisions of these Rules and to all the limitations herein stated or agreed to by the acceptance of the application for membership, or by the entry of the vessel, in the Association, and which shall result from the following liabilities, risks, events, occurrences and expenditures; provided that such liabilities, risks, events, occurrences and expenditures arise in respect of the Member's interest in such vessel; and in connection with the operation of such vessel by or on behalf of the Member; and out of events occurring during the period of entry of such vessel. (emphasis added).

36.     The Club Rules also provide in relevant part:

Class I Rule 1  Introductory: Interpretation:
               Membership: General Provisions

**34.**     The Association shall not be liable for any loss, damage or expense against which, but for the insurance herein provided, the Member, Co-assured or Affiliate would have been insured under any other existing insurance, except as set forth above in Rule 1.4.33; nor shall the Association provide prorated or allocated cover on the basis of double insurance or otherwise, except as set forth above in Rule 1.4.33; nor will this insurance replace any other insurance

8

where (for whatever reason) that other insurance does not
or is not able to respond to a claim thereunder.

37.    The defendant AMERICAN CLUB'S "Other Insurance" terms are commonly referred to as an "escape clause."

38.    The defendant AMERICAN CLUB has wrongfully declined defendant LAFARGE'S demand for payment of defense costs and indemnification under the Certificate of Entry and Club Rules.

**The Plaintiffs' Excess Policy**

39.    On or before May 1, 2005, the plaintiffs NACA and AHAC, together with the non-party NYMAGIC, subscribed to an Excess Marine Liability Policy ("Excess Policy") with an insured limit of $45,000,000.00, and up to $50,000,000.00 under certain circumstances, excess of $5,000,000.00 any one accident or occurrence.

40.    The plaintiffs, together with non-party NYMAGIC, issued the Excess Policy on a several and not joint basis.

41.    Plaintiff NACA subscribed to 25% of risk under the Excess Policy.

42.    Plaintiff AHAC subscribed to 35% of the risk under the Excess Policy.

43.    The non-party NYMAGIC subscribed to 40% of the risk under the Excess Policy.

44.    As a true Excess Policy, there was a requirement that defendant LAFARGE maintain certain "Underlying Insurances" as set forth and identified in the Excess Policy binder.

45.    The primary MMO Policy with a primary limit of $5,000,000.00, is identified as "Underlying Insurance" to the Excess Policy.

46.    Defendant LAFARGE'S entry in the defendant AMERICAN CLUB'S coverage with an underlying limit per Club Rules in an amount of at least $1,000,000,000.00, is also listed as an "Underlying Insurance" in the Excess Policy.

9

47.    The Excess Policy also provides in relevant part:

**7.    OTHER INSURANCE:**

> If other valid and collectible insurance with any other
> Insurer is available to the Assured covering a loss also
> covered by this Policy, other than insurance that is in
> excess of the insurance afforded by this Policy, the
> insurance afforded by this Policy shall be in excess of and
> shall not contribute with such other insurance, either as
> double insurance or otherwise.  Nothing herein shall be
> construed to make this Policy subject to the terms,
> conditions and limitations of other insurance.

48.    The "Other Insurance" clause in the Excess Policy is commonly referred to as an
"excess clause."

## UNDERLYING KATRINA CLAIMS

49.    Prior to August 29, 2005, Barge ING 4727 was utilized by defendant LAFARGE
to transport cement under the Transportation Agreement ("TA") to its New Orleans facility.

50.    On or about August 29, 2005, Barge ING 4727 was moored at defendant
LAFARGE'S facility on the Inner Harbor Navigation Canal.

51.    On or about August 29, 2005, Hurricane Katrina made landfall along the
Louisiana and Mississippi Gulf Coast.

52.    On or about August 29, 2005, Barge ING 4727 became adrift from her moorings
and floated through a breach in the Industrial Canal floodwall or was carried over the floodwall
by the rising water.

53.    At least four lawsuits, including class actions, arising out of Hurricane Katrina are
pending against defendant LAFARGE.

54.    The allegations set forth in the pleadings in the multiple Katrina Claims-related
lawsuits are sufficient to trigger the obligations of both NYMAGIC under the primary MMO

Policy and under the defendant AMERICAN CLUB'S primary cover for the cost of defending

defendant LAFARGE in the actions.

55.     For example, in the action entitled: *Blair Boutte, et al. v. Lafarge North America,*

*Inc.,* Index No.: 05 CV 5531, U.S.D.C. : E.D.La., it is alleged:

## CLASS ACTION COMPLAINT

\* \* \*

### I.

#### Nature of the Action

1.     This is a personal injury, wrongful death/survival, real
property damage, personal property damage and business
damage class action on behalf of all persons, property
owners, and business owners who sustained personal injury,
wrongful death/survival claims, personal and real property
damage and/or business damage as the result of flooding in
New Orleans, Louisiana following Hurricane Katrina,
beginning on or about August 30th, 2005 and thereafter.
Plaintiffs seek compensatory and exemplary damages.

\* \* \*

### III.

#### Parties

3.     Plaintiffs, BLAIR BOUTTE, DORIS SHANTS AND
HERBERT WARREN are representative of classes of
persons on New Orleans, Louisiana and surrounding
parishes who sustained the following types of damage due
to flooding following Hurricane Katrina: persons who
sustained damage to their personal and real property,
persons who sustained personal injury, persons who are the
heirs of persons who died as the result of the flooding and
are representative of those with wrongful death and
survival claims, persons whose businesses were damaged
due to the flooding.

4.     The following parties, made defendants in this suit, are
indebted to plaintiffs, in solido, for such damages as are

11

reasonable in the premises, with legal interest thereon from the date of judicial demand until paid:

a.  Defendant, Lafarge North America, Inc., is a Virginia Corporation that can be served through its registered agent for service of process, The Prentice-Hall Corporation Systems, Inc., 11 S. 12th Street, P.O. Box 1463, Richmond, Virginia, 23218.

b.  Defendant, John Doe, was an individual charged with the responsibility of adequately securing the barge made the basis of this suit prior to Hurricane Katrina's landfall.

c.  Defendants' acts and omissions have caused Plaintiffs' injuries and damages detailed above in that Defendants' negligence lead to the flooding of New Orleans following Hurricane Katrina on or about August 30, 2005.

**IV.**

**Louisiana State Law Causes of Action**

5.  Prior to Hurricane Katrina's landfall, Lafarge North America, Inc. (hereafter "Lafarge") was operating a barge believed to be know as the ING4727, owned by Ingram Barge Company, as an inland hopper barge. On or about August 28 and 29, 2005, the ING4727 was under the care, custody and control of Lafarge after having unloaded its cargo at Lafarge's terminal adjacent to the Industrial Canal.

\* \* \*

**V.**

**Count 1 Negligence**

9.  Defendants' conduct in not removing and/or failing to adequately secure the barge was the cause in fact of all Plaintiffs' injuries and damages as set forth above. Defendants owed a duty to Plaintiffs to exercise reasonable care in removing and/or securing the barge prior to the landfall of Hurricane Katrina. Defendants breached their duty and such breach was the legal cause of all Plaintiff's injuries. Plaintiffs have all suffered substantial damage as

12

the result of Defendants' conduct, including, but not limited to, personal injury, wrongful death, medical expenses, hospital expenses, funeral expenses, physical pain and suffering, mental anguish and distress, permanent injury and disability, loss of earnings, and or loss of real and personal property and damage to their businesses.

## VI.

## The Class

10.    Plaintiffs, individually, and on behalf of THOSE SIMILARLY SITUATED, bring this action as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of a Class, consisting of all persons who sustained personal injury, wrongful death/survival, real property damage, personal property damage and business damage class action on behalf of all persons, property owners, and business owners who sustained personal injury, wrongful death/survival claims, personal and real property damage and/or business damage as the result of flooding in New Orleans following Hurricane Katrina, beginning on or about August 30th, 2005. Excluded from the Class is the Defendants, any parent, subsidiary, affiliate, or controlled person of Defendants, as well as officers, directors, agents, servants, or employees of Defendants, and the immediate family members of such persons and any trial judge who may preside over this case.

56.    For example, in the action entitled: *Ethel Mumford v. Ingram Barge Company and Riverway Company*, Index No.: 05 CV 5724, U.S.D.C. : E.D.La., it is alleged:

## FIRST SUPPLEMENTAL AND AMENDED COMPLAINT

The first supplemental and amended complaint of Ethel Mumford, individually, and on behalf of a class of persons with common claims, with respect, represents:

## I.

Plaintiff desires to add Lafarge North America, Inc., a foreign corporation licensed to do and doing business in the State of Louisiana and within the venue of this Honorable Court, as a party defendant in the title, body, and prayer of the original complaint liable, jointly and in solido, with the original defendants

13

for the legal liability, acts of omission, acts of commission, and damages, alleged arising out of their joint, and concurrent, responsibility arising out of its ownership, charter, operation, and [. . . .]

\* \* \*

**SUIT FOR DAMAGES**
**TRIAL BY JURY**

\* \* \*

IV.

Defendants at all times pertinent were the owners, charterers, operators of a steel freight barge 200 feet in length, 35 feet in breadth, and 12 feet in depth, identified as ING 4727, VIN #955868, hull # 1942-10, and alternative VIN #CG025606.

V.

The allision between the unmanned barge and the east side flood wall compels defendants to prove that their negligence was not a proximate cause of the allision. At all times pertinent the aforesaid barge was under the joint, and concurrent, control and supervision of defendants through their employees acting in the course and scope of their employment with defendants. The incident was of a kind and nature that cannot occur without negligence and all of the facts are within the exclusive knowledge, and control of defendants and not equally accessible to plaintiffs wherefore the doctrine of res ipsa loquitur is applicable and specially pleaded herein.

\* \* \*

VII.

The aforesaid barge, abandoned by defendants to the elements, broke loose from its inadequate moorings and crashed through the East side flood wall of the Industrial Canal taking out a large section of the flood wall causing a huge amount of water from Lake Pontchartrain and the Industrial Canal to flow into the Ninth Ward of Orleans Parish and St. Bernard Parish causing catastrophic damage, personal injury and mental anguish to the nominal plaintiff and the class she seeks to represent.

* * *

IX.

Plaintiff's are entitled to recover of defendants the following elements of compensatory damage, among others that will be shown at the time of trial, to wit:

1.    Damage to their immovable and movable properties;

2.    Demolition and salvage of their immovable and movable properties;

3.    Cost of restoration of their land to the pre-Katrina uncontaminated state;

4.    Displacement cost in the temporary replacement of their home, and property;

5.    Lost income;

6.    Pain, suffering, and mental anguish.

57.    For example, in the action entitled: *In The Matter Of The Complaint Of Ingram Barge Company, As Owner Of The ING4727, Petitioning For Exoneration From Or Limitation Of Liability*, Index No.: 05 CV 4419, U.S.D.C. : E.D.La., it is alleged:

**THIRD-PARTY COMPLAINT AND CLASS ACTION
FOR COMPENSATORY AND EXEMPLARY
DAMAGES AND FOR REASONABLE
ATTORNEY'S FEES AND TAXABLE COSTS**

I.

Claimants and Third-Party Plaintiffs are The Parfait Family, Ashton R. O'Dwyer, Jr. (appearing in proper person), Wilson Simmons, Procula D. Simmons, Tammy Amos, Michael Green, Helen Frank . . . .

II.

Made third-party defendants in this action are the following:

* * *

2)      Lafarge North America Inc., a foreign corporation having its principal office and place of business in Baltimore, Maryland.

* * *

IV.

Sometime during or after the Category 5 hurricane KATRINA's passing through the Greater New Orleans Metropolitan area, a barge owned by Ingram Barge Company, namely the Barge ING-4727, broke free from its moorings and knocked down the floodwall of the Industrial Canal, causing widespread flooding in an area below the Industrial Canal, which otherwise would have survived the storm, causing Claimants to suffer the following:

a)      Death;

b)      Bodily injury;

c)      Loss of or damage to immovable property;

d)      Loss of or damage to movable property;

* * *

VII.

Claimants and Third-Party Plaintiffs invoke the Pennsylvania Rule, and aver that Third-Party Defendants are presumed to be at fault, because a moving vessel struck and penetrated a fixed or stationary object, namely the floodwall of the Industrial Canal.

58.    In each of the actions referenced above in paragraphs 55, 56, and 57, *supra*, it has been alleged that defendant LAFARGE was, at all times relevant, the owner, operator and/or in control of the Barge ING 4727 and by virtue of alleged negligent conduct caused the Barge ING 4727 to break loose of its moorings and strike the levy along the Industrial Canal, causing widespread flooding with ensuing personal injury and property damage.

16

59.    On or about September 9, 2005, defendant LAFARGE placed NYMAGIC on notice of claims that may be covered by the primary MMO Policy.

60.    On or about March 3, 2006, defendant LAFARGE submitted a claim to THE CLUB seeking "indemnification for all potential liability and/or reasonable settlements and litigation costs . . ." in connection with certain claims for property damage and/or personal injury relating to the breakaway of Barge ING 4727 and arising from the Hurricane Katrina disaster in New Orleans.

61.    On or about April 21, 2006, the defendant AMERICAN CLUB sent a letter to defendant LAFARGE wrongfully declining coverage to defendant LAFARGE, on the alleged ground that Barge ING 4727 had not been entered with the defendant AMERICAN CLUB at the time of the casualty, or at any other time, and even if it had been entered, coverage for claims against the vessel would have been excluded.

62.    Defendant LAFARGE is pursuing its claim for coverage and defense costs from the defendant AMERICAN CLUB relating to claims arising from the breakaway of the Barge ING 4727 in a related lawsuit entitled: *American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Lafarge North America, Inc.*, United States District Court, Southern District of New York, 06 CV 3123 (CSH) ("the Club D.J. Action").

63.    Defendant AMERICAN CLUB maintains that it does not cover any of defendant LAFARGE'S liabilities or defense costs arising from the breakaway of Barge ING 4727, which is central to the Katrina Claims.

64.    If the defendant AMERICAN CLUB is permitted to maintain its wrongful denial of defendant LAFARGE'S claim for defense costs and possible indemnification, these plaintiffs,

17

together with the non-party NYMAGIC, will sustain damage by defendant LAFARGE'S pursuit of coverages under the Excess Policy.

## AS AND FOR A FIRST CAUSE OF ACTION, AN ACTION AGAINST THE AMERICAN CLUB

65.    Repeat and incorporate by reference the allegations set forth in paragraphs 1 through 64, inclusive of this Complaint with the same force and effect as if more fully set forth herein.

66.    On or about April 21, 2006, defendant AMERICAN CLUB declined the claim by defendant LAFARGE for defense costs and indemnity with regard to the Katrina Claims by filing the Club D.J. Action.  A copy of the Complaint without exhibits is annexed hereto as Exhibit 2.

67.    In the Club D.J. Action filed by the defendant AMERICAN CLUB, two (2) causes of action are set forth for the declination of defendant LAFARGE'S claim for defense costs and indemnity with regard to the Katrina Claims.

68.    In the First Cause of Action in the Club D.J. Action, the defendant AMERICAN CLUB alleges that it does not insure the defendant LAFARGE for the liabilities arising out of or in connection with the Barge ING 4727 because 1) that barge is not listed on the Schedule of Vessels in the Certificate of Entry, 2) the Barge ING 4727 was not acquired by defendant LAFARGE in addition to or in substitution of scheduled vessels, 3) defendant LAFARGE did not acquire insurable interest in Barge ING 4727, and 4) defendant LAFARGE'S interest in Barge ING 4727 was not pursuant to a purchase or charter.

69.    The legal relationship which defendant LAFARGE has with the Barge ING 4727 is set forth, at least in part, in a particular Transportation Agreement (hereinafter "TA") by and

between defendant LAFARGE and Ingram Barge Company.  A copy of the TA is annexed

hereto as Exhibit 3.

70.    In and by the terms of the TA, it provides in relevant part:

34.    Possession of the Barge during Loading/Unloading:

Carrier [Ingram] shall deliver an empty or loaded barge to a
loading/unloading facility designated by Shipper [Lafarge]
for loading or unloading.  Shipper shall assume the duty
and responsibility for the safety of each barge in its
possession.    For the purposes of this Agreement,
"possession" shall begin when a Carrier delivers an empty
or loaded barge for loading or unloading to the landing
designated by Shipper and shall end when the barge is
removed by the Carrier or its agent(s).  Shipper shall be
responsible for the safekeeping of Carrier's barge delivered
to a landing regardless of whether Shipper owns or operates
the landing.  During possession, any barge delivered to a
landing designated by the Shipper shall be held without
charge to Carrier.

\* \* \*

36.    Mooring:

Shipper warrants that barges will be safely and adequately
moored free of wharfage, dockage, port and harbor charges
at the loading and unloading points and that the barges will
have warning lights properly displayed as required by
applicable U.S. Coast Guard and U.S. Army Corps. of
Engineers regulations and permits.  While barges are in the
care and custody of Shipper, or its agents, all U.S. Coast
Guard and U.S. Army Corps of Engineers regulations will
be complied with, . . . . (emphasis added).

71.    At all times relevant, pursuant to the terms of the TA and at law, defendant

LAFARGE had an insurable interest in Barge ING 4727.

72.    At all times relevant, Barge ING 4727 was at least a vessel in addition to if not in

substitution for those vessels identified in the "Certificate of Entry."

73.     Pursuant to the terms of the TA, defendant LAFARGE did obtain an insurable interest in the Barge ING 4727 through a "charter, lease or _otherwise_." (emphasis added).

74.     Pursuant to the Certificate of Entry, and the terms and conditions of the TA, coverage under the Club Rules "automatically" attached to the Barge ING 4727.

75.     Defendant LAFARGE did report to the defendant AMERICAN CLUB the name and gross tonnage of Barge ING 4727 and is willing to pay any additional reasonable premium as part of the automatic coverage that attached to the Barge ING 4727.

76.     Defendant LAFARGE has complied with all necessary conditions under the Certificate of Entry for coverage to attach on the Barge ING 4727 under the liability insurance provided by the Club Rules and the Certificate of Entry.

77.     Defendant AMERICAN CLUB is liable under the Certificate of Entry and the Club Rules 1) to provide defendant LAFARGE with the defense costs in the underlying Katrina related litigations, 2) to reimburse defendant LAFARGE for the cost of defending the Club D.J. Action and is liable to pay the cost of this declaratory judgment action incurred by plaintiffs NACA and AHAC to have the defendant AMERICAN CLUB'S wrongful declination found judicially null and void and without effect.

78.     In the Second Cause of Action in the Club D.J. Action, defendant AMERICAN CLUB alleges that defendant LAFARGE does not have any coverage under the Club Rules because of 1) the existence of Other Insurance and/or 2) that whatever liability, if any, arises from a indemnity agreement, because no such indemnity agreement was presented to the defendant AMERICAN CLUB for approval, and/or 3) defendant LAFARGE did not provide the defendant AMERICAN CLUB with a copy of the TA for THE CLUB'S approval.

20

79.    By virtue of the specific grounds for declination set forth in the Declaratory Judgment Complaint filed by defendant AMERICAN CLUB, any other possible or potential defenses to coverage under the Club Rules or Certificate of Entry have been waived.

80.    There is no express or implied term in the Certificate of Entry requiring THE CLUB'S approval for the TA.

81.    As set forth in the allegations of the underlying complaint by the various and several claimants in the Katrina litigations, liabilities being sought to be imposed upon defendant LAFARGE, in whole or in part, do not arise under a contract of indemnity.

82.    Based upon the terms and conditions of the "Other Insurance" clauses set forth in the MMO Policy and the Club Rules, THE CLUB'S defense of "Other Insurance" under New York law is invalid because an escape clause, such as that set forth in the Club Rules, is rendered ineffective and/or invalid when the Other Insurance policy on the same level as THE CLUB'S primary cover contains an "Other Insurance" clause which transforms the primary to an excess policy such as that set forth in the MMO Policy.

## AS AND FOR A SECOND CAUSE OF ACTION, AN ACTION AGAINST LAFARGE

83.    Repeat and incorporate by reference the allegations set forth in paragraphs 1 through 82, inclusive of this Complaint with the same force and effect as if more fully set forth herein.

84.    The Excess Policy provides in relevant part:

11.    MAINTENANCE OF UNDERLYING INSURANCE:

A.    It is a condition of this policy that the Section(s) or Policy(ies) referred to below in the "Schedule of Underlying Insurance" shall be maintained in full effect during the currency of this insurance except for any reduction of the aggregate limit(s) contained

21

therein solely by payment of claims in respect of accidents and/or occurrences, occurring during the term of this Policy.

B.    Inadvertent failure of the Assured to comply with Paragraph A above or inadvertent failure to notify this Company of any changes in the Underlying Insurances shall not prejudice the Assured's rights of recovery under this Policy, but in the event of such failure, this Company to be liable only to the same extent as they would have been had the Assured complied with the said condition.

85.    In the event that defendant LAFARGE failed to comply with all requirements of the Club Rules and/or the Certificate of Entry, which were and are necessary to bring the Barge ING 4727 within the scope of the coverage provided by the AMERICAN CLUB, such failure even if inadvertent, relieves the subscribers to the Excess Policy, including these plaintiffs of any obligation to make payment to defendant LAFARGE until such time as the amount which would have been covered under the Club Rules and the Certificate of Entry would have been exhausted as if coverage under the Club Rules and the Certificate of Entry were in fact in full force and effect.

86.    By virtue of the foregoing premises, the subscribing underwriters to the Excess Policy, including these plaintiffs shall not be required to pay under the Excess Policy until such time as an amount equivalent to the full amount of coverage under the AMERICAN CLUB been paid by defendant LAFARGE.

## AS AND FOR A THIRD CAUSE OF ACTION, AN ACTION AGAINST LAFARGE

87.    Repeat and incorporate by reference the allegations set forth in paragraphs 1 through 86, inclusive of this Complaint with the same force and effect as if more fully set forth herein.

22

88.    The MMO Policy provides in relevant part:

4.    **NAMING ATTORNEYS:**

This Company, in consideration, in consultation with the Assured, shall have the option of naming any mutually acceptable attorneys who shall represent the Assured in the prosecution or defense of any litigation or negotiations between the Assured and third parties concerning any claim based on a liability or an alleged liability covered by this policy, and shall have the direction of such litigation's [sic] or negotiations. If the Assured shall fail or refuse to settle any claim as authorized by this Company, the liability of this Company shall be limited to the amount for which settlement could have been made. (emphasis added).

89.    In and by the terms of the MMO Policy, the non-party NYMAGIC had the sole right with the consent of the Assured to name counsel for defendant LAFARGE in the actions involving the Katrina Claims.

90.    In and by the terms of the MMO Policy, defendant LAFARGE had no right whatsoever to name counsel to defend its interest in the Katrina Claims at the expense of the primary insurer NYMAGIC and/or the excess insurers, NYMAGIC, and plaintiffs AHAC and NACA.

91.    At all times relevant, the non-party NYMAGIC, after consultation with LAFARGE, sought the consent of LAFARGE for the retention of one of several firms to provide a defense for defendant LAFARGE in the underlying actions involving the Katrina Claims.

92.    At all times relevant, defendant LAFARGE failed to consult with NYMAGIC in good faith and wrongfully and unreasonably withheld consent to the appointment of counsel by NYMAGIC to defend defendant LAFARGE in the underlying Katrina Claims.

93.    By reason of defendant LAFARGE's failure to consult with NYMAGIC in good faith and then unreasonably withhold its consent to the counsel named by NYMAGIC, defendant

LAFARGE has, as a matter of law, waived its rights to participate in the naming of defense counsel under the MMO Policy and Excess Policy.

94.     After due consideration, NYMAGIC retained the law firm of Sutterfield & Webb, LLC., as counsel to defend LAFARGE in the Katrina Claims.

95.     At this time, defendant LAFARGE has paid and/or incurred cost for its separately retained counsel, Goodwin Procter, Holland & Knight, and Chaffe McCall, in an amount in excess of $7.5 million, whose services were and are, in whole or in part, duplicative of those services and/or unwarranted services rendered by counsel retained by NYMAGIC on behalf of defendant LAFARGE in defense of the underlying Katrina Claims.

96.     Defendant LAFARGE is now making claim under the MMO Policy and the Excess Policy for reimbursement of the costs for its separately retained counsel without having consulted with and/or having obtained the approval of plaintiffs AHAC and NACA and the non-party NYMAGIC.

97.     In and by the terms of the Excess Policy, it provides in relevant part:

4.     **ASSISTANCE AND COOPERATION:**

> This Company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceedings instituted against the Assured, but <u>this Company shall have the right and shall be given the opportunity to associate with the Assured or the Assured's Underlying Insurers, or both, in the defense and control of any claim</u>, suit or proceeding relative to an occurrence where the claim or suit involves or appears reasonably likely to involve this Company in which event the Assured, the Underlying Insurers and this Company shall cooperate in all things in the defense of such claim, suit or proceeding. (emphasis added).

98.    By the terms of the Excess Policy, plaintiffs AHAC and NACA, together with the non-party NYMAGIC, have the absolute right to be given the opportunity to associate with the insured and the underlying insurer in the defense and control of the Katrina Claims.

99.    Defendant LAFARGE did not give the plaintiffs AHAC and NACA and/or the non-party NYMAGIC an opportunity to associate with the defendant LAFARGE on the selection of its counsel and/or on the proper management and cost control of the defense of the underlying Katrina Claims with respect to the counsel which were separately retained by defendant LAFARGE.

100.    By virtue of the foregoing premises, defendant LAFARGE has no right to seek reimbursement for the past and/or future payments to be made to those counsel which were separately retained by defendant LAFARGE without the consent of, and/or without consultation with, its primary and excess insurers.

### AS AND FOR A FOURTH CAUSE OF ACTION,
### AN ACTION AGAINST BOTH THE AMERICAN CLUB AND LAFARGE

101.    Repeat and incorporate by reference the allegations set forth in paragraphs 1 through 100, inclusive of this Complaint with the same force and effect as if more fully set forth herein.

102.    The MMO Policy contains an "Other Insurance" clause which renders the MMO Policy excess to any other primary policy.

103.    The primary insurance coverage provided under the Club Rules and Certificate of Entry contains an "Other Insurance" clause or terms which attempts to make THE CLUB coverage null and void if Other Insurance coverage is applicable to the claim.

104.    Under New York law, when comparing an excess type "Other Insurance" clause in a primary policy to an escape type of "Other Insurance" clause in a second primary policy

25

covering the same insured, the escape clause is given no force and effect rendering the primary

policy with the escape clause the ultimate primary policy to respond to the claim with the other

primary policy containing the excess clause being the first excess policy.

105.    The Excess Policy subscribed to by these plaintiffs, together with the non-party

NYMAGIC, is a true Excess Policy which schedules both the MMO Policy and THE CLUB

cover as Underlying Insurance and therefore renders the Excess Policy the excess insurance

coverage to both the MMO Policy and THE CLUB cover.

106.    The Excess Policy also contains an "Other Insurance" clause which by its terms

makes it excess to any primary policy.

107.    By virtue of the foregoing, the coverage afforded under the Excess Policy is not

triggered until the limits of liability for the coverage afforded under both the MMO Policy and

THE CLUB cover are fully exhausted.

WHEREFORE, the plaintiffs The Northern Assurance Company of America and

American Home Assurance Company prays for judgment as follows:

A.    On the First Cause of Action, a judgment in favor of the plaintiffs The Northern

Assurance Company of America and American Home Assurance Company

against the defendant American Steamship Owners Mutual Protection and

Indemnity Association, Inc. declaring that the Club's denial of coverage to

defendant Lafarge North America, Inc. is invalid and that there is coverage under

the Club Rules and Certificate of Entry issued to defendant Lafarge North

America, Inc. for, at a minimum, the cost of paying for defending all underlying

Katrina Claims and related litigations;

B. On the Second Cause of Action, a judgment in favor of plaintiffs The Northern Assurance Company of America and American Home Assurance Company against defendant Lafarge North America, Inc., declaring that the Excess Marine Liability Policy, issued by plaintiffs The Northern Assurance Company of America and American Home Assurance Company, together with the non-party NYMAGIC, to defendant Lafarge North America, Inc. does not respond until the dollar limit under the primary MMO Policy has been paid up to its full limit of $5,000,000.00 and defendant Lafarge North America, Inc. has paid the full amount which should have been paid under the Club cover but for defendant Lafarge North America, Inc.'s failure to comply with the requirements to have the Barge ING 4727 validly entered for coverage under the Club Rules and Certificate of Entry.

C. On the Third Cause of Action, a judgment in favor of plaintiffs The Northern Assurance Company of America and American Home Assurance Company against defendant Lafarge North America, Inc. declaring that the Excess Marine Liability Policy issued by the plaintiffs The Northern Assurance Company of America and American Home Assurance Company, including the non-party NYMAGIC, are not liable to reimburse defendant Lafarge North America, Inc. for payments to those several counsel engaged by Lafarge North America, Inc. without the consent of the insurers.

D. On the Fourth Cause of Action, a judgment in favor of plaintiffs The Northern Assurance Company of America and American Home Assurance Company against both defendants Lafarge North America, Inc. and American Steamship

Owners Mutual Protection and Indemnity Association, Inc. declaring that the

Excess Marine Liability Policy issued by the plaintiffs The Northern Assurance

Company of America and American Home Assurance Company, including the

non-party NYMAGIC, to defendant Lafarge North America, Inc. is excess to the

available coverages under both the MMO Policy and the Club cover; and

E.      For other and such further relief as the Court deems just and proper;

and for the cost and disbursements of this action.


Dated:     New York, New York
           April 1, 2008


                              NICOLETTI HORNIG & SWEENEY
                              *Attorneys for Plaintiffs*
                              *The Northern Assurance Company of America*
                              *and American Home Assurance Company*


                    By:     _John A. V. Nicoletti (N.N.)_
                              John A. V. Nicoletti (JN-7174)
                              Nooshin Namazi (NN-9449)
                              Wall Street Plaza
                              88 Pine Street, 7th Floor
                              New York, New York 10005-1801
                              Telephone:   (212) 220-3830
                              Facsimile:   (212) 220-3780
                              Email:       jnicoletti@nicolettihornig.com
                              (FILE NO.:  10000478 JAVN/NN/WMF)

# EXHIBIT 1

Mitchell 4



American Steamship Owners Mutual Protection and Indemnity Association, Inc.
60 Broad Street - 37th Floor,
New York, NY 10004, U.S.A.

Shipowners Claims Bureau, Inc., Manager

# CERTIFICATE OF ENTRY

of the vessel(s) set out herein for account of the Member named hereunder subject to the By-Laws and Rules of the Association from time to time in force and to any special terms and conditions endorsed hereon and/or as may from time to time be circulated. Unless indicated to the contrary herein, the cover evidenced by this Certificate of Entry commences at noon GMT on the date specified below and continues until cover ceases or is terminated in accordance with the said By-Laws and Rules.

## Class I – Protection & Indemnity Insurance

| VESSEL(S) | FLAG | GROSS TONNAGE | COVER TO COMMENCE |
|---|---|---|---|
| As per Schedule | As per Schedule | As per Schedule | 20 February, 2005 |
| | | | RENEWAL DATE: |
| | | | 20 February, 2005 |

| MEMBER |
|---|
| LAFARGE NORTH AMERICA INC. |

| SPECIAL TERMS & CONDITIONS AS ATTACHED |
|---|

**IMPORTANT**

This Certificate of Entry is evidence only of the contract of indemnity insurance between the above-named Member and the Association and shall not be construed as evidence of any undertaking, financial or otherwise, on the part of the Association to any other party.

If a Member tenders this Certificate as evidence of insurance under any applicable law relating to financial responsibility, or otherwise shows or offers it to any other party as evidence of insurance, such use of this Certificate by the Member is not to be taken as any indication that the Association thereby consents to act as guarantor or to be sued directly in any jurisdiction whatsoever. The Association does not so consent.

The Member named in this Certificate of Entry is liable to pay Mutual Premium as provided for in Rule 4. Furthermore, the Member may become liable under the said Rule 4 to pay Overspill Calls to meet the Association's proportion of any Overspill Claims up to the limit per vessel as provided for in the said Rule 4.

CERTIFICATE NO.:    01729000

NEW YORK:    31 March, 2005    BY: _____

AUTHORIZED SIGNATURE

CLUB000424



CERTIFICATE NO.: 0173-9000

## SCHEDULE OF VESSELS

| VESSEL NAME | TYPE | FLAG | GROSS TONNAGE |
|---|---|---|---|
| ADELAIDE | Barge (dry) | USA | 8,512 |
| ALEXANDRA | Barge (dry) | USA | 8,512 |
| BARGE JOPPA | Tank Barge | USA | 1,500 |
| BELCRAFT | Barge (dry) | USA | 3,614 |
| CITADEL I | Barge (dry) | USA | 1,500 |
| CITADEL II | Barge (dry) | USA | 1,500 |
| CITADEL III | Barge (dry) | USA | 1,500 |
| CITADEL IV | Barge (dry) | USA | 1,500 |
| FLOATING DOCK JOPPA | Tank Barge | USA | 1,500 |
| G.L. OSTRANDER | Tug/Supply | USA | 198 |
| INTEGRITY | Dirty Oil Tank | USA | 7,557 |
| J.B. FORD | Bulk | USA | 4,368 |
| MAGNOLIA | Tank Barge | USA | 1,734 |
| MARIA T | Barge (dry) | USA | 8,855 |
| MC 65-2 | Barge (dry) | USA | 180 |
| MC 66-2 | Barge (dry) | USA | 180 |
| MPC253 | Barge (dry) | USA | 1,400 |
| MPC256 | Barge (dry) | USA | 1,400 |
| MPC257 | Barge (dry) | USA | 1,400 |
| MPC258 | Barge (dry) | USA | 1,400 |
| MPC259 | Barge (dry) | USA | 1,400 |
| MPC31 | Barge (dry) | USA | 1,800 |
| MPC32 | Barge (dry) | USA | 1,800 |
| MPC33 | Barge (dry) | USA | 2,600 |
| MPC350 | Barge (dry) | USA | 1,200 |
| MPC351 | Barge (dry) | USA | 1,500 |
| MPC352 | Barge (dry) | USA | 1,500 |
| MPC51 | Barge (dry) | USA | 1,526 |
| MPC52 | Barge (dry) | USA | 1,526 |
| MPC53 | Barge (dry) | USA | 1,526 |
| MPC54 | Barge (dry) | USA | 1,526 |
| MPC55 | Barge (dry) | USA | 1,526 |

2

CLUB000425

CERTIFICATE NO.:   01729000



| MPC66 | Barge (dry) | USA | 1,400 |
|---|---|---|---|
| MPC67 | Barge (dry) | USA | 1,400 |
| MPC68 | Barge (dry) | USA | 1,400 |
| MPC69 | Barge (dry) | USA | 1,400 |
| MPC70 | Barge (dry) | USA | 1,400 |
| MPC71 | Barge (dry) | USA | 1,400 |
| MPC72 | Barge (dry) | USA | 1,400 |
| MPC73 | Barge (dry) | USA | 1,400 |
| MPC74 | Barge (dry) | USA | 1,400 |
| MPC75 | Barge (dry) | USA | 1,400 |
| MPC76 | Barge (dry) | USA | 1,400 |
| MPC77 | Barge (dry) | USA | 1,400 |
| MPC78 | Barge (dry) | USA | 1,400 |
| MPC79 | Barge (dry) | USA | 1,400 |
| MPC80 | Barge (dry) | USA | 1,400 |
| MPC81 | Barge (dry) | USA | 1,400 |
| MPC82 | Barge (dry) | USA | 1,400 |
| MPC83 | Barge (dry) | USA | 1,400 |
| MPC84 | Barge (dry) | USA | 1,400 |
| MPC85 | Barge (dry) | USA | 1,400 |
| MPC86 | Barge (dry) | USA | 1,400 |
| MPC87 | Barge (dry) | USA | 1,400 |
| MPC88 | Barge (dry) | USA | 1,400 |
| MPC89 | Barge (dry) | USA | 1,900 |
| MPC90 | Barge (dry) | USA | 1,400 |
| MPC91 | Barge (dry) | USA | 1,400 |
| MPC92 | Barge (dry) | USA | 1,400 |
| MPC93 | Barge (dry) | USA | 1,400 |
| MPC94 | Barge (dry) | USA | 1,400 |
| MPC95 | Barge (dry) | USA | 1,400 |
| MPC96 | Barge (dry) | USA | 1,400 |
| MPC97 | Barge (dry) | USA | 1,400 |
| NORFOLK | Tug | USA | 499 |
| TRINITY I | Barge (dry) | USA | 400 |
| TRINITY II | Barge (dry) | USA | 1,102 |

3

CLUB000426

CERTIFICATE NO.:   01725000

| MPC81 | Barge (dry) | USA | 1,400 |
| MPC82 | Barge (dry) | USA | 1,400 |
| MPC84 | Barge (dry) | USA | 1,400 |
| MPC83 | Barge (dry) | USA | 1,400 |
| MPC85 | Barge (dry) | USA | 1,400 |

4

CLUB000427



CERTIFICATE NO.:    01729000

## SPECIAL TERMS & CONDITIONS

| | |
|---|---|
| COLLISION | **FOUR-FOURTHS COLLISION COVERAGE INCLUDED**<br><br>Coverage hereunder, pursuant to Rule 2, Section 3.2, includes four-fourths of those liabilities, costs and expenses set out as insured losses in the Collision Clause of the American Institute Hull Clauses (June 2, 1977), or as provided for by such similar terms as may be contained in the insured vessel's hull policies, and which would have been covered under the said Clauses, or hull policies but for their exclusion therefrom, and subject always and in any event to each and every other provision of Rule 2, Section 3, in general. |
| EXCLUSIONS | **COVERAGE IN RESPECT OF CARGO AND UNRECOVERABLE G.A. CONTRIBUTIONS EXCLUDED**<br><br>Coverage hereunder excludes absolutely all those claims in respect of cargo otherwise recoverable in accordance with Rule 2, Section 7, all those claims for Fines otherwise recoverable under Rule 2, Section 8.1, and all those claims in respect of unrecoverable general average contributions otherwise recoverable in accordance with Rule 2, Section 12. |
| DEDUCTIBLES | US$25,000 from all claims, each accident or occurrence. |
| OTHER CLAUSES | **NO LAID-UP RETURNS**<br><br>It is hereby noted and agreed that the provisions of Rule 4, Section 11, do not apply to the coverage evidenced by this Certificate of Entry. |
| MEMBER SPECIFIC CLAUSES | **CHARTERED BARGES**<br><br>If Lafarge Corporation et al acquires an insurable interest in any vessel in addition to or in substitution for those set forth herein, through purchase, charter, lease or otherwise, such insurance as is afforded hereunder to any similar vessel shall automatically cover such additional vessel effective from the date and time the Assured acquires an insurable interest in such additional vessel. With respect to a chartered, leased or similarly acquired vessel, the insurance hereunder automatically includes the owner as an additional Assured with waiver of subrogation against the owner, if required, effective from the date and time such vessel is insured hereunder.<br><br>The above provision shall not apply to vessels which are chartered under a contract whereby the owner (or Demise Owner) and Charterer agree that the owner (or Demise Owner) shall procure Protection & Indemnity Insurance on the vessel and such insurance shall include the charterer as an Assured. |

5

CLUB000428

CERTIFICATE NO.:    D1729000

THE AMERICAN CLUB

The Assured agrees to report the name and gross tonnage of any vessel in which they acquire an insurable interest at the expiration of this policy and pay any additional premium as may be required annually, at expiry at daily pro-rate the annual rates agreed.

6

CLUB000429



CERTIFICATE NO.:   01729000

PREMIUM(S)

| VESSEL NAME | RISK NUMBER | GT | RATE (USD per GT per annum) | ADVANCE PREMIUM FOR PERIOD (US Dollar) |
|---|---|---|---|---|
| ADELAIDE | 37741 | 8,512 | 1.6128 | 13,728.15 |
| ALEXANDRA | 37742 | 8,512 | 1.6128 | 13,728.15 |
| BARGE JOPPA | 37743 | 1,500 | 1.6128 | 2,419.20 |
| BELCRAFT | 37744 | 3,614 | 1.6128 | 5,828.68 |
| CITADEL I | 37745 | 1,500 | 1.6128 | 2,419.20 |
| CITADEL II | 37746 | 1,500 | 1.6128 | 2,419.20 |
| CITADEL III | 37747 | 1,500 | 1.6128 | 2,419.20 |
| CITADEL IV | 37748 | 1,500 | 1.6128 | 2,419.20 |
| FLOATING DOCK JOPPA | 37749 | 1,500 | 1.6128 | 2,419.20 |
| G.L. OSTRANDER | 37750 | 198 | 94.9772 | 18,805.49 |
| INTEGRITY | 37751 | 7,557 | 1.6128 | 12,187.93 |
| J.B. FORD | 37752 | 4,368 | 1.6128 | 7,044.71 |
| MAGNOLIA | 37753 | 1,734 | 1.6128 | 2,796.60 |
| MARIA T | 37754 | 8,865 | 1.6128 | 14,297.47 |
| MC 05-2 | 37755 | 180 | 13.4400 | 2,419.20 |
| MC 06-2 | 37756 | 180 | 13.4400 | 2,419.20 |
| MPC253 | 37757 | 1,400 | 1.7280 | 2,419.20 |
| MPC256 | 37758 | 1,400 | 1.7280 | 2,419.20 |
| MPC257 | 37759 | 1,400 | 1.7280 | 2,419.20 |
| MPC258 | 37760 | 1,400 | 1.7280 | 2,419.20 |
| MPC259 | 37761 | 1,400 | 1.7280 | 2,419.20 |
| MPC31 | 37762 | 1,800 | 1.3440 | 2,419.20 |
| MPC32 | 37763 | 1,800 | 1.3440 | 2,419.20 |
| MPC33 | 37764 | 2,600 | 0.9466 | 2,461.16 |
| MPC350 | 37765 | 1,200 | 2.0160 | 2,419.20 |
| MPC351 | 37766 | 1,500 | 1.6128 | 2,419.20 |
| MPC352 | 37767 | 1,500 | 1.6128 | 2,419.20 |
| MPC51 | 37768 | 1,528 | 1.6128 | 2,461.13 |
| MPC52 | 37769 | 1,528 | 1.6128 | 2,461.13 |
| MPC53 | 37770 | 1,528 | 1.6128 | 2,461.13 |

7

CLUB000430

CERTIFICATE NO.:   01729000



| | | | | |
|---|---|---|---|---|
| MPC54 | 37771 | 1,626 | 1.8128 | 2,461.13 |
| MPC55 | 37772 | 1,526 | 1.8128 | 2,461.13 |
| MPC56 | 37773 | 1,400 | 1.7280 | 2,419.20 |
| MPC67 | 37774 | 1,400 | 1.7280 | 2,419.20 |
| MPC68 | 37775 | 1,400 | 1.7280 | 2,419.20 |
| MPC89 | 37776 | 1,400 | 1.7280 | 2,419.20 |
| MPC70 | 37777 | 1,400 | 1.7280 | 2,419.20 |
| MPC71 | 37778 | 1,400 | 1.7280 | 2,419.20 |
| MPC72 | 37779 | 1,490 | 1.7280 | 2,419.20 |
| MPC73 | 37780 | 1,400 | 1.7280 | 2,419.20 |
| MPC74 | 37781 | 1,400 | 1.7280 | 2,419.20 |
| MPC75 | 37782 | 1,400 | 1.7280 | 2,419.20 |
| MPC76 | 37783 | 1,400 | 1.7280 | 2,419.20 |
| MPC77 | 37784 | 1,400 | 1.7280 | 2,419.20 |
| MPC78 | 37785 | 1,400 | 1.7280 | 2,419.20 |
| MPC79 | 37786 | 1,400 | 1.7280 | 2,419.20 |
| MPC80 | 37787 | 1,400 | 1.7280 | 2,419.20 |
| MPC81 | 37788 | 1,400 | 1.7280 | 2,419.20 |
| MPC82 | 37789 | 1,400 | 1.7280 | 2,419.20 |
| MPC83 | 37790 | 1,400 | 1.7280 | 2,419.20 |
| MPC84 | 37791 | 1,400 | 1.7280 | 2,419.20 |
| MPC85 | 37792 | 1,400 | 1.7280 | 2,419.20 |
| MPC86 | 37793 | 1,400 | 1.7280 | 2,419.20 |
| MPC87 | 37794 | 1,400 | 1.7280 | 2,419.20 |
| MPC88 | 37795 | 1,400 | 1.7280 | 2,419.20 |
| MPC89 | 37796 | 1,400 | 1.7280 | 2,419.20 |
| MPC96 | 37797 | 1,400 | 1.7280 | 2,419.20 |
| MPC91 | 37798 | 1,400 | 1.7280 | 2,419.20 |
| MPC92 | 37799 | 1,400 | 1.7280 | 2,419.20 |
| MPC93 | 37800 | 1,400 | 1.7280 | 2,419.20 |
| MPC94 | 37801 | 1,400 | 1.7280 | 2,419.20 |
| MPC95 | 37802 | 1,400 | 1.7280 | 2,419.20 |
| MPC96 | 37803 | 1,400 | 1.7280 | 2,419.20 |
| MPC97 | 37804 | 1,400 | 1.7280 | 2,419.20 |
| NORFOLK | 37805 | 499 | 13.5271 | 6,750.02 |

8

CLUB000431



CERTIFICATE NO.:   01729000

| | | | | |
|---|---|---|---|---|
| TRINITY I | 37806 | 400 | 6.0480 | 2,419.20 |
| TRINITY II | 37807 | 1,102 | 2.1953 | 2,419.22 |
| MPC61 | 37812 | 1,400 | 1.7280 | 2,419.20 |
| MPC62 | 37813 | 1,400 | 1.7280 | 2,419.25 |
| MPC64 | 37819 | 1,400 | 1.7280 | 2,419.20 |
| MPC63 | 37820 | 1,400 | 1.7280 | 2,419.20 |
| MPC65 | 37821 | 1,400 | 1.7280 | 2,419.20 |

9

CLUB000432

American Steamship Owners Mutual Protection & Indemnity Association, Inc.



| | | |
|---|---|---|
| THE AMERICAN CLUB | Shipowners Claims Bureau, Inc., Manager<br>60 Broad Street – 37th Floor<br>New York, New York 10004<br>U.S.A. | Tel: +1 212-847-4500<br>Fax: +1 212-847-4599 |

Willis of New York, Inc.
7 Hanover Square
New York, NY 10004-2594
USA

Date:        31 Mar 2005

Invoice No:        28299

For the Account of: Lafarge North America Inc.
Our Reference:  440

ADVANCE PREMIUM
CLASS P&I
FOR THE PERIOD FROM 20 Feb 2005 TO 20 Feb 2006
NO OF DAYS PRO RATA 365/365

| Vessel | (Risk No) | GT | Annual Rate USD per GT | Advance Premium for Period |
|---|---|---|---|---|
| ADELAIDE | (37741) | 8,512 | 1.6128 | 13,728.15 |
| ALEXANDRA | (37742) | 8,512 | 1.6128 | 13,728.15 |
| BARGE JOPPA | (37743) | 1,500 | 1.6128 | 2,419.20 |
| BELCRAFT | (37744) | 3,614 | 1.6128 | 5,828.66 |
| CITADEL I | (37745) | 1,500 | 1.6128 | 2,419.20 |
| CITADEL II | (37746) | 1,500 | 1.6128 | 2,419.20 |
| CITADEL III | (37747) | 1,500 | 1.6128 | 2,419.20 |
| CITADEL IV | (37748) | 1,500 | 1.6128 | 2,419.20 |
| FLOATING DOCK JOPPA | (37749) | 1,500 | 1.6128 | 2,419.20 |
| G.L. OSTRANDER | (37750) | 188 | 94.9772 | 18,855.49 |
| INTEGRITY | (37751) | 7,557 | 1.6128 | 12,187.93 |
| J.B. FORD | (37752) | 4,368 | 1.6128 | 7,044.71 |
| MAGNOLIA | (37753) | 1,734 | 1.6128 | 2,796.60 |
| MARIA T | (37754) | 8,865 | 1.6128 | 14,297.47 |
| MC 65-2 | (37755) | 180 | 13.4400 | 2,419.20 |
| MC 65-2 | (37756) | 180 | 13.4400 | 2,419.20 |
| MPC253 | (37757) | 1,400 | 1.7280 | 2,419.20 |
| MPC258 | (37758) | 1,400 | 1.7280 | 2,419.20 |
| MPC257 | (37759) | 1,400 | 1.7280 | 2,419.20 |
| MPC258 | (37760) | 1,400 | 1.7280 | 2,419.20 |
| MPC259 | (37761) | 1,400 | 1.7280 | 2,419.20 |
| MPC31 | (37762) | 1,800 | 1.3440 | 2,419.20 |
| MPC32 | (37763) | 1,800 | 1.3440 | 2,419.20 |
| MPC33 | (37764) | 2,600 | .9456 | 2,461.15 |

Wire/telegraphic transfers to the American Club should be made to its account at:
Deutsche Bank Trust Company Americas, New York, New York, U.S.A.
Depending upon the origin of funds, one of the following bank codes should be used:
Wire transfers made through a bank within the U.S.: ABA: 021-001-033
Wire transfers made through a bank outside the U.S.: SWIFT: BKTRUS33 or CHIPS: 0103
In both cases, funds should be indicated as being for the credit of:
Account Name: American Steamship Owners P&I Assn. Inc.
Account Number: 00-700-269

CLUB000433

American Steamship Owners Mutual Protection & Indemnity Association, Inc.



Shipowners Claims Bureau, Inc., Manager
60 Broad Street – 37th Floor
New York, New York 10004
U.S.A.

Tel: +1 212-847-4500
Fax: +1 212-847-4599

| Vessel | (Risk No) | GT | Annual Rate USD per GT | Advance Premium for Period |
|--------|-----------|-----|-----------------------|----------------------------|
| MPC350 | (37765) | 1,200 | 2.0160 | 2,419.20 |
| MPC351 | (37766) | 1,500 | 1.6128 | 2,419.20 |
| MPC352 | (37767) | 1,500 | 1.6128 | 2,419.20 |
| MPC51 | (37768) | 1,526 | 1.6128 | 2,461.13 |
| MPC52 | (37769) | 1,526 | 1.6128 | 2,461.13 |
| MPC53 | (37770) | 1,526 | 1.6128 | 2,461.13 |
| MPC54 | (37771) | 1,526 | 1.6128 | 2,461.13 |
| MPC55 | (37772) | 1,526 | 1.6128 | 2,461.13 |
| MPC61 | (37812) | 1,400 | 1.7280 | 2,419.20 |
| MPC62 | (37813) | 1,400 | 1.7280 | 2,419.20 |
| MPC63 | (37820) | 1,400 | 1.7280 | 2,419.20 |
| MPC64 | (37819) | 1,400 | 1.7280 | 2,419.20 |
| MPC65 | (37821) | 1,400 | 1.7280 | 2,419.20 |
| MPC66 | (37773) | 1,400 | 1.7280 | 2,419.20 |
| MPC67 | (37774) | 1,400 | 1.7280 | 2,419.20 |
| MPC68 | (37775) | 1,400 | 1.7280 | 2,419.20 |
| MPC69 | (37776) | 1,400 | 1.7280 | 2,419.20 |
| MPC70 | (37777) | 1,400 | 1.7280 | 2,419.20 |
| MPC71 | (37778) | 1,400 | 1.7280 | 2,419.20 |
| MPC72 | (37779) | 1,400 | 1.7280 | 2,419.20 |
| MPC73 | (37780) | 1,400 | 1.7280 | 2,419.20 |
| MPC74 | (37781) | 1,400 | 1.7280 | 2,419.20 |
| MPC75 | (37782) | 1,400 | 1.7280 | 2,419.20 |
| MPC76 | (37783) | 1,400 | 1.7280 | 2,419.20 |
| MPC77 | (37784) | 1,400 | 1.7280 | 2,419.20 |
| MPC78 | (37785) | 1,400 | 1.7280 | 2,419.20 |
| MPC79 | (37786) | 1,400 | 1.7280 | 2,419.20 |
| MPC80 | (37787) | 1,400 | 1.7280 | 2,419.20 |
| MPC81 | (37788) | 1,400 | 1.7280 | 2,419.20 |
| MPC82 | (37789) | 1,400 | 1.7280 | 2,419.20 |
| MPC83 | (37790) | 1,400 | 1.7280 | 2,419.20 |
| MPC84 | (37791) | 1,400 | 1.7280 | 2,419.20 |
| MPC85 | (37792) | 1,400 | 1.7280 | 2,419.20 |
| MPC86 | (37793) | 1,400 | 1.7280 | 2,419.20 |
| MPC87 | (37794) | 1,400 | 1.7280 | 2,419.20 |
| MPC88 | (37795) | 1,400 | 1.7280 | 2,419.20 |
| MPC89 | (37796) | 1,400 | 1.7280 | 2,419.20 |
| MPC90 | (37797) | 1,400 | 1.7280 | 2,419.20 |
| MPC91 | (37798) | 1,400 | 1.7280 | 2,419.20 |
| MPC92 | (37799) | 1,400 | 1.7280 | 2,419.20 |
| MPC93 | (37800) | 1,400 | 1.7280 | 2,419.20 |

Wire/telegraphic transfers to the American Club should be made to its account at:
Deutsche Bank Trust Company Americas, New York, New York, U.S.A.
Depending upon the origin of funds, one of the following bank codes should be used:
Wire transfers made through a bank within the U.S.: ABA: 021-001-033
Wire transfers made through a bank outside the U.S.: SWIFT: BKTRUS33 or CHIPS: 0103
In both cases, funds should be indicated as being for the credit of:
Account Name: American Steamship Owners P&I Assn, Inc.
Account Number: 00-700-269

CLUB000434

American Steamship Owners Mutual Protection & Indemnity Association, Inc.



Shipowners Claims Bureau, Inc., Manager
60 Broad Street – 37ᵗʰ Floor
New York, New York 10004
U.S.A.

Tel: +1 212-847-4500
Fax: +1 212-847-4599

| Vessel | (Risk No) | GT | Annual Rate USD per GT | Advance Premium for Period |
|---|---|---|---|---|
| MPC94 | (37801) | 1,400 | 1.7280 | 2,419.20 |
| MPC95 | (37602) | 1,400 | 1.7280 | 2,419.20 |
| MPC96 | (37803) | 1,400 | 1.7280 | 2,419.20 |
| MPC97 | (37804) | 1,400 | 1.7280 | 2,419.20 |
| NORFOLK | (37605) | 499 | 13.5271 | 6,750.02 |
| TRINITY I | (37608) | 400 | 6.0480 | 2,419.20 |
| TRINITY II | (37807) | 1,102 | 2.1953 | 2,419.22 |

| Total | USD | 247,828.42 |
|---|---|---|

| Due Dates | | Amount |
|---|---|---|
| 31 Mar 2005 | USD | 61,957.11 |
| 20 Jun 2005 | USD | 61,957.10 |
| 20 Sep 2005 | USD | 61,957.10 |
| 20 Dec 2005 | USD | 61,957.10 |

| Additional Details: | |
|---|---|

Wire/telegraphic transfers to the American Club should be made to its account at:
Deutsche Bank Trust Company Americas, New York, New York, U.S.A.
Depending upon the origin of funds, one of the following bank codes should be used:
Wire transfers made through a bank within the U.S.: ABA: 021-001-033
Wire transfers made through a bank outside the U.S.: SWIFT: BKTRUS33 or CHIPS: 0103
In both cases, funds should be indicated as being for the credit of:
Account Name: American Steamship Owners P&I Assn, Inc.
Account Number: 00-700-258

CLUB000435

# EXHIBIT 2

THACHER PROFFITT & WOOD LLP
Two World Financial Center
New York, New York 10281
(212) 912-7400
John M. Woods (JW/0697)
Alan F. Kaufman (AK/9114)
Neil T. Bloomfield (NB/0669)
*Attorneys for Plaintiff*



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY ASSOCIATION,
INC.,

ECF CASE

                                    Plaintiff,

Case No.:

- against -

LAFARGE NORTH AMERICA, INC.,

                                    Defendant.

**COMPLAINT**

Plaintiff, American Steamship Owners Mutual Protection and Indemnity Association,

Inc. (the "American Club" or the "Club"), by and through its attorneys, Thacher Proffitt & Wood

LLP, as and for its Complaint alleges as follows:

1.      The matter in controversy relates to the demand of one of the Club's members,

Lafarge North America, Inc. ("Lafarge"), for indemnification against potential liability and

defense costs in respect of claims arising from the breakaway of a barge that was at Lafarge's

New Orleans, Louisiana facility during Hurricane Katrina in August, 2005. In other lawsuits

pending against Lafarge, it is alleged that the barge, called the ING 4727, struck and caused or

contributed to the collapse of the 17th Street Industrial Canal floodwall causing massive flooding

in the City of New Orleans. By this action, the Club seeks a declaration that it is not obligated to

defend or provide cover to Lafarge because the Barge ING 4727 was never insured by the Club,

and because even if the barge had been insured pursuant to Lafarge's Certificate of Entry in the Club, coverage is excluded pursuant to the terms of the Club's rules.

## JURISDICTION

2.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332, 1333 because it is an admiralty or maritime dispute between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of fees and costs.

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Club's principal place of business is within this district and a substantial part of the events giving rise to Lafarge's claim occurred in this judicial district.

## NATURE OF THE ACTION

4.     This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, and involves an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

5.     Plaintiff seeks a declaration of its rights and other legal relations pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, in order to resolve an actual controversy between the parties to this action as is more fully described below.

## THE PARTIES

6.     Plaintiff, the American Club, is a non-profit mutual insurance association, operated by its members for their exclusive benefit. The Club provides protection and indemnity insurance (commonly referred to as "P&I Insurance"), which provides cover to shipowners and charterers against third-party liabilities encountered in their commercial operations. Traditional P&I Insurance is based on the not-for-profit principle of mutuality where members of the Club essentially insure one-another and, therefore, are both the insurers and the assureds. The

2

American Club is incorporated in New York and has its principal place of business at 60 Broad Street, New York, New York.

7.     Upon information and belief, defendant Lafarge is a diversified construction materials company and supplier of cement, aggregates and concrete, and other materials in the United States and Canada.   Lafarge is incorporated in Maryland and has its principal place of business at 12950 Worldgate Drive, Suite 500, Herndon, Virginia.

8.     Lafarge is registered to do business in the State of New York and/or is otherwise doing business in the State of New York including, but not limited to, entering into contracts with the Club.

## FACTUAL BACKGROUND

### A.     Entry into the Club

9.     The rights and obligations of every member of the Club are governed by the American Club By-Laws and Rules (the "Club Rules").

10.     When an assured becomes a member of the Club, it receives a Certificate of Entry, which expressly makes applicable the Club Rules to the member's insurance, and which lists a Schedule of Vessels which are insured by the Club.   The Certificate of Entry may include additional Member-Specific provisions, which are listed on a separate rider to the Certificate of Entry.   (Lafarge's Certificate of Entry for the period February 20, 2005 to February 20, 2006, is attached as Exhibit A.)

11.     Traditional P&I insurance is written on a policy year basis, with an inception date of February 20th for each policy year.   For example, the Club's current policy year incepted on February 20, 2006 and runs for twelve months.

3

**B.**   **Lafarge's Entry into the Club**

12.   Lafarge first became a member of the Club on or about February 20, 1999. It renewed its coverage each year, up to and including the policy year commencing February 20, 2005.

13.   Lafarge's Certificate of Entry contains a Schedule of Vessels that Lafarge entered with the Club. The Barge ING 4727 was never listed on any Schedule of Vessels for Lafarge's entry with the Club.

14.   Lafarge's Certificate of Entry contains a Member-Specific clause entitled "Chartered Barges," which states:

> CHARTERED BARGES.
>
> If Lafarge Corporation et al <u>acquires an insurable interest in any vessel in addition to or in substitution for those set forth herein, through purchase, charter, lease or otherwise,</u> such insurance as is afforded hereunder to any similar vessel shall <u>automatically</u> cover such additional vessel effective from the date and time the Assured acquires an insurable interest in such additional vessel. With respect to a chartered, leased or similarly acquired vessel, the insurance hereunder automatically includes the owner as an additional Assured with waiver of subrogation against the owner, if required, effective from the date and time such vessel is insured hereunder.
>
> The above provision shall not apply to vessels which are chartered under a contract whereby the owner (or Demise Owner) and Charterer agree that the owner (or Demise Owner) shall procure Protection & Indemnity Insurance on the vessel and such insurance shall include the charterer as an Assured.
>
> <u>The Assured agrees to report the name and gross tonnage of any vessel in which they acquire an insurable interest at the expiration of this policy and pay any additional premium as may be required annually, at expiry at daily pro-rate the annual rates agreed.</u> (emphasis added).

15.   Accordingly, to obtain cover for a vessel under the Chartered Barges clause, Lafarge must meet each of the following conditions:

   a.   first, Lafarge must acquire the requisite insurable interest in a vessel;

4

    b.     second, the vessel must be acquired <u>in addition to or in substitution for</u> those vessels listed on the Schedule of Vessels;

    c.     third, the interest in a vessel acquired by Lafarge must be akin to a purchase, charter or lease;

    d.     fourth, the vessel(s) to be covered must be declared to the Club;

    e.     fifth, Lafarge must pay premium to the Club for the vessel(s) to be covered.

## C.    The Transportation Agreement

16.    Upon information and belief, on or about December 14, 2004, Lafarge entered into a Transportation Agreement (the "Transportation Agreement") with Ingram Barge Company ("Ingram"), to be performed during the period from January 1, 2005 through December 31, 2005, and providing for the transportation by Ingram of approximately 160,000 net tons of cement in covered barges from Lafarge's Joppa, Illinois plant to its New Orleans, Louisiana facility on the Inner Harbor Navigation Canal. (The Transportation Agreement is attached as Exhibit B.)

17.    Clause 51 of the Transportation Agreement defines Lafarge as an "Independent Contractor" and explicitly states that "[n]othing in this Contract shall be construed as a contract by Shipper [Lafarge] for the chartering, hiring, or leasing of any barge . . . ."

18.    Upon information and belief, Ingram began transporting cargo for Lafarge under the Transportation Agreement beginning in January of 2005.

19.    Lafarge did not submit the Transportation Agreement to the Club for its review and approval.

20.    Upon information and belief, on or about May 1, 2005, Lafarge obtained a primary marine liability/wharfinger's policy with a limit of $5,000,000 from New York Marine & General Insurance Company (the "MMO Policy").

21.    The MMO Policy specifically includes coverage for Lafarge's "liability for damage caused directly or indirectly by the freeing or breaking away" of vessels at landing and/or mooring facilities that are owned operated, utilized, controlled or leased by Lafarge.

22.    Lafarge also obtained a policy providing excess coverage to the MMO Policy with a limit of $45,000,000 above the MMO Policy limit, for total wharfinger's liability coverage up to $50,000,000.

**D.    Lawsuits Against Lafarge Arising From Hurricane Katrina**

23.    Upon information and belief, prior to August 29, 2005, Ingram used its Barge ING 4727 to transport cement under the Transportation Agreement to Lafarge's New Orleans' facility.

24.    Upon information and belief, on or about August 29, 2005, Barge ING 4727 was moored at Lafarge's facility on the Inner Harbor Navigation Canal.

25.    On or about August 29, 2005, Hurricane Katrina made landfall along the Louisiana and Mississippi Gulf Coast.

26.    Upon information and belief, on or about August 29, 2005, Barge ING 4727 tore free of her moorings and drifted through a breach in the Industrial Canal floodwall or was carried over the floodwall by the rising water.

27.    Barge ING 4727 is not listed on any Lafarge Schedule of Vessels entered with the Club, nor were any Ingram vessels.

**E.    Lafarge's Claim for Defense and Cover from the Club**

28.    At least four lawsuits arising out of Hurricane Katrina are pending against Lafarge.

29.     Upon information and belief, on or about September 9, 2005, Lafarge placed their terminal operators and wharfinger's liability underwriters on notice of claims that may be covered by the MMO Policy.

30.     On or about March 3, 2006, Lafarge submitted a claim to the Club seeking "indemnification for all potential liability and/or reasonable settlements and litigation costs . . ." in connection with certain claims for property damage and/or personal injury relating to the breakaway of Barge ING 4727 and arising from the Hurricane Katrina disaster in New Orleans.

31.     On or about April 21, 2006, the Club sent a letter to Lafarge declining coverage to Lafarge because Barge ING 4727 had not been entered with the Club at the time of the casualty, or at any other time, and even if it had been entered, coverage for claims against the vessel would have been excluded.

32.     Upon information and belief, Lafarge intends to pursue its claim for cover and defense costs relating to claims arising from the breakaway of the ING 4727 from the Club.

33.     The Club maintains that it does not cover any of Lafarge's liabilities or defense costs arising from the breakaway of Barge ING 4727.

34.     An actual and justiciable controversy within the jurisdiction of this Court therefore exists between the parties to this action regarding the rights and liabilities of the parties, which controversy may be determined by a judgment of this Court.

## AS AND FOR A FIRST CAUSE OF ACTION

35.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs 1 through 34 as though fully set forth herein.

36.     Barge ING 4727 is not listed on the Schedule of Vessels in Lafarge's 2004 – 2005 Certificate of Entry issued by the Club.

37.    Lafarge did not acquire the Barge ING 4727 in addition to or in substitution for the vessels set forth in the Schedule of Vessels.

·38.    Lafarge did not acquire an insurable interest in Barge ING 4727 as required by Lafarge's Certificate of Entry.

39.    Any interest that Lafarge acquired in Barge ING 4727 was not akin to a purchase, charter or lease.

40.    Lafarge cannot obtain cover from the Club for Barge ING 4727 pursuant to the ·Chartered Barges clause of Lafarge's Certificate of Entry.

41.    Nonetheless, Lafarge contends that the Club is required to defend and provide cover to Lafarge for the claims asserted against Lafarge in connection with the breakaway of Barge ING 4727. ·

42.    An actual and justiciable controversy has thus arisen between the Club and Lafarge concerning the coverage of Barge ING 4727.

## AS AND FOR A SECOND CAUSE OF ACTION

43.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

44.    Even if Barge ING 4727 could be insured with the Club under the Chartered Barges clause, coverage is excluded.

45.    The Club Rules exclude liability "for any loss, damage or expense against which, but for the insurance herein provided, the Member, Co-assured or Affiliate would have been insured under any other existing insurance . . . ."

46.    The Club Rules also exclude "[l]iabilities, costs and expenses which would not have arisen but for the terms of a contract or indemnity entered into by a Member, unless those terms have been expressly approved in writing by the Managers."

8

47.     Cover by the Club for Barge ING 4727 is excluded because Lafarge's liability for the breakaway of Barge ING 4727 is covered by the MMO Policy.

48.     Cover by the Club for Barge ING 4727 is also excluded because Lafarge did not provide for review or obtain the Club's approval of the Transportation Agreement.

49.     Nonetheless, Lafarge contends that the Club is required to defend and provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727.

50.     The Club maintains that coverage is excluded.

51.     An actual and justiciable controversy has thus arisen between the Club and Lafarge concerning the coverage of Barge ING 4727.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

1.     that this Court declare the rights and liabilities of the parties with respect the American Club's obligations, if any, to defend and/or provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727;

2.     that this Court find and declare that Barge ING 4727 was not entered with or insured by the American Club, and as a result, the Club has no obligation to defend and/or provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727;

3.     that this Court find and declare that, because Lafarge maintained other insurance coverage, the American Club has no obligation to defend and/or provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727;

4.     that this Court find and declare that, because Lafarge failed to submit the Transportation Agreement to and obtain the approval of the American Club, the Club has no

9

obligation to defend and/or provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727;

     5.    that this Court award the American Club its costs and disbursements for this action, including attorneys fees; and

     6.    that this Court grant the Club such other and further relief as is just and proper.


Dated:     New York, New York
            April 21, 2006


     THACHER PROFFITT & WOOD LLP


     By:   *John M Woods*

         John M. Woods (JW/0697)
         jwoods@tpw.com
         Alan F. Kaufman (AK/9114)
         akaufman@tpw.com
         Neil T. Bloomfield (NB/0669)
         nbloomfield@tpw.com

     Two World Financial Center
     New York, New York 10281
     (212) 912-7400

     *Attorneys for Plaintiff*

# EXHIBIT 3

*Rev. 7/13/04*

# TRANSPORTATION AGREEMENT

**INGRAM**

| Carrier: INGRAM BARGE COMPANY | Shipper: LAFARGE NORTH AMERICA | |
|---|---|---|
| 13 Executive Drive, Suite 8 | Contact Address: | Billing Address (if different): |
| Fairview Heights, IL 62208-1342 | 600 SW Jefferson Street, Suite 302 | 2500 Portland Road |
| | Lee's Summit, MO 64063 | Grand Chain, IL 62941 |
| Attn:  J. E. (Gene) Shiver | Attn:  Mr. Jay Darlington | Attn:  Rachael Burnett |
| Sales Manager | Traffic Coordinator Barge | Barge Scheduler |
| Telephone:  618-628-3099 | Telephone:  816-251-2115 | Telephone:  618-543-3902 |
| E-Mail: shiverg@ingrambarge.com | E-Mail: jay.darlington@lafarge-na.com | E-Mail: rachael.burnett@lafarge-na.com |
| Facsimile:  618-628-3494 | Facsimile:  816-347-1884 | Facsimile:  618-543-3959 |
| Carrier's Contract No:  35443 | Shipper's Contract No: | Shipper's Contract No: |
| Carrier's Job No:  15070574 | Shipper's Customer No: | Shipper's Customer No: 10661 |

This Agreement is made as of December 14, 2004 by and between Carrier and Shipper (each as identified above) and is for the transportation of dry cargo by barge under the terms and conditions of Parts I and II as contained in this Agreement. In the event of a conflict, the provisions of Part I shall prevail over those contained in Part II to the extent of such conflict.

## PART I

| | | |
|---|---|---|
| 1. | Loading Date(s): | January 1, 2005 through December 31, 2005 |
| 2. | Equipment: | Fiber-Lift Covered Barges <u>ONLY</u>. All cover handling expense for the account of Shipper. |
| 3. | Cargo: | Cement |
| 4. | Cargo Value: | $300.00 per net ton or actual invoice value, whichever is less |
| 5. | Number of Net Tons: | Approximately 160,000 net tons. Refer to Appendix I for projected monthly shipping schedule. |
| 6. | Origin(s): | Joppa, IL (Lafarge)                              OH 953.2 T |
| 7. | Destination(s): | New Orleans, LA (Lafarge-France Road Wharf)      GIWE 8.0 T3 |
| 8. | Base Freight Rate(s): | $12,700 Flat Rate Per Barge |
| 9. | Free Time: | Six days all-purpose to load and unload each barge, including Sundays and holidays that occur within the freetime period.  (Refer to Part II, Section 28) |
| 10. | Demurrage Rate: | $185.00 per barge per day |
| 11. | Minimums: | Not applicable, due to flat rates per barge. |
| 12. | Fuel Protection: | Beginning January 1, 2005, the base freight rate(s) listed herein shall be subject to escalation during the term of this Agreement in the event of an increase in the cost of fuel above $.90 per gallon. If the actual average cost of fuel to Carrier for the second month immediately preceding the month of shipment rises above the specified cost per gallon, Carrier shall have the right to escalate the freight rate(s) on the first of every month during the term of this Agreement in accordance with the following formula: |

$$\left[ \text{Base Freight Rate} \times 30\% \times \left( \frac{\text{Actual Fuel Cost} - \text{Fuel Protection Cost}}{\text{Fuel Protection Cost}} \right) \right] + \text{Base Freight Rate} = \text{Adjusted Freight Rate}$$

As an example, Carrier's actual fuel cost for the month of November 2004 would determine the January 2005 rate(s). In no event will the adjusted freight rate(s) ever be lower than the base freight rate(s).

| | | |
|---|---|---|
| 13. | Cleaning Allowance: | $800.00 maximum per barge account Carrier (refer to Part II, Section 31) |
| 14. | Special Provisions: | Refer to Part II |

In witness whereof, the parties have executed this Agreement as of the date first written above.

Accepted:

Carrier:  INGRAM BARGE COMPANY                          Shipper: LAFARGE NORTH AMERICA

Signature: *[signature]*                                 Signature: *Fred Lazarowicz*      JL

By:     J. E. (Gene) Shiver – Sales Manager              By:     Frank Lazarowicz – Transportation Manager River Region

 Carrier's Contract No. 35443       APPENDIX 1       Carrier's Job No. 15070574

| Projected Monthly Shipping Schedule: | Monthly Breakdown of Projected Volume | | | |
|---|---|---|---|---|
| | January | 19,500 | July | 10,500 |
| | February | 18,000 | August | 9,000 |
| | March | 17,500 | September | 10,500 |
| | April | 9,000 | October | 15,500 |
| | May | 12,000 | November | 19,500 |
| | June | 10,500 | December | 7,500 |

Carrier Representative's Initials: _____       Shipper Representative's Initials: _____

Rev. 7/13/04

 **INGRAM**

**Carrier's Contract No. 35443**          **PART II**          **Carrier's Job No. 15070574**

15. **Cargo Description:** Prior to loading, Shipper will notify Carrier of the generic name of the cargo to be transported pursuant to this Agreement. In addition, Shipper will, if requested by the Carrier, provide Material Safety Data Sheets (MSDS). Further, the Shipper shall notify the Carrier of the cargo classification under U. S. Coast Guard regulations and any other applicable regulations. In the event of Shipper's improper or incomplete description of the cargo or failure to disclose all necessary information about the cargo which results in any expense, loss, damage, and/or penalty to the Carrier, Shipper agrees to reimburse Carrier for such expense, loss, damage, and/or penalty.

16. **Tonnage:** Wherever used in this Agreement, the term 'ton' shall mean a net ton of 2,000 pounds avoirdupois.

17. **Cargo Insurance:** Carrier will, at its own expense, obtain and keep in full force and effect during the term of this Agreement, or any extension thereof, Cargo insurance on the full value of all cargo transported under this Agreement. Carrier may, at its own risk, elect to self-insure the cargo. Cargo is insured up to the value stated in Part I, or the actual value of the cargo, whichever is less. In no case will the Carrier be responsible for any amount exceeding $700 per net ton.

18. **Weights:** Freight charges shall be calculated on the basis of loaded weights at origin. Carrier shall not assume any responsibility to weigh the cargo at origin or destination.

Within 72 hours after completion of loading, Shipper shall submit to Carrier a written report descriptive of the cargo and the weight thereof per barge.

If the actual weight of cargo cannot be ascertained upon completion of loading, estimated weights may be used for billing which shall be adjusted to out-turn weights at destination, if available, and applicable charges determined accordingly. If facilities for determining weight at destination are not available, the barge will be gauged before unloading, at Shipper's expense, and the weight thus ascertained will be used in determining the applicable charges.

Carrier may require proof of scale or gauged weights.

19. **Minimum Weights:** The freight due from Shipper will be based on the actual tons loaded subject to the minimum weights specified in Part I.

However, if the capacity of the barge (or draft if so specified by the Carrier) will not allow the Shipper to load to the minimum level specified, then the charges will be based on the actual tons loaded or the tons that could have been loaded at the specified draft according to Carrier's draft tables, whichever is greater.

20. **Loading Requirements:** Shipper shall load a barge to the draft specified by Carrier. Shipper shall be governed by Carrier's instructions regarding the height of load, the tonnage of the cargo, the draft of the barge, and such other instructions as Carrier may deem necessary for safe transportation where variable waterway conditions and anticipated weather conditions make such precautions desirable. Shipper shall be subject to any demurrage charges that may accrue due to the detention of any barge occasioned by non-compliance with Carrier's loading requirements specified herein. The Shipper shall load the barge so that the cargo is evenly distributed throughout the hopper hold; the Shipper shall not "center load" or "end load" a barge.

21. **Transport of Barges:** A barge loaded with Shipper's cargo will move only at the convenience of the Carrier, and either singly or with one or more other craft. Carrier will have the right to shift or interchange the tow from one to another towing vessel as frequently as it may find it convenient to do so, or to procure towage from any other vessel not owned or operated by the Carrier; to tie off the tow at any point and for any purpose; and to deviate from its route, and visit any port whether or not on said route, and in any order. Carrier is not bound to transport any barges containing Shipper's cargo in time for any particular market.

If, due to operating conditions, it is necessary in the judgment of the Carrier to delay the movement of barges while in transit, Carrier reserves the right to do so. Carrier makes no representation as to the time which will elapse between the acceptance of this Agreement until placement at origin, nor between departure of the barge from origin and arrival of the barge at destination; and under no circumstances shall Carrier be liable for any loss, damage, or expense incurred by Shipper or others by reason of delay.

22. **Inaccessible Points:** Carrier will not place barges for loading, nor pick up loaded barges, when the shipments are destined to points or points which are inaccessible because of an actual or anticipated, temporary or permanent condition that adversely affects the navigability of a waterway to be traversed by barge between origin and destination. If shipment has been accepted or to re-consigned for transportation to a port or point which subsequently becomes inaccessible because of a condition that adversely affects the navigability of a waterway to be traversed between origin and destination, the Carrier shall be privileged to tender delivery of such shipment at an accessible intermediate point nearest to consigned destination, in which event freight charges shall be adjusted in accordance with the transportation service actually rendered on the basis of the rate applicable for the movement to the original destination. In the determination of the inaccessibility of a destination port, the type and draft of propelling vessel, the type of barge, the loaded draft of barge, and necessity of returning empty barge, among other considerations, shall govern. Carrier's determination in this regard shall be final. In the event that operating conditions, including ice, prevents or delays the delivery of a barge, the Carrier will place the barge at a point short of the point of interruption and the barge will be subject to demurrage.

23. **Accessorial Charges:** Except as otherwise provided, the Carrier will not be liable for the following accessorial charges: ballasting, cleaning, demurrage, dockage, drayage, elevation, loading or unloading of cargo, opening or closing of barge hatch covers, removal or replacement of barge covers, sheddage, stacking or restacking of barge covers, switching tollage, wharfage, or any other terminal expense at either origin or destination.

24. **Shifting:** Rates stated herein will include only one shift of barges into and one shift out of loading and unloading facilities by Carrier at origin and/or destination. Any additional shifting of barges to accommodate loading or unloading will be for Shipper's account.

When Shipper arranges for shifts to be made without expense to Carrier, Shipper shall assume full responsibility for safety of barge and cargo thereof during such shifts, and further, Shipper shall reimburse Carrier in full for any damage or loss which may occur during such movements.

25. **Diversions, Re-Consignments, Holding in Transit, Stop-Offs for Partial Unloads**

A barge may be diverted, re-consigned, held in transit to await orders, or stopped-off for partial unloads only with the consent of Carrier, which may be withheld for any reason. The cost, terms and conditions of any agreement for re-consignment, diversion, holding in transit for orders, or partial stop-offs, must be confirmed in writing by all parties prior to Carrier's taking the requested action.

Any barge that is stopped to permit a partial discharge will not be allowed any additional free time. All time incurred during a partial stop will be charged at the demurrage rate.

26. **Payment of Freight:** Upon loading, the entire amount of the freight charge will become earned and due and payable to Carrier in cash and without discount, even though the barge or cargo is lost or not lost, damaged or not damaged, in whole or in part, at any stage of the voyage. The Carrier does not have to deliver the Cargo until all freight and demurrage due hereunder have been paid by Shipper. The actual date of loading, not placement date nor requested date, shall govern as to what freight rate shall be invoiced.

Interest at a rate of two percent (2%) per month (or any fraction thereof) or the maximum interest rate allowed by law, shall accrue on any payment obligations hereunder that are past due until such payment obligations are satisfied in full together with said interest. If any agency or attorney is employed to assist in the collection of such payment obligation, then the delinquent party also shall be required to pay such agency/attorney's reasonable fees relating to such collection. Carrier has the right to defer placement of any barge and/or delivery of the cargo if Shipper's payment obligations are past due until such time as all amounts due Carrier are paid in full.

Unless specified elsewhere, and notwithstanding the above, Shipper may be granted credit by Carrier's Credit Manager, in which case the monies owed must be paid by the Shipper within 30 days from the date of the invoice or within the number of days specified by Carrier's Credit Manager. The Carrier's Credit Manager has complete discretion as to whether or not credit is to be extended to Shipper, the amount of credit to be granted to Shipper, and the payment due date from the Shipper, and the form of payment. Shipper is to comply with all reasonable requests for financial information by Carrier's Credit Manager in order to establish Shipper's credit. The Carrier's Credit Manager may change or cancel the extension and amount of credit and the payment due date or the form of payment at the Credit Manager's sole discretion and at any time.

27. **Lien:** Carrier will have a lien upon all cargo for any freight or demurrage due hereunder, which lien will survive the delivery of such cargo.

28. **Demurrage and Free Time:** The free time to be allowed is to be that which is specified in Part I. No free time will be allowed on empty barges placed upon Shipper's request for placement if, subsequent to placement, such order is cancelled.

After the period of free time has expired, the demurrage charges specified under this agreement will be made for each day, including Saturdays, Sundays, and National Holidays, until the barge is released to the Carrier.

Except as otherwise provided, time will be computed for the total period barge is in Shipper's possession for loading or unloading and will begin as of the first 7:00 a.m. after barge is actually or constructively placed for loading or for unloading and will run until Carrier has been notified in writing that barge has completed loading or unloading and is available for pick up. The written release must be received by Carrier by 11:00 a.m. CST (Nashville time) or the barge will not be considered as having been released by 7:00 a.m. In computing time, days will consist of 24 hours running from 7:00 a.m. until the next 7:00 a.m. A fraction of a day will be considered as one day.

**Carrier Representative's Initials:** _____          **Shipper Representative's Initials:** _____

Rev. 7/13/04

 **INGRAM**  Carrier's Contract No. 35443        PART II        Carrier's Job No. 15070574

When Carrier, for its convenience, places a barge for loading prior to date specified by Shipper, time will run from the first 7:00 a.m. of the date specified by Shipper or from 7:00 a.m. of the date when actual loading began, whichever occurs sooner.

Actual placement is made by Carrier when barge is placed for loading or unloading at docks or wharves specified by Shipper or at a nearby fleet selected by Carrier, whichever occurs first.

Except as otherwise provided for herein, if Carrier is prevented from making actual placement by any cause over which it has no control, such barge is subject to constructive placement. Constructive placement will be made by Carrier when actual placement is not possible.

Constructive placement consists of placing or holding a barge at a point of Carrier's or Shipper's choice near the specified actual delivery point. Notice of such placement will be given to Shipper. In making any subsequent placement, no free time in addition to that provided will be allowed by Carrier.

If holidays are excluded from Free Time, the following are the holidays to be recognized:

| New Year's Day | Memorial Day | Independence Day | Labor Day |
| Easter Sunday | Thanksgiving Day | Christmas Day | |

If the holiday (except for Easter) falls on a Sunday, the following Monday shall be considered as the holiday.

If a barge is on demurrage and the shipper requests a reconsignment, the barge will remain on demurrage, even during transit, until the barge is released back to the Carrier.

In the event that delivery of a barge involves a destination beyond the lake front entrance to Lake Michigan, the barge will be placed in a fleet of Carrier's choosing on the Illinois River Waterway and free time and demurrage shall commence upon placement in the fleet. Adverse weather conditions which delay transit and barge delivery to destinations on Lake Michigan will not be considered Force Majeure events. It is the Shipper's responsibility to notify the loading/unloading terminal of the barge placement in the Illinois River Waterway fleet.

29.  **Fuel Protection**  Unless otherwise addressed in this Agreement, the freight rate shall not be subject to escalation during the term of this Agreement except in the event of an increase in the cost of fuel above the cost per gallon specified in Part I. If the actual average cost of fuel to Carrier for the second month immediately preceding the month of shipment rises above the specified cost per gallon, Carrier shall have the right to escalate the freight rate on the first of every month during the term of this Agreement in accordance with the following formula:

$$[\text{Base Rate} \times 30\% \times \frac{\text{Actual Fuel Cost} - \text{Fuel Protection Cost}}{\text{Fuel Protection Cost}}] + \text{Base Freight Rate} = \text{Adjusted Freight Rate}$$

As an example, the actual fuel cost for the month of October would determine the December rates. In no event will the adjusted freight rate ever be lower than the base freight rate.

30.  **Ratability**  Unless modified in Part I, Shipper shall ship in approximately equal monthly increments and approximately equal weekly increments within each month. Should the Shipper fail to ship ratably as described above, Carrier has the right to adjust its obligation to provide barges for the remainder of this Agreement. Barges not loaded ratably within a week or within a month cannot be carried forward to the following week or month, unless Carrier agrees to do so. Further, Carrier will not be obligated to supply a number of barges in any one month that is greater than the actual number of barges shipped in the prior months under this Agreement.

31.  **Cleaning**  Carrier shall absorb cleaning costs up to amount specified in Part I to remove cargo left in the hopper by shipper. All cleaning costs above the stipulated allowance are for the account of the Shipper. Shipper shall remove all dunnage, if any, at its sole expense.

If any cargo or debris is spilled or deposited on the exterior of the barge (including working surfaces, such as gunnels, covers, or decks) at either loading and unloading points, Shipper is responsible for all costs associated with cleaning the exterior of the barge.

Carrier may refuse to pick up or move a barge if an abnormal amount of cargo is left in the hopper or if cargo or debris is left or spilled on the barge if, in the Carrier's sole judgment, the cargo or debris left aboard represents a safety hazard to its crew or to other parties who may come in contact with the barge. The Carrier will require the Shipper to clean or remove all abnormal amounts of cargo left on board or to remove the cargo or debris that represents a safety hazard prior to movement. In such case, if the movement of a barge is delayed while the barge is being cleaned by the Shipper, then the Shipper shall be liable to the Carrier for the days consumed at the then applicable demurrage rate. Further, if Carrier arranges to have a barge cleaned due to abnormal amounts of cargo left in the hopper or if cargo or debris is left or spilled on the barge, the Shipper shall be liable to the Carrier for the days consumed at the then applicable demurrage rate.

32.  **Unloading**  It shall be the obligation of Shipper, or its consignee, to unload and remove the cargo from the barge, including any cargo or debris spilled on the working surfaces, promptly upon arrival of the barge at its destination. If the cargo is not so unloaded and removed, then the Carrier, at its option, shall be entitled to remove, sell or otherwise dispose of the cargo.

33.  **Distribution of Cargo**  Shipper shall be required to distribute cargo in each barge so as to ensure an even draft. If a barge is not loaded to ensure an even draft, Carrier reserves the right to refuse to accept the barge for transport. If Carrier refuses to accept any barge, Shipper must, at its expense, have the cargo redistributed to meet Carrier's requirements. In addition, the barge will be subject to demurrage charges, from the time and date of placement until the barge is accepted for transportation by Carrier.

34.  **Possession of the Barge during Loading/Unloading**  Carrier shall deliver an empty or loaded barge to a loading/unloading facility designated by Shipper for loading or unloading. Shipper shall assume the duty and responsibility for the safety of each barge in its possession. For the purposes of this Agreement, "possession" shall begin when Carrier delivers an empty or loaded barge for loading or unloading to the landing designated by Shipper and shall end when the barge is removed by Carrier or its agent(s). Shipper shall be responsible for the safekeeping of Carrier's barge delivered to a landing regardless of whether Shipper owns or operates the landing. During possession, any barge delivered to a landing designated by Shipper shall be held without charge to Carrier.

35.  **Safe Berth**  Shipper warrants the barge shall have a safe berth of not less than nine (9) feet of draft. The barge shall not be permitted, at any time, to touch bottom while in the Shipper's control.

36.  **Mooring**  Shipper warrants that barges will be safely and adequately moored free of wharfage, dockage, port and harbor charges at the loading and unloading points and that barges will have warning lights properly displayed as required by applicable U.S. Coast Guard and U.S. Army Corps of Engineers regulations and permits. While barges are in the care and custody of Shipper, or its agents, all U.S. Coast Guard and U.S. Army Corps of Engineers regulations will be complied with, and in the event that Carrier should in any manner be held responsible for Shipper's, or its agents acts or omissions in compliance with the mooring requirements herein provided, then Shipper agrees to indemnify and save harmless Carrier from all such responsibility and liability.

37.  **Request for Placement**  Shipper must send Carrier a written request for placement with a specific date for loading and the designated origin for loading. Carrier requires a minimum of 14 days notice for any loading; should Shipper fail to supply 14 days advance notice of a loading, Carrier has the right to adjust its obligation to provide barges for loading.

38.  **Change in Loading Date or Origin**  Any change by the Shipper in the requested loading date or designated origin given to the Carrier which is in excess of five (5) working days prior to the previously requested loading date will be accepted by Carrier without charge. Any change by the Shipper in the requested loading date or origin given to the Carrier on less than five (5) working days notice may subject the Shipper to charges (including but not limited to free days may be assessed, additional shifting or fleeting charges may be billed, barge cleaning, or cover handling).

39.  **Acceptance**  Carrier will tender barges which are in a condition suitable for the cargo to be carried. Loading of the barges will constitute Shipper's acceptance of the condition and suitability of the barges for the intended cargo.

40.  **Release**  Carrier shall not be liable for lost profits or other incidental or consequential damages under any circumstances. Nothing contained herein shall render Carrier responsible for the differences in the return weight and the outturn weight of cargo from barges safely delivered and unloaded.

41.  **Failure to Accept / Failure to Place**  If either Shipper or Carrier, for reasons other than Force Majeure, determines that it will be unable to accept or place barges on the requested Load Date or within the term of this Agreement, it shall be their duty to advise the other party at once; whereupon it shall be the other party's duty at once to elect to cancel the unplaced barge or to extend the placement time. In the case of cancellation, the other party shall have the right to buy or sell, as the case may be, the respective freight and the party unable to accept or place shall reimburse the other party for any loss sustained in such purchase or sale provided same is made at the prevailing market price.

42.  **Choice of Law**  This Agreement shall be governed by the laws of the State of Tennessee, both as to interpretation and performance, and all disputes that arise under this Agreement shall be resolved in accordance with Tennessee law.

43.  **General Average**  In the event of accident, danger, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, Carrier is not responsible, by statute, contract, or otherwise, the cargo, Shipper, and the consignee, and other parties having an interest in the cargo, jointly and severally, will contribute in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred in respect of the cargo. General average, if any, will be adjusted, stated, and settled at such port or place in the United States as may be selected by Carrier, and will be settled in accordance with the York/Antwerp Rules of 1974.

**Carrier Representative's Initials:**              **Shipper Representative's Initials:**

Rev. 7/13/04

**INGRAM**    Carrier's Contract No. 35443          PART II          Carrier's Job No. 15070574

44.  Force Majeure: Performance under this Contract by Shipper and Carrier shall be excused to the extent such performance is prevented by Force Majeure, provided the party declaring Force Majeure gives written notice of such condition to the other party within seventy-two (72) hours after commencement of the Force Majeure condition. The term "Force Majeure" shall include acts of God or the elements, acts of a public enemy, insurrections, riots, strikes, labor disputes, fires, explosions, floods, accidents of navigation, ice, high or low water, embargoes, acts or orders of civil or military authorities, lock delays or closings, fuel shortages, or other causes beyond the reasonable control of the party declaring Force Majeure. Such excuse from performance shall continue until the Force Majeure ceases to exist. A party declaring Force Majeure shall make reasonable efforts to eliminate or resolve the condition, recognizing, however, that the settlement of any strike or other labor dispute shall be solely within the discretion of that party. A declaration of Force Majeure by Shipper does not excuse payment of demurrage for a barge on demurrage status. When a Force Majeure is declared on a barge with remaining free time, free time shall continue to run; upon expiration of free time the barge will be placed in a demurrage status even if the Force Majeure event continues to exist. Any shortfall in cargo deliveries resulting from force majeure shall not be made up except by mutual consent of the Shipper and the Carrier.

45.  New Taxes: There will be added to the freight rate the amount of any new or increased Federal, State, or local taxes (except net income taxes) that may hereafter be charged to and paid by Carrier on account of the transportation services rendered hereunder, including the amount of any user charge, tax, or wharfage, port, harbor, or dockage fee imposed, levied, or collected for the use of the inland waterway system or of the locks and dams in said waterway system, wharfs, ports, or the use of the harbors and docks by Carrier while engaged in the transportation services rendered hereunder, or upon fuel used in performing such services.

46.  Subcontracts: Nothing herein shall prevent Carrier from subcontracting for any of the services provided by Carrier hereunder but Carrier will remain liable to Shipper for the proper performance of all of Carrier's obligations hereunder.

47.  Mitigation: If all or any part of the cargo is discovered to be damaged while subject to this Agreement, Carrier, in its sole discretion, in order to minimize the damage, may sell the Cargo at public or private sale to the best advantage. In such event, Carrier shall, where practicable, provide Shipper and any known consignee with notice of the proposed sale. The proceeds of any sale made under this section shall be applied by Carrier to the payment of freight, demurrage, storage, and any other charges and the expense of notice, advertisement, sale and other necessary expense of caring for and maintaining the Cargo, and the balance, if any, shall be paid to Shipper or consignee.

48.  Claims: As condition precedent to recovery, claims must be filed in writing with Carrier within nine (9) months of delivery of the Cargo, or, in case of failure to make delivery, then within nine (9) months after a reasonable time for delivery has elapsed. Suits shall be instituted against Carrier only within two (2) years and one (1) day from the day when notice in writing is given by the Carrier to the claimant that the Carrier has disallowed the claim or any part or parts thereof specified in the notice.

49.  Default: No default of either party in the performance of any of its covenants or obligations hereunder, which, except for this provision, would be the legal basis for rescission or termination of this Contract by the other party hereto, shall give or result in such a right unless and until the party committing such default shall fail to correct the default within thirty (30) days after written notice of such default is given to such defaulting party by the non-defaulting party. Notwithstanding anything in this Contract to the contrary, there shall be no cure period for any payment default and each party shall have each and every other right afforded it under law against the defaulting party.

50.  Notices: All notices, consents, determinations, instructions and communications provided for herein shall be validly given, made or served, if in writing and delivered personally, or by telegram, facsimile, electronic mail, overnight delivery or recognized courier service or sent by registered or certified mail, postage prepaid, to Shipper and Carrier at their respective addresses listed at the beginning of this Contract, or as the parties may otherwise direct in writing. Any notice, consent, determination, instruction, approval, or other communication hereunder shall be deemed given and effective as of the date of delivery in person or by courier, or as set forth on the return receipt or facsimile confirmation.

51.  Independent Contractor: Nothing contained in this Contract shall be construed as a contract by Shipper for the chartering, hiring or leasing of any barge, towboat or other equipment of Carrier to be provided hereunder; nor shall any of the agents, servants, subcontractors or employees of Carrier be regarded as employees of Shipper, it being understood that Carrier is in all respects an independent contractor and that Shipper shall exercise no control over the operation of any barge, towboat or other equipment of Carrier or over Carrier's agent, servants, subcontractors or employees.

52.  Changes in Operation: In the event Carrier's operating costs specifically related to the equipment, facilities, supplies, or services to be used or provided by Carrier under this Agreement are increased due to any law, rule, ordinance, regulation, restriction, directive, order, notice, advisory or interpretation, hereafter promulgated by any federal, state, or local authority, or any agency or division thereof, or any industry group advisory thereto, or any court, which is generally applicable to all barge carriers similarly situated, and such increased costs are not reimbursed to Carrier under any other provision of this Agreement, then Shipper shall reimburse Carrier monthly, following receipt of billing for the entire amount of such increase in operating costs that is fairly attributable to the services performed for Shipper under this Agreement.

53.  Miscellaneous:

A.  Conflict: In the event any of the terms of the Shipper's confirmation differ or conflict with any provision of this Agreement, then the terms set forth in this Agreement shall prevail.

B.  Assignment: Shipper shall not be permitted to assign or otherwise dispose of all or any part of its rights or obligations hereunder without first obtaining the written consent of Carrier. Such consent shall not unreasonably be withheld, provided that any such permitted assignment or other disposition shall not relieve Shipper of its obligation under this Agreement.

C.  No Waiver: The failure of Shipper or Carrier to insist upon strict performance of any of the provisions of this Agreement in one or more instances or the failure of Shipper or Carrier to exercise any of its rights hereunder in one or more instances shall not be construed as a waiver of any such provisions or the relinquishment of any such rights, but the same shall continue and remain in full force and effect.

D.  Binding Effect: This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee and shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns, subject to the restrictions of assignability herein contained.

E.  Headings; Terms: Section headings in the Agreement are included merely for the convenience of reference and shall not be construed as part of the governing terms of this Agreement. The term "barge" herein shall mean both the singular and the plural as intended by the parties depending on the number of barges subject to this Agreement.

F.  Integration; Execution: This Agreement sets forth the entire understanding between the parties hereto as to the subject matter and no amendment hereto shall be valid unless made in writing and duly signed by the parties hereto. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original hereof, and all counterparts collectively are to be deemed but one instrument. Whether or not Shipper executes this agreement in the acceptance space provided hereon, loading of a barge shall constitute an acceptance of all the terms and conditions of the Agreement.



Carrier Representative's Initials:                    Shipper Representative's Initials:

HILL RIVKINS & HAYDEN LLP
*Attorneys for Defendant*
*Lafarge North America Inc.*
45 Broadway – Suite 1500
New York, New York 10006
(212) 669-0600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

THE NORTHERN ASSURANCE COMPANY
OF AMERICA and AMERICAN HOME
ASSURANCE COMPANY,                                    Civil Action No. 08-3289 (CSH)

               Plaintiffs,

    - against –                                          **ANSWER**

LAFARGE NORTH AMERICA, INC. and
AMERICAN STEAMSHIP OWNERS
MUTUAL PROTECTION AND
INDEMNITY ASSOCIATION, INC.,

               Defendants.

-----------------------------------------------------------x

    Defendant, Lafarge North America Inc., ("LNA") by and through its attorneys,

Hill Rivkins & Hayden LLP, as and for its Answer to the Complaint of Plaintiffs, The

Northern Assurance Company of America ("NACA") and American Home Assurance

Company ("AHAC"), respectfully states upon information and belief as follows:

    1.  LNA denies that there is a matter in controversy, justiciable before this Court

by virtue of the instant action initiated by the plaintiffs, NACA and AHAC.

    2.  LNA admits that there are several third party lawsuits pending against LNA

for Hurricane Katrina claims, but except as so specifically admitted, denies the remaining

allegations of paragraph 2 of the Complaint.

3. LNA denies the allegations of paragraph 3 of the Complaint, and specifically denies that NACA and AHAC are entitled to the relief sought.

4. LNA admits that NACA and AHAC state that the instant action is brought under the Federal Declaratory Judgment Act, 28 U.S.C. §2201, but except as so specifically admitted, denies that the Act can be invoked with respect to the allegations of NACA and AHAC in the instant action.

5. LNA denies that the plaintiffs herein have a ripe or justiciable claim within this Court's subject matter jurisdiction.

6. LNA denies the allegations contained in paragraph 6 of the Complaint.

7. LNA admits there is a pending action in this district but denies the remaining allegations contained in paragraph 7 of the Complaint.

8. LNA is without knowledge or information sufficient to form a belief as to the allegations contained in paragraph 8 of the Complaint.

9. LNA is without knowledge or information sufficient to form a belief as to the allegations contained in paragraph 9 of the Complaint.

10. LNA is without knowledge or information sufficient to form a belief as to the allegations contained in paragraph 10 of the Complaint.

11. LNA is without knowledge or information sufficient to form a belief as to the allegations contained in paragraph 11 of the Complaint.

12. LNA is without knowledge or information sufficient to form a belief as to the allegations contained in paragraph 12 of the Complaint.

13. LNA admits the allegations contained in paragraph 13 of the Complaint.

14. LNA admits the allegations contained in paragraph 14 of the Complaint.

15. LNA admits the allegations contained in paragraph 15 of the Complaint.

16. LNA admits the allegations contained in paragraph 16 of the Complaint, except that LNA believes that the American Club has its principal place of business at 1 Battery Park Plaza.

17. LNA admits the allegations contained in paragraph 17 of the Complaint.

18. LNA admits that NYMAGIC issued a Primary Marine Liabilities Policy to LNA effective May 1, 2005, but is otherwise without knowledge or information sufficient to form a belief as to truth of the remaining allegations contained in paragraph 18 of the Complaint.

19. LNA is without knowledge or information sufficient to form a belief as to truth of the allegations contained in paragraph 19 of the Complaint.

20. LNA admits the allegations contained in paragraph 20 of the Complaint.

21. LNA admits that NYMAGIC as lead underwriter issued an Excess Marine Liabilities Policy to LNA for the period May 1, 2005, to May 1, 2006, with coverage up to $50,000,000, but otherwise is without knowledge or information sufficient to form a belief as to the remaining allegations contained in paragraph 21 of the Complaint.

22. LNA admits that the Primary Marine Liabilities Policy issued by NYMAGIC includes the quoted language, without emphasis, but denies the remaining allegations contained in paragraph 22 of the Complaint.

23. Paragraph 23 of the Complaint calls for a legal conclusion to which no response is required.

24. LNA denies the allegations contained in paragraph 24 of the Complaint.

25.  LNA is without knowledge or information sufficient to form a belief as to the allegations contained in paragraph 25 of the Complaint.

26.  LNA admits that it has incurred reasonable defense costs in excess of $7.5 million and is claiming against NYMAGIC for the recovery of same, but except as specifically so admitted, LNA denies the remaining allegations contained in paragraph 26 of the Complaint.

27.  LNA admits the allegations contained in paragraph 27 of the Complaint.

28.  LNA admits the allegations contained in paragraph 28 of the Complaint, except it avers that the Member-Specific Provisions are in the body of the applicable Certificate of Entry.

29.  Paragraph 29 of the Complaint calls for a legal conclusion to which no response is required.

30.  LNA admits the allegations contained in paragraph 30 of the Complaint.

31.  LNA admits the allegations contained in paragraph 31 of the Complaint.

32.  LNA admits the allegations contained in paragraph 32 of the Complaint.

33.  LNA admits the allegations contained in paragraph 33 of the Complaint.

34.  LNA admits the allegations contained in paragraph 34 of the Complaint.

35.  LNA admits the allegations contained in paragraph 35 of the Complaint.

36.  LNA admits the allegations contained in paragraph 36 of the Complaint.

37.  Paragraph 37 of the Complaint calls for a legal conclusion to which no response is required.

38.  LNA admits the allegations contained in paragraph 38 of the Complaint.

39. LNA admits that NYMAGIC issued an Excess Marine Liabilities Policy to which NACA and AHAC subscribe as following underwriters, but otherwise denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 39 of the Complaint.

40. LNA is without knowledge or information sufficient to form a belief as to the allegations contained in paragraph 40 of the Complaint.

41. LNA admits the allegations contained in paragraph 41 of the Complaint.

42. LNA denies the allegations contained in paragraph 42 of the Complaint.

43. LNA denies the allegations contained in paragraph 43 of the Complaint.

44. LNA admits that the Excess Marine Liabilities Policy contains a clause addressing underlying insurance, but avers that the remainder of Paragraph 44 of the Complaint calls for a legal conclusion to which no response is required.

45. LNA is without knowledge or information sufficient to form a belief as to the allegations contained in paragraph 45 of the Complaint.

46. LNA is without knowledge or information sufficient to form a belief as to the allegations contained in paragraph 46 of the Complaint.

47. LNA admits the Excess Policy contains the quoted language but otherwise denies the allegations contained in paragraph 47 of the Complaint.

48. LNA is without knowledge or information sufficient to form a belief as to the allegations contained in paragraph 48 of the Complaint.

49. LNA admits the allegations contained in paragraph 49 of the Complaint.

50. LNA admits the allegations contained in paragraph 50 of the Complaint.

51. LNA admits the allegations contained in paragraph 51 of the Complaint.

52. LNA admits Barge ING 4727 became adrift from her moorings and floated through an existing breach in the floodwall after that breach had already occurred, but denies the remaining allegations contained in paragraph 52 of the Complaint.

53. LNA admits that at least four lawsuits have been filed against LNA, and that the plaintiffs in some of the suits have made class action allegations, but otherwise denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 53 of the Complaint.

54. LNA admits the allegations contained in paragraph 54 of the Complaint.

55. LNA admits that allegations in the complaint in the *Boutte* action implicate LNA's coverage under its membership in the American Club, but otherwise denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 55 of the Complaint.

56. LNA admits that allegations in the complaint in the *Mumford* action implicate LNA's coverage under its membership in the American Club, but otherwise denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 56 of the Complaint.

57. LNA admits that allegations in the third party complaints in the *Ingram* limitation action implicate LNA's coverage under its membership in the American Club, but otherwise denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 57 of the Complaint.

58. LNA admits that the *Mumford* and *Boutte* actions include allegations that LNA was at all relevant times the owner, operator and/or was in control of barge ING

6

4727, but otherwise denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 58 of the Complaint.

59. LNA admits the allegations contained in paragraph 59 of the Complaint.

60. LNA admits its counsel wrote to the American Club on March 3, 2006, regarding its claim for indemnification arising from Hurricane Katrina, but otherwise denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 60 of the Complaint.

61. LNA admits the allegations contained in paragraph 61 of the Complaint.

62. LNA admits the allegations contained in paragraph 62 of the Complaint.

63. LNA admits the allegations contained in paragraph 63 of the Complaint.

64. LNA is without knowledge or information sufficient to form a belief as to the allegations contained in paragraph 64 of the Complaint.

### AS AND FOR AN ANSWER TO THE FIRST CAUSE OF ACTION

65. LNA repeats and incorporates its Answers to paragraphs 1 through 64 as if fully set forth herein.

66. LNA admits that counsel for the American Club sent a letter on or about April 21, 2006, to counsel for LNA, which purported to communicate a denial of coverage for LNA's claim, and that the American Club filed the Club D.J. Action, but otherwise denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 66 of the Complaint.

67. LNA admits the allegations contained in paragraph 67 of the Complaint.

68. LNA admits that the first cause of action in the Club D.J. Action complaint makes several allegations and respectfully directs the Court to that pleading, but

otherwise denies knowledge or information sufficient to form a belief as to the truth of

the remaining allegations contained in paragraph 68 of the Complaint.

69. LNA admits the allegations contained in paragraph 69 of the Complaint.

70. LNA admits that the Transportation Agreement contains the language quoted

in paragraph 70 of the Complaint, without the emphasis, and otherwise denies

knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in that paragraph.

71. LNA admits the allegations contained in paragraph 71 of the Complaint.

72. LNA admits the allegations contained in paragraph 72 of the Complaint.

73. LNA admits the allegations contained in paragraph 73 of the Complaint.

74. LNA admits the allegations contained in paragraph 74 of the Complaint.

75. LNA admits the allegations contained in paragraph 75 of the Complaint, and

further avers that it actually tendered the required premium to the American Club.

76. LNA admits the allegations contained in paragraph 76 of the Complaint.

77. LNA admits that the American Club is liable under the Certificate of Entry

and the Club Rules (1) to provide LNA with defense costs in the underlying Katrina

related litigations, and (2) to reimburse LNA for the costs of defending the Club D.J.

Action, but otherwise denies knowledge or information sufficient to form a belief as to

the truth of the remaining allegations contained in paragraph 77 of the Complaint.

78. LNA admits that the second cause of action in the Club D.J. Action complaint

makes several allegations and respectfully directs the Court to that pleading, but

otherwise denies knowledge or information sufficient to form a belief as to the truth of

the remaining allegations contained in paragraph 78 of the Complaint.

79. Paragraph 79 of the Complaint calls for a legal conclusion to which no response is required.

80. LNA admits the allegations contained in paragraph 80 of the Complaint.

81. LNA is without knowledge or information sufficient to form a belief as to the allegations contained in paragraph 81 of the Complaint.

82. Paragraph 82 of the Complaint calls for a legal conclusion to which no response is required.

## AS AND FOR AN ANSWER TO THE SECOND CAUSE OF ACTION

83. LNA repeats and incorporates its Answers to paragraphs 1 through 82 as if fully set forth herein.

84. LNA admits the quoted language appears in the "excess policy", but otherwise denies the allegations contained in paragraph 84 of the Complaint.

85. LNA denies the allegations contained in paragraph 85 of the Complaint.

86. LNA denies the allegations contained in paragraph 86 of the Complaint.

## AS AND FOR AN ANSWER TO THE THIRD CAUSE OF ACTION

87. LNA repeats and incorporates its Answers to paragraphs 1 through 86 as if fully set forth herein.

88. LNA admits that the quoted language appears, without emphasis, in the primary marine liabilities policy issued by NYMAGIC, but denies the remaining allegations contained in paragraph 88 of the Complaint.

89. LNA denies the allegations contained in paragraph 89 of the Complaint.

90. LNA denies the allegations contained in paragraph 90 of the Complaint.

91. LNA denies the allegations contained in paragraph 91 of the Complaint.

9

92.  LNA denies the allegations contained in paragraph 92 of the Complaint.

93.  LNA denies the allegations contained in paragraph 93 of the Complaint.

94.  LNA denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraph 94 of the Complaint.

95.  LNA admits that it paid and/or incurred expenses in excess of $7.5 million in defense of the underlying Katrina Claims, but except as so specifically admitted, denies the remaining allegations contained in paragraph 95 of the Complaint.

96.  LNA admits that it has made a claim for reimbursement of defense costs under the MMO Policy and the Excess Marine Liabilities Policy, but otherwise denies the remaining allegations contained in paragraph 96 of the Complaint.

97.  LNA admits that the "excess policy" contains the quoted language, without emphasis, but otherwise denies the allegations contained in paragraph 97 of the Complaint.

98.  LNA denies the allegations contained in paragraph 98 of the Complaint.

99.  LNA denies the allegations contained in paragraph 99 of the Complaint.

100.  LNA denies the allegations contained in paragraph 100 of the Complaint.

**AS AND FOR AN ANSWER TO THE FOURTH CAUSE OF ACTION**

101. LNA repeats and incorporates its Answers to paragraphs 1 through 100 as if fully set forth herein.

102.  Paragraph 102 of the Complaint calls for a legal conclusion to which no response is required; to the extent a response is required.

103.  Paragraph 103 of the Complaint calls for a legal conclusion to which no response is required.

10

104. Paragraph 104 asserts only legal conclusions to which no response is required.

105. LNA denies the allegations contained in paragraph 105 of the Complaint.

106. Paragraph 106 of the Complaint calls for a legal conclusion to which no response is required.

107. LNA denies the allegations contained in paragraph 107 of the Complaint.

### AS AND FOR A FIRST
### AFFIRMATIVE DEFENSE

108. The Complaint fails to state a claim against LNA upon which relief can be granted.

### AS AND FOR A SECOND
### AFFIRMATIVE DEFENSE

109. If there are any justiciable issues raised in the Complaint, these issues are the subjects of actions currently before this Court, and there is no need to litigate them anew in this action.

### AS AND FOR A THIRD
### AFFIRMATIVE DEFENSE

110. The Complaint must be dismissed as plaintiffs have failed to join an indispensable party.

### AS AND FOR A FOURTH
### AFFIRMATIVE DEFENSE

111. The plaintiffs do not have standing to commence this action.

### AS AND FOR A FIFTH
### AFFIRMATIVE DEFENSE

112. The plaintiffs are estopped from denying coverage, and/or from asserting

that the coverage to which they subscribe is excess to the coverage provided by the

American Club.

### AS AND FOR A SIXTH
### AFFIRMATIVE DEFENSE

113. The allegations in the plaintiffs' complaint are not justiciable, as, *inter alia*,

they are not ripe for adjudication.

### AS AND FOR A SEVENTH
### AFFIRMATIVE DEFENSE

114. The plaintiffs have sustained no damages, nor are they exposed to any

recoverable damages that can support this action.

### AS AND FOR A EIGHTH
### AFFIRMATIVE DEFENSE

115. LNA is entitled to all rights and defenses available under the New York

State Insurance Law, and/or any other applicable statutory provision.

### AS AND FOR A NINTH
### AFFIRMATIVE DEFENSE

116. LNA is entitled to the benefit of all rights and defenses set out in all policies

of insurance applicable to its claims.

### AS AND FOR A TENTH
### AFFIRMATIVE DEFENSE

117. LNA reserves the right to assert additional affirmative defenses should

additional facts be obtained through discovery.


**WHEREFORE**, LNA respectfully prays as follows:

1.     For judgment dismissing the plaintiffs' Complaint with prejudice;

2.    For a trial by jury as to all issues to be tried;

3.    For all costs of suit, including attorneys' fees;

4.    For such other and further relief as this Court deems just and proper.

Dated: New York, New York
        April 30, 2008

                            HILL RIVKINS & HAYDEN LLP
                            Attorneys for Defendant
                            Lafarge North America Inc.

By: _____
                            Robert G. Clyne (RC-2987)
                            John J. Sullivan (JS-1037)
                            45 Broadway – Suite 1500
                            New York, New York 10006
                            (212) 669-0600

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE NORTHERN ASSURANCE COMPANY OF AMERICA and AMERICAN HOME ASSURANCE COMPANY, | **ECF CASE** |
| Plaintiff, | |
| - against - | Case No.: 08 CV 3289 |
| LAFARGE NORTH AMERICA, INC. and AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC., | |
| Defendants. | ANSWER WITH <u>AFFIRMATIVE DEFENSES</u> |

Defendant, American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club" or the "Club"), by and through its attorneys, Thacher Proffitt & Wood LLP, hereby answers the Declaratory Judgment Complaint (the "Complaint") of Plaintiffs, The Northern Assurance Company of America and American Home Assurance Company (collectively, "Plaintiffs"), as follows:

1.      Paragraphs 1, 3-6, 65, 83, 87, 101 and 104 of the Complaint set forth a legal conclusion to which no responsive pleading is required.  To the extent a responsive pleading is required, the American Club denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 1, 3-6, 65, 83, 87, 101 and 104 of the Complaint.

2.      The American Club denies the allegations contained in paragraphs 29-30, 34, 37-38, 49, 62, 64, 71-77, 79-80 and 82 of the Complaint.

3.      The American Club denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 8-12, 15, 18-26, 32, 39-48, 50-53, 59, 81, 84-86, 88-100, 102 and 105-107 of the Complaint.

4.    The American Club admits the allegations contained in paragraphs 2, 14 and 63 of the Complaint.

5.    The American Club denies the allegations contained in paragraph 60, 68, 70 and 78, but refers to the referenced documents for the true and complete terms thereof.

6.    The American Club denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 55-58, but refers to the referenced documents for the true and complete terms thereof.

7.    The American Club admits the allegations contained in paragraphs 33, 35-36 and 67 of the Complaint and refers to the referenced documents for the true and complete terms thereof.

8.    The American Club admits that the Club and co-defendant Lafarge North America, Inc. ("Lafarge") are currently litigating an action in this judicial district entitled *American Steamship Owners Mutual Protection and Indemnity Association v. Lafarge North America, Inc.*, 06 CV 3123 (CSH), but except as expressly admitted, the American Club denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 7 of the Complaint.

9.    The American Club admits that Lafarge is incorporated in Maryland and has its principal place of business at 12950 Worldgate Drive, Suite 500, Herndon, Virginia, but except as expressly admitted, the American Club denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 of the Complaint.

10.    The American Club admits the allegations contained in paragraph 16 of the Complaint, except denies that it has a principal place of business at 60 Broad Street, New York, New York.

11.    The American Club admits that it provides cover to members against third-party liabilities encountered in their commercial operations, but except as expressly admitted, the American Club denies the allegations contained in paragraph 17 of the Complaint.

12.    The American Club admits that Lafarge's rights and obligations with the Club are governed at least in part by the American Club By-Laws and Rules (the "Club Rules"), but except as expressly admitted, the American Club denies the allegations contained in paragraph 27 of the Complaint.

13.    The American Club admits that the allegations contained in paragraph 28 of the Complaint and admits that Lafarge's Certificate of Entry for the period February 20, 2005 to February 20, 2006 is included within Exhibit 1 annexed to Plaintiff's Complaint.

14.    The American Club admits that Lafarge was a member of the Club during the policy year that commenced February 20, 1999 and was a member of the Club during the policy year that commenced February 20, 2005, but except as expressly admitted, the American Club denies the allegations contained in paragraph 31 of the Complaint.

15.    The American Club admits that the allegations set forth in the pleadings in the multiple Katrina Claims-related lawsuits are sufficient to trigger the obligations of NYMAGIC under the primary MMO policy. Except as expressly admitted, the American Club denies the allegations contained in paragraph 54 of the Complaint.

16.    The American Club admits that, on or about April 21, 2006, it sent a letter to Lafarge declining coverage, stating, among other things, that Barge ING 4727 had not been entered with the Club at the time of the casualty, or at any other time, and even if it had been entered, coverage for claims against the vessel would have been excluded. Except as expressly admitted, the American Club denies the allegations contained in paragraph 61 of the Complaint.

17.    The American Club admits that, on or about April 21, 2006, the American Club sent a letter to Lafarge declining its claim for defense costs and indemnity with regard to the Katrina Claims, and also admits that a copy of the American Club's declaratory judgment Complaint, without exhibits, filed in the action *American Steamship Owners Mutual Protection and Indemnity Association v. Lafarge North America, Inc.*, 06 CV 3123 (CSH), is annexed to Plaintiff's Complaint as Exhibit 2.  Except as expressly admitted, the American Club denies the allegations contained in paragraph 66 of the Complaint and refers to the referenced document for the true and complete terms thereof.

18.    The American Club admits that a copy of the Transportation Agreement between Lafarge and Ingram Barge Company is annexed to Plaintiff's Complaint as Exhibit 3.  Except as expressly admitted, the American Club denies the allegations contained in paragraph 69 of the Complaint and refers to the referenced document for the true and complete terms thereof.

19.    The American Club admits that the Club Rules contain an "Other Insurance" clause or terms and that the Club Rules are incorporated by reference into Lafarge's Certificate of Entry with the Club.  Except as expressly admitted, the American Club denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 103.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs have no standing to assert claims against the American Club.

### THIRD AFFIRMATIVE DEFENSE

The American Club does not owe any duty or obligation to Plaintiffs.

### FOURTH AFFIRMATIVE DEFENSE

The Complaint fails to join an indispensable party or parties.

### FIFTH AFFIRMATIVE DEFENSE

The allegations and/or damages specified within Plaintiffs' Complaint are not ripe for adjudication by this Court.

### SIXTH AFFIRMATIVE DEFENSE

Cover for the claims at issue is specifically excluded by the applicable Club Rules, Certificate(s) of Entry and/or other policy or membership terms and conditions between Lafarge and the Club.

### SEVENTH AFFIRMATIVE DEFENSE

Any claim against the American Club is barred, in whole or in part, by Lafarge's breach of its obligations under the applicable Club Rules, Certificate(s) of Entry and/or other policy or membership terms and conditions between Lafarge and the Club.

### EIGHTH AFFIRMATIVE DEFENSE

Any claim against the American Club is barred, in whole or in part, by Lafarge's breach of the implied covenant of good faith and fair dealing.

5

## NINTH AFFIRMATIVE DEFENSE

Any claim against the American Club is barred, in whole or in part, by the doctrines of waiver, estoppel and/or laches.

## TENTH AFFIRMATIVE DEFENSE

Any claim against the American Club is barred, in whole or in part, by Plaintiffs' and/or Lafarge's unclean hands.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs and/or Lafarge are equitably estopped from recovery.

## TWELFTH AFFIRMATIVE DEFENSE

Any claim against the American Club is barred, in whole or in part, pursuant to New York State Insurance Law and/or any other applicable statutory provisions.

## THIRTEENTH AFFIRMATIVE DEFENSE

Any claim against the American Club is barred, in whole or in part, by Plaintiffs' and/or Lafarge's failure to mitigate its claimed damages.

## FOURTEENTH AFFIRMATIVE DEFENSE

The allegations and/or damages specified within Plaintiffs' Complaint have been rendered moot by intervening circumstances and occurrences.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiffs have sustained no damages.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' Complaint is frivolous and without merit, constituting an abuse of process in violation of Federal Rule of Civil Procedure 11.

## SEVENTEENTH AFFIRMATIVE DEFENSE

The American Club reserves all rights to assert additional affirmative defenses should defenses be warranted based on the facts disclosed through discovery.

## PRAYER FOR RELIEF

WHEREFORE, Defendant, American Steamship Owners Mutual Protection and Indemnity Association, Inc., prays:

1.    that this Court dismiss with prejudice the Complaint of Plaintiffs, The Northern Assurance Company of America and American Home Assurance Company;

2.    that this Court award American Steamship Owners Mutual Protection and Indemnity Association, Inc. its costs and disbursements for this action, including, but not limited to, attorneys' fees; and

3.    that this Court grant American Steamship Owners Mutual Protection and Indemnity Association, Inc. such other and further relief as is just and proper.


Dated:      New York, New York          THACHER PROFFITT & WOOD LLP
            April 22, 2008

                                        By: /s/ John M. Woods
                                            John M. Woods
                                            jwoods@tpw.com
                                            Alan F. Kaufman
                                            akaufman@tpw.com

                                        Two World Financial Center
                                        New York, New York 10281
                                        (212) 912-7400

                                        *Attorneys for Defendant, American Steamship
                                        Owners Mutual Protection and Indemnity
                                        Association, Inc.*

The Company issu... ...his policy is indicated below:

The Northern Assur..... Company of America

**INTERNATIONAL MARINE ⊡ ⊠ ⬛ UNDERWRITERS**

**Policy Number**
N5JH00626

**Insured**        **LAFARAGE NORTH AMERICA**

**Street**
**City**                                                      **Renewal of**
**State**            **Zip**                                  C5JH00626

**Policy Period**
**At place of Issuance from**    **MAY 1, 2005**        **TO:**    **MAY 1, 2006**

**Representative:**                    **Producer**    **WILLIS OF NEW YORK, INC.**
**Producer #**    **80-10091**         **Street**      **7 HANOVER SQUARE**
                                       **City**        **NEW YORK**
                                       **State**       **NY**
                                       **Zip**         **10004**

| *Coverage* | *Amount Insured/ Limit of Liability* | *Rate* | *Premium* |
|---|---|---|---|
| HULL | As Per Policy | | $56,151.38 |
| HULL INCREASED VALUE | As Per Policy | | $8,981.00 |
| HULL WAR RISK | As Per Policy | | $4,590.95 |
| EXCESS MARINE LIABILITIES | As Per Policy | | $21,550.00 |
| TERRORISM | Not Covered | | $0.00 |

**Total Premium**    *$91,273.33*
**State Surcharge**    $

**For account of themselves**
**Loss, if any payable to:**        **Assured or Order**

**SUBJECT TO CONDITIONS OF FORM ATTACHED HERETO.**
**AS PER ATTACHED**

*THIS POLICY IS MADE AND ACCEPTED SUBJECT TO THE FOREGOING PROVISIONS AND STIPULATIONS AND  THOSE HEREINAFTER STATED, WHICH ARE HEREBY MADE A PART OF THIS POLICY TOGETHER WITH OTHER SUCH PROVISIONS, STIPULATIONS AND AGREEMENTS AS MAY BE ADDED HERETO, AS PROVIDED IN THIS POLICY.*

*IN WITNESS WHEREOF, this Company has caused this Policy to be executed below, but this Policy shall not be valid unless countersigned by a duly authorized representative of the Company.*

*Dennis R. Smith*                        *John P. Cavoores*
Dennis R. Smith                          John P. Cavoores
Secretary                                President & CEO

**Countersigned by**    _____

**this date**    _____

_____    **Authorized Representative**

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy Endorsement

Date: _____May 18 2004_____

Endorsement No.: _____1_____

Attached to and made a part of Joint Policy No. 02-0360-04

issued to                              **LAFARGE NORTH AMERICA INC**

IMU note and agree to include the following clause with effect from inception:

### PUNITIVE DAMAGE EXCLUSION

Absolute Exclusion of Punitive, Exemplary and Multiplication of damages:

Notwithstanding anything herein to the contrary, there shall be no liability to these underwriters for punitive damages or exemplary damages, or any other damages resulting from the multiplication of compensatory damages, whether double or treble damages or otherwise, howsoever described.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy Signature Endorsement

Date:    April 15th 2004

SCHEDULE OF UNDERWRITERS

| ASSURER | PERCENTAGE OF TOTAL VALUE | PREMIUM |
|---------|---------------------------|---------|
| International Marine Underwriters (IMU) | 25% | Nil |

**All Other Terms And Conditions Remain Unchanged.**

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:      02-0360-04

The subscribers designated on the Signature Page(s) attached hereto, severally but not jointly do insure

**ASSURED:**                 LAFARGE NORTH AMERICA INC, ET AL AS ATTACHED

**LOSS, IF ANY,
PAYABLE TO:**          Assured, or order.

**COVERING:**              Excess Marine Liabilities

**NAME OF VESSEL(S):**    As Attached

**PERIOD OF INSURANCE:**   From:  May 1st, 2004 – 12.01 A.M. Eastern Standard Time
                           To:     May 1st, 2005 – 12.01 A.M. Eastern Standard Time

**INSURED AMOUNT:**        $45,000,000 to $50,000,000 any one accident or occurrence and as
                           attached

**RATE OR PREMIUM:**       $86,200.

This Policy is made and accepted subject to the stipulations, terms and conditions as appearing herein on pages 1 - 27 inclusive, which are hereby specifically referred to and made a part of this Policy together with insuring agreements and conditions As Per Forms Attached and such other provisions and conditions as may be endorsed hereon or attached hereto; and no officer, agent or other representative of the Subscribing Assurers hereto shall have power to waive or be deemed to have waived any provisions or conditions of this Policy unless such waiver, if any, shall be written upon or attached hereto, nor shall any privilege or permission affecting the insurance under this Policy exist or be claimed by the Assured unless so written or attached.

**Any Provisions Required By Law To Be Stated In Policies Issued By Subscribing Assurers To This Policy Shall Be Deemed To Have Been Stated Herein.**

Lafarge XS  Liabs Policy/CP

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:        02-0360-04

## POLICY GENERAL CONDITIONS

1.  **NAMED ASSURED**:

    Lafarge North America Inc.and/or Lafarge S.A. and/or Lafarge Canada Inc. and/or Standard Industries, Inc. and/or Standard Lafarge Company and/or Concrete Acquisition Company and/or General Portland Inc. and/or Tews Company Inc. and/or Center Street Corporation and/or Missouri Portland Cement and/or Davenport Cement Company and/or Lafarge Florida, Inc. and/or Lafarge Building Materials, Inc.; their Subsidiary Companies and/or Corporations which now exist or may hereinafter be constituted (including Executive Officers, Directors and Stockholders all while acting within the scope of their duties as such) and, but not limited to, Affiliated, Associated, Interrelated, Operating Companies and/or Corporations, Partnerships or Joint Ventures singly or collectively referred to as the Assured, as their interests may appear.

    It is further agreed that if any party other than those named as Assured herein, have an interest as owner or part owner or otherwise in any vessels or property insured hereunder, this insurance extends to cover the interest of such party, if required, as though they had been specifically named as an Assured in this Policy without necessity of advice to this Company.

    This Policy will discharge any liability that it would bear if each Assured was separately insured, however, it is specifically understood and agreed that the inclusion of more than one Assured hereunder shall not increase the liability of this Company or otherwise alter any other terms or conditions of this Policy.

2.  **LOSS PAYEE**:

    Loss, if any, payable to the Assured, or order.

3.  **POLICY PERIOD**:

    From the 1st day of May, 2004, until the 1st day of May, 2005, both days at 12:01 A.M. Eastern Standard Time.

4.  **COVERAGE**:

    **EXCESS MARINE LIABILITIES**

    All as defined in contract wording attached.

LAFARGE NORTH AMERICA INC., ET AL
Coverage:  Excess Marine Liabilities

Lafarge XS Liabs Policy/CP

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY  10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:    02-0360-04

5.  **SUM INSURED:**

**EXCESS MARINE LIABILITIES**

|  |  | Limit | Primary |
|---|---|---|---|
| (A) | Marine Liabilities | | |
| | a)Wharfinger's/Landing Owner's/ Stevedore's | U.S. $45,000,000 | U.S. $   5,000,000 |
| | b)Charterer's Liability | U.S. $45,000,000 | U.S. $   5,000,000 |
| | a)  and b) combined occurrence aggregate. | U.S. $45,000,000 | U.S. $   5,000,000 |
| (B) | Protection & Indemnity | U.S. $45,000,000 | U.S. $ Per Club Rules |
| (C) | Pollution Liability | | |
| | (i)      U.S. Feet | U.S. $45,000,000 | U.S. $1,000,000,000 |
| | (ii)     Canadian Fleet | U.S. $45,000,000 | U.S. $1,000,000,000 |
| (D) | Excess Towers Liability | | |
| | (i)      U.S. Fleet | U.S. $49,000,000 | U.S. $   1,000,000 |
| | (ii)     Canadian Fleet | U.S. $49,000,000 | U.S. $   1,000,000 |
| (E) | All Coverages Combined | U.S. $50,000,000 | Occurrence Aggregate |

6.  **DEDUCTIBLE:**

Not Applicable

7.  **PREMIUM:**

This Policy is written for and in consideration of an annual premium of:

U.S. $86,200   Flat Annual

LAFARGE NORTH AMERICA INC., ET AL
Coverage:  Excess Marine Liabilities

Lafarge XS Liabs Policy/CP

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:     02-0360-04

8.    **CANCELLATION CLAUSE:**

This Policy may be cancelled by either the Assured or this Company by giving the other party sixty (60) days written notice, but such cancellation shall not prejudice any transit risk which has attached prior to the cancellation date.  Notice by the Assured to have the written consent endorsed hereon of all parties specifically named as Additional Assureds and Loss Payees elsewhere herein.

If cancellation at the option of this Company, pro rata will be charged; if cancelled at the option of the Assured, this Company to retain earned premium as per customary short rate table and procedure.

9.    **LEADER:**

It is agreed that all alterations, extensions, additions, endorsements, settlement of claim, etc. to be agreed by Marine Office of America Corporation as lead underwriter and to be binding on all remaining Underwriters participating hereon.

10.    **CAPTIONS AND HEADINGS:**

All captions and headings in this policy are inserted only for purposes of reference and shall not be used to interpret the clauses to which they apply.

11.    **ADDITIONAL CLAUSES:**

AIMU Economic and Trade Sanctions Clause as attached.
Silica Exclusion as attached.
Respirable Dust Exclusion as attached.
Fungi/Mold/Mildew/Yeast/Microbe Exclusion as attached.
AIMU Extended Radioactive Contamination Exclusion Clause with U.S.A. Endorsement as attached.
AIMU Chemical, Biological, bio-chemical and Electromagnetic Exclusion Clause as attached.

LAFARGE NORTH AMERICA INC., ET AL
Coverage:  Excess Marine Liabilities

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:    02-0360-04

12.   **SERVICE OF SUIT:**

It is agreed that in the event of the failure of this Company to pay any amount claimed to be due hereunder, this Company, at the request of the Assured, will submit to the jurisdiction of any Court of competent jurisdiction within the United States and/or Canada, and will comply with all requirements necessary to give such Court jurisdiction, and all matters arising hereunder shall be determined in accordance with the law and practice of such court.

13.   **OIL POLLUTION ACT OF 1990 DISCLAIMER:**

This insurance does not constitute evidence of financial responsibility under the Oil Pollution Act of 1990 or any similar federal, state or local law, and it is a condition of this insurance that it shall be submitted to the United States Coast Guard or any other federal, state of local agency as evidence of financial responsibility. This Company does not consent to be a guarantor.

LAFARGE NORTH AMERICA INC., ET AL
Coverage:  Excess Marine Liabilities

Lafarge XS Liabs Policy/CP

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:    02-0360-04

## EXCESS MARINE LIABILITIES
## INSURING AGREEMENTS

1. **COVERAGE:**

This policy is to indemnify the Assured in respect of the following marine liabilities (including such expenses as are set out in the definition of "ULTIMATE NET LOSS") arising out of the Assured's marine operations only:

A.    All Protection and Indemnity risks of whatsoever nature including, but not limited to, those covered by the Underlying Protection and Indemnity Insurances or which are absolutely or conditionally undertaken by the United Kingdom Mutual Steamship Assurance Association Limited. Nevertheless this insurance does not cover crew liabilities where excluded by the primary Protection and Indemnity Underlying Placements.

B.    General Average, Collision Liabilities, Tower's Liabilities, Salvage, Salvage Charges, and Sue and Labor arising from any cause whatsoever and also other marine liabilities which are absolutely or conditionally underwritten by the ocean marine departments of insurance companies or Lloyd's marine this company.

C.    All other sums which the Assured shall become legally liable to pay or by contract or agreement become liable to pay in respect of claims made against the Assured for damages of whatsoever nature, on account of:

        i.    Personal injuries, including death at any time resulting therefrom,

        ii.    Property Damage, caused by or arising out of each occurrence happening anywhere in the world.

Notwithstanding the foregoing this insurance shall not cover liabilities arising by reason of insolvency or inadequacy of capital.

LAFARGE NORTH AMERICA INC., ET AL
Coverage:  Excess Marine Liabilities

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:    02-0360-04

### EXCESS LIABILITIES
### DEFINITIONS

1.   **ASSURED**:

The unqualified word "Assured", wherever used in this Policy, includes not only the Named Assured but also:

    A.    Any executive officer, director, stockholder or employee of the Named Assured, while acting in his capacity as such;

    B.    Any person, organization, trustee or estate to whom the Named Assured is obligated by virtue of a written contract or agreement to provide insurance such as is afforded by this Policy, but only in respect of operations by or on behalf of the Named Assured;

2.   **OCCURRENCE**:

The term "Occurrence" wherever used herein, means an event or a continuous or repeated exposure to conditions which unintentionally causes injury, damages or destruction during the policy period. Any number of such injuries, damage or destruction resulting from a common cause or from exposure to substantially the same conditions shall be deemed to result from one occurrence.

The word "unintentionally" used in this definition of 'Occurrence' shall not apply to claims arising out of personal injuries.

3.   **ULTIMATE NET LOSS**:

The term 'Ultimate Net Loss" shall mean the total sum which the Assured becomes obligated to pay by reason of matters set out in Insuring Agreement I, including compromise settlements, and shall include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding, however the salaries of the Assured's permanent employees and general office overhead and also excluding any part of such expenses for which the Assured is covered by other valid and collectible insurance.

Nothing herein contained shall be construed to require the Assured to enforce by legal action, any rights of salvage, subrogation or indemnity, before this Company shall pay any loss covered hereunder.

LAFARGE NORTH AMERICA INC., ET AL
Coverage:  Excess Marine Liabilities

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:    02-0360-04

### SECTION II

### EXCESS MARINE LIABILITIES
### EXCLUSIONS

__THIS SECTION II SHALL NOT APPLY:__

1.    A.    To indemnify any Assured whose dishonesty or fraud, committed individually or in collusion with others, caused the loss for which that Assured seeks indemnity; nor

        B.    To indemnify any Assured against claims based upon any intentional noncompliance with any statute or regulation unless such claim(s) be for damages occasioned by actual or alleged bodily injury (fatal or otherwise) or physical loss of, damage to, and/or loss of use of tangible property; nor

        C.    To indemnify any Assured in respect of any criminal fines or penalties incurred through the criminal act of that Assured.

2.    With respect to advertising activities, to claims against the Assured:

        A.    For failure of performance of contract, but this shall not relate to claims for unauthorized appropriation of ideas based upon alleged breach of an implied contract;

        B.    By advertising agents of the Assured;

        C.    For infringement of registered trademark, service mark or trade name by use thereof as the registered trademark, service mark or trade name of goods or services sold, offered for sale or advertised, but this shall not relate to titles or slogans;

        D.    For incorrect description of any article or commodity;

        E.    For mistake in advertising price.

3.    To any claim(s) not covered by the Assured's Underlying Insurances as set forth in the "Schedule of Underlying Insurance" made under Insuring Agreement I. C. by any national provincial state or local government subdivisions or agencies thereof unless such claim(s) be for damages occasioned by actual or alleged personal and/or bodily injury (fatal or otherwise), physical loss of, damage to and/or loss of use of tangible property.

LAFARGE NORTH AMERICA INC., ET AL
Coverage:  Excess Marine Liabilities

Lafarge XS Liabs Policy/CP

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:    02-0360-04

4.    To any claim(s) or suit(s) alleging violation of the antitrust laws, unfair competition or other acts allegedly in restraint of trade.

5.    To any stockholders derivative action(s).

6.    To claims for nonpayment or delay in payment of charter hire; non-payment or delay in payment of loans, mortgages, promissory notes, checks, drafts or other evidence of debt.

7.    To claims for infringement of patent(s); unauthorized use of trademark(s) or trade name(s); misappropriation of design(s), drawing(s), process(es) or procedure(s) or to claims based on misappropriation of minerals or non-payment of mineral royalties.

8.    A.    To loss, damage or liability directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public local authority.

B.    Nevertheless, this Exclusion 8 shall not apply, except as provided in Paragraph C below, to liabilities:

i.    Arising in connection with vessels owned, chartered, hired or otherwise used by the Assured;

ii.    Arising out of property of any kind in transit by land, water or air during such periods as would be covered for full war risks under insurance covering physical loss of or damage to cargo subject to the Institute War Clauses relevant to the particular form of transit;

iii.    Arising out of any waterborne operations;

iv.    To seamen or under "Workers' Compensation Statutes";

v.    For death of or bodily injury to persons of any kind.

LAFARGE NORTH AMERICA INC., ET AL
Coverage: Excess Marine Liabilities

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.: 02-0360-04

C.  Notwithstanding the provisions of Paragraph B above, Paragraph A above shall apply to the liabilities set out in Paragraph B above:

    i.  Unless sooner applied under the provisions of Subparagraphs ii. or iii. of this Paragraph C, automatically upon and simultaneously with the outbreak of war (whether there be declaration of war or not) between any of the following countries: United States of America, United Kingdom, France, the Russian Federation, the People's Republic of China.

    ii.  At any time at the Assured's request, or by this Company giving seven (7) days written notice to the Assured, but in no event shall such notice affect or postpone the operation of the provisions of Subparagraphs i. or iii. of this Paragraph C. Written or telegraphic notice sent to the Assured at his (its) last known address shall constitute a complete notice and such notice mailed or telegraphed to the said Assured, care of the broker who negotiated this insurance, shall have the same effect as if sent to the said Assured direct. The mailing of notice as aforesaid shall be sufficient proof of notice and the effective date and hour of the operation of the provisions set out in Paragraph A above shall be seven (7) days from midnight of the day on which such notice was mailed or telegraphed as aforesaid. This Company agrees, however, that the provisions set out in Paragraph A above shall not apply subject to agreement between this Company and the Assured prior to the aforesaid effective date and hour as to an additional premium and/or new conditions and/or warranties.

    iii.  Unless sooner terminated under the provisions of Subparagraphs i. or ii. of this Paragraph C, automatically in respect of an insured vessel if and when such vessel is requisitioned, either for title or use, by the government of the United States or of the country in which the vessel is owned or registered or of the country in which any such right of requisition is vested.

If subsequent to the agreement of an additional premium as provided by Subparagraph ii. of this Paragraph C, either the Assured or this Company again elect to exercise the option provided therein, or Subparagraphs i. or iii. of this Paragraph C become operative, pro rata net return of the additional premium paid shall be refunded to the Assured. This Company to refund such return premium on demand or as soon thereafter as practicable.

LAFARGE NORTH AMERICA INC., ET AL
Coverage: Excess Marine Liabilities

Lafarge XS Liabs Policy/CP

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:     02-0360-04

### EXCESS MARINE LIABILITIES
### CONDITIONS

1.  **GEOGRAPHICAL LIMITS:**

    This policy covers the marine operations of the Assured anywhere in the world.

2.  **CROSS LIABILITY:**

    In the event of one of the Assureds incurring liability to any other of the Assureds, this Policy shall cover the Assured against whom claim is or may be made in the same manner as if separate Policies had been issued to each Assured. Nothing contained herein shall operate to increase this Company's limit(s) of liability as set forth in Clause 5 of the Policy General Conditions.

3.  **NOTICE OF OCCURRENCE:**

    Whenever the Assured's Insurance Department has information from which it may be reasonably concluded that an occurrence covered hereunder involved injuries or damages which, in the event that the Assured should be held liable, is likely to involve this policy, notice shall be sent to:

    Marsh Inc.
    Marine & Energy
    1166 Avenue of the Americas
    New York, New York 10036

    as soon as practicable, provided, however, that failure to notify the above firm of any occurrence which at the time of its happening did not appear to involve this Section II, but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims.

4.  **ASSISTANCE AND COOPERATION:**

    This Company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceedings instituted against the Assured, but this Company shall have the right and shall be given the opportunity to associate with the Assured or the Assured's Underlying Insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves or appears reasonably likely to involve this Company in which event the Assured, the Underlying Insurers and this Company shall cooperate in all things in the defense of such claim, suit or proceeding.

LAFARGE NORTH AMERICA INC., ET AL
Coverage: Excess Marine Liabilities

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:     02-0360-04

5.   **APPEALS:**

In the event the Assured or the Assured's Underlying Insurers elect not to appeal a judgment in excess of the Underlying Limit, this Company may elect to make such appeal at their own cost and expense, and shall be liable for the taxable costs and disbursements and interest incidental thereto, but in no event shall the liability of this Company for Ultimate Net Loss exceed the amount set forth in Policy Declarations as the Sum Insured for any one occurrence and in addition the cost and expense of such appeal plus the taxable costs and disbursements and interest incidental thereto.

6.   **BANKRUPTCY OR INSOLVENCY:**

In the event of the bankruptcy or insolvency of the Assured or any entity comprising the Assured, this Company shall not be relieved thereby of the payment of any claim hereunder because of such bankruptcy or insolvency.

7.   **OTHER INSURANCE:**

If other valid and collectible insurance with any other Insurer is available to the Assured covering a loss also covered by this Policy, other than insurance that is in excess of the insurance afforded by this Policy, the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance, either as double insurance or otherwise. Nothing herein shall be construed to make this Policy subject to the terms, conditions and limitations of other insurance.

8.   **SUBROGATION:**

Inasmuch as this policy provides "Excess Coverage", the Assured's right of recovery against any person or other entity cannot be exclusively subrogated to this Company. It is, therefore, understood and agreed that in case of any payment hereunder, this Company will act in concert with all other interests (including the Assured) concerned, in the exercise of such rights of recovery. The apportioning of any amount which may be so recovered shall follow the principle that any interests (including the Assured) that shall have paid an amount over and above any payment hereunder, shall first be reimbursed up to the amount paid by them; this Company is then to be reimbursed out of any balance then remaining up to the amount paid hereunder; lastly, the interests (including the Assured) of whom this coverage is in excess are entitled to claim the balance, if any. Expenses necessary to the recovery of any such amounts shall be apportioned between the interests (including the Assured) concerned in the ratio of their respective recoveries as finally settled.

LAFARGE NORTH AMERICA INC., ET AL
Coverage: Excess Marine Liabilities

Lafarge XS Liabs Policy/CP

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:    02-0360-04

9.    **ASSIGNMENT**:

Assignment of interest under this Policy shall not bind this Company until their consent is endorsed herein.

10.    **CONFLICTING STATUTES**:

In the event that any provision of this Policy is unenforceable by the Assured under the laws of any State, Province or other jurisdiction wherein it is claimed that the Assured is liable for any injury covered hereby, because of noncompliance with any statute thereof, then this Policy shall be enforceable by the Assured with the same effect as if it complied with such statute.

11.    **MAINTENANCE OF UNDERLYING INSURANCE**:

A.    It is a condition of this policy that the Section(s) or Policy(ies) referred to below in the "Schedule of Underlying Insurance' shall be maintained in full effect during the currency of this insurance except for any reduction of the aggregate limit(s) contained therein solely by payment of claims in respect of accidents and/or occurrences, occurring during the term of this Policy.

B.    Inadvertent failure of the Assured to comply with Paragraph A above or inadvertent failure to notify this Company of any changes in the Underlying Insurances shall not prejudice the Assured's rights of recovery under this Policy, but in the event of such failure, this Company to be liable only to the same extent as they would have been had the Assured complied with the said condition.

C.    In the event of an Underlying War Risks Insurance being cancelled by the this Company thereon under the terms of the cancellation clause therein, such cancellation shall not constitute a breach of Paragraph A above, but this Company to be liable hereunder only to the same extent as they would have been had that Underlying War Risks Insurance not been cancelled.  Nothing in the foregoing sentence shall be deemed to affect the application of Exclusion 8 hereunder.

LAFARGE NORTH AMERICA INC., ET AL
Coverage:  Excess Marine Liabilities

Lafarge XS Liabs Policy/CP

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:    02-0360-04

### SECTION II

### EXCESS MARINE LIABILITIES
### SCHEDULE OF UNDERLYING INSURANCE

| Locations, Vessels and Applicable Marine Interests | Company (Participation) | Underlying Limits and Coverage | |
|---|---|---|---|
| All As Per: 1. Primary Marine Liabilities | MOAC  − 50% MMO  − 50% | US$  5,000,000 | Landing Owners and Stevedore's Legal Liability |
| | | US$  5,000,000 | Charterer's Legal Liability |
| | | US$  5,000,000 | Combined Occ. Aggregate |
| 2. P&I Club Placements | | | |
| A.  Lafarge Canada Inc. | American Steamship Owners Mutual Protection & Indemnity Association, Inc. | US$  Per Club Rules | Protection & Indemnity (Including 4/4ths Collision Liability) |
| | | US$  1,000,000,000 | Pollution Liability |
| | | US$  1,000,000 | Tower's Liability |
| B.  Lafarge North America Inc. | American Steamship Owners Mutual Protection & Indemnity Association, Inc. | US$  Per Club Rules | Protection & Indemnity (Including 4/4ths Collision Liability) |
| | | US$  1,000,000,000 | Pollution Liability |
| | | US$  1,000,000 | Tower's Liability |

LAFARGE NORTH AMERICA INC., ET AL
Coverage:  Excess Marine Liabilities

Lafarge XS Liabs Policy/CP

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY  10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:    02-0360-04

### EXCESS MARINE LIABILITIES
### SUPPLEMENTARY CLAUSES

The following provisions shall supersede any inconsistent provisions of this Policy.

1.    <u>CONDITIONAL EXCLUSIONS</u>:

As respects all activities of the Assured (except liability arising out of ownership, charter, use, operation, maintenance, loading, unloading or as a bailee of any watercraft not otherwise excluded or limited herein), this insurance shall be free from liability (unless coverage is provided in an Underlying Policy scheduled herein, and then coverage hereunder shall operate only as excess of such coverage):

A.    From operation, ownership, or use of any automobile, truck or aircraft;

B.    From any employee with respect to personal injury to or death of another employee of the same employer injured in the course of such employment;

C.    For damage, loss, or expense to property of others which occurred while in the care, custody or control of the Assured hereunder;

D.    Assumed under contract;

E.    Arising out of goods or products manufactured, sold, handled or distributed by the Assured or by others trading under his name (hereinafter called "the Assured's Products") if the occurrence occurs after possession of such goods or products has been relinquished to others by the Assured or by others trading under his name and if such occurrence occurs away from premises owned, rented or controlled by the Assured; provided such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for use of others but not sold;

LAFARGE NORTH AMERICA INC., ET AL
Coverage:  Excess Marine Liabilities

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:    02-0360-04

F.    Arising out of operations, if the occurrence occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the Assured; provided that operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further the following shall not be deemed to be "operations" within the meaning of this Paragraph F:

i.    Pick-up or delivery, except from or onto a railroad car;

ii.    The maintenance of vehicles owned or used by or in behalf of the Assured;

iii.    The existence of tools, uninstalled equipment and abandoned or unused materials.

2.    **ABSOLUTE EXCLUSIONS:**

This insurance shall be free from liability or expense arising:

A.    From any non-marine operation of the Assured;

B.    From the failure of the Assured's non-marine products;

C.    From infidelity and/or dishonesty of the Assured, or any employee or representative of the Assured committed individually or in collusion with others;

D.    From ownership, use or operation of drilling rigs, drilling barges, drilling tenders, platforms, flow lines (used in petrochemical production and/or refining), gathering stations and/or pipelines, but this exclusion shall not apply to craft serving the foregoing including, but not limited to, crew, supply, utility or work boats, tenders or tugs;

E.    Under Employees Retirement Income Security Act (ERISA);

F.    Under United States Longshoremen's and Harbor Workers' Act (USL&IH)

G.    For loss of life or personal injury to employees of the Assured for which the Assured or any carrier as his insurer may be held liable under any State, Federal or Provincial worker's compensation, unemployment compensation, disability benefits law, occupational disability or under any similar law;

LAFARGE NORTH AMERICA INC., ET AL
Coverage:  Excess Marine Liabilities

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:      02-0360-04

H.   Because of the violation of any statute, law, ordinance or regulation prohibiting discrimination or humiliation because of race, creed, color, national origin, age and/or sex;

I.   From the failure of the Assured's products or work completed by or for the Assured to perform the function or serve the purpose intended by the Assured, if such failure is due to mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any Assured except with respect to bodily injury or property damage as a result of said failure provided such property damage or bodily injury is insured in the Underlying Insurance scheduled herein;

J.   From any activity as a ship repairer or shipbuilder other than for maintenance and repairs by the Assured to his own vessel(s).

K.   From bodily injury or personal injury or loss of, damage to or loss of use of property directly or indirectly caused by asbestos.

L.   From bodily injury or personal injury or loss of, damage to or loss of use of property directly or indirectly caused by Polychlorinated Biphenyl or any derivative thereof.

3.   SPECIAL CONDITIONS:

A.   Additional Assureds

In the event of Additional Assureds being added to the coverage under the Underlying Insurances during the currency hereof which results in an additional premium being charged by the Underlying Insurers, prompt notice shall be given to this Company who shall be entitled to charge an appropriate additional premium.

B.   Prior Insurance and Non-Cumulation of Liability

It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof, the limit(s) of liability as stated in the Policy Declarations as the Sum Insured shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:    02-0360-04

C.    Special Conditions Applicable to Occupational Disease

As regards personal injury (fatal or nonfatal) by occupational disease sustained by any employee of the Assured, this Policy is subject to the same warranties, terms and conditions (except as regards the premium amounts, limits of liability and the renewal agreement, if any) as are contained in or as may be added to the Underlying Insurance prior to the happening of an occurrence for which claim is made hereunder.

D.    Subrogation

In the event of any payment under this Policy, this Company shall participate with the Assured and any Underlying Insurers in the exercise of all the Assured's rights of recovery therefore against any person or organization.  All recoveries shall be applied as if recovered prior to any payment under this Policy and to that end all necessary adjustments shall be made as soon as practicable thereafter.  The expense of any subrogation proceeding brought to enforce such rights shall be apportioned among this Company, the Underlying Insurers and the Assured in accordance with their respective interests in the matter giving rise to such rights.

4.    **DEFINITIONS:**

These definitions shall apply as respects all activities of the Assured other than liability arising out of the ownership, charter, use, operation, maintenance, loading, unloading or as a bailee of any watercraft.

A.    **PERSONAL INJURIES:**

The term "Personal Injuries" whenever used herein means bodily injury (including death at any time resulting therefrom), mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution; also libel, slander, disparagement or defamation of character or invasion of rights of privacy, except that which arises out of any advertising activities.

B.    **PROPERTY DAMAGE:**

The term "Property Damage" wherever used herein shall mean loss of or direct damage to or destruction of tangible property (other than property owned by the Named Assured).

LAFARGE NORTH AMERICA INC., ET AL
Coverage: Excess Marine Liabilities

Lafarge XS Liabs Policy/CP

Page 18 of 1

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## JOINT Policy

Joint Policy No.:     02-0360-04

## ADDITIONAL CLAUSES

### AIMU U.S. ECONOMIC AND TRADE SANCTIONS CLAUSE

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to , those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) such coverage shall be null and void.

Similarly any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

### EXCLUSION – SILICA

This insurance does not apply to:

1.  "Bodily injury" arising in whole or in part out of the actual, alleged or threatened respiration or ingestion at any time of "silica" or:
2.  "Property damage" arising in whole or in part out of the actual, alleged or threatened presence of "silica", or
3.  "Personal and advertising injury' arising in whole or in part out of the actual, alleged or threatened exposure at any time to or the presence of "silica".

The following definition applies herein:
"silica" means the chemical compound silicon dioxide (Si02) in any form, including dust which contains "silica".

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

LAFARGE NORTH AMERICA INC., ET AL
Coverage: Excess Marine Liabilities

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:     02-0360-04

### EXCLUSION – RESPIRABLE DUST

This insurance does not apply to:

1. "Bodily injury" arising in whole or in part out of the actual, alleged or threatened respiration or ingestion at any time of "respirable dust" or:
2. "Property damage" arising in whole or in part out of the actual, alleged or threatened presence of "respirable dust", or
3. "Personal and advertising injury' arising in whole or in part out of the actual, alleged or threatened exposure at any time to or the presence of "respirable dust".

The following definition applies herein:
"respirable dust" means respirable particulate matter but does not include living organisms.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

### FUNGI / MOLD / MILDEW / YEAST / MICROBE EXCLUSION

This insurance does not apply to:

Fungi and Microbes

(1)   "Bodily injury", "property damage", "personal injury or advertising injury" which would not have occurred in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, contact with, exposure to, existence of , or presence of any "fungi" or microbes".

(2)   Any loss, cost or expense arising out of the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating, or disposing of, or in any way responding to or assisting the effects of "fungi" or "microbes" by any insured or by anyone else.

This exclusion applies regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage, loss, cost or expense.

The following definitions apply herein:

"Fungi" means any form of fungus, yeast, mold, mildew or mushroom, including mycotoxins, spores, scents, byproducts or other substances produced or released fungi. But "fungi" does not include fungi that were deliberately grown for human consumption.

LAFARGE NORTH AMERICA INC., ET AL
Coverage:  Excess Marine Liabilities

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY  10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:    02-0360-04

"Microbe" means any bacteria, virus, or any other non-fungal, single celled or colony-form organism, including any towins, scents, byproducts or other substances it produces or releases, whose injurious source is in or on a building or its contents.  But "microbe" does not mean:

(1)     Microbes that were transmitted directly from perosn to person.;
(2)     Microbes that caused food poisoning, if your business is food processing sales or serving.

ALL OTHER TERMS AND CONDIITONS OF THIS POLICY REMAIN UNCHANGED


## AIMU EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE AND CHEMICAL, BIOLOGICAL, ETC. EXCLUSION CLAUSE

### AIMU EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE (March 1, 2003) WITH U.S.A. ENDORSEMENT

**This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.**

1.     In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to or arising from

    1.1     ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

    1.2     the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

    1.3     any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter

    1.4     the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter.  The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

LAFARGE NORTH AMERICA INC., ET AL
Coverage:  Excess Marine Liabilities

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY  10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:     02-0360-04

### RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE
### (U.S.A. ENDORSEMENT)

This insurance is subject to the Extended Radioactive Contamination Exclusion Clause (March 1, 2003) provided that

if fire is an insured peril

and

where the subject matter insured is within the U.S.A., its islands, onshore territories or possessions

and

a fire arises directly or indirectly from one or more of the causes detailed in Sub-Clauses 1.1, 1.2, and 1.4 of the Extended Radioactive Contamination Exclusion Clause March 1, 2003 any loss or damage arising directly from that fire shall, subject to the provisions of this insurance, be covered, EXCLUDING however any loss damage liability or expense caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or indirectly from that fire.

### AIMU CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, AND
### ELECTROMAGNETIC EXCLUSION CLAUSE (March 1, 2003)

**This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.**

In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to or arising from an actual or threatened act involving a chemical, biological, bio-chemical or electromagnetic weapon, device, agent or material when used in an intentionally hostile manner.

LAFARGE NORTH AMERICA INC., ET AL
Coverage:  Excess Marine Liabilities

Lafarge XS Liabs Policy/CP

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy

Joint Policy No.:    02-0360-04

### SCHEDULE OF UNDERWRITERS

| ASSURER | PERCENTAGE OF TOTAL VALUE | PREMIUM |
|---|---|---|
| Continental Insurance Company through Marine Office of America Corporation (MOAC) | 25% | $21,550.00 |
| New York Marine and General Insurance Company through Mutual Marine Office, Inc. (MMO) | 25% | $21,550.00 |
| American Home Assurance Company (AIMA) | 25% | $21,550.00 |
| International Marine Underwriters (IMU) | 25% | $21,550.00 |

LAFARGE NORTH AMERICA INC., ET AL
Coverage:  Excess Marine Liabilities

Lafarge XS Liabs Policy/CP

Page 23 of 1

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy Signature Endorsement

Date: _____ May 13, 2004 _____

Applicable to Joint Policy No. _02-0360-04_

Assured:        LAFARGE NORTH AMERICA INC., ET AL

It is hereby understood and agreed that the signature of a duly authorized officer, attorney, or agent of the Assurer or Assurers indicated below, shall constitute acceptance of:

Excess Marine Liabilities

For the Policy Period:

From:        May 1st, 2004 – 12.01 A.M. Eastern Standard Time

To:        May 1st, 2005 – 12.01 A.M. Eastern Standard Time

For the amounts indicated:

| ASSURER | PERCENTAGE OF TOTAL VALUE | PREMIUM | AUTHORIZED SIGNATURE FOR ASSURER |
|---|---|---|---|
| International Marine Underwriters (IMU) | 25% | $21,550.00 | _____ |

All Other Terms And Conditions Remain Unchanged.

Lafarge XS Liabs Policy/CP

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy Endorsement

Date: _____ May 18 2004 _____

Endorsement No.: _____ 1 _____

Attached to and made a part of Joint Policy No. 02-0360-04

issued to              **LAFARGE NORTH AMERICA INC**

IMU note and agree to include the following clause with effect from inception:

### PUNITIVE DAMAGE EXCLUSION

Absolute Exclusion of Punitive, Exemplary and Multiplication of damages:

Notwithstanding anything herein to the contrary, there shall be no liability to these underwriters for punitive damages or exemplary damages, or any other damages resulting from the multiplication of compensatory damages, whether double or treble damages or otherwise, howsoever described.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

Type Coverage here

Lafarge Endt 1 - imu Only/AUTHOR

Marsh USA Inc.
1166 Avenue of the Americas
New York, NY 10036-2774
Telephone 212 345 6000

# MARSH

## Joint Policy Signature Endorsement

Date:  ___April 15th 2004___

### SCHEDULE OF UNDERWRITERS

| ASSURER | PERCENTAGE OF TOTAL VALUE | PREMIUM |
|---|---|---|
| International Marine Underwriters (IMU) | 25% | Nil |

**All Other Terms And Conditions Remain Unchanged.**

Lafarge Endt 1 - imu Only/AUTHOR

Page   of

# BINDING CONFIRMATION

# Willis

Willis of New York, Inc.
7 Hanover Square
New York, NY 10004
Tel:    212-344-8888
Fax:    212-820-7562
Website: www.willis.com

**DATED:**    May 31, 2005

**RISK CONTROL NO.:**    **WCM05-525**

**NAMED ASSURED:**    Lafarge S.A. and/or Lafarge North America Inc., and/or Lafarge Building Materials, Inc. and/or Individual Assureds and/or Associated and/or Affiliated and/or Subsidiary Companies for their respective rights and interests.

**LOSS PAYEE:**    Assured, or order, as attached

**VESSEL(S):**    As attached

**INTEREST:**    Section 1)  Hull and Machinery and everything connected therewith, nothing excluded.
Section 2)  Disbursements and/or Increased Value of Hull and Machinery, including Excess Liabilities.
Section 3)  War and Strikes Risks

**PERIOD:**    From: May 01, 2005, 3:30 P.M., Eastern Daylight Time
To:    May 01, 2006, 3:30 P.M., Eastern Daylight Time

**CONDITIONS:**    As attached

**NET PREMIUM:**    Section 1)    $ 272,735.32
Section 2)    $  43,622.00
Section 3)    $  28,595.70
               $ 344,953.02 payable in full, at policy inception

**INSURED WITH:**    17.50% - One Beacon America Insurance Company

_____
Authorized Signature

POLICY OR POLICIES WILL BE ISSUED AGAINST THE INSURANCE DESCRIBED HEREIN, AND IN THE EVENT OF ANY INCONSISTENCY HEREWITH, THE TERMS, CONDITIONS AND PROVISIONS OF THE POLICY OR POLICIES WILL PREVAIL. POLICY OR POLICIES WILL BE PROMPTLY FORWARDED TO YOU AS SOON AS RECEIVED.

Attached to and forming a pa      ...sk Control #WCM05-525
Dated: May 31, 2005
Page 2 of 26



### SCHEDULE OF VESSELS

### HULL AND MACHINERY

| VESSEL | YEAR BUILT | GT | HULL VALUE | DEDUCTIBLE | NET RATE | NET PREMIUM |
|---|---|---|---|---|---|---|
| 1. ADELAIDE | 1963 | 8,512 | $ 20,000,000 | $ 150,000 | 0.406776% | $ 81,355.20 |
| 2. ALEXANDRA | 1963 | 8,512 | 20,000,000 | 150,000 | 0.406776% | 81,355.20 |
| 3. MARIA T | 1982 | 8,865 | 20,000,000 | 150,000 | 0.406776% | 81,355.20 |
| 4. BECRAFT | 1963 | 3,614 | 5,200,000 | 150,000 | 0.518534% | 26,963.77 |
| 5. MAGNOLIA | 1958 | 1,734 | 385,000 | 25,000 | 0.443105% | 1,705.95 |
| SUBTOTAL | | | $ 65,585,000 | | | $ 272,735.32 |

### INCREASED VALUE

| VESSEL | YEAR BUILT | GT | INCREASED VALUE | DEDUCTIBLE | NET RATE | NET PREMIUM |
|---|---|---|---|---|---|---|
| 1. ADELAIDE | 1963 | 8,512 | $ 6,000,000 | N/A | 0.23375% | $ 14,025.00 |
| 2. ALEXANDRA | 1963 | 8,512 | 6,000,000 | N/A | 0.23375% | 14,025.00 |
| 3. MARIA T | 1982 | 8,865 | 6,000,000 | N/A | 0.23375% | 14,025.00 |
| 4. BECRAFT | 1963 | 3,614 | 520,000 | N/A | 0.29750% | 1,547.00 |
| 5. MAGNOLIA | 1958 | 1,734 | N/A | N/A | N/A | N/A |
| SUBTOTAL | | | $ 24,520,000 | | | $ 43,622.00 |

### WAR RISKS

| VESSEL | YEAR BUILT | GT | WAR VALUE | DEDUCTIBLE | NET RATE | NET PREMIUM |
|---|---|---|---|---|---|---|
| 1. ADELAIDE | 1963 | 8,512 | $ 26,000,000 | N/A | 0.034% | $ 8,840.00 |
| 2. ALEXANDRA | 1963 | 8,512 | 26,000,000 | N/A | 0.034% | 8,840.00 |
| 3. MARIA T | 1982 | 8,865 | 26,000,000 | N/A | 0.034% | 8,840.00 |
| 4. BECRAFT | 1963 | 3,614 | 5,720,000 | N/A | 0.034% | 1,944.80 |
| 5. MAGNOLIA | 1958 | 1,734 | 385,000 | N/A | 0.034% | 130.90 |
| SUBTOTAL | | | $ 24,520,000 | | | $ 28,595.70 |

**TOTAL NET PREMIUM: $ 344,953.02**

EACH VESSEL DEEMED TO BE SEPARATELY INSURED.

INCLUDING NEW AND/OR ACQUIRED AND/OR BAREBOAT CHARTERED VESSELS NOT EXCEEDING TOP VALUE, AT A RATE TO BE AGREED.

Attached to and forming a pa   t ...sk Control #WCM05-525
Dated: May 31, 2005
Page 3 of 26

# Willis

**Trading Limits:**

Barges "ADELAIDE", "ALEXANDRA", "MARIA T", and "BECRAFT" confined to the use and navigation of the coastwise and inland waters of the United States between Boston, MA and New Orleans, LA; also including the Bahamas or held covered at additional premium to be agreed.

Warranted that these vessels are Classed A1 by American Bureau of Shipping and that Class must be maintained.

Barge "MAGNOLIA" is currently located at the Blue Circle facility in New Orleans where it will be held covered on a Port Risk basis only, subject to the American Institute Port Risk Endorsement (January 18, 1970), as attached.

**Terms and Conditions:**

**SECTION 1:**

American Institute Hull Clauses (June 2nd 1977), as attached, with lines 43 through 54 (Lay Up Returns Clause) deleted and with Additional Insurances (Section A, Lines 215-217) amended to allow Increased Value of Hull and Machinery insurance in an amount not exceeding, in the aggregate, 35% of the agreed value

Deductibles (Line 30): $150,000 with respect to Vessels #1-4 and $25,000 with respect to Vessel #5

Excluding Collision Liability.

American Hull Insurance Syndicate Liner Negligence Clause.

Warranted that the vessels insured hereunder shall not be towed under Release Towage Contracts except where such contracts are customary, or in times of emergency when such contracts are unavoidable.

Titles of Paragraphs, as attached

Additional Insureds Clause, as attached

Ownership Clause, as attached

Cross Liability Clause, as attached

Contracts Clause, as attached

Errors and Omissions Clause, as attached

Salvage Service Clause, as attached

Civil Authority Clause, as attached

Deliberate Damage-Pollution Hazard Clause, as attached

Leased Equipment Clause, as attached

Equipment on Shore Clause, as attached

Permission to Tow or Be Towed Clause, as attached

Pilotage and Towage Clause, as attached

Extension of Cover Clause, as attached

Radio and Aids to Navigation, as attached

General Average and Salvage Charges, as attached

Cost of Prosecution Clause, as attached

Notice of Claim or Suit Clause, as attached

Attached to and forming a pa.  I __sk Control #WCM05-525
Dated: May 31, 2005
Page 4 of 26

# Willis

Assistance and Cooperation Clause, as attached

Insolvency Clause, as attached

Fees Clause, as attached

Fully Insured Clause, as attached

Subrogation and Waiver of Subrogation Clause, as attached

Action Against Insurers Clause, as attached

Service of Suit Clause, as attached.


## SECTION 2:

American Institute Increased Value and Excess Liabilities Clauses (November 3rd 1977), as attached

It is understood and agreed that all special clauses in the insured vessel's Hull Policy(ies) are deemed to be incorporated herein.

Deviation and Continuation Clause held covered with or without notice.


## SECTION 3:

American Institute Hull War and Strikes Clauses (December 1, 1977), as attached, including loss or damage caused by Terrorism, Vandalism, Sabotage and Malicious Mischief and including American Hull Insurance Syndicate addendum (April 1, 1984)

War Protection and Indemnity Clause (W138), as attached, for a separate limit of the total sum insured each vessel any one accident or occurrence

Missing Vessel Clause, as attached


## CONDITIONS APPLICABLE TO ALL VESSELS:

Follow Clause, as attached.

Automatic Attachment of New or Acquired Vessels Clause, as attached

Each Vessel Deemed Separately Insured Clause, as attached

Institute Radioactive Contamination, Chemical, Biological, Bio-Chemical and Electromagnetic Weapons Exclusion Clause (November 11, 2003) (CL370)

Radioactive Contamination Exclusion Clause (U.S.A. Endorsement) amended for use with the above clause, as attached.

U.S. Law and Practice Clause, as attached.

## SURVEYORS:

(i)      Any casualty to be reported immediately to North American Marine, Inc., or Salvage Association, the choice at the Insured's option and Willis

(ii)     Where any approval of sailings, operations, or carriage of cargoes is required in this Policy, such approval shall be obtained from one of the above-mentioned, the choice at

Attached to and forming a pa:    ...sk Control #WCM05-525
Dated: May 31, 2005
Page 5 of 26



the Insured's option.

(iii)     Where Winter Mooring Survey is required in this Policy, such approval shall be obtained from one of the above mentioned or the America Bureau of Shipping, at the Insured's option.

When instructed by the Assured, claims will be adjusted by Willis, with their reasonable adjusting fees and expenses also being recoverable as part of the claim(s).

Attached to and forming a pa    t ..sk Control #WCM05-525
Dated: May 31, 2005
Page 6 of 26
**SECTION1:**



𝔄𝔪𝔢𝔯𝔦𝔠𝔞𝔫 𝔍𝔫𝔰𝔱𝔦𝔱𝔲𝔱𝔢 𝔥𝔲𝔩𝔩 𝔠𝔩𝔞𝔲𝔰𝔢𝔰
    (June 2, 1977)                                                                                    7

To be attached to and form a part of Policy No _____
of the _____

    The terms and conditions of the following clauses are to be regarded as substituted for those of the policy form to which they are attached, the
latter being hereby waived, except provisions required by law to be inserted in the Policy. All captions are inserted only for purposes of reference and
shall not be used to interpret the clauses to which they apply.

**ASSURED**
    This Policy insures _____                                        1
_____                                        2
    If claim is made under this Policy by anyone other than the Owner of the Vessel, such person shall not be entitled to recover to a greater extent    3
than would the Owner, had claim been made by the Owner as an Assured named in this Policy.                                            4
    Underwriters waive any right of subrogation against affiliated, subsidiary or interrelated companies of the Assured, provided that such waiver shall    5
not apply in the event of a collision between the Vessel and any vessel owned, demise chartered or otherwise controlled by any of the aforesaid com-    6
panies, or with respect to any loss, damage or expense against which such companies are insured.                                      7

**LOSS PAYEE**                                                                                                                      8
    Loss, if any, payable to _____
_____                                        9
_____                                       10
    Provided, however, Underwriters shall pay claims to others as set forth in the Collision Liability clause and may make direct payment to persons _____ or order.    11
providing security for the release of the Vessel in Salvage cases.                                                                   12

**VESSEL**                                                                                                                         13
    The Subject Matter of this insurance is the Vessel called the _____
or by whatsoever name or names the said Vessel is or shall be called, which for purposes of this insurance shall consist of and be limited to her hull,    14
launches, lifeboats, rafts, furniture, bunkers, stores, supplies, tackle, fittings, equipment, apparatus, machinery, boilers, refrigerating machinery, insula-    15
tion, motor generators and other electrical machinery.                                                                               16
    In the event any equipment or apparatus not owned by the Assured is installed for use on board the Vessel and the Assured has assumed respon-    17
sibility therefore, it shall also be considered part of the Subject Matter and the aggregate value thereof shall be included in the Agreed Value.    18
    Notwithstanding the foregoing, cargo containers, barges and lighters shall not be considered a part of the Subject Matter of this insurance.    19
                                                                                                                                   20
**DURATION OF RISK**
    From the _____ day of _____ 19____
to the _____ day of _____ 19_____     time    21
    Should the Vessel at the expiration of this Policy be at sea, or in distress, or at a port of refuge or of call, she shall, provided previous notice be    22
given to the Underwriters, be held covered at a pro rata monthly premium to her port of destination.                                  23
    In the event of payment by the Underwriters for Total Loss of the Vessel this Policy shall thereupon automatically terminate.    24
                                                                                                                                   25
**AGREED VALUE**
    The Vessel, for so much as concerns the Assured, by agreement between the Assured and the Underwriters in this Policy, is and shall be valued at    26
_____ Dollars.    27

**AMOUNT INSURED HEREUNDER** _____ Dollars.    28

**DEDUCTIBLE**
    Notwithstanding anything in this Policy to the contrary, there shall be deducted from the aggregate of all claims (including claims under the Sue    29
and Labor clause and claims under the Collision Liability clause) arising out of each separate accident, the sum of $_____ unless the    30
accident results in a Total Loss of the Vessel in which case this clause shall not apply. A recovery from other interests, however, shall not operate to    31
exclude claims under this Policy provided the aggregate of such claims arising out of one separate accident if unreduced by such recovery exceeds that    32
sum. For the purpose of this clause each accident shall be treated separately, but it is agreed that (a) a sequence of damages arising from the same acci-    33
dent shall be treated as due to that accident and (b) all heavy weather damage, or damage caused by contact with floating ice, which occurs during a    34
single sea passage between two successive ports shall be treated as though due to one accident.                                       35

**PREMIUM**
    The Underwriters to be paid in consideration of this insurance _____
_____ Dollars being at the annual rate of _____    36
is insured under this Policy for a period of less than one year at pro rata of the annual rate, full annual premium shall be considered earned and immedi-    37
ately due and payable in the event of Total Loss of the Vessel.                                                                      38
                                                                                                                                   39
**RETURNS OF PREMIUM**
Premium returnable as follows:
    Pro rata daily net in the event of termination under the Change of Ownership clause;                                            40
    Pro rata monthly net for each uncommenced month if it be mutually agreed to cancel this Policy,                                  41
    For each period of 30 consecutive days the Vessel may be laid up in port for account of the Assured,                            42
_____ cents per cent, net not under repair, or                                                        43
_____ cents per cent, net under repair,                                                               44
provided always that:                                                                                                              45
                                                                                                                                   46

Attached to and forming a par ... usk Control #WCM05-525
Dated: May 31, 2005
Page 7 of 26



   (a)  a Total Loss of the Vessel has not occurred during the currency of this Policy;        47
   (b)  in no case shall a return for lay-up be allowed when the Vessel is lying in exposed or unprotected waters or in any location not approved by  48
        the Underwriters;         49
   (c)  in the event of any amendment of the annual rate, the above rates of return shall be adjusted accordingly;     50
   (d)  in no case shall a return be allowed when the Vessel is used as a storage ship or for lighting purposes.     51

If the Vessel is laid up for a period of 30 consecutive days, a part only of which attaches under this Policy, the Underwriters shall pay such pro-  52
portion of the return due in respect of a full period of 30 days as the number of days attaching hereto bears to 30. Should the lay-up period exceed 30  53
consecutive days, the Assured shall have the option to elect the period of 30 consecutive days for which a return is recoverable.   54

## NON-PAYMENT OF PREMIUM

In event of non-payment of premium 30 days after attachment, or of any additional premium when due, this Policy may be cancelled by the Under-  55
writers upon 10 days written or telegraphic notice sent to the Assured at his last known address or in care of the broker who negotiated this Policy.  56
Such proportion of the premium, however, as shall have been earned up to the time of cancellation shall be payable. In the event of Total Loss of the  57
Vessel occurring prior to any cancellation or termination of this Policy full annual premium shall be considered earned.   58

## ADVENTURE

Beginning the adventure upon the Vessel, as above, and so shall continue and endure during the period aforesaid, as employment may offer, in port or  59
at sea, in docks and graving docks, and on ways, gridirons and pontoons, at all times, in all places, and on all occasions, services and trades; with leave  60
to sail or navigate with or without pilots, to go on trial trips and to assist and tow vessels or craft in distress, but the Vessel may not be towed, except  61
as is customary or when in need of assistance, nor shall the Vessel render assistance or undertake towage or salvage services under contract previously  62
arranged by the Assured, the Owners, the Managers or the Charterers of the Vessel, nor shall the Vessel, in the course of trading operations, engage in  63
loading or discharging cargo at sea, from or into another vessel other than a barge, lighter or similar craft used principally in harbors or inland waters.  64
The phrase "engage in loading or discharging cargo at sea" shall include while approaching, leaving or alongside, or while another vessel is approaching,  65
leaving or alongside the Vessel.   66

The Vessel is held covered in case of any breach of conditions as to cargo, trade, locality, towage or salvage activities, or date of sailing, or loading  67
or discharging cargo at sea, provided (a) notice is given to the Underwriters immediately following receipt of knowledge thereof by the Assured, and (b)  68
any amended terms of cover and any additional premium required by the Underwriters are agreed to by the Assured.   69

## PERILS

Touching the Adventures and Perils which the Underwriters are contented to bear and take upon themselves, they are of the Seas, Men-of-War, Fire,  70
Lightning, Earthquake, Enemies, Pirates, Rovers, Assailing Thieves, Jettisons, Letters of Mart and Counter-Mart, Surprisals, Takings at Sea, Arrests, Re-  71
straints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners and of all  72
other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the Vessel, or any part thereof, excepting, how-  73
ever, such of the foregoing perils as may be excluded by provisions elsewhere in the Policy or by endorsement thereon.   74

## ADDITIONAL PERILS (INCHMAREE)

Subject to the conditions of this Policy, this insurance also covers loss of or damage to the Vessel directly caused by the following:

   Accidents in loading, discharging or handling cargo, or in bunkering;   75
   Accidents in going on or off, or while on drydocks, graving docks, ways, gridirons or pontoons;   76
   Explosions on shipboard or elsewhere;   77
   Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakage of shafts, or any  78
   latent defect in the machinery or hull, (excluding the cost and expense of replacing or repairing the defective part);   79
   Breakdown of or accidents to nuclear installations or reactors not on board the insured Vessel;   80
   Contact with aircraft, rockets or similar missiles, or with any land conveyance;   81
   Negligence of Charterers and/or Repairers, provided such Charterers and/or Repairers are not an Assured hereunder;   82
   Negligence of Masters, Officers, Crew or Pilots;   83
provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them.  84
Masters, Officers, Crew or Pilots are not to be considered Owners within the meaning of this clause should they hold shares in the Vessel.   85  86

## DELIBERATE DAMAGE (POLLUTION HAZARD)

Subject to the conditions of this Policy, this insurance also covers loss of or damage to the Vessel directly caused by governmental authorities  87
acting for the public welfare to prevent or mitigate a pollution hazard, or threat thereof, resulting directly from damage to the Vessel for which the  88
Underwriters are liable under this Policy, provided such act of governmental authorities has not resulted from want of due diligence by the Assured, the  89
Owners, or Managers of the Vessel or any of them to prevent or mitigate such hazard or threat. Masters, Officers, Crew or Pilots are not to be considered  90
Owners within the meaning of this clause should they hold shares in the Vessel.   91

## CLAIMS (GENERAL PROVISIONS)

In the event of any accident or occurrence which could give rise to a claim under this Policy, prompt notice thereof shall be given to the Under-  92
writers, and:

   (a)  where practicable, the Underwriters shall be advised prior to survey, so that they may appoint their own surveyor, if they so desire;  93
   (b)  the Underwriters shall be entitled to decide where the Vessel shall proceed for docking and/or repair (allowance to be made to the Assured for the  94
        actual additional expense of the voyage arising from compliance with the Underwriters' requirement);   95
   (c)  the Underwriters shall have the right of veto in connection with any repair firm proposed;   96
   (d)  the Underwriters may take tenders, or may require in writing that tenders be taken for the repair of the Vessel, in which event, upon acceptance  97
        of a tender with the approval of the Underwriters, an allowance shall be made at the rate of 30 per cent, per annum on the amount insured, for  98
        each day or pro rata for part of a day, for time lost between the issuance of invitations to tender and the acceptance of a tender, to the extent  99
        that such time is lost solely as the result of tenders having been taken and provided the tender is accepted without delay after receipt of the  100
        Underwriters' approval.   101

Due credit shall be given against the allowances in (b) and (d) above for any amount recovered:  102
   1.  in respect of fuel, stores, and wages and maintenance of the Master, Officers or Crew allowed in General or Particular Average;  103
   2.  from third parties in respect of damages for detention and/or loss of profit and/or running expenses;  104
for the period covered by the allowances or any part thereof.  105

No claim shall be allowed in Particular Average for wages and maintenance of the Master, Officers or Crew, except when incurred solely for the  106
necessary removal of the Vessel from one port to another for average repairs or for trial trips to test average repairs, in which cases wages and mainte-  107
nance will be allowed only while the Vessel is under way. This exclusion shall not apply to overtime or similar extraordinary payments to the Master,  108
Officers or Crew incurred in shifting the Vessel for tank cleaning or repairs or while specifically engaged in these activities, either in port or at sea.  109

General and Particular Average shall be payable without deduction, new for old.  110  111



The expense of sighting the bottom after stranding shall be paid, if reasonably incurred especially for that purpose, even if no damage be found.    112

No claim shall in any case be allowed in respect of scraping or painting the Vessel's bottom.    113

In the event of loss or damage to equipment or apparatus not owned by the Assured but installed for use on board the Vessel and for which the Assured has assumed responsibility, claim shall not exceed (1) the amount the Underwriters would pay if the Assured were owner of such equipment or apparatus, or (2) the contractual responsibility assumed by the Assured to the owners or lessors thereof, whichever shall be less.    114 / 115 / 116

No claim for unrepaired damages shall be allowed, except to the extent that the aggregate damage caused by perils insured against during the period of the Policy and last unrepaired at the expiration of the Policy shall be demonstrated by the Assured to have diminished the actual market value of the Vessel on that date if undamaged by such perils.    117 / 118 / 119

**GENERAL AVERAGE AND SALVAGE**

General Average and Salvage shall be payable as provided in the contract of affreightment, or failing such provision or there be no contract of affreightment, payable at the Assured's election either in accordance with York-Antwerp Rules 1950 or 1974 or with the Laws and Usages of the Port of New York. Provided always that when an adjustment according to the laws and usages of the port of destination is properly demanded by the owners of the cargo, General Average shall be paid accordingly.    120 / 121 / 122

In the event of salvage, towage or other assistance being rendered to the Vessel by any vessel belonging in part or in whole to the same Owners or Charterers, the value of such services (without regard to the common ownership or control of the vessels) shall be ascertained by arbitration in the same manner provided for under the Collision Liability clause in this Policy, and the amount so awarded so far as applicable to the interest hereby insured shall constitute a charge under this Policy.    123 / 124 / 125 / 126

When the contributory value of the Vessel is greater than the Agreed Value herein, the liability of the Underwriters for General Average contribution (except in respect to amounts made good to the Vessel), or Salvage, shall not exceed that proportion of the total contribution due from the Vessel which the amount insured hereunder bears to the contributory value, and if, because of damage for which the Underwriters are liable as Particular Average, the value of the Vessel has been reduced for the purpose of contribution, the amount of such Particular Average damage recoverable under this Policy shall first be deducted from the amount insured hereunder, and the Underwriters shall then be liable only for the proportion which such net amount bears to the contributory value.    127 / 128 / 129 / 130 / 131 / 132 / 133

**TOTAL LOSS**

In ascertaining whether the Vessel is a constructive Total Loss the Agreed Value shall be taken as the repaired value and nothing in respect of the damaged or break-up value of the Vessel or wreck shall be taken into account.    134 / 135

There shall be no recovery for a constructive Total Loss hereunder unless the expense of recovering and repairing the Vessel would exceed the Agreed Value. In making this determination, only expenses incurred or to be incurred by reason of a single accident or a sequence of damages arising from the same accident shall be taken into account, but expenses incurred prior to tender of abandonment shall not be considered if such are to be claimed separately under the Sue and Labor clause.    136 / 137 / 138 / 139

In the event of Total Loss (actual or constructive), no claim to be made by the Underwriters for freight, whether notice of abandonment has been given or not.    140 / 141

In no case shall the Underwriters be liable for unrepaired damage in addition to a subsequent Total Loss sustained during the period covered by this Policy.    142 / 143

**SUE AND LABOR**

And in case of any Loss or Misfortune, it shall be lawful and necessary for the Assured, their Factors, Servants and Assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the Vessel, or any part thereof, without prejudice to this insurance, to the charges whereof the Underwriters will contribute their proportion as provided below. And it is expressly declared and agreed that no acts of the Underwriters or Assured in recovering, saving or preserving the Vessel shall be considered as a waiver or acceptance of abandonment.    144 / 145 / 146 / 147

In the event of expenditure under the Sue and Labor clause, the Underwriters shall pay the proportion of such expenses that the amount insured hereunder bears to the Agreed Value, or that the amount insured hereunder (less loss and/or damage payable under this Policy) bears to the actual value of the salved property, whichever proportion shall be less; provided always that their liability for such expenses shall not exceed their proportionate part of the Agreed Value.    148 / 149 / 150

If claim for Total Loss is admitted under this Policy and sue and labor expenses have been reasonably incurred in excess of any proceeds realized or value recovered, the amount payable under this Policy will be the proportion of such excess that the amount insured hereunder (without deduction for loss or damage) bears to the Agreed Value or to the sound value of the Vessel at the time of the accident, whichever value was greater; provided always that Underwriters' liability for such expenses shall not exceed their proportionate part of the Agreed Value. The foregoing shall also apply to expenses reasonably incurred in salving or attempting to salve the Vessel and other property to the extent that such expenses shall be regarded as having been incurred in respect of the Vessel.    151 / 152 / 153 / 154 / 155 / 156 / 157

**COLLISION LIABILITY**

And it is further agreed that:    158

(a) if the Vessel shall come into collision with any other ship or vessel, and the Assured or the Surety in consequence of the Vessel being at fault shall become liable to pay and shall pay by way of damages to any other person or persons any sum or sums in respect of such collision, the Underwriters will pay the Assured or the Surety, whichever shall have paid, such proportion of such sum or sums so paid as their respective subscriptions hereto bear to the Agreed Value, provided always that their liability in respect to any one such collision shall not exceed their proportionate part of the Agreed Value;    159 / 160 / 161 / 162

(b) in cases where, with the consent in writing of a majority (in amount) of Hull Underwriters, the liability of the Vessel has been contested, or proceedings have been taken to limit liability, the Underwriters will also pay a like proportion of the costs which the Assured shall thereby incur or be compelled to pay.    163 / 164 / 165 / 166

When both vessels are to blame, then, unless the liability of the owners or charterers of one or both such vessels becomes limited by law, claims under the Collision Liability clause shall be settled on the principle of Cross-Liabilities as if the owners or charterers of each vessel had been compelled to pay to the owners or charterers of the other of such vessels such one-half or other proportion of the latter's damages as may have been properly allowed in ascertaining the balance or sum payable by or to the Assured in consequence of such collision.    167 / 168 / 169

The principles involved in this clause shall apply to the case where both vessels are the property, in part or in whole, of the same owners or charterers, all questions of responsibility and amount of liability as between the two vessels being left to the decision of a single Arbitrator, if the parties can agree upon a single Arbitrator, or failing such agreement, to the decision of Arbitrators, one to be appointed by the Assured and one to be appointed by the majority (in amount) of Hull Underwriters interested; the two Arbitrators chosen to choose a third Arbitrator before entering upon the reference, and the decision of such single Arbitrator, or of any two of such three Arbitrators, appointed as above, to be final and binding.    170 / 171 / 172 / 173 / 174 / 175

Provided always that this clause shall in no case extend to any sum which the Assured or the Surety may become liable to pay or shall pay in consequence of, or with respect to:    176 / 177

(a) removal or disposal of obstructions, wrecks or their cargoes under statutory powers or otherwise pursuant to law;    178

(b) injury to real or personal property of every description;    179

(c) the discharge, spillage, emission or leakage of oil, petroleum products, chemicals or other substances of any kind or description whatsoever;    180

(d) cargo or other property on or the engagements of the Vessel;    181

(e) loss of life, personal injury or illness.    182

Provided further that exclusions (b) and (c) above shall not apply to injury to other vessels or property thereon except to the extent that such injury arises out of any action taken to avoid, minimize or remove any discharge, spillage, emission or leakage described in (c) above.    183 / 184

Attached to and forming a par ...isk Control #WCM05-525
Dated: May 31, 2005
Page 9 of 26



**PILOTAGE AND TOWAGE**

This insurance shall not be prejudiced by reason of any contract limiting in whole or in part the liability of pilots, tugs, towboats, or their owners when the Assured or the agent of the Assured accepts such contract in accordance with established local practice. 185

Where in accordance with such practice, pilotage or towage services are provided under contracts requiring the Assured or the agent of the Assured: 186
    (a)  to assume liability for damage resulting from collision of the Vessel insured with any other ship or vessel, including the towing vessel; or 187
    (b)  to indemnify those providing the pilotage or towage services against loss or liability for any such damages, 188

it is agreed that amounts paid by the Assured or Surety pursuant to such assumed obligations shall be deemed payments "by way of damages to any other person or persons" and to have been paid "in consequence of the Vessel being at fault" within the meaning of the Collision Liability clause in this Policy to the extent that such payments would have been covered if the Vessel had been legally responsible in the absence of any agreement. Provided always that in no event shall the aggregate amount of liability of the Underwriters under the Collision Liability clause, including this clause, be greater than the amount of any statutory limitation of liability to which owners are entitled or would be entitled if liability under any contractual obligation referred to in this clause were included among the liabilities subject to such statutory limitations. 189 190 191 192 193 194 195

**CHANGE OF OWNERSHIP**

In the event of any change, voluntary or otherwise, in the ownership or flag of the Vessel, or if the Vessel be placed under new management, or be chartered on a bareboat basis or requisitioned on that basis, or if the Classification Society of the Vessel or her class therein be changed, cancelled or withdrawn, then, unless the Underwriters agree thereto in writing, this Policy shall automatically terminate at the time of such change of ownership, flag, management, charter, requisition or classification; provided, however, that: 196 197 198 199
    (a)  if the Vessel has cargo on board and has already sailed from her loading port, or is at sea in ballast, such automatic termination shall, if required, be deferred until arrival at final port of discharge if with cargo, or at port of destination if in ballast; 200 201
    (b)  in the event of an involuntary temporary transfer by requisition or otherwise, without the prior execution of a written agreement by the Assured, such automatic termination shall occur fifteen days after such transfer. 202 203

This insurance shall not inure to the benefit of any transferee or charterer of the Vessel and, if a loss payable hereunder should occur between the time of change or transfer and any deferred automatic termination, the Underwriters shall be subrogated to all of the rights of the Assured against the transferee or charterer in respect of all or part of such loss as is recoverable from the transferee or charterer, and in the proportion which the amount insured hereunder bears to the Agreed Value. 204 205 206 207

The term "new management" as used above refers only to the transfer of the management of the Vessel from one firm of corporation to another, and it shall not apply to any internal changes within the offices of the Assured. 208 209

**ADDITIONAL INSURANCES**

It is a condition of this Policy that no additional insurance against the risk of Total Loss of the Vessel shall be effected to operate during the currency of this Policy "by or for account of the Assured, Owners, Managers, Operators or Mortgagees except on the interests and up to the amounts enumerated in the following Sections (a) to (g), inclusive, and no such insurance shall be subject to P.P.I., F.I.A. or other like term on any interests whatsoever excepting those enumerated in Section (a); provided always and notwithstanding the limitation on recovery in the Assured clause a breach of this condition shall not afford the Underwriters any defense to a claim by a Mortgagee who has accepted this Policy without knowledge of such breach: 210 211 212 213
    (a)  DISBURSEMENTS, MANAGERS' COMMISSIONS, PROFITS OR EXCESS OR INCREASED VALUE OF HULL AND MACHINERY, AND/OR SIMILAR INTERESTS HOWEVER DESCRIBED, and FREIGHT (INCLUDING CHARTERED FREIGHT OR ANTICIPATED FREIGHT) INSURED FOR TIME. An amount not exceeding in the aggregate 25% of the Agreed Value. 214 215 216 217
    (b)  FREIGHT OR HIRE, UNDER CONTRACTS FOR VOYAGE. An amount not exceeding the gross freight or hire for the current cargo passage and next succeeding cargo passage (such insurance to include, if required, a preliminary and an intermediate ballast passage) plus the charges of insurance. In the case of a voyage charter where payment is made on a time basis, the amount shall be calculated on the estimated duration of the voyage, subject to the limitation of two cargo passages as laid down herein. Any amount permitted under this Section shall be reduced, as the freight or hire is earned, by the gross amount so earned. Any freight or hire to be earned under the form of Charters described in (d) below shall not be permitted under this Section (b) if any part thereof is insured as permitted under said Section (d). 218 219 220 221 222 223
    (c)  ANTICIPATED FREIGHT IF THE VESSEL SAILS IN BALLAST AND NOT UNDER CHARTER. An amount not exceeding the anticipated gross freight on next cargo passage, such amount to be reasonably estimated on the basis of the current rate of freight at time of insurance, plus the charges of insurance. Provided, however, that no insurance shall be permitted by this Section if any insurance is effected as permitted under Section (b). 224 225 226
    (d)  TIME CHARTER HIRE OR CHARTER HIRE FOR SERIES OF VOYAGES. An amount not exceeding 50% of the gross hire which is to be earned under the charter in a period not exceeding 18 months. Any amount permitted under this Section shall be reduced as the hire is earned under the charter by 50% of the gross amount so earned but, where the charter is for a period exceeding 18 months, the amount insured need not be reduced while it does not exceed 50% of the gross hire still to be earned under the charter. An insurance permitted by this Section may begin on the signing of the charter. 227 228 229 230 231
    (e)  PREMIUMS. An amount not exceeding the actual premiums of all interest insured for a period not exceeding 12 months (excluding premiums insured as permitted under the foregoing Sections but including, if required, the premium or estimated calls on any Protection and Indemnity or War Risks and Strikes insurance) reducing pro rata monthly. 232 233 234
    (f)  RETURNS OF PREMIUM. An amount not exceeding the actual returns which are recoverable subject to "and arrival" or equivalent provision under any policy of insurance. 235 236
    (g)  INSURANCE IRRESPECTIVE OF AMOUNT AGAINST: Risks excluded by War, Strikes and Related Exclusions clause; risks enumerated in the American Institute War Risks and Strikes Clauses; and General Average and Salvage Disbursements 237 238

**WAR STRIKES AND RELATED EXCLUSIONS**

The following conditions shall be paramount and shall supersede and nullify any contrary provisions of the Policy. 239

This Policy does not cover any loss, damage or expense caused by, resulting from, or incurred as a consequence of: 240
    (a)  Capture, seizure, arrest, restraint or detainment, or any attempt thereat; or 241
    (b)  Any taking of the Vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise; or 242
    (c)  Any mine, bomb or torpedo not carried as cargo on board the Vessel; or 243
    (d)  Any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter; or 244
    (e)  Civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or piracy; or 245
    (f)  Strikes, lockouts, political or labor disturbances, civil commotions, riots, martial law, military or usurped power; or 246
    (g)  Malicious acts or vandalism, unless committed by the Master or Mariners and not excluded elsewhere under this War Strikes and Related Exclusions clause; or 247 248
    (h)  Hostilities or warlike operations (whether there be a declaration of war or not) but this subparagraph (h) not to exclude collision or contact with aircraft, rockets or similar missiles, or with any fixed or floating object, or stranding, heavy weather, fire or explosion unless caused directly by a hostile act by or against a belligerent power which act is independent of the nature of the voyage or service which the Vessel concerned or, in the case of a collision, any other vessel involved therein, is performing. As used herein, "power" includes any authority maintaining, naval, military or air forces in association with a power. 249 250 251 252 253

If war risks or other risks excluded by this clause are hereafter insured by endorsement on this Policy, such endorsement shall supersede the above conditions only to the extent that the terms of such endorsement are inconsistent therewith and only while such endorsement remains in force. 254 255

Attached to and forming a pa    t . _sk Control #WCM05-525
Dated: May 31, 2005
Page 10 of 26



### AMERICAN HULL INSURANCE SYNDICATE
### LINER NEGLIGENCE CLAUSE
#### For attachment to American Institute Hull Clauses
#### (June 2, 1977)

*In consideration of additional premium of ___included___ it is understood and agreed that the ADDITIONAL PERILS (INCHMAREE) clause of the attached policy is deleted and in place thereof the following inserted:*

"Subject to the conditions of this Policy, this insurance also covers:

a.   Breakdown of motor generators or other electrical machinery and electrical connections thereto; bursting of boilers; breakage of shafts; or any latent defect in the machinery or hull;

b.   Loss of or damage to the subject matter insured directly caused by:

  1.   Accidents on shipboard or elsewhere, other than breakdown of or accidents to nuclear installations or reactors on board the Insured Vessel;

  2.   Negligence, error of judgement or incompetence of any person;

Excluding under both "a" and "b" above only the cost of repairing, replacing or renewing any part condemned solely as a result of a latent defect, wear and tear, gradual deterioration or fault or error in design or construction;

Provided such loss or damage (either as described in said "a" or "b" or both) has not resulted from want of due diligence by the Assured(s), the Owner(s) or Manager(s) of the Vessel, or any of them. Masters, mates, engineers, pilots or crew not to be considered as part owners within the meaning of this clause should they hold shares in the Vessel."

### TITLES OF PARAGRAPHS

The several titles of the various Paragraphs of this Policy (and of Endorsements, if any, now or hereafter attached hereto) are inserted solely for the inconvenience of reference and shall not be deemed to extend or limit in any way the provisions to which they relate.

### ADDITIONAL INSUREDS CLAUSE

In respect of the vessels insured hereunder, it is agreed that this Policy also covers the Named Insureds and their affiliated companies be they owners, subsidiaries, associated, related or interrelated companies and as bareboat charterers and/or charterers and/or subcharterers and/or operators and/or in whatever capacity, and shall so continue to cover notwithstanding the provisions of this Policy with respect to change of ownership. Provided, however, that in this Clause it shall not be entitled to recover in respect of any liability to which it would not be subject if it were the owner of the vessel, nor to a greater extent than an owner would be entitled in such event to recover. Moreover, should a vessel insured herein be sold or transferred to or chartered on a bareboat basis other than as above or be requisitioned on a bareboat basis, the provisions of this Policy with respect to change of ownership shall govern.

It is agreed that the Insuring Conditions of this Policy cover Master, Officers and Crew of vessels insured under this Policy as Additional Insureds in respect of liability risks insured herein.

This insurance covers in addition to the Insureds named above, any Company and/or Named Individual who may be the Registered Owner (in whole or in part) of any vessel insured herein.

It is further understood and agreed that when a vessel is chartered in accordance with the above Clause the charterer is included as an additional Insured hereunder.

# Willis

## OWNERSHIP CLAUSE

It is understood and agreed that this Policy shall be invalidated if the interests of the Insured be other than sole or unconditional ownership; and all property insured hereunder is also covered, whether owned by the within Named Insured (or provided the Insured shall be liable by law or shall have assumed liability therefore) held in trust or on commission or left for storage or repairs unless such property is otherwise specifically insured, in which case this Policy shall cover only the Insured's interests therein and liability therefore to the extent that such interest and liability are not covered under specific insurance. The loss herein shall be adjusted with the Insured named in this Policy.

## CROSS LIABILITY CLAUSE

In the event of one of the Insured's incurring liability to any other of the Insureds, this Policy shall cover the Insured against whom claim is or may be made in the same manner as if separate policies had been issued to each Insured. This Clause shall not operate to increase the Insurers Limit of Liability as set forth herein.

## CONTRACTS CLAUSE

It is understood and agreed that permission is granted for the Insured to enter into contracts and agreements, including time charters and bareboat charters of vessels into the fleet insured herein, requiring that other parties be named and included as additional Insureds hereunder.

## ERRORS AND OMISSIONS CLAUSE

The insured is not to be prejudiced by any unintentional or inadvertent omission, error, incorrect valuation or incorrect description of the interest, risk, vessel or voyage, provided notice is given to Willis as soon as practicable on discovery of any such error or omission.

## SALVAGE SERVICE CLAUSE

It is hereby understood and agreed that this insurance is extended to automatically cover the insured vessels during any Salvage Services undertaken.

## CIVIL AUTHORITY CLAUSE

Notwithstanding anything contained in this Policy to the contrary, it is understood and agreed that:

(a)    Vessel(s) which are insured under this Policy are also covered against the risk of damage or destruction by civil authority during a conflagration or other catastrophe;

(b)    If a vessel is required under "Emergency Services" conditions to act in a capacity other than her usual trade, such changes in trade shall not be treated as a breach of Policy conditions and this Policy shall remain in full force and effect.

## DELIBERATE DAMAGE -POLLUTION HAZARD CLAUSE

This Policy also covers loss of or damage to the vessel directly caused by governmental authorities acting for the public welfare to prevent or mitigate a pollution hazard, a threat thereof

Attached to and forming a par    ..isk Control #WCM05-525
Dated: May 31, 2005
Page 12 of 26

# Willis

## LEASED EQUIPMENT CLAUSE

This insurance is extended to cover equipment and apparatus not owned by the Insured but installed for use of the insured vessel, and for help for which the Insured has assumed Liability whether such equipment or apparatus be in the nature of aids to navigation or communication or otherwise, subject to all other terms and conditions of this Policy, but in no event shall the liability of the Insurer's exceed the contractual liability of the Insured for such equipment or apparatus. All such equipment or apparatus installed on the vessel but not owned by the Insured shall be included in the agreed valuation of the hull, etc.

## EQUIPMENT ON SHORE CLAUSE

It is hereby understood and agreed that this insurance is extended to cover against the risks of fire, explosion, theft, pilferage, malicious damage, tornado, windstorm, hail, earthquake, landslide, smoke, impact by vehicle or aircraft, sprinkler leakage, water escape and rising navigable waters on any tackle or equipment of the vessel insured which may be in storage on land, but for not more than 20% of value insured herein.

## PERMISSION TO TOW OR BE TOWED CLAUSE

Notwithstanding anything contained in this Policy to the contrary, it is agreed that the vessels insured hereunder may tow or be towed as desired without the requirement of additional premium.

## PILOTAGE AND TOWAGE CLAUSE

Where in accordance with established local practice the Insured, the Charterer or the agent of the Insured enters into pilotage or towage contracts under which the Insured, the Charterer or the agent of the Insured assumes liability for any damages resulting from collision of the vessel insured with another ship or vessel, including the towing vessel, and agrees to indemnify the pilot or the towboat and/or her owners, charterers, operators, managers, agents and/or pilots against loss or liability for any such damage, it is agreed that amounts paid by the Insured, Charterer or the agent of the Insured pursuant to such agreement, in respect of such damage caused by collision between the vessel insured and any other ship or vessel, shall be deemed payments "by way of damages to any other person or persons" and to have been paid "in consequence of the insured vessel being at fault" within the meaning of the Collision Clause in this policy to the extent that such payments would have been covered under the said Collision Clause if the insured vessel had been responsible for damage in the absence of any agreement.

The Insured shall not .be prejudiced by reason of any agreement limiting or exempting the liability of pilots and/or tugs and/or towboats and/or their owners when the Insured, the Charterer or the agent of the Insured accepts such contracts in accordance with established local practice.

Attached to and forming a part of Risk Control #WCM05-525
Dated: May 31, 2005
Page 13 of 26



## EXTENSION OF COVER CLAUSE

EXTENSION OF COVER CLAUSE ON MACHINERY AND/OR EQUIPMENT WHILST REMOVED
FOR REPAIRS AND/OR MAINTENANCE

It is further understood and agreed that notwithstanding the Perils Clause contained herein, this Policy is
extended to cover All Risks of Loss or Damage (Howsoever caused) except as excluded hereunder, to
machinery and/or equipment forming part of the vessel insured herein;

(A)   Whilst removed from the vessel for the purpose of repairs, such repairs being occasioned by a
casualty on the vessel insured herein occurring during the term of this Policy.

(B)   Whilst removed from the vessel insured herein for general maintenance, during the term of this
Policy.

Including transits by road, rail, air or water conveyance to the repair facility or maintenance location
anywhere in the World, whilst there and return to the vessel insured herein.

EXCLUSIONS -This clause does not cover:

(a)   War, Hostile or warlike action in time of peace or war including action in hindering, combating
or defending against an actual, impending or expected attack by:

(i) any government or sovereign power (de jure or de facto) or by any authority maintaining or
using military, naval or air forces; or

(ii) military, naval or air forces; or

(iii) an agent of any government, power, authority or forces.

(b)   Any weapon of war employing atomic fission or radioactive force, whether in time of peace or
war.

(c)   Civil war, revolution, rebellion or insurrection.

DEDUCTIBLE AVERAGE

With respect to (A) above:

(i)   Where the original loss and/or damage exceeds the deductible average contained herein and the
machinery and/or equipment is removed from the vessel insured herein for repairs, it is
understood and agreed that if additional loss or damage occurs whilst it is so removed, no
further deductible average shall be applied.

(ii)  Where the original loss and/or damage did not exceed the deductible average contained herein
and the machinery and/or equipment is removed from the vessel insured herein for repairs, it is
understood and agreed that if additional loss and/or damage occurs whilst it is removed, then,
for the purposes of this Extension Clause only, such additional loss and/or damage shall be
treated as part of the original claim and the deductible average contained herein shall be
applied.

(iii) Where machinery and/or equipment is removed for repairs and the original loss and/or damage
is not covered under the terms of the American Institute Great Lakes Hull Clauses (March 9,
1978)and amendments thereto, contained herein, it is understood and agreed that loss and/or
damage occurring to machinery and/or equipment so removed shall be subject to a deductible
average of 10% of the damaged value of such machinery and/or equipment, so removed, any
one accident or occurrence, but not exceeding the Deductible Average contained herein. In the
event of Total and/or Constructive Total Loss of machinery and/or equipment so removed, then

Attached to and forming a part of Risk Control #WCM05-525
Dated: May 31, 2005
Page 14 of 26



the Insurers shall be liable for the damaged value of said machinery and/or equipment, less the Deductible Average, and not the undamaged value of said machinery and/or equipment.

With respect to (B) above:

It is understood and agreed that in the event of loss or damage to the machinery and/or equipment so removed such loss or damage shall be subject to a Deductible Average of 10% of the value of such machinery and/or equipment so removed, any one accident or occurrence but not exceeding the Deductible Average contained herein.

## RADIO AND AIDS TO NAVIGATION

Radio apparatus and equipment, echo sounders, navigation equipment and other apparatus or equipment used for the purpose of communication or as aids to navigation or safety devices, portable cargo containers (Such as refrigerated boxes, etc.) when permanently installed in the insured vessel, tank cleaning equipment, also equipment consisting of projection machines, sound apparatus and motion picture film shall be covered by this Policy, and included within the agreed valuation of Hull, even when not owned by the Insured, provided the Insured has assumed liability therefore, but the liability of Insurers (either as to amount or as to the risks covered) shall not exceed the Insured's liability or liability to which Insurers should be subject if the property were fully owned by the Insured whichever shall be least.

## GENERAL AVERAGE AND SALVAGE CHARGES

General Average and Salvage shall be payable as provided in the contract of affreightment, or failing such provision or there be no contract of affreightment, payable at the Insured's election either in accordance with York-Antwerp Rules 1974 or as per American or Canadian Lake adjustment. Provided always that when an adjustment according to the laws and usages of the port of destination is properly demanded by the owners of the cargo, General Average shall be paid accordingly.

In the event of salvage, towage or other assistance being rendered to the Vessel by any vessel belonging in part or in whole to the same Owners, Charterers, the value of such services (without regard to the common ownership or control of the vessel(s) shall be ascertained by arbitration in the manner provided for under the Collision Liability Clause in this Policy, and the amount so awarded so far as applicable to the interest hereby insured shall constitute a charge under this Policy.

Notwithstanding anything herein to the contrary, the Insurers will pay any claim covered herein in full irrespective of any comparison between the insured value and the sound value.

## COST OF PROSECUTION CLAUSE

It is hereby understood and agreed that in the event of claim the Insurers shall indemnify the Insured for the additional costs or expenses they may incur or be compelled to pay in prosecuting claim against third parties which may be liable, always subject to the Insurer's prior approval.

## NOTICE OF CLAIM OR SUIT CLAUSE

The Insured as soon as practicable after learning of an accident or occurrence which may give rise to a claim hereunder, shall give written notice, or cause written notice to be given to the Insurers. Such notice shall contain all available information pertaining to such accident or occurrence which is obtainable at the time.

If the claim is made or suit is brought against the Insured, the Insured shall immediately forward to the Insurers every demand, notice, summons or other process received by the Insured or by the Insured's representatives.

Attached to and forming a part of Risk Control #WCM05-525
Dated: May 31, 2005
Page 15 of 26

# Willis

## ASSISTANCE AND COOPERATION CLAUSE

The Insured, when requested by the Insurers, shall aid in effecting settlement, in securing evidence and the attendance of witnesses, in defending suits, and in prosecuting appeals; and shall at all times render to the Insurers all cooperation and assistance in the Insured's power. All fees and expenses incurred by the Insured shall be payable by the Insurers and not subject to any deductible average contained herein.

## INSOLVENCY CLAUSE

Bankruptcy or insolvency of an Insured or on an Insured's Estate shall not relieve the Insurers of any of their obligations.

## FEES CLAUSE

Notwithstanding anything herein to the contrary it is understood and agreed that Insurers shall be liable for all Insurers' Surveyors Fees, Adjustment Expenses, Legal Fees, whether there be a claim on this Policy or not. Such fees and expenses shall not be subject to any deductible average contained herein.

## FULLY INSURED CLAUSE

It is agreed that vessels insured hereunder shall be considered fully insured for the purpose of contribution to General Average, Salvage, Salvage Charges and Sue and Labour Expenses.

## SUBROGATION AND WAIVER OF SUBROGATION CLAUSE

In the event of any payment under this Policy, the Insurers shall be subrogated to all the Insured's rights of recovery therefor, and the Insured shall execute all papers required and shall do everything that may be necessary to secure such rights, but it is agreed that the Insurers waive any right of subrogation against:

(a)  Any associated, affiliated, subsidiary or interrelated company of the Insured (except to the extent that any such company is insured for the liability asserted);

(b)  Any charterer(s)and/or operator(s)and/or lessee(s)and/or mortgagee(s), at the Insured's option.

(c)  Any additional named Insured(s) which are included under this Policy in accordance with Clause No. 5 (Contracts Clause) contained herein.

(d)  Any person(s), company, corporation, transportation company, of other legal entity which is not covered under (a), (b)or (c) above subject that the Insurers have been advised of such person(s), company, corporation, transportation company or other legal entity prior to a claim being made on this Policy.

## ACTION AGAINST INSURERS CLAUSE

When Action May be Brought: The Insured may not bring an action to recover the amount of any claim under the insurance unless the requirements of the conditions of this insurance are complied with or until the amount of the loss has been ascertained by judgment against the Insured after trial of the issue or by written agreement between the Insured, the claimant and the Insurers.

Any person or his legal representative who has secured such judgment or written agreement shall thereafter be entitled to recovery under the terms of this insurance in the same manner and to the same extent as the Insured. Nothing contained in this insurance shall give any person or organisation any right to join the Insurers as a co-defendant in any action against the Insured to determine the Insurers' liability.

Attached to and forming a part of Risk Control #WCM05-525
Dated: May 31, 2005
Page 16 of 26

# Willis

### SERVICE OF SUIT CLAUSE

It is agreed that in the event of the failure of Underwriters hereon to pay any amount claimed to be due hereunder, Underwriters hereon at the request of the Assured, will submit to the jurisdiction of any Court of competent jurisdiction within Canada and will comply with all requirements necessary to give such Court Jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court.

It is further agreed that service of process in such suit may be made upon Mr. D.L.D. Beard, Messrs. Beard, Winter, 150 King Street West, Suite 900, Toronto, Ontario M5H 2K4, and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Mr. D.L.D. Beard is authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the Assured's request to give a written undertaking to the Assured that he will cause a general appearance to be entered on Underwriter's behalf in the event such a suit shall be instituted.

Attached to and forming a part of Risk Control #WCM05-525
Dated: May 31, 2005
Page 17 of 26

**Willis**

## SECTION 2:

*American Institute*                                                                      129-P
INCREASED VALUE AND EXCESS LIABILITIES CLAUSES
(November 3, 1977)

To be attached to and form a part of Policy No. _____ of the _____

--------------------------------------------------------------------------------

The terms and conditions of the following clauses are to be regarded as substituted for those of the policy form to which they are attached, the latter being hereby waived, except provisions required by law to be inserted in the Policy. All captions are inserted only for purposes of reference and shall not be used to interpret the clauses to which they apply.

**ASSURED**

This Policy insures _____  1
_____  2
_____ hereinafter referred to as the Assured.  3

If claim is made under this Policy by anyone other than the Owner of the Vessel, such person shall not be entitled to recover to a greater  4
extent than would the Owner, had claim been made by the Owner as an Assured named in this Policy.  5

Underwriters waive any right of subrogation against affiliated, subsidiary or interrelated companies of the Assured, provided that such waiver  6
shall not apply in the event of a collision between the Vessel and any vessel owned, demise chartered or otherwise controlled by any of the  7
aforesaid companies, or with respect to any loss, damage or expense against which such companies are insured.  8

This insurance shall not be prejudiced by reason of any contract limiting in whole or in part the liability of pilots, tugs, towboats, or their  9
owners when the Assured or the Agent of the Assured accepts such contract in accordance with established local practice.  10

**LOSS PAYEE**

Loss, if any, payable to _____  11
_____  12
_____ or order.  13

Provided, however, Underwriters shall pay claims to others as set forth in the Collision Liability clause and may make direct payment to persons  14
providing security for the release of the Vessel in Salvage cases.  15

On INCREASED VALUE AND EXCESS LIABILITIES of the Vessel called the _____  16
(or by whatsoever name or names the said Vessel is or shall be called).  17

**AMOUNT INSURED HEREUNDER**

_____ Dollars.  18

**DURATION OF RISK**

From the _____ day of _____ 19___ _____ time  19
to the _____ day of _____ 19___ _____ time.  20

Should the Vessel at the expiration of this Policy be at sea, or in distress, or at a port of refuge or of call, she shall, provided previous notice  21
be given to the Underwriters, be held covered at a pro rata monthly premium to her port of destination.  22

In the event of payment by the Underwriters for Total Loss of the Vessel this Policy shall thereupon automatically terminate.  23

**PREMIUM**

The Underwriters to be paid in consideration of this insurance _____  24
_____ Dollars being at the annual rate of _____ per cent, which premium shall be  25
due on attachment. If the Vessel is insured under this Policy for a period of less than one year at pro rata of the annual rate, full annual premium shall be  26
considered earned and immediately due and payable in the event of Total Loss of the Vessel.  27

**RETURNS OF PREMIUMS**

Premium returnable as follows:  28

Pro rata daily net in the event of termination under the Change of Ownership clause;  29

Pro rata monthly net for each uncommenced month if it be mutually agreed to cancel this Policy;  30

For each period of 30 consecutive days the Vessel may be laid up in port for account of the Assured,  31

_____ cents per cent, net not under repair, or  32

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ cents per cent, net under repair;  33

provided always that:  34

(a) A Total Loss of the Vessel has not occurred during the currency of this Policy;  35

(b) In no case shall a return for lay-up be allowed when the Vessel is lying in exposed or unprotected waters or in any location not approved by  36
the Underwriters;  37

(c) In the event of any amendment of the annual rate, the above rates of return shall be adjusted accordingly;  38

(d) In no case shall a return be allowed when the Vessel is used as a storage ship or for lightering purposes.  39

If the Vessel is laid up for a period of 30 consecutive days, a part only of which attaches under this Policy, the Underwriters shall pay such  40
proportion of the return due in respect of a full period of 30 days as the number of days attaching hereto bears to 30. Should the lay-up period  41
exceed 30 consecutive days, the Assured shall have the option to elect the period of 30 consecutive days for which a return is recoverable.  42

**NON-PAYMENT OF PREMIUM**

In event of non-payment of premium 30 days after attachment, or of any additional premium when due, this Policy may be cancelled by the  43
Underwriters upon 10 days written or telegraphic notice sent to the Assured at his last known address or in care of the broker who negotiated this  44
Policy. Such proportion of the premium, however, as shall have been earned up to the time of cancellation shall be payable. In the event of Total Loss of  45
the Vessel occurring prior to any cancellation or termination of this Policy full annual premium shall be considered earned.  46

Attached to and forming a part of Risk Control #WCM05-525
Dated: May 31, 2005
Page 18 of 26

# Willis

## ADVENTURE

Beginning the adventure upon the Vessel, as above, and so shall continue and endure during the period aforesaid, as employment may offer, in port or at sea, in docks and graving docks, and on ways, gridirons and pontoons, at all times, in all places, and on all occasions, services and trades; with leave to sail or navigate with or without pilots, to go on trial trips and to assist and tow vessels or craft in distress, but the Vessel may not be towed, except as is customary or when in need of assistance, nor shall the Vessel render assistance or undertake towage or salvage services under contract previously arranged by the Assured, the Owners, the Managers or the Charterers of the Vessel, nor shall the Vessel, in the course of trading operations, engage in loading or discharging cargo at sea, from or into another vessel other than a barge, lighter or similar craft used principally in harbors or inland waters. The phrase "engage in loading or discharging cargo at sea" shall include while approaching, leaving or alongside, or while another vessel is approaching, leaving or alongside the Vessel.

The Vessel is held covered in case of any breach of conditions as to cargo, trade, locality, towage or salvage activities, date of sailing, or loading or discharging cargo at sea, provided (a) notice is given to the Underwriters immediately following receipt of knowledge thereof by the Assured, and (b) any amended terms of cover and any additional premium required by the Underwriters are agreed to by the Assured.

## COVERAGE

This insurance covers only:

(1) TOTAL LOSS (ACTUAL OR CONSTRUCTIVE) OF THE VESSEL directly caused by Perils of the Seas, Men-of-War, Fire, Lightning, Earthquake, Enemies, Pirates, Rovers, Assailing Thieves, Jettisons, Letters of Mart and Counter-Mart, Surprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the Vessel, or any part thereof, excepting, however, such of the foregoing perils as may be excluded by provisions elsewhere in the Policy or by endorsement thereon. It shall also cover Total Loss (actual or constructive) directly caused by the following:

Accidents in loading, discharging or handling cargo, or in bunkering;

Accidents in going on or off, or while on drydocks, graving docks, ways, gridirons or pontoons;

Explosions on shipboard or elsewhere;

Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull, (excluding the cost and expense of replacing or repairing the defective part);

Breakdown of accidents to nuclear installations or reactors not on board the insured Vessel;

Contact with aircraft, rockets or similar missiles, or with any land conveyance;

Negligence of Charterers and/or Repairers, provided such Charterers and/or Repairers are not an Assured hereunder;

Negligence of Masters, Officers, Crew or Pilots;

provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them. Masters, Officers, Crew or Pilots are not to be considered Owners within the meaning of this clause should they hold shares in the Vessel.

Subject to the conditions of this Policy, this insurance also covers Total Loss (actual or constructive) of the Vessel directly caused by governmental authorities acting for the public welfare to prevent or mitigate a pollution hazard, or threat thereof, resulting directly from damage to the Vessel for which the Underwriters are liable under this Policy, provided such act of governmental authorities has not resulted from want of due diligence by the Assured, the Owners, or Managers of the Vessel or any of them to prevent or mitigate such hazard or threat. Masters, Officers, Crew or Pilots are not to be considered Owners within the meaning of this clause should they hold shares in the Vessel.

In ascertaining whether the Vessel is a constructive Total Loss the Agreed Value in the policies on Hull and Machinery shall be taken as the repaired value and nothing in respect of the damaged or break-up value of the Vessel or wreck shall be taken into account.

There shall be no recovery for a constructive Total Loss hereunder unless the expense of recovering and repairing the Vessel would exceed the Agreed Value in policies on Hull and Machinery. In making this determination, only expenses incurred or to be incurred by reason of a single accident or a sequence of damages arising from the same accident shall be taken into account, but expenses incurred prior to tender of abandonment shall not be considered if such are to be claimed separately under the Sue and Labor clause in said policies.

Provided that the policies on Hull and Machinery contain the above clauses with respect to the method of ascertaining whether the Vessel is a constructive Total Loss (or clauses having a similar effect), the settlement of a claim for Total Loss under the policies on Hull and Machinery shall be accepted as proof of the Total Loss of the Vessel under this Policy; and in the event of a claim for Total Loss being settled under the policies on Hull and Machinery as a compromised total loss, the amount payable hereunder shall be the same percentage of the amount hereby insured as the percentage paid on the amount insured under said policies.

Should the Vessel be a constructive Total Loss but the claim on the policies on Hull and Machinery be settled as a claim for partial loss, no payment shall be due under this Section (1).

Full interest admitted; the Policy being deemed sufficient proof of interest.

In the event of Total Loss, the Underwriters waive interest in any proceeds from the sale or other disposition of the Vessel or wreck.

(2) GENERAL AVERAGE AND SALVAGE not recoverable in full under the policies on Hull and Machinery by reason of the difference between the Agreed Value of the Vessel as stated therein (or any reduced value arising from the deduction therefrom in process of adjustment of any claim which law or practice or the terms of the policies covering Hull and Machinery may have required) and the value of the Vessel adopted for the purpose of contribution to General Average or Salvage; the liability under this Policy being for such proportion of the amount not recoverable as the amount insured hereunder bears to the said difference or to the total amount insured against excess liabilities if it exceed such difference.

(3) SUE AND LABOR CHARGES not recoverable in full under the policies on Hull and Machinery by reason of the difference between the Agreed Value of the Vessel as stated therein (or any reduced value arising from the deduction therefrom of any claim which the terms of the policies covering Hull and Machinery may have required) and the value of the Vessel adopted for the purpose of ascertaining the amount recoverable under the policies on Hull and Machinery, the liability under this Policy being for such proportion of the amount not recoverable as the amount insured hereunder bears to the said difference or to the total amount insured against excess liabilities if it exceed such difference.

(4) COLLISION LIABILITY (including Costs) not recoverable in full under the Collision Liability clause (including the Pilotage and Towage extension) in the policies on Hull and Machinery by reason of such liability exceeding the Agreed Value of the Vessel as stated therein, in which case the amount recoverable under this Policy shall be such proportion of the difference so arising as the amount hereby insured bears to the total amount insured against excess liabilities.

Underwriters' liability under (1), (2), (3) and (4) is separate and shall not exceed the amount insured hereunder in any one section in respect of any one claim.

Attached to and forming a part of Risk Control #WCM05-525
Dated: May 31, 2005
Page 19 of 26



**NOTICE OF CLAIM**

When it becomes evident that any accident or occurrence could give rise to a claim under this Policy, prompt notice thereof shall be given to the Underwriters.

112
113

**CHANGE OF OWNERSHIP**

In the event of any change, voluntary or otherwise, in the ownership or flag of the Vessel, or if the Vessel be placed under new management, or be chartered on a bareboat basis or requisitioned on that basis, or if the Classification Society of the Vessel or her class therein be changed, cancelled or withdrawn, then, unless the Underwriters agree thereto in writing, this Policy shall automatically terminate at the time of such change of ownership, flag, management, charter, requisition or classification; provided however, that:

114
115
116
117

(a) if the Vessel has cargo on board and has already sailed from her loading port, or is at sea in ballast, such automatic termination shall, if required, be deferred until arrival at final port of discharge if with cargo, or at port of destination if in ballast;

118
119

(b) in the event of an involuntary temporary transfer by requisition or otherwise, without the prior execution of a written agreement by the Assured, such automatic termination shall occur fifteen days after such transfer.

120
121

This insurance shall not inure to the benefit of any transferee or charterer of the Vessel and, if a loss payable hereunder should occur between the time of change or transfer and any deferred automatic termination, the Underwriters shall be subrogated to all of the rights of the Assured against the transferee or charterer in respect of all or part of such loss as is recoverable from the transferee or charterer, and in the proportion which the amount insured hereunder bears to the Agreed Value.

122
123
124
125

The term "new management" as used above refers only to the transfer of the management of the Vessel from one firm or corporation to another, and it shall not apply to any internal changes within the offices of the Assured.

126
127

**WAR, STRIKES AND RELATED EXCLUSIONS**

The following conditions shall be paramount and shall supersede and nullify any contrary provisions of the Policy.

128

This Policy does not cover any loss, damage or expense caused by, resulting from, or incurred as a consequence of:

129

(a)  Capture, seizure, arrest, restraint or detainment, or any attempt thereat; or

130

(b)  Any taking of the Vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise; or

131

(c)  Any mine, bomb or torpedo not carried as cargo on board the Vessel; or

132

(d)  Any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter; or

133

(e)  Civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or piracy; or

134

(f)  Strikes, lockouts, political or labor disturbances, civil commotions, riots, martial law, military or usurped power; or

135

(g)  Malicious acts or vandalism, unless committed by the Master or Mariners and not excluded elsewhere under this War Strikes and Related Exclusions clause; or

136
137

(h)  Hostilities or warlike operations (whether there be a declaration of war or not) but this subparagraph (h) not to exclude collision or contact with aircraft, rockets or similar missiles, or with any fixed or floating object, or stranding, heavy weather, fire or explosion unless caused directly by a hostile act by or against a belligerent power which act is independent of the nature of the voyage or service which the Vessel concerned or, in the case of a collision, any other vessel involved therein, is performing. As used herein "power" includes any authority maintaining naval, military or air forces in association with a power.

138
139
140
141
142

If war risks or other risks excluded by this clause are hereafter insured by endorsement on this Policy, such endorsement shall supersede the above conditions only to the extent that the terms of such endorsement are inconsistent therewith and only while such endorsement remains in force.

143
144

Attached to and forming a part of Risk Control #WCM05-525
Dated: May 31, 2005
Page 20 of 26

# Willis

SECTION 3:

87B-108

**American Institute**
**Hull War Risks and Strikes Clauses**
**(Including Automatic Termination and Cancellation Provisions)**
**For Attachment to American Institute Hull Clauses**
**December 1, 1977**

This insurance, subject to the exclusions set forth herein, covers only those risks which would be covered by the underlined Policy (including collision liability) in the absence of the WAR, STRIKES AND RELATED EXCLUSIONS clause contained therein but which are excluded thereby and which risks shall be construed as also including:

1. Any mine, bomb or torpedo not carried as cargo on board the vessel;
2. Any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter;
3. Civil war, revolution, rebellion, insurrection, or civil strife arising therefrom;
4. Strikes, lockouts, political or labor disturbances, civil commotions, riots, martial law, military or usurped power;
5. Malicious acts or vandalism to the extent only that such risks are not covered by the underlined Policy;
6. Hostilities or warlike operations (whether there be a declaration of war or not) but this paragraph (6) shall not include collision or contact with aircraft, rockets or similar missiles, or with any fixed or floating object, or stranding, heavy weather, fire or explosion unless caused directly by a hostile act by or against a belligerent power which act is independent of the nature of the voyage or service which the Vessel concerned or, in the case of a collision, any other vessel involved therein, is performing.  As used herein, "power" includes any authority maintaining naval, military or air forces in association with power.

**EXCLUSIONS:**

This insurance does not cover any loss, damage or expense caused by, resulting from, or incurred as a consequence of:

a. Any hostile detonation of any weapon of war described above in paragraph (2);
b. Outbreak of war (whether there be a declaration of war or not) between any of the following countries; United States of America, United Kingdom, France, the Union of Soviet Socialist Republics or the People's Republic of China;
c. Delay or demurrage;
d. Requisition or preemption;
e. Arrest, restraint or detainment under customs or quarantine regulations and similar arrests, restraints or detainments not arising from actual or impending hostilities;
f. Capture, seizure, arrest, restraint, detainment, or confiscation by the Government of the United States or of the country in which the Vessel is owned or registered.

**HELD COVERED AND OTHER PROVISIONS:**

The held covered clause appearing under the heading ADVENTURE in the underlined Policy is deleted and the following clause substituted therefore;-

> "Subject to the provisions of the Automatic Termination and Cancellation Clauses below, held covered in the event of any breach of conditions as to loading or discharging of cargo at sea, or towage or salvage activities provided (a) notice is given to Underwriters immediately following receipt of knowledge thereof by the Assured, and (b) any amended terms of cover and any additional premium required by the Underwriters are agreed to by the Assured:"

If at the natural expiry of this insurance the Vessel is at sea, this insurance will be extended, provided previous notice be given to the Underwriters, for an additional premium at a rate to be named by the Underwriters, until midnight Local Time of the day on which the Vessel enters the next port to which she

Attached to and forming a part of Risk Control #WCM05-525
Dated: May 31, 2005
Page 21 of 26

# Willis

proceeds and for 24 hours thereafter, but in no event shall such extension affect or postpone the operation of the Automatic Termination and Cancellation Clauses below.

Warranted not to abandon in case of capture, seizure or detention, until after condemnation of the property insured.

The provisions of the <u>attached Policy</u> with respect to constructive Total Loss shall apply only to claims arising from physical damage to the Vessel.

## AUTOMATIC TERMINATION AND CANCELLATION CLAUSES:

A.   This insurance and any extension thereof, unless sooner terminated by the provisions of section B or C, shall terminate automatically upon and simultaneously with the occurrence of any hostile detonation of any nuclear weapon or war as defined above, wheresoever or whensoever such detonation may occur and whether or not the Vessel may be involved.

B.   This insurance and any extension thereof, unless sooner terminated by the provisions of section A or C, shall terminate automatically upon and simultaneously with the outbreak or war, whether there be a declaration of war or not, between any of the following countries: United States of America, United Kingdom, France, the Union of Soviet Socialist Republics or the Peoples Republic of China.

C.   This insurance and any extension thereof, unless sooner terminated by section A or B, shall terminate automatically if and when the vessel is requisitioned, either for title or use.

D.   This insurance and any extension thereof may be cancelled at any time at the Assured's request, or by Underwriters upon 14 days' written notice being given to the Assured, but in no even t shall such cancellation affect or postpone the operation of the provisions of section A, B or C. Written or telegraphic notice sent to the Assured at his (its) last known address shall constitute a complete notice of cancellation and such notice mailed or telegraphed to the said Assured, care of the broker who negotiated this insurance, shall have the same effect as if sent to the said Assured direct. The mailing of notice as aforesaid shall be sufficient proof of notice and the effective date and hour of cancellation shall be 14 days from midnight Local Time of the day on which such notice was mailed or telegraphed as aforesaid. Underwriters agree, however, to reinstate this insurance subject to agreement between Underwriters and the Assured prior to the effective date and hour of such cancellation as to new rate of premium and/or conditions and/or warranties.

## RETURNS OF PREMIUM
The RETURNS OF PREMIUM clause of the <u>attached Policy</u> is deleted and the following substituted therefore:-

> "In the event of an automatic termination or cancellation of this insurance under the provisions of sections A, B, C or D above, or if the Vessel be sold, pro-rata net return of premium will be payable to the Assured, provided always that a Total Loss of the Vessel has not occurred during the currency of this Policy. In no other event shall there be any return of premium.".

THIS INSURANCE SHALL NOT BECOME EFFECTIVE IF, PRIOR TO THE INTENDED TIME OF ITS ATTACHMENT, THERE HAS OCCURRED ANY EVENT WHICH WOULD HAVE AUTOMATICALLY TERMINATED THIS INSURANCE UNDER THE PROVISIONS OF SECTION A, B OR C HEREOF HAD THIS INSURANCE ATTACHED PRIOR TO SUCH OCCURRENCE.

CLA237 Sold by Witherby & Co. Ltd., London

Attached to and forming a part of Risk Control #WCM05-525
Dated: May 31, 2005
Page 22 of 26

**Willis**

**AMERICAN HULL INSURANCE SYNDICATE**
**ADDENDUM TO**
**AMERICAN INSTITUTE HULL WAR RISKS**
**AND STRIKES CLAUSES - DECEMBER 1, 1977**
**(APRIL 1, 1984)**

It is understood and agreed that the American Institute Hull War Risks and Strikes Clauses of December 1, 1977, for attachment to American Institute Hull Clauses (June 2, 1977), and to which this Addendum is attached are amended as follows:

1.  For the purpose of this Addendum only, line 241 of the American Institute Hull Clauses (June 2, 1977) - EXCLUSION (a) - shall be deemed amended by adding "confiscation or expropriation."

2.  In addition to the risks enumerated in the above described War Risks and Strikes Clauses, the following is added: "7. Confiscation or expropriation."

3.  In the event that the Vessel shall have been the subject of capture, seizure, arrest, restraint, detainment, confiscation or expropriation, and the Assured, by reason thereof, has lost the free use and disposal of the Vessel for a continuous period of twelve (12) months (even though condemnation has not occurred), then for the purposes of ascertaining whether the Vessel is a constructive Total Loss, the Assured shall be deemed to have been deprived of the possession of the Vessel without any likelihood of recovery.

    "Restraint" as used in this paragraph 3 shall be deemed to include the inability of the Vessel to sail from any port or place to the high seas because of closure of the connecting waterway to all vessels of similar size or draft due to blockage of such waterway caused by hostilities or warlike operations.

4.  Clause (f) of the EXCLUSIONS shall be amended to read as follows: "Capture, seizure, arrest, restraint, detainment, confiscation or expropriation by the Government of the United States or of the country in which the Vessel is owned or registered."

5.  The Warranty at line 42 shall be amended to read: "Warranted not to abandon in case of capture, seizure, arrest, restraint, detainment, confiscation or expropriation until after condemnation of the property insured, or, in circumstances set forth in 3. above, after twelve (12) months, whichever first occurs."

6.  The period of fourteen (14) days provided for in subparagraph "D" of the AUTOMATIC TERMINATION AND CANCELLATION Clauses, shall be amended to seven (7) days wherever appearing therein.

All other terms, limitations, conditions and exceptions remaining unchanged.

Attached to and forming a part of Risk Control #WCM05-525
Dated: May 31, 2005
Page 23 of 26



## PROTECTION AND INDEMNITY WAR RISKS AND STRIKES CLAUSES

1.   1.   It is further agreed that this insurance is extended to cover in full such claims for Protection and Indemnity:

   a.   as per clauses or conditions of the Marine Protection and Indemnity Insurance and/or Entry (with any Lloyd's Underwriters, Companies or Protection and Indemnity Associations) in connection with the insured Vessel as are excluded or otherwise are not and/or may not be recoverable under such Insurance and/or Entry by reason of:

   i.   any clause or clauses therein excluding capture, seizure, arrest, restraint or detainment or the consequences thereof or any attempt thereat, hostilities, warlike operations or the consequences thereof whether there be a declaration of war or not, civil war, revolution, rebellion, insurrection or civil strife arising therefrom, mines, torpedoes, bombs or other engines of war, piracy, strikes, lockouts, political or labor disturbances, riots, civil commotions, military or usurped power of acts of persons acting maliciously, or any of them, or

   ii.   any conditions therein stating that the insured Vessel shall be deemed to be entered in a 'War Risks Association', or

   b.   that result from the perils enumerated in the attached War and Strikes Clauses and sabotage and vandalism, or

   c.   as are or would be absolutely or conditionally recoverable under the conditions of entry in the United Kingdom Mutual War Risks Association Limited (as set forth in the Appendix detailing Protection and Indemnity Cover, Liabilities and Expenses Insured under the Rules of the said Association current at inception of this insurance).

   2.   In the event that Protection and Indemnity liability is not insured against marine perils, this Insurance shall be construed as if such marine liability had been covered by the United Kingdom Mutual Steamship Assurance Association (Bermuda) Limited.

2.   Should the insurance and/or club entry for Protection and Indemnity risks in connection with the insured vessel omit and/or exclude any of the protection granted absolutely or conditionally by entry against all Protection and Indemnity risks with the United Kingdom Mutual Steamship Assurance Association (Bermuda) Limited then for the purpose of this insurance such omitted and/or excluded protection shall be deemed to be included in such insurance and/or club entry.

3.   This insurance is also to cover liability for contractual repatriation expenses of any crew member as a result of any of the risks set forth in the preceding claims.

4.   Claims for which Insurers are liable under these clauses shall not be subject to any deduction and/or franchise (nor to any deduction and/or franchise contained in the clauses and conditions referred to in Clauses 1. and 2. above).

Attached to and forming a part of Risk Control #WCM05-525
Dated: May 31, 2005
Page 24 of 26



5.   The liability of Insurers under these clauses in respect of any one accident or series of accidents arising out of the same casualty shall be limited to the total sum insured in respect of Hull and Machinery of said vessel by the policy to which these clauses are attached, but including costs as below in addition.

6.   Insurers agree to accept the same percentage interest under these clauses as accepted on Hull War Risks.

7.   Should the vessel at the natural expiry time of this Policy be at sea, and provided the Automatic Termination and Cancellation Clauses in the Hull War Risk Policy have not by that time been brought into operation, this insurance shall be extended, provided previous notice be given to the Insurers, at a premium to be mutually agreed until Midnight Greenwich Mean Time of the day on which the vessel is moored at the next port to which she proceeds and for twenty-four (24) hours thereafter.

8.   This Protection and Indemnity insurance shall terminate automatically at the same time as the Hull Insurance against War Risks and upon the terms and conditions provided for in the Automatic Termination and Cancellation Clause of the Hull War Risk Policy.

9.   Notwithstanding the provisions of Clause 8., in the event of loss or shipwreck of the vessel from any cause prior to the natural expiry time or automatic termination of this Policy, this insurance shall continue to cover the liability of the Insured to the crew of the insured vessels, subject to its terms and conditions and at an additional premium if so required by Insurers until the crew shall be either discharged or landed at a port or place to which the owners or charterers are required to bring them.

10.  Insurers hereby agree to waive any right they may have to disclosure of the terms of the insurance and/or club entry against Protection and Indemnity risks.

11.  Any costs incurred, with the consent of the majority (in amount) of the Insurers hereunder, in determining the liability of the Insured to any third party (which expression shall include any other Insurers) to the Insured or the Insurers shall be payable by the latter without regard to any sum which may or may not be payable hereunder.

12.  Seaworthiness admitted

W.138 (Full War P. and I. Clauses)


## MISSING VESSELS CLAUSE

In the event of the vessel insured hereunder being posted as missing at Lloyd's or is announced by the Admiralty as missing it is specially agreed that such vessel is to be treated as a War Loss for the purpose of this insurance and this Policy will pay claims hereunder accordingly within thirty (30) days of presentation of proper documents; in consideration of such payment Underwriters are to have subrogation to any claim which the Assured may have against the Marine Underwriters with whom the vessel is insured, but this insurance is not to operate as double insurance.

In the event of this Clause becoming operative it is understood that Underwriters hereon will in no circumstances pay more than the sums insured hereunder for War Risks, or Protection and Indemnity Risks (if any).  It is further understood that the sum payable hereunder shall not exceed the Total Amount insured for Marine Risks on this interest and that the sum payable hereunder for War Protection and Indemnity Risks (if any) shall not exceed the amounts recoverable under the Marine Protection and Indemnity placing unless and until such time as Arbitration decides the vessel is a War Loss.

Attached to and forming a part of Risk Control #WCM05-525
Dated:  May 31, 2005
Page 25 of 26

# Willis

## CONDITIONS APPLICABLE TO ALL VESSELS:

### FOLLOW CLAUSE

It is understood and agreed that these underwriters will follow the leading underwriter:

**American Home Assurance Company**
**through American International Marine Agency of New York, Inc. (AIMA)**

in all or any additions, deletions, amendments etc. to coverage(s) as appearing hereunder and including settlements or agreements pertaining to losses and/or claims, including legal proceedings and in the settlement thereof, and shall make payment therefore as directed in the loss payable clause of this policy after receipt of advices of the basis upon which the leading underwriter paid or agreed to pay its proportion of such loss and/or claim.

This insurance is only against the same adventures, perils, risks and losses, and is subject to the same warranties, exceptions, privileges and other terms and conditions as are insured against by the leading underwriter (as above).

The terms of this Policy shall be the same as insured by the leading underwriter (as above).  In the event of automatic termination, forfeiture or cancellation by the leading underwriter (as above) this Policy shall terminate simultaneously therewith.

This clause shall prevail over any inconsistent provisions in the policy to which they are attached.

### AUTOMATIC ATTACHMENT OF NEW OR ACQUIRED VESSELS CLAUSE

It is hereby understood and agreed that this Policy is extended to cover additional vessels which the Insured may purchase or acquire or charter during the currency of this insurance. Unless otherwise agreed the liability of the Insurers shall not exceed their proportion of the Insured's acquisition cost but in no event to exceed their proportion of a sum equal to the insured value of the highest valued vessel scheduled herein. The Insured warrants to report such additional vessels to the Insurers within sixty (60) days after the date of purchase or acquisition or charter, and to pay pro rata additional premium thereon.

### EACH VESSEL DEEMED SEPARATELY INSURED CLAUSE

Each vessel as scheduled elsewhere in the Policy is to be deemed a separate interest, separately insured, in all respects as if a separate Policy for the amount opposite the name of each vessel were insured upon her and the Policy is to be read and applied accordingly.

Attached to and forming a part of Task Control #WCM05-525
Dated: May 31, 2005
Page 26 of 26



### INSTITUTE RADIOACTIVE CONTAMINATION, CHEMICAL, BIOLOGICAL, BIO-CHEMICAL AND ELECTROMAGNETIC WEAPONS EXCLUSION CLAUSE

**This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith**

1. In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from

    1.1 ionising radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

    1.2 the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

    1.3 any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter

    1.4 the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes

    1.5 any chemical, biological, bio-chemical, or electromagnetic weapon.

CL 370

### RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE
### (U.S.A. ENDORSEMENT)

This insurance (reinsurance) is subject to the Institute Extended Radioactive Contamination Exclusion Clause 1/11/02 provided that

if fire is an insured peril

and

where the subject matter insured or, in the case of a reinsurance, the subject matter insured by the original insurance, is within the U.S.A., its islands, onshore territories or possessions

and

a fire arises directly or indirectly from one or more of the causes detailed in Sub-Clauses 1.1 and 1.2 of the Institute Extended Radioactive Contamination Exclusion Clause 1/11/02.

any loss or damage arising directly from that fire shall, subject to the provisions of this insurance (reinsurance), be covered, EXCLUDING however any loss damage liability or expense caused by nuclear reaction nuclear radiation or radioactive contamination arising directly or indirectly from that fire.

### U.S. LAW AND PRACTICE CLAUSE

In the event of the Assured exercising the option under this clause, it is hereby noted and agreed that US Law and Practice and Jurisdiction shall apply notwithstanding any other provisions contained in this insurance.

# CONFIRMATION OF INSURANCE

## Willis

Willis of New York, Inc.
7 Hanover Square
New York, NY 10004
Tel:    212-344-8888
Fax:    212-635-3626
Website: www.willis.com

**DATED:**    May 2nd, 2005

**RISK CONTROL NO.:**    WCM05-530

**NAMED ASSURED:**    Lafarge North America Inc. Et Al.

Lafarge North America Inc. and/or Lafarge S.A. and/or Lafarge Canada Inc. and/or Standard Industries, Inc. and/or Standard Lafarge Company and/or Concrete Acquisition Company and/or General Portland Inc. and/or Tews Company Inc. and/or Center Street Corporation and/or Missouri Portland Cement and/or Davenport Cement Company and/or Lafarge Florida, Inc. and/or Lafarge Building Materials, Inc.; their Subsidiary Companies and/or Corporations which now exist or may hereinafter be constituted (including Executive Officers, Directors and Stockholders all while acting within the scope of their duties as such) and, but not limited to, Affiliated, Associated, Interrelated, Operating Companies and/or Corporations, Partnerships or Joint Ventures singly or collectively referred to as the Assured, as their interests may appear.

It is further agreed that if any party other than those named as Assured herein, have an interest as owner or part owner or otherwise in any vessels or property insured hereunder, this insurance extends to cover the interest of such party, if required, as though they had been specifically named as an Assured in this Policy without necessity of advice to this Company.

This Policy will discharge any liability that it would bear if each Assured was separately insured, however, it is specifically understood and agreed that the inclusion of more than one Assured hereunder shall not increase the liability of this Company or otherwise alter any other terms or conditions of this Policy.

**INTEREST:**    Primary Marine Liabilities consisting of:

| Section A) | Wharfingers Liability / Stevedores Liability |
| | Landing Owners Liability |
| Section B) | Charterers Legal Liability |

POLICY OR POLICIES WILL BE ISSUED AGAINST THE INSURANCE DESCRIBED HEREIN, AND IN THE EVENT OF ANY INCONSISTENCY HEREWITH, THE TERMS, CONDITIONS AND PROVISIONS OF THE POLICY OR POLICIES WILL PREVAIL. POLICY OR POLICIES WILL BE PROMPTLY FORWARDED TO YOU AS SOON AS RECEIVED.

WCM05-530.Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 2 of 16

# Willis

**PERIOD**:
From: 1st May 2005 at 12:01 AM Eastern Standard Time
To:    1st May 2006 at 12:01 AM Eastern Standard Time

**LIMIT OF LIABILITY**:

Section A)   $5,000,000 any one accident or occurrence.
Section B)   $5,000,000 any one accident or occurrence.
Sections A/B) $5,000,000 any one accident or occurrence/ aggregate

**DEDUCTIBLE**:

Section A)   $20,000 any one accident or occurrence
Section B)   $5,000 any one accident or occurrence for Hull Damage each declaration
$20,000 any one accident or occurrence for Protection & Indemnity each declaration

**CONDITIONS**:

All terms, clauses and conditions per expiring policy and as attached herein. Also including the following clauses:
US Economic & Trade Sanctions Clause
Silica Exclusion Clause
Respirable Dust Exclusion Clause
AIMU Extended Radioactive Contamination Exclusion Clause with USA Endorsement
AIMU Chemical, Biological, Bio-chemical and Electromagnetic Exclusion Clause

**PREMIUM**:

$102,500 Flat premium per annum.

**INSURED WITH**:

New York Marine & General Insurance Company - 100%

PER: _____

**WILLIS NEW YORK, INC.**
**BROKERS FOR THE ASSURED**

WCM05-530 Conformine

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 3 of 16



## POLICY GENERAL CONDITIONS

### 1. CANCELLATION CLAUSE:

This Policy may be cancelled by either the Assured or this Company by giving the other party sixty (60) days written notice, but such cancellation shall not prejudice any transit risk which has attached prior to the cancellation date. Notice by the Assured to have the written consent endorsed hereon of all parties specifically named as Additional Assureds and Loss Payees elsewhere herein.

If cancellation at the option of this Company, pro rata will be charged; if cancelled at he option of the Assured, this Company to retain earned premium as per customary short rate table and procedure.

### 2. LEADER:

It is agreed that all alterations, extensions, additions, endorsements, settlement of claim, etc. to be agreed by New York Marine & General Insurance Company as lead underwriter and to be binding on all remaining Underwriters participating hereon.

### 3. CAPTIONS ANT) HEADINGS:

All captions and headings in this policy are inserted only for purposes of reference and shall not be used to interpret the clauses to which they apply.

### 4. SERVICE OF SUIT:

It is agreed that in the event of the failure of this Company to pay any amount claimed to be due hereunder, this Company, at the request of the Assured, will submit to the jurisdiction of any Court of competent jurisdiction within the United States and/or Canada, and will comply with all requirements necessary to give such Court jurisdiction, and all matters arising hereunder shall be determined in accordance with the law and practice of such court.

### 5. OIL POLLUTION ACT OF 1990 DISCLAIMER:

This insurance does not constitute evidence of financial responsibility under the Oil Pollution Act of 1990 or any similar federal, state or local law, and it is a condition of this insurance that it shall be submitted to the United States Coast Guard or any other federal, state of local agency as evidence of financial responsibility. This Company does not consent to be a guarantor.

WCM05-530 Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 4 of 16



## PRIMARY MARINE LIABILITIES

### GENERAL CONDITIONS

1. **HELD COVERED:**

   It is necessary for the Assured to give prompt notice to this Company when they become aware of an event for which they are "held covered" under this policy and the right to such coverage is dependent on compliance with this obligation.

2. **ERRORS AND OMISSIONS:**

   This insurance shall not be invalidated by any unintentional error or omission made by the Assured in rendering reports required under this policy to this Company provided such unintentional error or omission be reported as soon as practicable after discovery and an additional premium, if due, be paid.

   The insurance afforded by this Clause shall not increase the limits of this Company's liability under this policy.

3. **NOTICE OF LOSS:**

   In the event of any occurrence which may result in loss, damage, injury, or expense, for which this Company is or may become liable under this policy, notice thereof shall be given to Marsh USA and/or this Company as soon as practicable after it becomes known to the Assured's Insurance Department; and further, any and every process, pleading and paper of any kind relating to such occurrence shall be forwarded promptly to this Company.

4. **NAMING ATTORNEYS:**

   This Company, in consideration, in consultation with the Assured, shall have the option of naming any mutually acceptable attorneys who shall represent the Assured in the prosecution or defense of any litigation or negotiations between the Assured and third parties concerning any claim based on a liability or an alleged liability covered by this policy, and shall have the direction of such litigation's or negotiations. If the Assured shall fail or refuse to settle any claim as authorized by this Company, the liability of this Company shall be limited to the amount for which settlement could have been made.

5. **SETTLEMENT OF CLAIMS:**

   The Assured shall not make any admission of liability, either before or after any occurrence, which could result in a claim for this Company may be liable. The Assured shall not interfere in any negotiations of this Company of settlement of any legal proceedings in respect of any occurrence\for which this Company may be liable under this policy; provided, however, that in respect of any occurrence likely to give rise to a claim under this policy, the Assured is

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 5 of 16



obligated to and shall take such steps to protect his and/or this Company's interests as would reasonably be taken in the absence of this or similar insurance.

6. **SISTERSHIP:**

In the event of salvage, towage or other assistance being rendered to an insured interest by any vessel belonging in part or in whole to the Assured as Charterer, the value of such services (without regard to the ownership on control of the vessel) shall be ascertained by arbitration in the manner provided for under the Collision Liability Clause (Lines 165 through 193 of the American Institute Hull Clauses (January 18, 1970) Form 6Z) of this policy and the amount so awarded so far as applicable to the interest hereby insured shall constitute a charge under this policy.

7. **LIMITATION OF ACTION:**

No suit or action shall lie against this Company for the payment or recovery of any claim under this policy until the liability of the Assured has been determined by final judgment against the Assured or by agreement between the Assured and the claimant with the written consent of this Company; nor, in any event, unless such action is brought against this Company within the time prescribed therefore in the statutes of State of New York, provided, however, that where such limitation of time is prohibited by the law of the State shall be sustained unless commenced within the shortest time limitation permitted under the laws of such State.

8. **RIGHTS OF SUBROGATION:**

Upon making payment under this policy, this Company shall be vested with all the Assured's rights of recovery against any person, corporation, vessel or interest and the Assured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights.

9. **PERMISSION TO RELEASE OR DECREASE LIABILITY:**

Notwithstanding anything to the contrary contained herein, it is hereby understood and agreed that when so required, or specified by any contract entered into by the Assured, or required in the ordinary course of business, the Assured is granted privilege to assume liabilities of; to grant releases from liability to, limit or decrease the liabilities of, and to waive the rights of subrogation hereunder of this Company against any person whatsoever (including outside vessels and other owners).

WCM05-530.Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 6 of 16



### 10. WAR, STRIKES AND RELATED EXCLUSIONS:

The following conditions shall be paramount and shall supersede and nullify any contrary provisions of this policy. This policy does not cover any loss, damage or expense caused by, resulting from, or incurred as a consequence of:

A. Capture, seizure, arrest, restraint or detainment, or any attempt thereat; of

B. Any taking of the property which is the subject of this insurance, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise; or

C. Any mine, bomb or torpedo not carried as cargo on board the vessel(s); or

D. Any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter; or

E. Civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or piracy; or

F. Strikes, lockouts, political or labor disturbances, civil commotions, riots or the acts of any person or persons taking part in any such occurrences or disorders; or

G. Vandalism, sabotage or malicious act, which shall be deemed also to encompass the act or acts of one or more persons, whether or not agents of a sovereign power, carried out for political, terroristic or ideological purposes and whether any loss, damage or expense resulting therefrom is accidental or intentional; or

H. Hostilities or warlike operations (whether there be a declaration of war or not) but this Paragraph H not to exclude collision or contract with aircraft, rockets or similar missiles, or with any fixed or floating object, or stranding, heavy weather, fire or explosion unless caused directly by or against a belligerent power which act is independent of the nature of the voyage or service which the vessel(s) concerned or, in the case of a collision, any other vessel involved therein, is performing. As used herein, "power" includes any authority maintaining naval, military or air forces in association with a power.

### 11. SURVEY AND LEGAL EXPENSES:

This Company is also to pay survey and related expenses reasonably incurred by the Assured and the legal cost and expense of defending and/or investigating and/or conducting proceedings to limit liability on any suit or claim against the Assured based on a liability or an alleged liability coming within the scope of this insurance, without application of the deductible provisions of this policy, but this Company shall not be liable for the cost or expense of defending any suit or claim unless said cost or expense shall be been incurred with the written consent of this Company. This Company, however, reserves the right to conduct the defense of any actions or suits at its own expense.

### 12. ACCIDENT OR OCCURRENCE:

For purposes of this policy, an accident or occurrence is defined as any accident or occurrence or series of accidents or occurrences arising out of one event.



Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 7 of 16

### 13. EXCESS INSURANCE:

Permission is granted for excess insurance which shall be liable only for any loss and/or losses, claim and claims beyond the amount insured under this policy.

### 14. OTHER INSURANCE:

Except for insurance carried by the Assured specifically as excess over and above the amount(s) recoverable hereunder, this Company shall not be liable for any loss, damage, liability or expense which may be recoverable under any other insurance arranged by the Assured, arranged by others for the Assured's account or otherwise available to the Assured, except as excess over and above the amount(s) recovered thereunder.

### 15. ASSIGNMENT:

No claim or demand against this Company under this policy shall be assigned or transferred, and no person, excepting a legally appointed Receiver of the property of the Assured, shall acquire any rights against this Company by virtue of this insurance without the expressed consent of this Company.

### 16. CONTINGENT TANKERMAN'S LIABILITY:

It is hereby understood and agreed that the liability insurances afforded by Part A "Landing Owner's Legal Liability" and Part B "Charterer's Legal Liability" of this policy are extended to cover the legal liability of the Assured for loss of or damage to property of others, including charges attendant thereto, or for loss of life or personal injury arising out of the operations or actions of qualified employees or outside contractors acting on behalf of the Assured in their capacity as tankermen in respect of vessels which are the subject of these insurances.

The insurance provided by this Clause is excess over any other valid and collectible insurance available to the Assured. This Clause shall not increased the limits of liability of this policy.

### 17. POLLUTION COVERAGE:

Notwithstanding anything to the contrary contained elsewhere herein, this policy covers loss, damage, cost, liability, expense, fine or penalty which the Assured as bailee, custodian, stevedore or charterer shall have become liable to pay in consequence of the actual or potential discharge, spillage or leakage of oil, fuel, cargo, petroleum products, chemicals or other substances of any kind or description caused by or emanating from vessels which are the subject of the liability insurances afforded under Part A "Landing Owner's Legal Liability" and Part B "Charterer's Legal Liability" of this policy, provided, however, that this Company shall not be liable to indemnify the Assured against any loss, damage, cost, liability, expense, fine or penalty resulting directly from the failure, neglect, of default of the

WCM05-530.Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 8 of 16



Assured or his managing officers or managing agents to exercise the highest degree of diligence to prevent a violation of law.

The insurance afforded by this Clause shall not increase the limits of this Company's liability under this policy.

18. **SEEPAGE AND POLLUTION ENDORSEMENT:**

In respect of onshore properties, such coverage as is afforded by this policy shall not apply to any claim arising out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, alkalis, toxic chemicals, liquids or gases, waste materials, oil or other petroleum substance or derivative (including any oil refuse or oil mixed wastes) or other irritants, contaminants (including saline contamination) pollutants into or upon land, the atmosphere, or any watercourse or body of water.

The exclusion shall not apply, however, provided that the Assured establishes that all of the following conditions have been met:

a) the occurrence was accidental and was neither expected nor intended by the Assured. An occurrence shall not be considered unintended or unexpected unless caused by some intervening event neither foreseeable nor intended by the Assured.
b) the occurrence is identified as first commencing at a specific time and date during the term of this policy.
c) the occurrence became known to the Assured within 7 days after its commencement.
d) the occurrence was reported in writing to these this company within 60 days after having become known to the Assured.
e) the occurrence did not result from the Assured's intentional and willful violation of any government statute, rule or regulation.

Nothing contained in this Endorsement shall operate to provide any coverage respect to:

1) loss of, damage to, or loss of use of property directly of indirectly resulting from subsidence caused by sub-surface operations of the Assured;
2) removal of, loss of, or damage to sub-surface oil, gas or any other substance;
3) fines, penalties, punitive damage, exemplary damages, treble damages or any other damages resulting from multiplication of compensatory damages;
4) any site or location used in whole or in part for the handling, processing, treatment, storage, disposal or dumping of any waste materials or substance or the transportation of any waste materials or substances;
5) blowout and cratering.

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 9 of 16

# Willis

## STRIKES, RIOTS & CIVIL COMMOTIONS

In consideration of an included premium, it is hereby understood and agreed that effective from the inception of this policy:

"This insurance also covers damage to or destruction of the property, which is the subject of this insurance, directly caused by strikers, locked out workmen, or persons taking part in labor disturbances or riots or civil commotions or caused by vandalism, sabotage, or malicious mischief, but excluding civil war, revolution, rebellion or insurrection, or civil strife arising therefrom, and warranted free from any claim for delay, detention or loss of use, and free from all loss, damage or expense caused by any weapon of war employing atomic or nuclear fission and/or fusion or other reaction or radioactive force of matter.

Notwithstanding the exclusions in this Policy's War, Strikes and Related Exclusions Clause (Clause Number 10 of the General Conditions), 'vandalism', 'sabotage', and 'malicious mischief, as used herein, shall be construed to include willful or malicious physical injury to or destruction of the described property caused by acts committed by an agent of any Government, party or faction engaged in war, hostilities, or other warlike operations, provided such agent is acting secretly and not in connection with any operations of military or naval armed forces in the country where the described property is situated."

This Company has the right to change the premium consideration for the additional protection afforded by this Endorsement at any time on fifteen (15) days written notice to the Assured; but the Assured shall have the option to cancel this Endorsement as of the time when such change in premium would effect, provided previous notice of such cancellation be given to this Company. The premium may be changed as above notwithstanding strikes, labor troubles or civil commotions, on board the described property or elsewhere, may be threatened or actually exist either at the time when such notice is given or when it takes effect.

WCM05-530 Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 10 of 16



## PRIMARY MARINE LIABILITIES

### PART A
### WHARFINGER'S/LANDING OWNER'S/STEVEDORE'S LEGAL LIABILITY

1. **COVERAGE:**

To cover 100% interest of:

A. The legal or assumed liability of the Assured for all sums which the Assured shall become obligated to pay by reason of loss, damage, injury, or expense, including loss of use, to tankers, towboats, barges or other vessels and their cargoes, which are the property of others, while docking, undocking or in the Assured's custody, or possession at landing and/or mooring facilities which are owned, operated, utilized, controlled or leased by the Assured.

Coverage includes while proceeding to or from the aforementioned landing and/or mooring facilities, and Assured's liability for damage caused directly or indirectly by the freeing or breaking away from such premises. This coverage is to also include liability as defined herein during time as the Assured may have technical or contractual custody of a vessel during its constructive placement away from the Assured's premises.

B. The legal or assumed liability of the Assured for all sums which the Assured shall become obligated to pay as damages because of bodily injury or death sustained by any person; and damages because of injury to or destruction of the property of others including loss of use thereof, caused by accident and arising out of the Assured's operations as bailee, custodian or stevedore or or to tankers, towboats, barges or other vessels and their cargoes described in Paragraph A of this Clause.

C. The costs and expenses after deduction of the gross proceeds of salvage, not recoverable from third parties, for the removal of the wreck of any vessel which is neither owned nor operated by the Assured from the landing(s) owned, operated, utilized, controlled or leased by the Assured. The Assured agrees to make every reasonable effort to have the governmental authority having jurisdiction, or other responsible persons or parties assume responsibility and pay the expense for removal of the wreck before claim is made hereunder.

The costs and expenses insured under this Paragraph C of this Clause shall be payable even though the Assured may have no legal or assumed liability therefor.

WCM05-530.Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 11 of 16



2. **EXCLUSIONS:**

Notwithstanding the foregoing, it is hereby understood and agreed that this Part A does not cover against nor shall any liability attach hereunder for loss, damage, injury or expense caused by or resulting from:

A.  Vessel repair, construction, conversion or gas freeing performed or authorized by the Assured.

B.  Loss of life or personal injury to employees of the Assured for which the Assured or any carrier as his insurer may be held liable under any State, Federal, or Provincial workers' compensation, unemployment compensation of disability benefits law, or under any similar law.

C.  Loss or damage to property owned, leased or rented, by the Assured.

D.  Loss, damage or expense to cargo owned by the Assured.

E.  Theft by infidelity or similar act of dishonest character on the part of the Assured or their employees or sub-contractors.

F.  Loss of or damage to any property or loss of life of or injury to any person that would be covered by the terms of the standard Commercial General Liability Policy as promulgated by the Insurance Services Office, Inc. except that this exclusion shall not apply to claims falling within the exclusions of said Commercial General Liability Policy to "property in the care, custody or control of the Insured" or "watercraft if the accident occurs away from premise owned by, rented to or controlled by the Named Assured."

G.  Bodily injury or personal injury or loss of, damage to or loss of use of property directly or indirectly caused by asbestos.

H.  Bodily injury or personal injury or loss of, damage to or loss of use of property directly or indirectly caused by Polychlorinated Biphenyl or any derivative thereof.

3. **LIMIT OF LIABILITY:**

The liability of this Company with respect to the costs, expenses and liabilities assumed under
Paragraphs A, B and C of Clause 1 of this Part A shall not exceed the limit stated in the Sum Insured (Clause 5 of the Policy General Conditions) each Paragraph separately and in the aggregate in respect of any one accident or occurrence subject to the deductible applying to this Part A.

WCM05-530 Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated:  May 2nd, 2005
Page 12 of 16



**PRIMARY MARINE LIABILITIES**

**PART B**
**CHARTERER'S LEGAL LIABILITY**

**Not Applicable To Tank Vessels Nor To Vessels On Demise
Or Bareboat Charters**

1.  **COVERAGE:**

This insurance is only to indemnify the Assured in respect of losses, costs, and expenses incurred
by the Assured as Charterers:

A.  In respect of liabilities other than to owners of the chartered vessel, or liabilities to the
owners of the chartered vessel by way of reimbursement for claims brought against them
by third parties, and:

which are covered in the United Kingdom Mutual Assurance Association (Bermuda) Ltd.
standard form of Certificate for charterer's Risks for Dry Cargo Vessels published and in
effect at the inception of this insurance excluding liability to cargo or rate to be agreed,
but subject to the limits of this Policy and further this Company herein retain all the rights
reserved by the Association in said certificate; claims under this Section shall be subject
to a deductible of US$2,500 any one accident or event.

B.  In respect of liabilities for loss of or damage to the chartered vessel, but only to pay
claims subject to a deductible of US$5,000 any one accident or event.

No Coverage is afforded herein for any liability for contributions in General Average,
Salvage or Salvage Charges, other than liability for contributions in respect of charterer's
freight at risk, or contributions which are attributable to the chartered vessel and which
arise directly because of loss or damage to the chartered vessel following upon an
accident for which the Charterer is legally liable and which is covered under this
insurance.

Except for demurrage payments arising under the terms of the charter party and which
directly arise due to an accident to the vessel for which the Charterer is legally liable and
which liability is covered under this insurance, nothing herein shall be construed as
insuring any liability, costs or expenses which the Assured may incur by reason of delay,
detention or loss of use of the chartered vessel or cargo.

With the exception of insurance expressly to apply in excess of the limits of this Policy,
this insurance is in excess of and not contributory with any other insurance available to
the Assured covering any liability insured herein.

WCM05-530.Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 13 of 16



Contractual or assumed liabilities other than to the Shipowner under the Charter Party (which is to be approved by this Company herein at inception of risk) or under any Bill of Lading issued pursuant to the said Charter Party, are excluded herein, except with prior agreement of this Company and an additional premium, if required, paid thereof.

## 2. ASSISTANCE AND COOPERATION:

In the event that any claim or claims appear reasonable likely to involve this Company, the Assured shall give prompt written notice to this Company hereon, shall forward every summons or process (or copies thereof) served upon the Assured and shall thereafter keep this Company fully advised as this Company may request. This Company shall not be called upon to undertake or assume charge of investigation, defense or settlement of any claim, suit or proceeding against the Assured, but expressly reserve hereby the right and shall be given the opportunity to associate with the Assured or the Assured's underlying insurers, or both, in the defense and control of any claim, suit or proceeding which in the opinion of this Company is likely to involve this insurance, in which event the Assured and this Company shall cooperate in such defense to the mutual advantage of both.

## 3. COSTS:

Costs incurred by the Assured shall be payable by this Company only if this Company hereon gives written consent to the incurring of such costs in respect of any particular claim, suit or proceeding and if such costs are not covered by underlying insurance, and then only in proportion between the amount (excluding costs) paid by the Assured (or by the underlying insurers) and the amount (excluding costs) paid by this company hereon. (The word "costs" shall be understood to mean investigation, adjustment and legal fees and expenses, excluding, however, all expenses for salaried employees and retained counsel and all office expenses of the Assured.) This Company's liability under this insurance shall not exceed in respect of any one loss or series of losses arising out of one accident or event.

## 4. U.S. OIL POLLUTION EXCLUSION CLAUSE:

Notwithstanding anything contained in this policy to the contrary, this policy shall not apply to or cover any loss, damage, cost, liability, expense, fine, penalty, or punitive or exemplary damage whatsoever, directly or indirectly caused by or contributed to by or arising from the actual, alleged, suspected or threatened discharge, release, dispersal, emission, spillage or leakage of oil into or upon the navigable waters of the United States of America, or adjoining shorelines, or the exclusive economic zone of the United States established by Presidential Proclamation Numbered 5030, dated March 10, 1993.

For purposes of this clause, oil means oil of any kind or in any form, including but not limited to, crude oil, petroleum, fuel oil, sludge, oil refuse, and oil mixed with any wastes or other substances.

WCM05-530 Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 14 of 16



## ADDITIONAL CLAUSES

### AIMU U.S. ECONOMIC AND TRADE SANCTIONS CLAUSE

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to , those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) such coverage shall be null and void.

Similarly any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

### EXCLUSION - SILICA

This insurance does not apply to:

1. "Bodily injury" arising in whole or in part out of the actual, alleged or threatened respiration or ingestion at any time of "silica" or:

2. "Property damage" arising in whole or in part out of the actual, alleged or threatened presence of "silica", or

3. "Personal and advertising injury' arising in whole or in part out of the actual, alleged or threatened exposure at any time to or the presence of "silica".

The following definition applies herein:
"silica" means the chemical compound silicon dioxide (5i02) in any form, including dust which contains "silica".

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Attached to and forming a part of Risk Control #WCM05-530

Dated: May 2nd, 2005

Page 15 of 16

# Willis

## EXCLUSION - RESPIRABLE DUST

This insurance does not apply to:

1. "Bodily injury" arising in whole or in part out of the actual, alleged or threatened respiration or ingestion at any time of "respirable dust" or:

2. "Property damage" arising in whole or in part out of the actual, alleged or threatened presence of "respirable dust", or

3. "Personal and advertising injury' arising in whole or in part out of the actual, alleged or threatened exposure at any time to or the presence of "respirable dust".

The following definition applies herein:

"respirable dust" means respirable particulate matter but does not include living organisms.

ALL OTHER TERMS AND CONDIITONS OF THIS POLICY REMAN UNCHANGED.

## AIMU EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE
### (March 1, 2003)
### WITH U.S.A. ENDORSEMENT

**This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.**

1. In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to or arising from

    1.1 ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

    1.2 the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

    1.3 any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter

    1.4 the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

WCM05-530.Confirmation

# Willis

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 16 of 16

## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE
### (U.S.A. ENDORSEMENT)

This insurance is subject to the Extended Radioactive Contamination Exclusion Clause (March 1, 2003) provided that

    if fire is an insured peril

    and

    where the subject matter insured is within the U.S.A, its islands, onshore territories or possessions

    and

    a fire arises directly or indirectly from one or more of the causes detailed in Sub-Clauses 1.1, 1.2, and 1.4 of the Extended Radioactive Contamination Exclusion Clause March 1, 2003 any loss or damage arising directly from that fire shall, subject to the provisions of this insurance, be covered, EXCLUDING however any loss damage liability or expense caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or indirectly from that fire.

## AIMU CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, AND ELECTROMAGNETIC EXCLUSION CLAUSE
### (March 1, 2003)

**This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.**

In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to or arising from an actual or threatened act involving a chemical, biological, bio-chemical or electromagnetic weapon, device, agent or material when used in an intentionally hostile manner.

WCM05-530.Confirmation

## BOARD OF DIRECTORS

*as of January 1, 2006*

| | |
|---|---|
| *Chairman* | Paul Sa — Standard Shipping, Inc. |
| *Deputy Chairman* | James P. Sweeney — Penn Maritime Inc. |

Vassilios Bacolitsas — Sea Pioneer Shipping Corp.
Lawrence J. Bowles — Nourse & Bowles, LLP
Calvin W.S. Cheng — Eastmark Associates, Inc.
Keith Denholm — Pacific Carriers Limited
Kenneth T. Engstrom — International Shipping Partners
Samuel A. Giberga — Hornbeck Offshore Operators, LLC
George D. Gourdomichalis — Free Bulkers S.A.
Robert A. Guthans — R G Company, LLC
Chih-Chien Hsu — Eddie Steamship Company, Ltd.
Markos K. Marinakis — Marinakis Chartering Inc.
Harkilia N. Moundreas — Good Faith Shipping Company S.A.
Michael L. Muriey — Martin Resource Mgmt. Corp.
Martin C. Recchuite
Victor S. Restis — Enterprises Shipping & Trading S.A.
Steven T. Scaizo — Foss Maritime Company
George Vakirtzis — Polembros Shipping Limited
Jonathan C. Wales — Reinauer Transportation Companies
J. Arnold Witte — Donjon Marine Co., Inc.
Servet Yardimci — Yardimci Group

*Secretary*  Joseph E. M. Hughes

*Manager*  SHIPOWNERS CLAIMS BUREAU, INC.
60 Broad Street – 37th Floor
New York, New York 10004 U.S.A.
Tel:     +1.212.847.4500
Fax:     +1.212.847.4599
Website:     www.american-club.com

SHIPOWNERS CLAIMS BUREAU (UK) LTD.
London Liaison Office
3rd Floor, Latham House
16 Minories
London EC3N 1AX U.K.
Tel:     + 44.20.7709.1390
Fax:     + 44.20.7709.1399
Claims Fax: + 44.20.7709.1350

PACIFIC MARINE ASSOCIATES, INC.
100 Webster Street, Suite 300
Oakland, CA 94607 U.S.A.
Tel:     +1.510.452.1186
Fax:     +1.510.452.1267

SHIPOWNERS CLAIMS BUREAU (HELLAS) INC.
51 Akti Miaouli – 4th Floor
Piraeus 185 36 Greece
Tel:     +30.210.429.4990/1/2/3
Fax:     +30.210.429.4187/88
E-mail:     claims@scb-hellas.com



THE A...
BY LAWS, RU...
LIST OF CORRESPON...

07

CLASS I    RULE 1    INTRODUCTORY: INTERPRETATION: MEMBERSHIP: GENERAL PROVISIONS

## Subrogation

12  The Association shall be subrogated to all the rights which the Member may have against any other person or entity, in respect of any payment made in accordance with these Rules, to the extent of such payment, and the Member shall, upon the request of the Association, execute all documents necessary to secure to the Association such rights.

13  The Association shall have the right to sue in the name of the Member, and the Member shall execute all papers and documents in connection therewith, as requested by the Managers, and shall lend all assistance to the prosecution of any suit. The balance of any amount recovered after full reimbursement of the Association for its loss and all expenses incurred shall be paid to the Member. Compliance with this requirement may, in the Managers' absolute discretion, be made a condition of the payment of a loss.

## Classification and Statutory Requirements

14  Unless otherwise expressly agreed in writing between a Member and the Managers, the following conditions are fundamental terms of the insurance of every insured vessel:

i  The vessel must be and remain throughout the period of insurance classed with a Classification Society approved by the Managers.

ii  Any incident or condition in respect of which that Classification Society might make recommendations as to repairs or other action to be taken by the Member must be promptly reported to that Classification Society.

iii  The Member must comply with all the rules, recommendations and requirements of the Classification Society relating to the insured vessel within the time or times specified by that Society.

iv  The Member authorizes the Managers to inspect any documents and obtain any information relating to the maintenance of class of the insured vessel in the possession of any Classification Society or Societies with which the vessel is, or at any time has been, classed and will, where necessary,

CLASS I    RULE 1    INTRODUCTORY: INTERPRETATION: MEMBERSHIP: GENERAL PROVISIONS

authorize such Classification Society or Societies to disclose and make available such documents and information to the Managers upon their request for whatsoever purposes the Managers may consider necessary.

v  The Member must comply or procure compliance with all statutory requirements of the State of the insured vessel's flag including without limitation those relating to the construction, adaptation, condition, fitment, equipment and manning of the insured vessel and must at all times maintain the validity of such statutory certificates as are issued by or on behalf of the State of the insured vessel's flag in relation to such requirements and in relation to the International Safety Management (ISM) Code and the International Ship and Port Facility Security (ISPS) Code or any equivalent mandatory flag State regime.

In the event that a Member is, or comes to be, in breach of any of the conditions referred to in this Rule 1.4.14, cover automatically ceases with immediate effect without notice. Unless and to the extent that the Directors in their absolute discretion otherwise decide, a Member shall not be entitled to any recovery from the Association for any claim of whatsoever nature and howsoever arising during a period in which the Member is or was in such breach of condition.

## General Conditions in Regard to Claims

15  Without prejudice to any other provision of these Rules and without waiving any of the Association's rights hereunder, the Managers may at any and all times appoint and employ on behalf of a Member, upon such terms as the Managers may think fit, lawyers, surveyors or other persons for the purpose of dealing with any matter liable to give rise to a claim by a Member upon the Association, including investigating or advising upon any such matter and taking or defending legal or other proceedings in connection therewith. The Managers may also at any time discontinue such employment if they think fit.

**CLASS I**   RULE 1   INTRODUCTORY: INTERPRETATION:
MEMBERSHIP: GENERAL PROVISIONS

Provided further that if the aggregate amount of any oil pollution claims against a Member, Co-assured and/or Affiliate exceeds the aforesaid $1,000,000,000, the Association will not be liable to make any payment in respect of that amount by which any such claim exceeds $1,000,000,000; and

Provided further that where an insured vessel gives or attempts to give salvage or other assistance to another vessel following a casualty, any oil pollution liability incurred by the insured vessel in consequence thereof shall be aggregated with any oil pollution liability incurred by any other vessels similarly assisting in connection with the same casualty which are insured in respect of oil pollution liability either by the Association or by any other association which participates in the International Group of P&I Clubs' Pooling Agreement or Excess Reinsurance Policies, and recovery in respect of the oil pollution liability of any insured vessel assisting as aforesaid shall not exceed such proportion of the above $1,000,000,000 limit as that vessel's oil pollution liability bears to the aggregate of the oil pollution liabilities of all the similarly assisting vessels; and

Provided further that where an insured vessel is separately insured on behalf of its owner, demise charterer, manager or operator with the Association or any other association which participates in the International Group of P&I Clubs' Pooling Agreement or Excess Reinsurance Policies, recovery in respect of all claims for oil pollution liability following any one occurrence brought against the owner, demise charterer, manager or operator of an insured vessel or against the Association or any other association shall be limited to $1,000,000,000. The liability of the Association in respect of such claims shall be limited to that proportion of $1,000,000,000 that each claim recoverable from the Association bears to the aggregate of the claims recoverable against the Association and such other associations, if any.

33   In respect of the risks insured hereunder, to the extent a Member, Co-assured or Affiliate is insured for pollution risks under any other insurance, cover hereunder shall be null, void and of no effect, up to the limits of said other insurance. Above the limits

**CLASS I**   RULE 1   INTRODUCTORY: INTERPRETATION:
MEMBERSHIP: GENERAL PROVISIONS

of said other insurance, cover under this insurance shall remain in effect, subject always to the limits herein which are applicable to such risks, to any deductible(s), and to the Rules of the Association. In the event the limits available under such other insurance are the same as or greater than the limits available for pollution losses under this insurance, then this insurance shall be null, void and of no effect with regard to such claims. In the event the limits of said other insurance are less than the limits available hereunder, this insurance shall respond up to the limits set forth herein for pollution losses, but only for the amount by which any such losses exceed the stated limits of such other insurance, and then only up to the limits set forth herein for pollution losses. This insurance shall respond only in excess of the stated limits of the other insurance, whether or not the full amount of such policy limits, or any amount at all, is recoverable thereunder.

34   The Association shall not be liable for any loss, damage or expense against which, but for the insurance herein provided, the Member, Co-assured or Affiliate would have been insured under any other existing insurance, except as set forth above in Rule 1.4.33; nor shall the Association provide prorated or allocated cover on the basis of double insurance or otherwise, except as set forth above in Rule 1.4.33; nor will this insurance replace any other insurance where (for whatever reason) that other insurance does not or is not able to respond to a claim thereunder.

35   No act, omission, course of dealing, forbearance, delay or indulgence by the Association in enforcing any of these Rules or any contractual terms and conditions shall prejudice or affect the rights and remedies of the Association under these Rules or under such contracts, and no such matter shall be treated as any evidence of waiver of the Association's rights thereunder, nor shall any waiver of a breach by a Member of such Rules or contracts operate as a waiver of any subsequent breach thereof. The Association shall at all times and without notice be entitled to insist on the strict application of these Rules and on the strict enforcement of its contracts.

**CLASS I**

## RULE 1    INTRODUCTORY: INTERPRETATION: MEMBERSHIP: GENERAL PROVISIONS

### Applicable Law

45  These Rules and any contract of insurance between the Association and a Member shall be governed by and construed in accordance with the law of the State of New York. This provision is not, in any way, to be construed as a waiver of any rights, claims or defenses available to the Association under any other Rule set forth herein, including, but not limited to, Rule 1.4.46.

### Maritime Lien

46  The Association shall have a lien on the insured vessel for all premium and all other sums of whatsoever nature due to it under these Rules or any applicable contract of insurance or otherwise. Such lien shall extend to other insured vessels which are part of a fleet as defined in Rule 1.2 and shall be in addition to, and in no way may be construed as a waiver of, or amendment to, any other contractual or maritime lien which the Association may either expressly or impliedly possess in regard to the said insured vessel or vessels. Such lien shall apply notwithstanding that the cover of the Member in respect of any vessel insured by him with the Association may have ceased or been terminated.

The Federal Maritime Lien Act, as codified at Sections 31341, *et seq.* of Title 40 of the United States Code, shall govern this Rule concerning the creation and enforcement of maritime liens.

Nothing herein shall prejudice or otherwise affect the right of the Association to take action and/or commence proceedings in any jurisdiction to enforce its right of lien on vessels or to otherwise obtain security by seizure, attachment or arrest of assets or to otherwise recover any amounts owed to the Association.

### Delegation

47  Whenever any power, duty or discretion is conferred or imposed upon the Managers by virtue of these Rules, such power, duty or discretion may, subject to any terms, conditions or restrictions contained in these Rules, be exercised by any one or more of the Managers or by any servant or agent of the Managers to whom the same shall have been delegated or sub-delegated.

40

**CLASS I**

## RULE 1    INTRODUCTORY: INTERPRETATION: MEMBERSHIP: GENERAL PROVISIONS

48  Whenever any power, duty or discretion is stated in these Rules to be vested in the Directors, such power, duty or discretion shall be exercisable by the Directors unless the same shall have been delegated to any Committee of the Directors or to the Managers in accordance with the provisions as regards delegation contained in the By-Laws, in which event the power, duty or discretion may be exercised by any person to whom the same shall have been so delegated.

### Members and Successors Bound by Rules

49  All contracts of insurance effected by the Association shall, save and insofar as they contain any special terms inconsistent herewith, be deemed to incorporate and shall incorporate all the provisions of these Rules. A Member or other person by whom or on whose behalf an application is made for insurance or reinsurance by the Association shall be deemed to have agreed not only on his own behalf but also on behalf of his successors and each of them, that both he and they will in every respect, be subject to and bound by the provisions of these Rules and by any contract of insurance with the Association.

41

**CLASS I**

RULE 2     RISKS AND LOSSES COVERED

Each Member of the Association shall be indemnified in connection with each vessel entered in the Association for Protection and Indemnity insurance against any loss, damage or expense which the Member shall become liable to pay and shall pay by reason of the fact that the Member is the owner (or operator, manager, charterer, mortgagee, trustee, receiver or agent, as the case may be) of the insured vessel, subject to the provisions of these Rules and to all the limitations herein stated or agreed to by the acceptance of the application for membership, or by the entry of the vessel, in the Association, and which shall result from the following liabilities, risks, events, occurrences and expenditures; provided that such liabilities, risks, events, occurrences and expenditures arise in respect of the Member's interest in such vessel; and in connection with the operation of such vessel by or on behalf of the Member; and out of events occurring during the period of entry of such vessel.

Section I     LOSS OF LIFE, INJURY AND ILLNESS

A     Liability for life salvage in respect of, or loss of life of, or personal injury to, or illness of, any person, (other than the persons specified in paragraphs B, C and D of this Section) and hospital, medical or funeral expenses incurred in relation to such injury, illness or death.

B     Liability for life salvage in respect of, or loss of life of, or personal injury to, or illness of, any seaman and hospital, medical or funeral expenses incurred in relation to such injury, illness or death.

1     Liability hereunder shall include liability arising ashore or afloat.

2     For the purposes of this Rule 2, Section I, B a seaman shall be defined as an employee of the Member:

a     who is the master or a member of the crew of the insured vessel; or

b     who is on board the insured vessel with the intention of becoming a member of her crew; or

42

**CLASS I**

RULE 2     RISKS AND LOSSES COVERED

c     who, in the event of the insured vessel being laid up and out of commission, is engaged in the upkeep, maintenance or watching of the insured vessel; or

d     who is engaged by the insured vessel or its master to perform stevedoring work in connection with the insured vessel's cargo at ports where contract stevedores are not readily available.

PROVIDED that:

i     Where the liability arises, or the costs or expenses are incurred, under the terms of crew articles or other contract of service or employment and would not have arisen but for those terms, that liability shall not be covered by the Association unless and to the extent that those terms shall have been previously approved by the Managers in writing.

ii     There shall be no recovery in respect of liabilities, costs and expenses incurred by a Member in respect of the personal injury of a seaman under or pursuant to the terms of a contract of employment between the Member and that seaman, where that seaman has suffered injury while on leave, except where the claim on the Association is made under the entry of the last insured vessel on which the seaman served prior to suffering the injury.

C     Liability for life salvage in respect of, or loss of life of, or personal injury to, or illness of, any person engaged to handle the cargo of an insured vessel and hospital, medical or funeral expenses incurred in relation to such injury, illness or death.

1     Liability hereunder in connection with the handling of cargo for the insured vessel shall commence from the time of receipt by the Member of the cargo on dock or wharf, or on craft alongside, for loading, and shall continue until due delivery thereof to dock or wharf of discharge or until discharge from the insured vessel onto craft alongside;

43

**CLASS I**    RULE 2    RISKS AND LOSSES COVERED

Small Tanker Owners Pollution Indemnification Agreement (STOPIA). A Member who has insurance in respect of such vessel shall, by virtue of entry with and through the agency of the Association, and unless the Managers otherwise agree in writing, become a party to STOPIA for the period of entry of such vessel in the Association. In the event that the Member exercises his rights under STOPIA to withdraw from that agreement, and unless the Managers have agreed in writing, or unless the Directors otherwise determine, there shall be no cover under this Rule 2, Section 13 in respect of such vessel so long as the Member is not a party to STOPIA.

Section 14    SHIP'S PROPORTION OF GENERAL AVERAGE

The insured vessel's proportion of general average, special charges or salvage not recoverable under the hull policies by reason of the value of the ship being assessed for contribution to general average or salvage at a sound value in excess of the insured value under the hull policies.

Provided always that for the purpose of determining any sum recoverable under this Section 14, the Managers shall be entitled to determine the proper value at which the insured vessel should have been insured under the hull policies and the Association shall only be liable for the excess (if any) above the amount which would have been recoverable under the hull policies had the insured vessel been insured thereunder at such value. For the purpose of this Section 14, "proper value" is defined as an amount equal to the free, uncommitted market value of the insured vessel at the time of the incident giving rise to the general average, special charges or salvage.

Section 15    OFFICIAL INQUIRIES

Costs and expenses incurred by a Member in defending himself or in protecting his interests before an official inquiry into the loss of an insured vessel or into a casualty involving an insured vessel but only to the extent and on such conditions as the Managers in their sole discretion may determine.

**CLASS I**    RULE 2    RISKS AND LOSSES COVERED

Section 16    SUE AND LABOR AND LEGAL COSTS

Extraordinary costs and expenses reasonably incurred after any casualty for the purpose of avoiding or minimizing any liabilities, costs or expenses against which the Member is insured by the Association.

Legal costs and expenses relating to any liabilities, costs or expenses against which the Member is insured by the Association, but only to the extent that such legal costs and expenses have been incurred with the prior approval of the Managers in writing or to the extent and on such conditions as the Directors in their sole discretion may determine.

Section 17    EXPENSES OF INVESTIGATION AND DEFENSE

Liability for costs, charges and expenses reasonably incurred and paid by the Member in connection with any liability insured under this Rule, subject, however, to the same deduction that would be applicable by the terms of entry to the liability defended; provided that if any liability is incurred and paid by the Member as aforesaid, the deduction shall be applied to the aggregate of the claim and expenses; and provided further that the Member shall not be entitled to indemnity for expenses unless they were incurred with the approval in writing of the Managers, or the Managers shall be satisfied that such approval could not have been obtained under the circumstances without unreasonable delay, or that the expenses were reasonably and properly incurred; and provided further that any suggestion or approval of counsel, or any incurring of expenses in connection with liabilities not insured under this Rule, shall not be deemed an admission of the Association's liability.

It is understood and agreed that the Managers may undertake the investigation of any occurrence which might develop into a claim against the Member, and may undertake the investigation and defense of any claim made against the Member with respect to which the Member shall be or may claim to be insured by the Association, and that during such investigation and/or defense the Association



American Steamship Owners Mutual Protection and Indemnity Association, Inc.
50 Broad Street - 37th Floor,
New York, NY 10004, U.S.A.

Shipowners Claims Bureau, Inc., Manager

# CERTIFICATE OF ENTRY

of the vessel(s) set out herein for account of the Member named hereunder subject to the By-Laws and Rules of the Association from time to time in force and to any special terms and conditions endorsed hereon and/or as may from time to time be circularized. Unless indicated to the contrary herein, the cover evidenced by this Certificate of Entry commences at noon GMT on the date specified below and continues until cover ceases or is terminated in accordance with the said By-Laws and Rules.

## Class I – Protection & Indemnity Insurance

| VESSEL(S) | FLAG | GROSS TONNAGE | COVER TO COMMENCE |
|---|---|---|---|
| As per Schedule | As per Schedule | As per Schedule | 20 February, 2005 <br> **RENEWAL DATE** <br> 20 February, 2006 |

| MEMBER |
|---|
| LAFARGE NORTH AMERICA INC. |

| SPECIAL TERMS & CONDITIONS AS ATTACHED |
|---|

**IMPORTANT**

This Certificate of Entry is evidence only of the contract of indemnity insurance between the above-named Member and the Association and shall not be construed as evidence of any undertaking, financial or otherwise, on the part of the Association to any other party.

If a Member tenders this Certificate as evidence of insurance under any applicable law relating to financial responsibility, or otherwise shows or offers it to any other party as evidence of insurance, such use of this Certificate by the Member is not to be taken as any indication that the Association thereby consents to act as guarantor or to be sued directly in any jurisdiction whatsoever. The Association does not so consent.

The Member named in this Certificate of Entry is liable to pay Mutual Premium as provided for in Rule 4. Furthermore, the Member may become liable under the said Rule 4 to pay Overspill Calls to meet the Association's proportion of any Overspill Claims up to the limit per vessel as provided for in the said Rule 4.

CERTIFICATE NO.:    01729000

NEW YORK:    31 March, 2005    BY:

AUTHORIZED SIGNATURE



CERTIFICATE NO.:    01729000

## SCHEDULE OF VESSELS

| VESSEL NAME | TYPE | FLAG | GROSS TONNAGE |
|---|---|---|---|
| ADELAIDE | Barge (dry) | USA | 8,512 |
| ALEXANDRA | Barge (dry) | USA | 8,512 |
| BARGE JOPPA | Tank Barge | USA | 1,500 |
| BELCRAFT | Barge (dry) | USA | 3,614 |
| CITADEL I | Barge (dry) | USA | 1,500 |
| CITADEL II | Barge (dry) | USA | 1,500 |
| CITADEL III | Barge (dry) | USA | 1,500 |
| CITADEL IV | Barge (dry) | USA | 1,500 |
| FLOATING DOCK JOPPA | Tank Barge | USA | 1,500 |
| G.L. OSTRANDER | Tug/Supply | USA | 198 |
| INTEGRITY | Dirty Oil Tank | USA | 7,557 |
| J.B. FORD | Bulk | USA | 4,368 |
| MAGNOLIA | Tank Barge | USA | 1,734 |
| MARIA T | Barge (dry) | USA | 8,865 |
| MC 65-2 | Barge (dry) | USA | 180 |
| MC 66-2 | Barge (dry) | USA | 180 |
| MPC253 | Barge (dry) | USA | 1,400 |
| MPC256 | Barge (dry) | USA | 1,400 |
| MPC257 | Barge (dry) | USA | 1,400 |
| MPC258 | Barge (dry) | USA | 1,400 |
| MPC259 | Barge (dry) | USA | 1,400 |
| MPC31 | Barge (dry) | USA | 1,800 |
| MPC32 | Barge (dry) | USA | 1,800 |
| MPC33 | Barge (dry) | USA | 2,600 |
| MPC350 | Barge (dry) | USA | 1,200 |
| MPC351 | Barge (dry) | USA | 1,500 |
| MPC352 | Barge (dry) | USA | 1,500 |
| MPC51 | Barge (dry) | USA | 1,526 |
| MPC52 | Barge (dry) | USA | 1,526 |
| MPC53 | Barge (dry) | USA | 1,526 |
| MPC54 | Barge (dry) | USA | 1,526 |
| MPC55 | Barge (dry) | USA | 1,526 |



CERTIFICATE NO.:    01729000

| MPC66 | Barge (dry) | USA | 1,400 |
| MPC67 | Barge (dry) | USA | 1,400 |
| MPC68 | Barge (dry) | USA | 1,400 |
| MPC69 | Barge (dry) | USA | 1,400 |
| MPC70 | Barge (dry) | USA | 1,400 |
| MPC71 | Barge (dry) | USA | 1,400 |
| MPC72 | Barge (dry) | USA | 1,400 |
| MPC73 | Barge (dry) | USA | 1,400 |
| MPC74 | Barge (dry) | USA | 1,400 |
| MPC75 | Barge (dry) | USA | 1,400 |
| MPC76 | Barge (dry) | USA | 1,400 |
| MPC77 | Barge (dry) | USA | 1,400 |
| MPC78 | Barge (dry) | USA | 1,400 |
| MPC79 | Barge (dry) | USA | 1,400 |
| MPC80 | Barge (dry) | USA | 1,400 |
| MPC81 | Barge (dry) | USA | 1,400 |
| MPC82 | Barge (dry) | USA | 1,400 |
| MPC83 | Barge (dry) | USA | 1,400 |
| MPC84 | Barge (dry) | USA | 1,400 |
| MPC85 | Barge (dry) | USA | 1,400 |
| MPC86 | Barge (dry) | USA | 1,400 |
| MPC87 | Barge (dry) | USA | 1,400 |
| MPC88 | Barge (dry) | USA. | 1,400 |
| MPC89 | Barge (dry) | USA | 1,400 |
| MPC90 | Barge (dry) | USA | 1,400 |
| MPC91 | Barge (dry) | USA | 1,400 |
| MPC92 | Barge (dry) | USA | 1,400 |
| MPC93 | Barge (dry) | USA | 1,400 |
| MPC94 | Barge (dry) | USA | 1,400 |
| MPC95 | Barge (dry) | USA | 1,400 |
| MPC96 | Barge (dry) | USA | 1,400 |
| MPC97 | Barge (dry) | USA | 1,400 |
| NORFOLK | Tug | USA | 499 |
| TRINITY I | Barge (dry) | USA | 400 |
| TRINITY II | Barge (dry) | USA | 1,102 |



CERTIFICATE NO.:    01729000

| MPC61 | Barge (dry) | USA | 1,400 |
| MPC62 | Barge (dry) | USA | 1,400 |
| MPC64 | Barge (dry) | USA | 1,400 |
| MPC63 | Barge (dry) | USA | 1,400 |
| MPC65 | Barge (dry) | USA | 1,400 |

4



CERTIFICATE NO.:    01729000

## SPECIAL TERMS & CONDITIONS

| COLLISION | FOUR-FOURTHS COLLISION COVERAGE INCLUDED<br><br>Coverage hereunder, pursuant to Rule 2, Section 3.2, includes four-fourths of those liabilities, costs and expenses set out as insured losses in the Collision Clause of the American Institute Hull Clauses (June 2, 1977), or as provided for by such similar terms as may be contained in the insured vessel's hull policies, and which would have been covered under the said Clauses, or hull policies but for their exclusion therefrom, and subject always and in any event to each and every other provision of Rule 2, Section 3, in general. |
|---|---|
| EXCLUSIONS | COVERAGE IN RESPECT OF CARGO AND UNRECOVERABLE G.A. CONTRIBUTIONS EXCLUDED<br><br>Coverage hereunder excludes absolutely all those claims in respect of cargo otherwise recoverable in accordance with Rule 2, Section 7, all those claims for Fines otherwise recoverable under Rule 2, Section 8.1, and all those claims in respect of unrecoverable general average contributions otherwise recoverable in accordance with Rule 2, Section 12. |
| DEDUCTIBLES | US$25,000 from all claims, each accident or occurrence. |
| OTHER CLAUSES | NO LAID-UP RETURNS<br><br>It is hereby noted and agreed that the provisions of Rule 4, Section 11, do not apply to the coverage evidenced by this Certificate of Entry. |
| MEMBER SPECIFIC CLAUSES | CHARTERED BARGES<br><br>If Lafarge Corporation et al acquires an insurable interest in any vessel in addition to or in substitution for those set forth herein, through purchase, charter, lease or otherwise, such insurance as is afforded hereunder to any similar vessel shall automatically cover such additional vessel effective from the date and time the Assured acquires an insurable interest in such additional vessel. With respect to a chartered, leased or similarly acquired vessel, the insurance hereunder automatically includes the owner as an additional Assured with waiver of subrogation against the owner, if required, effective from the date and time such vessel is insured hereunder.<br><br>The above provision shall not apply to vessels which are chartered under a contract whereby the owner (or Demise Owner) and Charterer agree that the owner (or Demise Owner) shall procure Protection & Indemnity Insurance on the vessel and such insurance shall include the charterer as an Assured. |

5



CERTIFICATE NO.:    01729000

| | The Assured agrees to report the name and gross tonnage of any vessel in which they acquire an insurable interest at the expiration of this policy and pay any additional premium as may be required annually, at expiry at daily pro-rate the annual rates agreed. |
| --- | --- |



CERTIFICATE NO.:    01729000

## PREMIUM(S)

| VESSEL NAME | RISK NUMBER | GT | RATE (USD per GT per annum) | ADVANCE PREMIUM FOR PERIOD (US Dollar) |
|---|---|---|---|---|
| ADELAIDE | 37741 | 8,512 | 1.6128 | 13,728.15 |
| ALEXANDRA | 37742 | 8,512 | 1.6128 | 13,728.16 |
| BARGE JOPPA | 37743 | 1,500 | 1.6128 | 2,419.20 |
| BELCRAFT | 37744 | 3,614 | 1.6128 | 5,828.66 |
| CITADEL I | 37745 | 1,500 | 1.6128 | 2,419.20 |
| CITADEL II | 37746 | 1,500 | 1.6128 | 2,419.20 |
| CITADEL III | 37747 | 1,500 | 1.6128 | 2,419.20 |
| CITADEL IV | 37748 | 1,500 | 1.6128 | 2,419.20 |
| FLOATING DOCK JOPPA | 37749 | 1,500 | 1.6128 | 2,419.20 |
| G.L. OSTRANDER | 37750 | 198 | 94.9772 | 18,805.49 |
| INTEGRITY | 37751 | 7,557 | 1.6128 | 12,187.93 |
| J.B. FORD | 37752 | 4,368 | 1.6128 | 7,044.71 |
| MAGNOLIA | 37753 | 1,734 | 1.6128 | 2,796.60 |
| MARIA T | 37754 | 8,865 | 1.6128 | 14,297.47 |
| MC 65-2 | 37755 | 180 | 13.4400 | 2,419.20 |
| MC 66-2 | 37756 | 180 | 13.4400 | 2,419.20 |
| MPC253 | 37757 | 1,400 | 1.7280 | 2,419.20 |
| MPC256 | 37758 | 1,400 | 1.7280 | 2,419.20 |
| MPC257 | 37759 | 1,400 | 1.7280 | 2,419.20 |
| MPC258 | 37760 | 1,400 | 1.7280 | 2,419.20 |
| MPC259 | 37761 | 1,400 | 1.7280 | 2,419.20 |
| MPC31 | 37762 | 1,800 | 1.3440 | 2,419.20 |
| MPC32 | 37763 | 1,800 | 1.3440 | 2,419.20 |
| MPC33 | 37764 | 2,600 | 0.9466 | 2,461.16 |
| MPC350 | 37765 | 1,200 | 2.0160 | 2,419.20 |
| MPC351 | 37766 | 1,500 | 1.6128 | 2,419.20 |
| MPC352 | 37767 | 1,500 | 1.6128 | 2,419.20 |
| MPC51 | 37768 | 1,526 | 1.6128 | 2,461.13 |
| MPC52 | 37769 | 1,526 | 1.6128 | 2,461.13 |
| MPC53 | 37770 | 1,526 | 1.6128 | 2,461.13 |

THE
AMERICAN
CLUB

CERTIFICATE NO.:    01729000

| | | | | |
|---|---|---|---|---|
| TRINITY I | | | | |
| TRINITY II | | | | |
| MPC61 | | | | |
| MPC62 | | | | |
| MPC64 | | | | |
| MPC63 | | | | |
| MPC65 | | | | |

*Rev. 7/13/04*

# TRANSPORTATION AGREEMENT

**INGRAM**

| Carrier: **INGRAM BARGE COMPANY** | Shipper: **LAFARGE NORTH AMERICA** | |
|---|---|---|
| 13 Executive Drive, Suite 8 | *Contact Address:* | *Billing Address (if different):* |
| Fairview Heights, IL 62208-1342 | 600 SW Jefferson Street, Suite 302 | 2500 Portland Road |
| | Lee's Summit, MO 64063 | Grand Chain, IL 62941 |
| Attn:   J. E. (Gene) Shiver | Attn:  Mr. Jay Darlington | Attn:   Rachael Burnett |
| Sales Manager | Traffic Coordinator Barge | Barge Scheduler |
| Telephone:   618-628-3099 | Telephone:   816-251-2115 | Telephone:   618-543-3902 |
| E-Mail: shiverg@ingrambarge.com | E-Mail: jay.darlington@lafarge-na.com | E-Mail: rachael.burnett@lafarge-na.com |
| Facsimile:   618-628-3494 | Facsimile:   816-347-1884 | Facsimile:   618-543-3959 |
| Carrier's Contract No:   35443 | Shipper's Contract No: | Shipper's Contract No: |
| Carrier's Job No:   15070574 | Shipper's Customer No: | Shipper's Customer No: 10661 |

This Agreement is made as of December 14, 2004 by and between Carrier and Shipper (each as identified above) and is for the transportation of dry cargo by barge under the terms and conditions of Parts I and II as contained in this Agreement. In the event of a conflict, the provisions of Part I shall prevail over those contained in Part II to the extent of such conflict.

## PART I

| | | | |
|---|---|---|---|
| 1. | Loading Date(s): | January 1, 2005 through December 31, 2005 | |
| 2. | Equipment: | Fiber-Lift Covered Barges <u>ONLY</u>. All cover handling expense for the account of Shipper. | |
| 3. | Cargo: | Cement | |
| 4. | Cargo Value: | $300.00 per net ton or actual invoice value, whichever is less | |
| 5. | Number of Net Tons: | Approximately 160,000 net tons. Refer to Appendix I for projected monthly shipping schedule. | |
| 6. | Origin(s): | Joppa, IL (Lafarge) | OH 953.2 T |
| 7. | Destination(s): | New Orleans, LA (Lafarge-France Road Wharf) | GIWE 8.0 T3 |
| 8. | Base Freight Rate(s): | $12,700 Flat Rate Per Barge | |
| 9. | Free Time: | Six days all-purpose to load and unload each barge, including Sundays and holidays that occur within the freetime period.  (Refer to Part II, Section 28) | |
| 10. | Demurrage Rate: | $185.00 per barge per day | |
| 11. | Minimums: | Not applicable, due to flat rates per barge. | |
| 12. | Fuel Protection: | Beginning January 1, 2005, the base freight rate(s) listed herein shall be subject to escalation during the term of this Agreement in the event of an increase in the cost of fuel above $.90 per gallon.  If the actual average cost of fuel to Carrier for the second month immediately preceding the month of shipment rises above the specified cost per gallon, Carrier shall have the right to escalate the freight rate(s) on the first of every month during the term of this Agreement in accordance with the following formula: | |

$$[\text{Base Freight Rate} \times 30\% \times \frac{\text{Actual Fuel Cost} - \text{Fuel Protection Cost}}{\text{Fuel Protection Cost}}] + \text{Base Freight Rate} = \text{Adjusted Freight Rate}$$

As an example, Carrier's actual fuel cost for the month of November 2004 would determine the January 2005 rate(s). In no event will the adjusted freight rate(s) ever be lower than the base freight rate(s).

| | | |
|---|---|---|
| 13. | Cleaning Allowance: | $800.00 maximum per barge account Carrier (refer to Part II, Section 31) |
| 14. | Special Provisions: | Refer to Part II |

In witness whereof, the parties have executed this Agreement as of the date first written above.

Accepted:

Carrier:  **INGRAM BARGE COMPANY**                    Shipper:  **LAFARGE NORTH AMERICA**

Signature: _____                    Signature: _____

**INGRAM** Carrier's Contract No. 35443          APPENDIX I          Carrier's Job No. 15070574

| Projected Monthly Shipping Schedule: | Monthly Breakdown of Projected Volume | | | |
|---|---|---|---|---|
| | January | 19,500 | July | 10,500 |
| | February | 18,000 | August | 9,000 |
| | March | 17,500 | September | 10,500 |
| | April | 9,000 | October | 15,500 |
| | May | 12,000 | November | 19,500 |
| | June | 10,500 | December | 7,500 |

Carrier Representative's Initials: _____          Shipper Representative's Initials: _____



Rev. 7 13.64

(INGRAM)   Carrier's Contract No. 35443          PART II          Carrier's Job No. 15070574

15. **Cargo Description:** Prior to loading, Shipper will notify Carrier of the generic name of the cargo to be transported pursuant to this Agreement. In addition, Shipper will, if requested by the Carrier, provide Material Safety Data Sheets (MSDS). Further, the Shipper shall notify the Carrier of the cargo classification under U. S. Coast Guard regulations and any other applicable regulations. In the event of Shipper's improper or incomplete description of the cargo or failure to disclose all necessary information about the cargo which results in any expense, loss, damage, and/or penalty to the Carrier, Shipper agrees to reimburse Carrier for such expense, loss, damage, and/or penalty.

16. **Tonnage:** Wherever used in this Agreement, the term "ton" shall mean a net ton of 2,000 pounds avoirdupois.

17. **Cargo Insurance:** Carrier will, at its own expense, obtain and keep in full force and effect during the term of this Agreement, or any extension thereof, Cargo Insurance on the full value of all cargo transported under this Agreement. Carrier may, at its own risk, elect to self-insure the cargo. Cargo is insured up to the value stated in Part I, or the actual value of the cargo, whichever is less. In no case will the Carrier be responsible for any amount exceeding $700 per net ton.

18. **Weights:** Freight charges shall be calculated on the basis of loaded weights at origin. Carrier shall not assume any responsibility to weigh the cargo at origin or destination.

Within 72 hours after completion of loading, Shipper shall submit to Carrier a written report descriptive of the cargo and the weight thereof per barge.

If the actual weight of cargo cannot be ascertained upon completion of loading, estimated weights may be used for billing which shall be adjusted to out-turn weights at destination, if available, and applicable charges determined accordingly. If facilities for determining weight at destination are not available, the barge will be gauged before unloading, at Shipper's expense, and the weight thus ascertained will be used in determining the applicable charges.

Carrier may require proof of scale or gauged weights.

19. **Minimum Weights:** The freight due from Shipper will be based on the actual tons loaded subject to the minimum weights specified in Part I.

However, if the capacity of the barge (or draft if so specified by the Carrier) will not allow the Shipper to load to the minimum level specified, then the charges will be based on the actual tons loaded or the tons that could have been loaded at the specified draft according to Carrier's draft tables, whichever is greater.

20. **Loading Requirements:** Shipper shall load a barge to the draft specified by Carrier. Shipper shall be governed by Carrier's instructions regarding the height of load, the tonnage of the cargo, the draft of the barge, and such other instructions as Carrier may deem necessary for safe transportation where variable waterway conditions and anticipated weather conditions make such precautions desirable. The Shipper shall be subject to any demurrage charges that may accrue due to the detention of any barge occasioned by non-compliance with Carrier's loading requirements specified herein. The Shipper shall load the barge so that the cargo is evenly distributed throughout the hopper hold; the Shipper shall not "center load" or "end load" a barge. Carrier will have the right to shift any

21. **Transport of Barges:** A barge loaded with Shipper's cargo will move only at the convenience of the Carrier, and either singly or with one or more other craft. Carrier will have the right to shift at interchanges the tow from one to another towing vessel as frequently as it may find it convenient to do so, or to procure towage from any other vessel not owned or operated by the Carrier; to tie off the tow at any point and for any purpose; and to deviate from its route, and visit any port whether or not on said route, and in any order. Carrier is not bound to transport any barges containing Shipper's cargo in time for any particular market.

If, due to operating conditions, it is necessary in the judgment of the Carrier to delay the movement of barges while in transit, Carrier reserves the right to do so. Carrier makes no representation as to the time which will elapse between the placement at origin, nor between departure of the barge from origin and arrival of the barge at destination; and under no circumstances shall Carrier be liable for any loss, damage, or expense incurred by Shipper or others by reason of delay.

22. **Inaccessible Points:** Carrier will not place barges for loading, nor pick up loaded barges, when the shipments are destined to ports or points which are inaccessible because of an actual or anticipated, temporary or permanent condition that adversely affects the navigability of a waterway to be traversed by barges between origin and destination. If shipment has been accepted or is re-consigned for transportation to a port or point which subsequently becomes inaccessible because of a condition that adversely affects the navigability of a waterway to be traversed between origin and destination, the Carrier shall be privileged to tender delivery of such shipment at an accessible intermediate point nearest to consigned destination, in which event freight charges shall be adjusted in accordance with the transportation service actually rendered on the basis of the rate applicable for the movement to the original destination. In the determination of the inaccessibility of a destination port, the type and draft of propelling vessel, the type of barge, the loaded draft of barge, and necessity of reaching empty barges, among other considerations, shall govern. Carrier's determination in this regard shall be final. In the event that operating conditions, including ice, prevents or delays the delivery of a barge, the Carrier will place the barge at a point short of the point of interruption and the barge will be subject to demurrage.

23. **Accessorial Charges:** Except as otherwise provided, the Carrier will not be liable for the following accessorial charges: ballasting, cleaning, demurrage, dockage, drayage, elevation, loading or unloading of cargo, opening or closing of barge hatch covers, removal or replacement of barge covers, sheddage, stacking or restacking of barge covers, switching tollage, wharfage, or any other terminal expense at either origin or destination.

24. **Shifting:** Rates stated herein will include only one shift of barges into and one shift out of loading and unloading facilities by Carrier at origin and/or destination. Any additional shifting of barges to accommodate loading or unloading will be for Shipper's account.

When Shipper arranges for shifts to be made without expense to Carrier, Shipper will assume full responsibility for safety of barge and cargo thereof during such shifts, and further, Shipper shall reimburse Carrier in full for any damage or loss which may occur during such movements.

25. **Diversions, Re-Consignments, Holding in Transit, Stop-Offs for Partial Unloads**

A barge may be diverted, re-consigned, held in transit to await orders, or stopped-off for partial unloads only with the consent of Carrier, which may be withheld for any reason. The cost, terms, and conditions of any agreement for re-consignment, diversion, holding in transit for orders, or partial stop-offs, must be confirmed in writing by all parties prior to Carrier's taking the requested action.

Any barge that is stopped to permit a partial discharge will not be allowed any additional free time. All time incurred during a partial stop will be charged at the demurrage rate.

26. **Payment of Freight:** Upon loading, the entire amount of the freight charge will become earned and due and payable to Carrier in cash and without discount, even though the barge or cargo is lost or not lost, damaged or not damaged, in whole or in part, at any stage of the voyage. The Carrier does not have to deliver the Cargo until all freight and demurrage due hereunder have been paid by Shipper. The actual date of loading, not placement date nor requested date, shall govern as to what freight rate will be invoiced.

Interest at a rate of two percent (2%) per month (or any fraction thereof) or the maximum interest rate allowed by law, shall accrue on any payment obligations hereunder that are past due until such payment obligations are satisfied in full together with said interest. If any agency or attorney is employed to assist in the collection of such payment obligation, then the delinquent party also shall be required to pay such agency/attorney's reasonable fees relating to such collection. Carrier has the right to defer placement of any barge and/or delivery of the cargo if Shipper's payment obligations are past due until such time as all amounts due Carrier are paid in full.

Unless specified elsewhere, and notwithstanding the above, Shipper may be granted credit by Carrier's Credit Manager, in which case the monies owed must be paid by the Shipper within 30 days from the date of the invoice or within the number of days specified by Carrier's Credit Manager. The Carrier's Credit Manager has complete discretion as to whether or not credit is to be extended to Shipper, the amount of credit to be granted to Shipper, and the payment due date from the Shipper, and the form of payment. Shipper is to comply with all reasonable requests for financial information by Carrier's Credit Manager in order to establish Shipper's credit. The Carrier's Credit Manager may change or cancel the extension and amount of credit and the payment due date or the form of the payment at the Credit Manager's sole discretion and at any time.

27. **Lien:** Carrier will have a lien upon all cargo for any freight or demurrage due hereunder, which lien will survive the delivery of such cargo.

28. **Demurrage and Free Time:** The free time to be allowed is to be that which is specified in Part I. No free time will be allowed on empty barges placed upon Shipper's request for placement if, subsequent placement, such order is cancelled.

After the period of free time has expired, the demurrage charges specified under this agreement will be made for each day, including Saturdays, Sundays, and National Holidays, until the barge is released to the Carrier.

Except as otherwise provided, time will be computed for the total period barge is in Shipper's possession for loading or for unloading and will begin as of the first 7:00 a.m. after barge is actually constructively placed for loading or for unloading and will run until Carrier has been notified in writing that barge has completed loading or unloading and is available for pick up. The written release must be received by Carrier by 11:00 a.m. CST (Nashville time) or the barge will not be considered as having been released by 7:00 a.m. In computing time, days will consist of 24 hours running from 7:00 a.m. until the next 7:00 a.m. A fraction of a day will be considered as one day.



Shipper Representative's Initials: _____

Rev. 7 13 54

 **INGRAM**     Carrier's Contract No. 35443          PART II          Carrier's Job No. 15070574

When Carrier, for its convenience, places a barge for loading prior to date specified by Shipper time will run from the first 7:00 a.m. of the date specified by Shipper or from 7:00 a.m. of the date when actual loading began, whichever occurs sooner.

Actual placement is made by Carrier when barge is placed for loading or unloading at docks or wharves specified by Shipper or at a nearby fleet selected by Carrier, whichever occurs first.

Except as otherwise provided for herein, if Carrier is prevented from making actual placement by any cause over which it has no control, such barge is subject to constructive placement. Constructive placement will be made by Carrier when actual placement is not possible.

Constructive placement consists of placing or holding a barge at a point of Carrier's or Shipper's choice near the specified actual delivery point. Notice of such placement will be given to Shipper. In making any subsequent placement, no free time in addition to that provided will be allowed Carrier

If holidays are excluded from Free Time, the following are the holidays to be recognized:

| | | | |
|---|---|---|---|
| New Year's Day | Memorial Day | Independence Day | Labor Day |
| Easter Sunday | Thanksgiving Day | Christmas Day | |

If the holiday (except for Easter) falls on a Sunday, the following Monday shall be considered as the holiday.

If a barge is on demurrage and the shipper requests a reconsignment, the barge will remain on demurrage, even during transit, until the barge is released back to the Carrier.

In the event that delivery of a barge involves a destination beyond the lake front entrance to Lake Michigan, the barge will be placed in a fleet of Carrier's choosing on the Illinois River Waterway and free time and demurrage shall commence upon placement in the fleet. Adverse weather conditions which delay transit and barge delivery to destinations on Lake Michigan will not be considered Force Majeure events. It is the Shipper's responsibility to notify the loading/unloading terminal of the barge placement in the Illinois River Waterway fleet.

29. **Fuel Protection:** Unless otherwise addressed in this Agreement, the freight rate will not be subject to escalation during the term of this Agreement except in the event of an increase in the cost of fuel above the cost per gallon specified in Part I. If the actual average cost of fuel to Carrier for the second month immediately preceding the month of shipment rises above the specified cost per gallon, Carrier shall have the right to escalate the freight rate on the first of every month during the term of this Agreement in accordance with the following formula:

[Base Rate x 30% x Actual Fuel Cost – Fuel Protection Cost] + Base Freight Rate = Adjusted Freight Rate

Fuel Protection Cost

As an example, the actual fuel cost for the month of October would determine the December rates. In no event will the adjusted freight rate ever be lower than the base freight rate.

30. **Ratability:** Unless modified in Part I, Shipper shall ship in approximately equal monthly increments and approximately equal weekly increments within each month. Should the Shipper fail to ship ratably as described above, Carrier has the right to adjust its obligation to provide barges for the remainder of this Agreement. Barges not loaded ratably within a week or within a month cannot be carried forward to the following week or month, unless Carrier agrees to do so. Further, Carrier will not be obligated to supply a number of barges in any one month that is greater than the actual number of barges shipped in the prior months under this Agreement.

31. **Cleaning:** Carrier shall absorb cleaning costs up to amount specified in Part I to remove cargo left in the hopper by shipper. All cleaning costs above the stipulated allowance are for the account of the Shipper. Shipper shall remove all dunnage, if any, at its sole expense.

If any cargo or debris is spilled or deposited on the exterior of the barge (including working surfaces, such as gunnels, covers, or decks) at either loading and unloading points, Shipper is responsible for all costs associated with cleaning the exterior of the barge.

Carrier may refuse to pick up or move a barge if an abnormal amount of cargo is left in the hopper or if cargo or debris is left or spilled on the barge if, in the Carrier's sole judgment, the cargo or debris left aboard represents a safety hazard to its crew or to other parties who may come in contact with the barge. The Carrier will require the Shipper to clean or remove all abnormal amounts of cargo left on board or to remove the cargo or debris that represents a safety hazard prior to movement. In such case, if the movement of a barge is delayed while the barge is being cleaned by the Shipper, then the Shipper shall be liable to the Carrier for the days consumed at the then applicable demurrage rate. Further, if the Carrier arranges to have a barge cleaned due to abnormal amounts of cargo left in the hopper or if cargo or debris is left or spilled on the barge, the Shipper shall be liable to the Carrier for the days consumed at the then applicable demurrage rate.

32. **Unloading:** It shall be the obligation of Shipper, or its consignee, to unload and remove the cargo from the barge, including any cargo or debris spilled on the working surfaces, promptly upon arrival of the barge at its destination. If the cargo is not so unloaded and removed, then the Carrier, at its option, shall be entitled to remove, sell or otherwise dispose of the cargo.

33. **Distribution of Cargo:** Shipper shall be required to distribute cargo in each barge so as to ensure an even draft. If a barge is not loaded to ensure an even draft, Carrier reserves the right to refuse to accept the barge for transport. If Carrier refuses to accept any barge, Shipper must, at its expense, have the cargo redistributed to meet Carrier's requirements. In addition, the barge will be subject to demurrage charges, from the time and date of placement until the barge is accepted for transportation by Carrier.

34. **Possession of the Barge during Loading/Unloading:** Carrier shall deliver an empty or loaded barge to a loading/unloading facility designated by Shipper for loading or unloading. Shipper shall assume the duty and responsibility for the safety of each barge in its possession. For the purposes of this Agreement, "possession" shall begin when Carrier delivers an empty or loaded barge for loading or unloading to the landing designated by Shipper and shall end when the barge is removed by Carrier or its agent(s). Shipper shall be responsible for the safekeeping of Carrier's barge delivered to a landing regardless of whether Shipper owns or operates the landing. During possession, any barge delivered to a landing designated by Shipper shall be held without charge to Carrier.

35. **Safe Berth:** Shipper warrants the barge shall have a safe berth of not less than nine (9) feet of draft. The barge shall not be permitted, at any time, to touch bottom while in the Shipper's control.

36. **Mooring:** Shipper warrants that barges will be safely and adequately moored free of wharfage, dockage, port and harbor charges at the loading and unloading points and that barges will have warning lights properly displayed as required by applicable U.S. Coast Guard and U.S. Army Corps of Engineers regulations and permits. While barges are in the care and custody of Shipper, or its agents, or U.S. Coast Guard and U.S. Army Corps of Engineers regulations will be complied with, and in the event that Carrier should in any manner be held responsible for Shipper's, or its agents acts or omissions in compliance with the mooring requirements herein provided, then Shipper agrees to indemnify and save harmless Carrier from all such responsibility and liability.

37. **Request for Placement:** Shipper must send Carrier a written request for placement with a specific date for loading and the designated origin for loading. Carrier requires a minimum of 14 days notice for any loading; should Shipper fail to supply 14 days advance notice of a loading, Carrier has the right to adjust its obligation to provide barges for loading.

38. **Change in Loading Date or Origin:** Any change by the Shipper in the requested loading date or designated origin given to the Carrier which is in excess of five (5) working days prior to the previously requested loading date will be accepted by Carrier without charge. Any change by the Shipper in the requested loading date or origin given to the Carrier on less than five (5) working days notice may subject the Shipper to charges (including but not limited to free days may be assessed, additional shifting or fleeting charges may be billed, barge cleaning, or cover handling).

39. **Acceptance:** Carrier will tender barges which are in a condition suitable for the cargo to be carried. Loading of the barges will constitute Shipper's acceptance of the condition and suitability of the barges for the intended cargo.

40. **Release:** Carrier shall not be liable for lost profits or other incidental or consequential damages under any circumstances. Nothing contained herein shall render Carrier responsible for the difference in the intum weight and the outtum weight of cargo from barges safely delivered and unloaded.

41. **Failure to Accept / Failure to Place:** If either Shipper or Carrier, for reasons other than Force Majeure, determines that it will be unable to accept or place barges on the requested Load Date or within the term of this Agreement, it shall be their duty to advise the other party at once; whereupon it shall be the other party's duty at once to elect to cancel the unplaced barge or to extend the placement time. In the case of cancellation, the other party shall have the right to buy or sell, as the case may be, the respective freight and the party unable to accept or place shall reimburse the other party for any loss sustained in such purchase or sale provided same is made at the prevailing market price.

42. **Choice of Law:** This Agreement shall be governed by the laws of the State of Tennessee, both as to interpretation and performance, and all disputes that arise under this Agreement shall be resolve in accordance with Tennessee law.

43. **General Average:** In the event of accident, danger, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for th consequences of which, Carrier is not responsible, by statute, contract, or otherwise, the cargo, Shipper, and the consignee, and other parties having an interest in the cargo, jointly and severally, w contribute in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred in respect of the cargo. General average, if any, will b adjusted, stated, and settled at such port or place in the United States as may be selected by Carrier, and will be settled in accordance with the York/Antwerp Rules of 1974.



Rev. 7/15/12

(INGRAM)    Carrier's Contract No. 35443          PART II          Carrier's Job No. 15070574

44.  Force Majeure: Performance under this Contract by Shipper and Carrier shall be excused to the extent such performance is prevented by Force Majeure, provided the party declaring Force Majeure gives written notice of such condition to the other party within seventy-two (72) hours after commencement of the Force Majeure. The term "Force Majeure" shall include acts of God or the elements, acts of a public enemy, insurrections, riots, strikes, labor disputes, fires, explosions, floods, accidents of navigation, ice, high or low water, embargoes, acts or orders of civil or military authorities, lock delays or closings, fuel shortages, or other causes beyond the reasonable control of the party declaring Force Majeure. Such excuse from performance shall continue until the Force Majeure ceases to exist. A party declaring Force Majeure shall make reasonable efforts to eliminate or resolve the condition, recognizing, however, that the settlement of any strike or other labor dispute shall be solely within the discretion of that party. A declaration of Force Majeure by Shipper does not excuse payment of demurrage for a barge on demurrage status. When a Force Majeure is declared on a barge with remaining free time, free time shall continue to run; upon expiration of free time the barge will be placed in a demurrage status even if the Force Majeure event continues to exist. Any shortfall in cargo deliveries resulting from Force Majeure shall not be made up except by mutual consent of the Shipper and the Carrier.

45.  New Taxes: There will be added to the freight rate the amount of any new or increased Federal, State, or local taxes (except net income taxes) that may hereafter be charged to and paid by Carrier on account of the transportation services rendered hereunder, including the amount of any user charge, tax, or wharfage, port, harbor, or dockage fee imposed, levied, or collected for the use of the inland waterway system or of the locks and dams in said waterway system, wharfs, ports, or the use of the harbors and docks by Carrier while engaged in the transportation services rendered hereunder, or upon fuel used in performing such services.

46.  Subcontracts: Nothing herein shall prevent Carrier from subcontracting for any of the services provided by Carrier hereunder but Carrier will remain liable to Shipper for the proper performance of all of Carrier's obligations hereunder.

47.  Mitigation: If all or any part of the cargo is discovered to be damaged while subject to this Agreement, Carrier, in its sole discretion, in order to minimize the damage, may sell the Cargo at public or private sale to the best advantage. In such event, Carrier shall, where practicable, provide Shipper and any known consignee with notice of the proposed sale. The proceeds of any sale made under this section shall be applied by Carrier to the payment of freight, demurrage, storage, and any other charges and the expense of notice, advertisement, sale and other necessary expense of caring for and maintaining the Cargo, and the balance, if any, shall be paid to Shipper or consignee

48.  Claims: As condition precedent to recovery, claims must be filed in writing with Carrier within nine (9) months of delivery of the Cargo, or, in case of failure to make delivery, then within nine (9) months after a reasonable time for delivery has elapsed. Suits shall be instituted against Carrier only within two (2) years and one (1) day from the day when notice in writing is given by the Carrier to the claimant that the Carrier has disallowed the claim or any part or parts thereof specified in the notice.

49.  Default: No default of either party in the performance of any of its covenants or obligations hereunder, which, except for this provision, would be the legal basis for rescission or termination of this Contract by the other party hereto, shall give or result in such a right unless and until the party committing such default shall fail to correct the default within thirty (30) days after written notice of such default is given to such defaulting party by the non-defaulting party. Notwithstanding anything in this Contract to the contrary, there shall be no cure period for any payment default and each party shall have each and every other right afforded it under law against the defaulting party.

50.  Notices: All notices, consents, determinations, instructions and communications provided for herein shall be validly given, made or served, if in writing and delivered personally, or by telegram, facsimile, electronic mail, overnight delivery or recognized courier service or sent by registered or certified mail, postage prepaid, to Shipper and Carrier at their respective addresses listed at the beginning of this Contract, or as the parties may otherwise direct in writing. Any notice, consent, determination, instruction, approval, or other communication hereunder shall be deemed given and effective as of the date of delivery in person or by courier, or as set forth on the return receipt or facsimile confirmation.

51.  Independent Contractor: Nothing contained in this Contract shall be construed as a contract by Shipper for the chartering, hiring or leasing of any barge, towboat or other equipment of Carrier to be provided hereunder; nor shall any of the agents, servants, subcontractors or employees of Carrier be regarded as employees of Shipper, it being understood that Carrier is in all respects an independent contractor and that Shipper shall exercise no control over the operation of any barge, towboat or other equipment of Carrier or over Carrier's agent, servants, subcontractors or employees.

52.  Changes in Operation: In the event Carrier's operating costs specifically related to the equipment, facilities, supplies, or services to be used or provided by Carrier under this Agreement are increased due to any law, rule, ordinance, regulation, restriction, directive, order, notice, advisory or interpretation, hereafter promulgated by any federal, state, or local authority, or any agency or division thereof, or any industry group advisory thereto, or any court, which is generally applicable to all barge carriers similarly situated, and such increased costs are not reimbursed to Carrier under any other provision of this Agreement, then Shipper should reimburse Carrier monthly, following receipt of billing for the entire amount of such increase in operating costs that is fairly attributable to the services performed for Shipper under this Agreement.

53.  Miscellaneous:

   A.  Conflict: In the event any of the terms of the Shipper's confirmation differ or conflict with any provision of this Agreement, then the terms set forth in this Agreement shall prevail.
   B.  Assignment: Shipper shall not be permitted to assign or otherwise dispose of all or any part of its rights or obligations hereunder without first obtaining the written consent of Carrier. Such consent shall not unreasonably be withheld, provided that any such permitted assignment or other disposition shall not relieve Shipper of its obligation under this Agreement.
   C.  No Waiver: The failure of Shipper or Carrier to insist upon strict performance of any of the provisions of this Agreement in one or more instances or the failure of Shipper or Carrier to exercise any of its rights hereunder in one or more instances shall not be construed as a waiver of any such provisions or the relinquishment of any such rights, but the same shall continue and remain in full force and effect.
   D.  Binding Effect: This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee and shall be binding upon and inure to the benefit of the parties herein, their successors and assigns, subject to the restrictions or assignability herein contained.
   E.  Headings; Terms: Section headings in this Agreement are included merely for the convenience of reference and shall not be construed as part of the governing terms of this Agreement. The term "barge" herein shall mean both the singular and the plural as intended by the parties depending on the number of barges subject to this Agreement.
   F.  Integration; Execution: This Agreement sets forth the entire understanding between the parties hereto as to the subject matter and no amendment hereto shall be valid unless made in writing and duly signed by the parties hereto. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original hereof, and all counterparts collectively are to be deemed but one instrument. Whether or not Shipper executes this agreement in the acceptance space provided hereon, loading of a barge shall constitute an acceptance of all the terms and conditions of the Agreement.

Carrier Representative's Initials:          Shipper Representative's Initials:

THACHER PROFFITT & WOOD LLP
Two World Financial Center
New York, New York 10281
(212) 912-7400
John M. Woods (JW/0697)
Alan F. Kaufman (AK/9114)
Neil T. Bloomfield (NB/0669)
*Attorneys for Plaintiff*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY ASSOCIATION,
INC.,

                                        Plaintiff,

   - against -

LAFARGE NORTH AMERICA, INC.,

                                        Defendant.

ECF CASE

Case No.:

**COMPLAINT**

   Plaintiff, American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club" or the "Club"), by and through its attorneys, Thacher Proffitt & Wood LLP, as and for its Complaint alleges as follows:

   1.   The matter in controversy relates to the demand of one of the Club's members, Lafarge North America, Inc. ("Lafarge"), for indemnification against potential liability and defense costs in respect of claims arising from the breakaway of a barge that was at Lafarge's New Orleans, Louisiana facility during Hurricane Katrina in August, 2005. In other lawsuits pending against Lafarge, it is alleged that the barge, called the ING 4727, struck and caused or contributed to the collapse of the 17th Street Industrial Canal floodwall causing massive flooding in the City of New Orleans. By this action, the Club seeks a declaration that it is not obligated to defend or provide cover to Lafarge because the Barge ING 4727 was never insured by the Club,

and because even if the barge had been insured pursuant to Lafarge's Certificate of Entry in the Club, coverage is excluded pursuant to the terms of the Club's rules.

## JURISDICTION

2.       The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332, 1333 because it is an admiralty or maritime dispute between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of fees and costs.

3.       Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Club's principal place of business is within this district and a substantial part of the events giving rise to Lafarge's claim occurred in this judicial district.

## NATURE OF THE ACTION

4.       This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, and involves an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

5.       Plaintiff seeks a declaration of its rights and other legal relations pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, in order to resolve an actual controversy between the parties to this action as is more fully described below.

## THE PARTIES

6.       Plaintiff, the American Club, is a non-profit mutual insurance association, operated by its members for their exclusive benefit.  The Club provides protection and indemnity insurance (commonly referred to as "P&I Insurance"), which provides cover to shipowners and charterers against third-party liabilities encountered in their commercial operations.  Traditional P&I Insurance is based on the not-for-profit principle of mutuality where members of the Club essentially insure one-another and, therefore, are both the insurers and the assureds.  The

2

American Club is incorporated in New York and has its principal place of business at 60 Broad Street, New York, New York.

7.    Upon information and belief, defendant Lafarge is a diversified construction materials company and supplier of cement, aggregates and concrete, and other materials in the United States and Canada. Lafarge is incorporated in Maryland and has its principal place of business at 12950 Worldgate Drive, Suite 500, Herndon, Virginia.

8.    Lafarge is registered to do business in the State of New York and/or is otherwise doing business in the State of New York including, but not limited to, entering into contracts with the Club.

## FACTUAL BACKGROUND

### A.    Entry into the Club

9.    The rights and obligations of every member of the Club are governed by the American Club By-Laws and Rules (the "Club Rules").

10.    When an assured becomes a member of the Club, it receives a Certificate of Entry, which expressly makes applicable the Club Rules to the member's insurance, and which lists a Schedule of Vessels which are insured by the Club. The Certificate of Entry may include additional Member-Specific provisions, which are listed on a separate rider to the Certificate of Entry. (Lafarge's Certificate of Entry for the period February 20, 2005 to February 20, 2006, is attached as Exhibit A.)

11.    Traditional P&I insurance is written on a policy year basis, with an inception date of February 20th for each policy year. For example, the Club's current policy year incepted on February 20, 2006 and runs for twelve months.

3

**B.    Lafarge's Entry into the Club**

12.    Lafarge first became a member of the Club on or about February 20, 1999.  It renewed its coverage each year, up to and including the policy year commencing February 20, 2005.

13.    Lafarge's Certificate of Entry contains a Schedule of Vessels that Lafarge entered with the Club.  The Barge ING 4727 was never listed on any Schedule of Vessels for Lafarge's entry with the Club.

14.    Lafarge's Certificate of Entry contains a Member-Specific clause entitled "Chartered Barges," which states:

> CHARTERED BARGES.
>
> If Lafarge Corporation et al <u>acquires an insurable interest in any vessel in addition to or in substitution for those set forth herein, through purchase, charter, lease or otherwise</u>, such insurance as is afforded hereunder to any similar vessel shall <u>automatically</u> cover such additional vessel effective from the date and time the Assured acquires an insurable interest in such additional vessel. With respect to a chartered, leased or similarly acquired vessel, the insurance hereunder automatically includes the owner as an additional Assured with waiver of subrogation against the owner, if required, effective from the date and time such vessel is insured hereunder.
>
> The above provision shall not apply to vessels which are chartered under a contract whereby the owner (or Demise Owner) and Charterer agree that the owner (or Demise Owner) shall procure Protection & Indemnity Insurance on the vessel and such insurance shall include the charterer as an Assured.
>
> <u>The Assured agrees to report the name and gross tonnage of any vessel in which they acquire an insurable interest at the expiration of this policy and pay any additional premium as may be required annually, at expiry at daily pro-rate the annual rates agreed</u>. (emphasis added).

15.    Accordingly, to obtain cover for a vessel under the Chartered Barges clause, Lafarge must meet each of the following conditions:

a.    first, Lafarge must acquire the requisite insurable interest in a vessel;

4

     b.     second, the vessel must be acquired <u>in addition to or in substitution for</u> those vessels listed on the Schedule of Vessels;

     c.     third, the interest in a vessel acquired by Lafarge must be akin to a purchase, charter or lease;

     d.     fourth, the vessel(s) to be covered must be declared to the Club;

     e.     fifth, Lafarge must pay premium to the Club for the vessel(s) to be covered.

## C.    The Transportation Agreement

16.    Upon information and belief, on or about December 14, 2004, Lafarge entered into a Transportation Agreement (the "Transportation Agreement") with Ingram Barge Company ("Ingram"), to be performed during the period from January 1, 2005 through December 31, 2005, and providing for the transportation by Ingram of approximately 160,000 net tons of cement in covered barges from Lafarge's Joppa, Illinois plant to its New Orleans, Louisiana facility on the Inner Harbor Navigation Canal. (The Transportation Agreement is attached as Exhibit B.)

17.    Clause 51 of the Transportation Agreement defines Lafarge as an "Independent Contractor" and explicitly states that "[n]othing in this Contract shall be construed as a contract by Shipper [Lafarge] for the chartering, hiring, or leasing of any barge . . . ."

18.    Upon information and belief, Ingram began transporting cargo for Lafarge under the Transportation Agreement beginning in January of 2005.

19.    Lafarge did not submit the Transportation Agreement to the Club for its review and approval.

20.    Upon information and belief, on or about May 1, 2005, Lafarge obtained a primary marine liability/wharfinger's policy with a limit of $5,000,000 from New York Marine & General Insurance Company (the "MMO Policy").

21.    The MMO Policy specifically includes coverage for Lafarge's "liability for damage caused directly or indirectly by the freeing or breaking away" of vessels at landing and/or mooring facilities that are owned operated, utilized, controlled or leased by Lafarge.

22.    Lafarge also obtained a policy providing excess coverage to the MMO Policy with a limit of $45,000,000 above the MMO Policy limit, for total wharfinger's liability coverage up to $50,000,000.

**D.    Lawsuits Against Lafarge Arising From Hurricane Katrina**

23.    Upon information and belief, prior to August 29, 2005, Ingram used its Barge ING 4727 to transport cement under the Transportation Agreement to Lafarge's New Orleans' facility.

24.    Upon information and belief, on or about August 29, 2005, Barge ING 4727 was moored at Lafarge's facility on the Inner Harbor Navigation Canal.

25.    On or about August 29, 2005, Hurricane Katrina made landfall along the Louisiana and Mississippi Gulf Coast.

26.    Upon information and belief, on or about August 29, 2005, Barge ING 4727 tore free of her moorings and drifted through a breach in the Industrial Canal floodwall or was carried over the floodwall by the rising water.

27.    Barge ING 4727 is not listed on any Lafarge Schedule of Vessels entered with the Club, nor were any Ingram vessels.

**E.    Lafarge's Claim for Defense and Cover from the Club**

28.    At least four lawsuits arising out of Hurricane Katrina are pending against Lafarge.

29.    Upon information and belief, on or about September 9, 2005, Lafarge placed their terminal operators and wharfinger's liability underwriters on notice of claims that may be covered by the MMO Policy.

30.    On or about March 3, 2006, Lafarge submitted a claim to the Club seeking "indemnification for all potential liability and/or reasonable settlements and litigation costs . . ." in connection with certain claims for property damage and/or personal injury relating to the breakaway of Barge ING 4727 and arising from the Hurricane Katrina disaster in New Orleans.

31.    On or about April 21, 2006, the Club sent a letter to Lafarge declining coverage to Lafarge because Barge ING 4727 had not been entered with the Club at the time of the casualty, or at any other time, and even if it had been entered, coverage for claims against the vessel would have been excluded.

32.    Upon information and belief, Lafarge intends to pursue its claim for cover and defense costs relating to claims arising from the breakaway of the ING 4727 from the Club.

33.    The Club maintains that it does not cover any of Lafarge's liabilities or defense costs arising from the breakaway of Barge ING 4727.

34.    An actual and justiciable controversy within the jurisdiction of this Court therefore exists between the parties to this action regarding the rights and liabilities of the parties, which controversy may be determined by a judgment of this Court.

## AS AND FOR A FIRST CAUSE OF ACTION

35.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs 1 through 34 as though fully set forth herein.

36.    Barge ING 4727 is not listed on the Schedule of Vessels in Lafarge's 2004 – 2005 Certificate of Entry issued by the Club.

37.    Lafarge did not acquire the Barge ING 4727 in addition to or in substitution for the vessels set forth in the Schedule of Vessels.

38.    Lafarge did not acquire an insurable interest in Barge ING 4727 as required by Lafarge's Certificate of Entry.

39.    Any interest that Lafarge acquired in Barge ING 4727 was not akin to a purchase, charter or lease.

40.    Lafarge cannot obtain cover from the Club for Barge ING 4727 pursuant to the Chartered Barges clause of Lafarge's Certificate of Entry.

41.    Nonetheless, Lafarge contends that the Club is required to defend and provide cover to Lafarge for the claims asserted against Lafarge in connection with the breakaway of Barge ING 4727.

42.    An actual and justiciable controversy has thus arisen between the Club and Lafarge concerning the coverage of Barge ING 4727.

## AS AND FOR A SECOND CAUSE OF ACTION

43.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

44.    Even if Barge ING 4727 could be insured with the Club under the Chartered Barges clause, coverage is excluded.

45.    The Club Rules exclude liability "for any loss, damage or expense against which, but for the insurance herein provided, the Member, Co-assured or Affiliate would have been insured under any other existing insurance . . . ."

46.    The Club Rules also exclude "[l]iabilities, costs and expenses which would not have arisen but for the terms of a contract or indemnity entered into by a Member, unless those terms have been expressly approved in writing by the Managers."

47.    Cover by the Club for Barge ING 4727 is excluded because Lafarge's liability for the breakaway of Barge ING 4727 is covered by the MMO Policy.

48.    Cover by the Club for Barge ING 4727 is also excluded because Lafarge did not provide for review or obtain the Club's approval of the Transportation Agreement.

49.    Nonetheless, Lafarge contends that the Club is required to defend and provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727.

50.    The Club maintains that coverage is excluded.

51.    An actual and justiciable controversy has thus arisen between the Club and Lafarge concerning the coverage of Barge ING 4727.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

1.    that this Court declare the rights and liabilities of the parties with respect the American Club's obligations, if any, to defend and/or provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727;

2.    that this Court find and declare that Barge ING 4727 was not entered with or insured by the American Club, and as a result, the Club has no obligation to defend and/or provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727;

3.    that this Court find and declare that, because Lafarge maintained other insurance coverage, the American Club has no obligation to defend and/or provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727;

4.    that this Court find and declare that, because Lafarge failed to submit the Transportation Agreement to and obtain the approval of the American Club, the Club has no

9

obligation to defend and/or provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727;

5.      that this Court award the American Club its costs and disbursements for this action, including attorneys fees; and

6.      that this Court grant the Club such other and further relief as is just and proper.

Dated:      New York, New York
            April 21, 2006

                        THACHER PROFFITT & WOOD LLP


                        By: _John M Woods_____

                        John M. Woods (JW/0697)
                        jwoods@tpw.com
                        Alan F. Kaufman (AK/9114)
                        akaufman@tpw.com
                        Neil T. Bloomfield (NB/0669)
                        nbloomfield@tpw.com

                        Two World Financial Center
                        New York, New York 10281
                        (212) 912-7400

                        *Attorneys for Plaintiff*

**EXHIBIT A**



THE
AMERICAN
CLUB

American Steamship Owners Mutual Protection and Indemnity Association, Inc.
60 Broad Street - 37th Floor,
New York, NY 10004, U.S.A.

Shipowners Claims Bureau, Inc., Manager

# CERTIFICATE OF ENTRY

of the vessel(s) set out herein for account of the Member named hereunder subject to the By-Laws and Rules of the Association from time to time in force and to any special terms and conditions endorsed hereon and/or as may from time to time be circularized. Unless indicated to the contrary herein, the cover evidenced by this Certificate of Entry commences at noon GMT on the date specified below and continues until cover ceases or is terminated in accordance with the said By-Laws and Rules.

## Class I – Protection & Indemnity Insurance

| VESSEL(S) | FLAG | GROSS TONNAGE | COVER TO COMMENCE |
|---|---|---|---|
| As per Schedule | As per Schedule | As per Schedule | 20 February, 2005 **RENEWAL DATE** 20 February, 2006 |
| **MEMBER** | | | |
| LAFARGE NORTH AMERICA INC. | | | |
| SPECIAL TERMS & CONDITIONS AS ATTACHED | | | |

**IMPORTANT**

This Certificate of Entry is evidence only of the contract of indemnity insurance between the above-named Member and the Association and shall not be construed as evidence of any undertaking, financial or otherwise, on the part of the Association to any other party.

If a Member tenders this Certificate as evidence of insurance under any applicable law relating to financial responsibility, or otherwise shows or offers it to any other party as evidence of insurance, such use of this Certificate by the Member is not to be taken as any indication that the Association thereby consents to act as guarantor or to be sued directly in any jurisdiction whatsoever. The Association does not so consent.

The Member named in this Certificate of Entry is liable to pay Mutual Premium as provided for in Rule 4. Furthermore, the Member may become liable under the said Rule 4 to pay Overspill Calls to meet the Association's proportion of any Overspill Claims up to the limit per vessel as provided for in the said Rule 4.

CERTIFICATE NO.:    01729000

NEW YORK:    31 March, 2005    BY:

AUTHORIZED SIGNATURE



CERTIFICATE NO.:    01729000

## SCHEDULE OF VESSELS

| VESSEL NAME | TYPE | FLAG | GROSS TONNAGE |
|---|---|---|---|
| ADELAIDE | Barge (dry) | USA | 8,512 |
| ALEXANDRA | Barge (dry) | USA | 8,512 |
| BARGE JOPPA | Tank Barge | USA | 1,500 |
| BELCRAFT | Barge (dry) | USA | 3,614 |
| CITADEL I | Barge (dry) | USA | 1,500 |
| CITADEL II | Barge (dry) | USA | 1,500 |
| CITADEL III | Barge (dry) | USA | 1,500 |
| CITADEL IV | Barge (dry) | USA | 1,500 |
| FLOATING DOCK JOPPA | Tank Barge | USA | 1,500 |
| G.L. OSTRANDER | Tug/Supply | USA | 198 |
| INTEGRITY | Dirty Oil Tank | USA | 7,557 |
| J.B. FORD | Bulk | USA | 4,368 |
| MAGNOLIA | Tank Barge | USA | 1,734 |
| MARIA T | Barge (dry) | USA | 8,865 |
| MC 65-2 | Barge (dry) | USA | 180 |
| MC 66-2 | Barge (dry) | USA | 180 |
| MPC253 | Barge (dry) | USA | 1,400 |
| MPC256 | Barge (dry) | USA | 1,400 |
| MPC257 | Barge (dry) | USA | 1,400 |
| MPC258 | Barge (dry) | USA | 1,400 |
| MPC259 | Barge (dry) | USA | 1,400 |
| MPC31 | Barge (dry) | USA | 1,800 |
| MPC32 | Barge (dry) | USA | 1,800 |
| MPC33 | Barge (dry) | USA | 2,600 |
| MPC350 | Barge (dry) | USA | 1,200 |
| MPC351 | Barge (dry) | USA | 1,500 |
| MPC352 | Barge (dry) | USA | 1,500 |
| MPC51 | Barge (dry) | USA | 1,526 |
| MPC52 | Barge (dry) | USA | 1,526 |
| MPC53 | Barge (dry) | USA | 1,526 |
| MPC54 | Barge (dry) | USA | 1,526 |
| MPC55 | Barge (dry) | USA | 1,526 |



CERTIFICATE NO.:  01729000

| | | | |
|---|---|---|---|
| MPC66 | Barge (dry) | USA | 1,400 |
| MPC67 | Barge (dry) | USA | 1,400 |
| MPC68 | Barge (dry) | USA | 1,400 |
| MPC69 | Barge (dry) | USA | 1,400 |
| MPC70 | Barge (dry) | USA | 1,400 |
| MPC71 | Barge (dry) | USA | 1,400 |
| MPC72 | Barge (dry) | USA | 1,400 |
| MPC73 | Barge (dry) | USA | 1,400 |
| MPC74 | Barge (dry) | USA | 1,400 |
| MPC75 | Barge (dry) | USA | 1,400 |
| MPC76 | Barge (dry) | USA | 1,400 |
| MPC77 | Barge (dry) | USA | 1,400 |
| MPC78 | Barge (dry) | USA | 1,400 |
| MPC79 | Barge (dry) | USA | 1,400 |
| MPC80 | Barge (dry) | USA | 1,400 |
| MPC81 | Barge (dry) | USA | 1,400 |
| MPC82 | Barge (dry) | USA | 1,400 |
| MPC83 | Barge (dry) | USA | 1,400 |
| MPC84 | Barge (dry) | USA | 1,400 |
| MPC85 | Barge (dry) | USA | 1,400 |
| MPC86 | Barge (dry) | USA | 1,400 |
| MPC87 | Barge (dry) | USA | 1,400 |
| MPC88 | Barge (dry) | USA. | 1,400 |
| MPC89 | Barge (dry) | USA | 1,400 |
| MPC90 | Barge (dry) | USA | 1,400 |
| MPC91 | Barge (dry) | USA | 1,400 |
| MPC92 | Barge (dry) | USA | 1,400 |
| MPC93 | Barge (dry) | USA | 1,400 |
| MPC94 | Barge (dry) | USA | 1,400 |
| MPC95 | Barge (dry) | USA | 1,400 |
| MPC96 | Barge (dry) | USA | 1,400 |
| MPC97 | Barge (dry) | USA | 1,400 |
| NORFOLK | Tug | USA | 499 |
| TRINITY I | Barge (dry) | USA | 400 |
| TRINITY II | Barge (dry) | USA | 1,102 |

CERTIFICATE NO.:    01729000

| MPC61 | Barge (dry) | USA | 1,400 |
| MPC62 | Barge (dry) | USA | 1,400 |
| MPC64 | Barge (dry) | USA | 1,400 |
| MPC63 | Barge (dry) | USA | 1,400 |
| MPC65 | Barge (dry) | USA | 1,400 |

4



CERTIFICATE NO.:    01729000

## SPECIAL TERMS & CONDITIONS

| COLLISION | **FOUR-FOURTHS COLLISION COVERAGE INCLUDED** |
|---|---|
| | Coverage hereunder, pursuant to Rule 2, Section 3.2, includes four-fourths of those liabilities, costs and expenses set out as insured losses in the Collision Clause of the American Institute Hull Clauses (June 2, 1977), or as provided for by such similar terms as may be contained in the insured vessel's hull policies, and which would have been covered under the said Clauses or hull policies but for their exclusion therefrom, and subject always and in any event to each and every other provision of Rule 2, Section 3, in general. |
| EXCLUSIONS | **COVERAGE IN RESPECT OF CARGO AND UNRECOVERABLE G.A. CONTRIBUTIONS EXCLUDED** |
| | Coverage hereunder excludes absolutely all those claims in respect of cargo otherwise recoverable in accordance with Rule 2, Section 7, all those claims for Fines otherwise recoverable under Rule 2, Section 8.1, and all those claims in respect of unrecoverable general average contributions otherwise recoverable in accordance with Rule 2, Section 12. |
| DEDUCTIBLES | US$25,000 from all claims, each accident or occurrence. |
| OTHER CLAUSES | **NO LAID-UP RETURNS** |
| | It is hereby noted and agreed that the provisions of Rule 4, Section 11, do not apply to the coverage evidenced by this Certificate of Entry. |
| MEMBER SPECIFIC CLAUSES | **CHARTERED BARGES** |
| | If Lafarge Corporation et al acquires an insurable interest in any vessel in addition to or in substitution for those set forth herein, through purchase, charter, lease or otherwise, such insurance as is afforded hereunder to any similar vessel shall automatically cover such additional vessel effective from the date and time the Assured acquires an insurable interest in such additional vessel. With respect to a chartered, leased or similarly acquired vessel, the insurance hereunder automatically includes the owner as an additional Assured with waiver of subrogation against the owner, if required, effective from the date and time such vessel is insured hereunder. |
| | The above provision shall not apply to vessels which are chartered under a contract whereby the owner (or Demise Owner) and Charterer agree that the owner (or Demise Owner) shall procure Protection & Indemnity Insurance on the vessel and such insurance shall include the charterer as an Assured. |

5



CERTIFICATE NO.:     01729000

| | The Assured agrees to report the name and gross tonnage of any vessel in which they acquire an insurable interest at the expiration of this policy and pay any additional premium as may be required annually, at expiry at daily pro-rate the annual rates agreed. |
| --- | --- |
| | |

6



CERTIFICATE NO.:     01729000

## PREMIUM(S)

| VESSEL NAME | RISK NUMBER | GT | RATE (USD per GT per annum) | ADVANCE PREMIUM FOR PERIOD (US Dollar) |
|---|---|---|---|---|
| ADELAIDE | 37741 | 8,512 | 1.6128 | 13,728.15 |
| ALEXANDRA | 37742 | 8,512 | 1.6128 | 13,728.15 |
| BARGE JOPPA | 37743 | 1,500 | 1.6128 | 2,419.20 |
| BELCRAFT | 37744 | 3,614 | 1.6128 | 5,828.66 |
| CITADEL I | 37745 | 1,500 | 1.6128 | 2,419.20 |
| CITADEL II | 37746 | 1,500 | 1.6128 | 2,419.20 |
| CITADEL III | 37747 | 1,500 | 1.6128 | 2,419.20 |
| CITADEL IV | 37748 | 1,500 | 1.6128 | 2,419.20 |
| FLOATING DOCK JOPPA | 37749 | 1,500 | 1.6128 | 2,419.20 |
| G.L. OSTRANDER | 37750 | 198 | 94.9772 | 18,805.49 |
| INTEGRITY | 37751 | 7,557 | 1.6128 | 12,187.93 |
| J.B. FORD | 37752 | 4,368 | 1.6128 | 7,044.71 |
| MAGNOLIA | 37753 | 1,734 | 1.6128 | 2,796.60 |
| MARIA T | 37754 | 8,865 | 1.6128 | 14,297.47 |
| MC 65-2 | 37755 | 180 | 13.4400 | 2,419.20 |
| MC 66-2 | 37756 | 180 | 13.4400 | 2,419.20 |
| MPC253 | 37757 | 1,400 | 1.7280 | 2,419.20 |
| MPC256 | 37758 | 1,400 | 1.7280 | 2,419.20 |
| MPC257 | 37759 | 1,400 | 1.7280 | 2,419.20 |
| MPC258 | 37760 | 1,400 | 1.7280 | 2,419.20 |
| MPC259 | 37761 | 1,400 | 1.7280 | 2,419.20 |
| MPC31 | 37762 | 1,800 | 1.3440 | 2,419.20 |
| MPC32 | 37763 | 1,800 | 1.3440 | 2,419.20 |
| MPC33 | 37764 | 2,800 | 0.9466 | 2,461.16 |
| MPC350 | 37765 | 1,200 | 2.0160 | 2,419.20 |
| MPC351 | 37766 | 1,500 | 1.6128 | 2,419.20 |
| MPC352 | 37767 | 1,500 | 1.6128 | 2,419.20 |
| MPC51 | 37768 | 1,526 | 1.6128 | 2,461.13 |
| MPC52 | 37769 | 1,526 | 1.6128 | 2,461.13 |
| MPC53 | 37770 | 1,526 | 1.6128 | 2,461.13 |



CERTIFICATE NO.:    01729000

| | | | | |
|---|---|---|---|---|
| MPC54 | 37771 | 1,526 | 1.6128 | 2,461.13 |
| MPC55 | 37772 | 1,526 | 1.6128 | 2,461.13 |
| MPC66 | 37773 | 1,400 | 1.7280 | 2,419.20 |
| MPC67 | 37774 | 1,400 | 1.7280 | 2,419.20 |
| MPC68 | 37775 | 1,400 | 1.7280 | 2,419.20 |
| MPC69 | 37776 | 1,400 | 1.7280 | 2,419.20 |
| MPC70 | 37777 | 1,400 | 1.7280 | 2,419.20 |
| MPC71 | 37778 | 1,400 | 1.7280 | 2,419.20 |
| MPC72 | 37779 | 1,400 | 1.7280 | 2,419.20 |
| MPC73 | 37780 | 1,400 | 1.7280 | 2,419.20 |
| MPC74 | 37781 | 1,400 | 1.7280 | 2,419.20 |
| MPC75 | 37782 | 1,400 | 1.7280 | 2,419.20 |
| MPC76 | 37783 | 1,400 | 1.7280 | 2,419.20 |
| MPC77 | 37784 | 1,400 | 1.7280 | 2,419.20 |
| MPC78 | 37785 | 1,400 | 1.7280 | 2,419.20 |
| MPC79 | 37786 | 1,400 | 1.7280 | 2,419.20 |
| MPC80 | 37787 | 1,400 | 1.7280 | 2,419.20 |
| MPC81 | 37788 | 1,400 | 1.7280 | 2,419.20 |
| MPC82 | 37789 | 1,400 | 1.7280 | 2,419.20 |
| MPC83 | 37790 | 1,400 | 1.7280 | 2,419.20 |
| MPC84 | 37791 | 1,400 | 1.7280 | 2,419.20 |
| MPC85 | 37792 | 1,400 | 1.7280 | 2,419.20 |
| MPC86 | 37793 | 1,400 | 1.7280 | 2,419.20 |
| MPC87 | 37794 | 1,400 | 1.7280 | 2,419.20 |
| MPC88 | 37795 | 1,400 | 1.7280 | 2,419.20 |
| MPC89 | 37796 | 1,400 | 1.7280 | 2,419.20 |
| MPC90 | 37797 | 1,400 | 1.7280 | 2,419.20 |
| MPC91 | 37798 | 1,400 | 1.7280 | 2,419.20 |
| MPC92 | 37799 | 1,400 | 1.7280 | 2,419.20 |
| MPC93 | 37800 | 1,400 | 1.7280 | 2,419.20 |
| MPC94 | 37801 | 1,400 | 1.7280 | 2,419.20 |
| MPC95 | 37802 | 1,400 | 1.7280 | 2,419.20 |
| MPC96 | 37803 | 1,400 | 1.7280 | 2,419.20 |
| MPC97 | 37804 | 1,400 | 1.7280 | 2,419.20 |
| NORFOLK | 37805 | 499 | 13.5271 | 6,750.02 |



CERTIFICATE NO.:    01729000

| | | | | |
|---|---|---|---|---|
| TRINITY I | | | | |
| TRINITY II | | | | |
| MPC61 | | | | |
| MPC62 | | | | |
| MPC64 | | | | |
| MPC63 | | | | |
| MPC65 | | | | |

**EXHIBIT B**

*Rev. 7/13/04*

## TRANSPORTATION AGREEMENT

**INGRAM**

| | | |
|---|---|---|
| Carrier: INGRAM BARGE COMPANY | Shipper: LAFARGE NORTH AMERICA | |
| 13 Executive Drive, Suite 8 | Contact Address: | Billing Address (if different): |
| Fairview Heights, IL 62208-1342 | 600 SW Jefferson Street, Suite 302 | 2500 Portland Road |
| | Lee's Summit, MO 64063 | Grand Chain, IL  62941 |
| Attn:    J. E. (Gene) Shiver | Attn:   Mr. Jay Darlington | Attn:    Rachael Burnett |
| Sales Manager | Traffic Coordinator Barge | Barge Scheduler |
| Telephone:    618-628-3099 | Telephone:    816-251-2115 | Telephone:     618-543-3902 |
| E-Mail: shiverg@ingrambarge.com | E-Mail: jay.darlington@lafarge-na.com | E-Mail: rachael.burnett@lafarge-na.com |
| Facsimile:    618-628-3494 | Facsimile:    816-347-1884 | Facsimile:    618-543-3959 |
| Carrier's Contract No:    35443 | Shipper's Contract No: | Shipper's Contract No: |
| Carrier's Job No:    15070574 | Shipper's Customer No: | Shipper's Customer No: 10661 |

This Agreement is made as of December 14, 2004 by and between Carrier and Shipper (each as identified above) and is for the transportation of dry cargo by barge under the terms and conditions of Parts I and II as contained in this Agreement. In the event of a conflict, the provisions of Part I shall prevail over those contained in Part II to the extent of such conflict.

### PART I

| | | |
|---|---|---|
| 1. | Loading Date(s): | January 1, 2005 through December 31, 2005 |
| 2. | Equipment: | Fiber-Lift Covered Barges ONLY.  All cover handling expense for the account of Shipper. |
| 3. | Cargo: | Cement |
| 4. | Cargo Value: | $300.00 per net ton or actual invoice value, whichever is less |
| 5. | Number of Net Tons: | Approximately 160,000 net tons.  Refer to Appendix I for projected monthly shipping schedule. |
| 6. | Origin(s): | Joppa, IL (Lafarge)                              OH 953.2 T |
| 7. | Destination(s): | New Orleans, LA (Lafarge-France Road Wharf)    GIWE 8.0 T3 |
| 8. | Base Freight Rate(s): | $12,700 Flat Rate Per Barge |
| 9. | Free Time: | Six days all-purpose to load and unload each barge, including Sundays and holidays that occur within the freetime period.  (Refer to Part II, Section 28) |
| 10. | Demurrage Rate: | $185.00 per barge per day |
| 11. | Minimums: | Not applicable, due to flat rates per barge. |
| 12. | Fuel Protection: | Beginning January 1, 2005, the base freight rate(s) listed herein shall be subject to escalation during the term of this Agreement in the event of an increase in the cost of fuel above $.90 per gallon.  If the actual average cost of fuel to Carrier for the second month immediately preceding the month of shipment rises above the specified cost per gallon, Carrier shall have the right to escalate the freight rate(s) on the first of every month during the term of this Agreement in accordance with the following formula: |

$$[\text{Base Freight Rate} \times 30\% \times (\frac{\text{Actual Fuel Cost} - \text{Fuel Protection Cost}}{\text{Fuel Protection Cost}})] + \text{Base Freight Rate} = \text{Adjusted Freight Rate}$$

| | | |
|---|---|---|
| | | As an example, Carrier's actual fuel cost for the month of November 2004 would determine the January 2005 rate(s). In no event will the adjusted freight rate(s) ever be lower than the base freight rate(s). |
| 13. | Cleaning Allowance: | $800.00 maximum per barge account Carrier (refer to Part II, Section 31) |
| 14. | Special Provisions: | Refer to Part II |

In witness whereof, the parties have executed this Agreement as of the date first written above.

Accepted:

Carrier:   INGRAM BARGE COMPANY                    Shipper: LAFARGE NORTH AMERICA

Signature:                                         Signature:

Carrier's Contract No. 35443                    APPENDIX I                    Carrier's Job No. 15070574

| Projected Monthly Shipping Schedule: | Monthly Breakdown of Projected Volume | | | |
|---|---|---|---|---|
| | January | 19,500 | July | 10,500 |
| | February | 18,000 | August | 9,000 |
| | March | 17,500 | September | 10,500 |
| | April | 9,000 | October | 15,500 |
| | May | 12,000 | November | 19,500 |
| | June | 10,500 | December | 7,500 |

Carrier Representative's Initials: _____          Shipper Representative's Initials: _____

Rev. 9 12-01

 Carrier's Contract No. 35443    PART II    Carrier's Job No. 15070574

15. **Cargo Description:** Prior to loading, Shipper will notify Carrier of the generic name of the cargo to be transported pursuant to this Agreement. In addition, Shipper will, if requested by the Carrier, provide Material Safety Data Sheets (MSDS). Further, the Shipper shall notify the Carrier of the cargo classification under U. S. Coast Guard regulations and any other applicable regulations. In the event of Shipper's improper or incomplete description of the cargo or failure to disclose all necessary information about the cargo which results in any expense, loss, damage, and/or penalty, Shipper agrees to reimburse Carrier for such expense, loss, damage, and/or penalty.

16. **Tonnage:** Wherever used in this Agreement, the term "ton" shall mean a net ton of 2 000 pounds avoirdupois.

17. **Cargo Insurance:** Carrier will, at its own expense, obtain and keep in full force and effect during the term of this Agreement, or any extension thereof, Cargo insurance on the full value of all cargo transported under this Agreement. Carrier may, at its own risk, elect to self-insure the cargo. Cargo is insured up to the value stated in Part I, or the actual value of the cargo, whichever is less. In no case will the Carrier be responsible for any amount exceeding $700 per net ton.

18. **Weights:** Freight charges shall be calculated on the basis of loaded weights at origin. Carrier shall not assume any responsibility to weigh the cargo at origin or destination.

Within 72 hours after completion of loading, Shipper shall submit to Carrier a written report descriptive of the cargo and the weight thereof per barge.

If the actual weight of cargo cannot be ascertained upon completion of loading, estimated weights may be used for billing which shall be adjusted to out-turn weights at destination, if available, and applicable charges determined accordingly. If facilities for determining weight at destination are not available, the barge will be gauged before unloading, at Shipper's expense, and the weight thus ascertained will be used in determining the applicable charges.

Carrier may require proof of scale or gauged weights.

19. **Minimum Weights:** The freight due from Shipper will be based on the actual tons loaded subject to the minimum weights specified in Part I.

However, if the capacity of the barge (or draft if so specified by the Carrier) will not allow the Shipper to load to the minimum level specified, then the charges will be based on the actual tons loaded or the tons that could have been loaded at the specified draft according to Carrier's draft tables, whichever is greater.

20. **Loading Requirements:** Shipper shall load a barge to the draft specified by Carrier. Shipper shall be governed by Carrier's instructions regarding the height of load, the tonnage of the cargo, the draft of the barge, and such other instructions as Carrier may deem necessary for safe transportation where variable waterway conditions and anticipated weather conditions make such precautions desirable. Shipper shall be subject to any demurrage charges that may accrue due to the detention of any barge occasioned by non-compliance with Carrier's loading requirements specified herein. The Shipper shall load the barge so that the cargo is evenly distributed throughout the hopper hold; the Shipper shall not "center load" or "end load" a barge.

21. **Transport of Barges:** A barge loaded with Shipper's cargo will move only at the convenience of the Carrier, and either singly or with one or more other craft. Carrier will have the right to shift or interchange the tow from one to another towing vessel as frequently as it may find it convenient to do so, or to procure towage from any other vessel not owned or operated by the Carrier; to tie off the tow at any point and for any purpose; and to deviate from its route, and visit any port whether or not on said route, and in any order. Carrier is not bound to transport any barges containing Shipper's cargo in time for any particular market.

If, due to operating conditions, it is necessary in the judgment of the Carrier to delay the movement of barges while in transit, Carrier reserves the right to do so. Carrier makes no representation as to the time which will elapse between the acceptance of this Agreement until placement at origin, nor between departure of the barge from origin and arrival of the barge at destination; and under no circumstances shall Carrier be liable for any loss, damage, or expense incurred by Shipper or others by reason of delay.

22. **Inaccessible Points:** Carrier will not place barges for loading, nor pick up loaded barges, when the shipments are destined to ports or points which are inaccessible because of an actual or anticipated, temporary or permanent condition that adversely affects the navigability of a waterway to be traversed by barge between origin and destination. If shipment has been accepted or is re-consigned for transportation to a port or point which subsequently becomes inaccessible because of a condition that adversely affects the navigability of a waterway to be traversed between origin and destination, the Carrier shall be privileged to tender delivery of such shipment at an accessible intermediate point nearest to consigned destination. In which event freight charges shall be adjusted in accordance with the transportation service actually rendered on the basis of the rate applicable for the movement to the original destination. In the determination of the inaccessibility of a destination port, the type and draft of propelling vessel, the type of barge, the loaded draft of barge, and necessity of returning empty barge, among other considerations, shall govern. Carrier's determination in this regard shall be final. In the event that operating conditions, including ice, prevents or delays the delivery of a barge, the Carrier will place the barge at a point short of the point of interruption and the barge will be subject to demurrage.

23. **Accessorial Charges:** Except as otherwise provided, the Carrier will not be liable for the following accessorial charges: ballasting, cleaning, demurrage, dockage, drayage, elevation, loading or unloading of cargo, opening or closing of barge hatch covers, removal or replacement of barge covers, sheddage, stacking or restacking of barge covers, switching tollage, wharfage, or any other terminal expense at either origin or destination.

24. **Shifting:** Rates stated herein will include only one shift of barges into and one shift out of loading and unloading facilities by Carrier at origin and/or destination. Any additional shifting of barges to accommodate loading or unloading will be for Shipper's account.

When Shipper arranges for shifts to be made without expense to Carrier, Shipper shall assume full responsibility for safety of barge and cargo thereof during such shifts, and further, Shipper shall reimburse Carrier in full for any damage or loss which may occur during such movements.

25. **Diversions, Re-Consignments, Holding in Transit, Stop-Offs for Partial Unloads** The cost, terms, and conditions of any agreement for re-consignment, diversion, holding in transit for orders, or partial stop-offs, must be confirmed in writing by all parties prior to Carrier's taking the requested action.

A barge may be diverted, re-consigned, held in transit to await orders, or stopped-off for partial unloads only with the consent of Carrier, which may be withheld for any reason.

Any barge that is stopped to permit a partial discharge will not be allowed any additional free time. All time incurred during a partial stop will be charged at the demurrage rate.

26. **Payment of Freight:** Upon loading, the entire amount of the freight charge will become earned and due and payable to Carrier in cash and without discount, even though the barge or cargo is lost or not lost, damaged or not damaged, in whole or in part, at any stage of the voyage. The Carrier does not have to deliver the Cargo until all freight and demurrage due hereunder have been paid by Shipper. The actual date of loading, not placement date nor requested date, shall govern as to what freight rate shall be invoiced.

Interest at a rate of two percent (2%) per month (or any fraction thereof) or the maximum interest rate allowed by law, shall accrue on any payment obligations hereunder that are past due until such payment obligations are satisfied in full together with said interest. If any agency or attorney is employed to assist in the collection of such payment obligation, then the delinquent party also shall be required to pay such agency/attorney's reasonable fees relating to such collection. Carrier has the right to defer placement of any barge and/or delivery of the cargo if Shipper's payment obligations are past due until such time as all amounts due Carrier are paid in full.

Unless specified elsewhere, and notwithstanding the above, Shipper may be granted credit by Carrier's Credit Manager, in which case the monies owed must be paid by the Shipper within 30 days from the date of the invoice or within the number of days specified by Carrier's Credit Manager. The Carrier's Credit Manager has complete discretion as to whether or not credit is to be extended to Shipper, the amount of credit to be granted to Shipper, and the payment due date from the Shipper, and the form of payment. Shipper is to comply with all reasonable requests for financial information by Carrier's Credit Manager in order to establish Shipper's credit. The Carrier's Credit Manager may change or cancel the extension and amount of credit and the payment due date or the form of the payment at the Credit Manager's sole discretion and at any time.

27. **Lien:** Carrier will have a lien upon all cargo for any freight or demurrage due hereunder, which lien will survive the delivery of such cargo.

28. **Demurrage and Free Time:** The free time to be allowed is to be that which is specified in Part I. No free time will be allowed on empty barges placed upon Shipper's request for placement if, subsequent placement, such order is cancelled.

After the period of free time has expired, the demurrage charges specified under this agreement will be made for each day, including Saturdays, Sundays, and National Holidays, until the barge is released to the Carrier.

Except as otherwise provided, time will be computed for the total period barge is in Shipper's possession for loading or for unloading and will begin as of the first 7:00 a.m. after barge is actually constructively placed for loading or for unloading and will run until Carrier has been notified in writing that barge has completed loading or unloading and is available for pick up. The written release must be received by Carrier by 11:00 a.m. CST (Nashville time) or the barge will not be considered as having been released by 7:00 a.m. In computing time, days will consist of 24 hours running from 7:00 a.m. until the next 7:00 a.m. A fraction of a day will be considered as one day.

Shipper Representative's Initials: ___

Rev. 7 1394

INGRAM    Carrier's Contract No. 35443          PART II          Carrier's Job No. 15070574

When Carrier, for its convenience, places a barge for loading prior to date specified by Shipper time will run from the first 7:00 a.m. of the date specified by Shipper or from 7:00 a.m. of the date when actual loading began, whichever occurs sooner.

Actual placement is made by Carrier when barge is placed for loading or unloading at docks or wharves specified by Shipper or at a nearby fleet selected by Carrier, whichever occurs first.

Except as otherwise provided for herein, if Carrier is prevented from making actual placement by any cause over which it has no control, such barge is subject to constructive placement. Constructive placement will be made by Carrier when actual placement is not possible.

Constructive placement consists of placing or holding a barge at a point of Carrier's or Shipper's choice near the specified actual delivery point. Notice of such placement will be given to Shipper. In making any subsequent placement, no free time in addition to that provided will be allowed by Carrier.

If holidays are excluded from Free Time, the following are the holidays to be recognized:

| New Year's Day | Memorial Day | Independence Day | Labor Day |
|---|---|---|---|
| Easter Sunday | Thanksgiving Day | Christmas Day | |

If the holiday (except for Easter) falls on a Sunday, the following Monday shall be considered as the holiday.

If a barge is on demurrage and the shipper requests a reconsignment, the barge will remain on demurrage, even during transit, until the barge is released back to the Carrier.

In the event that delivery of a barge involves a destination beyond the lake front entrance to Lake Michigan, the barge will be placed in a fleet of Carrier's choosing on the Illinois River Waterway and free time and demurrage shall commence upon placement in that fleet. Adverse weather conditions which delay transit and barge delivery to destinations on Lake Michigan will not be considered Force Majeure events. It is the Shipper's responsibility to notify the loading/unloading terminal of the barge placement in the Illinois River Waterway fleet.

29.  **Fuel Protection:** Unless otherwise addressed in this Agreement, the freight rate shall not be subject to escalation during the term of this Agreement except in the event of an increase in the cost of fuel above the cost per gallon specified in Part I. If the actual average cost of fuel to Carrier for the second month immediately preceding the month of shipment rises above the specified cost per gallon, Carrier shall have the right to escalate the freight rate on the first of every month during the term of this Agreement in accordance with the following formula:

$$(Base\ Rate\ x\ 30\%\ x\ \frac{Actual\ Fuel\ Cost - Fuel\ Protection\ Cost}{Fuel\ Protection\ Cost}) + Base\ Freight\ Rate = Adjusted\ Freight\ Rate$$

As an example, the actual fuel cost for the month of October would determine the December rates. In no event will the adjusted freight rate ever be lower than the base freight rate.

30.  **Ratability:** Unless modified in Part I, Shipper shall ship in approximately equal monthly increments and approximately equal weekly increments within each month. Should the Shipper fail to ship ratably as described above, Carrier has the right to adjust its obligation to provide barges for the remainder of this Agreement. Barges not loaded ratably within a week or within a month cannot be carried forward to the following week or month, unless Carrier agrees to do so. Further, Carrier will not be obligated to supply a number of barges in any one month that is greater than the actual number of barges shipped in the prior months under this Agreement.

31.  **Cleaning:** Carrier shall absorb cleaning costs up to amount specified in Part I to remove cargo left in the hopper by shipper. All cleaning costs above the stipulated allowance are for the account of the Shipper. Shipper shall remove all dunnage, if any, at its sole expense.

If any cargo or debris is spilled or deposited on the exterior of the barge (including working surfaces, such as gunnels, covers, or decks) at either loading and unloading points, Shipper is responsible for all costs associated with cleaning the exterior of the barge.

Carrier may refuse to pick up or move a barge if an abnormal amount of cargo is left in the hopper or if cargo or debris is left or spilled on the barge if, in the Carrier's sole judgment, the cargo or debris left aboard represents a safety hazard to its crew or to other parties who may come in contact with the barge. The Carrier will require the Shipper to clean or remove all abnormal amounts of cargo left on board or to remove the cargo or debris that represents a safety hazard prior to movement. In such case, if the movement of a barge is delayed while the barge is being cleaned by the Shipper, then the Shipper shall be liable to the Carrier for the days consumed in the then applicable demurrage rate. Further, if the Carrier arranges to have a barge cleaned due to abnormal amounts of cargo left in the hopper or if cargo or debris is left or spilled on the barge, the Shipper shall be liable to the Carrier for the days consumed in the then applicable demurrage rate.

32.  **Unloading:** It shall be the obligation of Shipper, or its consignee, to unload and remove the cargo from the barge, including any cargo or debris spilled on the working surfaces, promptly upon arrival of the barge at its destination. If the cargo is not so unloaded and removed, then the Carrier, at its option, shall be entitled to remove, sell or otherwise dispose of the cargo.

33.  **Distribution of Cargo:** Shipper shall be required to distribute cargo in each barge so as to ensure an even draft. If a barge is not loaded to ensure an even draft, Carrier reserves the right to refuse to accept the barge for transport. If Carrier refuses to accept any barge, Shipper must, at its expense, have the cargo redistributed to meet Carrier's requirements. In addition, the barge will be subject to demurrage charges, from the time and date of placement until the barge is accepted for transportation by Carrier.

34.  **Possession of the Barge during Loading/Unloading:** Carrier shall deliver an empty or loaded barge to a loading/unloading facility designated by Shipper for loading or unloading. Shipper shall assume the duty and responsibility for the safety of each barge in its possession. For the purposes of this Agreement, "possession" shall begin when Carrier delivers an empty or loaded barge for loading or unloading to the landing designated by Shipper and shall end when the barge is removed by Carrier or its agent(s). Shipper shall be responsible for the safekeeping of Carrier's barge delivered to a landing regardless of whether Shipper owns or operates the landing. During possession, any barge delivered to a landing designated by Shipper shall be held without charge to Carrier.

35.  **Safe Berth:** Shipper warrants the barge shall have a safe berth of not less than nine (9) feet of draft. The barge shall not be permitted, at any time, to touch bottom while in the Shipper's control.

36.  **Mooring:** Shipper warrants that barges will be safely and adequately moored free of wharfage, dockage, port and harbor charges at the loading and unloading points and that barges will have warning lights properly displayed as required by applicable U.S. Coast Guard and U.S. Army Corps of Engineers regulations and permits. While barges are in the care and custody of Shipper, or its agents, all U.S. Coast Guard and U.S. Army Corps of Engineers regulations will be complied with, and in the event that Carrier should in any manner be held responsible for Shipper's, or its agents acts or omissions in compliance with the mooring requirements herein provided, then Shipper agrees to indemnify and save harmless Carrier from all such responsibility and liability.

37.  **Request for Placement:** Shipper must send Carrier a written request for placement with a specific date for loading and the designated origin for loading. Carrier requires a minimum of 14 days notice for any loading; should Shipper fail to supply 14 days advance notice of a loading, Carrier has the right to adjust its obligation to provide barges for loading.

38.  **Change in Loading Date or Origin:** Any change by the Shipper in the requested loading date or designated origin given to the Carrier which is in excess of five (5) working days prior to the previously requested loading date will be accepted by Carrier without charge. Any change by the Shipper in the requested loading date or origin given to the Carrier less than five (5) working days notice may subject the Shipper to charges (including but not limited to free days may be assessed, additional shifting or fleeting charges may be billed, barge cleaning, or cover handling).

39.  **Acceptance:** Carrier will tender barges which are in a condition suitable for the cargo to be carried. Loading of the barges will constitute Shipper's acceptance of the condition and suitability of the barges for the intended cargo.

40.  **Release:** Carrier shall not be liable for lost profits or other incidental or consequential damages under any circumstances. Nothing contained herein shall render Carrier responsible for the difference in the intum weight and the outturn weight of cargo from barges safely delivered and unloaded.

41.  **Failure to Accept / Failure to Place:** If either Shipper or Carrier, for reasons other than Force Majeure, determines that it will be unable to accept or place barges on the requested Load Date or within the term of this Agreement, it shall be their duty to advise the other party at once whereupon it shall be the other party's duty at once to cancel the unplaced barge or to extend the placement time. In the case of cancellation, the other party shall have the right to buy or sell, as the case may be, the respective freight and the party unable to accept or place shall reimburse the other party for any loss sustained in such purchase or sale provided same is made at the prevailing market price.

42.  **Choice of Law:** This Agreement shall be governed by the laws of the State of Tennessee, both as to interpretation and performance, and all disputes that arise under this Agreement shall be resolved in accordance with Tennessee law.

43.  **General Average:** In the event of accident, danger, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, Carrier is not responsible, by statute, contract, or otherwise, the cargo, Shipper, and the consignee, and other parties having an interest in the cargo, jointly and severally, will contribute in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred in respect of the cargo. General average, if any, will be adjusted, stated, and settled at such port or place in the United States as may be selected by Carrier, and will be settled in accordance with the York/Antwerp Rules of 1974.

Rev. 13/14

(INGRAM)   Carrier's Contract No. 35443          PART II          Carrier's Job No. 15070574

44. **Force Majeure:** Performance under this Contract by Shipper and Carrier shall be excused to the extent such performance is prevented by Force Majeure, provided the party declaring Force Majeure gives written notice of such condition to the other party within seventy-two (72) hours after commencement of the Force Majeure condition. The term "Force Majeure" shall include acts of God or the elements, acts of a public enemy, insurrections, riots, strikes, labor disputes, fires, explosions, floods, accidents of navigation, ice, high or low water, embargoes, acts or orders of civil or military authorities, lock delays or closings, fuel shortages, or other causes beyond the reasonable control of the party declaring Force Majeure. Such excuse from performance shall continue until the Force Majeure ceases to exist. A party declaring Force Majeure shall make reasonable efforts to eliminate or resolve the condition, recognizing, however, that the settlement of any strike or other labor dispute shall be solely within the discretion of that party. A declaration of Force Majeure by Shipper does not excuse payment of demurrage for a barge on demurrage status. When a Force Majeure is declared on a barge with remaining free time, free time shall continue to run, upon expiration of free time the barge will be placed in a demurrage status even if the Force Majeure event continues to exist. Any shortfall in cargo deliveries resulting from force majeure shall not be made up except by mutual consent of the Shipper and the Carrier.

45. **New Taxes:** There will be added to the freight rate the amount of any new or increased Federal, State, or local taxes (except net income taxes) that may hereafter be charged to and paid by Carrier on account of the transportation services rendered hereunder, including the amount of any user charge, tax, or wharfage, port, harbor, or dockage fee imposed, levied, or collected for the use of the inland waterway system or of the locks and dams in said waterway system, wharfs, ports, or the use of the harbors and docks by Carrier while engaged in the transportation services rendered hereunder, or upon fuel used in performing such services.

46. **Subcontracts:** Nothing herein shall prevent Carrier from subcontracting for any of the services provided by Carrier hereunder but Carrier will remain liable to Shipper for the proper performance of all of Carrier's obligations hereunder.

47. **Mitigation:** If all or any part of the cargo is discovered to be damaged while subject to this Agreement, Carrier, in its sole discretion, in order to minimize the damage, may sell the Cargo at public or private sale to the best advantage. In such event, Carrier shall, where practicable, provide Shipper and any known consignee with notice of the proposed sale. The proceeds of any sale made under this section shall be applied by Carrier to the payment of freight, demurrage, storage, and any other charges and the expense of notice, advertisement, sale and other necessary expense of caring for and maintaining the Cargo, and the balance, if any, shall be paid to Shipper or consignee

48. **Claims:** As condition precedent to recovery, claims must be filed in writing with Carrier within nine (9) months of delivery of the Cargo, or, in case of failure to make delivery, then within nine (9) months after a reasonable time for delivery has elapsed. Suits shall be instituted against Carrier only within two (2) years and one (1) day from the day when notice in writing is given by the Carrier to the claimant that the Carrier has disallowed the claim or any part or parts thereof specified in the notice.

49. **Default:** No default of either party in the performance of any of its covenants or obligations hereunder, which, except for this provision, would be the legal basis for rescission or termination of this Contract by the other party hereto, shall give or result in such a right unless and until the party committing such default shall fail to correct the default within thirty (30) days after written notice of such default is given to such defaulting party by the non-defaulting party. Notwithstanding anything in this Contract to the contrary, there shall be no cure period for any payment default and each party shall have each and every right afforded it under law against the defaulting party.

50. **Notices:** All notices, consents, determinations, instructions and communications provided for herein shall be validly given, made or served, if in writing and delivered personally, or by telegram, facsimile, electronic mail, overnight delivery or recognized courier service or sent by registered or certified mail, postage prepaid, to Shipper and Carrier at their respective addresses listed at the beginning of this Contract, or as the parties may otherwise direct in writing. Any notice, consent, determination, instruction, approval, or other communication hereunder shall be deemed given and effective as of the date of delivery in person or by courier, or as set forth on the return receipt or facsimile confirmation.

51. **Independent Contractor:** Nothing contained in this Contract shall be construed as a contract by Shipper for the chartering, hiring or leasing of any barge, towboat or other equipment of Carrier to be provided hereunder; nor shall any of the agents, servants, subcontractors or employees of Carrier be regarded as employees of Shipper, it being understood that Carrier is in all respects an independent contractor and that Shipper shall exercise no control over the operation of any barge, towboat or other equipment of Carrier or over Carrier's agent, servants, subcontractors or employees.

52. **Changes in Operation:** In the event Carrier's operating costs specifically related to the equipment, facilities, supplies, or services to be used or provided by Carrier under this Agreement are increased due to any law, rule, ordinance, regulation, restriction, directive, order, notice, advisory or interpretation, hereafter promulgated by any federal, state, or local authority, or any agency or division thereof, or any industry group advisory thereto, or any court, which is generally applicable to all barge carriers similarly situated, and such increased costs are not reimbursed to Carrier under any other provision of this Agreement, then Shipper shall reimburse Carrier monthly, following receipt of billing for the entire amount of such increase in operating costs that is fairly attributable to the services performed for Shipper under this Agreement.

53. **Miscellaneous:**

   A. **Conflict:** In the event any of the terms of the Shipper's confirmation differ or conflict with any provision of this Agreement, then the terms set forth in this Agreement shall prevail.
   B. **Assignment:** Shipper shall not be permitted to assign or otherwise dispose of all or any part of its rights or obligations hereunder without first obtaining the written consent of Carrier. Such consent shall not unreasonably be withheld, provided that any such permitted assignment or other disposition shall not relieve Shipper of its obligation under this Agreement.
   C. **No Waiver:** The failure of Shipper or Carrier to insist upon strict performance of any of the provisions of this Agreement in one or more instances or the failure of Shipper or Carrier to exercise any of its rights hereunder in one or more instances shall not be construed as a waiver of any such provisions or the relinquishment of any such rights, but the same shall continue and remain in full force and effect.
   D. **Binding Effect:** This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee and shall be binding upon and inure to the benefit of the parties herein, their successors and assigns, subject to the restrictions or assignability herein contained.
   E. **Headings; Terms:** Section headings in the Agreement are included merely for the convenience of reference and shall not be construed as part of the governing terms of this Agreement. The term "barge" herein shall mean both the singular and the plural as intended by the parties depending on the number of barges subject to this Agreement.
   F. **Integration; Execution:** This Agreement sets forth the entire understanding between the parties hereto as to the subject matter and no amendment hereto shall be valid unless made in writing and duly signed by the parties hereto. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original hereof, and all counterparts collectively are to be deemed but one instrument. Whether or not Shipper executes this agreement in the acceptance space provided hereon, loading of a barge shall constitute an acceptance of all the terms and conditions of the Agreement.

Carrier Representative's Initials: _____

Shipper Representative's Initials: _____