**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

THE NORTHERN ASSURANCE COMPANY
OF AMERICA and AMERICAN HOME
ASSURANCE COMPANY,

                        Plaintiffs,

     - against -

LAFARGE NORTH AMERICA, INC. and
AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY
ASSOCIATION, INC.

                        Defendants.

-------------------------------------------------------------X

08 CV 3289 (CSH) (AJP)

**Electronically Filed**

# MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

NICOLETTI HORNIG & SWEENEY
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005-1801
(212) 220-3830

*Attorneys for Plaintiffs*
   *The Northern Assurance Company of America*
   *and American Home Assurance Company*

Of Counsel:
   John A.V. Nicoletti
   Nooshin Namazi
   Guerric S.D.L. Russell

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND ....................................................................................................2

LEGAL ARGUMENT............................................................................................................2

POINT I
THE ATTACHMENT POINT OF THE EXCESS POLICY IS
EXCESS OF THE LIMITS OF BOTH THE CLUB AND THE
MMO PRIMARY POLICIES....................................................................................................2

    A.    The Club Cover Automatically Attached In Connection With Barge ING 4727 .............3

    B.    If Lafarge Failed To Maintain The Club Cover With Respect
        To Barge ING 4727, The Excess Policy Is Still Excess Of The
        Club's Limit As A Self-Insured Retention By Lafarge .....................................................6

POINT II
THE STACKING OF THE POLICIES: THE CLUB POLICY SHOULD
COVER LAFARGE FIRST, FOLLOWED BY THE MMO PRIMARY
POLICY AND THEN THE EXCESS POLICY, RESPECTIVELY .......................................12

    A.    Both Primary Policies Provide Coverage For The Cost Of Lafarge's Defense...............12

    B.    The "Other Insurance" Conflict Between The Club And MMO
        Primary Policies Requires That The Club Policy Pays First ..........................................14

    C.    The Excess Policy Is Only Triggered After The Primary Policies Are Exhausted ........17

POINT III
THE CLUB MAY NOT DECLINE LIABILITY BASED ON THE
EXCLUSION FOR FAILURE TO SEEK APPROVAL OF THE
TRANSPORTATION AGREEMENT .................................................................................19

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

20th Century Foods Pte. v. Home Ins. Co.,
1989 WL 99773 (S.D.N.Y. 1989)................................................................. 11

Advani Enterprises, Inc. v. Underwriters of Lloyds,
140 F.3d 157 (2d Cir. 1998) ....................................................................... 14

Aetna Cas. & Sur. Co. v. National Union Fire Ins. Co. of Pittsburgh, Pa.,
228 A.D.2d 385, 645 N.Y.S.2d 5 (1st Dept. 1996)................................... 15

Ambassador Assoc. v. Corcoran,
541 N.Y.S.2d 715 (Sup. Ct. 1989).................................................... 10, 11

Benton v. Long Mfg. N.C., Inc.,
550 So.2d 859 (La.App.Ct., 2d Cir. 1989)............................................. 7

Bovis Lend Lease Lmb, Inc. v. Great American Ins. Co.,
855 N.Y.S.2d 459 (1st Dept. 2008) ................................................ 17, 18

Brooklyn Clothing Corp. v. Fidelity-Phenix Fire Ins. Co.,
200 N.Y.S. 208 (2d Dept. 1923)............................................................ 5

Buckeye Cellulose Corp. v. Atlantic Mut. Ins. Co.,
643 F.Supp. 1030 (S.D.N.Y. 1986) ...................................................... 11

Federal Ins. Co. v. Kozlowski,
18 A.D.3d 33, 792 N.Y.S.2d 397 (1st Dept. 2005)..................... 12, 14, 20

General Accident Fire & Life Assurance Corp. v. Piazza,
4 N.Y.2d 659, 176 N.Y.S.2d 976 (N.Y. 1958) ................................... 17

General Motors Acceptance Corp. v. Nationwide Ins. Co.,
4 N.Y.3d 451, 796 N.Y.S.2d 2 (N.Y. 2005) ...................................... 18

Great Northern Ins. Co. v. Mount Vernon Fire Ins. Co.,
92 N.Y.2d 682, 685 N.Y.S.2d 411 (N.Y. 1999) ................................ 14

Ins. Corp. of New York v. United States Fire Ins. Co.,
18 Misc.3d 1131(A), 2008 WL 399166 (N.Y. Sup.Ct. 2008) ........... 18, 19

Kipper v. Universal Underwriters Group,
304 A.D.2d 62, 756 N.Y.S.2d 682 (4th Dept. 2003) ......................... 16

Liberty Mutual Ins. Co. v. Ins. Co. of the State of Pennsylvania,
43 A.D.3d 666, 841 N.Y.S.2d 288 (1st Dept. 2007)........................... 18

In re Liquidation of Midland Ins. Co.,
269 A.D.2d 50, 709 N.Y.S.2d 24 (1st Dept. 2000)........................... 18

Luria Bros. & Co., Inc. v. Alliance Assurance Co., Ltd.,
780 F.2d 1082, 1986 A.M.C. 1539 (2d Cir. 1986) ........................... 13

Material Serv. Corp. v. Commonwealth Edison Co.,
  1990 WL 77573, 1990 A.M.C. 2807 (N.D. Ill. 1990) ................................................................ 5

Merritt v. Jefferson Ins. Co.,
  112 Misc.2d 51, 445 N.Y.S.2d 972 (N.Y. Sup. Ct. 1982) ...................................................... 17

Molina v. United States Fire Ins. Co.,
  574 F.2d 1176 (4th Cir. 1978) ............................................................................................... 11

Mord v. New York Indem. Co.,
  214 N.Y.S. 693 (2d Dept. 1926) ............................................................................................... 5

Mosca v. Ford Motor Credit Co.,
  150 A.D.2d 656, 541 N.Y.S.2d 528 (2d Dept. 1989) ............................................................. 16

National Union Fire Ins. Co of Pittsburgh v. Connecticut Indemnity Co.,
  ___ N.Y.S.2d ___, 2008 WL 2342121 (1st Dept. 2008) ........................................................ 18

Nu-Way Environmental, Inc. v. Planet Ins. Co.,
  1997 WL 462010 (S.D.N.Y. 1997) .......................................................................................... 13

