UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

THE NORTHERN ASSURANCE COMPANY                    Case No.:
OF AMERICA and AMERICAN HOME                      08 CV 3289 (CSH) (AJP)
ASSURANCE COMPANY,

                              Plaintiffs,                **ECF CASE**

        - against -

LAFARGE NORTH AMERICA, INC. and
AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY
ASSOCIATION, INC.,

                              Defendants.
------------------------------------------------------------X

### DECLARATION OF DAVID H. FROMM
### IN SUPPORT OF MOTION TO INTERVENE

        DAVID H. FROMM, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

        1.  I am a member of Brown Gavalas & Fromm LLP, attorneys for the Intervenor

Plaintiff New York Marine and General Insurance Company ("NYMAGIC"), and am fully

familiar with the facts and circumstances of this case.   I make this declaration in support of

NYMAGIC's motion to intervene and be made a plaintiff in this action pursuant to Fed. R. Civ.

P. Rule 24.

        2.  Attached hereto as Exhibit "1" is a true and correct copy of the Confirmation of

Insurance dated May 2, 2005, for Primary Marine Liabilities insured with NYMAGIC for the

period of May 1, 2005 to May 1, 2006 ("the Primary Policy").

        3.  Attached hereto as Exhibit "2" is a true and correct copy of the Confirmation of

Insurance dated May 2, 2005, for Excess Marine Liabilities insured with, and subscribed to on a

several and not joint basis by, NYMAGIC and Plaintiffs The Northern Assurance Company of

America ("Northern Assurance") and American Home Assurance Company ("American Home") for the period of May 1, 2005 to May 1, 2006 ("the Excess Policy").

4.    Attached hereto as Exhibit "3" is a true and correct copy of the Ratification of NYMAGIC in connection with the above-captioned action.

5.    Attached hereto as Exhibit "4" is a true and correct copy of NYMAGIC's proposed Intervenor Complaint.

6.    Attached hereto as Exhibit "5" is a true and correct copy of our letter dated July 3, 2008, addressed to counsel for Lafarge and Defendant American Steamship Mutual Protection and Indemnity Association, Inc. (the "American Club").

7.    Attached hereto as Exhibit "6" is a true and correct copy of a letter dated July 9, 2008 from counsel for Lafarge in response to my letter of July 3, 2008.

8.    Attached hereto as Exhibit "7" is a true and correct copy of our letter dated July 16, 2008, addressed to counsel for Lafarge and in response the July 9, 2008 letter from Lafarge's counsel.

I declare under penalty of perjury that the foregoing to true and correct.

Dated: July 16, 2008
        New York, New York


_____/S/_____
DAVID H. FROMM

EXHIBIT 1

# CONFIRMATION OF INSURANCE

**Willis**

Willis of New York, Inc.
7 Hanover Square
New York, NY 10004
Tel:     212-344-8888
Fax:     212-635-3626
Website: www.willis.com

**DATED:**            May 2nd, 2005

**RISK CONTROL NO.:**     WCM05-530

**NAMED ASSURED:**     Lafarge North America Inc. Et Al.

Lafarge North America Inc. and/or Lafarge S.A. and/or Lafarge Canada Inc. and/or Standard Industries, Inc. and/or Standard Lafarge Company and/or Concrete Acquisition Company and/or General Portland Inc. and/or Tews Company Inc. and/or Center Street Corporation and/or Missouri Portland Cement and/or Davenport Cement Company and/or Lafarge Florida, Inc. and/or Lafarge Building Materials, Inc.; their Subsidiary Companies and/or Corporations which now exist or may hereinafter be constituted (including Executive Officers, Directors and Stockholders all while acting within the scope of their duties as such) and, but not limited to, Affiliated, Associated, Interrelated, Operating Companies and/or Corporations, Partnerships or Joint Ventures singly or collectively referred to as the Assured, as their interests may appear.

It is further agreed that if any party other than those named as Assured herein, have an interest as owner or part owner or otherwise in any vessels or property insured hereunder, this insurance extends to cover the interest of such party, if required, as though they had been specifically named as an Assured in this Policy without necessity of advice to this Company.

This Policy will discharge any liability that it would bear if each Assured was separately insured, however, it is specifically understood and agreed that the inclusion of more than one Assured hereunder shall not increase the liability of this Company or otherwise alter any other terms or conditions of this Policy.

**INTEREST:**            Primary Marine Liabilities consisting of:
Section A)      Wharfingers Liability / Stevedores Liability
                      Landing Owners Liability
Section B)      Charterers Legal Liability

POLICY OR POLICIES WILL BE ISSUED AGAINST THE INSURANCE DESCRIBED HEREIN, AND IN THE EVENT OF ANY INCONSISTENCY HEREWITH, THE TERMS, CONDITIONS AND PROVISIONS OF THE POLICY OR POLICIES WILL PREVAIL. POLICY OR POLICIES WILL BE PROMPTLY FORWARDED TO YOU AS SOON AS RECEIVED.

WCM05-530.Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 2 of 16

# Willis

**PERIOD**:          From: 1st May 2005 at 12:01 AM Eastern Standard Time
                 To:    1st May 2006 at 12:01 AM Eastern Standard Time

**LIMIT OF**
**LIABILITY**:       Section A)     $5,000,000 any one accident or occurrence.
                 Section B)     $5,000,000 any one accident or occurrence.
                 Sections A/B) $5,000,000 any one accident or occurrence/
                                aggregate

**DEDUCTIBLE**:     Section A)     $20,000 any one accident or occurrence
                 Section B)     $5,000 any one accident or occurrence for Hull
                                Damage each declaration
                                $20,000 any one accident or occurrence for
                                Protection & Indemnity each declaration

**CONDITIONS**:     All terms, clauses and conditions per expiring policy and as
                 attached herein. Also including the following clauses:
                 US Economic & Trade Sanctions Clause
                 Silica Exclusion Clause
                 Respirable Dust Exclusion Clause
                 AIMU Extended Radioactive Contamination Exclusion Clause
                 with USA Endorsement
                 AIMU Chemical, Biological, Bio-chemical and Electromagnetic
                 Exclusion Clause

**PREMIUM**:        $102,500 Flat premium per annum.

**INSURED WITH**:   New York Marine & General Insurance Company - 100%

PER: _Marl Peruss_
         **WILLIS NEW YORK, INC.**
         **BROKERS FOR THE ASSURED**

WCM05-530.Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 3 of 16



## POLICY GENERAL CONDITIONS

### 1. CANCELLATION CLAUSE:

This Policy may be cancelled by either the Assured or this Company by giving the other party sixty (60) days written notice, but such cancellation shall not prejudice any transit risk which has attached prior to the cancellation date. Notice by the Assured to have the written consent endorsed hereon of all parties specifically named as Additional Assureds and Loss Payees elsewhere herein.

If cancellation at the option of this Company, pro rata will be charged; if cancelled at the option of the Assured, this Company to retain earned premium as per customary short rate table and procedure.

### 2. LEADER:

It is agreed that all alterations, extensions, additions, endorsements, settlement of claim, etc. to be agreed by New York Marine & General Insurance Company as lead underwriter and to be binding on all remaining Underwriters participating hereon.

### 3. CAPTIONS AND HEADINGS:

All captions and headings in this policy are inserted only for purposes of reference and shall not be used to interpret the clauses to which they apply.

### 4. SERVICE OF SUIT:

It is agreed that in the event of the failure of this Company to pay any amount claimed to be due hereunder, this Company, at the request of the Assured, will submit to the jurisdiction of any Court of competent jurisdiction within the United States and/or Canada, and will comply with all requirements necessary to give such Court jurisdiction, and all matters arising hereunder shall be determined in accordance with the law and practice of such court.

### 5. OIL POLLUTION ACT OF 1990 DISCLAIMER:

This insurance does not constitute evidence of financial responsibility under the Oil Pollution Act of 1990 or any similar federal, state or local law, and it is a condition of this insurance that it shall be submitted to the United States Coast Guard or any other federal, state of local agency as evidence of financial responsibility. This Company does not consent to be a guarantor.

WCM05-530.Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 4 of 16



## PRIMARY MARINE LIABILITIES

### GENERAL CONDITIONS

1. **HELD COVERED:**

   It is necessary for the Assured to give prompt notice to this Company when they become aware of an event for which they are "held covered" under this policy and the right to such coverage is dependent on compliance with this obligation.

2. **ERRORS AND OMISSIONS:**

   This insurance shall not be invalidated by any unintentional error or omission made by the Assured in rendering reports required under this policy to this Company provided such unintentional error or omission be reported as soon as practicable after discovery and an additional premium, if due, be paid.

   The insurance afforded by this Clause shall not increase the limits of this Company's liability under this policy.

3. **NOTICE OF LOSS:**

   In the event of any occurrence which may result in loss, damage, injury, or expense, for which this Company is or may become liable under this policy, notice thereof shall be given to Marsh USA and/or to this Company as soon as practicable after it becomes known to the Assured's Insurance Department; and further, any and every process, pleading and paper of any kind relating to such occurrence shall be forwarded promptly to this Company.

4. **NAMING ATTORNEYS:**

   This Company, in consideration, in consultation with the Assured, shall have the option of naming any mutually acceptable attorneys who shall represent the Assured in the prosecution or defense of any litigation or negotiations between the Assured and third parties concerning any claim based on a liability or an alleged liability covered by this policy, and shall have the direction of such litigation's or negotiations. If the Assured shall fail or refuse to settle any claim as authorized by this Company, the liability of this Company shall be limited to the amount for which settlement could have been made.

5. **SETTLEMENT OF CLAIMS:**

   The Assured shall not make any admission of liability, either before or after any occurrence, which could result in a claim for this Company may be liable. The Assured shall not interfere in any negotiations of this Company of settlement of any legal proceedings in respect of any occurrence\for which this Company may be liable under this policy; provided, however, that in respect of any occurrence likely to give rise to a claim under this policy, the Assured is

WCM05-530.Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 5 of 16



obligated to and shall take such steps to protect his and/or this Company's interests as would
reasonably be taken in the absence of this or similar insurance.

6. **SISTERSHIP:**

In the event of salvage, towage or other assistance being rendered to an insured interest by
any vessel belonging in part or in whole to the Assured as Charterer, the value of such
services (without regard to the ownership on control of the vessel) shall be ascertained by
arbitration in the manner provided for under the Collision Liability Clause (Lines 165
through 193 of the American Institute Hull Clauses (January 18, 1970) Form 6Z) of this
policy and the amount so awarded so far as applicable to the interest hereby insured shall
constitute a charge under this policy.

7. **LIMITATION OF ACTION:**

No suit or action shall lie against this Company for the payment or recovery of any claim
under this policy until the liability of the Assured has been determined by final judgment
against the Assured or by agreement between the Assured and the claimant with the written
consent of this Company; nor, in any event, unless such action is brought against this
Company within the time prescribed therefore in the statutes of State of New York, provided,
however, that where such limitation of time is prohibited by the law of the State shall be
sustained unless commenced within the shortest time limitation permitted under the laws of
such State.

8. **RIGHTS OF SUBROGATION:**

Upon making payment under this policy, this Company shall be vested with all the Assured's
rights of recovery against any person, corporation, vessel or interest and the Assured shall
execute and deliver instruments and papers and do whatever else is necessary to secure such
rights.

9. **PERMISSION TO RELEASE OR DECREASE LIABILITY:**

Notwithstanding anything to the contrary contained herein, it is hereby understood and agreed
that when so required, or specified by any contract entered into by the Assured, or required in
the ordinary course of business, the Assured is granted privilege to assume liabilities of; to
grant releases from liability to, limit or decrease the liabilities of, and to waive the rights of
subrogation hereunder of this Company against any person whatsoever (including outside
vessels and other owners).

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 6 of 16



10. **WAR, STRIKES AND RELATED EXCLUSIONS:**

The following conditions shall be paramount and shall supersede and nullify any contrary provisions of this policy. This policy does not cover any loss, damage or expense caused by, resulting from, or incurred as a consequence of:

A. Capture, seizure, arrest, restraint or detainment, or any attempt thereat; of
B. Any taking of the property which is the subject of this insurance, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise; or
C. Any mine, bomb or torpedo not carried as cargo on board the vessel(s); or
D. Any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter; or
E. Civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or piracy; or
F. Strikes, lockouts, political or labor disturbances, civil commotions, riots or the acts of any person or persons taking part in any such occurrences or disorders; or
G. Vandalism, sabotage or malicious act, which shall be deemed also to encompass the act or acts of one or more persons, whether or not agents of a sovereign power, carried out for political, terroristic or ideological purposes and whether any loss, damage or expense resulting therefrom is accidental or intentional; or
H. Hostilities or warlike operations (whether there be a declaration of war or not) but this Paragraph H not to exclude collision or contract with aircraft, rockets or similar missiles, or with any fixed or floating object, or stranding, heavy weather, fire or explosion unless caused directly by or against a belligerent power which act is independent of the nature of the voyage or service which the vessel(s) concerned or, in the case of a collision, any other vessel involved therein, is performing. As used herein, "power" includes any authority maintaining navel, military or air forces in association with a power.

11. **SURVEY AND LEGAL EXPENSES:**

This Company is also to pay survey and related expenses reasonably incurred by the Assured and the legal cost and expense of defending and/or investigating and/or conducting proceedings to limit liability on any suit or claim against the Assured based on a liability or an alleged liability coming within the scope of this insurance, without application of the deductible provisions of this policy, but this Company shall not be liable for the cost or expense of defending any suit or claim unless said cost or expense shall be been incurred with the written consent of this Company. This Company, however, reserves the right to conduct the defense of any actions or suits at its own expense.

12. **ACCIDENT OR OCCURRENCE:**

For purposes of this policy, an accident or occurrence is defined as any accident or occurrence or series of accidents or occurrences arising out of one event.

WCM05-530.Confirmation

Attached to and forming a part of Risk Control #WCM05-530

Dated: May 2nd, 2005

Page 7 of 16



13. **EXCESS INSURANCE:**

   Permission is granted for excess insurance which shall be liable only for any loss and/or losses, claim and claims beyond the amount insured under this policy.

14. **OTHER INSURANCE:**

   Except for insurance carried by the Assured specifically as excess over and above the amount(s) recoverable hereunder, this Company shall not be liable for any loss, damage, liability or expense which may be recoverable under any other insurance arranged by the Assured, arranged by others for the Assured's account or otherwise available to the Assured, except as excess over and above the amount(s) recovered thereunder.

15. **ASSIGNMENT:**

   No claim or demand against this Company under this policy shall be assigned or transferred, and no person, excepting a legally appointed Receiver of the property of the Assured, shall acquire any rights against this Company by virtue of this insurance without the expressed consent of this Company.

16. **CONTINGENT TANKERMAN'S LIABILITY:**

   It is hereby understood and agreed that the liability insurances afforded by Part A "Landing Owner's Legal Liability" and Part B "Charterer's Legal Liability" of this policy are extended to cover the legal liability of the Assured for loss of or damage to property of others, including charges attendant thereto, or for loss of life or personal injury arising out of the operations or actions of qualified employees or outside contractors acting on behalf of the Assured in their capacity as tankermen in respect of vessels which are the subject of these insurances.

   The insurance provided by this Clause is excess over any other valid and collectible insurance available to the Assured. This Clause shall not increased the limits of liability of this policy.

17. **POLLUTION COVERAGE:**

   Notwithstanding anything to the contrary contained elsewhere herein, this policy covers loss, damage, cost, liability, expense, fine or penalty which the Assured as bailee, custodian, stevedore or charterer shall become liable to pay in consequence of the actual or potential discharge, spillage or leakage of oil, fuel, cargo, petroleum products, chemicals or other substances of any kind or description caused by or emanating from vessels which are the subject of the liability insurances afforded under Part A "Landing Owner's Legal Liability" and Part B "Charterer's Legal Liability" of this policy, provided, however, that this Company shall not be liable to indemnify the Assured against any loss, damage, cost, liability, expense, fine or penalty resulting directly from the failure, neglect, of default of the

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 8 of 16

# Willis

Assured or his managing officers or managing agents to exercise the highest degree of diligence to prevent a violation of law.

The insurance afforded by this Clause shall not increase the limits of this Company's liability under this policy.

18. **SEEPAGE AND POLLUTION ENDORSEMENT:**

In respect of onshore properties, such coverage as is afforded by this policy shall not apply to any claim arising out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, alkalis, toxic chemicals, liquids or gases, waste materials, oil or other petroleum substance or derivative (including any oil refuse or oil mixed wastes) or other irritants, contaminants (including saline contamination) pollutants into or upon land, the atmosphere, or any watercourse or body of water.

The exclusion shall not apply, however, provided that the Assured establishes that all of the following conditions have been met:

a) the occurrence was accidental and was neither expected nor intended by the Assured. An occurrence shall not be considered unintended or unexpected unless caused by some intervening event neither foreseeable nor intended by the Assured.
b) the occurrence is identified as first commencing at a specific time and date during the term of this policy.
c) the occurrence became known to the Assured within 7 days after its commencement.
d) the occurrence was reported in writing to these this company within 60 days after having become known to the Assured.
e) the occurrence did not result from the Assured's intentional and willful violation of any government statute, rule or regulation.

Nothing contained in this Endorsement shall operate to provide any coverage respect to:

1) loss of, damage to, or loss of use of property directly of indirectly resulting from subsidence caused by sub-surface operations of the Assured;
2) removal of, loss of, or damage to sub-surface oil, gas or any other substance;
3) fines, penalties, punitive damage, exemplary damages, treble damages or any other damages resulting from multiplication of compensatory damages;
4) any site or location used in whole or in part for the handling, processing, treatment, storage, disposal or dumping of any waste materials or substance or the transportation of any waste materials or substances;
5) blowout and cratering.

WCM05-530:Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 9 of 16



### STRIKES, RIOTS & CIVIL COMMOTIONS

In consideration of an included premium, it is hereby understood and agreed that effective from the inception of this policy:

"This insurance also covers damage to or destruction of the property, which is the subject of this insurance, directly caused by strikers, locked out workmen, or persons taking part in labor disturbances or riots or civil commotions or caused by vandalism, sabotage, or malicious mischief, but excluding civil war, revolution, rebellion or insurrection, or civil strife arising therefrom, and warranted free from any claim for delay, detention or loss of use, and free from all loss, damage or expense caused by any weapon of war employing atomic or nuclear fission and/or fusion or other reaction or radioactive force of matter.

Notwithstanding the exclusions in this Policy's War, Strikes and Related Exclusions Clause (Clause Number 10 of the General Conditions), 'vandalism', 'sabotage', and 'malicious mischief, as used herein, shall be construed to include willful or malicious physical injury to or destruction of the described property caused by acts committed by an agent of any Government, party or faction engaged in war, hostilities, or other warlike operations, provided such agent is acting secretly and not in connection with any operations of military or naval armed forces in the country where the described property is situated."

This Company has the right to change the premium consideration for the additional protection afforded by this Endorsement at any time on fifteen (15) days written notice to the Assured; but the Assured shall have the option to cancel this Endorsement as of the time when such change in premium would effect, provided previous notice of such cancellation be given to this Company. The premium may be changed as above notwithstanding strikes, labor troubles or civil commotions, on board the described property or elsewhere, may be threatened or actually exist either at the time when such notice is given or when it takes effect.

WCM05-530.Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 10 of 16



## PRIMARY MARINE LIABILITIES

### PART A
### WHARFINGER'S/LANDING OWNER'S/STEVEDORE'S LEGAL LIABILITY

1. <u>COVERAGE:</u>

   To cover 100% interest of:

   A.  The legal or assumed liability of the Assured for all sums which the Assured shall
       become obligated to pay by reason of loss, damage, injury, or expense, including loss of
       use, to tankers, towboats, barges or other vessels and their cargoes, which are the property
       of others, while docking, undocking or in the Assured's custody, or possession at landing
       andlor mooring facilities which are owned, operated, utilized, controlled or leased by the
       Assured.

       Coverage includes while proceeding to or from the aforementioned landing and/or
       mooring facilities, and Assured's liability for damage caused directly or indirectly by the
       freeing or breaking away from such premises. This coverage is to also include liability as
       defined herein during time as the Assured may have technical or contractual custody of a
       vessel during its constructive placement away from the Assured's premises. .

   B.  The legal or assumed liability of the Assured for all sums which the Assured shall
       become obligated to pay as damages because of bodily injury or death sustained by any
       person; and damages because of injury to or destruction of the property of others
       including loss of use thereof, caused by accident and arising out of the Assured's
       operations as bailee, custodian or stevedore of or to tankers, towboats, barges or other
       vessels and their cargoes described in Paragraph A of this Clause.

   C.  The costs and expenses after deduction of the gross proceeds of salvage, not recoverable
       from third parties, for the removal of the wreck of any vessel which is neither owned nor
       operated by the Assured from the landing(s) owned, operated, utilized, controlled or
       leased by the Assured. The Assured agrees to make every reasonable effort to have the
       governmental authority having jurisdiction, or other responsible persons or parties assume
       responsibility and pay the expense for removal of the wreck before claim is made
       hereunder.

       The costs and expenses insured under this Paragraph C of this Clause shall be payable
       even though the Assured may have no legal or assumed liability therefor.

WCM05-530.Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 11 of 16



2. **EXCLUSIONS:**

Notwithstanding the foregoing, it is hereby understood and agreed that this Part A does not cover against nor shall any liability attach hereunder for loss, damage, injury or expense caused by or resulting from:

A. Vessel repair, construction, conversion or gas freeing performed or authorized by the Assured.

B. Loss of life or personal injury to employees of the Assured for which the Assured or any carrier as his insurer may be held liable under any State, Federal, or Provincial workers' compensation, unemployment compensation of disability benefits law, or under any similar law.

C. Loss or damage to property owned, leased or rented, by the Assured.

D. Loss, damage or expense to cargo owned by the Assured.

E. Theft by infidelity or similar act of dishonest character on the part of the Assured or their employees or sub-contractors.

F. Loss of or damage to any property or loss of life of or injury to any person that would be covered by the terms of the standard Commercial General Liability Policy as promulgated by the Insurance Services Office, Inc. except that this exclusion shall not apply to claims falling within the exclusions of said Commercial General Liability Policy to "property in the care, custody or control of the Insured" or "watercraft if the accident occurs away from premise owned by, rented to or controlled by the Named Assured."

G. Bodily injury or personal injury or loss of, damage to or loss of use of property directly or indirectly caused by asbestos.

H. Bodily injury or personal injury or loss of, damage to or loss of use of property directly or indirectly caused by Polychlorinated Biphenyl or any derivative thereof.

3. **LIMIT OF LIABILITY:**

The liability of this Company with respect to the costs, expenses and liabilities assumed under
Paragraphs A, B and C of Clause 1 of this Part A shall not exceed the limit stated in the Sum Insured (Clause 5 of the Policy General Conditions) each Paragraph separately and in the aggregate in respect of any one accident or occurrence subject to the deductible applying to this Part A.

WCM05-530.Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 12 of 16



## PRIMARY MARINE LIABILITIES

### PART B
### CHARTERER'S LEGAL LIABILITY

**Not Applicable To Tank Vessels Nor To Vessels On Demise
Or Bareboat Charters**

1. **COVERAGE:**

This insurance is only to indemnify the Assured in respect of losses, costs, and expenses incurred by the Assured as Charterers:

A. In respect of liabilities other than to owners of the chartered vessel, or liabilities to the owners of the chartered vessel by way of reimbursement for claims brought against them by third parties, and:

which are covered in the United Kingdom Mutual Assurance Association (Bermuda) Ltd. standard form of Certificate for charterer's Risks for Dry Cargo Vessels published and in effect at the inception of this insurance excluding liability to cargo or rate to be agreed, but subject to the limits of this Policy and further this Company herein retain all the rights reserved by the Association in said certificate; claims under this Section shall be subject to a deductible of US$2,500 any one accident or event.

B. In respect of liabilities for loss of or damage to the chartered vessel, but only to pay claims subject to a deductible of US$5,000 any one accident or event.

