**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X          **ECF Case**
NEW YORK MARINE AND GENERAL
INSURANCE COMPANY,

                    Plaintiff,          **05 Civ. 9612 (CSH)**

    -against-

LAFARGE NORTH AMERICA, INC.,

                    Defendant.
------------------------------------------------------------X
THE NORTHERN ASSURANCE COMPANY
OF AMERICA and AMERICAN HOME
ASSURANCE COMPANY,

                    Plaintiffs,          **08 Civ. 3289 (CSH)**

    -against-

LAFARGE NORTH AMERICA, INC. and
AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY
ASSOCIATION, INC.

                    Defendants.
------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

NICOLETTI HORNIG & SWEENEY
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005-1801
(212) 220-3830
*Attorneys for Plaintiffs*
    *The Northern Assurance Company of America*
    *and American Home Assurance Company*

Of Counsel:
    John A.V. Nicoletti
    Nooshin Namazi
    Kevin J.B. O'Malley

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................. 3

ARGUMENT ........................................................................................................................ 3

POINT I

    TO CONSTRUE THE CERTIFICATE OF ENTRY AS A CLEAR
    AND UNAMBIGUOUS AGREEMENT, EVERY WORD MUST
    BE GIVEN ITS PLAIN AND ORDINARY MEANING AND <u>ONLY</u>
    IF AN AMBIGUITY EXISTS, MAY THE COURT RESORT TO
    RULES OF CONSTRUCTION OR EXTRINSIC EVIDENCE ....................................... 3

    A.    The Court Erred By Resorting To Rules Of Construction
        Without First Finding An Ambiguity ....................................................................... 3

    B.    The Court Erred By Failing To Glean The Parties' Intent From
        The Four Corners Of The Certificate Of Entry............................................................ 6

POINT II

    IF LAFARGE FAILED TO MAINTAIN THE CLUB COVER WITH
    RESPECT TO BARGE ING 4727, THE EXCESS POLICY IS STILL
    EXCESS OF THE CLUB'S LIMIT AS A SELF-INSURED
    RETENTION BY LAFARGE ........................................................................................ 12

POINT III

    THE STACKING OF THE POLICIES: THE CLUB POLICY
    SHOULD COVER LAFARGE FIRST, FOLLOWED BY THE MMO
    PRIMARY POLICY AND THEN THE EXCESS POLICY, RESPECTIVELY ............ 16

    A.    Both Primary Policies Provide Coverage For The
        Cost Of Lafarge's Defense...................................................................................... 16

    B.    The "Other Insurance" Conflict Between The Club And
        MMO Primary Policies Requires That The Club Policy Pays First ......................... 17

    C.    The Excess Policy Is Only Triggered After The Primary
        Policies Are Exhausted .......................................................................................... 19

CONCLUSION.................................................................................................................... 21

## **TABLE OF AUTHORITIES**

**Cases**

*Aetna Cas. & Sur. Co. v. National Union Fire Ins. Co. of Pittsburgh, Pa.,*
    228 A.D.2d 385, 645 N.Y.S.2d 5 (1st Dept. 1996) ................................................................ 18

*Benton v. Long Mfg. N.C., Inc.,*
    550 So.2d 859 (La.App.Ct., 2d Cir. 1989) ............................................................................ 13

*Bovis Lend Lease Lmb, Inc. v. Great American Ins. Co.,*
    855 N.Y.S.2d 459 (1st Dept. 2008) .............................................................................. 19, 20

*Brooklyn Clothing Corporation v. Fidelity-Phenix Fire Ins. Co.,*
    205 A.D. 743, 200 N.Y.S. 208 (2d Dept. 1923) .................................................................. 8

*Commercial Union Ins. Co. v. Bohemia River Associates, Ltd.,*
    855 F.Supp. 802 (D. Md. 1991) ............................................................................................ 8

*Consolidated Edison, Inc. v. Northeast Utilities,*
    426 F.3d 524 (2d Cir. 2005) .................................................................................................. 4

*Davitian v. Peerless Photo-Engraving Co.,*
    106 N.Y.S. 2d 111 (N.Y. Sup. 1951) .................................................................................... 4

*Dunham v. Omaha & Council Bluffs St. Ry. Co.,*
    106 F.2d 1 (2d Cir. 1939) .................................................................................................... 10

*Federal Ins. Co. v. Kozlowski,*
    18 A.D.3d 33, 792 N.Y.S.2d 397 (1st Dept. 2005) ...................................................... 16, 17

*Fraternity Fund Ltd. v. Beacon Hill Asset Management LLC,*
    371 F. Supp. 2d 571 (S.D.N.Y. 2005) .................................................................................. 4

*General Accident Fire & Life Assurance Corp. v. Piazza,*
    4 N.Y.2d 659 (1958) ............................................................................................................ 19

*General Motors Acceptance Corp. v. Nationwide Ins. Co.,*
    4 N.Y.3d 451, 796 N.Y.S.2d 2 ( 2005) .............................................................................. 20

*Great Northern Ins. Co. v. Mount Vernon Fire Ins. Co.,*
    92 N.Y.2d 682 (1999) .......................................................................................................... 17

*Hartford Fire Ins. Co. v. Novocargo USA Inc.,*
    257 F. Supp. 2d 665 (S.D.N.Y. 2003) .................................................................................. 4

*Ice Fern Shipping Co., Ltd. v. Golten Service Co., Inc.,*
    No. 1:04-CV-20741, 2005 WL 3692840, 2005 A.M.C. 1043 (S.D. Fla. Mar. 22, 2005) .......... 8

*In re Ingram Barge Co.,* No. Civ. A. 05-4419,
    2008 WL 906303 (E.D. La. Mar. 31, 2008) .......................................................................... 8

*Ingersoll Milling Mach. Co. v. M/V BODENA,*
    829 F.2d 293 (2d Cir. 1987) ............................................................................................ 3, 4

*Ins. Corp. of New York v. United States Fire Ins. Co.*,
    18 Misc.3d 1131(A), No. 600469/07, 2008 WL 399166 (N.Y. Sup.Ct. Feb. 5, 2008)............ 20

*Kipper v. Universal Underwriters Group*,
    304 A.D.2d 62, 756 N.Y.S.2d 682 (4th Dept. 2003) .............................................. 18

*Liberty Mutual Ins. Co. v. Ins. Co. of the State of Pennsylvania*,
    43 A.D.3d 666, 841 N.Y.S.2d 288 (1st Dept. 2007)............................................... 20

*In re Liquidation of Midland Ins. Co.*,
    269 A.D.2d 50, 709 N.Y.S.2d 24 (1st Dept. 2000)................................................. 20

*Luria Bros. & Co., Inc. v. Alliance Assurance Co., Ltd.*,
    780 F.2d 1082, 1986 A.M.C. 1539 (2d Cir. 1986).................................................. 16

*Matter of Bath & Hammondsport R.R. Co. v. New York State Dept. of Envtl. Conservation*,
    73 N.Y.2d 434 (1989) ..................................................................................... 11

