**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X          **ECF Case**
NEW YORK MARINE AND GENERAL
INSURANCE COMPANY,

               Plaintiff,          **05 Civ. 9612 (CSH)**

    -against-

LAFARGE NORTH AMERICA, INC.,

               Defendant.
-------------------------------------------------------------X
THE NORTHERN ASSURANCE COMPANY
OF AMERICA and AMERICAN HOME
ASSURANCE COMPANY,

               Plaintiffs,          **08 Civ. 3289 (CSH)**

    -against-

LAFARGE NORTH AMERICA, INC. and
AMERICAN STEAMSHIP OWNERS MUTUAL
PROTECTION AND INDEMNITY
ASSOCIATION, INC.

               Defendants.
-------------------------------------------------------------X

### AMERICAN HOME ASSURANCE COMPANY AND THE NORTHERN ASSURANCE COMPANY OF AMERICA'S MEMORANDUM OF LAW IN OPPOSITION TO LAFARGE NORTH AMERICA INC.'S MOTION FOR SUMMARY JUDGMENT

               NICOLETTI HORNIG & SWEENEY
               Wall Street Plaza, 88 Pine Street, 7th Floor
               New York, New York 10005-1801
               (212) 220-3830

               *Attorneys for Plaintiffs*
                   *The Northern Assurance Company of America*
                   *and American Home Assurance Company*

Of Counsel:
    John A.V. Nicoletti
    Nooshin Namazi
    Kevin J.B. O'Malley

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...........................................................................................................i

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL BACKGROUND.........................................................................................................1

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT.................................................................................................................................3

POINT I

THE FIRST, SECOND AND FOURTH CAUSES
OF ACTION SHOULD NOT BE DISMISSED ............................................................................3

    A.    Excess Insurers Are Not Bound By The
           Court's Decision In The Club Action..............................................................................3

    B.    No Policy Defenses Have Been Waived .........................................................................5

    C.    Lafarge's Interpretation Of Maintenance Of
           Underlying Insurance Clause Is Misplaced......................................................................7

POINT II

LAFARGE'S INTERPRETATION OF THE
LEADER CLAUSE AND THE ASSISTANCE
AND COOPERATION CLAUSE IS MISPLACED....................................................................12

    A.    Excess Insurers Are Entitled To Challenge Appointment
           And Reasonableness of Attorneys' Fees ........................................................................12

    B.    Excess Insurers Are Not Required To Follow
           NYMAGIC Where The Insured May Have
           Breached A Material Promissory Representation ............................................................13

POINT III

LAFARGE IS NOT ENTITLED TO ATTORNEYS'
FEES AND COSTS IN THIS LITIGATION..............................................................................16

CONCLUSION ...........................................................................................................................17

## TABLE OF AUTHORITIES

**Cases**

*20th Century Foods Pte. v. Home Ins. Co.,*
  1989 WL 99773 (S.D.N.Y. 1989) ...................................................................................11

*Ambassador Assoc. v. Corcoran,*
  541 N.Y.S.2d 715 (Sup. Ct. 1989) ............................................................................10, 11

*Benton v. Long Mfg. N.C., Inc.,*
  550 So.2d 859 (La.App.Ct., 2d Cir. 1989) .....................................................................8

*Buckeye Cellulose Corp. v. Atlantic Mut. Ins. Co.,*
  643 F.Supp. 1030 (S.D.N.Y. 1986) ...............................................................................11

*Illusion Hair Designers, Inc. v. Commercial Union Ins. Cos.,*
  581 N.Y.S.2d 312 (1st Dep't 1992)................................................................................16

*In re, September 11th Liability Ins. Coverage Cases,*
  458 F.Supp.2d 104 (S.D.N.Y. 2006) ...............................................................................7

*Kingdom 5-KR-41, Ltd. v. Star Cruises PLC,*
  2004 WL 359138 (S.D.N.Y. 2004) ..................................................................................3

*Mighty Midgets, Inc. v. Centennial Ins. Co.,*
  47 N.Y.2d 12 (1979).......................................................................................................16

*Molina v. United States Fire Ins. Co.,*
  574 F.2d 1176 (4th Cir. 1978).........................................................................................11

*Navegacion Goya S.A. v. Mutual Boiler and Machinery Inc. Co.,*
  411 F.Supp. 929 (S.D.N.Y. 1975) .............................................................................14, 15

*Platex FP, Inc. v. Columbia Cas. Co.,*
  622 A.2d 1074 (Del. Super. Ct. 1992)..............................................................................8

*Reserve Ins. Co. v. Pisciotta,* 30 Cal.3d 800,
  180 Cal.Rptr. 628, 640 P.2d 764 (Cal. 1982) ..................................................................8

*U.S. Underwriters Ins. Co. v. Affordable Housing Found., Inc.,*
  256 F.Supp.2d 176 (S.D.N.Y. 2003) ............................................................................9, 11