Ocean Partners LLC et al. v. North River Insurance Co.,
  546 F.Supp.2d 101 (S.D.N.Y. 2008) ...................................................................................... 19

Pittston Co. v. Allianz Ins. Co.,
  795 F.Supp. 678 (D.N.J. 1992) ................................................................................................ 14

Platex FP, Inc. v. Columbia Casualty Co.,
  622 A.2d 1074 (Del. Super. Ct. 1992) ...................................................................................... 7

Reserve Ins. Co. v. Pisciotta, 30 Cal.3d 800,
  180 Cal.Rptr. 628, 640 P.2d 764 (Cal. 1982) .......................................................................... 7

Rodi Yachts v. National Marine,
  984 F.2d 880, 1993 A.M.C. 913 (7th Cir. 1993) ...................................................................... 5

September 11th Liability Ins. Coverage Cases, In re,
  458 F.Supp.2d 104 (S.D.N.Y. 2006) ........................................................................................ 6

SR International Business Insurance Co., Ltd. v. World Trade Center Properties, LLC,
  445 F.Supp.2d 320 (S.D.N.Y. 2006) ........................................................................................ 5

State Farm Fire and Cas. Co. v. LiMauro,
  65 N.Y.2d 369, 492 N.Y.S.2d 534 (N.Y. 1985) ..................................................................... 18

State Trading Corp. of India, Ltd. v. AssuranceforeningenSkuld,
  921 F.2d 409 (2d Cir. 1990) .................................................................................................... 14

Trustees of Princeton University v. National Union Fire Ins. Co. of Pittsburgh, PA,
  15 Misc.3d 1118(A), 2007 WL 1063870 (N.Y. Sup.Ct. 2007) .............................................. 13

U.S. Underwriters Ins. Co. v. Affordable Housing Found., Inc.,
  256 F.Supp.2d 176 (S.D.N.Y. 2003) .................................................................................. 8, 11

United States Fidelity & Guaranty Co. v. Treadwell Corp.,
  58 F.Supp.2d 77 (S.D.N.Y. 1999) .......................................................................................... 18

United States Fire Insurance Co. v. Charter Financial Group, Inc.,
    851 F.2d 957 (7th Cir. 1988) ............................................................................... 9

Utica Mut. Ins. Co. v. Travelers Ins. Co.,
    213 A.D.2d 983, 624 N.Y.S.2d 485 (4th Dept. 1995) ......................................... 16

Wedtech Corp. v. Federal Ins. Co.,
    740 F.Supp. 214 (S.D.N.Y. 1990) ...................................................................... 13

Wells Fargo Bank v. Cal. Ins. Guar. Ass'n,
    45 Cal. Rptr. 2d 537 (Cal. Ct. App. 1995) ........................................................... 6

Worldcom, Inc. Securities Litigation,
    354 F.Supp.2d 455 (S.D.N.Y. 2005) .................................................... 12, 13, 14

Zurich Insurance Co. v. The Heil Co.,
    815 F.2d 1122 (7th Cir. 1987) ............................................................................ 11

## Other Authorities

15 Couch on Insurance, § 218:5 (3d ed. 2005) ............................................................ 17

2 Barry R. Ostrager and Thomas R. Newman,
    Handbook on Insurance Coverage Disputes (14th ed. 2008)
        §13.01................................................................................................... 6
        §13.02.................................................................................................. 6

http://merriam-webster.com (follow dictionary search hyperlink for word "otherwise") .............. 4

## PRELIMINARY STATEMENT

Plaintiffs The Northern Assurance Company of America and American Home Assurance Company (collectively, the "Excess Underwriters") submit this Memorandum of Law in Support of their Cross-Motion for Summary Judgment.[1]

As a result of the Katrina claims filed against it, Lafarge has incurred rightfully or wrongfully a substantial sum in defense costs and expenses. In turn, Lafarge has sought coverage from two primary insurers, the Club and Mutual Marine Office, Inc. ("MMO") as the authorized representative of New York Marine and General Insurance Company ("NYMAGIC"). Both the Club and MMO primary policies are listed on the Schedule of Underlying Insurance in the Excess Marine Liability Policy ("Excess Policy"). **There has been no finding of liability in the underlying actions and thus, the issue is the extent and the order in which each of the policies (including the Excess Policy) should pay for the cost of defending Lafarge in the underlying actions.** Although MMO disputes Lafarge's unilateral selection of counsel, it has paid $4.6 million of the $5 million limit under its primary policy for undisputed legal fees and expenses. In contrast, the Club has declined liability for its multi-billion dollar primary limit based on three contractual defenses; that Lafarge has no insurance because "Barge ING 4727 was never entered with or insured"; that the Club policy "escapes" if there is other available insurance; and the contract indemnity exclusion.

As will be shown below, regardless of the outcome of the coverage disputes between Lafarge and its primary insurers, **the attachment point of the Excess Policy is excess of both primary limits because: (1) the Club policy is triggered, and thus the Excess Policy is excess**

---

[1] Plaintiffs fully incorporate herein their papers in opposition to Lafarge North America, Inc.'s ("Lafarge") motion to dismiss this action; the moving and reply papers in support of the plaintiffs' motion to consolidate this action with *American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Lafarge North America, Inc.*, 06 CV 3123 (the "Club Action"); and the opposition papers to the motion to stay filed by American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "American Club" or the "Club").

to the available limit of coverage under <u>both</u> scheduled underlying primary policies; or (2) even if coverage does not exist with respect to Barge ING 4727, then the Excess Policy is again excess to the limit of MMO's primary limit <u>and</u> excess of the Club's primary limit as a self-insured retention pursuant to the Maintenance of Underlying Insurance provision in the Excess Policy. Further, the claims in the Katrina litigation(s) against Lafarge arise under common law as third party tort claims and not under the Transportation Agreement for contract indemnity, and therefore the Club may not decline coverage for failure to approve that agreement.

## FACTUAL BACKGROUND

For the sake of efficiency, the Excess Underwriters will not repeat the undisputed facts and instead fully incorporate their Local Civil Rule 56.1 Statement herein. To the extent facts are referenced in this Memorandum of Law, the Excess Underwriters will specifically direct the Court's attention to such facts and the citation to the record in support thereof.