No Coverage is afforded herein for any liability for contributions in General Average, Salvage or Salvage Charges, other than liability for contributions in respect of charterer's freight at risk, or contributions which are attributable to the chartered vessel and which arise directly because of loss or damage to the chartered vessel following upon an accident for which the Charterer is legally liable and which is covered under this insurance.

Except for demurrage payments arising under the terms of the charter party and which directly arise due to an accident to the vessel for which the Charterer is legally liable and which liability is covered under this insurance, nothing herein shall be construed as insuring any liability, costs or expenses which the Assured may incur by reason of delay, detention or loss of use of the chartered vessel or cargo.

With the exception of insurance expressly to apply in excess of the limits of this Policy, this insurance is in excess of and not contributory with any other insurance available to the Assured covering any liability insured herein.

WCM05-530.Confirmation

Attached to and forming a part of Risk Control #WCM05-530



Dated: May 2nd, 2005

Page 13 of 16

Contractual or assumed liabilities other than to the Shipowner under the Charter Party (which is to be approved by this Company herein at inception of risk) or under any Bill of Lading issued pursuant to the said Charter Party, are excluded herein, except with prior agreement of this Company and an additional premium, if required, paid thereof.

## 2. ASSISTANCE AND COOPERATION:

In the event that any claim or claims appear reasonable likely to involve this Company, the Assured shall give prompt written notice to this Company hereon, shall forward every summons or process (or copies thereof) served upon the Assured and shall thereafter keep this Company fully advised as this Company may request. This Company shall not be called upon to undertake or assume charge of investigation, defense or settlement of any claim, suit or proceeding against the Assured, but expressly reserve hereby the right and shall be given the opportunity to associate with the Assured or the Assured's underlying insurers, or both, in the defense and control of any claim, suit or proceeding which in the opinion of this Company is likely to involve this insurance, in which event the Assured and this Company shall cooperate in such defense to the mutual advantage of both.

## 3. COSTS:

Costs incurred by the Assured shall be payable by this Company only if this Company hereon gives written consent to the incurring of such costs in respect of any particular claim, suit or proceeding and if such costs are not covered by underlying insurance, and then only in proportion between the amount (excluding costs) paid by the Assured (or by the underlying insurers) and the amount (excluding costs) paid by this company hereon. (The word "costs" shall be understood to mean investigation, adjustment and legal fees and expenses, excluding, however, all expenses for salaried employees and retained counsel and all office expenses of the Assured.) This Company's liability under this insurance shall not exceed in respect of any one loss or series of losses arising out of one accident or event.

## 4. U.S. OIL POLLUTION EXCLUSION CLAUSE:

Notwithstanding anything contained in this policy to the contrary, this policy shall not apply to or cover any loss, damage, cost, liability, expense, fine, penalty, or punitive or exemplary damage whatsoever, directly or indirectly caused by or contributed to by or arising from the actual, alleged, suspected or threatened discharge, release, dispersal, emission, spillage or leakage of oil into or upon the navigable waters of the United States of America, or adjoining shorelines, or the exclusive economic zone of the United States established by Presidential Proclamation Numbered 5030, dated March 10, 1993.

For purposes of this clause, oil means oil of any kind or in any form, including but not limited to, crude oil, petroleum, fuel oil, sludge, oil refuse, and oil mixed with any wastes or other substances.

WCM05-530.Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 14 of 16

# Willis

## ADDITIONAL CLAUSES

## AIMU U.S. ECONOMIC AND TRADE SANCTIONS CLAUSE

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to , those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) such coverage shall be null and void.

Similarly any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

## EXCLUSION - SILICA

This insurance does not apply to:

1. "Bodily injury" arising in whole or in part out of the actual, alleged or threatened respiration or ingestion at any time of "silica" or:

2. "Property damage" arising in whole or in part out of the actual, alleged or threatened presence of "silica", or

3. "Personal and advertising injury' arising in whole or in part out of the actual, alleged or threatened exposure at any time to or the presence of "silica".

The following definition applies herein:
"silica" means the chemical compound silicon dioxide (5i02) in any form, including dust which contains "silica".

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

WCM05-530.Confirmation

Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2ⁿᵈ, 2005
Page 15 of 16



## EXCLUSION - RESPIRABLE DUST

This insurance does not apply to:

1. "Bodily injury" arising in whole or in part out of the actual, alleged or threatened respiration or ingestion at any time of "respirable dust" or:

2. "Property damage" arising in whole or in part out of the actual, alleged or threatened presence of "respirable dust", or

3. "Personal and advertising injury' arising in whole or in part out of the actual, alleged or threatened exposure at any time to or the presence of "respirable dust".

The following definition applies herein:
"respirable dust" means respirable particulate matter but does not include living organisms.

ALL OTHER TERMS AND CONDIITONS OF THIS POLICY REMAN UNCHANGED.

## AIMU EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE
### (March 1, 2003)
### WITH U.S.A. ENDORSEMENT

**This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.**

1. In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to or arising from

    1.1 ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

    1.2 the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

    1.3 any weapon or device employing atomic or nuclear fission andJor fusion or other like reaction or radioactive force or matter

    1.4 the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

WCM05-530.Confirmation



Attached to and forming a part of Risk Control #WCM05-530
Dated: May 2nd, 2005
Page 16 of 16

## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE
## (U.S.A. ENDORSEMENT)

This insurance is subject to the Extended Radioactive Contamination Exclusion Clause (March 1, 2003) provided that

if fire is an insured peril

and

where the subject matter insured is within the U.S.A., its islands, onshore territories or possessions

and

a fire arises directly or indirectly from one or more of the causes detailed in Sub-Clauses 1.1, 1.2, and 1.4 of the Extended Radioactive Contamination Exclusion Clause March 1, 2003 any loss or damage arising directly from that fire shall, subject to the provisions of this insurance, be covered, EXCLUDING however any loss damage liability or expense caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or indirectly from that fire.

## AIMU CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, AND ELECTROMAGNETIC EXCLUSION CLAUSE
## (March 1, 2003)

**This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.**

In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to or arising from an actual or threatened act involving a chemical, biological, bio-chemical or electromagnetic weapon, device, agent or material when used in an intentionally hostile manner.

EXHIBIT 2

# CONFIRMATION OF INSURANCE

## Willis

Willis of New York, Inc.
7 Hanover Square
New York, NY 10004
Tel:    212-344-8888
Fax:    212-635-3626
Website:  www.willis.com

**DATED:**  May 2nd, 2005

**RISK CONTROL NO.:**  WCM05-531

**NAMED ASSURED:**  Lafarge North America Inc. Et Al.

Lafarge North America Inc. and/or Lafarge S.A. and/or Lafarge Canada Inc. and/or Standard Industries, Inc. and/or Standard Lafarge Company and/or Concrete Acquisition Company and/or General Portland Inc. and/or Tews Company Inc. and/or Center Street Corporation and/or Missouri Portland Cement and/or Davenport Cement Company and/or Lafarge Florida, Inc. and/or Lafarge Building Materials, Inc.; their Subsidiary Companies and/or Corporations which now exist or may hereinafter be constituted (including Executive Officers, Directors and Stockholders all while acting within the scope of their duties as such) and, but not limited to, Affiliated, Associated, Interrelated, Operating Companies and/or Corporations, Partnerships or Joint Ventures singly or collectively referred to as the Assured, as their interests may appear.

It is further agreed that if any party other than those named as Assured herein, have an interest as owner or part owner or otherwise in any vessels or property insured hereunder, this insurance extends to cover the interest of such party, if required, as though they had been specifically named as an Assured in this Policy without necessity of advice to this Company.

This Policy will discharge any liability that it would bear if each Assured was separately insured, however, it is specifically understood and agreed that the inclusion of more than one Assured hereunder shall not increase the liability of this Company or otherwise alter any other terms or conditions of this Policy.

**INTEREST:**  Excess Marine Liabilities

POLICY OR POLICIES WILL BE ISSUED AGAINST THE INSURANCE DESCRIBED HEREIN, AND IN THE EVENT OF ANY INCONSISTENCY HEREWITH, THE TERMS, CONDITIONS AND PROVISIONS OF THE POLICY OR POLICIES WILL PREVAIL. POLICY OR POLICIES WILL BE PROMPTLY FORWARDED TO YOU AS SOON AS RECEIVED.

WCM05-531.Confirmation

Attached to and forming a part of Risk Control #WCM05-531
Dated:  May 2nd, 2005
Page 2 of 22

# Willis

**PERIOD**:

From:  1st May 2005 at 12:01 AM Eastern Standard Time
To:    1st May 2006 at 12:01 AM Eastern Standard Time

**LIMIT OF
LIABILITY**:

$45,000,000 to $50,000,000 any one accident or occurrence per attached schedule.

**CONDITIONS**:

All terms, clauses and conditions per expiring policy and as attached herein.  Also including the following clauses:
US Economic & Trade Sanctions Clause
Silica Exclusion Clause
Respirable Dust Exclusion Clause
AIMU  Extended  Radioactive  Contamination  Exclusion  Clause with USA Endorsement
AIMU Chemical, Biological, Bio-chemical and Electromagnetic Exclusion Clause

**PREMIUM**:

$86,200 Flat premium per annum.

**INSURED WITH**:

| | |
|---|---|
| New York Marine & General Insurance Company | 50% of 100% |
| American Home Assurance Company | 25% of 100% |
| International Marine Underwriters | 25% of 100% |
| | 100% of 100% |

PER: _Mael Berist_
WILLIS NEW YORK, INC.
**BROKERS FOR THE ASSURED**

WCM05-531.Confirmation

Attached to and forming a part of Risk Control #WCM05-53
Dated:   May 2nd, 2005
Page 3 of 22



### EXCESS MARINE LIABILITIES

### LIMITS OF LIABILITY

|  | Excess Policy Limit | Primary Policy Limit |
|---|---|---|
| (A) Marine Liabilities | | |
| a) Wharfinger's/Landing Owner's/ Stevedore's | U.S. $45,000,000 | U.S. $    5,000,000 |
| b) Charterer's Liability | U.S. $45,000,000 | U.S. $    5,000,000 |
| a) and b) combined occurrence aggregate. | U.S. $45,000,000 | U.S. $    5,000,000 |
| (B) Protection & Indemnity | U.S. $45,000,000 | U.S. $ Per Club Rules |
| (C) Pollution Liability | | |
| (i)  U.S. Feet | U.S. $45,000,000 | U.S. $1,000,000,000 |
| (ii) Canadian Fleet | U.S. $45,000,000 | U.S. $1,000,000,000 |
| (D) Excess Towers Liability | | |
| (i)  U.S. Fleet | U.S. $49,000,000 | U.S. $    1,000,000 |
| (ii) Canadian Fleet | U.S. $49,000,000 | U.S. $    1,000,000 |
| (E) All Coverages Combined | U.S. $50,000,000 | Occurrence/Aggregate |

WCM05-533.Confirmation

Attached to and forming a part of Risk Control #WCM05-531
Dated:  May 2nd, 2005
Page 4 of 22



## POLICY GENERAL CONDITIONS

1. **CANCELLATION CLAUSE:**

   This Policy may be cancelled by either the Assured or this Company by giving the other party sixty (60) days written notice, but such cancellation shall not prejudice any transit risk which has attached prior to the cancellation date. Notice by the Assured to have the written consent endorsed hereon of all parties specifically named as Additional Assureds and Loss Payees elsewhere herein.

   If cancellation at the option of this Company, pro rata will be charged; if cancelled at the option of the Assured, this Company to retain earned premium as per customary short rate table and procedure.

2. **LEADER:**

   It is agreed that all alterations, extensions, additions, endorsements, settlement of claim, etc. New York Marine & General Insurance Company to be agreed by as lead underwriter and to be binding on all remaining Underwriters participating hereon.

3. **CAPTIONS AND HEADINGS:**

   All captions and headings in this policy are inserted only for purposes of reference and shall not be used to interpret the clauses to which they apply.

4. **SERVICE OF SUIT:**

   It is agreed that in the event of the failure of this Company to pay any amount claimed to be due hereunder, this Company, at the request of the Assured, will submit to the jurisdiction of any Court of competent jurisdiction within the United States and/or Canada, and will comply with all requirements necessary to give such Court jurisdiction, and all matters arising hereunder shall be determined in accordance with the law and practice of such court.

5. **OIL POLLUTION ACT OF 1990 DISCLAIMER:**

   This insurance does not constitute evidence of financial responsibility under the Oil Pollution Act of 1990 or any similar federal, state or local law, and it is a condition of this insurance that it shall be submitted to the United States Coast Guard or any other federal, state of local agency as evidence of financial responsibility. This Company does not consent to be a guarantor.

WCM05-531.Confirmation

Attached to and forming a part of Risk Control #WCM05-531
Dated:  May 2nd, 2005
Page 5 of 22



## EXCESS MARINE LIABILITIES
## INSURING AGREEMENTS

### COVERAGE:

This policy is to indemnify the Assured in respect of the following marine liabilities (including such expenses as are set out in the definition of "ULTIMATE NET LOSS") arising out of the Assured's marine operations only:

    A. All Protection and Indemnity risks of whatsoever nature including, but not limited to, those covered by the Underlying Protection and Indemnity Insurances or which are absolutely or conditionally undertaken by the United Kingdom Mutual Steamship Assurance Association Limited. Nevertheless this insurance does not cover crew liabilities where excluded by the primary Protection and Indemnity Underlying Placements.

    B. General Average, Collision Liabilities, Tower's Liabilities, Salvage, Salvage Charges, and Sue and Labor arising from any cause whatsoever and also other marine liabilities which are absolutely or conditionally underwritten by the ocean marine departments of insurance companies or Lloyd's marine this company.

    C. All other sums which the Assured shall become legally liable to pay or by contract or agreement become liable to pay in respect of claims made against the Assured for damages of whatsoever nature, on account of:

        i. Personal injuries, including death at any time resulting therefrom,

        ii. Property Damage, caused by or arising out of each occurrence happening anywhere in the world.

Notwithstanding the foregoing this insurance shall not cover liabilities arising by reason of insolvency or inadequacy of capital.

WCM05-531 Confidential

Attached to and forming a part of Risk Control #WCM05-531
Dated:  May 2nd, 2005
Page 6 of 22



## EXCESS LIABILITIES
## DEFINITIONS

1. **ASSURED:**

The unqualified word "Assured", wherever used in this Policy, includes not only the Named Assured but also:

A. Any executive officer, director, stockholder or employee of the Named Assured, while acting in his capacity as such;

B. Any person, organization, trustee or estate to whom the Named Assured is obligated by virtue of a written contract or agreement to provide insurance such as is afforded by this Policy, but only in respect of operations by or on behalf of the Named Assured;

2. **OCCURRENCE:**

The term "Occurrence" wherever used herein, means an event or a continuous or repeated exposure to conditions which unintentionally causes injury, damages or destruction during the policy period. Any number of such injuries, damage or destruction resulting from a common cause or from exposure to substantially the same conditions shall be deemed to result from one occurrence.

The word "unintentionally" used in this definition of 'Occurrence' shall not apply to claims arising out of personal injuries.

3. **ULTIMATE NET LOSS:**

The term 'Ultimate Net Loss" shall mean the total sum which the Assured becomes obligated to pay by reason of matters set out in Insuring Agreement I, including compromise settlements, and shall include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding, however the salaries of the Assured's permanent employees and general office overhead and also excluding any part of such expenses for which the Assured is covered by other valid and collectible insurance.

Nothing herein contained shall be construed to require the Assured to enforce by legal action, any rights of salvage, subrogation or indemnity, before this Company shall pay any loss covered hereunder.

WCM05-531 Confirmation

Attached to and forming a part of Risk Control #WCM05-531
Dated:   May 2ⁿᵈ, 2005
Page 7 of 22



## SECTION II

### EXCESS MARINE LIABILITIES
### EXCLUSIONS

__THIS SECTION II SHALL NOT APPLY:__

1.  A. To indemnify' any Assured whose dishonesty or fraud, committed individually or in collusion with others, caused the loss for which that Assured seeks indemnity; nor

   B. To indemnify any Assured against claims based upon any intentional noncompliance with any statute or regulation unless such claim(s) be for damages occasioned by actual or alleged bodily injury (fatal or otherwise) or physical loss of; damage to, and/or loss of use of tangible property; nor

   C. To indemnify any Assured in respect of any criminal fines or penalties incurred through the criminal act of that Assured.

2.  With respect to advertising activities, to claims against the Assured:

   A. For failure of performance of contract, but this shall not relate to claims for unauthorized appropriation of ideas based upon alleged breach of an implied contract;

   B. By advertising agents of the Assured;

   C. For infringement of registered trademark, service mark or trade name by use thereof as the registered trademark, service mark or trade name of goods or services sold, offered for sale or advertised, but this shall not relate to titles or slogans;

   D. For incorrect description of any article or commodity;

   E. For mistake in advertising price.

3.  To any claim(s) not covered by the Assured's Underlying Insurances as set forth in the "Schedule of Underlying Insurance" made under Insuring Agreement 1. C. by any national provincial state or local government subdivisions or agencies thereof unless such claim(s) be for damages occasioned by actual or alleged personal and/or bodily injury (fatal or otherwise), physical loss of, damage to and/or loss of use of tangible property.

4.  To any claim(s) or suit(s) alleging violation of the antitrust laws, unfair competition or other acts allegedly in restraint of trade.

5.  To any stockholders derivative action(s).

WCM05-531.Confirmation

Attached to and forming a part of Risk Control #WCM05-531
Dated:  May 2nd, 2005
Page 8 of 22

6.  To claims for nonpayment or delay in payment of charter hire; non-payment or delay in payment of loans, mortgages, promissory notes, checks, drafts or other evidence of debt.

7.  To claims for infringement of patent(s); unauthorized use of trademark(s) or trade name(s); misappropriation of design(s), drawing(s), process(es) or procedure(s) or to claims based on misappropriation of minerals or non-payment of mineral royalties.

8.  A.  To loss, damage or liability directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public local authority.

B.  Nevertheless, this Exclusion 8 shall not apply, except as provided in Paragraph C below, to liabilities:

i.  Arising in connection with vessels owned, chartered, hired or otherwise used by the Assured;

ii.  Arising out of property of any kind in transit by land, water or air during such periods as would be covered for full war risks under insurance covering physical loss of or damage to cargo subject to the Institute War Clauses relevant to the particular form of transit;

iii.  Arising out of any waterborne operations;

iv.  To seamen or under "Workers' Compensation Statutes";

v.  For death of or bodily injury to persons of any kind.

C.  Notwithstanding the provisions of Paragraph B above, Paragraph A above shall apply to the liabilities set out in Paragraph B above:

i.  Unless sooner applied under the provisions of Subparagraphs ii. or iii. of this Paragraph C, automatically upon and simultaneously with the outbreak of war (whether there be declaration of war or not) between any of the following countries: United States of America, United Kingdom, France, the Russian Federation, the People's Republic of China.

i.  At any time at the Assured's request, or by this Company giving seven (7) days written notice to the Assured, but in no event shall such notice affect or postpone the operation of the provisions of Subparagraphs i. or iii. of this Paragraph C. Written or telegraphic notice sent to the Assured at his (its) last known address shall constitute a complete notice and such notice mailed or telegraphed to the said Assured, care of the broker who negotiated this

Attached to and forming a part of Risk Control #WCM05-531
Dated:   May 2nd, 2005
Page 9 of 22

# Willis

insurance, shall have the same effect as if sent to the said Assured direct. The mailing of notice as aforesaid shall be sufficient proof of notice and the effective date and hour of the operation of the provisions set out in Paragraph A above shall be seven (7) days from midnight of the day on which such notice was mailed or telegraphed as aforesaid. This Company agrees, however, that the provisions set out in Paragraph A above shall not apply subject to agreement between this Company and the Assured prior to the aforesaid effective date and hour as to an additional premium and/or new conditions and/or warranties.

iii.    Unless sooner terminated under the provisions of Subparagraphs i. or ii. of this Paragraph C, automatically in respect of an insured vessel if and when such vessel is requisitioned, either for title or use, by the government of the United States or of the country in which the vessel is owned or registered or of the country in which any such right of requisition is vested.

If subsequent to the agreement of an additional premium as provided by Subparagraph ii. of this Paragraph C, either the Assured or this Company again elect to exercise the option provided therein, or Subparagraphs i. or iii. of this Paragraph C become operative, pro rata net return of the additional premium paid shall be refunded to the Assured. This Company to refund such return premium on demand or as soon thereafter as practicable.

Attached to and forming a part of Risk Control #WCM05-531
Dated:   May 2nd, 2005
Page 10 of 22



## EXCESS MARINE LIABILITIES
## CONDITIONS

### 1.  GEOGRAPHICAL LIMITS:

This policy covers the marine operations of the Assured anywhere in the world.

### 2  CROSS LIABILITY:

In the event of one of the Assureds incurring liability to any other of the Assureds, this Policy shall cover the Assured against whom claim is or may be made in the same manner as if separate
Policies had been issued to each Assured. Nothing contained herein shall operate to increase this
Company's limit(s) of liability as set forth in Clause 5 of the Policy General Conditions.

### 3.  NOTICE OF OCCURRENCE:

Whenever the Assured's Insurance Department has information from which it may be reasonably concluded that an occurrence covered hereunder involved injuries or damages which, in the event that the Assured should be held liable, is likely to involve this policy, notice shall be sent to:

Willis of New York
7 Hanover Square
New York, NY 10004

as soon as practicable, provided, however, that failure to notify the above firm of any occurrence which at the time of its happening did not appear to involve this Section II, but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims.

### 4.  ASSISTANCE AND COOPERATION:

This Company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceedings instituted against the Assured, but this Company shall have the right and shall be given the opportunity to associate with the Assured or the Assured's Underlying Insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves or appears reasonably likely to involve this Company in which event the Assured, the Underlying Insurers and this Company shall cooperate in all things in the defense of such claim, suit or proceeding.

Attached to and forming a part of Risk Control #WCM05-531
Dated:  May 2nd, 2005
Page 11 of 22



5.  **APPEALS:**

In the event the Assured or the Assured's Underlying Insurers elect not to appeal a judgment in excess of the Underlying Limit, this Company may elect to make such appeal at their own cost and expense, and shall be liable for the taxable costs and disbursements and interest incidental thereto, but in no event shall the liability of this Company for Ultimate Net Loss exceed the amount set forth in Policy Declarations as the Sum Insured for any one occurrence and in addition the cost and expense of such appeal plus the taxable costs and disbursements and interest incidental thereto.

6.  **BANKRUPTCY OR INSOLVENCY:**

In the event of the bankruptcy or insolvency of the Assured or any entity comprising the Assured, this Company shall not be relieved thereby of the payment of any claim hereunder because of such bankruptcy or insolvency.

7.  **OTHER INSURANCE:**

If other valid and collectible insurance with any other insurer is available to the Assured covering a loss also covered by this Policy, other than insurance that is in excess of the insurance afforded by this Policy, the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance, either as double insurance or otherwise. Nothing herein shall be construed to make this Policy subject to the terms, conditions and limitations of other insurance.

8.  **SUBROGATION:**

Inasmuch as this policy provides "Excess Coverage", the Assured's right of recovery against any person or other entity cannot be exclusively subrogated to this Company. It is, therefore, understood and agreed that in case of any payment hereunder, this Company will act in concert with all other interests (including the Assured) concerned, in the exercise of such rights of recovery. The apportioning of any amount which may be so recovered shall follow the principle that any interests (including the Assured) that shall have paid an amount over and above any payment hereunder, shall first be reimbursed up to the amount paid by them; this Company is then to be reimbursed out of any balance then remaining up to the amount paid hereunder; lastly, the interests (including the Assured) of whom this coverage is in excess are entitled to claim the balance, if any. Expenses necessary to the recovery of any such amounts shall be apportioned between the interests (including the Assured) concerned in the ratio of their respective recoveries as finally settled.

9.  **ASSIGNMENT:**

Assignment of interest under this Policy shall not bind this Company until their consent is endorsed herein.