*Matter of Flowers*, 526 F.2d 242 (8th Cir. 1975) .......................................................... 8

*Matter of Riefberg's Estate*,
    58 N.Y.2d 134 (1983) ..................................................................................... 11

*Mazzola v. County of Suffolk*,
    143 A.D. 2d 734, 533 N.Y.S. 2d 297 (2d Dept. 1988) ............................................. 4

*Merritt v. Jefferson Ins. Co.*,
    112 Misc.2d 51, 445 N.Y.S.2d 972 (N.Y. Sup. Ct. 1982) ......................................... 19

*Mid-America Transp. Co. v. St. Louis Barge Fleeting Service, Inc.*,
    229 F.Supp. 409 (E.D. Mo. 1964)....................................................................... 8

*Mord v. New York Indemnity Co.*,
    216 A.D. 252, 214 N.Y.S. 693 (2d Dep't 1926)...................................................... 8

*Mosca v. Ford Motor Credit Co.*,
    150 A.D.2d 656, 541 N.Y.S.2d 528 (2d Dept. 1989) ............................................. 19

*National Union Fire Ins. Co. of Pittsburgh v. Connecticut Indemnity Co.*,
    860 N.Y.S.2d 35 (1st Dept. 2008)...................................................................... 20

*Nu-Way Environmental, Inc. v. Planet Ins. Co.*,
    No. 95 Civ. 573, 1997 WL 462010 (S.D.N.Y. Aug. 12, 1997) ................................. 17

*Platex FP, Inc. v. Columbia Casualty Co.*,
    622 A.2d 1074 (Del. Super. Ct. 1992) ............................................................... 13

*Polley v. Daniels*,
    238 A.D. 181, 264 N.Y.S. 194 (3d Dept. 1933) .................................................... 8

*Reserve Ins. Co. v. Pisciotta*,
    30 Cal.3d 800, 180 Cal.Rptr. 628, 640 P.2d 764 (Cal. 1982) ................................... 13

*Seaboard Sand & Gravel Corp. v. Moran Towing Corp.*,
    154 F.2d 399 (2d Cir. 1946)............................................................................. 7

*In re, September 11th Liability Ins. Coverage Cases,*
  458 F.Supp.2d 104 (S.D.N.Y. 2006) ........................................................................................... 12

*St. Paul Fire and Marine Ins. Co. v. Conagra, Inc.,*
  834 F. Supp. 1177 (E.D. Mo. 1993) .............................................................................................. 8

*State Farm Fire and Cas. Co. v. LiMauro,*
  65 N.Y.2d 369, 492 N.Y.S.2d 534 (1985) .................................................................................. 20

*Stewart v. Barber,*
  182 Misc. 91, 43 N.Y.S. 2d 560 (N.Y. Sup. 1943) ..................................................................... 4

*Thyssen Steel Co. v. M/V KAVO YERAKAS,*
  50 F.3d 1349 (5th Cir. 1995) ................................................................................................. 7, 8

*Trustees of Princeton University v. National Union Fire Ins. Co. of Pittsburgh, PA,*
  15 Misc.3d 1118(A), 2007 WL 1063870 (N.Y. Sup.Ct. Apr. 10, 2007) .................................. 17

*U.S. Underwriters Ins. Co. v. Affordable Housing Found., Inc.,*
  256 F.Supp.2d 176 (S.D.N.Y. 2003 ........................................................................................... 14

*U.S. v. Turkette,*
  452 U.S. 576 (1981) ...................................................................................................................... 4

*United States Fidelity & Guaranty Co. v. Treadwell Corp.,*
  58 F.Supp.2d 77 (S.D.N.Y. 1999) .............................................................................................. 20

*United States Fire Insurance Co. v. Charter Financial Group, Inc.,*
  851 F.2d 957 (7th Cir. 1988) ...................................................................................................... 15

*United States v. Amato,*
  540 F.3d 153 (2d Cir. 2008) ................................................................................................ 4, 5, 6

*Utica Mut. Ins. Co. v. Travelers Ins. Co.,*
  213 A.D.2d 983, 624 N.Y.S.2d 485 (4th Dept. 1995) ............................................................... 19

*Wedtech Corp. v. Federal Ins. Co.,*
  740 F.Supp. 214 (S.D.N.Y. 1990) .............................................................................................. 17

*Wells Fargo Bank v. Cal. Ins. Guar. Ass'n,*
  45 Cal. Rptr. 2d 537 (Cal. Ct. App. 1995) ................................................................................. 12

*Worldcom, Inc. Securities Litigation,*
  354 F.Supp.2d 455 (S.D.N.Y. 2005) ................................................................................... 16, 17

*Zurich Am. Ins. Co. v. ABM Indus.,*
  397 F.3d 158 (2d Cir. 2005) ................................................................................................ 4, 5, 6

## Other Authorities

3 *Couch on Insurance* § 42.21 (3d ed. 2005) ................................................................................. 8

15 *Couch on Insurance*, § 218:5 (3d ed. 2005) ............................................................................. 20

22 N.Y. Jur. 2d *Contracts* § 252 ................................................................................................... 5

Barry R. Ostrager and Thomas R. Newman,
   2 *Handbook on Insurance Coverage Disputes* §13.01 (14th ed. 2008)............................ 12, 13

http://merriam-webster.com........................................................................................................ 8

## PRELIMINARY STATEMENT

Plaintiffs The Northern Assurance Company of America and American Home Assurance Company ("Excess Insurers") submit this Memorandum of Law in Support of their Motion for Summary Judgment on the First and Fourth Causes of Action against American Steamship Owners Mutual Protection and Indemnity Association, Inc. (the "Club") and on the Second and Fourth Causes of Action against Lafarge North America, Inc. ("Lafarge") (collectively, "Defendants").[1]

This is the second time Excess Insurers have moved for summary judgment. *See* Docket Nos. 39 – 45. The Court stayed Excess Insurers' first motion in this action (mid-briefing) while, at the same time, granting Defendants leave to file summary judgment motions in a related action (*American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Lafarge North America, Inc.*, 06 Civ. 3123 (CSH) (the "Club Action")). Then, the Court excluded Excess Insurers (who have significant and adverse interests to Defendants) from participating in the Club Action. *See* Docket No. 71. Finally, the Court granted summary judgment in favor of the Club (*See* Docket No. 68, (the "Decision")) and has now lifted the stay in this action. *See* Docket Nos. 76, 78, 79 and 80.

Because of its direct impact upon Excess Insurers, this memorandum will address the Decision. As will be shown *infra*, the Decision is erroneous because it disregarded a fundamental rule of contract interpretation: having found that the Certificate of Entry is a clear and unambiguous agreement (which it is), the Court must give every word its plain and ordinary meaning, exclusively through an examination of the four corners of the document and through

---

[1] Excess Insurers' Third Cause of Action seeks identical declaratory relief to that sought by Plaintiff New York Marine and General Insurance Company ("NYMAGIC") in 05 Civ. 9612. NYMAGIC will or has filed a motion for summary judgment. Excess Insurers join in that motion, except to the extent that: (1) there is any reference to or allegations concerning the obligation to pay fees or expenses under the Excess Policy; and (2) any party alleges that the limits of the MMO primary policy have been exhausted. Excess Insurers reserve all of their rights.

dictionary definitions.  Only if ambiguity exists, may the Court resort to rules of construction or extrinsic evidence.