*U.S. Underwriters Ins. Co. v. City Club Hotel, LLC,*
  3 N.Y.3d 592, 822 N.E.2d 777 (2004) ...........................................................................16

*Wells Fargo Bank v. Cal. Ins. Guar. Ass'n,*
  45 Cal. Rptr. 2d 537 (Cal. Ct. App. 1995).......................................................................7

*Westerbeke Corp. v. Daihatsu Motor Co., Ltd.,*
  304 F.3d 200 (2d Cir. 2002) .............................................................................................3

*Zurich Ins. Co. v. The Heil Co.,*
  815 F.2d 1122 (7th Cir. 1987)..........................................................................................11

**Other Authorities**

Barry R. Ostrager and Thomas R. Newman,
   2 *Handbook on Insurance Coverage Disputes* §13.01 (14th ed. 2008) ..................................7, 8

## PRELIMINARY STATEMENT

Plaintiffs The Northern Assurance Company of America ("NACA") and American Home Assurance Company ("AHA") (collectively the "Excess Insurers") submit this Memorandum of Law in Opposition to Lafarge North America, Inc.'s ("Lafarge") Motion for Summary Judgment seeking to dismiss Excess Insurers' declaratory judgment complaint including claims asserted against American Steamship Owners Mutual Protection and Indemnity Association, Inc. ("The Club").[1]

## FACTUAL BACKGROUND

Excess Insurers respectfully refer to and incorporate their Local Civil Rule 56.1 Statement, Additional Statements and their response to Lafarge's Local Rule 56.1 Statement together with all exhibits for a recitation of the factual background.

## PRELIMINARY STATEMENT

Lafarge seeks summary judgment against Excess Insurers on the following grounds: (a) that although Lafarge is currently appealing the Court's Order (hereinafter the "Decision") granting summary judgment in favor of the Club in *American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Lafarge North America, Inc.*, Case No. 06 CV 3123 (CSH)(Docket No. 1)(the "Club Action"), in the interim, the Decision should be binding on Excess Insurers; (b) that NYMAGIC's counsel's letter dated March 26, 2008, amounts to waiver of the First, Second and fourth Causes of Action asserted by Excess Insurers; (c) that pursuant to the Leader clause in the Excess Policy, NACA and AHA must follow NYMAGIC (who has taken the position that it will not pay any of the fees by the law firms of Goodwin Proctor LLP,

---

[1] Excess Insurers expressly incorporate by reference herein all exhibits, Rule 56.1 statements, counter-statements, and memorandum of law submitted in support of their motion for summary judgment and in their opposition to Lafarge's and the Club's motion for summary judgment and/or to dismiss.

Chaffe McCall LLP, and Holland & Knight for several million dollars and will only pay the fees of the law firm of Sutterfield & Webb and the expert fees); and (d) that there is no requirement in the Assistance and Cooperation clause in the Excess Policy that Excess Insurers shall question the reasonableness of attorneys' fees. Lafarge also seeks payment of its attorneys' fees and costs in connection with this declaratory judgment action.

As will be shown below, Lafarge is not entitled to summary judgment. First, Excess Insurers are not bound by the Court's Decision because they were denied a full and fair opportunity to litigate the initial determination in the Club Action. Specifically, Excess Insurers made every effort to participate in the Club Action, including the filing of a motion to consolidate, a motion to intervene in the filing of the summary judgment motions in the Club Action, and a cross-motion for summary judgment, all of which were denied and/or stayed by the Court. Second, contrary to Lafarge's contention, the March 28, 2008 letter by counsel for NYMAGIC does not constitute a waiver. Third, with regard to the Leader clause, and the issue of whether NACA and AHA are required to follow NYMAGIC with respect to its limited decision to only pay the counsel fees for Sutterfield & Webb and expert fees, Excess Insurers are not required to follow NYMAGIC where the insured may have breached a material promissory representation. Further, the Excess Policy requires that incurred defense costs be reasonable and that the insured cooperate. Because the primary insurer, NYMAGIC, has among other things contested the cooperation and reasonableness of the defense costs incurred by Lafarge, Excess Insurers similarly have both an independent right under the Excess Policy, as well as those asserted by the primary insurer. Lastly, Lafarge's reliance on case law in favor of awarding attorneys' fees is unsustainable because here, in contrast to the case law cited by Lafarge, Excess Insurers have not denied coverage to Lafarge. To the contrary, Excess Insurers have stated that

2

Lafarge is entitled to coverage under the Excess Policy, but, the issue raised by the Excess Insurers is the stacking and/or the order of payment as between the primary policies and/or Lafarge's self-insured retention.

**ARGUMENT**

**POINT I**

**THE FIRST, SECOND AND FOURTH CAUSES
OF ACTION SHOULD NOT BE DISMISSED**

**A.    Excess Insurers Are Not Bound By The
       Court's Decision In The Club Action**

Lafarge contends that although Lafarge is currently appealing the Court's Decision granting summary judgment in favor of the Club in Club Action, in the interim, the Decision should be binding on Excess Insurers (who are non-parties to the Club Action).