## LEGAL ARGUMENT

## POINT I

### THE ATTACHMENT POINT OF THE EXCESS POLICY IS EXCESS OF THE LIMITS OF BOTH THE CLUB AND THE MMO PRIMARY POLICIES

In its motion to dismiss the Excess Underwriters' Second Cause of Action, Lafarge asserts that, because it had coverage with the MMO primary policy and it maintained its membership in the Club, it met its obligation to maintain "the policy(ies)" listed on the Schedule of Underlying Insurance pursuant to the Maintenance of Underlying Insurance clause in the Excess Policy. *See* Lafarge Mem. of Law to Dismiss at p. 20. As stated previously, MMO's primary cover is not an issue. **However, the Club has declined liability on the basis that its coverage is on a <u>per</u> <u>vessel</u> basis and that Lafarge failed to "report" Barge ING 4727; pleading that:**

> [The Club] is not obligated to defend or provide cover to Lafarge because the Barge ING 4727 *was never insured by the Club*...
>
> * * *
>
> [T]hat this Court find and declare *that Barge ING 4727 was not entered with or insured by the American Club*, and as a result, the Club has no obligation to defend and/or provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727.

*See* Ex. 9 Club Complaint at ¶¶ 1-2 and ¶ 2 in Prayer For Relief (emphasis added).  Further, the Club claims Lafarge is not insured in connection with Barge ING 4727 because it did not have an insurable interest in the barge; and did not acquire the barge in addition to or in substitution for those vessels listed on the schedule of vessels; and its interest was not akin to a purchase, charter or lease; and did not timely "enter" or report the barge.

Although the Club's contractual defenses[2] lack merit (because Barge ING 4727 was an addition to Lafarge's barge fleet and coverage therefore automatically attached, and thus the only requirement was for Lafarge to report the barge to the Club – post loss); nevertheless, the Excess Policy requires that Lafarge <u>shall</u> maintain not just some but "<u>the policy(ies)</u>" identified in the Schedule of Underlying Insurance.  Lafarge's failure, inadvertent or otherwise, to comply with the above condition, does not negate Lafarge's right of recovery under the Excess Policy, but delays collection thereunder until the amount of the multi-billon dollar "gap in coverage," if any, is satisfied as a self-insured retention.

## A.    The Club Cover Automatically Attached In Connection With Barge ING 4727

Lafarge has been a member of the American Club since 1999.  Upon becoming a member of the Club, Lafarge received a Certificate of Entry which in addition to incorporating the Club

---

[2] It is important to note that the Club does not dispute the covered nature of the claim, *i.e.* there is no dispute that the underlying claims asserted against Lafarge fall within the scope of the P&I policy's coverage.  *See* discussion *infra* POINT I A.  Rather, the Club's defenses are strictly contractual in nature, *i.e.* the Club claims Lafarge failed to satisfy a condition precedent and subsequent to attachment of the Club cover.

rules, also contains certain additional Member-Specific "SPECIAL TERMS AND CONDITIONS," including the following:

> CHARTERED BARGES.
>
> > If Lafarge Corporation et al <u>acquires an insurable interest in any vessel in addition to or in substitution for those set forth herein, through purchase, charter, lease or otherwise</u>, such insurance as is afforded hereunder to any similar vessel shall <u>automatically</u> cover such additional vessel effective from the date and time the Assured acquires an insurable interest in such additional vessel. With respect to a chartered, leased or similarly acquired vessel, the insurance hereunder automatically includes the owner as an additional Assured with waiver of subrogation against the owner, if required, effective from the date and time such vessel is insured hereunder.
> >
> > \* \* \*
> >
> > The Assured agrees to <u>report</u> the name and gross tonnage of any vessel in which they acquire an insurable interest at the expiration of this policy and pay any additional premium as may be required annually, at expiry at daily pro-rate the annual rates agreed.

*See* Ex. 7 Certificate of Entry (emphasis added).

Pursuant to this clause, coverage "automatically" attaches upon Lafarge acquiring "an insurable interest in any vessel . . . through purchase, charter, lease <u>or</u> **otherwise**."[3] The Club conveniently omits any mention of the word "*otherwise*," and instead asserts that insurable interest must be acquired <u>solely</u> through a purchase, charter, or lease. This is clearly contradicted by the plain language of the Certificate of Entry.

Here, the Transportation Agreement by and between Lafarge and Ingram Barge Company ("Ingram"), at Clauses 34 and 36, allocated to Lafarge "the duty and responsibility for the safety" of the barge. See Ex. 8 Transportation Agreement. Therefore, when Lafarge had care, custody, and control of Barge ING 4727, it satisfied the condition precedent for automatic attachment of insurance by this acquired insurable interest in Barge ING 4727, as either bailee or

---

[3] The dictionary definition of the word "otherwise" is "anything else." *See* http://merriam-webster.com (follow dictionary search hyperlink for word "otherwise").

wharfinger. *See e.g. Rodi Yachts v. National Marine*, 984 F.2d 880, 1993 A.M.C. 913 (7th Cir. 1993) (barge broke from moorings and drifted downstream striking other vessels; dock owner liable as either bailee or wharfinger); *Material Serv. Corp. v. Commonwealth Edison Co.*, 1990 WL 77573, 1990 A.M.C. 2807 (N.D. Ill. 1990) (Transportation Agreement contained a safe berth clause; receiver liable as bailee for breakaway barges drifting downstream); *Mord v. New York Indem. Co.*, 214 N.Y.S. 693, 694-95 (2d Dept. 1926), *aff'd*, 244 N.Y. 589 (N.Y. 1927); *Brooklyn Clothing Corp. v. Fidelity-Phenix Fire Ins. Co.*, 200 N.Y.S. 208, 210 (2d Dept. 1923); *SR International Business Insurance Co., Ltd. v. World Trade Center Properties, LLC*, 445 F.Supp.2d 320, 331 (S.D.N.Y. 2006).