Attached to and forming a part of Risk Control #WCM05-531
Dated:  May 2nd, 2005
Page 12 of 22



10. **CONFLICTING STATUTES:**

In the event that any provision of this Policy is unenforceable by the Assured under the laws of any State, Province or other jurisdiction wherein it is claimed that the Assured is liable for any injury covered hereby, because of noncompliance with any statute thereof, then this Policy shall be enforceable by the Assured with the same effect as if it complied with such statute.

11. **MAINTENANCE OF UNDERLYING INSURANCE:**

A.  It is a condition of this policy that the Section(s) or Policy(ies) referred to below in the "Schedule of Underlying Insurance' shall be maintained in full effect during the currency of this insurance except for any reduction of the aggregate limit(s) contained therein solely by payment of claims in respect of accidents and/or occurrences, occurring during the term of this Policy.

B.  Inadvertent failure of the Assured to comply with Paragraph A above or inadvertent failure to notify this Company of any changes in the Underlying Insurances shall not prejudice the Assured's rights of recovery under this Policy, but in the event of such failure, this Company to be liable only to the same extent as they would have been had the Assured complied with the said condition.

C.  In the event of an Underlying War Risks Insurance being cancelled by the this Company thereon under the terms of the cancellation clause therein, such cancellation shall not constitute a breach of Paragraph A above, but this Company to be liable hereunder only to the same extent as they would have been had that Underlying War Risks Insurance not been cancelled. Nothing in the foregoing sentence shall be deemed to affect the application of Exclusion 8 hereunder.

Attached to and forming a part of Risk Control #WCM05-531
Dated:  May 2nd, 2005
Page 13 of 22



## SCHEDULE OF UNDERLYING INSURANCES

| Policy | Underwriter | Limits of Liability/Coverages |
|---|---|---|
| Primary Marine Liabilities | New York Marine & General Insurance Company - 100% | $5,000,000 per occurrence for Stevedores/Wharfingers/Landing Owners Liability<br>$5,000,000 per occurrence for Charterers Liability<br>$5,000,000 Combined Occurrence Aggregate |
| P&I Club Policies: | | |
| Lafarge Canada Inc. | American Steamship Owners Mutual P&I Association | Per Club Rules for Protection & Indemnity (including 4/4ths Collision Liability)<br><br>$1,000,000,000 for Pollution Liability<br><br>$1,000,000 for Towers Liability |
| Lafarge North America Inc. | American Steamship Owners Mutual P&I Association | Per Club Rules for Protection & Indemnity (including 4/4ths Collision Liability)<br><br>$1,000,000,000 for Pollution Liability<br><br>$1,000,000 for Towers Liability |

WCM05-531.Confirmation

Attached to and forming a part of Risk Control #WCM05-531
Dated:   May 2nd, 2005
Page 14 of 22

**Willis**

## EXCESS MARINE LIABILITIES
## SUPPLEMENTARY CLAUSES

The following provisions shall supersede any inconsistent provisions of this Policy.

1. **CONDITIONAL EXCLUSIONS:**

As respects all activities of the Assured (except liability arising out of ownership, charter, use, operation, maintenance, loading, unloading or as a bailee of any watercraft not otherwise excluded or limited herein), this insurance shall be free from liability (unless coverage is provided in an Underlying Policy scheduled herein, and then coverage hereunder shall operate only as excess of such coverage):

A. From operation, ownership, or use of any automobile, truck or aircraft;

B. From any employee with respect to personal injury to or death of another employee of the same employer injured in the course of such employment;

C. For damage, loss, or expense to property of others which occured while in the care, custody or control of the Assured hereunder;

D. Assumed under contract;

E. Arising out of goods or products manufactured, sold, handled or distributed by the Assured or by others trading under his name (hereinafter called "the Assured's Products") if the occurrence occurs after possession of such goods or products has been relinquished to others by the Assured or by others trading under his name and if such occurrence occurs away from premises owned, rented or controlled by the Assured; provided such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for use of others but not sold;

F. Arising out of operations, if the occurrence occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the Assured; provided that operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further the following shall not be deemed to be "operations" within the meaning of this Paragraph F:

   i.   Pick-up or delivery, except from or onto a railroad car;

   ii.  The maintenance of vehicles owned or used by or in behalf of the Assured;

   iii. The existence of tools, uninstalled equipment and abandoned or unused materials.

Attached to and forming a part of Risk Control #WCM05-531
Dated:  May 2nd, 2005
Page 15 of 22



## 2.  **ABSOLUTE EXCLUSIONS:**

This insurance shall be free from liability or expense arising:

A. From any non-marine operation of the Assured;

B. From the failure of the Assured's non-marine products;

C. From infidelity and/or dishonesty of the Assured, or any employee or representative of the Assured committed individually or in collusion with others;

D. From ownership, use or operation of drilling rigs, drilling barges, drilling tenders, platforms, flow lines (used in petrochemical production and/or refining), gathering stations and/or pipelines, but this exclusion shall not apply to craft serving the foregoing including, but not limited to, crew, supply, utility or work boats, tenders or tugs,

E. Under Employees Retirement Income Security Act (ERISA);

F. Under United States Longshoremen's and Harbor Workers' Act (USL&H)

G. For loss of life or personal injury to employees of the Assured for which the Assured or any carrier as his insurer may be held liable under any State, Federal or Provincial worker's compensation, unemployment compensation, disability benefits law, occupational disability or under any similar law;

H. Because of the violation of any statute, law, ordinance or regulation prohibiting discrimination or humiliation because of race, creed, color, national origin, age and/or sex;

I. From the failure of the Assured's products or work completed by or for the Assured to perform the function or serve the purpose intended by the Assured, if such failure is due to mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any Assured except with respect to bodily injury or property damage as a result of said failure provided such property damage or bodily injury is insured in the Underlying Insurance scheduled herein;

J. From any activity as a ship repairer or shipbuilder other than for maintenance and repairs by the Assured to his own vessel(s).

K. From bodily injury or personal injury or loss of, damage to or loss of use of property directly or indirectly caused by asbestos.

L. From bodily injury or personal injury or loss of, damage to or loss of use of property directly or indirectly caused by Polychlorinated Biphenyl or any derivative thereof.

Attached to and forming a part of Risk Control #WCM05-531
Dated:   May 2nd, 2005
Page 16 of 22

**Willis**

3.  **SPECIAL CONDITIONS:**

A.  Additional Assureds

In the event of Additional Assureds being added to the coverage under the Underlying Insurances during the currency hereof which results in an additional premium being charged by the Underlying Insurers, prompt notice shall be given to this Company who shall be entitled to charge an appropriate additional premium.

B.  Prior Insurance and Non-Cumulation of Liability

It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof, the limit(s) of liability as stated in the Policy Declarations as the Sum Insured shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

C.  Special Conditions Applicable to Occupational Disease

As regards personal injury (fatal or nonfatal) by occupational disease sustained by any employee of the Assured, this Policy is subject to the same warranties, terms and conditions (except as regards the premium amounts, limits of liability and the renewal agreement, if any) as are contained in or as may be added to the Underlying Insurance prior to the happening of an occurrence for which claim is made hereunder.

D.  Subrogation

In the event of any payment under this Policy, this Company shall participate with the Assured and any Underlying Insurers in the exercise of all the Assured's rights of recovery therefore against any person or organization. All recoveries shall be applied as if recovered prior to any payment under this Policy and to that end all necessary adjustments shall be made as soon as practicable thereafter. The expense of any subrogation proceeding brought to enforce such rights shall be apportioned among this Company, the Underlying Insurers and the Assured in accordance with their respective interests in the matter giving rise to such rights.

4.  **DEFINITIONS:**

These definitions shall apply as respects all activities of the Assured other than liability arising out of the ownership, charter, use, operation, maintenance, loading, unloading or as a bailee of any watercraft.

Attached to and forming a part of Risk Control #WCM05-531
Dated:   May 2nd, 2005
Page 17 of 22



### A.  PERSONAL INJURIES:

The term "Personal Injuries" whenever used herein means bodily injury (including death at any time resulting therefrom), mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution; also libel, slander, disparagement or defamation of character or invasion of rights of privacy, except that which arises out of any advertising activities.

### B.  PROPERTY DAMAGE:

The term "Property Damage" whenever used herein shall mean loss of or direct damage to or destruction of tangible property (other than property owned by the Named Assured).

WCM05-531.Confirmation

Attached to and forming a part of Risk Control #WCM05-531
Dated:   May 2nd, 2005
Page 18 of 22



## ADDITIONAL CLAUSES

### AIMU U.S. ECONOMIC AND TRADE SANCTIONS CLAUSE

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) such coverage shall be null and void.

Similarly any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

### EXCLUSION - SILICA

This insurance does not apply to:

1.  "Bodily injury" arising in whole or in part out of the actual, alleged or threatened respiration or ingestion at any time of "silica" or:

2.  "Property damage" arising in whole or in part out of the actual, alleged or threatened presence of "silica", or

3.  "Personal and advertising injury' arising in whole or in part out of the actual, alleged or threatened exposure at any time to or the presence of "silica".

The following definition applies herein:
"silica" means the chemical compound silicon dioxide (Si02) in any form, including dust which contains "silica".

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

Attached to and forming a part of Risk Control #WCM05-531
Dated:   May 2nd, 2005
Page 19 of 22



## EXCLUSION - RESPIRABLE DUST

This insurance does not apply to:

1. "Bodily injury" arising in whole or in part out of the actual, alleged or threatened respiration or ingestion at any time of "respirable dust" or:

2. "Property damage" arising in whole or in part out of the actual, alleged or threatened presence of "respirable dust", or

3. "Personal and advertising injury' arising in whole or in part out of the actual, alleged or threatened exposure at any time to or the presence of "respirable dust".

The following definition applies herein:
"respirable dust" means respirable particulate matter but does not include living organisms.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

WCM05-531.Confirmation

Attached to and forming a part of Risk Control #WCM05-531
Dated: May 2nd, 2005
Page 20 of 22

# Willis

## FUNGI / MOLD / MILDEW / YEAST / MICROBE EXCLUSION

This insurance does not apply to:

Fungi and Microbes

    (1) "Bodily injury", "property damage", "personal injury or advertising injury" which would not have occurred in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, contact with, exposure to, existence of, or presence of any "fungi" or microbes".

    (2) Any loss, cost or expense arising out of the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating, or disposing of, or in any way responding to or assisting the effects of "fungi" or "microbes" by any insured or by anyone else.

This exclusion applies regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage, loss, cost or expense.

The following definitions apply herein:

"Fungi" means any form of fungus, yeast, mold, mildew or mushroom, including mycotoxins, spores, scents, byproducts or other substances produced or released fungi. But "fungi" does not include fungi that were deliberately grown for human consumption.

"Microbe" means any bacteria, virus, or any other non-fungal, single celled or colony-form organism, including any towins, scents, byproducts or other substances it produces or releases, whose injurious source is in or on a building or its contents. But "microbe" does not mean:

(1) Microbes that were transmitted directly from person to person.;
(2) Microbes that caused food poisoning, if your business is food processing sales or serving.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

WCM05-531.Confirmation

Attached to and forming a part of Risk Control #WCM05-531
Dated:  May 2ⁿᵈ, 2005
Page 21 of 22



## AIMU EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE
### (March 1, 2003)
### WITH U.S.A. ENDORSEMENT

**This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.**

1.  In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to or arising from

    1.1 ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

    1.2 the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

    1.3 any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter

    1.4 the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

WCM05-531 Confirmation

Attached to and forming a part of Risk Control #WCM05-531
Dated:  May 2nd, 2005
Page 22 of 22

# Willis

## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE
## (U.S.A. ENDORSEMENT)

This insurance is subject to the Extended Radioactive Contamination Exclusion Clause (March 1, 2003) provided that

if fire is an insured peril

and

where the subject matter insured is within the U.S.A., its islands, onshore territories or possessions

and

a fire arises directly or indirectly from one or more of the causes detailed in Sub-Clauses 1.1, 1.2, and 1.4 of the Extended Radioactive Contamination Exclusion Clause March 1, 2003 any loss or damage arising directly from that fire shall, subject to the provisions of this insurance, be covered, EXCLUDING however any loss damage liability or expense caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or indirectly from that fire.

## AIMU CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, AND
## ELECTROMAGNETIC EXCLUSION CLAUSE (March 1, 2003)

**This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.**

In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to or arising from an actual or threatened act involving a chemical, biological, bio-chemical or electromagnetic weapon, device, agent or material when used in an intentionally hostile manner.

WCM05-531.Confirmation

EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
THE NORTHERN ASSURANCE COMPANY
OF AMERICA and AMERICAN HOME
ASSURANCE COMPANY,

                                    Plaintiffs,

            - against -                                             08 CV 3289 (CSH) (AJP)

LAFARGE NORTH AMERICA, INC. and
AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY                                            **Electronically Filed**
ASSOCIATION, INC.,

                                    Defendants.
-------------------------------------------------------------X

**RATIFICATION OF**
**<u>NEW YORK MARINE AND GENERAL INSURANCE COMPANY</u>**

George Sutcliffe declares and states as follows:

1.      I am a Senior Vice President of Mutual Marine Office, Inc. ("MMO").

2.      MMO is the authorized representative of New York Marine and General Insurance Company ("NYMAGIC").

3.      NYMAGIC, Northern Assurance Company of America ("Northern Assurance") and American Home Assurance Company ("American Home") subscribed, on a several and not joint basis, to an Excess Marine Liability Policy issued to Lafarge North America, Inc. ("Lafarge") for the period from May 1, 2005 to May 1, 2006 (the "Excess Policy").

4.      NYMAGIC subscribed to 40% of the risk under the Excess Policy.

5.      Northern Assurance subscribed to 35% of risk under the Excess Policy.

6.      American Home subscribed to 25% of the risk under the Excess Policy.

7.      NYMAGIC is the lead underwriter under the Excess Policy.

8.      Pursuant to Rule 17(a) of the Federal Rules of Civil Procedure, MMO, on behalf of NYMAGIC, hereby ratifies the commencement and prosecution of the above-captioned action by Northern Assurance and American Home on behalf of all of the underwriters subscribing to the Excess Policy, including NYMAGIC, and agrees to be bound by a final judgment in said action after all appeals have been exhausted or the time to appeal has expired, as applicable..

9.      NYMAGIC intends to file a motion with the Court, pursuant to Rule 24 of the Federal Rules of Civil Procedure, to intervene in the above-captioned action as a plaintiff.

Dated: New York, New York
       June 26, 2008

_____
GEORGE SUTCLIFFE

EXHIBIT 4

BROWN GAVALAS & FROMM LLP
Attorneys for Intervenor Plaintiff
*New York Marine and General Insurance Company*
355 Lexington Avenue
New York, New York 10017
Tel: (212) 983-8500
Fax: (212) 983-5946

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

THE NORTHERN ASSURANCE COMPANY                 Case No.:
OF AMERICA and AMERICAN HOME                   08 CV 3289 (CSH) (AJP)
ASSURANCE COMPANY,

                            Plaintiffs,

        - against -

                                               **INTERVENOR COMPLAINT**

LAFARGE NORTH AMERICA, INC. and
AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY
ASSOCIATION, INC.,

                            Defendants.
------------------------------------------------------------X
NEW YORK MARINE AND GENERAL
INSURANCE COMPANY,

                        Intervenor Plaintiff,

        -against-

LAFARGE NORTH AMERICA, INC. and
AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY
ASSOCIATION, INC.,

                            Defendants.
------------------------------------------------------------X

        Intervenor Plaintiff NEW YORK MARINE AND GENERAL INSURANCE

COMPANY ("NYMAGIC"), by and through their attorneys, Brown Gavalas & Fromm LLP, as

and for a Complaint against Defendants LAFARGE NORTH AMERICA, INC. ("LAFARGE")

and AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC., ("AMERICAN CLUB" or "THE CLUB") respectfully allege upon information and belief as follows:

### SUMMARY

1.    The matter in controversy relates to the demands by defendant LAFARGE under separate primary liability insurance coverages issued by intervenor plaintiff NYMAGIC, and the defendant AMERICAN CLUB, and an excess liability policy issued on a subscription basis by the plaintiffs THE NORTHERN ASSURANCE COMPANY OF AMERICA ("NACA") and AMERICAN HOME ASSURANCE COMPANY ("AHAC") and intervenor plaintiff NYMAGIC, for defense costs and indemnification against potential liability in respect of claims arising from the breakaway of a barge that was at defendant LAFARGE'S New Orleans, Louisiana facility during Hurricane Katrina in August, 2005 ("Katrina Claims").

2.    In the several third-party lawsuits pending against defendant LAFARGE for Katrina Claims, it is alleged that the barge, called the Barge ING 4727, struck and caused or contributed to the collapse of the 17th Street Industrial Canal floodwall causing massive flooding in the City of New Orleans.

3.    By this action, intervenor plaintiff NYMAGIC seeks 1) a declaration that coverage for defense costs and indemnity exists under defendant LAFARGE'S entry in the defendant AMERICAN CLUB and 2) a declaration that intervenor plaintiff NYMAGIC is not obligated to pay the defense costs and/or to indemnify defendant LAFARGE under the excess liability policy until all primary policies have responded up to their full respective limits.

## JURISDICTION

4.      This action is filed under and pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

5.      The following issues constitute questions of insurance coverage under Admiralty or Maritime contracts of insurance and thereby come within the Admiralty and Maritime jurisdiction of the United States District Court pursuant to Title 28 U.S.C. § 1333 *et seq.*, and within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

6.      An actual controversy of a justiciable nature exists between intervenor plaintiff NYMAGIC and defendants involving the rights and obligations under these several marine contracts of insurance and depending on the construction of said contracts, the aforesaid controversy can be determined by a judgment of this Court without further suit.

## VENUE

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) inasmuch as a substantial part of events giving rise to the insurance coverage dispute herein occurred in this judicial district and the defendants AMERICAN CLUB and LAFARGE are currently litigating a related action in this judicial district entitled *American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Lafarge North America, Inc.*, *United States District Court, Southern District of New York*, 06 CV 3123 (CSH).

## PARTIES

8.      At all relevant times, intervenor plaintiff NYMAGIC is an insurance company duly qualified pursuant to the laws of the State of New York and doing business in this jurisdiction through its authorized representative Mutual Marine Office, Inc. ("MMO"), with an office and principal place of business at 919 Third Avenue, New York, New York.

9.    At all times relevant, plaintiff NACA was and is a corporation duly organized and existing under and by virtue of the laws of the State of Massachusetts, with a place of business for marine insurance located at One Beacon Street, Boston, Massachusetts 02108.

10.    At all times relevant, plaintiff NACA was and is authorized to issue policies of marine excess liability insurance in the State of New York.

11.    At all times relevant, plaintiff AHAC was and is a corporation duly organized under and existing under and by virtue of the laws of the State of New York with an office and principal place of business at 70 Pine Street, New York, New York.

12.    At all times relevant, plaintiff AHAC was and is authorized to issue policies of marine excess liability insurance in the State of New York.

13.    Defendant LAFARGE is a corporation duly organized under and existing by virtue of the laws of the State of Maryland or another one of the states of the United States of America, with its principal place of business at 12950 Worldgate Drive, Suite 500, Herndon, Virginia 20170.

14.    Defendant LAFARGE is registered to do business in the State of New York and/or is otherwise doing business in the State of New York.

15.    Defendant LAFARGE is a diversified construction materials company and supplier of cement, aggregates and concrete, and other materials for residential, commercial, institutional and public works construction.

16.    Defendant AMERICAN CLUB is a mutual insurance association, operated by its members for their exclusive benefit and is incorporated in New York and has a principal place of business at 60 Broad Street, New York, New York.

17.    Defendant AMERICAN CLUB provides liability insurance, which provides cover

4

to members against third-party liabilities encountered in their commercial operations.

## THE POLICIES

**The Primary MMO Policy**

18.    MMO, as the authorized representative for intervenor plaintiff NYMAGIC, agreed to issue a Primary Marine Liabilities Policy of Insurance No. MMO-30981ML505, to defendant LAFARGE, for the period of May 1, 2005 to May 1, 2006 (the "MMO Policy").

19.    For the policy period of May 1, 2005 to May 1, 2006, intervenor plaintiff NYMAGIC and defendant LAFARGE agreed that the general terms and conditions of the Binding Memorandum for the Primary Marine Policy of Insurance would remain in force and effect for the period of May 1, 2005 to May 1, 2006 until such time as the policy of insurance was issued.

20.    The MMO Policy has an aggregate limit of $5,000,000.00 for any one accident or occurrence.

21.    MMO, as the authorized representative of intervenor plaintiff NYMAGIC, also agreed to participate in an excess liability policy issued to defendant LAFARGE with limits in excess of the primary limit of $5,000,000.00 and up to $50,000,000.00 under certain circumstances for the period of May 1, 2005 to May 1, 2006.

22.    The MMO Policy provides in relevant part:

**14.    OTHER INSURANCE:**

> Except for insurance carried by the Assured specifically as excess over and above the amount(s) recoverable hereunder, this Company shall not be liable for any loss, damage, liability or expense which may be recoverable under any other insurance arranged by the Assured, arranged by others for the Assured's account or otherwise available to the Assured, except as excess over and above the amount(s) recovered thereunder. (emphasis added).

23. The MMO Policy's "Other Insurance" clause is commonly referred to as an "excess clause."

24. Intervenor plaintiff NYMAGIC has accepted the obligation under the MMO Policy to pay the reasonable defense costs and has provided defendant LAFARGE with a defense in the multiple Katrina Claims lawsuits through an assigned counsel, Sutterfield & Webb, LLC, as well as through other investigators and experts.

25. To date, intervenor plaintiff NYMAGIC has paid and/or incurred defense costs in excess of $4.6 million.

26. At this time, defendant LAFARGE is claiming against NYMAGIC under the MMO Policy for payment of its separately incurred defense costs in an amount in excess of $7.5 million, which, if payable, would exhaust the limits of the primary MMO Policy and potentially trigger the obligations of plaintiffs NACA and AHAC and intervenor plaintiff NYMAGIC, *albeit* denied by plaintiffs NACA and AHAC and intervenor plaintiff NYMAGIC, to pay defense costs under a particular Excess Policy issued to defendant LAFARGE in which they participate.

**The American Club Primary Policy**

27. The rights and obligations of every member of THE CLUB, including defendant LAFARGE, are governed at least in part by the American Club By-Laws and Rules (the "Club Rules").

28. Upon becoming a member of THE CLUB, defendant LAFARGE received a Certificate of Entry, which expressly makes applicable the Club Rules to the member's insurance. The Certificate of Entry includes additional Member-Specific provisions, which are

listed on a separate rider to the Certificate of Entry.  (LAFARGE'S Certificate of Entry for the period February 20, 2005 to February 20, 2006, is attached as Exhibit 1).

29.     The Certificate of Entry is the paramount document and to the extent that the terms of the Certificate of Entry are contrary to the Club Rules, the terms of the Certificate of Entry are controlling with respect to the rights and obligations of the defendant AMERICAN CLUB and defendant LAFARGE under the Club cover.

30.     The Certificate of Entry does not by its terms require any pre-approval by the Club of an agreement pursuant to which defendant LAFARGE acquires an insurable interest in a vessel for the Club cover to automatically attach to said vessel.

31.     Defendant LAFARGE first became a member of THE CLUB on or about February 20, 1999.  It renewed its coverage each year, up to and including the policy year commencing February 20, 2005.

32.     At all times relevant, defendant LAFARGE was a member of the defendant AMERICAN CLUB.

33.     Defendant LAFARGE'S Certificate of Entry contains a Member-Specific clause entitled "Chartered Barges," which states:

> CHARTERED BARGES.
>
> If Lafarge Corporation et al acquires an insurable interest in any vessel in addition to or in substitution for those set forth herein, through purchase, charter, lease or otherwise, such insurance as is afforded hereunder to any similar vessel shall automatically cover such additional vessel effective from the date and time the Assured acquires an insurable interest in such additional vessel.  With respect to a chartered, leased or similarly acquired vessel, the insurance hereunder automatically includes the owner as an additional Assured with waiver of subrogation against the owner, if required, effective from the date and time such vessel is insured hereunder.