The Court incorrectly used the canon of *ejusdem generis* to interpret a term the Court concluded was clear and unambiguous, *i.e.* "or otherwise."  The Court should have first determined the parties' intent through an examination of the four corners of the Certificate of Entry and should have given the term "*or otherwise*" its plain and ordinary meaning.  Only if applying these steps leads to ambiguity, may the Court then consider not only rules of construction but also all other extrinsic evidence of the parties' intent and past course of performance.  This mistaken use of *ejusdem generis* resulted in the Court's re-writing the Certificate of Entry to the detriment of Lafarge and Excess Insurers.

An examination limited to the four corners of the agreement would have shown that the parties intended to expand the traditional scope of the Club's liability cover well beyond "owned" or "operated" (*i.e.* chartered or leased) vessels to accommodate Lafarge's business needs, including where Lafarge acquired an insurable interest as a bailee in Barge ING 4727, over which it exercised significant care, custody and control.  This expansive intent is expressed in the Certificate of Entry itself, which "automatically" extends P&I coverage to include any situation in which Lafarge acquired "an insurable interest" in any vessel "through purchase, charter, lease *or otherwise*."  The parties knew what they meant when they used the term "*or otherwise*" because they used the terms "chartered, leased" again in the same paragraph, but this time those same terms were followed by the term "*or similarly acquired* vessel." If the parties intended to limit the scope of coverage only to situations akin to purchased, chartered, or leased vessels, they could have, but did not use the term "*or similarly acquired*" in place of "*or otherwise*."

As stated *supra*, the Court's Decision directly impacts Excess Insurers because the Excess Policy operates in the following manner: First, the Club Policy does cover Lafarge, and thus the Excess Policy is excess of the Club cover, among other primary coverages. Second, if the Club coverage does not exist, then it is a result of Lafarge's failure to maintain that cover as required by the Excess Policy, which results in the Club's primary limit being a self-insured retention for Lafarge.

## FACTUAL BACKGROUND

For the sake of efficiency, Excess Insurers will not repeat every undisputed fact and, instead, fully incorporate their Local Civil Rule 56.1 Statement (the "Statement") herein. To the extent facts are referenced in this memorandum of law, Excess Insurers will direct the Court's attention to such facts with the appropriate citation to the record.

## ARGUMENT

### POINT I

**TO CONSTRUE THE CERTIFICATE OF ENTRY AS A CLEAR AND UNAMBIGUOUS AGREEMENT, EVERY WORD MUST BE GIVEN ITS PLAIN AND ORDINARY MEANING AND <u>ONLY</u> IF AN AMBIGUITY EXISTS, MAY THE COURT RESORT TO RULES OF CONSTRUCTION OR EXTRINSIC EVIDENCE**

In an effort to avoid ambiguity in the Certificate of Entry (which would require resort to extrinsic evidence; *i.e.* the parties' past course of performance), the Court erroneously resorted to a rule of construction "to avoid ambiguity, not to resolve it." *See* Docket No. 68 at p. 12.

**A.     The Court Erred By Resorting To Rules Of Construction Without First Finding An Ambiguity**

"The starting point in interpreting an insurance policy is to determine whether the policy terms are ambiguous." *Ingersoll Milling Mach. Co. v. M/V BODENA*, 829 F.2d 293, 306 (2d Cir. 1987) (citations omitted). " 'Where the contract is clear and unambiguous on its face, the Courts

3

must determine the intent of the parties from within the four corners of the instrument.' "
*Consolidated Edison, Inc. v. Northeast Utilities*, 426 F.3d 524, 527 (2d Cir. 2005) (citation
omitted). "As a general rule, plain or unambiguous language will be given its ordinary meaning
and effect, and the need to resort to rules of construction arises only when an ambiguity exists."
*Ingersoll*, 829 F.2d at 306 (citations omitted). "A Court may look to a dictionary as an aid in
determining a word's reasonable and ordinary meaning." *Hartford Fire Ins. Co. v. Novocargo
USA Inc.*, 257 F. Supp. 2d 665, 675 (S.D.N.Y. 2003) (citations omitted); *see also Mazzola v.
County of Suffolk*, 143 A.D. 2d 734, 735, 533 N.Y.S. 2d 297 (2d Dept. 1988).

The doctrine of *ejusdem generis* is an aid to interpretation that may be applicable to the
construction of statutes and contracts. *See, e.g., United States v. Amato*, 540 F.3d 153, 160 (2d
Cir. 2008); *Zurich Am. Ins. Co. v. ABM Indus.*, 397 F.3d 158, 165 (2d Cir. 2005). However,
*ejusdem generis* applies only when an ambiguity exists. It is "to be used when the meaning of a
word or phrase is unclear . . . ." *Fraternity Fund Ltd. v. Beacon Hill Asset Management LLC*,
371 F. Supp. 2d 571, 576 (S.D.N.Y. 2005) (footnote citations omitted); *see also U.S. v. Turkette*,
452 U.S. 576 (1981) ("The rule of *ejusdem generis* is no more than an aid to construction and
comes into play only when there is some uncertainty as to the meaning of a particular clause in a
statute."). "If the meaning be clear and unambiguous from the language used, there is no need
for or purpose of invoking the doctrine." *Stewart v. Barber*, 182 Misc. 91, 92, 43 N.Y.S. 2d
560 (N.Y. Sup. 1943); *see also Davitian v. Peerless Photo-Engraving Co.*, 106 N.Y.S. 2d 111,
114 (N.Y. Sup. 1951), *rev'd on other grounds*, 279 A.D. 585, 107 N.Y.S. 2d 105 (2d Dept. 1951).
Further, it is "inappropriate" to use the doctrine of *ejusdem generis* "where it renders words or
phrases meaningless or otherwise defeats the parties' intent." *Fraternity Fund*, 371 F. Supp. at
576 (footnote citations omitted). Finally, "the rule is not in and of itself a rule of interpretation,

but merely an aid to interpretation where the intention is not otherwise apparent, and it never controls where it clearly appears from the instrument that no such limitation was intended." 22 N.Y. Jur. 2d *Contracts* § 252 (citing *In re Chateaugay Corp.*, 154 B.R. 843 (Bankr. S.D.N.Y. 1993)).

The Court's reliance on the Second Circuit cases of *Zurich* and *Amato* is misplaced. Neither decision stands for the proposition suggested by the Court: that *ejusdem generis* may be used to interpret an unambiguous term. In both cases, the Second Circuit held that the words at issue should be given their plain and ordinary meaning, and thus there was no need to look beyond the four corners of the contract or the statute.