Excess Insurers are not bound by the Court's Decision because they were denied a full and fair opportunity to litigate the initial determination in the Club Action. *See, e.g., Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 219 (2d Cir. 2002) (stating that "'law of the case' doctrine may be properly invoked only if 'the parties had a 'full and fair' opportunity to litigate the initial determination.'") (*see also, Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, 2004 WL 359138 at *6 (S.D.N.Y. 2004)) (stating that "[t]he law of the case doctrine should not be invoked unless the parties had a "full and fair" opportunity to litigate the initial determination). *See also*, Excess Insurers' Mem. of Law in Opp. to The Club's Motion to Dismiss at pp. 5-8.

Specifically, Excess Insurers made several attempts to participate in the Club Action, including the filing of a motion to consolidate (*see* Ex. "12"), a motion to intervene in the filing of the summary judgment motions in the Club Action (*see* Ex. "13"), and a cross-motion for summary judgment (*see* Ex. "14"), all of which were denied and/or stayed by the Court. (*See*

3

Exs. "15" – "18"). Because Excess Insurers did not have the opportunity to participate in the

determination of the issues in the Club Action, they are not bound by the Court's Decision.

Further, and as more fully discussed in Excess Insurers' opposition to the Club's motion

to dismiss, Excess Insurers are also not bound by the Court's Decision under the doctrines of

issue preclusion and claim preclusion:

> Neither issue preclusion nor claim preclusion can be applied under the
> present circumstances because Excess Insurers were not privies of Lafarge.
> Where an insurer and its insured have conflicting interests, collateral estoppel and
> *res judicata* cannot be applied. *See, e.g., Greenway Center, Inc. v. Essex Ins. Co.*,
> 475 F.3d 139, 149 (3d Cir. 2007); *Riddle v. Cerro Wire and Cable Group, Inc.*,
> 902 F.2d 918, 923 n. 6 (11th Cir. 1990); *Allen v. Zurich Ins. Co.*, 667 F.2d 1162,
> 1166 (4th Cir. 1982); *Levitz v. Nationwide Ins. Co.*, 167 F. Supp. 2d 748, 750
> (E.D. Pa. 2001). The Club's reliance on *Intri-Plex Technologies, Inc. v. Crest
> Group, Inc.*, 499 F.3d 1048 (9th Cir. 2007) is misplaced. In that case, the insurer
> was necessarily a privy of its insured because it was subrogated to its insured and,
> therefore, held no more rights than its insured:
>
>> Res judicata "precludes parties or their privies from
>> relitigating a *cause of action* that has been finally
>> determined by a court of competent jurisdiction." *Rice v.
>> Crow*, 81 Cal.App.4th 725, 734, 97 Cal.Rptr.2d 110 (2000)
>> (internal quotation marks omitted). Since an insured-here,
>> Intri-Plex-and its subrogated insurer-AMI-are privies, *see
>> Ferraro v. S. Cal. Gas Co.*, 102 Cal.App.3d 33, 42, 162
>> Cal.Rptr. 238 (1980), the privity requirement is met here.
>
> *Id.* at 1052 (emphasis added). This is obviously not a subrogation claim and the
> Excess Insurers and Lafarge who are engaged in a declaratory judgment dispute
> with each other are not in privy. *See e.g. Levitz v. Nationwide Ins. Co.*, 167
> F.Supp.2d 748, 750 (E.D.Pa. 2001)(holding that where an insurer and insured
> have a conflict of interest regarding the measure of damages in an underlying
> lawsuit, they are not in privity for the purposes of assessing issue preclusion).
>
> Furthermore, "[w]hen a person was not a party to an earlier suit, that
> person generally 'has not had a 'full and fair opportunity to litigate' the claims
> settled in that suit.' " *Yankton Sioux Tribe v. U.S. Dep't of Health and Human
> Services*, 533 F.3d 634, 640 (8th Cir. 2008) (quoting *Taylor v. Sturgell*, __ U.S.
> __, 128 S. Ct. 2161, 171 L. Ed. 2d 155 (2008)). The exception to this rule that the
> Club puts forward – adequate representation of the non-party – does not apply.
> *See* Memo in Supp. at p. 7. Application of issue preclusion and claim preclusion
> is inappropriate because Lafarge could not have adequately represented Excess

Insurers' interests because of the conflict of interest between Lafarge and Excess Insurers. *See Kourtis v. Cameron*, 419 F.3d 989, 997 (9th Cir. 2005), *abrogated on other grounds by Taylor*, 128 S.Ct. at 2178. "[A] conflict of interest between a non-party and his purported representative forecloses the possibility of privity because a nonparty cannot be adequately represented by a person with whom he is in conflict." *Id.* (footnote omitted).