Contrary to the Club's contention, *see* the Club's Mem. of Law to Dismiss at p. 4, the Club's Certificate of Entry by using the word "otherwise" expanded the scope of available coverage beyond the traditional P&I cover which is typically limited to an insured's status as an "owner" or "operator" of a vessel, to include any other arrangement by which Lafarge obtains an insurable interest, including as a wharfinger or common law bailee. Thus, there is an overlap of coverages by and between the MMO's primary marine liability policy and the Club's P&I insurance. This is indeed evidenced by Lafarge's own concurrent pursuit of coverage under both MMO's Marine Liabilities policy and the Club's P&I policy.

**Having established the initial, automatic attachment of insurance for Barge ING 4727, the Certificate of Entry, however, also contains a condition subsequent to maintaining that coverage, which is that Lafarge must "report" the subject barge to the Club at the expiration of the policy. Lafarge claims it met that condition subsequent, while the Club disputes it. Either Lafarge reported the barge and met the condition subsequent,**

5

which means it maintained the Club's coverage for the barge, or, it failed to maintain the Club cover thus resulting in the breach of the Maintenance of Underlying Insurance clause.

**B.      If Lafarge Failed To Maintain The Club Cover With Respect To Barge ING 4727, The Excess Policy Is Still Excess Of The Club's Limit As A Self-Insured Retention By Lafarge**

In its motion to dismiss the Excess Underwriters' Complaint, Lafarge completely ignores both the Maintenance of Underlying Insurance clause and the Schedule of Underlying Insurance in the Excess Policy, and focuses exclusively on the Ultimate Net Loss provision, to suggest that the Excess Policy is ambiguous. Lafarge therefore contends that if it is uninsured by the Club, the Excess Policy should drop down to fill the multi-billion dollar gap in coverage. *See* Lafarge Mem. of Law to Dismiss at p. 21. This assertion is belied by the policy language and the law.

As a general principle, excess insurance "means insurance that, by its terms, provides coverage 'only after a predetermined amount of primary coverage is exhausted.'" 2 Barry R. Ostrager and Thomas R. Newman, *Handbook on Insurance Coverage Disputes* §13.01 (14th ed. 2008)(internal citation omitted); *see also September 11th Liability Ins. Coverage Cases, In re,* 458 F.Supp.2d 104, 104 (S.D.N.Y. 2006) ("Excess, or secondary insurance is coverage that attaches only after a predetermined amount of underlying primary insurance has been exhausted."); *Wells Fargo Bank v. Cal. Ins. Guar. Ass'n,* 45 Cal. Rptr. 2d 537, 539, fn.2 (Cal. Ct. App. 1995). In other words, while an Excess Policy increases the *amount* of coverage available to compensate for a loss, it does not increase the *scope* of coverage.

The typical indicia or provisions which distinguish a true excess policy from a primary policy are the Maintenance of Underlying Insurance clause and the Schedule of Underlying Insurance. *See e.g.* 2 Barry R. Ostrager and Thomas R. Newman, *Handbook on Insurance Coverage Disputes* §13.02 (14th ed. 2008) ("Excess insurance policies usually contain a

provision requiring the Insured to maintain specified levels of underlying insurance.")(internal

citations omitted); *see also Platex FP, Inc. v. Columbia Casualty Co.,* 622 A.2d 1074, 1085 (Del.

Super. Ct. 1992)(the court found that the Maintenance of Underlying Insurance clause was a

"condition meant to obligate the Insured to maintain its underlying insurance."  Thus, the

maintenance clause was not intended to expand the Insured's coverage or force the excess

insurance to drop down.); *Reserve Ins. Co. v. Pisciotta,* 30 Cal.3d 800, 180 Cal.Rptr. 628, 640

P.2d 764 (Cal. 1982)(where the Excess Policy contained a Maintenance of Underlying Insurance

clause [similar to the Excess Underwriters' Policy herein], the court held that the importance of

the maintenance clause was that the excess insurer would not allow the Insured to expand the

scope of the excess insurers' coverage and force a drop down in the event of the Insured

breaching the warranty to comply with the maintenance clause.)  Other courts have considered

an Excess Policy's maintenance clause:

> The maintenance clause [] provides that the insured's failure to
> maintain the required underlying insurance – resulting in a breach
> of the maintenance clause – will cause [the excess insurer] to be
> liable only to the extent it would have been had the insured
> complied with the maintenance clause … We conclude that the
> clear and unambiguous import of the policy language is that the
> insured [must maintain the specified underlying insurance].

*Benton v. Long Mfg. N.C., Inc.,* 550 So.2d 859, 862 (La.App.Ct., 2d Cir. 1989).

The Excess Policy in this case contains both a Maintenance of Underlying Insurance

clause and a Schedule of Underlying Insurance and as such is a true Excess Policy:

MAINTENANCE OF UNDERLYING INSURANCE:

A)      It is a condition of this policy that the Section(s) or
        Policy(ies) referred to below in the "Schedule of
        Underlying Insurance" shall be maintained in full effect
        during the currency of this insurance except for any
        reduction of the aggregate limit(s) contained therein solely

by payment of claims in respect of accidents and/or occurrences, occurring during the term of this Policy.

B) Inadvertent failure of the Assured to comply with Paragraph A above or inadvertent failure to notify this Company of any changes in the Underlying Insurances shall not prejudice the Assured's rights of recovery under this Policy, <u>but in the event of such failure, this Company to be liable only to the same extent as they would have been had the Assured complied with the said condition.</u>

*See* Ex. 4 Excess Policy (emphasis added). The Excess Policy's Schedule of Underlying Insurance provides in relevant part:

### EXCESS MARINE LIABILITIES

### SCHEDULE OF UNDERLYING INSURANCE

| Locations, Vessels and Applicable Marine Interests | Company (Participation) | Underlying Limits and Coverage | |
|---|---|---|---|
| All As Per: | | | |
| 1. Primary Marine Liabilities | MOAC – 50% MMO – 50% | US$ 5,000,000 | Landing Owners and Stevedore's Legal Liability |
| | | US$ 5,000,000 | Charterer's Legal Liability |
| | | US$ 5,000,000 | Combined Occ. Aggregate |
| 2. P&I Club Placements | | * * * | |
| B. Lafarge North America Inc. | American Steamship Owners Mutual Protection & Indemnity Association, Inc. | US$ Per Club Rules | Protection & Indemnity (Including 4/4ths Collision Liability |

*See* Ex. 4 Excess Policy.