The above provision shall not apply to vessels which are chartered under a contract whereby the owner (or Demise Owner) and Charterer agree that the owner (or Demise Owner) shall procure Protection & Indemnity Insurance on the vessel and such insurance shall include the charterer as an Assured.

The Assured agrees to report the name and gross tonnage of any vessel in which they acquire an insurable interest at the expiration of this policy and pay any additional premium as may be required annually, at expiry at daily pro-rate the annual rates agreed. (emphasis added).

34.     Pursuant to the terms of the Certificate of Entry, defendant LAFARGE did report the name and gross tonnage of the Barge ING 4727 and is prepared to pay the reasonable additional premium assessed by the defendant AMERICAN CLUB, if any reasonable additional premium is due and owing.

35.     The Club Rules also provide in relevant part:

Class I Rule 2  Risks and Losses Covered

Each Member of the Association shall be indemnified in connection with each vessel entered in the Association for Protection and Indemnity Insurance against any loss, damage or expense which the Member shall become liable to pay and shall pay by reason of the fact that the Member is the owner (or operator, manager, charterer, mortgagee, trustee, receiver or agent, as the case may be) of the insured vessel, subject to the provisions of these Rules and to all the limitations herein stated or agreed to by the acceptance of the application for membership, or by the entry of the vessel, in the Association, and which shall result from the following liabilities, risks, events, occurrences and expenditures; provided that such liabilities, risks, events, occurrences and expenditures arise in respect of the Member's interest in such vessel; and in connection with the operation of such vessel by or on behalf of the Member; and out of events occurring during the period of entry of such vessel.  (emphasis added).

36.     The Club Rules also provide in relevant part:

Class I Rule 1  Introductory: Interpretation:
                        Membership: General Provisions

**34.**    The Association shall not be liable for any loss, damage or expense against which, but for the insurance herein provided, the Member, Co-assured or Affiliate would have been insured under any other existing insurance, except as set forth above in Rule 1.4.33; nor shall the Association provide prorated or allocated cover on the basis of double insurance or otherwise, except as set forth above in Rule 1.4.33; nor will this insurance replace any other insurance where (for whatever reason) that other insurance does not or is not able to respond to a claim thereunder.

37.    The defendant AMERICAN CLUB'S "Other Insurance" terms are commonly referred to as an "escape clause."

38.    The defendant AMERICAN CLUB has wrongfully declined defendant LAFARGE'S demand for payment of defense costs and indemnification under the Certificate of Entry and Club Rules.

**The Plaintiffs' Excess Policy**

39.    On or before May 1, 2005, the plaintiffs NACA and AHAC, together with intervenor plaintiff NYMAGIC, subscribed to an Excess Marine Liability Policy ("Excess Policy") with an insured limit of $45,000,000.00, and up to $50,000,000.00 under certain circumstances, excess of $5,000,000.00 any one accident or occurrence.

40.    Intervenor plaintiff NYMAGIC and plaintiffs NACA and AHAC, issued the Excess Policy on a several and not joint basis.

41.    Intervenor plaintiff NYMAGIC subscribed to 40% of the risk under the Excess Policy.

42.    Plaintiff NACA subscribed to 25% of risk under the Excess Policy.

43.    Plaintiff AHAC subscribed to 35% of the risk under the Excess Policy.

44.     As a true Excess Policy, there was a requirement that defendant LAFARGE maintain certain "Underlying Insurances" as set forth and identified in the Excess Policy binder.

45.     The primary MMO Policy with a primary limit of $5,000,000.00, is identified as "Underlying Insurance" to the Excess Policy.

46.     Defendant LAFARGE'S entry in the defendant AMERICAN CLUB'S coverage with an underlying limit per Club Rules in an amount of at least $1,000,000,000.00, is also listed as an "Underlying Insurance" in the Excess Policy.

47.     The Excess Policy also provides in relevant part:

> **7.     OTHER INSURANCE:**
>
> If other valid and collectible insurance with any other Insurer is available to the Assured covering a loss also covered by this Policy, other than insurance that is in excess of the insurance afforded by this Policy, the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance, either as double insurance or otherwise.  Nothing herein shall be construed to make this Policy subject to the terms, conditions and limitations of other insurance.

48.     The "Other Insurance" clause in the Excess Policy is commonly referred to as an "excess clause."

## UNDERLYING KATRINA CLAIMS

49.     Prior to August 29, 2005, Barge ING 4727 was utilized by defendant LAFARGE to transport cement under the Transportation Agreement ("TA") to its New Orleans facility.

50.     On or about August 29, 2005, Barge ING 4727 was moored at defendant LAFARGE'S facility on the Inner Harbor Navigation Canal.

51.     On or about August 29, 2005, Hurricane Katrina made landfall along the Louisiana and Mississippi Gulf Coast.

52.    On or about August 29, 2005, Barge ING 4727 became adrift from her moorings and floated through a breach in the Industrial Canal floodwall or was carried over the floodwall by the rising water.

53.    At least four lawsuits, including class actions, arising out of Hurricane Katrina are pending against defendant LAFARGE.

54.    The allegations set forth in the pleadings in the multiple Katrina Claims-related lawsuits are sufficient to trigger the obligations of both NYMAGIC under the primary MMO Policy and under the defendant AMERICAN CLUB'S primary cover for the cost of defending defendant LAFARGE in the actions.

55.    For example, in the action entitled: *Blair Boutte, et al. v. Lafarge North America, Inc.*, Index No.: 05 CV 5531, U.S.D.C. : E.D.La., it is alleged:

## CLASS ACTION COMPLAINT

\* \* \*

## I.

## Nature of the Action

1.    This is a personal injury, wrongful death/survival, real property damage, personal property damage and business damage class action on behalf of all persons, property owners, and business owners who sustained personal injury, wrongful death/survival claims, personal and real property damage and/or business damage as the result of flooding in New Orleans, Louisiana following Hurricane Katrina, beginning on or about August 30th, 2005 and thereafter.  Plaintiffs seek compensatory and exemplary damages.

\* \* \*

## III.

## Parties

3.      Plaintiffs, BLAIR BOUTTE, DORIS SHANTS AND
        HERBERT WARREN are representative of classes of
        persons on New Orleans, Louisiana and surrounding
        parishes who sustained the following types of damage due
        to flooding following Hurricane Katrina: persons who
        sustained damage to their personal and real property,
        persons who sustained personal injury, persons who are the
        heirs of persons who died as the result of the flooding and
        are representative of those with wrongful death and
        survival claims, persons whose businesses were damaged
        due to the flooding.

4.      The following parties, made defendants in this suit, are
        indebted to plaintiffs, in solido, for such damages as are
        reasonable in the premises, with legal interest thereon from
        the date of judicial demand until paid:

        a.      Defendant, Lafarge North America, Inc., is a
                Virginia Corporation that can be served through its
                registered agent for service of process, The
                Prentice-Hall Corporation Systems, Inc., 11 S. 12th
                Street, P.O. Box 1463, Richmond, Virginia, 23218.

        b.      Defendant, John Doe, was an individual charged
                with the responsibility of adequately securing the
                barge made the basis of this suit prior to Hurricane
                Katrina's landfall.

        c.      Defendants' acts and omissions have caused
                Plaintiffs' injuries and damages detailed above in
                that Defendants' negligence lead to the flooding of
                New Orleans following Hurricane Katrina on or
                about August 30, 2005.

**IV.**

**Louisiana State Law Causes of Action**

5.      Prior to Hurricane Katrina's landfall, Lafarge North
        America, Inc. (hereafter "Lafarge") was operating a barge
        believed to be know as the ING4727, owned by Ingram
        Barge Company, as an inland hopper barge.  On or about
        August 28 and 29, 2005, the ING4727 was under the care,
        custody and control of Lafarge after having unloaded its
        cargo at Lafarge's terminal adjacent to the Industrial Canal.

\* \* \*

## V.

## <u>Count 1 Negligence</u>

9.      Defendants' conduct in not removing and/or failing to
        adequately secure the barge was the cause in fact of all
        Plaintiffs' injuries and damages as set forth above.
        Defendants owed a duty to Plaintiffs to exercise reasonable
        care in removing and/or securing the barge prior to the
        landfall of Hurricane Katrina.  Defendants breached their
        duty and such breach was the legal cause of all Plaintiff's
        injuries.  Plaintiffs have all suffered substantial damage as
        the result of Defendants' conduct, including, but not limited
        to, personal injury, wrongful death, medical expenses,
        hospital expenses, funeral expenses, physical pain and
        suffering, mental anguish and distress, permanent injury
        and disability, loss of earnings, and or loss of real and
        personal property and damage to their businesses.

## VI.

## <u>The Class</u>

10.     Plaintiffs, Individually, and on behalf of THOSE
        SIMILARLY SITUATED, bring this action as a class
        action pursuant to Federal Rule of Civil Procedure 23, on
        behalf of a Class, consisting of all persons who sustained
        personal injury, wrongful death/survival, real property
        damage, personal property damage and business damage
        class action on behalf of all persons, property owners, and
        business owners who sustained personal injury, wrongful
        death/survival claims, personal and real property damage
        and/or business damage as the result of flooding in New
        Orleans following Hurricane Katrina, beginning on or
        about August 30th, 2005.  Excluded from the Class is the
        Defendants, any parent, subsidiary, affiliate, or controlled
        person of Defendants, as well as officers, directors, agents,
        servants, or employees of Defendants, and the immediate
        family members of such persons and any trial judge who
        may preside over this case.

56.    For example, in the action entitled:  *Ethel Mumford v. Ingram Barge Company and Riverway Company*, Index No.: 05 CV 5724, U.S.D.C. : E.D.La., it is alleged:

## FIRST SUPPLEMENTAL AND AMENDED COMPLAINT

The first supplemental and amended complaint of Ethel Mumford, individually, and on behalf of a class of persons with common claims, with respect, represents:

I.

Plaintiff desires to add Lafarge North America, Inc., a foreign corporation licensed to do and doing business in the State of Louisiana and within the venue of this Honorable Court, as a party defendant in the title, body, and prayer of the original complaint liable, jointly and in solido, with the original defendants for the legal liability, acts of omission, acts of commission, and damages, alleged arising out of their joint, and concurrent, responsibility arising out of its ownership, charter, operation, and [. . . .]

* * *

## SUIT FOR DAMAGES
## TRIAL BY JURY

* * *

IV.

Defendants at all times pertinent were the owners, charterers, operators of a steel freight barge 200 feet in length, 35 feet in breadth, and 12 feet in depth, identified as ING 4727, VIN #955868, hull # 1942-10, and alternative VIN #CG025606.

V.

The allision between the unmanned barge and the east side flood wall compels defendants to prove that their negligence was not a proximate cause of the allision.  At all times pertinent the aforesaid barge was under the joint, and concurrent, control and supervision of defendants through their employees acting in the course and scope of their employment with defendants.  The incident was of a kind and nature that cannot occur without negligence and all of the facts are within the exclusive knowledge,

and control of defendants and not equally accessible to plaintiffs wherefore the doctrine of res ipsa loquitur is applicable and specially pleaded herein.

\* \* \*

VII.

The aforesaid barge, abandoned by defendants to the elements, broke loose from its inadequate moorings and crashed through the East side flood wall of the Industrial Canal taking out a large section of the flood wall causing a huge amount of water from Lake Pontchartrain and the Industrial Canal to flow into the Ninth Ward of Orleans Parish and St. Bernard Parish causing catastrophic damage, personal injury and mental anguish to the nominal plaintiff and the class she seeks to represent.

\* \* \*

IX.

Plaintiff's are entitled to recover of defendants the following elements of compensatory damage, among others that will be shown at the time of trial, to wit:

1.   Damage to their immovable and movable properties;

2.   Demolition and salvage of their immovable and movable properties;

3.   Cost of restoration of their land to the pre-Katrina uncontaminated state;

4.   Displacement cost in the temporary replacement of their home, and property;

5.   Lost income;

6.   Pain, suffering, and mental anguish.

57.   For example, in the action entitled:  *In The Matter Of The Complaint Of Ingram Barge Company, As Owner Of The ING4727, Petitioning For Exoneration From Or Limitation Of Liability*, Index No.: 05 CV 4419, U.S.D.C. : E.D.La., it is alleged:

**THIRD-PARTY COMPLAINT AND CLASS ACTION
FOR COMPENSATORY AND EXEMPLARY
DAMAGES AND FOR REASONABLE
<u>ATTORNEY'S FEES AND TAXABLE COSTS</u>**

I.

Claimants and Third-Party Plaintiffs are The Parfait Family, Ashton R. O'Dwyer, Jr. (appearing in proper person), Wilson Simmons, Procula D. Simmons, Tammy Amos, Michael Green, Helen Frank . . . .

II.

Made third-party defendants in this action are the following:

\* \* \*

2)      Lafarge North America Inc., a foreign corporation having its principal office and place of business in Baltimore, Maryland.

\* \* \*

IV.

Sometime during or after the Category 5 hurricane KATRINA's passing through the Greater New Orleans Metropolitan area, a barge owned by Ingram Barge Company, namely the Barge ING-4727, broke free from its moorings and knocked down the floodwall of the Industrial Canal, causing widespread flooding in an area below the Industrial Canal, which otherwise would have survived the storm, causing Claimants to suffer the following:

a)      Death;

b)      Bodily injury;

c)      Loss of or damage to immovable property;

d)      Loss of or damage to movable property;

\* \* \*

16

VII.

Claimants and Third-Party Plaintiffs invoke the Pennsylvania Rule, and aver that Third-Party Defendants are presumed to be at fault, because a moving vessel struck and penetrated a fixed or stationary object, namely the floodwall of the Industrial Canal.

58.     In each of the actions referenced above in paragraphs 55, 56, and 57, *supra*, it has been alleged that defendant LAFARGE was, at all times relevant, the owner, operator and/or in control of the Barge ING 4727 and by virtue of alleged negligent conduct caused the Barge ING 4727 to break loose of its moorings and strike the levy along the Industrial Canal, causing widespread flooding with ensuing personal injury and property damage.

59.     On or about September 9, 2005, defendant LAFARGE placed intervenor plaintiff NYMAGIC on notice of claims that may be covered by the primary MMO Policy.

60.     On or about March 3, 2006, defendant LAFARGE submitted a claim to THE CLUB seeking "indemnification for all potential liability and/or reasonable settlements and litigation costs . . ." in connection with certain claims for property damage and/or personal injury relating to the breakaway of Barge ING 4727 and arising from the Hurricane Katrina disaster in New Orleans.

61.     On or about April 21, 2006, the defendant AMERICAN CLUB sent a letter to defendant LAFARGE wrongfully declining coverage to defendant LAFARGE, on the alleged ground that Barge ING 4727 had not been entered with the defendant AMERICAN CLUB at the time of the casualty, or at any other time, and even if it had been entered, coverage for claims against the vessel would have been excluded.

62.     Defendant LAFARGE is pursuing its claim for coverage and defense costs from the defendant AMERICAN CLUB relating to claims arising from the breakaway of the Barge

17

ING 4727 in a related lawsuit entitled:    *American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Lafarge North America, Inc.*, United States District Court, Southern District of New York, 06 CV 3123 (CSH) ("the Club D.J. Action").

63.    Defendant AMERICAN CLUB maintains that it does not cover any of defendant LAFARGE'S liabilities or defense costs arising from the breakaway of Barge ING 4727, which is central to the Katrina Claims.

64.    If the defendant AMERICAN CLUB is permitted to maintain its wrongful denial of defendant LAFARGE'S claim for defense costs and possible indemnification, the plaintiffs NACA and AHAC and intervenor plaintiff NYMAGIC will sustain damage by defendant LAFARGE'S pursuit of coverages under the Excess Policy.

## AS AND FOR A FIRST CAUSE OF ACTION, AN ACTION AGAINST THE AMERICAN CLUB

65.    Repeat and incorporate by reference the allegations set forth in paragraphs 1 through 64, inclusive of this Complaint with the same force and effect as if more fully set forth herein.

66.    On or about April 21, 2006, defendant AMERICAN CLUB declined the claim by defendant LAFARGE for defense costs and indemnity with regard to the Katrina Claims by filing the Club D.J. Action.   A copy of the Complaint without exhibits is annexed hereto as Exhibit 2.

67.    In the Club D.J. Action filed by the defendant AMERICAN CLUB, two (2) causes of action are set forth for the declination of defendant LAFARGE'S claim for defense costs and indemnity with regard to the Katrina Claims.

68.    In the First Cause of Action in the Club D.J. Action, the defendant AMERICAN CLUB alleges that it does not insure the defendant LAFARGE for the liabilities arising out of or

in connection with the Barge ING 4727 because 1) that barge is not listed on the Schedule of

Vessels in the Certificate of Entry, 2) the Barge ING 4727 was not acquired by defendant

LAFARGE in addition to or in substitution of scheduled vessels, 3) defendant LAFARGE did

not acquire insurable interest in Barge ING 4727, and 4) defendant LAFARGE'S interest in

Barge ING 4727 was not pursuant to a purchase or charter.

69.     The legal relationship which defendant LAFARGE has with the Barge ING 4727

is set forth, at least in part, in a particular Transportation Agreement (hereinafter "TA") by and

between defendant LAFARGE and Ingram Barge Company.   A copy of the TA is annexed

hereto as Exhibit 3.

70.     In and by the terms of the TA, it provides in relevant part:

34.     Possession of the Barge during Loading/Unloading:

Carrier [Ingram] shall deliver an empty or loaded barge to a
loading/unloading facility designated by Shipper [Lafarge]
for loading or unloading.   Shipper shall assume the duty
and responsibility for the safety of each barge in its
possession.     For the purposes of this Agreement,
"possession" shall begin when a Carrier delivers an empty
or loaded barge for loading or unloading to the landing
designated by Shipper and shall end when the barge is
removed by the Carrier or its agent(s).   Shipper shall be
responsible for the safekeeping of Carrier's barge delivered
to a landing regardless of whether Shipper owns or operates
the landing.   During possession, any barge delivered to a
landing designated by the Shipper shall be held without
charge to Carrier.

* * *

36.     Mooring:

Shipper warrants that barges will be safely and adequately
moored <u>free of wharfage</u>, <u>dockage</u>, <u>port and harbor charges</u>
<u>at the loading and unloading points</u> and that the barges will
have warning lights properly displayed as required by
applicable U.S. Coast Guard and U.S. Army Corps. of

19

> Engineers regulations and permits. While barges are in the
> care and custody of Shipper, or its agents, all U.S. Coast
> Guard and U.S. Army Corps of Engineers regulations will
> be complied with, . . . . (emphasis added).

71.    At all times relevant, pursuant to the terms of the TA and at law, defendant

LAFARGE had an insurable interest in Barge ING 4727.

72.    At all times relevant, Barge ING 4727 was at least a vessel in addition to if not in

substitution for those vessels identified in the "Certificate of Entry."

73.    Pursuant to the terms of the TA, defendant LAFARGE did obtain an insurable

interest in the Barge ING 4727 through a "charter, lease or <u>otherwise</u>."  (emphasis added).

74.    Pursuant to the Certificate of Entry, and the terms and conditions of the TA,

coverage under the Club Rules "automatically" attached to the Barge ING 4727.

75.    Defendant LAFARGE did report to the defendant AMERICAN CLUB the name

and gross tonnage of Barge ING 4727 and is willing to pay any additional reasonable premium

as part of the automatic coverage that attached to the Barge ING 4727.

76.    Defendant LAFARGE has complied with all necessary conditions under the

Certificate of Entry for coverage to attach on the Barge ING 4727 under the liability insurance

provided by the Club Rules and the Certificate of Entry.

77.    Defendant AMERICAN CLUB is liable under the Certificate of Entry and the

Club Rules 1) to provide defendant LAFARGE with the defense costs in the underlying Katrina

related litigations, 2) to reimburse defendant LAFARGE for the cost of defending the Club D.J.

Action and is liable to pay the cost of this declaratory judgment action incurred by plaintiffs

NACA and AHAC to have the defendant AMERICAN CLUB'S wrongful declination found

judicially null and void and without effect.

78.     In the Second Cause of Action in the Club D.J. Action, defendant AMERICAN CLUB alleges that defendant LAFARGE does not have any coverage under the Club Rules because of 1) the existence of Other Insurance and/or 2) that whatever liability, if any, arises from a indemnity agreement, because no such indemnity agreement was presented to the defendant AMERICAN CLUB for approval, and/or 3) defendant LAFARGE did not provide the defendant AMERICAN CLUB with a copy of the TA for THE CLUB'S approval.

79.     By virtue of the specific grounds for declination set forth in the Declaratory Judgment Complaint filed by defendant AMERICAN CLUB, any other possible or potential defenses to coverage under the Club Rules or Certificate of Entry have been waived.

80.     There is no express or implied term in the Certificate of Entry requiring THE CLUB'S approval for the TA.

81.     As set forth in the allegations of the underlying complaint by the various and several claimants in the Katrina litigations, liabilities being sought to be imposed upon defendant LAFARGE, in whole or in part, do not arise under a contract of indemnity.

82.     Based upon the terms and conditions of the "Other Insurance" clauses set forth in the MMO Policy and the Club Rules, THE CLUB'S defense of "Other Insurance" under New York law is invalid because an escape clause, such as that set forth in the Club Rules, is rendered ineffective and/or invalid when the Other Insurance policy on the same level as THE CLUB'S primary cover contains an "Other Insurance" clause which transforms the primary to an excess policy such as that set forth in the MMO Policy.

## AS AND FOR A SECOND CAUSE OF ACTION,
## <ins>AN ACTION AGAINST LAFARGE</ins>

83.     Repeat and incorporate by reference the allegations set forth in paragraphs 1

through 82, inclusive of this Complaint with the same force and effect as if more fully set forth

herein.

84.     The Excess Policy provides in relevant part:

> 11.    <ins>MAINTENANCE OF UNDERLYING INSURANCE</ins>:
>
>> A.    It is a condition of this policy that the Section(s) or Policy(ies) referred to below in the "Schedule of Underlying Insurance" shall be maintained in full effect during the currency of this insurance except for any reduction of the aggregate limit(s) contained therein solely by payment of claims in respect of accidents and/or occurrences, occurring during the term of this Policy.
>>
>> B.    Inadvertent failure of the Assured to comply with Paragraph A above or inadvertent failure to notify this Company of any changes in the Underlying Insurances shall not prejudice the Assured's rights of recovery under this Policy, but in the event of such failure, this Company to be liable only to the same extent as they would have been had the Assured complied with the said condition.

85.     In the event that defendant LAFARGE failed to comply with all requirements of

the Club Rules and/or the Certificate of Entry, which were and are necessary to bring the Barge

ING 4727 within the scope of the coverage provided by the AMERICAN CLUB, such failure

even if inadvertent, relieves the subscribers to the Excess Policy, including plaintiffs NACA and

AHAC and intervenor plaintiff NYMAGIC of any obligation to make payment to defendant

LAFARGE until such time as the amount which would have been covered under the Club Rules

and the Certificate of Entry would have been exhausted as if coverage under the Club Rules and

the Certificate of Entry were in fact in full force and effect.

86.    By virtue of the foregoing premises, the subscribing underwriters to the Excess Policy, including the intervenor plaintiff, shall not be required to pay under the Excess Policy until such time as an amount equivalent to the full amount of coverage under the AMERICAN CLUB been paid by defendant LAFARGE.

**AS AND FOR A THIRD CAUSE OF ACTION,**
**AN ACTION AGAINST LAFARGE**

87.    Repeat and incorporate by reference the allegations set forth in paragraphs 1 through 86, inclusive of this Complaint with the same force and effect as if more fully set forth herein.

88.    The MMO Policy provides in relevant part:

> 4.    **NAMING ATTORNEYS:**
>
> This Company, in consideration, in consultation with the Assured, shall have the option of naming any mutually acceptable attorneys who shall represent the Assured in the prosecution or defense of any litigation or negotiations between the Assured and third parties concerning any claim based on a liability or an alleged liability covered by this policy, and shall have the direction of such litigation's [sic] or negotiations.  If the Assured shall fail or refuse to settle any claim as authorized by this Company, the liability of this Company shall be limited to the amount for which settlement could have been made. (emphasis added).