In *Zurich America Insurance Co. v. ABM Industries, Inc.*, 397 F.3d 158 (2d Cir. 2005), the Second Circuit reversed the district court's grant of summary judgment, which was based on a finding that the insurance contract was ambiguous. At issue in *Zurich* was the interpretation of a business interruption policy that covered "[t]he interest of the insured in all real and personal property including but not limited to property owned, controlled, used, leased or intended for use by the insured." 397 F.3d at 165. The Second Circuit rejected the insurer's invitation to use *ejusdem generis*, because it "would require us to ignore the phrase 'but not limited to' as well as the disjunctive 'or' in the provision." *Id.* The Second Circuit further stated that "[i]n interpreting an insurance contract under New York law, a Court must strive to 'give meaning to every sentence, clause, and word.'" *Id.* (emphasis added)(citations omitted). The Second Circuit concluded that "[w]e think instead that the 'plain meaning [of those words] unambiguously includes the actual situation for which coverage is sought.'" *Id.* (citation omitted).

In *United States of America v. Amato*, 540 F.3d 153 (2d Cir. 2008), the Second Circuit considered the criminal defendants' appeal of several counts of mail and wire fraud. The defendants challenged the district court's award of over $3 million in attorneys' fees and accounting costs under the Mandatory Victims Restitution Act. *Id.* at 159. Invoking *ejusdem generis*, the defendants contended that the term "other expenses" in the statute "should be read to include only those expenses similar in nature to the ones specifically listed in the provision: lost income, child care expenses, and travel expenses." 540 F.3d at 160. The Second Circuit held that the term "other expenses" in the context of the statute may include attorneys' fees and accounting costs. *See id.* Significantly, the Court's holding was based on the following: "<u>Our conclusion follows from the plain language of the statute</u>." *See id.* Next, and as an ancillary issue, the Court rejected *ejusdem generis* as unnecessary. *See id.* at 161. ("We do not need *ejusdem generis* to limit 'other expenses' [when the statute] already does so expressly.")

In this case, the Court disregarded well entrenched protocols of contract interpretation and erroneously used *ejusdem generis* as the <u>first</u> method of interpretation. Neither *Zurich* nor *Amato* support this approach. The hierarchy of contract interpretation mandates that the <u>first</u> step is to determine the parties' intent from the four corners of the Certificate of Entry, using the available dictionary definition of the term "or otherwise," a step the Court did not undertake.

**B.     The Court Erred By Failing To Glean The Parties' Intent From The Four Corners Of The Certificate Of Entry**

The Certificate of Entry provides:

> CHARTERED BARGES.
>
> If Lafarge Corporation et al <u>acquires an insurable interest in any vessel in addition to or in substitution for those set forth herein, through purchase, charter, lease *or otherwise*</u>, such insurance as is afforded hereunder to any similar vessel <u>shall</u> <u>automatically</u> <u>cover</u> <u>such additional vessel</u> effective from the date and time the Assured

acquires an insurable interest in such additional vessel.   With
respect to a chartered, leased or *similarly acquired* vessel, the
insurance hereunder automatically includes the owner as an
additional Assured with waiver of subrogation against the owner, if
required, effective from the date and time such vessel is insured
hereunder.

* * *

The Assured agrees to report the name and gross tonnage of any
vessel in which they acquire an insurable interest at the expiration
of this policy and pay any additional premium as may be required
annually, at expiry at daily pro-rate the annual rates agreed.

*See* Ex. 7 Certificate of Entry (emphasis added).

Turning to the four corners of the Certificate of Entry, the parties have expressed their

intent: coverage shall "automatically" attach to any situation in which Lafarge "acquires an

insurable interest in any vessel in addition to or in substitution" of those vessels specifically

listed on the schedule of vessels "through purchase, charter, lease *or otherwise.*" Here, instead

of giving the words "or otherwise" their plain and ordinary meaning, the Court bypassed this

significant interpretive step and, without finding an ambiguity, went straight to *ejusdem generis*.

An examination of the four corners of the agreement shows that the parties intended to expand

the traditional Club Liability cover well beyond Lafarge's status as an "owner" or "operator"; *i.e.*

a charterer or lesee.

The first issue is whether Lafarge acquired an "insurable interest" in a vessel.   The Court

did not give this term a meaning.   Lafarge was the bailee of the Barge ING 4727 and, as such,

had an insurable interest in that barge.[2]  *See* The Decision, Docket No. 68 at p. 16.   The Barge

---

[2]        "Bailment is the delivery of goods or personal property to the bailee in trust, under an express or implied
contract, which requires the bailee to perform the trust and either to redeliver the goods or to otherwise dispose of
the goods in conformity with the purpose of the trust." *Thyssen Steel Co. v. M/V KAVO YERAKAS*, 50 F.3d 1349,
1354-55 (5th Cir. 1995) (citations omitted).   "It is the element of lawful possession, and the duty to account for the
thing as the property of another, that creates the bailment, whether such possession results from contract or is
otherwise lawfully obtained. . . . Taking lawful possession without present intent to appropriate creates a bailment."
*Seaboard Sand & Gravel Corp. v. Moran Towing Corp.*, 154 F.2d 399, 402 (2d Cir. 1946).

was also an addition to, if not in substitution for one of, the vessels identified in the Certificate of Entry.

The next issue is the parties' intent in using the disjunctive "or" followed by the word "otherwise." There is a dictionary definition for the word "otherwise." It means "anything else." *See* http://merriam-webster.com (follow dictionary search hyperlink for the word "otherwise"). The Court dismissed this definition and thereby gave the term no meaning or effect. Also, the parties knew what they meant when they used the words "*or otherwise*" because in the same paragraph they again used the terms "chartered, leased *or similarly acquired* vessel." If the parties intended to limit the scope of cover to situations that are <u>akin</u> to purchase, charter and lease, they *could have* stated: coverage to automatically attach to situations where Lafarge acquires an insurable interest through "purchase, charter, lease *or similarly acquired* vessels." They *did not*. Instead, they intentionally chose the much broader term "or otherwise," which means "anything else," or "in a different manner," or "in another way." Lafarge's insurable interest in Barge ING 4727 through bailment is sufficient to trigger the Club coverage.

---

"Under general admiralty law, bailment does not arise unless delivery to the bailee is complete and he has exclusive possession of the bailed property, even as against the property owner." *Thyssen Steel Co. v. M/V KAVO YERAKAS*, 50 F.3d 1349, 1355 (5th Cir. 1995) (citations omitted). The assumption of exclusive control or custody is an essential requirement of an admiralty bailment. *See, e.g., Ice Fern Shipping Co., Ltd. v. Golten Service Co., Inc.*, No. 1:04-CV-20741, 2005 WL 3692840, at *2, 2005 A.M.C. 1043 (S.D. Fla. Mar. 22, 2005); *Commercial Union Ins. Co. v. Bohemia River Associates, Ltd.*, 855 F.Supp. 802, 805 (D. Md. 1991); *Mid-America Transp. Co. v. St. Louis Barge Fleeting Service, Inc.*, 229 F.Supp. 409, 411 (E.D. Mo. 1964), *aff'd sub nom. St. Louis Barge Fleeting Service, Inc. v. Mid-America Transportation Company*, 348 F.2d 920 (8th Cir. 1965).