Moreover, neither of the elements discussed in *Taylor* are present in this case. *See* __ U.S. __, 128 S. Ct. at 2176. First, the interests of Excess Insurers and Lafarge, their purported representative, were not aligned. In particular, there is a substantial coverage dispute between Excess Insurers and Lafarge over whether Lafarge has breached its obligation to maintain certain underlying insurance policies (for instance with respect to the Club's P&I Policy), under the Maintenance of Underlying Insurance Clause in the Excess Policy. This is directly tied to the question of whether the Club coverage exists for the Katrina claims against Lafarge. Lafarge contends it was its intention to secure and did in fact secure coverage for precisely the types of claims asserted against it in the Katrina litigations. The Club disputes this contention and has cited as one of the reasons, Lafarge's failure to report to the Club approximately 3,000 other instances where Lafarge had a similar interest in a vessel. The interests of Excess Insurers and Lafarge are obviously adverse in that if Lafarge breached its obligation to maintain the Club coverage as it intended for the purpose of covering precisely the claims at issue, then that breach would result in a gap in the Club cover amounting to a self-insured retention for Lafarge. Excess Insurers were denied the opportunity to participate in the briefing or have access to the discovery of the relevant evidence when this issue was litigated.

*See* Excess Insurers' Mem. of Law in Opp. to The Club's Motion to Dismiss at pp. 6-8.

## B.    No Policy Defenses Have Been Waived

As another ground for summary judgment against Excess Insurers, Lafarge asserts that the Excess Underwriters are purportedly asserting policy defenses not preserved by NYMAGIC. Lafarge Memo at p. 13-17. The primary basis for Lafarge's argument is a March 26, 2008 letter from counsel for NYMAGIC concerning defense costs under the Excess Policy. *See* Lafarge Memo at p. 13. Lafarge's reading of that letter is terribly strained.

The letter from NYMAGIC's counsel was not asserting a coverage position being taken by NYMAGIC and the Excess Underwriters under the Excess Policy. Nor was it a declination letter or a reservation of rights letter. Rather, the letter was sent in response to a letter from

counsel for Lafarge in which Lafarge "demand[ed] that NYMAGIC and following underwriters undertake their respective obligations and immediately reimburse [Lafarge] for the sums expended to date and to assume the further defense costs that will be incurred in the [Hurricane Katrina] proceedings." Exhibit "D" Clyne Decl. NYMAGIC's letter was nothing more than a response to this specific inquiry regarding the reimbursement of defense costs. *See* Exhibit "E" to Clyne Decl. ("We are writing in response to your letter of March 11, 2008 . . ."). The letter did not state, one way or another, the coverage position being taken by NYMAGIC and the Excess Underwriters under the Excess Policy. Moreover, NYMAGIC specifically stated that the position taken in its letter was without prejudice to its other rights and defenses. The letter states:

> Neither this letter nor any future communications shall be construed as a waiver of the rights and/or defenses available to NYMAGIC under the policy, at law or otherwise.

*Id.* Therefore, it cannot be said that Excess Underwriters have waived any policy defenses.[2]

In any event, the Excess Underwriters do not deny that the Excess Policy provides coverage to Lafarge for the subject Hurricane Katrina claims. The question of coverage under the Excess Policy is not an issue. Rather, as more fully set forth in Excess Insurers' Motion for Summary Judgment, the relevant issues are: (1) at what point does that coverage attach (*i.e.*, after the primary policy issued by NYMAGIC and after the limits of coverage provided through the Club); and (2) which of Lafarge's legal expenses are recoverable under the Excess Policy. Thus, Lafarge's argument regarding the alleged waiver of policy defenses is misplaced.

---

[2] Further, Excess Insurers refer to and incorporate the Affidavit of NYMAGIC's counsel, Mr. David Fromm which is attached to NYMAGIC's opposition papers and the accompanying additional Affidavit by Mr. Paul Smith and the documents referenced therein, all in support of the contention that Excess Insurers did not waive any rights.

**C.      Lafarge's Interpretation Of Maintenance Of
         Underlying Insurance Clause Is Misplaced**

Lafarge also contends that even if it is uninsured by the Club, the Excess Policy should

drop down to fill the multi-billion dollar gap in coverage.  To achieve its desired interpretation,

Lafarge focuses exclusively on the Excess Policy's Ultimate Net Loss provision, to the complete

exclusion of the Maintenance of Underlying Insurance provision and the Schedule of Underlying

Insurance provision.  *See* Lafarge Mem. of Law p. 11-13.  This assertion is belied by the policy

language and the law.