The Excess Policy's Maintenance of Underlying Insurance clause must be considered together with the Schedule of Underlying Insurance. *See U.S. Underwriters Ins. Co. v. Affordable Housing Found., Inc.,* 256 F.Supp.2d 176, 181 (S.D.N.Y. 2003). For instance, both the MMO primary Marine Liabilities policy and the Club's P&I policy (which are the <u>only</u>

primary policies at issue with regard to Lafarge's claim) are specifically identified on the Schedule of Underlying Insurance as primary policies, identifying the nature of the risk, the insuring primary company, and the primary limit of coverage per the specific policy. As such and consistent with other Courts' interpretation, *supra*, the language is clear. It is a condition of the Excess Policy that Lafarge <u>shall</u> maintain not just some but "<u>the policy(ies)</u>" identified in the Schedule of Underlying Insurance. **Lafarge's failure, inadvertent or otherwise, to comply with the above condition, does not negate Lafarge's right of recovery under the Excess Policy, but delays collection thereunder until the amount of the multi-billon dollar "gap in coverage," if any, is satisfied as a self-insured retention.**

In *United States Fire Insurance Co. v. Charter Financial Group, Inc.,* for instance, the excess insurer argued that an insured's "failure to list [a named partnership as a named insured] on the primary policy constituted a violation of a duty to 'maintain' that policy in force." *United States Fire Insurance Co. v. Charter Financial Group, Inc.,* 851 F.2d 957, 960 (7th Cir. 1988). The insured argued to the contrary that insurance was in full effect for other members of the partnership. The court analyzed the Maintenance of Underlying Insurance clause of the Excess Policy, and determined that "it seems clear that the purpose of the maintenance clause is to prevent the insureds from rendering the excess insurer liable as a primary insurer simply by failing to acquire or pay premiums on the underlying policy." *Id.* at 963. Thus, the court "agreed ... that the intent of the parties upon entering into the contract provision [Maintenance of Underlying Insurance] was to achieve excess liability coverage above the threshold level of the face value of the [schedule of underlying insurance] policies." *Id.* (citations omitted).

Here, in like manner as in *United States Fire*, if Lafarge failed to maintain the cover with respect to Barge ING 4727 by its inadvertent or intentional failure to "report" the barge to the

Club post loss, resulting in a multi-billion dollar gap in underlying insurance coverage, then such failure to maintain the underlying insurance (the Club cover), results in a self-insured retention for Lafarge.

Moreover, Lafarge's reliance on the case of *Ambassador Assoc. v. Corcoran,* 541 N.Y.S.2d 715, 717 (Sup. Ct. 1989), *aff'd,* 562 N.Y.S.2d 507 (1st Dept. 1990), *aff'd,* 589 N.E.2d 1258 (N.Y. 1992), is misplaced. *Ambassador* involved a dispute over whether a second layer excess insurer should drop down due to the first excess layer's insolvency. *Id.* 708. The insured in *Ambassador* argued that the word "recoveries" and the phrase "other valid and collectible insurance" in the definition of the Ultimate Net Loss were ambiguous which would in effect create a drop down by the excess carrier. In other words, the insured argued that because the first layer excess insurer was insolvent, the underlying insurance was no longer valid and collectible or recoverable. The trial court rejected the ambiguity pointing to language in the Ultimate Net Loss clause which referred to amounts "in excess of the underlying insurance." *Id.* at 709. Moreover, the Court cited to the previous decisions under New York law, wherein Courts have held that "insolvency and/or unidentifiability [of a primary insurance carrier] do not create liability on the part of the excess carrier." *Id.* at 710 (internal citations omitted):

> The excess insurer first becomes liable when the limits of the underlying insurance have been exceeded; its coverage is only activated when the loss exceeds the amount specified in the underlying policies (see *American Re-Ins. Co. v. SGB Universal Builders Supply, Inc.,* 141 Misc.2d 375, 532 N.Y.S.2d 712 [Sup.Ct.N.Y.Co. 1988]). Were the courts to impose upon excess insurers the risk of an underlying insurer's insolvency, it would, in effect, "transmogrify the policy into one guaranteeing the solvency of whatever primary insurer the insured might choose (*Continental Marble & Granite Co. v. Canal Ins. Co.,* 785 F.2d 1258, 1259 [5th Cir. 1986]).

*Id.*  **Other Courts, citing the Maintenance Clause, have similarly rejected drop down of an Excess Policy in the event of insolvency of a primary insurer.** *See e.g. Molina v. United States Fire Ins. Co.,* **574 F.2d 1176, 1178 (4th Cir. 1978);** *Zurich Insurance Co. v. The Heil Co.,* **815 F.2d 1122, 1125 (7th Cir. 1987).** Even more to the point, the policy in *Ambassador* also contained a Maintenance of Underlying Insurance clause and the dissent (in the Court of Appeals) highlighted the fact that "it was the policy's maintenance clause – not its insuring clause – which was intended to protect [the excess insurer] against having to drop down under ordinary circumstances. The maintenance clause required the insured to maintain the 'limit' of the underlying insurance policy in effect." *Ambassador,* 79 N.Y.2d 871 at 876.

As a final point, if the clause is found to be ambiguous, any ambiguity must be construed against the drafter, Lafarge (the policy is a Marsh/Willis form). [4]   Further, Lafarge's interpretation would improperly render both the maintenance clause and the schedule of underlying insurance a nullity, which is against the accepted rules of contract interpretation. *See e.g. U.S. Underwriters,* 256 F.Supp.2d at 181.  Also, the Club policy and the MMO primary policy cover all existing claims in the Katrina litigations, and are the only primary policies Lafarge has claimed provide coverage.  Thus, Lafarge's hypothetical suggestion of other theories of recovery outside of these policies which allegedly may create a drop down of the Excess Policy is a red herring.  Even if these additional hypothetical claim theories existed, it does not effect the duty to pay defense costs and expenses. *See infra* POINT II.  Certainly, Lafarge's drop down interpretation of the Excess Policy would allow it to receive far more than the benefit it bargained for, in that it could not have been within the contemplation of the parties that if

---

[4] *See 20th Century Foods Pte. v. Home Ins. Co.,* 1989 WL 99773, at *13 (S.D.N.Y. 1989); *see also Buckeye Cellulose Corp. v. Atlantic Mut. Ins. Co.,* 643 F.Supp. 1030, 1038 (S.D.N.Y. 1986).