89.    In and by the terms of the MMO Policy, intervenor plaintiff NYMAGIC had the sole right with the consent of the Assured to name counsel for defendant LAFARGE in the actions involving the Katrina Claims.

90.    In and by the terms of the MMO Policy, defendant LAFARGE had no right whatsoever to name counsel to defend its interest in the Katrina Claims at the expense of the primary insurer NYMAGIC and/or the excess insurers, intervenor plaintiff NYMAGIC, and plaintiffs AHAC and NACA.

23

91.     At all times relevant, intervenor plaintiff NYMAGIC, after consultation with LAFARGE, sought the consent of LAFARGE for the retention of one of several firms to provide a defense for defendant LAFARGE in the underlying actions involving the Katrina Claims.

92.     At all times relevant, defendant LAFARGE failed to consult with NYMAGIC in good faith and wrongfully and unreasonably withheld consent to the appointment of counsel by NYMAGIC to defend defendant LAFARGE in the underlying Katrina Claims.

93.     By reason of defendant LAFARGE's failure to consult with NYMAGIC in good faith and then unreasonably withhold its consent to the counsel named by NYMAGIC, defendant LAFARGE has, as a matter of law, waived its rights to participate in the naming of defense counsel under the MMO Policy and Excess Policy.

94.     After due consideration, NYMAGIC retained the law firm of Sutterfield & Webb, LLC, as counsel to defend LAFARGE in the Katrina Claims.

95.     At this time, defendant LAFARGE has paid and/or incurred cost for its separately retained counsel, Goodwin Procter, Holland & Knight, and Chaffe McCall, in an amount in excess of $7.5 million, whose services were and are, in whole or in part, duplicative of those services and/or unwarranted services rendered by counsel retained by NYMAGIC on behalf of defendant LAFARGE in defense of the underlying Katrina Claims.

96.     Defendant LAFARGE is now making claim under the MMO Policy and the Excess Policy for reimbursement of the costs for its separately retained counsel without having consulted with and/or having obtained the approval of plaintiffs AHAC and NACA and intervenor plaintiff NYMAGIC.

97.     In and by the terms of the Excess Policy, it provides in relevant part:

4.     **ASSISTANCE AND COOPERATION:**

> This Company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceedings instituted against the Assured, but <u>this Company shall have the right and shall be given the opportunity to associate with the Assured or the Assured's Underlying Insurers, or both, in the defense and control of any claim</u>, suit or proceeding relative to an occurrence where the claim or suit involves or appears reasonably likely to involve this Company in which event the Assured, the Underlying Insurers and this Company shall cooperate in all things in the defense of such claim, suit or proceeding. (emphasis added).

98.     By the terms of the Excess Policy, plaintiffs AHAC and NACA and intervenor plaintiff NYMAGIC, have the absolute right to be given the opportunity to associate with the insured and the underlying insurer in the defense and control of the Katrina Claims.

99.     Defendant LAFARGE did not give the plaintiffs AHAC and NACA and/or the intervenor plaintiff NYMAGIC an opportunity to associate with the defendant LAFARGE on the selection of its counsel and/or on the proper management and cost control of the defense of the underlying Katrina Claims with respect to the counsel which were separately retained by defendant LAFARGE.

100.     By virtue of the foregoing premises, defendant LAFARGE has no right to seek reimbursement for the past and/or future payments to be made to those counsel which were separately retained by defendant LAFARGE without the consent of, and/or without consultation with, its primary and excess insurers.

**AS AND FOR A FOURTH CAUSE OF ACTION,**
**AN ACTION AGAINST BOTH THE AMERICAN CLUB AND LAFARGE**

101.    Repeat and incorporate by reference the allegations set forth in paragraphs 1 through 100, inclusive of this Complaint with the same force and effect as if more fully set forth herein.

102.    The MMO Policy contains an "Other Insurance" clause which renders the MMO Policy excess to any other primary policy.

103.    The primary insurance coverage provided under the Club Rules and Certificate of Entry contains an "Other Insurance" clause or terms which attempts to make THE CLUB coverage null and void if Other Insurance coverage is applicable to the claim.

104.    Under New York law, when comparing an excess type "Other Insurance" clause in a primary policy to an escape type of "Other Insurance" clause in a second primary policy covering the same insured, the escape clause is given no force and effect rendering the primary policy with the escape clause the ultimate primary policy to respond to the claim with the other primary policy containing the excess clause being the first excess policy.

105.    The Excess Policy subscribed to by plaintiffs NACA and AHAC and intervenor plaintiff NYMAGIC, is a true Excess Policy which schedules both the MMO Policy and THE CLUB cover as Underlying Insurance and therefore renders the Excess Policy the excess insurance coverage to both the MMO Policy and THE CLUB cover.

106.    The Excess Policy also contains an "Other Insurance" clause which by its terms makes it excess to any primary policy.

107.    By virtue of the foregoing, the coverage afforded under the Excess Policy is not triggered until the limits of liability for the coverage afforded under both the MMO Policy and THE CLUB cover are fully exhausted.

WHEREFORE, the plaintiffs The Northern Assurance Company of America and American Home Assurance Company prays for judgment as follows:

A.    On the First Cause of Action, a judgment in favor of the intervenor plaintiff New York Marine and General Insurance Company against the defendant American Steamship Owners Mutual Protection and Indemnity Association, Inc. declaring that the Club's denial of coverage to defendant Lafarge North America, Inc. is invalid and that there is coverage under the Club Rules and Certificate of Entry issued to defendant Lafarge North America, Inc. for, at a minimum, the cost of paying for defending all underlying Katrina Claims and related litigations;

B.    On the Second Cause of Action, a judgment in favor of intervenor plaintiff New York Marine and General Insurance Company against defendant Lafarge North America, Inc., declaring that the Excess Marine Liability Policy, issued by plaintiffs The Northern Assurance Company of America and American Home Assurance Company and intervenor plaintiff NYMAGIC to defendant Lafarge North America, Inc. does not respond until the dollar limit under the primary MMO Policy has been paid up to its full limit of $5,000,000.00 and defendant Lafarge North America, Inc. has paid the full amount which should have been paid under the Club cover but for defendant Lafarge North America, Inc.'s failure to comply with the requirements to have the Barge ING 4727 validly entered for coverage under the Club Rules and Certificate of Entry.

C.    On the Third Cause of Action, a judgment in favor of intervenor plaintiff New York Marine and General Insurance Company against defendant Lafarge North America, Inc. declaring that the Excess Marine Liability Policy issued by the

plaintiffs The Northern Assurance Company of America and American Home Assurance Company and intervenor plaintiff New York Marine and General Insurance Company, are not liable to reimburse defendant Lafarge North America, Inc. for payments to those several counsel engaged by Lafarge North America, Inc. without the consent of the insurers.

D.    On the Fourth Cause of Action, a judgment in favor of intervenor plaintiff New York Marine and General Insurance Company against both defendants Lafarge North America, Inc. and American Steamship Owners Mutual Protection and Indemnity Association, Inc. declaring that the Excess Marine Liability Policy issued by the plaintiffs The Northern Assurance Company of America and American Home Assurance Company and intervenor plaintiff NYMAGIC to defendant Lafarge North America, Inc. is excess to the available coverages under both the MMO Policy and the Club cover; and

E.    For other and such further relief as the Court deems just and proper;

and for the cost and disbursements of this action.

Dated:    New York, New York
          July 16, 2008

                              BROWN GAVALAS & FROMM LLP
                              Attorneys for Intervenor Plaintiff
                              *New York Marine and*
                              *General Insurance Company*


                    By:    _____/S/_____

                              David H. Fromm (DF-9334)
                              E-Mail: dhf@browngavalas.com
                              Michael P. Naughton (MN-6870)
                              E-Mail: mpn@browngavalas.com
                              355 Lexington Avenue
                              New York, New York 10017
                              Telephone:  (212) 983-8500
                              Facsimile:   (212) 983-5946

# EXHIBIT 1

Mitchell 4



THE
AMERICAN
CLUB

American Steamship Owners Mutual Protection and Indemnity Association, Inc.
60 Broad Street – 37th Floor,
New York, NY 10004, U.S.A.

Shipowners Claims Bureau, Inc., Manager

# CERTIFICATE OF ENTRY

of the vessel(s) set out herein for account of the Member named hereunder subject to the By-Laws and Rules of the Association from time to time in force and to any special terms and conditions endorsed hereon and/or as may from time to time be circularized. Unless indicated to the contrary herein, the cover evidenced by this Certificate of Entry commences at noon GMT on the date specified below and continues until cover ceases or is terminated in accordance with the said By-Laws and Rules.

## Class I – Protection & Indemnity Insurance

| VESSEL(S) | FLAG | GROSS TONNAGE | COVER TO COMMENCE |
|---|---|---|---|
| As per Schedule | As per Schedule | As per Schedule | 20 February, 2005 RENEWAL DATE 20 February, 2006 |
| **MEMBER** | | | |
| LAFARGE NORTH AMERICA INC. | | | |
| **SPECIAL TERMS & CONDITIONS AS ATTACHED** | | | |

**IMPORTANT**

This Certificate of Entry is evidence only of the contract of indemnity insurance between the above-named Member and the Association and shall not be construed as evidence of any undertaking, financial or otherwise, on the part of the Association to any other party.

If a Member tenders this Certificate as evidence of insurance under any applicable law relating to financial responsibility, or otherwise shows or offers it to any other party as evidence of insurance, such use of this Certificate by the Member is not to be taken as any indication that the Association thereby consents to act as guarantor or to be sued directly in any jurisdiction whatsoever. The Association does not so consent.

The Member named in this Certificate of Entry is liable to pay Mutual Premium as provided for in Rule 4. Furthermore, the Member may become liable under the said Rule 4 to pay Overspill Calls to meet the Association's proportion of any Overspill Claims up to the limit per vessel as provided for in the said Rule 4.

CERTIFICATE NO.:     01729000

NEW YORK:     31 March, 2005     BY: _____

AUTHORIZED SIGNATURE

CLUB000424



CERTIFICATE NO.:    017.9000

### SCHEDULE OF VESSELS

| VESSEL NAME | TYPE | FLAG | GROSS TONNAGE |
|---|---|---|---|
| ADELAIDE | Barge (dry) | USA | 8,512 |
| ALEXANDRA | Barge (dry) | USA | 8,512 |
| BARGE JOPPA | Tank Barge | USA | 1,500 |
| BELCRAFT | Barge (dry) | USA | 3,814 |
| CITADEL I | Barge (dry) | USA | 1,500 |
| CITADEL II | Barge (dry) | USA | 1,500 |
| CITADEL III | Barge (dry) | USA | 1,500 |
| CITADEL IV | Barge (dry) | USA | 1,500 |
| FLOATING DOCK JOPPA | Tank Barge | USA | 1,500 |
| G.L. OSTRANDER | Tug/Supply | USA | 198 |
| INTEGRITY | Dirty Oil Tank | USA | 7,557 |
| J.B. FORD | Bulk | USA | 4,368 |
| MAGNOLIA | Tank Barge | USA | 1,734 |
| MARIA T | Barge (dry) | USA | 8,865 |
| MC 65-2 | Barge (dry) | USA | 180 |
| MC 66-2 | Barge (dry) | USA | 180 |
| MPC253 | Barge (dry) | USA | 1,400 |
| MPC256 | Barge (dry) | USA | 1,400 |
| MPC257 | Barge (dry) | USA | 1,400 |
| MPC258 | Barge (dry) | USA | 1,400 |
| MPC259 | Barge (dry) | USA | 1,400 |
| MPC31 | Barge (dry) | USA | 1,800 |
| MPC32 | Barge (dry) | USA | 1,800 |
| MPC33 | Barge (dry) | USA | 2,600 |
| MPC350 | Barge (dry) | USA | 1,200 |
| MPC351 | Barge (dry) | USA | 1,500 |
| MPC352 | Barge (dry) | USA | 1,500 |
| MPC51 | Barge (dry) | USA | 1,526 |
| MPC52 | Barge (dry) | USA | 1,526 |
| MPC53 | Barge (dry) | USA | 1,526 |
| MPC54 | Barge (dry) | USA | 1,526 |
| MPC55 | Barge (dry) | USA | 1,526 |

2

CLUB000425



CERTIFICATE NO.:   01729000

| | | | |
|---|---|---|---|
| MPC66 | Barge (dry) | USA | 1,400 |
| MPC67 | Barge (dry) | USA | 1,400 |
| MPC68 | Barge (dry) | USA | 1,400 |
| MPC69 | Barge (dry) | USA | 1,400 |
| MPC70 | Barge (dry) | USA | 1,400 |
| MPC71 | Barge (dry) | USA | 1,400 |
| MPC72 | Barge (dry) | USA | 1,400 |
| MPC73 | Barge (dry) | USA | 1,400 |
| MPC74 | Barge (dry) | USA | 1,400 |
| MPC75 | Barge (dry) | USA | 1,400 |
| MPC76 | Barge (dry) | USA | 1,400 |
| MPC77 | Barge (dry) | USA | 1,400 |
| MPC78 | Barge (dry) | USA | 1,400 |
| MPC79 | Barge (dry) | USA | 1,400 |
| MPC80 | Barge (dry) | USA | 1,400 |
| MPC81 | Barge (dry) | USA | 1,400 |
| MPC82 | Barge (dry) | USA | 1,400 |
| MPC83 | Barge (dry) | USA | 1,400 |
| MPC84 | Barge (dry) | USA | 1,400 |
| MPC85 | Barge (dry) | USA | 1,400 |
| MPC86 | Barge (dry) | USA | 1,400 |
| MPC87 | Barge (dry) | USA | 1,400 |
| MPC88 | Barge (dry) | USA | 1,400 |
| MPC89 | Barge (dry) | USA | 1,400 |
| MPC90 | Barge (dry) | USA | 1,400 |
| MPC91 | Barge (dry) | USA | 1,400 |
| MPC92 | Barge (dry) | USA | 1,400 |
| MPC93 | Barge (dry) | USA | 1,400 |
| MPC94 | Barge (dry) | USA | 1,400 |
| MPC95 | Barge (dry) | USA | 1,400 |
| MPC96 | Barge (dry) | USA | 1,400 |
| MPC97 | Barge (dry) | USA | 1,400 |
| NORFOLK | Tug | USA | 499 |
| TRINITY I | Barge (dry) | USA | 400 |
| TRINITY II | Barge (dry) | USA | 1,102 |

3

CLUB000426



CERTIFICATE NO.:   01729000

| MPC61 | Barge (dry) | USA | 1,400 |
| MPC62 | Barge (dry) | USA | 1,400 |
| MPC64 | Barge (dry) | USA | 1,400 |
| MPC63 | Barge (dry) | USA | 1,400 |
| MPC65 | Barge (dry) | USA | 1,400 |

4

CLUB000427



CERTIFICATE NO.:   01729000

## SPECIAL TERMS & CONDITIONS

| COLLISION | FOUR-FOURTHS COLLISION COVERAGE INCLUDED |
|---|---|
| | Coverage hereunder, pursuant to Rule 2, Section 3.2, includes four-fourths of those liabilities, costs and expenses set out as insured losses in the Collision Clause of the American Institute Hull Clauses (June 2, 1977), or as provided for by such similar terms as may be contained in the insured vessel's hull policies, and which would have been covered under the said Clauses, or hull policies but for their exclusion therefrom, and subject always and in any event to each and every other provision of Rule 2, Section 3, in general. |
| EXCLUSIONS | COVERAGE IN RESPECT OF CARGO AND UNRECOVERABLE G.A. CONTRIBUTIONS EXCLUDED |
| | Coverage hereunder excludes absolutely all those claims in respect of cargo otherwise recoverable in accordance with Rule 2, Section 7, all those claims for Fines otherwise recoverable under Rule 2, Section 8.1, and all those claims in respect of unrecoverable general average contributions otherwise recoverable in accordance with Rule 2, Section 12. |
| DEDUCTIBLES | US$25,000 from all claims, each accident or occurrence. |
| OTHER CLAUSES | NO LAID-UP RETURNS |
| | It is hereby noted and agreed that the provisions of Rule 4, Section 11, do not apply to the coverage evidenced by this Certificate of Entry. |
| MEMBER SPECIFIC CLAUSES | CHARTERED BARGES |
| | If Lafarge Corporation et al acquires an insurable interest in any vessel in addition to or in substitution for those set forth herein, through purchase, charter, lease or otherwise, such insurance as is afforded hereunder to any similar vessel shall automatically cover such additional vessel effective from the date and time the Assured acquires an insurable interest in such additional vessel. With respect to a chartered, leased or similarly acquired vessel, the insurance hereunder automatically includes the owner as an additional Assured with waiver of subrogation against the owner, if required, effective from the date and time such vessel is insured hereunder.<br><br>The above provision shall not apply to vessels which are chartered under a contract whereby the owner (or Demise Owner) and Charterer agree that the owner (or Demise Owner) shall procure Protection & Indemnity Insurance on the vessel and such insurance shall include the charterer as an Assured. |

5

CLUB000428

CERTIFICATE NO.:    01729000

The Assured agrees to report the name and gross tonnage of any vessel in which they acquire an insurable interest at the expiration of this policy and pay any additional premium as may be required annually, at expiry at daily pro-rate the annual rates agreed.

6

CLUB000429



CERTIFICATE NO.:    01729000

PREMIUM(S)

| VESSEL NAME | RISK NUMBER | GT | RATE (USD per GT per annum) | ADVANCE PREMIUM FOR PERIOD (US Dollar) |
|---|---|---|---|---|
| ADELAIDE | 37741 | 8,512 | 1.6128 | 13,728.15 |
| ALEXANDRA | 37742 | 8,512 | 1.6128 | 13,728.15 |
| BARGE JOPPA | 37743 | 1,500 | 1.6128 | 2,419.20 |
| BELCRAFT | 37744 | 3,614 | 1.6128 | 5,828.66 |
| CITADEL I | 37745 | 1,500 | 1.6128 | 2,419.20 |
| CITADEL II | 37746 | 1,500 | 1.6128 | 2,419.20 |
| CITADEL III | 37747 | 1,500 | 1.6128 | 2,419.20 |
| CITADEL IV | 37748 | 1,500 | 1.6128 | 2,419.20 |
| FLOATING DOCK JOPPA | 37749 | 1,500 | 1.6128 | 2,419.20 |
| G.L. OSTRANDER | 37750 | 198 | 94.9772 | 18,805.49 |
| INTEGRITY | 37751 | 7,557 | 1.6128 | 12,187.93 |
| J.B. FORD | 37752 | 4,368 | 1.6128 | 7,044.71 |
| MAGNOLIA | 37753 | 1,734 | 1.6128 | 2,796.60 |
| MARIA T | 37754 | 8,865 | 1.6128 | 14,297.47 |
| MC 05-2 | 37755 | 180 | 13.4400 | 2,419.20 |
| MC 66-2 | 37756 | 180 | 13.4400 | 2,419.20 |
| MPC253 | 37757 | 1,400 | 1.7280 | 2,419.20 |
| MPC256 | 37758 | 1,400 | 1.7280 | 2,419.20 |
| MPC257 | 37759 | 1,400 | 1.7280 | 2,419.20 |
| MPC258 | 37760 | 1,400 | 1.7280 | 2,419.20 |
| MPC259 | 37761 | 1,400 | 1.7280 | 2,419.20 |
| MPC31 | 37762 | 1,800 | 1.3440 | 2,419.20 |
| MPC32 | 37763 | 1,800 | 1.3440 | 2,419.20 |
| MPC33 | 37764 | 2,600 | 0.9486 | 2,461.16 |
| MPC350 | 37765 | 1,200 | 2.0160 | 2,419.20 |
| MPC351 | 37766 | 1,500 | 1.6128 | 2,419.20 |
| MPC352 | 37767 | 1,500 | 1.6128 | 2,419.20 |
| MPC51 | 37768 | 1,526 | 1.6128 | 2,461.13 |
| MPC52 | 37769 | 1,526 | 1.6128 | 2,461.13 |
| MPC53 | 37770 | 1,526 | 1.6128 | 2,461.13 |

7

CLUB000430



CERTIFICATE NO.:   01729000

| | | | | |
|---|---|---|---|---|
| MPC54 | 37771 | 1,526 | 1.6128 | 2,461.13 |
| MPC55 | 37772 | 1,526 | 1.6128 | 2,461.13 |
| MPC66 | 37773 | 1,400 | 1.7280 | 2,419.20 |
| MPC67 | 37774 | 1,400 | 1.7280 | 2,419.20 |
| MPC68 | 37775 | 1,400 | 1.7280 | 2,419.20 |
| MPC69 | 37776 | 1,400 | 1.7280 | 2,419.20 |
| MPC70 | 37777 | 1,400 | 1.7280 | 2,419.20 |
| MPC71 | 37778 | 1,400 | 1.7280 | 2,419.20 |
| MPC72 | 37779 | 1,400 | 1.7280 | 2,419.20 |
| MPC73 | 37780 | 1,400 | 1.7280 | 2,419.20 |
| MPC74 | 37781 | 1,400 | 1.7280 | 2,419.20 |
| MPC75 | 37782 | 1,400 | 1.7280 | 2,419.20 |
| MPC76 | 37783 | 1,400 | 1.7280 | 2,419.20 |
| MPC77 | 37784 | 1,400 | 1.7280 | 2,419.20 |
| MPC78 | 37785 | 1,400 | 1.7280 | 2,419.20 |
| MPC79 | 37786 | 1,400 | 1.7280 | 2,419.20 |
| MPC80 | 37787 | 1,400 | 1.7280 | 2,419.20 |
| MPC81 | 37788 | 1,400 | 1.7280 | 2,419.20 |
| MPC82 | 37789 | 1,400 | 1.7280 | 2,419.20 |
| MPC83 | 37790 | 1,400 | 1.7280 | 2,419.20 |
| MPC84 | 37791 | 1,400 | 1.7280 | 2,419.20 |
| MPC85 | 37792 | 1,400 | 1.7280 | 2,419.20 |
| MPC86 | 37793 | 1,400 | 1.7280 | 2,419.20 |
| MPC87 | 37794 | 1,400 | 1.7280 | 2,419.20 |
| MPC88 | 37795 | 1,400 | 1.7280 | 2,419.20 |
| MPC89 | 37796 | 1,400 | 1.7280 | 2,419.20 |
| MPC90 | 37797 | 1,400 | 1.7280 | 2,419.20 |
| MPC91 | 37798 | 1,400 | 1.7280 | 2,419.20 |
| MPC92 | 37799 | 1,400 | 1.7280 | 2,419.20 |
| MPC93 | 37800 | 1,400 | 1.7280 | 2,419.20 |
| MPC94 | 37801 | 1,400 | 1.7280 | 2,419.20 |
| MPC95 | 37802 | 1,400 | 1.7280 | 2,419.20 |
| MPC96 | 37803 | 1,400 | 1.7280 | 2,419.20 |
| MPC97 | 37804 | 1,400 | 1.7280 | 2,419.20 |
| NORFOLK | 37805 | 499 | 13.5271 | 6,750.02 |

8

CLUB000431



CERTIFICATE NO.:    01729000

| | | | | |
|---|---|---|---|---|
| TRINITY I | 37806 | 400 | 6.0480 | 2,419.20 |
| TRINITY II | 37807 | 1,102 | 2.1953 | 2,419.22 |
| MPC61 | 37812 | 1,400 | 1.7280 | 2,419.20 |
| MPC62 | 37813 | 1,400 | 1.7280 | 2,419.20 |
| MPC64 | 37819 | 1,400 | 1.7280 | 2,419.20 |
| MPC63 | 37820 | 1,400 | 1.7280 | 2,419.20 |
| MPC65 | 37821 | 1,400 | 1.7280 | 2,419.20 |

9

CLUB000432

American Steamship Owners Mutual Protection & Indemnity Association, Inc.



| | |
|---|---|
| Shipowners Claims Bureau, Inc., Manager | Tel: +1 212-847-4500 |
| 60 Broad Street – 37th Floor | Fax: +1 212-847-4599 |
| New York, New York 10004 | |
| U.S.A. | |

Willis of New York, Inc.
7 Hanover Square
New York, NY 10004-2594
USA

Date:          31 Mar 2005

Invoice No:    28299

For the Account of:  Lafarge North America Inc.
Our Reference:    440

### ADVANCE PREMIUM
### CLASS P&I
### FOR THE PERIOD FROM 20 Feb 2005 TO 20 Feb 2006
### NO OF DAYS PRO RATA 365/365

| Vessel | (Risk No) | GT | Annual Rate USD per GT | Advance Premium for Period |
|---|---|---|---|---|
| ADELAIDE | (37741) | 8,512 | 1.6128 | 13,728.15 |
| ALEXANDRA | (37742) | 8,512 | 1.6128 | 13,728.15 |
| BARGE JOPPA | (37743) | 1,500 | 1.6128 | 2,419.20 |
| BELCRAFT | (37744) | 3,614 | 1.6128 | 5,828.66 |
| CITADEL I | (37745) | 1,500 | 1.6128 | 2,419.20 |
| CITADEL II | (37746) | 1,500 | 1.6128 | 2,419.20 |
| CITADEL III | (37747) | 1,500 | 1.6128 | 2,419.20 |
| CITADEL IV | (37748) | 1,500 | 1.6128 | 2,419.20 |
| FLOATING DOCK JOPPA | (37749) | 1,500 | 1.6128 | 2,419.20 |
| G.L. OSTRANDER | (37750) | 198 | 94.9772 | 18,805.49 |
| INTEGRITY | (37751) | 7,557 | 1.6128 | 12,187.93 |
| J.B. FORD | (37752) | 4,368 | 1.6128 | 7,044.71 |
| MAGNOLIA | (37753) | 1,734 | 1.6128 | 2,796.60 |
| MARIA T | (37754) | 8,865 | 1.6128 | 14,297.47 |
| MC 65-2 | (37755) | 180 | 13.4400 | 2,419.20 |
| MC 65-2 | (37756) | 180 | 13.4400 | 2,419.20 |
| MPC253 | (37757) | 1,400 | 1.7280 | 2,419.20 |
| MPC256 | (37758) | 1,400 | 1.7280 | 2,419.20 |
| MPC257 | (37759) | 1,400 | 1.7280 | 2,419.20 |
| MPC258 | (37760) | 1,400 | 1.7280 | 2,419.20 |
| MPC259 | (37761) | 1,400 | 1.7280 | 2,419.20 |
| MPC31 | (37762) | 1,800 | 1.3440 | 2,419.20 |
| MPC32 | (37763) | 1,800 | 1.3440 | 2,419.20 |
| MPC33 | (37764) | 2,600 | .9466 | 2,461.15 |

Wire/telegraphic transfers to the American Club should be made to its account at:
Deutsche Bank Trust Company Americas, New York, New York, U.S.A.
Depending upon the origin of funds, one of the following bank codes should be used:
Wire transfers made through a bank within the U.S.: ABA: 021-001-033
Wire transfers made through a bank outside the U.S.: SWIFT: BKTRUS33 or CHIPS: 0103
In both cases, funds should be indicated as being for the credit of:
Account Name: American Steamship Owners P&I Assn. Inc.
Account Number: 00-700-269

American Steamship Owners Mutual Protection & Indemnity Association, Inc.