The delivery of a barge to a corporation engaged in the business of loading barges with cargo creates a bailment. *See, e.g., Matter of Flowers*, 526 F.2d 242, 244 (8th Cir. 1975); *St. Paul Fire and Marine Ins. Co. v. Conagra, Inc.*, 834 F. Supp. 1177, 1181 (E.D. Mo. 1993). The United States District Court for the Eastern District of Louisiana has held that Lafarge's relationship to the Barge ING-4727 was that of a bailee and its duty that of a wharfinger. *See In re Ingram Barge Co.*, No. Civ. A. 05-4419, 2008 WL 906303, at *4-*5 (E.D. La. Mar. 31, 2008). As such, Lafarge had an insurable interest in the barge.

"A bailee has an insurable interest in goods bailed because he or she is liable, by law, custom, or contract, for certain risks to which they may be subjected, and may insure goods in [his] possession to their full value, or for the benefit of both himself and the bailor." 3 *Couch on Insurance* § 42.21 (3d ed. 2005) (footnote citations omitted); *see also Polley v. Daniels*, 238 A.D. 181, 183, 264 N.Y.S. 194 (3d Dept. 1933); *Mord v. New York Indemnity Co.*, 216 A.D. 252, 253, 214 N.Y.S. 693 (2d Dep't 1926), *aff'd*, 244 N.Y. 589, 155 N.E. 908 (1927); *Brooklyn Clothing Corporation v. Fidelity-Phenix Fire Ins. Co.*, 205 A.D. 743, 200 N.Y.S. 208 (2d Dept. 1923).

This interpretation is consistent with and represents the parties' intent to expand the P&I cover beyond the traditional "owner" or "operator," *i.e.* charterer or lesee of a scheduled vessel. This is because Lafarge, as a "shipper" of cement cargoes (as noted by the Court), would routinely engage in business transactions (such as the Transportation Agreement ("TA") between it and Ingram, *See* Ex. 8), whereby Lafarge, as a baliee, exercised significant care, custody and control over barges such as the Barge ING 4727. Here, for instance, the Court exclusively highlighted paragraph 51 of the TA to make the point that Lafarge was neither an owner nor charterer nor an operator of the Barge ING 4727 and thus did not have care, custody and control over the vessel. But, the Court overlooked several other key provisions in the TA, including paragraphs 24, 34 and 36, which assigned significant care, custody and control of the Barge to Lafarge.[3]

---

[3]
> 34.   Possession of the Barge during Loading/Unloading:
>
> > **Shipper [Lafarge] shall assume the duty and responsibility for the safety of each barge in its possession.** For the purposes of this Agreement, "possession" shall begin when a Carrier delivers an empty or loaded barge for loading or unloading to the landing designated by Shipper and shall end when the barge is removed by the Carrier or its agent(s). **Shipper [Lafarge] shall be responsible for the safekeeping of Carrier's barge delivered to a landing regardless of whether Shipper owns or operates the landing.** During possession, any barge delivered to a landing designated by the Shipper shall be held without charge to Carrier.
> >
> > * * *
>
> 36.   Mooring:
>
> > **While barges are in the care and custody of Shipper [Lafarge]**, or its agents, **all** U.S. Coast Guard and U.S. Army Corps of Engineers **regulations will be complied with,** . . . .
> >
> > * * *
>
> 24.   When Shipper [Lafarge] arranges for shifts to be made without expense to Carrier, **Shipper [Lafarge] shall assume full responsibility for safety of barge and cargo thereof during such shifts, and further, Shipper [Lafarge] shall reimburse Carrier in full for any damage or loss which may occur during such movements.**

*See* Ex. 8 Lafarge Transportation Agreement (emphasis added).

Even more to the point, the Court's review of the history and purpose of traditional P&I coverage, although enlightening, is not relevant to the present matter because the parties intended to provide a specialized and expanded P&I coverage to Lafarge beyond the traditional owner and/or operator circumstances.

The case law in this jurisdiction has also given the term "or otherwise" its ordinary dictionary definition: "in a different manner" or "in another way." For instance, the Second Circuit in *Dunham v. Omaha & Council Bluffs St. Ry. Co.*, 106 F.2d 1 (2d Cir. 1939), analyzed the causes of action that a bondholder could assert under the language of a mortgage agreement. The bondholder argued that because the controlling provision within the agreement did not specifically restrict his cause of action, his suit could proceed. *Dunham*, 106 F.2d at 1. The provision stated: "under no circumstances shall the holder of any bond or coupon, or any number of such holders, have any right to institute any action at law upon any coupon or coupons, or otherwise, or any suit or proceedings in equity, or otherwise, for the purpose of enforcing any payment, covenant or remedy herein or in said bonds or coupons contained, or to foreclose this mortgage." Based on the plain meaning of the words, the court of appeals held that:

> "Otherwise" means, "In a different manner; in another way, or in other ways." *Webster's International Dictionary*. Given their ordinary meaning in their context, the words "or otherwise" broaden the scope of the restriction to the same extent as though all possible forms of action a bondholder could institute to enforce the payment of his bonds had been included by name. For the broadening effect of the words "or otherwise" upon specific terms in connection with which they have been used *see Carpenter v. Romer & Tremper Co.*, 48 App.Div. 363, 63 N.Y.S. 274; *Whitlock v. Boston & M.R.R. Co.*, 1 Cir., 29 F.2d 351; *Franklin Sugar Refining Co. v. United States, C.C.*, 137 F. 655. This point is decisive....

*Id.* at 3.

10

The Court of Appeals in *Matter of Riefberg's Estate*, 58 N.Y.2d 134, 141 (1983), expressly declined to employ *ejusdem generis* to interpret a statute's controlling provision that included the words "or otherwise." Instead, the Court let the plain language of the phrase control and concluded that the word "otherwise ... is better taken literally to mean 'different from' [the specific term that preceded it] (Webster's New International Dictionary [2d ed.], p. 1729)." *Id.* at 141. (emphasis added).

Subsequent New York decisions are in accord with *Reifberg*. For instance, in *Matter of Bath & Hammondsport R.R. Co. v. New York State Dept. of Envtl. Conservation*, 73 N.Y.2d 434, 436 (1989), the Court of Appeals examined a statute (containing language somewhat similar to the contract language at issue) that vested the Commissioner of the Department of Environmental Conservation the authority to "acquire [lands] by *lease*, *purchase*, gift, devise, agreement *or otherwise*." The narrow issue presented was "whether the absence of explicit reference to eminent domain power in [the statute] precludes the exercise of that power...." *Id.* The petitioners argued that under the canon of "*ejusdem generis* ... the 'or otherwise' phrase ... encompass[es] only voluntary acquisitions such as purchase or lease." *Id.* at 440. However, the Court refused to venture beyond the plain language of the statutory text. *Id.* at 441. The Court decided that "[s]uch an application of the rules of construction is inappropriate here. The purpose of such rules is to *assist in ascertaining* legislative intent, not to defeat it... There is simply no reason to resort to canons of construction to 'discover' [within the statute] a 'legislative intent' directly contrary to the Legislature's evident purpose as reflected in the language ... of the [statute]." *Id.* (emphasis added).