The Excess Policy requires that Lafarge maintain all policies listed on the schedule of

underlying insurance in full effect.  Lafarge contends it intended for the Club's multi-billion

expansive Liability Policy to cover it (for defense costs and indemnity) for the Katrina related

claims.  *See* Lafarge's Cross-Motion for Summary Judgment, Docket Nos. 49-58 and 63-64.  If

Lafarge failed to maintain the Club cover (whether inadvertently or otherwise), either (1)

because it did not clearly state its intent in the Certificate of Entry for the Club's Liability

coverage to extend to situations where Lafarge acquired an insurable interest in a vessel through

bailment; <u>or</u> (2) because of its failure to comply with any conditions of the Club coverage, *i.e.*

failure to report over 3,000 prior similar transactions (*See* Docket Nos. 44-47, 59-61 and 65-66),

then that is a breach of the Maintenance of Underlying Insurance provision in the Excess Policy.

The result is that the gap in the Club coverage becomes Lafarge's self-insured retention.[3]

---

[3]  As a general principle, excess insurance "means insurance that, by its terms, provides coverage
'only after a predetermined amount of primary coverage is exhausted.'"  Barry R. Ostrager and
Thomas R. Newman, 2 *Handbook on Insurance Coverage Disputes* §13.01 (14th ed.
2008)(internal citation omitted); *see also In re, September 11th Liability Ins. Coverage Cases,*
458 F.Supp.2d 104 (S.D.N.Y. 2006) ("Excess, or secondary insurance is coverage that attaches
only after a predetermined amount of underlying primary insurance has been exhausted."); *Wells
Fargo Bank v. Cal. Ins. Guar. Ass'n,* 45 Cal. Rptr. 2d 537, 539, fn.2 (Cal. Ct. App. 1995).  In

The Excess Policy in this case contains both a Maintenance of Underlying Insurance clause and a Schedule of Underlying Insurance and, as such, is a true Excess Policy.

### MAINTENANCE OF UNDERLYING INSURANCE:

A)    It is a condition of this policy that the Section(s) or Policy(ies) referred to below in the "Schedule of Underlying Insurance" shall be maintained in full effect during the currency of this insurance except for any reduction of the aggregate limit(s) contained therein solely by payment of claims in respect of accidents and/or occurrences, occurring during the term of this Policy.

B)    Inadvertent failure of the Assured to comply with Paragraph A above or inadvertent failure to notify this Company of any changes in the Underlying Insurances shall not prejudice the Assured's rights of recovery under

---

other words, while an excess policy increases the *amount* of coverage available to compensate for a loss, it does not increase the *scope* of coverage.

The typical indicia or provisions that distinguish a true excess policy from a primary policy are the Maintenance of Underlying Insurance clause and the Schedule of Underlying Insurance. *See, e.g.,* Ostrager, *supra,* § 13.02 ("Excess insurance policies usually contain a provision requiring the Insured to maintain specified levels of underlying insurance.")(internal citations omitted); *see also Platex FP, Inc. v. Columbia Cas. Co.,* 622 A.2d 1074, 1085 (Del. Super. Ct. 1992)(the Court found that the Maintenance of Underlying Insurance clause was a "condition meant to obligate the Insured to maintain its underlying insurance." Thus, the maintenance clause was not intended to expand the Insured's coverage or force the excess insurance to drop down.); *Reserve Ins. Co. v. Pisciotta,* 30 Cal.3d 800, 180 Cal.Rptr. 628, 640 P.2d 764 (Cal. 1982)(where the Excess Policy contained a Maintenance of Underlying Insurance clause [similar to the Excess Insurers' Policy herein], the Court held that the importance of the maintenance clause was that the excess insurer would not allow the insured to expand the scope of the Excess Insurers' coverage and force a drop down in the event of the insured breaching the warranty to comply with the maintenance clause.)   Other courts have considered an excess policy's maintenance clause:

The maintenance clause [] provides that the insured's failure to maintain the required underlying insurance -- resulting in a breach of the maintenance clause -- will cause [the excess insurer] to be liable only to the extent it would have been had the insured complied with the maintenance clause ... We conclude that the clear and unambiguous import of the policy language is that the insured [must maintain the specified underlying insurance].

*Benton v. Long Mfg. N.C., Inc.,* 550 So.2d 859, 862 (La.App.Ct., 2d Cir. 1989).

> this Policy, <u>but in the event of such failure, this Company</u>
> <u>to be liable only to the same extent as they would have</u>
> <u>been had the Assured complied with the said condition.</u>

*See* Ex. 4 Excess Policy (emphasis added).    The Excess Policy's Schedule of Underlying

Insurance provides in relevant part:

### EXCESS MARINE LIABILITIES

### SCHEDULE OF UNDERLYING INSURANCE

| Locations, Vessels and Applicable Marine Interests | Company (Participation) | Underlying Limits and Coverage | | |
|---|---|---|---|---|
| | | * * * | | |
| 2. P&I Club Placements | | | | |
| | | * * * | | |
| B. Lafarge North America Inc. | American Steamship Owners Mutual Protection & Indemnity Association, Inc. | US$ | Per Club Rules | Protection & Indemnity (Including 4/4ths Collision Liability |

See Ex. 4 Excess Policy.