Lafarge failed to maintain a Scheduled Underlying Insurance that its liability under that primary policy would be covered free of charge under the Excess Policy.

## POINT II

### THE STACKING OF THE POLICIES: THE CLUB POLICY SHOULD COVER LAFARGE FIRST, FOLLOWED BY THE MMO PRIMARY POLICY AND THEN THE EXCESS POLICY, RESPECTIVELY

Lafarge and the Club seek to dismiss the Excess Underwriters' Fourth Cause of Action on the ground (but without citing any legal authority in support) that the Excess Policy should provide coverage for its defense costs upon the exhaustion of the MMO primary policy, regardless of whether the Club policy owes coverage. *See* Lafarge and Club Mem. of Law to Dismiss 24-25, 4-5. Both Lafarge's and the Club's contentions lack merit as a matter of law.

**A.    Both Primary Policies Provide Coverage For The Cost Of Lafarge's Defense**

Putting aside the fact that the Club cover automatically attached and should cover Lafarge, *see* POINT I *supra*, when it comes to payment of defense costs, like the duty to defend, the duty to pay or reimburse is broader than the duty to indemnify. *See Worldcom, Inc. Securities Litigation*, 354 F.Supp.2d 455, 464 (S.D.N.Y. 2005)("[t]he duty of an insurer to pay an insured's defense costs 'is distinct from and broader than its duty to indemnify'"); *Federal Ins. Co. v. Kozlowski*, 18 A.D.3d 33, 41, 792 N.Y.S.2d 397 (1st Dept. 2005). Thus, where an insurer agrees to cover defense costs, like the Club and MMO policies, the duty to pay is triggered whenever a complaint against the insured alleges claims that may be covered under the insurer's policy. *See Worldcom*, 354 F.Supp.2d at 464; *Federal Ins.*, 18 A.D.3d at 41, 792 N.Y.S.2d 397. To this extent, "any doubts about coverage are resolved in the insured's favor." *Id.*

MMO does not dispute that its primary policy has an obligation to pay for Lafarge's defense costs. This is evident by the fact that MMO has almost paid its full $5 million limit for

undisputed defense costs and expenses. In contrast, the Club has refused to pay Lafarge's defense costs and expenses. The Club policy states the following regarding payment of defense costs and expenses:

> Section 16        SUE AND LABOR AND LEGAL COSTS
>
> Legal costs and expenses relating to any liabilities, costs or expenses against which the Member is insured by the Association, but only to the extent that such legal costs and expenses have been incurred with the prior approval of the Managers in writing or to the extent and on such conditions as the Directors in their sole discretion may determine. *See* Ex. 6 Club Rules.[5]

Where, as here, the policy is silent as to the timing of reimbursement and states that defense costs are paid as they are "<u>incurred</u>", the insurer has a duty to contemporaneously pay because defense costs are "incurred" as the insured is billed by defense counsel. *See Trustees of Princeton University v. National Union Fire Ins. Co. of Pittsburgh, PA*, 15 Misc.3d 1118(A), 2007 WL 1063870, *5 (N.Y. Sup.Ct. 2007)("The insurer's duty to pay defense costs arises when the insured incurs the expenses."); *Worldcom*, 354 F.Supp.2d at 464; *Nu-Way Environmental, Inc. v. Planet Ins. Co.*, 1997 WL 462010 at *2 (S.D.N.Y. 1997)(in an indemnity policy, "where the insurance policy does not impose a duty to defend, provides for payment of defense costs, and is silent as to the timing of payment of such costs, the insurer has a duty of payment of defense costs"); *Wedtech Corp. v. Federal Ins. Co.*, 740 F.Supp. 214, 221 (S.D.N.Y. 1990).

**Moreover, an insurer may not avoid its duty to contemporaneously pay or reimburse defense costs as they are incurred merely because coverage has been disputed.** *See Trustees of Princeton University*, **15 Misc.3d 1118(A), 2007 WL 1063870 at \*5** ("where coverage is disputed, insurers are required to make contemporaneous interim advances of

---

[5] Once an insurer wrongfully declines coverage, that insurer waives any consent provision to the payment of defense costs. *Luria Bros. & Co., Inc. v. Alliance Assurance Co., Ltd.*, 780 F.2d 1082, 1092, 1986 A.M.C. 1539 (2d Cir. 1986)(holding that insured had no need to obtain approval for legal expenditures where insurer disclaimed all liability despite the fact that policy required prior consent).

defense expenses subject to recoupment in the event it is ultimately determined the Policy does not cover the claim"); *Worldcom*, 354 F.Supp.2d 455 (insurer was obligated to contemporaneously reimburse defense costs as they are incurred despite claim by insurer that policy should be rescinded); *Federal Ins.*, 18 A.D.3d at 40-41, 792 N.Y.S. 397 (insurer was required to reimburse insured's defense costs as they are incurred despite pending declaratory judgment action where insurer sought a declaration that claim against insured fell within policy exclusion).

Section 16 of the Club policy unambiguously provides coverage for all legal costs and expenses "incurred" by Lafarge. In this regard, the Club has a duty to contemporaneously pay or reimburse Lafarge as the defense costs are incurred because the Club policy does not set forth any conditions concerning the timing of payment. There is no doubt that Lafarge has already incurred and will continue to incur legal costs and expenses related to its defense of the Katrina claims. **Although the Club seeks to avoid its indemnity obligations regarding these Katrina claims because of certain technical defenses (which are discussed, *supra*, POINT I), Lafarge need not wait for the conclusion of the Club's declaratory judgment action before it is entitled to reimbursement of these costs.**

**B.    The "Other Insurance" Conflict Between The Club And MMO Primary Policies Requires That The Club Policy Pays First**

Because both primary policies have a concurrent duty to reimburse Lafarge for its defense costs, the obligations of the American Club and MMO are controlled by their "other insurance" clauses.[6] *See Great Northern Ins. Co. v. Mount Vernon Fire Ins. Co.*, 92 N.Y.2d 682,