THE AMERICAN CLUB

Shipowners Claims Bureau, Inc., Manager
60 Broad Street – 37th Floor
New York, New York 10004
U.S.A.

Tel: +1 212-847-4500
Fax: +1 212-847-4599

| Vessel | (Risk No) | GT | Annual Rate USD per GT | Advance Premium for Period |
|--------|-----------|----|-----|-----|
| MPC350 | (37765) | 1,200 | 2.0160 | 2,419.20 |
| MPC351 | (37766) | 1,500 | 1.8128 | 2,419.20 |
| MPC352 | (37767) | 1,500 | 1.8128 | 2,419.20 |
| MPCS1 | (37768) | 1,526 | 1.6128 | 2,461.13 |
| MPC52 | (37769) | 1,526 | 1.6128 | 2,461.13 |
| MPC53 | (37770) | 1,526 | 1.6128 | 2,461.13 |
| MPC54 | (37771) | 1,526 | 1.6128 | 2,461.13 |
| MPC55 | (37772) | 1,526 | 1.6128 | 2,461.13 |
| MPC61 | (37812) | 1,400 | 1.7280 | 2,419.20 |
| MPC62 | (37813) | 1,400 | 1.7280 | 2,419.20 |
| MPC63 | (37820) | 1,400 | 1.7280 | 2,419.20 |
| MPC64 | (37819) | 1,400 | 1.7280 | 2,419.20 |
| MPC65 | (37821) | 1,400 | 1.7280 | 2,419.20 |
| MPC66 | (37773) | 1,400 | 1.7280 | 2,419.20 |
| MPC67 | (37774) | 1,400 | 1.7280 | 2,419.20 |
| MPC68 | (37775) | 1,400 | 1.7280 | 2,419.20 |
| MPC69 | (37776) | 1,400 | 1.7280 | 2,419.20 |
| MPC70 | (37777) | 1,400 | 1.7280 | 2,419.20 |
| MPC71 | (37778) | 1,400 | 1.7280 | 2,419.20 |
| MPC72 | (37779) | 1,400 | 1.7280 | 2,419.20 |
| MPC73 | (37780) | 1,400 | 1.7280 | 2,419.20 |
| MPC74 | (37781) | 1,400 | 1.7280 | 2,419.20 |
| MPC75 | (37782) | 1,400 | 1.7280 | 2,419.20 |
| MPC76 | (37783) | 1,400 | 1.7280 | 2,419.20 |
| MPC77 | (37784) | 1,400 | 1.7280 | 2,419.20 |
| MPC78 | (37785) | 1,400 | 1.7280 | 2,419.20 |
| MPC79 | (37786) | 1,400 | 1.7280 | 2,419.20 |
| MPC80 | (37787) | 1,400 | 1.7280 | 2,419.20 |
| MPC81 | (37788) | 1,400 | 1.7280 | 2,419.20 |
| MPC82 | (37789) | 1,400 | 1.7280 | 2,419.20 |
| MPC83 | (37790) | 1,400 | 1.7280 | 2,419.20 |
| MPC84 | (37791) | 1,400 | 1.7280 | 2,419.20 |
| MPC85 | (37792) | 1,400 | 1.7280 | 2,419.20 |
| MPC86 | (37793) | 1,400 | 1.7280 | 2,419.20 |
| MPC87 | (37794) | 1,400 | 1.7280 | 2,419.20 |
| MPC88 | (37795) | 1,400 | 1.7280 | 2,419.20 |
| MPC89 | (37796) | 1,400 | 1.7280 | 2,419.20 |
| MPC90 | (37797) | 1,400 | 1.7280 | 2,419.20 |
| MPC91 | (37798) | 1,400 | 1.7280 | 2,419.20 |
| MPC92 | (37799) | 1,400 | 1.7280 | 2,419.20 |
| MPC93 | (37800) | 1,400 | 1.7280 | 2,419.20 |

Wire/telegraphic transfers to the American Club should be made to its account at:
Deutsche Bank Trust Company Americas, New York, New York, U.S.A.
Depending upon the origin of funds, one of the following bank codes should be used:
Wire transfers made through a bank within the U.S.: ABA: 021-001-033
Wire transfers made through a bank outside the U.S.: SWIFT: BKTRUS33 or CHIPS: 0103
In both cases, funds should be indicated as being for the credit of:
Account Name: American Steamship Owners P&I Assn. Inc.
Account Number: 00-700-269

CLUB000434

American Steamship Owners Mutual Protection & Indemnity Association, Inc.



Shipowners Claims Bureau, Inc., Manager
60 Broad Street – 37th Floor
New York, New York 10004
U.S.A.

Tel:  +1 212-847-4500
Fax:  +1 212-847-4599

| Vessel | (Risk No) | GT | Annual Rate USD per GT | Advance Premium for Period |
|--------|-----------|-----|------------------------|----------------------------|
| MPC94 | (37801) | 1,400 | 1.7280 | 2,419.20 |
| MPC95 | (37802) | 1,400 | 1.7280 | 2,419.20 |
| MPC96 | (37803) | 1,400 | 1.7280 | 2,419.20 |
| MPC97 | (37804) | 1,400 | 1.7280 | 2,419.20 |
| NORFOLK | (37805) | 499 | 13.5271 | 6,750.02 |
| TRINITY I | (37806) | 400 | 6.0480 | 2,419.20 |
| TRINITY II | (37807) | 1,102 | 2.1953 | 2,419.22 |

| Total | USD | 247,828.42 |
|-------|-----|-----------|

| Due Dates | | Amount |
|-----------|-----|--------|
| 31 Mar 2005 | USD | 61,957.11 |
| 20 Jun 2005 | USD | 61,957.10 |
| 20 Sep 2005 | USD | 61,957.10 |
| 20 Dec 2005 | USD | 61,957.10 |

| Additional Details: |
|---------------------|
| |

Wire/telegraphic transfers to the American Club should be made to its account at:
Deutsche Bank Trust Company Americas, New York, New York, U.S.A.
Depending upon the origin of funds, one of the following bank codes should be used:
Wire transfers made through a bank within the U.S.: ABA: 021-001-033
Wire transfers made through a bank outside the U.S.: SWIFT: BKTRUS33 or CHIPS: 0103
In both cases, funds should be indicated as being for the credit of:
Account Name: American Steamship Owners P&I Assn, Inc.
Account Number: 00-700-268

CLUB000435

# EXHIBIT 2

THACHER PROFFITT & WOOD LLP
Two World Financial Center
New York, New York 10281
(212) 912-7400
John M. Woods (JW/0697)
Alan F. Kaufman (AK/9114)
Neil T. Bloomfield (NB/0669)
*Attorneys for Plaintiff*



06 CV 3123

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY ASSOCIATION,
INC.,

                                        Plaintiff,

        - against -

LAFARGE NORTH AMERICA, INC.,

                                        Defendant.

ECF CASE

RECEIVED
APR 24 2006
U.S.D.C. S.D. N.Y.
CASHIERS

Case No.:

**COMPLAINT**

        Plaintiff, American Steamship Owners Mutual Protection and Indemnity Association,

Inc. (the "American Club" or the "Club"), by and through its attorneys, Thacher Proffitt & Wood

LLP, as and for its Complaint alleges as follows:

        1.      The matter in controversy relates to the demand of one of the Club's members,

Lafarge North America, Inc. ("Lafarge"), for indemnification against potential liability and

defense costs in respect of claims arising from the breakaway of a barge that was at Lafarge's

New Orleans, Louisiana facility during Hurricane Katrina in August, 2005. In other lawsuits

pending against Lafarge, it is alleged that the barge, called the ING 4727, struck and caused or

contributed to the collapse of the 17th Street Industrial Canal floodwall causing massive flooding

in the City of New Orleans. By this action, the Club seeks a declaration that it is not obligated to

defend or provide cover to Lafarge because the Barge ING 4727 was never insured by the Club,

and because even if the barge had been insured pursuant to Lafarge's Certificate of Entry in the Club, coverage is excluded pursuant to the terms of the Club's rules.

## JURISDICTION

2.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332, 1333 because it is an admiralty or maritime dispute between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of fees and costs.

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Club's principal place of business is within this district and a substantial part of the events giving rise to Lafarge's claim occurred in this judicial district.

## NATURE OF THE ACTION

4.     This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, and involves an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

5.     Plaintiff seeks a declaration of its rights and other legal relations pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, in order to resolve an actual controversy between the parties to this action as is more fully described below.

## THE PARTIES

6.     Plaintiff, the American Club, is a non-profit mutual insurance association, operated by its members for their exclusive benefit.  The Club provides protection and indemnity insurance (commonly referred to as "P&I Insurance"), which provides cover to shipowners and charterers against third-party liabilities encountered in their commercial operations.  Traditional P&I Insurance is based on the not-for-profit principle of mutuality where members of the Club essentially insure one-another and, therefore, are both the insurers and the assureds.  The

2

American Club is incorporated in New York and has its principal place of business at 60 Broad Street, New York, New York.

7.      Upon information and belief, defendant Lafarge is a diversified construction materials company and supplier of cement, aggregates and concrete, and other materials in the United States and Canada.  Lafarge is incorporated in Maryland and has its principal place of business at 12950 Worldgate Drive, Suite 500, Herndon, Virginia.

8.      Lafarge is registered to do business in the State of New York and/or is otherwise doing business in the State of New York including, but not limited to, entering into contracts with the Club.

## FACTUAL BACKGROUND

### A.    Entry into the Club

9.      The rights and obligations of every member of the Club are governed by the American Club By-Laws and Rules (the "Club Rules").

10.     When an assured becomes a member of the Club, it receives a Certificate of Entry, which expressly makes applicable the Club Rules to the member's insurance, and which lists a Schedule of Vessels which are insured by the Club.  The Certificate of Entry may include additional Member-Specific provisions, which are listed on a separate rider to the Certificate of Entry.  (Lafarge's Certificate of Entry for the period February 20, 2005 to February 20, 2006, is attached as Exhibit A.)

11.     Traditional P&I insurance is written on a policy year basis, with an inception date of February 20th for each policy year.  For example, the Club's current policy year incepted on February 20, 2006 and runs for twelve months.

3

**B.    Lafarge's Entry into the Club**

12.    Lafarge first became a member of the Club on or about February 20, 1999.  It

renewed its coverage each year, up to and including the policy year commencing February 20,

2005.

13.    Lafarge's Certificate of Entry contains a Schedule of Vessels that Lafarge entered

with the Club.  The Barge ING 4727 was never listed on any Schedule of Vessels for Lafarge's

entry with the Club.

14.    Lafarge's  Certificate  of  Entry  contains  a  Member-Specific  clause  entitled

"Chartered Barges," which states:

> CHARTERED BARGES.
>
> If Lafarge Corporation et al acquires an insurable interest in any
> vessel in addition to or in substitution for those set forth herein,
> through purchase, charter, lease or otherwise, such insurance as is
> afforded hereunder to any similar vessel shall automatically cover
> such additional vessel effective from the date and time the Assured
> acquires an insurable interest in such additional vessel. With
> respect to a chartered, leased or similarly acquired vessel, the
> insurance hereunder automatically includes the owner as an
> additional Assured with waiver of subrogation against the owner, if
> required, effective from the date and time such vessel is insured
> hereunder.
>
> The above provision shall not apply to vessels which are chartered
> under a contract whereby the owner (or Demise Owner) and
> Charterer agree that the owner (or Demise Owner) shall procure
> Protection & Indemnity Insurance on the vessel and such insurance
> shall include the charterer as an Assured.
>
> The Assured agrees to report the name and gross tonnage of any
> vessel in which they acquire an insurable interest at the expiration
> of this policy and pay any additional premium as may be required
> annually, at expiry at daily pro-rate the annual rates agreed.
> (emphasis added).

15.    Accordingly, to obtain cover for a vessel under the Chartered Barges clause,

Lafarge must meet each of the following conditions:

a.    first, Lafarge must acquire the requisite insurable interest in a vessel;

4

     b.     second, the vessel must be acquired <u>in addition to or in substitution for</u> those vessels listed on the Schedule of Vessels;

     c.     third, the interest in a vessel acquired by Lafarge must be akin to a purchase, charter or lease;

     d.     fourth, the vessel(s) to be covered must be declared to the Club;

     e.     fifth, Lafarge must pay premium to the Club for the vessel(s) to be covered.

## C.    The Transportation Agreement

16.    Upon information and belief, on or about December 14, 2004, Lafarge entered into a Transportation Agreement (the "Transportation Agreement") with Ingram Barge Company ("Ingram"), to be performed during the period from January 1, 2005 through December 31, 2005, and providing for the transportation by Ingram of approximately 160,000 net tons of cement in covered barges from Lafarge's Joppa, Illinois plant to its New Orleans, Louisiana facility on the Inner Harbor Navigation Canal. (The Transportation Agreement is attached as Exhibit B.)

17.    Clause 51 of the Transportation Agreement defines Lafarge as an "Independent Contractor" and explicitly states that "[n]othing in this Contract shall be construed as a contract by Shipper [Lafarge] for the chartering, hiring, or leasing of any barge . . . ."

18.    Upon information and belief, Ingram began transporting cargo for Lafarge under the Transportation Agreement beginning in January of 2005.

19.    Lafarge did not submit the Transportation Agreement to the Club for its review and approval.

20.    Upon information and belief, on or about May 1, 2005, Lafarge obtained a primary marine liability/wharfinger's policy with a limit of $5,000,000 from New York Marine & General Insurance Company (the "MMO Policy").

21.    The MMO Policy specifically includes coverage for Lafarge's "liability for damage caused directly or indirectly by the freeing or breaking away" of vessels at landing and/or mooring facilities that are owned operated, utilized, controlled or leased by Lafarge.

22.    Lafarge also obtained a policy providing excess coverage to the MMO Policy with a limit of $45,000,000 above the MMO Policy limit, for total wharfinger's liability coverage up to $50,000,000.

**D.    Lawsuits Against Lafarge Arising From Hurricane Katrina**

23.    Upon information and belief, prior to August 29, 2005, Ingram used its Barge ING 4727 to transport cement under the Transportation Agreement to Lafarge's New Orleans' facility.

24.    Upon information and belief, on or about August 29, 2005, Barge ING 4727 was moored at Lafarge's facility on the Inner Harbor Navigation Canal.

25.    On or about August 29, 2005, Hurricane Katrina made landfall along the Louisiana and Mississippi Gulf Coast.

26.    Upon information and belief, on or about August 29, 2005, Barge ING 4727 tore free of her moorings and drifted through a breach in the Industrial Canal floodwall or was carried over the floodwall by the rising water.

27.    Barge ING 4727 is not listed on any Lafarge Schedule of Vessels entered with the Club, nor were any Ingram vessels.

**E.    Lafarge's Claim for Defense and Cover from the Club**

28.    At least four lawsuits arising out of Hurricane Katrina are pending against Lafarge.

29.    Upon information and belief, on or about September 9, 2005, Lafarge placed their terminal operators and wharfinger's liability underwriters on notice of claims that may be covered by the MMO Policy.

30.    On or about March 3, 2006, Lafarge submitted a claim to the Club seeking "indemnification for all potential liability and/or reasonable settlements and litigation costs . . ." in connection with certain claims for property damage and/or personal injury relating to the breakaway of Barge ING 4727 and arising from the Hurricane Katrina disaster in New Orleans.

31.    On or about April 21, 2006, the Club sent a letter to Lafarge declining coverage to Lafarge because Barge ING 4727 had not been entered with the Club at the time of the casualty, or at any other time, and even if it had been entered, coverage for claims against the vessel would have been excluded.

32.    Upon information and belief, Lafarge intends to pursue its claim for cover and defense costs relating to claims arising from the breakaway of the ING 4727 from the Club.

33.    The Club maintains that it does not cover any of Lafarge's liabilities or defense costs arising from the breakaway of Barge ING 4727.

34.    An actual and justiciable controversy within the jurisdiction of this Court therefore exists between the parties to this action regarding the rights and liabilities of the parties, which controversy may be determined by a judgment of this Court.

## AS AND FOR A FIRST CAUSE OF ACTION

35.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs 1 through 34 as though fully set forth herein.

36.    Barge ING 4727 is not listed on the Schedule of Vessels in Lafarge's 2004 – 2005 Certificate of Entry issued by the Club.

37.    Lafarge did not acquire the Barge ING 4727 in addition to or in substitution for the vessels set forth in the Schedule of Vessels.

·38.    Lafarge did not acquire an insurable interest in Barge ING 4727 as required by Lafarge's Certificate of Entry.

39.    Any interest that Lafarge acquired in Barge ING 4727 was not akin to a purchase, charter or lease.

40.    Lafarge cannot obtain cover from the Club for Barge ING 4727 pursuant to the Chartered Barges clause of Lafarge's Certificate of Entry.

41.    Nonetheless, Lafarge contends that the Club is required to defend and provide cover to Lafarge for the claims asserted against Lafarge in connection with the breakaway of Barge ING 4727.

42.    An actual and justiciable controversy has thus arisen between the Club and Lafarge concerning the coverage of Barge ING 4727.

## AS AND FOR A SECOND CAUSE OF ACTION

43.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

44.    Even if Barge ING 4727 could be insured with the Club under the Chartered Barges clause, coverage is excluded.

45.    The Club Rules exclude liability "for any loss, damage or expense against which, but for the insurance herein provided, the Member, Co-assured or Affiliate would have been insured under any other existing insurance . . . ."

46.    The Club Rules also exclude "[l]iabilities, costs and expenses which would not have arisen but for the terms of a contract or indemnity entered into by a Member, unless those terms have been expressly approved in writing by the Managers."

8

47.    Cover by the Club for Barge ING 4727 is excluded because Lafarge's liability for the breakaway of Barge ING 4727 is covered by the MMO Policy.

48.    Cover by the Club for Barge ING 4727 is also excluded because Lafarge did not provide for review or obtain the Club's approval of the Transportation Agreement.

49.    Nonetheless, Lafarge contends that the Club is required to defend and provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727.

50.    The Club maintains that coverage is excluded.

51.    An actual and justiciable controversy has thus arisen between the Club and Lafarge concerning the coverage of Barge ING 4727.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

1.    that this Court declare the rights and liabilities of the parties with respect the American Club's obligations, if any, to defend and/or provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727;

2.    that this Court find and declare that Barge ING 4727 was not entered with or insured by the American Club, and as a result, the Club has no obligation to defend and/or provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727;

3.    that this Court find and declare that, because Lafarge maintained other insurance coverage, the American Club has no obligation to defend and/or provide cover to Lafarge for the claims asserted against Lafarge in connection with Barge ING 4727;

4.    that this Court find and declare that, because Lafarge failed to submit the Transportation Agreement to and obtain the approval of the American Club, the Club has no

9

obligation to defend and/or provide cover to Lafarge for the claims asserted against Lafarge in
connection with Barge ING 4727;

    5.      that this Court award the American Club its costs and disbursements for this
action, including attorneys fees; and

    6.      that this Court grant the Club such other and further relief as is just and proper.

Dated:      New York, New York
          April 21, 2006

THACHER PROFFITT & WOOD LLP

By: _John M Woods_____

John M. Woods (JW/0697)
jwoods@tpw.com
Alan F. Kaufman (AK/9114)
akaufman@tpw.com
Neil T. Bloomfield (NB/0669)
nbloomfield@tpw.com

Two World Financial Center
New York, New York 10281
(212) 912-7400

*Attorneys for Plaintiff*

# EXHIBIT 3

*Rev. 7/13/04*

## TRANSPORTATION AGREEMENT

**INGRAM** *(logo)*

| **Carrier: INGRAM BARGE COMPANY** | **Shipper: LAFARGE NORTH AMERICA** | |
|---|---|---|
| 13 Executive Drive, Suite 8 | **Contact Address:** | **Billing Address (if different):** |
| Fairview Heights, IL 62208-1342 | 600 SW Jefferson Street, Suite 302 | 2500 Portland Road |
| | Lee's Summit, MO 64063 | Grand Chain, IL 62941 |
| Attn:  J. E. (Gene) Shiver | Attn:  Mr. Jay Darlington | Attn:  Rachael Burnett |
| Sales Manager | Traffic Coordinator Barge | Barge Scheduler |
| Telephone:  618-628-3099 | Telephone:  816-251-2115 | Telephone:  618-543-3902 |
| E-Mail: shiverg@ingrambarge.com | E-Mail: jay.darlington@lafarge-na.com | E-Mail: rachael.burnett@lafarge-na.com |
| Facsimile:  618-628-3494 | Facsimile:  816-347-1884 | Facsimile:  618-543-3959 |
| Carrier's Contract No:  35443 | Shipper's Contract No: | Shipper's Contract No: |
| Carrier's Job No:  15070574 | Shipper's Customer No: | Shipper's Customer No: 10661 |

This Agreement is made as of **December 14, 2004** by and between Carrier and Shipper (each as identified above) and is for the transportation of dry cargo by barge under the terms and conditions of Parts I and II as contained in this Agreement. In the event of a conflict, the provisions of Part I shall prevail over those contained in Part II to the extent of such conflict.