## POINT II

### IF LAFARGE FAILED TO MAINTAIN THE CLUB COVER WITH RESPECT TO BARGE ING 4727, THE EXCESS POLICY IS STILL EXCESS OF THE CLUB'S LIMIT AS A SELF-INSURED RETENTION BY LAFARGE

The Excess Policy requires that Lafarge maintain any policy listed on the schedule of underlying insurance in full effect. Lafarge contends it intended for the Club's multi-billion expansive Liability Policy to cover it (for defense costs and indemnity) for the Katrina related claims. *See* Lafarge's Cross-Motion for Summary Judgment, Docket Nos. 49-58 and 63-64. If Lafarge failed to maintain the Club cover (whether inadvertently or otherwise), either (1) because it did not clearly state its intent in the Certificate of Entry for the Club's Liability coverage to extend to situations where Lafarge acquired an insurable interest in a vessel through bailment; <u>or</u> (2) because of its failure to comply with any conditions of the Club coverage, *i.e.* failure to report over 3,000 prior similar transactions (*See* Docket Nos. 44-47, 59-61 and 65-66), then that is a breach of the Maintenance of Underlying Insurance provision in the Excess Policy. The result is that the gap in the Club coverage is Lafarge's self-insured retention.

As a general principle, excess insurance "means insurance that, by its terms, provides coverage 'only after a predetermined amount of primary coverage is exhausted.'" Barry R. Ostrager and Thomas R. Newman, 2 *Handbook on Insurance Coverage Disputes* §13.01 (14th ed. 2008)(internal citation omitted); *see also In re, September 11th Liability Ins. Coverage Cases,* 458 F.Supp.2d 104 (S.D.N.Y. 2006) ("Excess, or secondary insurance is coverage that attaches only after a predetermined amount of underlying primary insurance has been exhausted."); *Wells Fargo Bank v. Cal. Ins. Guar. Ass'n,* 45 Cal. Rptr. 2d 537, 539, fn.2 (Cal. Ct. App. 1995). In other words, while an excess policy increases the *amount* of coverage available to compensate for a loss, it does not increase the *scope* of coverage.

The typical indicia or provisions that distinguish a true excess policy from a primary policy are the Maintenance of Underlying Insurance clause and the Schedule of Underlying Insurance. *See, e.g.,* Ostrager, *supra,* § 13.02 ("Excess insurance policies usually contain a provision requiring the Insured to maintain specified levels of underlying insurance.")(internal citations omitted); *see also Platex FP, Inc. v. Columbia Casualty Co.,* 622 A.2d 1074, 1085 (Del. Super. Ct. 1992)(the Court found that the Maintenance of Underlying Insurance clause was a "condition meant to obligate the Insured to maintain its underlying insurance." Thus, the maintenance clause was not intended to expand the Insured's coverage or force the excess insurance to drop down.); *Reserve Ins. Co. v. Pisciotta,* 30 Cal.3d 800, 180 Cal.Rptr. 628, 640 P.2d 764 (Cal. 1982)(where the Excess Policy contained a Maintenance of Underlying Insurance clause [similar to the Excess Insurers' Policy herein], the Court held that the importance of the maintenance clause was that the excess insurer would not allow the insured to expand the scope of the Excess Insurers' coverage and force a drop down in the event of the insured breaching the warranty to comply with the maintenance clause.)   Other courts have considered an excess policy's maintenance clause:

> The maintenance clause [] provides that the insured's failure to maintain the required underlying insurance – resulting in a breach of the maintenance clause – will cause [the excess insurer] to be liable only to the extent it would have been had the insured complied with the maintenance clause ... We conclude that the clear and unambiguous import of the policy language is that the insured [must maintain the specified underlying insurance].

*Benton v. Long Mfg. N.C., Inc.,* 550 So.2d 859, 862 (La.App.Ct., 2d Cir. 1989).

The Excess Policy in this case contains both a Maintenance of Underlying Insurance clause and a Schedule of Underlying Insurance and, as such, is a true Excess Policy.

MAINTENANCE OF UNDERLYING INSURANCE:

A)  It is a condition of this policy that the Section(s) or Policy(ies) referred to below in the "Schedule of Underlying Insurance" shall be maintained in full effect during the currency of this insurance except for any reduction of the aggregate limit(s) contained therein solely by payment of claims in respect of accidents and/or occurrences, occurring during the term of this Policy.

B)  Inadvertent failure of the Assured to comply with Paragraph A above or inadvertent failure to notify this Company of any changes in the Underlying Insurances shall not prejudice the Assured's rights of recovery under this Policy, but in the event of such failure, this Company to be liable only to the same extent as they would have been had the Assured complied with the said condition.

*See* Ex. 4 Excess Policy (emphasis added).   The Excess Policy's Schedule of Underlying

Insurance provides in relevant part:

EXCESS MARINE LIABILITIES

SCHEDULE OF UNDERLYING INSURANCE

| Locations, Vessels and Applicable Marine Interests | Company (Participation) | Underlying Limits and Coverage | | |
|---|---|---|---|---|
| | | * * * | | |
| 2.  P&I Club Placements | | | | |
| | | * * * | | |
| B.  Lafarge North America Inc. | American Steamship Owners Mutual Protection & Indemnity Association, Inc. | US$ | Per Club Rules | Protection & Indemnity (Including 4/4ths Collision Liability |

*See* Ex. 4 Excess Policy.

The Excess Policy's Maintenance of Underlying Insurance clause must be considered

together with the Schedule of Underlying Insurance.  *See U.S. Underwriters Ins. Co. v.*

*Affordable Housing Found., Inc.,* 256 F.Supp.2d 176, 181 (S.D.N.Y. 2003).  For instance, both

the MMO primary Marine Liabilities policy and the Club's P&I policy (which are the only

primary policies at issue with regard to Lafarge's claim) are specifically identified on the Schedule of Underlying Insurance as primary policies, identifying the nature of the risk, the insuring primary company, and the primary limit of coverage per the specific policy. As such and consistent with other courts' interpretation, *supra*, the language is clear. It is a condition of the Excess Policy that Lafarge <u>shall</u> maintain not just some but all of "<u>the policy(ies)</u>" identified in the Schedule of Underlying Insurance. Lafarge's failure, inadvertent or otherwise, to comply with the above condition, does not negate Lafarge's right of recovery under the Excess Policy, but it delays collection thereunder until the amount of the multi-billon dollar "gap in coverage," if any, is satisfied as a self-insured retention.