The Excess Policy's Maintenance of Underlying Insurance clause must be considered

together with the Schedule of Underlying Insurance.  *See U.S. Underwriters Ins. Co. v.*

*Affordable Housing Found., Inc.,* 256 F.Supp.2d 176, 181 (S.D.N.Y. 2003).  For instance, both

the MMO primary Marine Liabilities policy and the Club's P&I policy (which are the <u>only</u>

primary policies at issue with regard to Lafarge's claim) are specifically identified on the

Schedule of Underlying Insurance as primary policies, identifying the nature of the risk, the

insuring primary company, and the primary limit of coverage per the specific policy.  As such

and consistent with other courts' interpretation, *supra*, the language is clear.  It is a condition of

the Excess Policy that Lafarge <u>shall</u> maintain not just some but all of "<u>the policy(ies)</u>" identified

9

in the Schedule of Underlying Insurance.  Lafarge's failure, inadvertent or otherwise, to comply with the above condition, does not negate Lafarge's right of recovery under the Excess Policy, but it delays collection thereunder until the amount of the multi-billon dollar "gap in coverage," if any, is satisfied as a self-insured retention.

Lafarge relies on the case of *Ambassador Assoc. v. Corcoran,* 541 N.Y.S.2d 715, 717 (Sup. Ct. 1989), *aff'd,* 562 N.Y.S.2d 507 (1st Dept. 1990), *aff'd,* 589 N.E.2d 1258 (N.Y. 1992), to support its argument in favor of a drop down.  *Ambassador* involved a dispute over whether a second layer excess insurer should drop down due to the first excess layer's insolvency.  *Id.* 708.  The insured in *Ambassador* argued that the word "recoveries" and the phrase "other valid and collectible insurance" in the definition of the Ultimate Net Loss were ambiguous which would in effect create a drop down by the excess carrier.  In other words, the insured argued that because the first layer excess insurer was insolvent, the underlying insurance was no longer valid and collectible or recoverable.  The trial court rejected the ambiguity pointing to language in the Ultimate Net Loss clause which referred to amounts "in excess of the underlying insurance." *Id.* at 709.  Moreover, the Court cited to the previous decisions under New York law, wherein Courts have held that "insolvency and/or unidentifiability [of a primary insurance carrier] do not create liability on the part of the excess carrier." *Id.* at 710 (internal citations omitted):

> The excess insurer first becomes liable when the limits of the underlying insurance have been exceeded; its coverage is only activated when the loss exceeds the amount specified in the underlying policies (see *American Re-Ins. Co. v. SGB Universal Builders Supply, Inc.*, 141 Misc.2d 375, 532 N.Y.S.2d 712 [Sup.Ct.N.Y.Co. 1988]).  Were the courts to impose upon excess insurers the risk of an underlying insurer's insolvency, it would, in effect, "transmogrify the policy into one guaranteeing the solvency of whatever primary insurer the insured might choose (*Continental Marble & Granite Co. v. Canal Ins. Co.*, 785 F.2d 1258, 1259 [5th Cir. 1986]).

10

*Id.* Other Courts, citing the Maintenance Clause, have similarly rejected drop down of an Excess Policy in the event of insolvency of a primary insurer. *See e.g. Molina v. United States Fire Ins. Co.,* 574 F.2d 1176, 1178 (4th Cir. 1978); *Zurich Ins. Co. v. The Heil Co.,* 815 F.2d 1122, 1125 (7th Cir. 1987). Even more to the point, the policy in *Ambassador* also contained a Maintenance of Underlying Insurance clause and the dissent (in the Court of Appeals) highlighted the fact that "it was the policy's maintenance clause – not its insuring clause – which was intended to protect [the excess insurer] against having to drop down under ordinary circumstances. The maintenance clause required the insured to maintain the 'limit' of the underlying insurance policy in effect." *Ambassador,* 79 N.Y.2d 871 at 876.

As a final point, if the clause is found to be ambiguous, any ambiguity must be construed against the drafter, Lafarge (the policy is a Marsh/Willis form).[4]   Further, Lafarge's interpretation would improperly render both the maintenance clause and the schedule of underlying insurance a nullity, which is against the accepted rules of contract interpretation. *See e.g. U.S. Underwriters,* 256 F.Supp.2d at 181. Also, the Club policy and the MMO primary policy cover all existing claims in the Katrina litigations, and are the only primary policies Lafarge has claimed provide coverage. Thus, Lafarge's hypothetical suggestion of other theories of recovery outside of these policies which allegedly may create a drop down of the Excess Policy is a red herring. Even if these additional hypothetical claim theories existed, it does not effect the duty to pay defense costs and expenses. Certainly, Lafarge's drop down interpretation of the Excess Policy would allow it to receive far more than the benefit it bargained for, in that it could not have been within the contemplation of the parties that if Lafarge failed to maintain a

---

[4] *See 20th Century Foods Pte. v. Home Ins. Co.,* 1989 WL 99773, at *13 (S.D.N.Y. 1989); *see also Buckeye Cellulose Corp. v. Atlantic Mut. Ins. Co.,* 643 F.Supp. 1030, 1038 (S.D.N.Y. 1986).