---

[6] The interpretation of the policies' "other insurance" clauses should be governed by the laws of the State of New York. A federal court sitting in admiralty will apply the federal choice of law analysis to determine the governing state law. *See e.g. Pittston Co. v. Allianz Ins. Co.*, 795 F.Supp. 678, 689 (D.N.J. 1992); *State Trading Corp. of India, Ltd. v. AssuranceforeningenSkuld*, 921 F.2d 409 (2d Cir. 1990); *Advani Enterprises, Inc. v. Underwriters of Lloyds*, 140 F.3d 157, 162 (2d Cir. 1998). It is undisputed that the Court's admiralty jurisdiction is sustained by reason of

686-87, 685 N.Y.S.2d 411 (N.Y. 1999)("[w]hen an insured has more than one potentially applicable policy for a claim, courts determine the insurer's obligations to the insured by applying a body of law developed to resolve 'other insurance' disputes"); *Aetna Cas. & Sur. Co. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 228 A.D.2d 385, 386-87, 645 N.Y.S.2d 5 (1st Dept. 1996)("[t]he allocation of the payment of damages among concurrent insurers whose coverages are to be applied to the loss on the same basis is governed by the respective 'other insurance' clauses in the policies, if any, and, where, two or more such policies provide for contribution by equal shares, the concurrent insurers subject to those clauses are obligated to contribute equally to the defense or indemnity of their mutual insured").

The Club Rules include an escape "other insurance" clause, which states:

> 34. The Association shall not be liable for any loss, damage or expense against which, but for the insurance herein provided, the Member, Co-assured or Affiliate would have been insured under any other existing insurance, except as set forth above in Rule 1.4.33; nor shall the Association provide prorated or allocated cover on the basis of double insurance or otherwise, except as set forth above in Rule 1.4.33; nor will this insurance replace any other insurance where (for whatever reason) that other insurance does not or is not able to respond to a claim thereunder. *See* Ex. 1 Complaint ¶ 36; Ex. 3 Club Answer ¶ 7.

The "other insurance" clause in the MMO primary policy is an excess clause:

> 14. OTHER INSURANCE
> Except for insurance carried by the Assured specifically as excess over and above the amount(s) recoverable hereunder, this Company shall not be liable for any loss, damage,

---

the policies being marine insurance contracts. In addition, the Club Rules contain an express Choice of Law provision:

> Applicable Law
> 45. These Rules and any contract of insurance between the Association and a Member shall be governed by and construed in accordance with the law of the State of New York. *See* Ex. 6 Club Rules.

In light of the Club policy's choice of law clause and the contacts the policies have with the State of New York, in the absence of established maritime law, New York law should apply.

> liability or expense which may be recoverable under any
> other insurance arranged by the Assured, arranged by
> others for the Assured's account or otherwise available to
> the Assured, except as excess over and above the amount(s)
> recoverable thereunder. *See* Ex. 1 Complaint ¶ 22; Ex. 2
> Lafarge Answer ¶ 22.

One of the reasons the Club has denied coverage is based on the "escape" clause. *See*

Ex. 9 Club Complaint at ¶¶ 45, 49-50. However, when there is a conflict between an "escape"

clause and an "excess" clause, under New York law, the policy with the "escape" clause

provides primary coverage for the loss. *See Kipper v. Universal Underwriters Group*, 304

A.D.2d 62, 65, 756 N.Y.S.2d 682 (4th Dept. 2003) ("[i]n cases in which one insurance policy has

a no liability clause and the other insurance policy has an excess clause, the general rule is that

the no liability clause is not given effect"); *Utica Mut. Ins. Co. v. Travelers Ins. Co.*, 213 A.D.2d

983, 984, 624 N.Y.S.2d 485 (4th Dept. 1995) ("[w]hen an excess clause and a nonliability clause

conflict, the nonliability clause is not given effect"); *Mosca v. Ford Motor Credit Co.*, 150

A.D.2d 656, 541 N.Y.S.2d 528, 530 (2d Dept. 1989) ("[w]here one of the policies contains an

excess insurance clause . . . and the other contains a nonliabiltiy clause . . . liability will be

imposed on the insurer issuing the policy containing the nonliability clause"). The rationale for

this rule is that the policy containing the "excess" clause does not constitute "other available

insurance" within the meaning of the "escape" clause. *See Kipper*, 304 A.D.2d at 65, 756

N.Y.S.2d 682; *Utica*, 213 A.D.2d at 984, 624 N.Y.S.2d 485.

**Thus, where both primary policies are triggered, the "escape" clause in the Club**

**policy is not enforced. Rather, the "excess" clause in the MMO primary policy will apply.**

**Under these circumstances, the Club policy is required to pay Lafarge's defense costs in the**

**first instance. Once the Club policy is exhausted, the MMO primary policy must go next.**

**C.    The Excess Policy Is Only Triggered After The Primary Policies Are Exhausted**

Both Lafarge and the Club contend (without citing to any legal authority) that payment under the Excess Policy is triggered upon the exhaustion of only one of the primary policies. *See* Lafarge Mem. of Law to Dismiss at pp. 24-25; Club Mem. of Law to Dismiss at pp. 4-5.  In other words, they contend that once the MMO's policy limit is exhausted, the Excess Policy is triggered.  This position is plainly wrong and belied by the case law.

Unlike the Club and MMO primary policies, the Excess Policy provides true excess coverage for, among other things, Lafarge's defense costs. *See supra* POINT I.  To the extent that the Excess Policy also provides coverage for Lafarge's defense costs, however, this does not create an "other insurance" issue between the Excess Policy and the primary policies. *See Bovis Lend Lease Lmb, Inc. v. Great American Ins. Co.*, 855 N.Y.S.2d 459, 467-68 (1st Dept. 2008)(true excess policy would only trigger after primary coverage was exhausted regardless of excess "other insurance" clause in primary policy); *General Accident Fire & Life Assurance Corp. v. Piazza*, 4 N.Y.2d 659, 669, 176 N.Y.S.2d 976 (N.Y. 1958)(because the excess policy is expressly stated to be excess, it will be required to contribute to the indemnity, if any, only after the limits of the primary policy are consumed, notwithstanding a standard "other insurance" clause in the primary policy); *Merritt v. Jefferson Ins. Co.*, 112 Misc.2d 51, 52, 445 N.Y.S.2d 972 (N.Y. Sup. Ct. 1982)(excess insurance, procured at a substantially reduced rate, cannot be used to determine the "triggering" of co-insurance provisions); 15 *Couch on Insurance*, § 218:5 (3d ed. 2005).[7]