### PART I

1. Loading Date(s): January 1, 2005 through December 31, 2005

2. Equipment: Fiber-Lift Covered Barges <u>ONLY</u>. All cover handling expense for the account of Shipper.

3. Cargo: Cement

4. Cargo Value: $300.00 per net ton or actual invoice value, whichever is less

5. Number of Net Tons: Approximately 160,000 net tons. Refer to Appendix I for projected monthly shipping schedule.

6. Origin(s): Joppa, IL (Lafarge)          OH 953.2 T

7. Destination(s): New Orleans, LA (Lafarge-France Road Wharf)     GIWE 8.0 T3

8. Base Freight Rate(s): $12,700 Flat Rate Per Barge

9. Free Time: Six days all-purpose to load and unload each barge, including Sundays and holidays that occur within the freetime period.  (Refer to Part II, Section 28)

10. Demurrage Rate: $185.00 per barge per day

11. Minimums: Not applicable, due to flat rates per barge.

12. Fuel Protection: Beginning January 1, 2005, the base freight rate(s) listed herein shall be subject to escalation during the term of this Agreement in the event of an increase in the cost of fuel above $.90 per gallon.  If the actual average cost of fuel to Carrier for the second month immediately preceding the month of shipment rises above the specified cost per gallon, Carrier shall have the right to escalate the freight rate(s) on the first of every month during the term of this Agreement in accordance with the following formula:

$$[\text{Base Freight Rate} \times 30\% \times \frac{\text{Actual Fuel Cost} - \text{Fuel Protection Cost}}{\text{Fuel Protection Cost}}] + \text{Base Freight Rate} = \text{Adjusted Freight Rate}$$

As an example, Carrier's actual fuel cost for the month of November 2004 would determine the January 2005 rate(s). In no event will the adjusted freight rate(s) ever be lower than the base freight rate(s).

13. Cleaning Allowance: $800.00 maximum per barge account Carrier (refer to Part II, Section 31)

14. Special Provisions: Refer to Part II

In witness whereof, the parties have executed this Agreement as of the date first written above.

Accepted:

Carrier:  **INGRAM BARGE COMPANY**          Shipper:  **LAFARGE NORTH AMERICA**

Signature:  *X.I.*          Signature:  *Frank Lazarowicz*  *(JI)*

By:     J. E. (Gene) Shiver – Sales Manager          By:     Frank Lazarowicz – Transportation Manager River Region

 Carrier's Contract No. 35443          APPENDIX I          Carrier's Job No. 15070574

| Projected Monthly Shipping Schedule: | Monthly Breakdown of Projected Volume | | | |
|---|---|---|---|---|
| | January | 19,500 | July | 10,500 |
| | February | 18,000 | August | 9,000 |
| | March | 17,500 | September | 10,500 |
| | April | 9,000 | October | 15,500 |
| | May | 12,000 | November | 19,500 |
| | June | 10,500 | December | 7,500 |

Carrier Representative's Initials: _____          Shipper Representative's Initials: _____

Rev. 7/13/04

**INGRAM**    Carrier's Contract No. 35443      PART II      Carrier's Job No. 15070574

15. Cargo Description: Prior to loading, Shipper will notify Carrier of the generic name of the cargo to be transported pursuant to this Agreement. In addition, Shipper will, if requested by the Carrier, provide Material Safety Data Sheets (MSDS). Further, the Shipper shall notify the Carrier of the cargo classification under U. S. Coast Guard regulations and any other applicable regulations. In the event of Shipper's improper or incomplete description of the cargo or failure to disclose all necessary information about the cargo which results in any expense, loss, damage, and/or penalty to the Carrier, Shipper agrees to reimburse Carrier for such expense, loss, damage, and/or penalty.

16. Tonnage: Wherever used in this Agreement, the term "ton" shall mean a net ton of 2,000 pounds avoirdupois.

17. Cargo Insurance: Carrier will, at its own expense, obtain and keep in full force and effect during the term of this Agreement, or any extension thereof, Cargo Insurance on the full value of all cargo transported under this Agreement. Carrier may, at its own risk, elect to self-insure the cargo. Cargo is insured up to the value stated in Part I, or the actual value of the cargo, whichever is less. In no case will the Carrier be responsible for any amount exceeding $700 per net ton.

18. Weights: Freight charges shall be calculated on the basis of loaded weights at origin. Carrier shall not assume any responsibility to weigh the cargo at origin or destination.

Within 72 hours after completion of loading, Shipper shall submit to Carrier a written report descriptive of the cargo and the weight thereof per barge.

If the actual weight of cargo cannot be ascertained upon completion of loading, estimated weights may be used for billing which shall be adjusted to out-turn weights at destination, if available, and applicable charges determined accordingly. If facilities for determining weight at destination are not available, the barge will be gauged before unloading, at Shipper's expense, and the weight thus ascertained will be used in determining the applicable charges.

Carrier may require proof of scale or gauged weights.

19. Minimum Weights: The freight due from Shipper will be based on the actual tons loaded subject to the minimum weights specified in Part I.

However, if the capacity of the barge (or draft if so specified by the Carrier) will not allow the Shipper to load to the minimum level specified, then the charges will be based on the actual tons loaded or the tons that could have been loaded at the specified draft according to Carrier's draft tables, whichever is greater.

20. Loading Requirements: Shipper shall load a barge to the draft specified by Carrier. Shipper shall be governed by Carrier's instructions regarding the height of load, the tonnage of the cargo, the draft of the barge, and such other instructions as Carrier may deem necessary for safe transportation where variable waterway conditions and anticipated weather conditions make such precautions desirable. Shipper shall be subject to any demurrage charges that may accrue due to the detention of any barge occasioned by non-compliance with Carrier's loading requirements specified herein. The Shipper shall load the barge so that the cargo is evenly distributed throughout the hopper hold; the Shipper shall not "center load" or "end load" a barge.

21. Transport of Barges: A barge loaded with Shipper's cargo will move only at the convenience of the Carrier, and either singly or with one or more other craft. Carrier will have the right to shift or interchange the tow from one to another towing vessel as frequently as it may find it convenient to do so; to procure towage from any other vessel not owned or operated by the Carrier; to tie off the tow at any point and for any purpose; and to deviate from its route, and visit any port whether or not on said route, and in any order. Carrier is not bound to transport any barges containing Shipper's cargo in time for any particular market.

If, due to operating conditions, it is necessary in the judgment of the Carrier to delay the movement of barges while in transit, Carrier reserves the right to do so. Carrier makes no representation as to the time which will elapse between the acceptance of this Agreement until placement at origin, nor between departure of the barge from origin and arrival of the barge at destination; and under no circumstances shall Carrier be liable for any loss, damage, or expense incurred by Shipper or others by reason of delay.

22. Inaccessible Points: Carrier will not place barges for loading, nor pick up loaded barges, when the shipments are destined to points or points which are inaccessible because of an actual or anticipated, temporary or permanent condition that adversely affects the navigability of a waterway to be traversed by barge between origin and destination. If shipment has been accepted or is re-consigned for transportation to a port or point which subsequently becomes inaccessible because of a condition that adversely affects the navigability of a waterway to be traversed between origin and destination, the Carrier shall be privileged to tender delivery of such shipment at an accessible intermediate point nearest to consigned destination, in which event freight charges shall be adjusted in accordance with the transportation service actually rendered on the basis of the rate applicable for the movement to the original destination. In the determination of the inaccessibility of a destination point, the type and draft of propelling vessel, the type of barge, the loaded draft of barge, and necessity of returning empty barge, among other considerations, shall govern. Carrier's determination in this regard shall be final. In the event that operating conditions, including ice, prevents or delays the delivery of a barge, the Carrier will place the barge at a point short of the point of interruption and the barge will be subject to demurrage.

23. Accessorial Charges: Except as otherwise provided, the Carrier will not be liable for the following accessorial charges: ballasting, cleaning, demurrage, dockage, drayage, elevation, loading or unloading of cargo, opening or closing of barge hatch covers, removal or replacement of barge covers, sheddage, stacking or restacking of barge covers, switching tollage, wharfage, or any other terminal expense at either origin or destination.

24. Shifting: Rates stated herein will include only one shift of barges into and one shift of loading and unloading facilities by Carrier at origin and/or destination. Any additional shifting of barges to accommodate loading or unloading will be for Shipper's account.

When Shipper arranges for shifts to be made without expense to Carrier, Shipper shall assume full responsibility for safety of barge and cargo thereof during such shifts, and further, Shipper shall reimburse Carrier in full for any damage or loss which may occur during such movements.

25. Diversions, Re-Consignments, Holding in Transit, Stop-Offs for Partial Unloads

A barge may be diverted, re-consigned, held in transit to await orders, or stopped-off for partial unloads only with the consent of Carrier, which may be withheld for any reason. The cost, terms, and conditions of any agreement for re-consignment, diversion, holding in transit for orders, or partial stop-offs, must be confirmed in writing by all parties prior to Carrier's taking the requested action.

Any barge that is stopped to permit a partial discharge will not be allowed any additional free time. All time incurred during a partial stop will be charged at the demurrage rate.

26. Payment of Freight: Upon loading, the entire amount of the freight charge will become earned and due and payable to Carrier in cash and without discount, even though the barge or cargo is lost or not lost, damaged or not damaged, in whole or in part, at any stage of the voyage. The Carrier does not have to deliver the Cargo until all freight and demurrage due hereunder have been paid by Shipper. The actual date of loading, not placement date nor requested date, shall govern as to what freight rate shall be invoiced.

Interest at a rate of two percent (2%) per month (or any fraction thereof) or the maximum interest rate allowed by law, shall accrue on any payment obligations hereunder that are past due until such payment obligations are satisfied in full together with said interest. If any agency or attorney is employed to assist in the collection of such payment obligation, then the delinquent party also shall be required to pay such agency/attorney's reasonable fees relating to such collection. Carrier has the right to defer placement of any barge and/or delivery of the cargo if Shipper's payment obligations are past due until such time as all amounts due Carrier are paid in full.

Unless specified elsewhere, and notwithstanding the above, Shipper may be granted credit by Carrier's Credit Manager, in which case the monies owed must be paid by the Shipper within 30 days from the date of the invoice or within the number of days specified by Carrier's Credit Manager. The Carrier's Credit Manager has complete discretion as to whether or not credit is to be extended to Shipper, the amount of credit to be granted to Shipper, and the payment due date from the Shipper, and the form of payment. Shipper is to comply with all reasonable requests for financial information by Carrier's Credit Manager in order to establish Shipper's credit. The Carrier's Credit Manager may change or cancel the extension and amount of credit and the payment due date or the form of the payment at the Credit Manager's sole discretion and at any time.

27. Lien: Carrier will have a lien upon all cargo for any freight or demurrage due hereunder, which lien will survive the delivery of such cargo.

28. Demurrage and Free Time: The free time to be allowed is to be that which is specified in Part I. No free time will be allowed on empty barges placed upon Shipper's request for placement if, subsequent to placement, such order is cancelled.

After the period of free time has expired, the demurrage charges specified under this agreement will be made for each day, including Saturdays, Sundays, and National Holidays, until the barge is released to the Carrier.

Except as otherwise provided, time will be computed for the total period barge is in Shipper's possession for loading or for unloading and will begin as of the first 7:00 a.m. after barge is actually or constructively placed for loading or for unloading and will run until Carrier has been notified in writing that barge has completed loading or unloading and is available for pick up. The written release must be received by Carrier by 11:00 a.m. CST (Nashville time) or the barge will not be considered as having been released by 7:00 a.m. In computing time, days will consist of 24 hours running from 7:00 a.m. until the next 7:00 a.m. A fraction of a day will be considered as one day.

**Carrier Representative's Initials:** _____        **Shipper Representative's Initials:** _____

Rev. 7/13/04

 **INGRAM**    Carrier's Contract No. 35443        **PART II**        Carrier's Job No. 15070574

When Carrier, for its convenience, places a barge for loading prior to date specified by Shipper, time will run from the first 7:00 a.m. of the date specified by Shipper or from 7:00 a.m. of the date when actual loading began, whichever occurs sooner.

Actual placement is made by Carrier when barge is placed for loading or unloading at docks or wharves specified by Shipper or at a nearby fleet selected by Carrier, whichever occurs first.

Except as otherwise provided for herein, if Carrier is prevented from making actual placement by any cause over which it has no control, such barge is subject to constructive placement. Constructive placement will be made by Carrier when actual placement is not possible.

Constructive placement consists of placing or holding a barge at a point of Carrier's or Shipper's choice near the specified actual delivery point. Notice of such placement will be given to Shipper. In making any subsequent placement, no free time in addition to that provided will be allowed by Carrier.

If holidays are excluded from Free Time, the following are the holidays to be recognized:

| New Year's Day | Memorial Day | Independence Day | Labor Day |
| Easter Sunday | Thanksgiving Day | Christmas Day | |

If the holiday (except for Easter) falls on a Sunday, the following Monday shall be considered as the holiday.

If a barge is on demurrage and the shipper requests a reconsignment, the barge will remain on demurrage, even during transit, until the barge is released back to the Carrier.

In the event that delivery of a barge involves a destination beyond the lake front entrance to Lake Michigan, the barge will be placed in a fleet of Carrier's choosing on the Illinois River Waterway and free time and demurrage shall commence upon placement in the fleet. Adverse weather conditions which delay transit and barge delivery to destinations on Lake Michigan will not be considered Force Majeure events. It is the Shipper's responsibility to notify the loading/unloading terminal of the barge placement in the Illinois River Waterway fleet.

29. **Fuel Protection:** Unless otherwise addressed in this Agreement, the freight rate shall not be subject to escalation during the term of this Agreement except in the event of an increase in the cost of fuel above the cost per gallon specified in Part I. If the actual average cost of fuel to Carrier for the second month immediately preceding the month of shipment rises above the specified cost per gallon, Carrier shall have the right to escalate the freight rate on the first of every month during the term of this Agreement in accordance with the following formula:

$$\left[\text{Base Rate} \times 30\% \times \frac{\text{Actual Fuel Cost} - \text{Fuel Protection Cost}}{\text{Fuel Protection Cost}}\right] + \text{Base Freight Rate} = \text{Adjusted Freight Rate}$$

As an example, the actual fuel cost for the month of October would determine the December rates. In no event will the adjusted freight rate ever be lower than the base freight rate.

30. **Ratability:** Unless modified in Part I, Shipper shall ship in approximately equal monthly increments and approximately equal weekly increments within each month. Should the Shipper fail to ship ratably as described above, Carrier has the right to adjust its obligation to provide barges for the remainder of this Agreement. Barges not loaded ratably within a week or within a month cannot be carried forward to the following week or month, unless Carrier agrees to do so. Further, Carrier will not be obligated to supply a number of barges in any one month that is greater than the actual number of barges shipped in the prior months under this Agreement.

31. **Cleaning:** Carrier shall absorb cleaning costs up to amount specified in Part I to remove cargo left in the hopper by shipper. All cleaning costs above the stipulated allowance are for the account of the Shipper. Shipper shall remove all dunnage, if any, at its sole expense.

If any cargo or debris is spilled or deposited on the exterior of the barge (including working surfaces, such as gunnels, covers, or decks) at either loading and unloading points, Shipper is responsible for all costs associated with cleaning the exterior of the barge.

Carrier may refuse to pick up or move a barge if an abnormal amount of cargo is left in the hopper or if cargo or debris is left or spilled on the barge if, in the Carrier's sole judgment, the cargo or debris left aboard represents a safety hazard to its crew or to other parties who may come in contact with the barge. The Carrier will require the Shipper to clean or remove all abnormal amounts of cargo left on board or to remove the cargo or debris that represents a safety hazard prior to movement. In such case, if the movement of a barge is delayed while the barge is being cleaned by the Shipper, then the Shipper shall be liable to the Carrier for the days consumed at the then applicable demurrage rate. Further, if the Carrier arranges to have a barge cleaned due to abnormal amounts of cargo left in the hopper or if cargo or debris is left or spilled on the barge, the Shipper shall be liable to the Carrier for the days consumed at the then applicable demurrage rate.

32. **Unloading:** It shall be the obligation of Shipper, or its consignee, to unload and remove the cargo from the barge, including any cargo or debris spilled on the working surfaces, promptly upon arrival of the barge at its destination. If the cargo is not so unloaded and removed, then the Carrier, at its option, shall be entitled to remove, sell or otherwise dispose of the cargo.

33. **Distribution of Cargo:** Shipper shall be required to distribute cargo in each barge so as to ensure an even draft. If a barge is not loaded to ensure an even draft, Carrier reserves the right to refuse to accept the barge for transport. If Carrier refuses to accept any barge, Shipper must, at its expense, have the cargo redistributed to meet Carrier's requirements. In addition, the barge will be subject to demurrage charges, from the time and date of placement until the barge is accepted for transportation by Carrier.

34. **Possession of the Barge during Loading/Unloading:** Carrier shall deliver an empty or loaded barge to a loading or unloading facility designated by Shipper for loading or unloading. Shipper shall assume the duty and responsibility for the safety of each barge in its possession. For the purposes of this Agreement, "possession" shall begin when Carrier delivers an empty or loaded barge for loading or unloading to the landing designated by Shipper and shall end when the barge is removed by Carrier or its agent(s). Shipper shall be responsible for the safekeeping of Carrier's barge delivered to a landing regardless of whether Shipper owns or operates the landing. During possession, any barge delivered to a landing designated by Shipper shall be held without charge to Carrier.

35. **Safe Berth:** Shipper warrants the barge shall have a safe berth of not less than nine (9) feet of draft. The barge shall not be permitted, at any time, to touch bottom while in the Shipper's control.

36. **Mooring:** Shipper warrants that barges will be safely and adequately moored free of wharfage, dockage, port and harbor charges at the loading and unloading points and that barges will have warning lights properly displayed as required by applicable U.S. Coast Guard and U.S. Army Corps of Engineers regulations and permits. While barges are in the care and custody of Shipper, or its agents, all U.S. Coast Guard and U.S. Army Corps of Engineers regulations will be complied with, and in the event that Carrier should in any manner be held responsible for Shipper's, or its agents acts or omissions in compliance with the mooring requirements herein provided, then Shipper agrees to indemnify and save harmless Carrier from all such responsibility and liability.

37. **Request for Placement:** Shipper must send Carrier a written request for placement with a specific date for loading and the designated origin for loading. Carrier requires a minimum of 14 days notice for any loading; should Shipper fail to supply 14 days advance notice of a loading, Carrier has the right to adjust its obligation to provide barges for loading.

38. **Change in Loading Date or Origin:** Any change by the Shipper in the requested loading date or designated origin given to the Carrier which is in excess of five (5) working days prior to the previously requested loading date will be accepted by Carrier without charge. Any change by the Shipper in the requested loading date or origin given to the Carrier on less than five (5) working days notice may subject the Shipper to charges (including but not limited to free days may be assessed, additional shifting or fleeting charges may be billed, barge cleaning, or cover handling).

39. **Acceptance:** Carrier will tender barges which are in a condition suitable for the cargo to be carried. Loading of the barges will constitute Shipper's acceptance of the condition and suitability of the barges for the intended cargo.

40. **Release:** Carrier shall not be liable for lost profits or other incidental or consequential damages under any circumstances. Nothing contained herein shall render Carrier responsible for the differences in the inturn weight and the outturn weight of cargo from barges safely delivered and unloaded.

41. **Failure to Accept / Failure to Place:** If either Shipper or Carrier, for reasons other than Force Majeure, determines that it will be unable to accept or place barges on the requested Load Date or within the term of this Agreement, it shall be their duty to advise the other party at once; whereupon it shall be the other party's duty at once to elect to cancel the unplaced barge or to extend the placement time. In the case of cancellation, the other party shall have the right to buy or sell, as the case may be, the respective freight and the party unable to accept or place shall reimburse the other party for any loss sustained in such purchase or sale provided same is made at the prevailing market price.

42. **Choice of Law:** This Agreement shall be governed by the laws of the State of Tennessee, both as to interpretation and performance, and all disputes that arise under this Agreement shall be resolved in accordance with Tennessee law.

43. **General Average:** In the event of accident, danger, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, Carrier is not responsible, by statute, contract, or otherwise, the cargo, Shipper, and the consignee, and other parties having an interest in the cargo, jointly and severally, will contribute in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred in respect of the cargo. General average, if any, will be adjusted, stated, and settled at such port or place in the United States as may be selected by Carrier, and will be settled in accordance with the York/Antwerp Rules of 1974.

Carrier Representative's Initials: _____        Shipper Representative's Initials: _____

Rev. 7/13/04

**INGRAM**    Carrier's Contract No. 35443    PART II    Carrier's Job No. 15070574

44. **Force Majeure:** Performance under this Contract by Shipper and Carrier shall be excused to the extent such performance is prevented by Force Majeure, provided the party declaring Force Majeure gives written notice of such condition to the other party within seventy-two (72) hours after commencement of the Force Majeure condition. The term "Force Majeure" shall include acts of God or the elements, acts of a public enemy, insurrections, riots, strikes, labor disputes, fires, explosions, floods, accidents of navigation, ice, high or low water, embargoes, acts or orders of civil or military authorities, lock delays or closings, fuel shortages, or other causes beyond the reasonable control of the party declaring Force Majeure. Such excuse from performance shall continue until the Force Majeure ceases to exist. A party declaring Force Majeure shall make reasonable efforts to eliminate or resolve the condition, recognizing, however, that the settlement of any strike or other labor dispute shall be solely within the discretion of that party. A declaration of Force Majeure by Shipper does not excuse payment of demurrage for a barge on demurrage status. When a Force Majeure is declared on a barge with remaining free time, free time shall continue to run; upon expiration of free time the barge will be placed in a demurrage status even if the Force Majeure event continues to exist. Any shortfall in cargo deliveries resulting from force majeure shall not be made up except by mutual consent of the Shipper and the Carrier.

45. **New Taxes:** There will be added to the freight rate the amount of any new or increased Federal, State, or local taxes (except net income taxes) that may hereafter be charged to and paid by Carrier on account of the transportation services rendered hereunder, including the amount of any user charge, tax, or wharfage, port, harbor, or dockage fee imposed, levied, or collected for the use of the inland waterway system or of the locks and dams in said waterway system, wharfs, ports, or the use of the harbors and docks by Carrier while engaged in the transportation services rendered hereunder, or upon fuel used in performing such services.

46. **Subcontracts:** Nothing herein shall prevent Carrier from subcontracting for any of the services provided by Carrier hereunder but Carrier will remain liable to Shipper for the proper performance of all of Carrier's obligations hereunder.

47. **Mitigation:** If all or any part of the cargo is discovered to be damaged while subject to this Agreement, Carrier, in its sole discretion, in order to minimize the damage, may sell the Cargo at public or private sale to the best advantage. In such event, Carrier shall, where practicable, provide Shipper and any known consignee with notice of the proposed sale. The proceeds of any sale made under this section shall be applied by Carrier to the payment of freight, demurrage, storage, and any other charges and the expense of notice, advertisement, sale and other necessary expense of caring for and maintaining the Cargo, and the balance, if any, shall be paid to Shipper or consignee.

48. **Claims:** As condition precedent to recovery, claims must be filed in writing with Carrier within nine (9) months of delivery of the Cargo, or, in case of failure to make delivery, then within nine (9) months after a reasonable time for delivery has elapsed. Suits shall be instituted against Carrier only within two (2) years and one (1) day from the day when notice in writing is given by the Carrier to the claimant that the Carrier has disallowed the claim or any part or parts thereof specified in the notice.

49. **Default:** No default of either party in the performance of any of its covenants or obligations hereunder, which, except for this provision, would be the legal basis for rescission or termination of this Contract by the other party hereto, shall give or result in such a right unless and until the party committing such default shall fail to correct the default within thirty (30) days after written notice of such default is given to such defaulting party by the non-defaulting party. Notwithstanding anything in this Contract to the contrary, there shall be no cure period for any payment default and each party shall have each and every other right afforded it under law against the defaulting party.