In *United States Fire Insurance Co. v. Charter Financial Group, Inc.,* 851 F.2d 957, 960 (7th Cir. 1988), for instance, the excess insurer argued that an insured's "failure to list [a named partnership as a named insured] on the primary policy constituted a violation of a duty to 'maintain' that policy in force." The insured argued that insurance was in full effect for other members of the partnership. The court analyzed the Maintenance of Underlying Insurance clause of the excess policy, and determined that "it seems clear that the purpose of the maintenance clause is to prevent the insureds from rendering the excess insurer liable as a primary insurer simply by failing to acquire or pay premiums on the underlying policy." *U.S. Fire*, 851 at 963. Thus, the court "agreed ... that the intent of the parties upon entering into the contract provision [Maintenance of Underlying Insurance] was to achieve excess liability coverage above the threshold level of the face value of the [schedule of underlying insurance] policies." *Id.* (citations omitted).

15

## POINT III

### THE STACKING OF THE POLICIES: THE CLUB POLICY SHOULD COVER LAFARGE FIRST, FOLLOWED BY THE MMO PRIMARY POLICY AND THEN THE EXCESS POLICY, RESPECTIVELY

**A.      Both Primary Policies Provide Coverage For The Cost Of Lafarge's Defense**

Putting aside the fact that the Club cover automatically attached and should cover Lafarge, *see* POINT I *supra*, when it comes to payment of defense costs, like the duty to defend, the duty to pay or reimburse is broader than the duty to indemnify. *See Worldcom, Inc. Securities Litigation*, 354 F.Supp.2d 455, 464 (S.D.N.Y. 2005)("[t]he duty of an insurer to pay an insured's defense costs 'is distinct from and broader than its duty to indemnify'"); *Federal Ins. Co. v. Kozlowski*, 18 A.D.3d 33, 41, 792 N.Y.S.2d 397 (1st Dept. 2005). Thus, where an insurer agrees to cover defense costs, like the Club and MMO policies, the duty to pay is triggered whenever a complaint against the insured alleges claims that <u>may be covered</u> under the insurer's policy. *See Worldcom*, 354 F.Supp.2d at 464; *Federal Ins.*, 18 A.D.3d at 41, 792 N.Y.S.2d 397. To this extent, "any doubts about coverage are resolved in the insured's favor." *Id.*

The Club has refused to pay Lafarge's defense costs and expenses.[4] Where, as here, the policy is silent as to the timing of payment and states that defense costs are paid as they are "<u>incurred</u>," the insurer has a duty to pay because defense costs are "incurred" as the insured is

---

[4] The Club Policy states the following regarding payment of defense costs and expenses:

> Section 16      SUE AND LABOR AND LEGAL COSTS
>
> Legal costs and expenses relating to any liabilities, costs or expenses against which the Member is insured by the Association, but only to the extent that such legal costs and expenses have been incurred with the prior approval of the Managers in writing or to the extent and on such conditions as the Directors in their sole discretion may determine. *See* Ex. 6 Club Rules.

Once an insurer wrongfully declines coverage, that insurer waives any consent provision to the payment of defense costs. *Luria Bros. & Co., Inc. v. Alliance Assurance Co., Ltd.*, 780 F.2d 1082, 1092, 1986 A.M.C. 1539 (2d Cir. 1986)(holding that insured had no need to obtain approval for legal expenditures where insurer disclaimed all liability despite the fact that policy required prior consent).

billed by defense counsel. *See Trustees of Princeton University v. National Union Fire Ins. Co. of Pittsburgh, PA*, 15 Misc.3d 1118(A), 2007 WL 1063870, *5 (N.Y. Sup.Ct. Apr. 10, 2007)("The insurer's duty to pay defense costs arises when the insured incurs the expenses."); *Worldcom*, 354 F.Supp.2d at 464; *Nu-Way Environmental, Inc. v. Planet Ins. Co.*, No. 95 Civ. 573, 1997 WL 462010, at *2 (S.D.N.Y. Aug. 12, 1997)(in an indemnity policy, "where the insurance policy does not impose a duty to defend, provides for payment of defense costs, and is silent as to the timing of payment of such costs, the insurer has a duty of payment of defense costs"); *Wedtech Corp. v. Federal Ins. Co.*, 740 F.Supp. 214, 221 (S.D.N.Y. 1990).

Moreover, an insurer may not avoid its duty to pay or reimburse defense costs as they are incurred merely because coverage has been disputed. *See Trustees of Princeton University*, 15 Misc.3d 1118(A), 2007 WL 1063870 at *5 ("where coverage is disputed, insurers are required to make contemporaneous interim advances of defense expenses subject to recoupment in the event it is ultimately determined the Policy does not cover the claim"); *Worldcom*, 354 F.Supp.2d at 455 (insurer was obligated to contemporaneously reimburse defense costs as they are incurred despite claim by insurer that policy should be rescinded); *Federal Ins.*, 18 A.D.3d at 40-41, 792 N.Y.S. 397 (insurer was required to reimburse insured's defense costs as they are incurred despite pending declaratory judgment action where insurer sought a declaration that claim against insured fell within policy exclusion).

**B.    The "Other Insurance" Conflict Between The Club And MMO Primary Policies Requires That The Club Policy Pays First**

Because both primary policies have a concurrent duty to reimburse Lafarge for its defense costs, the obligations of the American Club and MMO are controlled by their "other insurance" clauses. *See Great Northern Ins. Co. v. Mount Vernon Fire Ins. Co.*, 92 N.Y.2d 682, 686-87 (1999)("[w]hen an insured has more than one potentially applicable policy for a claim,

Courts determine the insurer's obligations to the insured by applying a body of law developed to resolve 'other insurance' disputes"); *Aetna Cas. & Sur. Co. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 228 A.D.2d 385, 386-87, 645 N.Y.S.2d 5 (1st Dept. 1996)("[t]he allocation of the payment of damages among concurrent insurers whose coverages are to be applied to the loss on the same basis is governed by the respective 'other insurance' clauses in the policies, if any, and, where, two or more such policies provide for contribution by equal shares, the concurrent insurers subject to those clauses are obligated to contribute equally to the defense or indemnity of their mutual insured").[5]

One of the reasons the Club has denied coverage is based on the "escape" clause. *See* Ex. 9 Club Complaint at ¶¶ 45, 49-50.  However, when there is a conflict between an "escape" clause and an "excess" clause, under New York law, the policy with the "escape" clause provides primary coverage for the loss. *See Kipper v. Universal Underwriters Group*, 304 A.D.2d 62, 65, 756 N.Y.S.2d 682 (4th Dept. 2003) ("[i]n cases in which one insurance policy has

---

[5]  The Club Rules include an escape "other insurance" clause, which states:

> 34.  The Association shall not be liable for any loss, damage or expense against which, but for the insurance herein provided, the Member, Co-assured or Affiliate would have been insured under any other existing insurance, except as set forth above in Rule 1.4.33; nor shall the Association provide prorated or allocated cover on the basis of double insurance or otherwise, except as set forth above in Rule 1.4.33; nor will this insurance replace any other insurance where (for whatever reason) that other insurance does not or is not able to respond to a claim thereunder. *See* Ex. 1 Complaint ¶ 36; Ex. 3 Club Answer ¶ 7.