Scheduled Underlying Insurance that its liability under that primary policy would be covered free of charge under the Excess Policy.

## POINT II

### LAFARGE'S INTERPRETATION OF THE LEADER CLAUSE AND THE ASSISTANCE AND COOPERATION CLAUSE IS MISPLACED

**A.      Excess Insurers Are Entitled To Challenge Appointment And Reasonableness of Attorneys' Fees**

Lafarge contends that because there is no specific wording in the Assistance and Cooperation clause in the Excess Policy that Excess Insurers have the sole option to appoint defense counsel, that this should lead to the conclusion that they must pay all of the counsel fees incurred by Lafarge, even though the primary insurer (specifically listed on the schedule of underlying insurance), contests both the appointment of counsel and the reasonableness of the fees incurred. Lafarge's interpretation is incorrect.

The Assistance and Cooperation clause in the Excess Policy provides as follows:

> **4.      ASSISTANCE AND COOPERATION:**
>
> This Company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceedings instituted against the Assured, but this Company shall have the right and shall be given the opportunity to associate with the Assured or the Assured's Underlying Insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves or appears reasonably likely to involve this Company in which event the Assured, the Underlying Insurers and this Company shall cooperate in all things in the defense of such claim, suit or proceeding.

(*See* Ex. "4").

Pursuant to the Assistance and Cooperation clause, Excess Insurers have no duty to defend but "shall have the right and shall be given the opportunity to associate with the Assured

or the Assured's Underlying Insurers, or both, in the defense and control of any claim, suit...."
Further, the insured is obligated to cooperate in the defense of claim or suit.  Here, Lafarge's
rejection of the six (6) law firms offered by the primary insurer, NYMAGIC, constitutes a
violation of the Cooperation clause.  Under these circumstances, because the primary insurer,
NYMAGIC, has contested both Lafarge's decision to appoint counsel without consultation
and/or consent of NYMAGIC and also has contested the reasonableness of the fees incurred,
Excess Insurers similarly have the right to challenge both the lack of cooperation and the
reasonableness of fees under the terms of the Assistance and Cooperation clause.

**B.     Excess Insurers Are Not Required To Follow NYMAGIC Where The
        Insured May Have Breached A Material Promissory Representation**

Lafarge also cites the Leader clause in the Excess Policy in support of the contention that
Excess Insurers must follow NYMAGIC's lead who has taken the position that it will not pay
any of the fees by the law firms of Goodwin Proctor LLP, Chaffe McCall LLP, and Holland &
Knight for several million dollars, and will only pay the fees of a law firm of Sutterfield & Webb
and expert fees.

The Leader clause states as follows:

> 9.     LEADER:
>
> It is agreed that all alterations, extensions, additions,
> endorsements, settlement of a claim, etc. to be agreed by
> the Marine Office of America Corporation as lead
> underwriter and to be binding on all remaining
> Underwriters participating hereon.

(*See* Ex. "4").

To be clear, the issue with regard to the Leader clause is not settlement or payment of
claims by NYMAGIC because no decision and/or determination about indemnity has been made
in the underlying actions pending in the Louisiana.  Nor is there any issue with regard to

13

alterations, extensions, additions, or endorsements. Rather, the issue is that NYMAGIC has determined that it will not pay any of the fees incurred or charged by the law firms of Goodwin Proctor LLP, Chaffe McCall LLP, and Holland & Knight for several million dollars. Instead, NYMAGIC has determined that it will only pay for the fees of the law of Sutterfield & Webb and the expert fees.

Because Excess Insurers contend that Lafarge may have breached a promissory representation contained in the Excess Policy (*i.e.* the Maintenance of Underlying Insurance provision), Excess Insurers are not required to follow NYMAGIC's limited decision to pay only the above specifically identified counsel fees and expenses. *See, e.g., Navegacion Goya S.A. v. Mutual Boiler and Machinery Inc. Co.*, 411 F.Supp. 929, 931 (S.D.N.Y. 1975).

In *Navegacion Goya S.A. v. Mutual Boiler & Machinery Inc. Co.,* the plaintiff insureds changed the flag of their vessel from the United States to Panamanian one day before the vessel was damaged due to fire. The Leader clause of the policy provided that the five American insurer defendants were to follow the British leading underwriters and it was not disputed that the British underwriters had settled the claims in regard to the damaged vessel. *Id.* at 934. The following insurers, however, argued that when the plaintiffs changed the flag of their vessel from United States to Panamanian, they breached a promissory representation made at the time the insurance was bound that the flag of the vessel would remain American throughout the term of the policy. *Id.* at 935.