---

[7] In any event, even if the excess clause in the MMO primary policy brought its coverage to the same level as the Excess Policy, which is denied, the Excess Policy's "other insurance" clause provides that it would still be excess over the MMO policy.  The "other insurance" clause in the Excess Policy provides as follows:

> 7.    OTHER INSURANCE
> If other valid and collectible insurance with any other Insurer is available to the Assured covering a loss also covered by this Policy, other than insurance that is

**Instead, it is well settled that policies providing true excess coverage, like the Excess Policy, are not required to contribute to a loss until all primary policies owing coverage have been exhausted.** *See National Union Fire Ins. Co of Pittsburgh v. Connecticut Indemnity Co.*, ___ N.Y.S.2d ___, 2008 WL 2342121 (1st Dept. 2008)(primary policies must be exhausted before excess coverage can apply); *Bovis*, 855 N.Y.S.2d at 471-72 (holding that true excess policy will only be triggered upon the exhaustion of the primary policies); *Ins. Corp. of New York v. United States Fire Ins. Co.*, 18 Misc.3d 1131(A), 2008 WL 399166, *7 (N.Y. Sup.Ct. 2008)("Since excess coverage is implicated only upon the exhaustion of primary insurance…and the record does not indicate that the underlying policies were exhausted, it cannot be said that U.S. Fire's obligation to indemnify Inscorp for payments Inscorp made in excess of its Policy limits has triggered."); *Liberty Mutual Ins. Co. v. Ins. Co. of the State of Pennsylvania*, 43 A.D.3d 666, 668-69, 841 N.Y.S.2d 288 (1st Dept. 2007); *General Motors Acceptance Corp. v. Nationwide Ins. Co.*, 4 N.Y.3d 451, 456, 796 N.Y.S.2d 2 (N.Y. 2005); *In re Liquidation of Midland Ins. Co.*, 269 A.D.2d 50, 66, 709 N.Y.S.2d 24 (1st Dept. 2000); *United States Fidelity & Guaranty Co. v. Treadwell Corp.*, 58 F.Supp.2d 77, 97 (S.D.N.Y. 1999); *State Farm Fire and Cas. Co. v. LiMauro*, 65 N.Y.2d 369, 377-78, 492 N.Y.S.2d 534 (N.Y. 1985).

The instant matter is similar to that presented in *Insurance Corporation of New York, supra*. In that case, the primary insurer, sought to recover settlement funds paid in excess of its policy limit from an excess insurer. *Id.* at *1. The court, however, noted that according to U.S. Fire's excess policy, two other primary insurers were listed on the Schedule of Underlying Insurance. *Id.* at *7. After finding that there was no evidence that these primary policies had

---

in excess of the insurance afforded by this Policy, the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance, either as double insurance or otherwise. Nothing herein shall be construed to make this Policy subject to the terms, conditions and limitations of other insurance. *See* Ex. 4 Excess Policy.

similarly been exhausted, the court held that excess did not have an obligation to indemnify Inscorp. *Id.* The court based this conclusion on the principle that an excess policy does not trigger until all primary policies have exhausted. *Id.*

**POINT III**

**THE CLUB MAY NOT DECLINE LIABILITY BASED ON THE EXCLUSION FOR FAILURE TO SEEK APPROVAL OF THE TRANSPORTATION AGREEMENT**

The Club also contends that coverage should be denied because Lafarge failed to submit the Transportation Agreement to the Club for approval. *See* Ex. 9 Club Complaint at ¶ 46 (emphasis added). This argument also lacks merit.

Under New York law, an insurer bears the burden of proving that a claim falls within the scope of an exclusion. *See Ocean Partners LLC et al. v. North River Insurance Co.*, 546 F.Supp.2d 101 (S.D.N.Y. 2008) (stating that "[t]o negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case.") (Emphasis added).

At this time, there are no claims in any of the Katrina related actions which seek indemnity under the Transportation Agreement. All claims against Lafarge are true third-party tort claims at law with no reference to any indemnity obligations under the Transportation Agreement or otherwise. Although Ingram by way of cross-claim, or otherwise, did initially claim contract indemnity from Lafarge under the Transportation Agreement for the claims arising out of the Katrina incident, Ingram has been dismissed from the suit and therefore, those cross-claims for indemnity no longer exist. At most, there were initially both covered claims (third party tort) and arguably excluded claims (Ingram's contract indemnity) against Lafarge in the multiple litigations. The existence of excluded claims in the Complaints does not nullify the

Club's duty to pay for the defense when there are also contemporaneously pleaded covered claims. *See Federal Ins. Co. v. Kozlowski, supra.*

## CONCLUSION

By virtue of the foregoing, the Court should grant the Excess Underwriters' Motion for Summary Judgment in its entirety, finding that the Excess Policy's attachment point is either excess of both primary policies' limit (the Club and the MMO primary policy) or excess of the MMO's primary policy and the Club's primary limit as a self-insured retention.  Further, the Court should find the stacking of the policies as follows: the Club policy followed by the MMO primary policy and the Excess Policy, respectively.

Dated:    July 2, 2008
          New York, New York

NICOLETTI HORNIG & SWEENEY
*Attorneys for Plaintiffs*
*The Northern Assurance Company of America*
*and American Home Assurance Company*

By:    _John A. V Nicoletti_____

John A. V. Nicoletti (JN-7174)
Nooshin Namazi (NN-9449)
Guerric S.D.L. Russell (GR-4845)
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005-1801
Telephone:  (212) 220-3830
Facsimile:  (212) 220-3780
Email:      jnicoletti@nicolettihornig.com
(FILE NO.: 10000478 JAVN/NN/GSR)

To:    Robert G. Clyne, Esq.
        HILL, RIVKINS & HAYDEN
        45 Broadway
        New York, New York 10006
        *Attorneys for Lafarge North America, Inc.*

        John M. Woods, Esq.
        THACHER PROFFITT & WOOD LLP
        Two World Financial Center
        New York, New York 10281
        *Attorneys for American Steamship Owners Mut. P&I Assoc., Inc.*