50. **Notices:** All notices, consents, determinations, instructions and communications provided for herein shall be validly given, made or served, if in writing and delivered personally, or by telegram, facsimile, electronic mail, overnight delivery or recognized courier service or sent by registered or certified mail, postage prepaid, to Shipper and Carrier at their respective addresses listed at the beginning of this Contract, or as the parties may otherwise direct in writing. Any notice, consent, determination, instruction, approval, or other communication hereunder shall be deemed given and effective as of the date of delivery in person or by courier, or as set forth on the return receipt or facsimile confirmation.

51. **Independent Contractor:** Nothing contained in this Contract shall be construed as a contract by Shipper for the chartering, hiring or leasing of any barge, towboat or other equipment of Carrier to be provided hereunder; nor shall any of the agents, servants, subcontractors or employees of Carrier be regarded as employees of Shipper, it being understood that Carrier is in all respects an independent contractor and that Shipper shall exercise no control over the operation of any barge, towboat or other equipment of Carrier or over Carrier's agent, servants, subcontractors or employees.

52. **Changes in Operation:** In the event Carrier's operating costs specifically related to the equipment, facilities, supplies, or services to be used or provided by Carrier under this Agreement are increased due to any law, rule, ordinance, regulation, restriction, directive, order, notice, advisory or interpretation, hereafter promulgated by any federal, state, or local authority, or any agency or division thereof, or any industry group advisory thereto, or any court, which is generally applicable to all barge carriers similarly situated, and such increased costs are not reimbursed to Carrier under any other provision of this Agreement, then Shipper shall reimburse Carrier monthly, following receipt of billing for the entire amount of such increase in operating costs that is fairly attributable to the services performed for Shipper under this Agreement.

53. **Miscellaneous:**

   A. **Conflict:** In the event any of the terms of the Shipper's confirmation differ or conflict with any provision of this Agreement, then the terms set forth in this Agreement shall prevail.
   B. **Assignment:** Shipper shall not be permitted to assign or otherwise dispose of all or any part of its rights or obligations hereunder without first obtaining the written consent of Carrier. Such consent shall not unreasonably be withheld, provided that any such permitted assignment or other disposition shall not relieve Shipper of its obligation under this Agreement.
   C. **No Waiver:** The failure of Shipper or Carrier to insist upon strict performance of any of the provisions of this Agreement in one or more instances or the failure of Shipper or Carrier to exercise any of its rights hereunder in one or more instances shall not be construed as a waiver of any such provisions or the relinquishment of any such rights, but the same shall continue and remain in full force and effect.
   D. **Binding Effect:** This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee and shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns, subject to the restrictions or assignability herein contained.
   E. **Headings; Terms:** Section headings in the Agreement are included merely for the convenience of reference and shall not be construed as part of the governing terms of this Agreement. The term "barge" herein shall mean both the singular and the plural as intended by the parties depending on the number of barges subject to this Agreement.
   F. **Integration; Execution:** This Agreement sets forth the entire understanding between the parties hereto as to the subject matter and no amendment hereto shall be valid unless made in writing and duly signed by the parties hereto. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original hereof, and all counterparts collectively are to be deemed but one instrument. Whether or not Shipper executes this agreement in the acceptance space provided hereon, loading of a barge shall constitute an acceptance of all the terms and conditions of the Agreement.

**Carrier Representative's Initials:**     **Shipper Representative's Initials:**

EXHIBIT 5

# BROWN GAVALAS & FROMM LLP

355 LEXINGTON AVENUE
NEW YORK, NEW YORK 10017

TEL: (212) 983-8500
FAX: (212) 983-5946
www.browngavalas.com
bgmail@browngavalas.com

NEW JERSEY OFFICE

1118 CLIFTON AVENUE
CLIFTON, NJ 07013
TEL: (973) 779-1116
FAX: (973) 779-0739

HARRY A. GAVALAS
(1978-1999)
ROBERT J. SEMINARA
(1987-1999)

July 3, 2008

## VIA FACSIMILE

Hill Rivkins & Hayden LLP
45 Broadway, Suite 1500
New York, New York 10006

Attn:   Robert G. Clyne, Esq.

Thacher Proffitt & Wood LLP
Two World Financial Center
New York, New York 10281

Attn:   John M. Woods, Esq.

Re:   *The Northern Assurance Co. of America et ano.*
          *v. LaFarge North America, Inc. et al.*
      United States District Court for the Southern District of New York
      08 Civ. 3289 (CSH)
      Our Ref: 460.1324

Gentlemen:

We represent New York Marine and General Insurance Company ("NYMAGIC") and are writing to request that you consent to NYMAGIC's intervention as a plaintiff in the above-referenced action.

As you know, NYMAGIC is the lead insurer on the Excess Marine Liability Policy issued to Lafarge North America, Inc. ("Lafarge") in May 2005. The other two insurers on the policy, The Northern Assurance Company of American and American Home Assurance Company, have commenced the above-referenced action seeking a declaration of rights under the Excess Marine Liability Policy.

In previous filings with the Court, your clients admit that NYMAGIC is an indispensable party to this litigation and should be a plaintiff in the action. In fact, in LaFarge's Memorandum of Law In Support of the Cross-Motion To Dismiss (Docket No. 31), which the American Club joined in, Lafarge expressly states that "NYMAGIC is an indispensable party to any action where coverage under the Excess Policy will be

BROWN GAVALAS & FROMM LLP

Hill Rivkins & Hayden LLP
Thacher Proffitt & Wood LLP
July 3, 2008
Page 2

litigated" (p. 16). In view of your clients' prior representations to the Court, there does not appear to be a good faith basis to oppose intervention. Accordingly, in order to avoid the time and expense associated with a motion to intervene, we ask that you consent to NYMAGIC's intervention in the above-referenced action as a plaintiff. We look forward to your favorable response.

Very truly yours,

BROWN GAVALAS & FROMM LLP

David H. Fromm

cc:    (via facsimile)
       Nicoletti Hornig & Sweeney
       Wall Street Plaza
       88 Pine Street
       New York, New York 10005-1801
       Attn:   John A.V. Nicoletti, Esq.

BROADCAST REPORT

```
TIME  : 07/03/2008 11:27
NAME  : BROWN GAVALAS FROMM
FAX   : 2129835991
TEL   : 2129830500
SER.# : BROK6J556231
```

| PAGE(S) | 03 |
|---------|----|

| DATE | TIME | FAX NO./NAME | DURATION | PAGE(S) | RESULT | COMMENT |
|------|------|--------------|----------|---------|--------|---------|
| 07/03 | 11:24 | 912126690698 | 28 | 03 | OK | |
| 07/03 | 11:25 | 912129127751 | 52 | 03 | OK | ECM |
| 07/03 | 11:27 | 912122203780 | 51 | 03 | OK | |

```
BUSY: BUSY/NO RESPONSE
NG  : POOR LINE CONDITION
CV  : COVERPAGE
```

EXHIBIT 6

# HILL RIVKINS

## HILL RIVKINS & HAYDEN LLP

45 Broadway, Suite 1500, New York, NY 10006-3739
Tel: 212 669-0600    Fax: 212 669-0698/0699
e-mail: thefirm@hillrivkins.com
Website: www.hillrivkins.com

**RECEIVED**
JUL 1 4 2008
BROWN GAVALAS & FROMM LLP

July 9, 2008

*Via Mail & Telefax: 212-983-5946*

David H. Fromm, Esq.
Brown Gavalas & Fromm LLP
355 Lexington Avenue
New York, NY 10017

Re:    **The North Assurance Co. of Amer. et al v. Lafarge
North America, Inc. et al.
08 Civ. 3289 (CSH)
Your Ref: 460.1324
Our File No: 29089-RGC/JJS**

Dear Mr. Fromm:

Further to our letter of April 7, 2008, and in response to your letter of July 3, 2008, we write regarding the position of NYMAGIC as lead insurer on the excess marine liability policy issued to Lafarge North America Inc. ("LNA"). Please be advised that LNA will not consent to NYMAGIC's intervention in the above referenced action, because any such attempt by NYMAGIC would be a breach of the Excess Policy and would constitute bad faith.

We refer to the filing by counsel for the following excess insurers in the above referenced action of a "Notice of Filing Ratification", with an annexed "Ratification of New York Marine and General Insurance Company", signed by George Sutcliffe of Mutual Marine Office. A copy of said notice is attached for your reference. The Ratification signed by Mr. Sutcliffe purports to bind NYMAGIC to the outcome of the legal action undertaken by the following excess insurers.

NYMAGIC is treading on very dangerous ground with what is fundamentally a dishonest ploy. NYMAGIC has purported to ratify a lawsuit that is itself a breach of the express terms and conditions of the excess policy. NYMAGIC agreed with LNA in the "Leader" clause that it would be designated the lead insurer on the Excess Policy, with the following insurers agreeing to abide by any and all coverage decisions of NYMAGIC. The Leader clause is in the policy for the benefit of LNA, as it permits

---

NEW JERSEY
175 North Broadway
South Amboy, NJ 08879-1638
Tel: 732 838-0300  Fax: 732 316-2365
e-mail: thefirm@hillrivkins.com

TEXAS
712 Main Street, Suite 1515
Houston, TX 77002-3209
Tel: 713 222-1515  Fax: 713 222-1359
e-mail: thefirm@hillrivkins.com

CONNECTICUT
60 Quarry Dock Road
Branford, CT 06405-4654
Tel: 203 315-9274  Fax: 203 315-9264
e-mail: thefirm@hillrivkins.com

CALIFORNIA
Hill Rivkins/Brown & Associates
11140 Fair Oaks Boulevard, Suite 100
Fair Oaks, CA 95628-5126
Tel: 916 535-0263  Fax: 916 535-0268
e-mail: thefirm@brnlaw.com

Brown Gavalas & Fromm LLP
July 9, 2008
-Page 2-


LNA to deal solely with NYMAGIC in respect of any and all claims. Instead, NYMAGIC has allowed the following insurers to breach the policy by "authorizing" the commencement of their baseless action. NYMAGIC has now joined in that breach by agreeing to defer coverage decisions to the followers through the Ratification, contrary to the express terms of the Excess Policy. NYMAGIC cannot shirk its responsibility under the Excess Policy by permitting the followers to take the lead on LNA's claim.

The action filed by the following excess insurers is frivolous and never should have been brought, a position that NYMAGIC shared until very recently. While LNA's memorandum of law in support of its motion to dismiss discussed NYMAGIC as an indispensable party, it does not follow "it should be a plaintiff in the action". The basis for the motion to dismiss is that the following excess insurers have no cause of action for a declaratory judgment against LNA because they agreed to defer all coverage determinations to NYMAGIC. NYMAGIC cannot overcome this defect by simply seeking to go along with the followers' baseless action.

Moreover, NYMAGIC has no substantive grounds to intervene in the excess insurers' action, as that action states positions that contradict NYMAGIC's previously stated coverage position under the Excess Policy. First, we refer to your letter of March 26, 2008, wherein NYMAGIC stated its coverage position accepting coverage if and when the primary policy limits were exhausted, subject to the excess insurers' "right and authority to approve and authorize all defense counsel and defense costs that are incurred in this matter". Notwithstanding LNA's rejection of NYMAGIC's position that it has such rights under the terms of the excess policy, NYMAGIC may not now deny coverage or otherwise seek to impose conditions on coverage that were not stated in your March 26, 2008, letter. Any such attempt would unquestionably constitute bad faith. NYMAGIC cannot rely upon the general non-waiver/reservation language in your letter, which, at best for an insurer, can preserve only defenses of which the insurer is not aware.

Furthermore, NYMAGIC has never contested coverage under the Primary Marine Liability Policy, beyond its position regarding the appointment of defense counsel, and has admitted by word and deed that the Excess Policy applies as soon as the Primary is exhausted. We refer to NYMAGIC's answers to the direct action complaints, filed by Sutterfield & Webb, the same firm NYMAGIC has appointed to assist in LNA's defense. Those answers never contested coverage, either under the



Brown Gavalas & Fromm LLP
July 9, 2008
-Page 3-

Primary or the Excess, and the very appointment of Sutterfield & Webb to defend the excess insurers constitutes an admission that coverage was never at issue. Indeed, Paul Smith of MMO confirmed NYMAGIC's position under the Excess Policy, when he openly stated to LNA at a recent meeting that NYMAGIC would continue to pay the same costs it had been paying under the Excess once the Primary was exhausted, and that NYMAGIC did not agree with the "gap in coverage" theory expressed in the following insurers' complaint.

Accordingly, please be advised that LNA will seek any and all remedies should NYMAGIC seek to intervene on behalf of the following excess insurers. Any contesting of coverage by NYMAGIC along the lines of the erroneous theories of the following insurers would be meritless.

As the amounts NYMAGIC has agreed to pay under the primary wharfinger policy is quickly approaching the policy limits, we must now request NYMAGIC's confirmation that it will, at a minimum, continue to pay the experts' fees and legal fees of Sutterfield & Webb under the Excess Policy. This request for NYMAGIC's confirmation is entirely without prejudice to LNA's position that neither the primary nor excess policy provides the basis for NYMAGIC's claim that it has the sole right to approve and authorize all defense costs.

Very truly yours,

HILL RIVKINS & HAYDEN LLP

Robert G. Clyne

013-Fromm

cc:   John A.V. Nicoletti, Esq.
      Nicoletti Hornig Campise & Sweeney
      Via Telecopier: 212-220-3780

HILL
RIVKINS

John A. V. Nicoletti
Nooshin Namazi
Kevin J.B. O'Malley
NICOLETTI HORNIG & SWEENEY
*Attorneys for Plaintiffs*
Wall Street Plaza
88 Pine Street, Seventh Floor
New York, New York 10005
(212) 220-3830

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

THE NORTHERN ASSURANCE COMPANY
OF AMERICA and AMERICAN HOME
ASSURANCE COMPANY,

                             Plaintiffs,

    - against -

LAFARGE NORTH AMERICA, INC. and
AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY
ASSOCIATION, INC.

                         Defendants.
-------------------------------------------------------------X

**08 CV 3289 (CSH) (AJP)**

**NOTICE OF**
**FILING RATIFICATION**

**Electronically Filed**

    **PLEASE TAKE NOTICE** that, pursuant to Rule 17 of the Federal Rules of Civil Procedure, the annexed ratification of New York Marine and General Insurance Company is being filed with the Court in the above-captioned action.

Dated: New York, New York
        June 27, 2008

                  NICOLETTI HORNIG & SWEENEY
                  *Attorneys for Plaintiffs*
                    *The Northern Assurance Company of America*
                    *and American Home Assurance Company*

        By:    /s John A. V. Nicoletti
              John A. V. Nicoletti
              Wall Street Plaza
              88 Pine Street, Seventh Floor
              New York, New York 10005
              (212) 220-3830

To:    Robert G. Clyne, Esq.
       HILL, RIVKINS & HAYDEN
       45 Broadway
       New York, New York 10006
       *Attorneys for Lafarge North America, Inc.*

       John M. Woods, Esq.
       THACHER PROFFITT & WOOD LLP
       Two World Financial Center
       New York, New York 10281
       *Attorneys for American Steamship Owners Mut. P&I Assoc., Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
THE NORTHERN ASSURANCE COMPANY
OF AMERICA and AMERICAN HOME
ASSURANCE COMPANY,

                          Plaintiffs,

        - against -                                              08 CV 3289 (CSH) (AJP)

LAFARGE NORTH AMERICA, INC. and
AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY                          **Electronically Filed**
ASSOCIATION, INC.

                          Defendants.
-------------------------------------------------------------X

## RATIFICATION OF
## NEW YORK MARINE AND GENERAL INSURANCE COMPANY

George Sutcliffe declares and states as follows:

1.      I am a Senior Vice President of Mutual Marine Office, Inc. ("MMO").

2.      MMO is the authorized representative of New York Marine and General Insurance Company ("NYMAGIC").

3.      NYMAGIC, Northern Assurance Company of America ("Northern Assurance") and American Home Assurance Company ("American Home") subscribed, on a several and not joint basis, to an Excess Marine Liability Policy issued to Lafarge North America, Inc. ("Lafarge") for the period from May 1, 2005 to May 1, 2006 (the "Excess Policy").

4.      NYMAGIC subscribed to 40% of the risk under the Excess Policy.

5.      Northern Assurance subscribed to 35% of risk under the Excess Policy.

6.      American Home subscribed to 25% of the risk under the Excess Policy.

7.      NYMAGIC is the lead underwriter under the Excess Policy.

8.    Pursuant to Rule 17(a) of the Federal Rules of Civil Procedure, MMO, on behalf of NYMAGIC, hereby ratifies the commencement and prosecution of the above-captioned action by Northern Assurance and American Home on behalf of all of the underwriters subscribing to the Excess Policy, including NYMAGIC, and agrees to be bound by a final judgment in said action after all appeals have been exhausted or the time to appeal has expired, as applicable..

9.    NYMAGIC intends to file a motion with the Court, pursuant to Rule 24 of the Federal Rules of Civil Procedure, to intervene in the above-captioned action as a plaintiff.

Dated: New York, New York
       June 26, 2008

_____
GEORGE SUTCLIFFE

2

EXHIBIT 7

# BROWN GAVALAS & FROMM LLP

### 355 LEXINGTON AVENUE
### NEW YORK, NEW YORK 10017

TEL: (212) 983-8500
FAX: (212) 983-5946
www.browngavalas.com
bgmail@browngavalas.com

NEW JERSEY OFFICE

1118 CLIFTON AVENUE
CLIFTON, NJ 07013
TEL: (973) 779-1116
FAX: (973) 779-0739

HARRY A. GAVALAS
(1978-1999)
ROBERT J. SEMINARA
(1987-1999)

July 16, 2008

## VIA FACSIMILE & MAIL

Hill Rivkins & Hayden LLP
45 Broadway, Suite 1500
New York, New York 10006

Attn:  Robert G. Clyne, Esq.

Re:  *The Northern Assurance Co. of Amer., et al. v. Lafarge North America, Inc., et al.*
United States District Court for the Southern District of New York
08 Civ. 3289 (CSH)
Your File No.: 29089-RGC/JJS
Our Ref:  460.1324

Dear Mr. Clyne:

We write in response to your letter of July 9, 2008.  While we do not believe it is productive to address every misstatement contained in your letter, we are, however, compelled to respond to certain allegations.

Initially, please be advised that New York Marine and General Insurance Company's ("NYMAGIC") intervention in the above-referenced action is not a breach of any of the terms and conditions of the Excess Policy.  Instead, NYMAGIC is joining in a pending action which seeks to clarify all parties' rights and responsibilities under the various policies.  Accordingly, NYMAGIC rejects your contention that it has acted in bad faith in any way and its intervention in the above-referenced action is entirely proper.

Contrary to your assertions, NYMAGIC is not attempting to deny coverage under the Excess Policy.  NYMAGIC does not deny that the Excess Policy provides coverage to Lafarge North America, Inc. ("Lafarge") for the claims arising out of Hurricane Katrina.  Rather, the relevant issues in this declaratory judgment action are: (i) at what point does the coverage under the Excess Policy attach and (ii) which of Lafarge's legal expenses are recoverable under the Excess Policy.  Accordingly, it is not an issue of whether there is coverage under the Excess policy, but when the coverage attaches and which claimed defense costs are recoverable under the Excess Policy.

**BROWN GAVALAS & FROMM LLP**

Hill Rivkins & Hayden LLP
July 16, 2008
Page 2

In addition, despite your claim, our letter of March 26, 2008, was not intended to, and, did not, assert a coverage position on behalf of NYMAGIC under the Excess Policy. It was not a declination or reservation of rights letter. Instead, this letter was sent solely in response to Lafarge's specific demand for reimbursement of legal and defense costs under the Excess Policy. As a result, there are no coverage positions set forth in the March 26th letter of which NYMAGIC would be taking a contradictory position in the above-referenced action. Moreover, the letter was written without prejudice and without waiver of any of NYMAGIC's rights and/or defenses maintained under the policy, at law or otherwise.

With respect to Lafarge's latest inquiry regarding reimbursement of expert and legal fees under the Excess Policy, please be advised that once the Primary Policy is exhausted, NYMAGIC will pay its percentage of the reasonable and approved expert fees and legal fees of Sutterfield & Webb under the Excess Policy pursuant to a full reservation of rights.

In particular, NYMAGIC reserves its right to seek recovery of any payments made under the Excess Policy on the grounds that the American Steamship Owners Mutual Protection and Indemnity Association (the "American Club") provides protection and indemnity insurance coverage to Lafarge for the subject claims under the Club Rules and the Certificate of Entry (the "American Club Policy") and that the Excess Policy is excess of the American Club coverage. In this regard, the Excess Policy is a true excess policy of insurance that is over and above all other available primary insurance including the American Club Policy, which is listed as underlying insurance in the Excess Policy. Moreover, inasmuch as the "other insurance" clause of the American Club Policy is an "escape" clause, while the NYAMGIC Primary Policy and Excess Policy contain "excess" "other insurance" clauses, the American Club will be required to provide primary coverage over the Excess Policy. As such, coverage under the American Club Policy must be exhausted before payments are required to be made under the Excess Policy. Therefore, if it is determined that there is coverage under the American Club Policy, NYMAGIC reserves its right to seek recovery of any and all payments made under the Excess Policy.

NYMAGIC further reserves its right to seek recovery of any payments made under the Excess Policy on the grounds that Lafarge failed to comply with all requirements of the American Club Policy, which were and are necessary to bring the Barge ING 4727 within the scope of coverage provide by the American Club. The failure to maintain this insurance, pursuant to terms and conditions of the Maintenance of Underlying Insurance of the Excess Policy, even if inadvertent, will relieve any obligation under the Excess Policy to make payments to Lafarge until such time as the amount which would have been covered under the American Club Policy would have been exhausted as if coverage under the American club Policy was in full force and effect. Therefore, if it is determined that there is no coverage under the American Club Policy and Lafarge failed to comply with all requirements of the American Club Policy,

BROWN GAVALAS & FROMM LLP

Hill Rivkins & Hayden LLP
July 16, 2008
Page 2

NYMAGIC reserves its right to seek recovery of any and all payments made under the Excess Policy.

Moreover, as with the Primary Policy, NYMAGIC has no obligation under the Excess Policy to reimburse or pay for the past and/or future payments to the attorneys, including, but not limited to, Goodwin Procter LLP, Chaffe McCall LLP and Holland & Knight LLP, that were separately retained by Lafarge and without the consent of, and/or consultation with, NYMAGIC. In addition, NYMAGIC will continue to maintain the right and authority to approve and authorize all defense counsel and defenses costs that are incurred in the Hurricane Katrina litigation under the Excess Policy. NYMAGIC also reserves all of its rights in connection the declaratory judgment action of *New York Marine and General Insurance Company v. Lafarge North America, Inc.*, 05 CV 9612 (CSH) (SDNY).

Neither this letter nor any future communication shall be constructed as a waiver of the rights and/or defenses available to NYMAGIC under the policies, at law or otherwise.

Very truly yours,

BROWN GAVALAS & FROMM LLP

David H. Fromm

cc:    (via facsimile only)
       Nicoletti Hornig & Sweeney
       Attn:   John A.V. Nicoletti, Esq.

BROADCAST REPORT

```
TIME  : 07/16/2008 11:17
NAME  : BROWN GAVALAS FROMM
FAX   : 2129835991
TEL   : 2129838500
SER.# : BROK6J556231
```

| PAGE(S) | 04 |
|---|---|

| DATE | TIME | FAX NO./NAME | DURATION | PAGE(S) | RESULT | COMMENT |
|---|---|---|---|---|---|---|
| 07/16 | 11:15 | 912126690698 | 42 | 04 | OK | |
| 07/16 | 11:16 | 912122203780 | 01:24 | 04 | OK | ECM |

```
BUSY: BUSY/NO RESPONSE
NG  : POOR LINE CONDITION
CV  : COVERPAGE
```