The "other insurance" clause in the MMO primary policy is an excess clause:

> 14.  OTHER INSURANCE
> Except for insurance carried by the Assured specifically as excess over and above the amount(s) recoverable hereunder, this Company shall not be liable for any loss, damage, liability or expense which may be recoverable under any other insurance arranged by the Assured, arranged by others for the Assured's account or otherwise available to the Assured, except as excess over and above the amount(s) recoverable thereunder. *See* Ex. 1 Complaint ¶ 22; Ex. 2 Lafarge Answer ¶ 22.

a no liability clause and the other insurance policy has an excess clause, the general rule is that the no liability clause is not given effect"); *Utica Mut. Ins. Co. v. Travelers Ins. Co.*, 213 A.D.2d 983, 984, 624 N.Y.S.2d 485 (4th Dept. 1995) ("[w]hen an excess clause and a nonliability clause conflict, the nonliability clause is not given effect"); *Mosca v. Ford Motor Credit Co.*, 150 A.D.2d 656, 541 N.Y.S.2d 528, 530 (2d Dept. 1989).

Thus, where both primary policies are triggered, the "escape" clause in the Club Policy is not enforced. Rather, the "excess" clause in the MMO primary policy will apply. Under these circumstances, the Club Policy is required to pay Lafarge's defense costs in the first instance, with the MMO primary policy going next.

**C.      The Excess Policy Is Only Triggered After The Primary Policies Are Exhausted**

Unlike the Club and MMO primary policies, the Excess Policy provides true excess coverage for, among other things, Lafarge's defense costs. To the extent that the Excess Policy also provides coverage for Lafarge's defense costs, however, this does not create an "other insurance" issue between the Excess Policy and the primary policies. *See Bovis Lend Lease Lmb, Inc. v. Great American Ins. Co.*, 855 N.Y.S.2d 459, 467-68 (1st Dept. 2008)(true excess policy would only trigger after primary coverage was exhausted regardless of excess "other insurance" clause in primary policy); *General Accident Fire & Life Assurance Corp. v. Piazza*, 4 N.Y.2d 659, 669 (1958)(because the excess policy is expressly stated to be excess, it will be required to contribute to the indemnity, if any, only after the limits of the primary policy are consumed, notwithstanding a standard "other insurance" clause in the primary policy); *Merritt v. Jefferson Ins. Co.*, 112 Misc.2d 51, 52, 445 N.Y.S.2d 972 (N.Y. Sup. Ct. 1982)(excess insurance, procured

at a substantially reduced rate, cannot be used to determine the "triggering" of co-insurance provisions); 15 *Couch on Insurance*, § 218:5 (3d ed. 2005).[6]

Instead, it is well settled that policies providing true excess coverage, like the Excess Policy, are not required to contribute to a loss until all primary policies owing coverage have been exhausted. *See National Union Fire Ins. Co. of Pittsburgh v. Connecticut Indemnity Co.*, 860 N.Y.S.2d 35 (1st Dept. 2008)(primary policies must be exhausted before excess coverage can apply); *Bovis*, 855 N.Y.S.2d at 471-72 (holding that true excess policy will only be triggered upon the exhaustion of the primary policies); *Ins. Corp. of New York v. United States Fire Ins. Co.*, 18 Misc.3d 1131(A), No. 600469/07, 2008 WL 399166, at *7 (N.Y. Sup.Ct. Feb. 5, 2008)("Since excess coverage is implicated only upon the exhaustion of primary insurance…and the record does not indicate that the underlying policies were exhausted, it cannot be said that U.S. Fire's obligation to indemnify Inscorp for payments Inscorp made in excess of its Policy limits has triggered."); *Liberty Mutual Ins. Co. v. Ins. Co. of the State of Pennsylvania*, 43 A.D.3d 666, 668-69, 841 N.Y.S.2d 288 (1st Dept. 2007).[7]

---

[6] In any event, even if the excess clause in the MMO primary policy brought its coverage to the same level as the Excess Policy, which is denied, the Excess Policy's "other insurance" clause provides that it would still be excess.

> 7.    OTHER INSURANCE
> If other valid and collectible insurance with any other Insurer is available to the Assured covering a loss also covered by this Policy, other than insurance that is in excess of the insurance afforded by this Policy, the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance, either as double insurance or otherwise. Nothing herein shall be construed to make this Policy subject to the terms, conditions and limitations of other insurance. *See* Ex. 4 Excess Policy.

[7] *See also General Motors Acceptance Corp. v. Nationwide Ins. Co.*, 4 N.Y.3d 451, 456, 796 N.Y.S.2d 2 (2005); *In re Liquidation of Midland Ins. Co.*, 269 A.D.2d 50, 66, 709 N.Y.S.2d 24 (1st Dept. 2000); *United States Fidelity & Guaranty Co. v. Treadwell Corp.*, 58 F.Supp.2d 77, 97 (S.D.N.Y. 1999); *State Farm Fire and Cas. Co. v. LiMauro*, 65 N.Y.2d 369, 377-78, 492 N.Y.S.2d 534 (1985).

## CONCLUSION

By virtue of the foregoing, the Court should grant Excess Insurers' Motion for Summary

Judgment.

Dated:    November 13, 2008
          New York, New York

                              NICOLETTI HORNIG & SWEENEY
                              *Attorneys for Plaintiffs*
                                   *The Northern Assurance Company of America*
                                   *and American Home Assurance Company*

                    By:   /s John A.V. Nicoletti
                          John A. V. Nicoletti
                          Nooshin Namazi
                          Kevin J.B. O'Malley
                          Wall Street Plaza
                          88 Pine Street, 7th Floor
                          New York, New York 10005-1801
                          Telephone:  (212) 220-3830
                          Facsimile:  (212) 220-3780
                          Email:      jnicoletti@nicolettihornig.com
                          (FILE NO.:  10000478 JAVN/NN/KJO)

To:   Robert G. Clyne, Esq.
      HILL RIVKINS & HAYDEN
      45 Broadway
      New York, New York 10006
      *Attorneys for Lafarge North America, Inc.*

      John M. Woods, Esq.
      THACHER PROFFITT & WOOD, LLP
      Two World Financial Center
      New York, New York 10281
      *Attorneys for American Steamship Owners Mut. P&I Assoc., Inc.*

      David H. Fromm, Esq.
      BROWN GAVALAS & FROMM LLP
      355 Lexington Avenue
      New York, New York 10017
      *Attorneys for New York Marine & General Insurance Co.*

X:\Public Word Files\478\Legal\Consolidated NY Action\05-CV-9612 & 08-CV-3289\Motions\NACA & AHAC's MOL in Supp. of Motion for SJ\MOL in Supp. of Pls' Motion for SJ.11.13.08.nnn(FINAL).doc

21