The plaintiff insured's response was "that even if their statement that the flag of the vessel was American constituted a material promissory representation which was breached, the defendants are nevertheless obligated to pay under the contract of insurance; and that the obligation of the defendants to pay flowed from the Following Clause which binds the

defendants to pay if the British underwriters had paid, which they have." *Id.* However, the court noted that for the plaintiffs to prevail with this theory of contract, they would have to show either that there was express contractual language to this effect or that other evidence reflected an intent on the part of the contracting parties to be so bound. *Id.* Because the court found that the plaintiffs had *not met the burden* of establishing their theory of contract by means of either alternative, the court found one remaining issue to be determined concerning the obligation of the following insurers to pay by virtue of the following clause: "whether the contract of insurance was in effect at the time of the of the loss or was suspended because of the change of flag." *Id.*

The court rejected the following insurers' theory of breach of a promissory representation because "while the issue is not firmly settled, the more persuasive authority supports the view of [the insured] that under New York law a representation as to future conduct of the insured has no promissory character unless it is either *specifically so described or is included in the policy itself.*" *Id.* (emphasis added). The court based much of its reasoning on the rationale that "if an exclusion of liability is intended by the insurer which is not made apparent from the language used, it is the insurer's responsibility to make this fact *clearly known.*" *Id.* at 936. (emphasis added). Therefore, while "the defendants made it clear in the contract of insurance that an unauthorized *change of ownership* [of the vessel] was a change which would result in an automatic cancellation of the policy … they said nothing about a *change of flag.*" *Id.* (emphasis added).

Here, the language of the Maintenance of Underlying Insurance clause makes "clearly known" a representation of promissory character on behalf of the insured and "it is specifically described in the policy itself." Thus, unlike the situation in *Navegacion* where the following

underwriter's theory of a breach of promissory representation failed because such a representation was not expressly set out within the terms of the contract, the Maintenance of Underlying Insurance clause explicitly states that underlying insurance "shall be maintained" by the insured.

## POINT III

### LAFARGE IS NOT ENTITLED TO ATTORNEYS' FEES AND COSTS IN THIS LITIGATION

Lafarge's reliance on case law in favor of awarding attorneys' fees is unsustainable because here, in contrast to the case law cited by Lafarge, Excess Insurers have not denied coverage to Lafarge nor do Excess Insurers have a duty to defend.

Under New York law, the recovery of attorneys' fees in the context of a litigation initiated by a liability insurer is permitted where the insurer is found to have violated its "duty to defend" as found in the liability policy itself. *See, e.g., Mighty Midgets, Inc. v. Centennial Ins. Co.*, 47 N.Y.2d 12, 21 (1979). *See also U.S. Underwriters Ins. Co. v. City Club Hotel, LLC*, 3 N.Y.3d 592, 822 N.E.2d 777 (2004) (where U.S. Underwriters brought an action seeking "a declaratory judgment that it ha[d] no duty to defend or indemnify defendants..."); *Illusion Hair Designers, Inc. v. Commercial Union Ins. Cos.*, 581 N.Y.S.2d 312 (1st Dep't 1992) (where insurer unsuccessfully brought a declaratory judgment action to determine its duty to defend and indemnify).

Here, Excess Insurers have no duty to defend Lafarge as per the terms of the Assistance And Cooperation clause. Further, Excess Insurers have not denied coverage, but instead have stated affirmatively that Lafarge is entitled to coverage under the Excess Policy, but, the issues raised by the Excess Insurers are: (1) at what point does that coverage attach (*i.e.*, after the

primary policy issued by NYMAGIC and after the limits of coverage provided through the

Club); and (2) which of Lafarge's legal expenses are recoverable under the Excess Policy.

## CONCLUSION

For the foregoing reasons, Lafarge's motion should be **DENIED**.

Dated: New York, New York
December 11, 2008

> NICOLETTI HORNIG & SWEENEY
> *Attorneys for Plaintiffs*
> > *The Northern Assurance Company of America*
> > *and American Home Assurance Company*

> By:   s/ John A.V. Nicoletti
> John A. V. Nicoletti
> Nooshin Namazi
> Kevin J.B. O'Malley
> Wall Street Plaza
> 88 Pine Street, 7th Floor
> New York, New York 10005-1801
> Telephone:   (212) 220-3830
> Facsimile:   (212) 220-3780
> Email: jnicoletti@nicolettihornig.com
> (FILE NO.:  10000478 JAVN/NN/KJO)

To:   Robert G. Clyne, Esq.
HILL RIVKINS & HAYDEN
45 Broadway
New York, New York 10006
*Attorneys for Lafarge North America, Inc.*

John M. Woods, Esq.
THACHER PROFFITT & WOOD, LLP
Two World Financial Center
New York, New York 10281
*Attorneys for American Steamship Owners Mut. P&I Assoc., Inc.*

David H. Fromm, Esq.
BROWN GAVALAS & FROMM LLP
355 Lexington Avenue
New York, New York 10017
*Attorneys for New York Marine & General Insurance Co.*